**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WAUKEGAN POTAWATOMI CASINO, LLC, an Illinois limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:20-cv-750 |
| v. | ) ) | Judge John F. Kness |
| CITY OF WAUKEGAN, an Illinois municipal corporation, | ) ) ) | Magistrate Judge M. David Weisman |
| Defendant. | ) ) | |

**PLAINTIFF'S LR 56.1 STATEMENT
OF ADDITIONAL MATERIAL FACTS**

Pursuant to Local Rule 56.1(b)(3), plaintiff Waukegan Potawatomi Casino, LLC submits the following statement of additional material facts.[1]

**Waukegan's Strong-Mayor Form of Government**

1.      The City of Waukegan is one of the few municipalities in Illinois with a strong-mayor form of government, in which all executive power is vested in the mayor, who generally has the power "[t]o appoint and remove administrative assistants, budget and finance director, heads of all departments, and to appoint and remove all other officers of the municipality, commissions, boards and agencies," and "[t]o exercise control of all [statutorily authorized] departments and divisions" of the City.

*Evidence*:  Pl. SJ Ex. 122 (Long 4/27/21 Tr.) at 140:11-141:2. *See* 65 ILCS 5/6-4-7.

---

[1] Exhibits submitted with this statement shall be cited as "Pl. SJ Ex." Defendant's exhibits to its LR 56.1(a)(2) statement shall be cited as "Def. SJ Ex."

**Bond's Support for Cunningham's Campaign**

2.     During Samuel Cunningham's successful 2017 run for Waukegan mayor, Michael Bond advised him on campaign strategy.

*Evidence*:  Pl. SJ Ex. 131 (Bond Tr.) at 32:9-33:1; Pl. SJ Ex. 124 (Maillard Tr.) at 28:8-31:7.

3.     An Illinois state senator from 2007 to 2011, Bond was at relevant times the sole member of State Street Public Affairs, LLC, a lobbying and public affairs business, and a founder and chief executive of video gaming company Tap Room Gaming, LLC as well as a related company called Tap Room Amusement, LLC (together, "Tap Room"). He also became a founding partner in Lakeside Casino, LLC, which proposed to develop a Waukegan casino called "North Point Casino."

*Evidence*:  Pl. SJ Ex. 131 (Bond Tr.) at 11:4-11:16, 12:3-15:6; Def. SJ Ex. 4.

4.     Bond was the initial chair of a political action committee called Video Gaming United PAC, of which Tap Room Gaming's one-time CFO was the initial treasurer.

*Evidence*:  Pl. SJ Ex. 131 (Bond Tr.) at 36:12-36:22 (acknowledging Bond was chair, and Brian Barrett was treasurer); *see also id.* 17:22-17:24 (identifying Brian Barrett as CFO of Tap Room Gaming); Pl. SJ Ex. 1 (Video Gaming United PAC Form D-1, 11/8/16, identifying Bond as Chairman and Barrett as Treasurer, with "taproomgaming.com" email addresses for each).

5.      In March and April 2017, Cunningham's campaign received $52,000 in contributions ($47,000 in in-kind contributions and a $5,000 cash contribution) from Tap Room and Bond associates through the Waukegan Democratic Organization ("WDO") via the Video Gaming United PAC, with no cash or in-kind contribution to the campaign from any other source exceeding $5,000 during that period.

*Evidence*:  Pl. SJ Ex. 7 (Dep. Ex. 300, Cunningham Campaign Committee Form D-2, 1/1/2017-3/31/017) at 3-11 (disclosing $33,139.68 in in-kind contributions from WDO between 3/13/2017 and 3/31/2017); Pl. SJ Ex. 8 (Dep. Ex. 301, Cunningham Campaign Committee Form D-2, 4/1/2017-6/30/2017) at 2-7 (disclosing $5,000 transfer and $14,233.16 in in-kind contributions from WDO between 4/3/2017 and 4/7/2017); Pl. SJ Ex. 9 (WDO Form D-2, 1/1/2017-3/31/2017) at 2-4 (disclosing $50,000 in transfers from Video Gaming United PAC and $33,1139.68 in expenditures for Cunningham Campaign); Pl. SJ Ex. 10 (Dep. Ex. 143, WDO Form D-2, 4/1/2017-6/30/2017) at 2-3, 5 (disclosing $5,000 transfers from Continum Financial LLC and North Riverside Corp. following $10,000 reimbursement to Video Gaming United PAC, and $5,000 transfer to Cunningham campaign); Pl. SJ Ex. 2 (Video Gaming United PAC Form D-2, 11/8/2016-12/31/2016) at 3 (disclosing initial contributions of $42,100 from Tap Room); Pl. SJ Ex. 3 (Video Gaming United PAC Form D-2, 1/1/17-3/31/2017) at 3-4 (disclosing $43,200 in contributions from Tap Room entities and $50,000 in contributions to WDO); Pl. SJ Ex. 4 (Video Gaming United PAC Form D-2, 4/1/17-6/3/2017) at 3-4 (disclosing $10,000 contribution to WDO followed by return of same amount as "Refund of Excess

Contribution"); Pl. SJ Ex. 14 (Illinois Secretary of State report showing Andrew Hochberg as secretary of North Riverside Corp.); Pl. SJ Ex. 13 (Illinois Secretary of State report showing Brian T. Barrett as manager of Continum Financial, LLC); Pl. SJ Ex. 131 (Bond Tr.) at 33:7-33:17 (acknowledging that "Tap Room Gaming contributed to Mayor Cunningham's campaign by making certain contributions to . . . Video Gaming United PAC, which, in turn, contributed money to the Waukegan Democratic Organization, which, in turn, contributed money to Mr. Cunningham's campaign in 2017"); *id.* at 12:25-13:4 (Andy Hochberg was partner in Tap Room Gaming); *id.* at 37:10-37:19 (acknowledging Barrett association with Continum Financial).

6.     After winning the mayoral election in 2017, Cunningham selected to serve as the City's corporation counsel attorney Robert Long, who had known Cunningham since approximately 2000 or 2001, and who previously had worked extensively on a medical malpractice case on behalf of Cunningham's mother-in-law, had represented Cunningham's mother and other family members, and had represented Cunningham himself, including by advising him in connection with his campaign paperwork.

*Evidence*: Pl. SJ Ex. 122 (Long 4/27/2019 Tr.) at 14:21-18:7.

### Bond's Casino-Related Meetings With City Officials and Candidates

7.     In approximately 2018, Bond hired 28-year-old Jon Kozlowski as executive director of the Video Gaming United Association, an industry association

founded in 2016, with Bond and two other Tap Room employees (Barrett and Elaine Gates) as its first board of directors, that received all of its funding in the form of "dues" from Tap Room Gaming.

***Evidence***:  Pl. SJ Ex. 132 (Kozlowski Tr.) at 11:2-11:3 (30 years old at time of April 2021 deposition); 19:8-23:10 (describing hiring by Bond); *id.* at 35:3-35:13 (identifying Gates as Tap Room employee); Pl. SJ Ex. 131 (Bond Tr.) at 17:22-17:24 (identifying Barrett as CFO of Tap Room Gaming); Pl. SJ Ex. 15 at 3 (Video Gaming United Articles of Incorporation listing Bond, Barrett, and Gates as initial directors).

8.     Starting in approximately late 2018 and continuing into the first half of 2019 (before passage of SB 690), Kozlowski assisted Bond in scheduling meetings, mostly at Tap Room Gaming's offices, at which (among other things) Bond shared his pitch for his casino vision with City officials, City Council members, and potential candidates for City Council, including meetings with the following: Mayor Cunningham, Thomas Maillard, Sylvia Sims Bolton (First Ward alderman), Greg Moisio (Third Ward alderman); David Villalobos (Forth Ward alderman); Edith Newsome (Fifth Ward alderman); Keith Turner (Sixth Ward candidate); Lynn Florian (Eighth Ward candidate); Ann Taylor (Ninth Ward alderman).

***Evidence***:  Pl. SJ Ex. 109 at 3-6 (Defendant's Supplemented Answers to Plaintiff's Second Set of Interrogatories, Dep. Ex. 90); Pl. SJ Ex. 16 ("Most incumbents leading in Waukegan City Council, District 60 school board races," Lake County News Sun, 4/2/2019) at 4-5 (identifying candidates and wards); Pl. SJ Ex.

**125** (Bolton Tr.) at 18:23-34:5; Pl. SJ Ex. 132 (Kozlowski Tr.) at 79:23-81:20, 82:14-83:9.

9.    Thomas Maillard was a former Bond campaign staffer and Tap Room employee who worked for Cunningham's mayoral campaign at Bond's suggestion, and who then assisted Cunningham on the mayoral transition, including the selection of Sylvia Sims Bolton to replace Cunningham as First Ward Alderman, and became a special projects analyst in the mayor's office.

*Evidence*:  Pl. SJ Ex. 124 (Maillard Tr.) at 15:8-15:20, 18:4-20:8, 23:3-32:12, 34:6-35:4, 36:20-38:4.

10.    During at least some of the meetings described in paragraph 8, the casino plans discussed at the meeting included an entertainment component.

*Evidence*:  Pl. SJ Ex. 130 (Turner Tr.) at 58:23-61:23; Pl. SJ Ex. 129 (Taylor Tr.) at 28:4-28:23

11.    At some point prior to the June 2019 enactment of SB690, Fourth Ward candidate Roudell Kirkwood and Second Ward alderman Patrick Seger separately received tours of the Tap Room Gaming facility, where they met with Bond and Kozlowski.

*Evidence*:  Pl. SJ Ex. 109 (Dep. Ex. 90) at 4, 6; Pl. SJ Ex. 16 ("Most incumbents leading in Waukegan City Council, District 60 school board races," Lake County News Sun, 4/2/2019) at 5 (identifying candidates and wards); Pl. SJ Ex. 132 (Kozlowski Tr.) at 82:14-83:6, 87:18-88:2.

12.     In the weeks before her meeting with Bond at Tap Room's offices, Bolton had two calls with Kozlowski, during which Kozlowski indicated that he was affiliated with Tap Room and raised the possibility of assisting businesses in the community, and Bolton, in turn, provided the names of local businesses within her ward (the First Ward) that Tap Room could collaborate with, and also agreed to meet with Bond.

*Evidence*:  Pl. SJ Ex. 125 (Bolton Tr.) at 19:2-20:8, 21:13-22:21, 23:2-23:16, 24:22-26:14.

13.     Subsequently, at City Council meetings in June and July 2019, Bolton first voted against an ordinance establishing a downtown entertainment district, but then, after a conversation with Maillard, voted in favor of the ordinance, which established a district within which distance requirements otherwise applicable to establishments offering video gaming or serving alcohol were eliminated.

*Evidence***:**     Pl. SJ Ex. 125 (Bolton Tr.) at 99:6-103:4, 147:2-147:14 (acknowledging vote change and Maillard conversation but claiming not to know ordinance was desired by video gaming industry); Pl. SJ Ex. 126 (Florian Tr.) at 60:5-61:11; *id.* at 163:5-163:21 ("I knew this item on the agenda was going to be helpful for Mr. Bond.")

**Bond's Intervention in City Council Elections**

14.     In the 2019 election cycle, as executive director of the Video Gaming United Association, Kozlowski helped set up a joint campaign headquarters and provided campaign support, including coordinating mail programs and phone

banks, overseeing campaign staff, overseeing field work, helping set up video shoots for campaign ads, and arranging for a consultant to handle campaign filings, for six City Council candidates—Roudell Kirkwood, Patrick Seger, Keith Turner, Sylvia Sims Bolton, Annette Darden, and John Patterson—to whom Kozlowski disclosed that Bond's organization, Tap Room Gaming, was the primary funder of the Video Gaming Association.

*Evidence*: Pl. SJ Ex. 132 (Kozlowski Tr.) at 94:13-95:16, 96:14-98:18, 105:13-108:5, 118:14-120:13, 139:8-141:11.

15.    In the 2019 election cycle, using funding provided by Tap Room Gaming's dues to the Video Gaming United Association, Kozlowski commissioned successful objections to the candidacies of Seger's and Bolton's primary opponents, for which Kozlowski retained a Springfield law firm recommended by Will Cousineau, a lobbyist who worked with Bond.

*Evidence*: Pl. SJ Ex. 132 (Kozlowski Tr.) at 112:11-115:5.

16.    In connection with the 2019 election, Kozlowski also arranged for the same Springfield law firm to represent the Bolton and Kirkwood campaigns in response to complaints filed against them with the Illinois State Board of Elections, with the firm's fees paid by the Waukegan Voter Alliance, a political action committee formed earlier that year.

*Evidence*:   Pl. SJ Ex. 132 (Kozlowski Tr.) at 159:6-160:6; Pl. SJ Ex. 17 (Waukegan Voter Alliance Form D-1 filed 1/3/2019); Pl. SJ Ex. 25 (Citizens for

Sylvia Form D-2, 10/1/2019-12/31/2019) at 2; Pl. SJ Ex. 32 (Friends of Roudell Kirkwood Form D-2, 10/1/2019-12/31/2019) at 2.

17. In his deposition in this case, Seger claimed to be unaware of any connection between Kozlowski and Bond.

*Evidence*: Pl. SJ Ex. 128 (Seger Tr.) at 41:1-42:1.

18. In connection with the 2019 City Council election, the Waukegan Voter Alliance spent more than $250,000 on behalf of the above-mentioned six candidates' campaigns using more than $220,00 directly or indirectly contributed by Tap Room Gaming, Tap Room Amusement, and State Street Public Affairs; $30,000 in direct and indirect contributions that Bond solicited from a video gaming company called J&J Ventures Gaming (which subsequently purchased the Tap Room entities); and $2,500 contributed by Cunningham's campaign.

*Evidence*: Pl. SJ Ex. 18 (Waukegan Voter Alliance Form D-2, 1/2/2019-3/31/2019) at 2-3 (receipts from Tap Room entities, J&J Ventures, Cunningham Campaign, Video Gaming United PAC, and Waukegan Democratic Organization (WDO)); *id.* at 4-19 (campaign expenditures); Pl. SJ Ex. 19 (Waukegan Voter Alliance Form D-2, 4/1/2019-6/30/2019) at 3-5 (receipts from State Street, Tap Room Amusement, Small Business Coalition, Video Gaming United PAC, and "repayment" from Citizens for Annette Darden of $56,300 and $4,692.46); *id.* at 6-11 (campaign expenditures); Pl. SJ Ex. 21 (Small Business Coalition Form D-2, 4/11/2019-6/30/19) at 2-3 (receipts from State Street Public Affairs and Tap Room entities, and transfers of $56,300 to Citizens for Annette Darden and $11,800 to

Waukegan Voter Alliance); Pl. SJ Ex. 20 (Citizens for Annette Darden Form D-2, 4/1/2019-6/30/219) at 3-6 (contributions of $56,300 from Small Business Coalition and $4,692.46 from Video Gaming United Association and transfers of same amounts to Waukegan Voter Alliance); Pl. SJ Ex. 5 (Video Gaming United PAC Form D-2, 1/1/2019-3/31/2019) at 3-4 (receipts from J&J Ventures and Tap Room entities and $45,000 in contributions to Waukegan Voter Alliance); Pl. SJ Ex. 6 (Video Gaming United PAC Form D-2, 4/1/2019-6/30/2019) at 2 ($12,000 contribution to Waukegan Voter Alliance and $4,692.46 contribution to Citizens for Annette Darden); Pl. SJ Ex. 11 (WDO Form D-2, 1/1/2019-3/31/2019) at 3-5 (contributions from Tap Room entities and transfer to Waukegan Voter Alliance); Pl. SJ Ex. 131 (Bond Tr.) at 13:11-13:14 (sale of Tap Room to J&J in December 2019); *id.* at 99:18-100:5 (acknowledging soliciting contribution from J&J); Pl. SJ Ex. 42 (Dep. Ex. 144) at 9 (text from Bond to Cunningham soliciting check for "$2,500 to Waukegan Voter Alliance"); Pl. SJ Ex. 119 (Cunningham Tr.) at 69:7-70:23 (testifying that check was for help with aldermanic campaigns) Pl. SJ Ex. 132 (Kozlowski Tr.) at 155:6-156:4 (Confirming that "Ms. Darden got money from Michael Bond's organizations through Waukegan Voter Alliance and was in excess of contribution limits. You [Kozlowski] then asked Michael Bond to contribute to the Small Business Coalition so she could refund those excess contributions to the Waukegan Voter Alliance.").

19. Kozlowski communicated with Bond about funding of the six City Council campaigns Kozlowski worked on, and advised the chair of the Waukegan

Voter Alliance when it would receive money, which took the form of checks Kozlowski picked up at Tap Room Gaming and either delivered to the Waukegan Voter Alliance or deposited directly himself into the Waukegan Voter Alliance's bank account.

**Evidence**: Pl. SJ Ex. 132 (Kozlowski Tr.) at 31:12-31:23, 99:12-99:18, 110:3-112:10, 123:20-125:23, 131:23-133:21.

20.     During the 2019 election cycle, according to the Bolton campaign's public filings, Bolton's campaign did not independently raise any money or have any cash on hand, but, instead, was funded entirely by in-kind contributions totaling approximately $16,024.36, consisting of approximately $15,573.30 from the Waukegan Voter Alliance and approximately $451.06 from the Video Gaming United Association.

**Evidence**: Pl. SJ Ex. 22 (Citizens for Sylvia Form D-1); Pl. SJ Ex. 23 (Citizens for Sylvia Form D-2, 3/7/2019-3/31/2019) at 1-3; Pl. SJ Ex. 24 (Citizens for Sylvia Form D-2, 4/1/2019-6/30/2019) at 1-4.

21.     During the 2019 election cycle, according to the Seger campaign's public filings, Seger's campaign did not independently raise or spend any money, but instead relied entirely on in-kind contributions totaling at least approximately $29,480.34, consisting of approximately $28,880.28 from the Waukegan Voter Alliance, approximately $599.51 from the Video Gaming United Association, and a non-itemized contribution of approximately $80.55.

*Evidence*:  Pl. SJ Ex. 26 (Friends of Patrick Seger Form D-1); Pl. SJ Ex. 27 (Friends of Patrick Seger Form D-2, 2/15/2019-3/31/2019) at 1-5); Pl. SJ Ex. 28 (Friends of Patrick Seger Form D-2, 4/1/2019-6/30/2019) at 1-3.

22.     During the 2019 election cycle, according to the Kirkwood campaign's public filings, apart from $100 available at the creation of the campaign committee, $135 in non-itemized contributions, and approximately $1,414.13 in expenses that Kirkwood reportedly paid, the only other funds raised by the Kirkwood campaign consisted of approximately $17,324.99 from the Video Gaming United Association and approximately $2,373.00 from the Waukegan Voter Alliance, or a total of approximately $19,697.99 from those two organizations.

*Evidence*:  Pl. SJ Ex. 29 (Friends of Roudell Kirkwood Form D-1); Pl. SJ Ex. 30 (Friends of Roudell Kirkwood Form D-2, 3/20/19-3/31/19) at 3-4; Pl. SJ Ex. 31 (Friends of Roudell Kirkwood Form D-2, 4/1/19-6/30/19) at 2-4.

23.     During the 2019 election cycle, according to the Turner campaign's public filings, the campaign received approximately $18,263.14 in in-kind contributions from the Waukegan Voter Alliance and approximately $1,099.52 in contributions from the Video Gaming United Association, or a total of approximately $19,362.66 in in-kind contributions from the two organizations.

*Evidence*:  Pl. SJ Ex. 33 (Friends of Keith Turner Form D-1); Pl. SJ Ex. 34 (Friends of Keith Turner Form D-2, 1/1/2019-3/31/2019) at 5-6; Pl. SJ Ex.35 (Friends of Keith Turner Form D-2, 4/1/2019-6/30/2019) at 4.

24.    According to the Turner campaign's public filings, and the campaign's bank records, on May 20, 2019, the Waukegan Voter Alliance contributed $6,273.00 to the campaign, raising the campaign's available funds from $1,884.00 to $8,157 and thereby enabling the campaign on June 1, 2019 to repay Turner $2,700 that he had loaned to the campaign in January and March 2019 and to pay $4,783.00 owed to Breaker Press.

*Evidence*:  Pl. SJ Ex. 34 (Friends of Keith Turner Form D-2, 1/1/2019-3/31/2019) at 4 (showing loans); Pl. SJ Ex. 35 (Friends of Keith Turner Form D-2, 4/1/2019-6/30/2019) at 1, 5; Pl. SJ Ex. 36.

### Kirkwood's Business Ties to Bond's Video Gaming Company

25.    In early 2019, then-City Council candidate Kirkwood became president and owner of a business operating a bar and lounge, managed by his son, with five Tap Room Gaming video gaming terminals that from January through October 2019 generated $2,506,715.29 in wagering activity, yielding $216,020.30 in net wagering activity for the business before taxes.

*Evidence*:  Pl. SJ Ex. 127 (Kirkwood Tr.) at 12:13-13:18, 20:21-27:21, 45:10-47:24; Pl. SJ Ex. 37 (Dep. Ex. 101, Illinois Gaming Board, Video Gaming Location Disclosure of Records, Mac Dynasty Inc.); Pl. SJ Ex. 38 (Dep. Ex. 104, showing Mac Dynasty Inc. adopted corporate name of C.Y.O.C. Create Your Own Cheesecake and Cheesesteak Bar & Lounge); Pl. SJ Ex. 39 (Dep. Ex. 105, July 2019 C.Y.O.C. Facebook printout with Tap Room logos); Pl. SJ Ex. 40 (Dep. Ex. 106, Illinois Gaming Board Video Gaming Report, Mac Dynasty Inc.).

**Bond-Cunningham Collaboration**

26.     On March 19, 2019, in a text conversation among Cunningham, Bond, Kozlowski, and Thomas Maillard, Bond and Cunningham had the following exchange



*Evidence*:  Pl. SJ Ex. 41 (Dep. Ex. 145) at 2.

27.     In April 2019, following the City Council election, Bond organized a strategy session for Cunningham's re-election campaign at Bond's lake house, which was attended by Bond, Cunningham, Maillard, Kozlowski, attorney Michael Del Galdo, whose law firm did economic development work for the City, and Will Cousineau, a lobbyist who represented Bond on gaming issues.

*Evidence*:   Pl. SJ Ex. 124 (Maillard Tr.) at 42:2-43:8; Pl. SJ Ex. 132 (Kozlowski Tr.) at 41:23-44:14; *see also* Pl. SJ Ex. 42 (Dep. Ex. 144) at 13; Pl. SJ Ex. 131 (Bond Tr.) at 74:1-75:19.

28.     From September 20, 2018 through July 18, 2019, Cunningham and

Bond exchanged the text messages included in Plaintiff's Summary Judgment

Exhibit 42, including the following exchange on April 8 2019:

> Bond:          Let's think through your [City Council]
>                committee assignments when we get together on
>                Tuesday. Hold off on commitments if you can.
>                You need to make sure you have the right
>                people in the right spots. You should not
>                empower your enemies with powerful committee
>                chairmanships or assignments. Just my
>                thoughts.
>
> Cunningham:     Will do and I think we have done that. I'll show
>                you the list today.

*Evidence*:  Pl. SJ Ex42 (Dep Ex. 144) at 13; Pl. SJ Ex. 131 (Bond Tr.) at

75:24-76:16; Pl. SJ Ex. 119 (Cunningham Tr.) at 81:21-84:15.


29.     On May 15, 2019, Cunningham and Bond exchanged the following text

messages:

> Bond:          I'm in Las Vegas traveling to Hard Rock Casino
>                in Tulsa later today. I'm not sure we need the
>                Hard Rock brand but I want to make sure we
>                have the option. They basically take a licensing
>                fee and this just makes the economics more
>                challenging. I'll let you know how it goes.
>
> Cunningham:     Awesome

*Evidence*:  Pl. SJ Ex. 43 (Dep. Ex. 304) at 5; Pl. SJ Ex. 42 (Dep. Ex. 144) at

14; Pl. SJ Ex. 131 (Bond Tr.) at 77:15-78:23; Pl. SJ Ex. 119 (Cunningham Tr.) at

86:7-87:18.

30.    On June 16, 2019, Bond texted Cunningham concerning the anticipated IGB license fee for Waukegan and advised, "Host communities will need to take this into consideration when working with developers." On the same date, Cunningham responded by acknowledging Bond's message and advised, "We are getting r RFQ info together as we speak," to which Bond replied, "Awesome!!!"

*Evidence*:  Pl. SJ Ex. 43 (Dep. Ex. 304) at WKGN 008511; Pl. SJ Ex. 42 (Dep Ex. 144) at 16-17; Pl. SJ Ex. 119 (Cunningham Tr.) at 87:19-89:14; Pl. SJ Ex. 131 (Bond Tr.) at 80:18-82:9.

31.    On the morning of June 28, 2019, the day Governor Pritzker signed SB 690 into law, Bond sent successive texts to Cunningham that read in part as follows, referencing statutory language that required disclosure to the Illinois Gaming Board of communications between any casino license applicant and a City official:

> Today is the big day!!! Call me this morning before 10am.
>
> Hey just to make sure you remember that after the gaming bill takes effect any communication related to gaming between you and us needs to be disclosed to the gaming board. We can still speak about other things that are not related to gaming. For your information here is the language from the bill (p .628) "Any communication between an official of the corporate authority of a host community and any applicant for an owners license in the host community, or an officer, director, or employee of a riverboat or casino in the host community, concerning any matter relating in any way to gaming shall be disclosed to the board. . . .

*Evidence*:  Pl. SJ Ex. 43 (Dep. Ex. 304) at 2; 230 ILCS 10/5.3(j); Pl. SJ Ex. 42 (Dep Ex. 144) at 17; Pl. SJ Ex. (Bond Tr.) at 82:15-84:8.

32.　The City's Request for Qualifications and Proposals, Casino Development & Operator ("RFQ"), publicly released July 3, 2019, and subsequently amended to extend the response deadline, in the form attached as Plaintiff's Summary Judgment Exhibit 44, included provisions prohibiting, with certain limited exceptions, contact between any Project Team (defined to include the "entire development/operator group" for a proposed casino) and any City Council member, City Employees, or City Contractors involved in the RFQ process.

*Evidence*:　Pl. SJ Ex. 44 (Dep. Ex. 5) at 2, 6.

33.　On July 12, 2019, Cunningham and Bond exchanged the following texts concerning the Milan Banquet Hall, a facility located directly across the street from the Fountain Square property that Cunningham understood would be helpful to Bond if he were to develop a casino:

> Cunningham:　R u interested in the Milan Banquet Hall?
>
> Bond:　Yes.
>
> Cunningham:　Ok they might be open to sales
>
> Bond:　Can you send me contact info?
>
> Cunningham:　Yes,

*Evidence*:　Pl. SJ Ex. 42 (Dep. Ex. 144) at WKGN 008532-33; Pl. SJ Ex. 119 (Cunningham Tr.) at 89:10-93:7.

34.　The City's mandatory monthly report to the IGB disclosing July 2019 contacts with casino applicants, on which Cunningham was copied, did not disclose Cunningham's July 12, 2019 text exchange with Bond.

*Evidence*:  Pl. SJ Ex. 45 (7/31/2019 email attaching letter to Illinois Gaming Board re: "Waukegan monthly reporting SB 690 Requirement Compliance").

### The Waukegan Gaming Litigation

35.    On June 28, 2019, the day Governor Pritzker signed SB 690 into law, the City filed a lawsuit against Waukegan Gaming, LLC in the Circuit Court of Lake County (the "Waukegan Gaming litigation") seeking "a declaration that a Redevelopment Agreement it entered into with Waukegan Gaming LLC's predecessor in interest in 2004 in which Waukegan Gaming was granted the exclusive right to develop and operate a casino in Waukegan expired by its own terms given that the express purpose of the Agreement is no longer available; namely acquisition by Waukegan Gaming of the state of Illinois' 10th casino license. The 10th license was awarded to Midwest Gaming by the Illinois Gaming Board on January 14, 2009."

*Evidence*:  Pl. SJ Ex. 46 at 1.

36.    Quoting language in the Illinois Gaming Board's January 2009 decision denying the 10th License to Waukegan Gaming based on "concern regarding William Cellini's longstanding concern with the Waukegan casino project [as then proposed by Waukegan Gaming]," which the Gaming Board viewed as relating "to the character, reputation, experience and financial integrity factor," the City's complaint also attached a June 4, 2019 letter to Waukegan Gaming's principal in which Corporation Counsel Robert Long stated, "I am informed that the sole reason that Waukegan's bid was denied [in 2009] was your affiliation with

William Cellini, a state power broker who fell from grace and influence to spend time in federal prison, and questions "[w]hether you would even qualify to bid [for a casino license] in that round is unknown and somewhat questionable given your past affiliation with Mr. Cellini and given that you don't appear to have an operating company as a partner at the present time.

*Evidence*:  Pl. SJ Ex. 46 (Complaint for a Declaratory Judgment) at 5-6 ¶ 24; *id.* at 44 (June 4, 2019 letter from Robert J. Long to Alan B. Ludwig).

37.    On July 18, 2019, Waukegan Gaming filed a counterclaim against the City, alleging, among other things, that, "[t]o further his effort to secure the casino license for Waukegan, Bond has been making substantial political contributions to City of Waukegan public officials, including Mayor Cunningham and several aldermen and aldermanic candidates," and that Bond "appears to have the inside track with Mayor Cunningham to gain the City's support for his application for the Waukegan casino license . . . ."

*Evidence*:  Pl. SJ Ex. 47 (Verified Counterclaim for Temporary Restraining Order Specific Performance and Other Relief) at 6 ¶ 28; *id.* at 8 ¶ 39.

38.    Commenting for an article published July 16, 2019 in the Lake County News Sun (which had received an advance copy of Waukegan Gaming's counterclaim), Cunningham stated in substance as follows regarding Waukegan Gaming's allegations:

> Cunningham said the process was designed to be as open and transparent as possible with the city leaving many of the choices on where the casino is

located and what it would like up to potential developers.

The city's plan is to identify three or four potential developers to recommend to the Illinois Gaming Board, which will ultimately select the final developer. That set-up quashes the argument Ludwig [Waukegan Gaming's principal] is trying to make, Cunningham said.

*Evidence*:  Pl. SJ Ex. 119 (Cunningham Tr.) at 111:5-111:18, 116:4-118:14; Pl. SJ Ex. 54 (Dep. Ex. 307).

### The City's Initial Casino Review Process

39.    By email dated July 12, 2019, Cunningham instructed City personnel as follows:

> Please add Thomas [Maillard] with [zoning and planning director] Noelle [Kischer-Lepper] as project managers to the Casino RFP/Q for WKPurchasing [a City email address allowing RFQ-related items to be posted]. Thomas may send periodic updates that need to be included as Q&A updates to the online RFP/Q.
>
> Mayor

*Evidence*:  Pl. SJ Ex. 56 (Dep. Ex. 198) at 1; Pl. SJ Ex. 55 (Dep. Ex. 182) at 1; Pl. SJ Ex. 120 (Dorando Tr.) at 38:15-39:17.

40.    As of July 2019, Maillard was acting as a point of contact between Cunningham and the other people working on behalf of the City to respond to questions about the casino RFQ.

*Evidence*:  Pl. SJ Ex. 63 (Dep. Ex. 163) at 1; Pl. SJ Ex. 121 (Kischer-Lepper Tr.) at 84:19-85:7.

41.    In the course of drafting "score sheets" for their internal evaluation of casino proposals, City personnel started with a draft score sheet that largely tracked the various categories in the City's RFQ to a score sheet revised to reflect what they understood to be Cunningham's desire "to make Waukegan a destination spot."

*Evidence*:  Pl. SJ Ex. 120 (Dorando Tr.) at 47:7-50:23; Pl. SJ Exs. 58-61 (Dep. Exs. 164, 164A, 165, 165A, 166, 166A, 167, 167A).

42.    As of the City's August 5, 2019 deadline for submission of casino proposals, no steps had been taken to use an outside consultant to assist in the City's review of casino proposals but instead the intention was to use the same group of people, selected by Cunningham, who had been involved to that point in the RFQ process (Cunningham, Long, Long's deputy Douglas Dorando, Maillard, planning and zoning director Noelle Kischer-Lepper, James Vasselli of the Del Galdo law firm, and mayoral aide Markus Pitchford) to review the proposals.

*Evidence*:   Pl. SJ Ex. 121 (Kischer-Lepper Tr.) at 22:13-24:10, 25:9-25:20, 40:17-42:8, 46:12-49:22, 85:8-87:9; Pl. SJ Ex. 120 (Dorando Tr.) at 27:1-27:6; Pl. SJ Ex. 124 (Maillard Tr.) at 134:8-134:22; Pl. SJ Ex. 61 (Dep. Ex. 167); see also Pl. SJ Ex. 62 (Dep. Ex. 162); Pl. SJ Ex. 63 (Dep. Ex. 163); Pl. SJ Ex. 64 (Dep. Ex. 194); Pl. SJ Ex. 65 (Dep. Ex. 196); Pl. SJ Ex. 66 (Dep. Ex. 198); Pl. SJ Ex. 67 (Dep. Ex. 199); Pl. SJ Ex. 68 (Dep. Ex. 200).

## Timing of the City's Search for an Outside Consultant

43. On August 6, 2019, ProPublica reporter Jason Grotto emailed Cunningham a number of questions regarding "a story I plan to publish this week about the casino, political donations from Tap Room Gaming and its affiliates as well as Tap Room-funded PACs and a dark money group that pushed for a casino at Fountain Square, where one of Tap Room's owners purchased land a few months after funding your campaign for mayor," including the following questions:

1. Contributions from Tap Room Gaming and groups affiliated with it provided more than half of your campaign contributions for the 2017 mayor's race. The donations, which amounted to $50,000, came in the final three weeks of the campaign. Why were these donations provided so late? Did you coordinate the contributions with Tap Room's owners, officers or representatives or discuss how they would be used? What discussions did you have with Tap Room's owners, officers or representatives about the donations?

. . .

3. In February, your political campaign transferred $2,500 to the Waukegan Voter Alliance, a PAC funded primarily by Tap Room and run by David Koss, who was also the treasurer of the Waukegan Democratic Organization PAC, which was the conduit for Tap Room donations to your campaign. Koss also received invoices for television time purchased by the Waukegan Jobs Coalition, a dark money group started by James Parks, a former Tap Room employee. Why did you donate money to the WVA, which supported a slate of candidates favorable to Tap Room's interests in Waukegan?

. . .

5. In the aldermanic elections this year, Tap Room proved the bulk of the campaign contributions in

the election. This pattern, of an out-of-town gambling company pouring huge amounts of money into local elections, is a new phenomenon in Waukegan. Do you feel it is a good trend? Do you have concerns about one entity having such a large voice in local elections? Are you concerned that gambling interests play an outsized role in the city?

. . .

7.      How did you choose the selection committee for the casino? Why did you choose an attorney from the Del Galdo Group to sit on the commission? How did you come to learn about the Del Galdo Group? Did someone recommend them? If so, who?

*Evidence*:  Pl. SJ Ex. 69 (Dep. Ex. 216); *see also* Pl. SJ Ex. 119 (Cunningham Tr.) at 121:23-124:14 (claiming not to recall email but acknowledging awareness of reporter "asking about this, these type of questions").

44.    The City's earliest effort to find an outside consultant to assist with reviewing casino proposals occurred on August 7, 2019.

*Evidence*:  Pl. SJ Ex. 122 (Long 4/27/2019 Tr.) at 40:18-42:1; Pl. SJ Ex. 70 (Dep. Ex. 214).

45.    On August 8, 2019, ProPublica, WBEZ Chicago, and the Chicago Sun Times jointly published Grotto's article, entitled, "From Truck Stops to Elections, a River of Gambling Money Is Flooding Waukegan; Owners of one of Illinois' largest video gambling companies are behind efforts to influence city politics, expand gambling and build a casino near land they control."

*Evidence*:  Pl. SJ Ex. 71 (Dep. Ex. 57).

46.     At about the same time that the City decided to retain an outside consultant to assist with reviewing casino proposals, it was decided that Vasselli and Maillard (because of his past association with Bond) would not be involved in the evaluation of casino proposals.

*Evidence*:  Pl. SJ Ex. 120 (Dorando Tr.) at 54:24-55:20; Pl. SJ Ex. 121 (Kischer-Lepper Tr.) at 87:10-88:10; Pl. SJ Ex. 124 (Maillard Tr.) at 108:14-109:10, 113:11-114:7, 146:22-147:12.

**City Review Process After Retaining Johnson Consulting**

47.     After the City retained Johnson Consulting on August 19, 2019, Cunningham and Long reached out to Johnson Consulting on multiple occasions for phone calls or meetings not involving other City personnel involved in the RFQ process.

*Evidence*:  Pl. SJ Ex. 72 (Dep. Ex. 8); Pl. SJ Ex. 73 (Dep. Ex. 9); Pl. SJ Ex. 74 (Dep. Ex. 31); Pl. SJ Ex. 75 (Dep. Ex. 37); Pl. SJ Ex. 76 (Dep. Ex. 42); Pl. SJ Ex. 77; Pl. SJ Ex. 134 (Johnson 30(b)(6) 11/16/20 Tr.) at 61:1-62:24, 181:14-184:17.

48.     Based on its review of the casino proposals received by the City, Johnson Consulting prepared a summary of the proposals, which it emailed to Long on September 6, 2019, and Long forwarded to Cunningham and others the next day, showing, among other things, that: ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████ Potawatomi's bank reference letter stated that Potawatomi had the financial capacity to fully fund the project; and █████████████████████ ████████████████████████████████████████████████████ ████████████████████████████

*Evidence*: Pl. SJ Ex. 133 (Emmerton 12/9/2020 Tr.) at 64:15-65:9, 65:23-66:7, 67:2-68:1, 68:18-68:23, 71:9-74:7, 74:23-76:3, 76:23-77:15; Pl. SJ Ex. 78 (Dep. Ex. 10, 9/6/19 transmittal email); Pl. SJ Ex. 79 (pdf printout of Dep. Ex. 10A, excel spreadsheet summarizing proposals) at 10 ("Comparison of Benefits to the City of Waukegan and Its Residents"); *id.* at 11 ("Comparison of Financial Positions – Balance Sheet and Summaries of Activities"); *id.* at 14 ("Comparison of Financial Reference(s)"); *id.* at 16 ("Comparison of Proforma"); Pl. SJ Ex. 80 (Dep. Ex. 170) at 1 (9/7/2019 email transmitting 9/6/19 Johnson Consulting email and spreadsheet: "Please take a look at this information.").

49.    With the City's knowledge and approval, Johnson Consulting solicited and considered additional information from applicants other than Potawatomi that the other applicants had not included in their original proposals, including pro forma financials, tax projections, supplemental detail regarding projected revenues and expenses, and (in the case of Full House) job projections that ultimately were included in Johnson Consulting's subsequent, October 2019 report to the City.

*Evidence*: Pl. SJ Ex. 133 (Emmerton 12/9/2020 Tr.) at 19:17-19:22, 21:6-23:6, 65:23-66:7, 71:19-73:8, 76:18-77:10, 88:19-89:6, 99:3-101:10, 102:12-103:2, 104:23-105:22, 106:18-107:8, 174:12-174:24, 184:20-185:3; Pl. SJ Ex. 134 (Johnson

30(b)(6) 11/16/2020 Tr.) at 146:10-147:14; Pl. SJ Ex. 81 (Dep. Ex. 7) at 8, Figure 4;

Pl. SJ Ex. 82 (Dep. Ex. 15); Pl. SJ Ex. 83 (Dep. Ex. 16); Pl. SJ Ex. 84 (Dep. Ex. 17);

Pl. SJ Ex. 85; (Dep. Ex. 18); Pl. SJ Ex. 86 (Dep. Ex. 19); Pl. SJ Ex. 87 (Dep. Ex. 20);

Pl. SJ Ex. 88 (Dep. Ex. 21); Pl. SJ Ex. 89 (Dep. Ex. 22).

50.     At the September 18, 2019 public hearing, and later in the October

2019 report it submitted to the City, Johnson Consulting characterized

Potawatomi's proposal as offering $5.625 million for Fountain Square—a number

Johnson Consulting took not from Potawatomi's proposal but from an appraisal for

the City as of June 1, 2019, not previously made available to Potawatomi, other

casino applicants, or the broader public, that assumed the property's highest and

best use was "subdivision in to smaller lots for new commercial development."

***Evidence***:  Pl. SJ Ex. 90 (Dep. Ex. 25, Real Estate Appraisal attached to

9/13/2019 email) at 29, 41; Pl. SJ Ex. 81 (Dep. Ex. 7) at 1, Fig. 1; Pl. SJ Ex. 133

(Emmerton 12/9/2020 Tr.) at 112:22-114:13; Pl. SJ Ex. 134 (Johnson 30(b)(6)

11/16/2020 Tr.) at 156:4-158:15 (acknowledging that appraisal "does not appear to

appraise Fountain Square as a casino site itself"); Pl. SJ Ex. 91 (Dep. Ex. 161) at 1,

3 (proposing to post appraisal in response to applicant question regarding price for

"the City-owned land"); Pl. SJ Ex. 62 (Dep. Ex. 162) at 1 ("Mayor had some

resistance to releasing the appraisals for the first time in this as opposed to a

different public rollout"); Pl. SJ Ex. 63 (Dep. Ex. 163) at 1, 3 (responses to applicant

questions, "[b]ased on Mayor's initial feedback," declining to provide price for

Fountain Square); Pl. SJ Ex. 121 (Kischer-Lepper Tr.) at 81:9-83:8 (confirming that

City posted responses included in Dep. Ex. 163); Pl. SJ Ex. 134 (Johnson 30(b)(6) 11/16/20 Tr.) at 135:1-135:17 (conceding there was nothing "to stop the City or Johnson Consulting . . . from asking for clarification" of Potawatomi proposal's reference to appraised value, but no one from City suggested Johnson Consulting request such clarification).

51.    On October 4, 2019, by email to the City's address for casino-related correspondence, subsequently forwarded to corporation counsel Long, his deputy Dorando, and planning director Kischer-Lepper, submitted as Plaintiff's Summary Judgment Exhibit 92, North Point stated that, if the City certified solely North Point, then its proposal would be as originally stated, but that, if the City certified multiple proposals, North Point proposed to enter into a memorandum of understanding with the City under which North Point would "match the terms of the project team offering a lower financial contribution to the City"—*i.e.*, adjust the original North Point proposal to "*(i) reduce the City Revenue Share and Additional Donations from the levels in the Original North Point Development Proposal down to the lowest, aggregate minimum payments (or percentage(s) of adjusted gross revenues) proposed to he paid to the City under the Competing Proposals/, (ii) incorporate the lease and purchase terms offered under the Competing Proposal/s] that are most favorable to the competing proponent[s]; and (iii) match any donation to the City or community project to the extent documented in publicly available REP responses to the City].*'

*Evidence*:  Pl. SJ Ex. 92 (Dep. Ex. 336) at 1-2, 4-6, 20 (italics in original).

52.    Upon reviewing the October 4, 2019 North Point email referenced in the preceding paragraph, Long determined that North Point was attempting to achieve an unfair advantage, but he did not disclose the email to the Illinois Gaming Board as required by SB 690, and he testified at deposition that, to avoid prejudicing the process, he did not disclose the emails contents to Johnson Consulting, the mayor, or the City Council, or include it among the materials the City Council considered when it subsequently voted on the certifying resolution for North Point.

*Evidence*:  Pl. SJ Ex. 93 (Dep. Ex. 337, 10/30/2019 letter to Illinois Gaming Board); Pl. SJ Ex. 123 (Long 8/11/2021 Tr.) at 6:21-9:3, 11:3-12:22, 14:16-15:23, 22:17-23:1, 24:16-25:12, 27:12-27:23, 29:4-29:9, 30:1-30:6, 35:21-38:9, 53:2-53:12.

53.    On October 10, 2019, by email to Long, Johnson Consuling transmitted to the City the report concerning casino proposals (the "Johnson Consulting Report") that is submitted with this statement as part of Plaintiff's Summary Judgment Exhibit 94 (Dep. Ex. 43) and as Plaintiff's Summary Judgment Exhibit 81 (Dep. Ex. 7).

*Evidence*:  Pl. SJ Ex. 94 (Dep. Ex. 43); Pl. SJ Ex. 81 (Dep. Ex. 7); Pl. SJ Ex. 133 (Emmerton 12/9/2020 Tr.) at 153:12-153:22.

54.    The Johnson Consulting Report stated that Full House reported $182.3 million of assets in 2017, ██ ███████████████████████████████████ █████████████████████████

*Evidence*:  Pl. SJ Ex. 81 (Dep. Ex. 7) at 17, Fig. 14.

55.     The Johnson Consulting Report omitted any detail about the casino applicants' bank reference letters other than to identify the financial institution(s) providing the reference.

*Evidence*:  Pl. SJ Ex. 81 (Dep. Ex. 7) at 17, Fig. 14.

56.     The Johnson Consulting Report did not disclose or consider that North Point had made an alternative proposal that would be applicable in the event the City certified multiple applicants.

*Evidence*:  Pl. SJ Ex. 81 (Dep. Ex. 7).

57.     Of the four casino proposals, the Potawatomi proposal was projected to create the most annual employment, generate the second-most gaming/admissions taxes (after Rivers), and generate the most gaming revenue.

*Evidence*:  Pl. SJ Ex.81 (Dep. Ex. 7) at 8, Fig. 4; *id.* at 9, Fig. 5; *id.* at 12-13, Figs. 9-10; *id*

58.     The Johnson Consulting Report included a "score matrix" that assigned Full House the best "overall ranking," followed by North Point, then Rivers, and, in last place, Potawatomi.

*Evidence*:  Pl. SJ Ex. 81 (Dep Ex. 7) at 18, Fig. 15.

59.     In their depositions in this case, the two responsible Johnson Consulting representatives gave conflicting answers about how various criteria factored into their ranking.

*Evidence*: Pl. SJ Ex.133 (Emmerton 12/9/2020 Tr.) at 171:23-173:3 (relatively speaking, fact that Waukegan Potawatomi Casino had quite a number of slots, as shown in Johnson Consulting Report Figure 3, was a positive for Potawatomi); *id.* at 174:12-176:21 (fact that Waukegan Potawatomi Casino had the most total jobs created, as shown in Johnson Consulting Report Figure 4, was a positive factor); *id.* at 176:22-177:11 (fact that Waukegan Potawatomi Casino projected higher gaming and admissions taxes, as shown on Johnson Consulting Report Figure 5, "would be a net positive for Waukegan [Potawatomi] Casino based on this admittedly single criterion"); Pl. SJ Ex. 134 (Johnson 30(b)(6) 11/16/2020 Tr.) at 235:9-237:5 (claiming that Waukegan Potawatomi Casino's high number for slots and gaming tables in Johnson Consulting Report Figure 3 worked against Potawatomi, but conceding, "I don't think we called anything out as a problem or a strength"); *id.* at 242:14-242:23 (in Johnson Consulting Report Figure 5, "we felt that the Potawatomi was too big because we didn't think the scale and the sales capability of a servicing of that level in this market was good"); *id.* at 243:11-243:20 (in Johnson Consulting Report Figure 4, "lower employment numbers were better because they were more in keeping with an appropriate scale for the City of Waukegan").

60. In their depositions in this case, the responsible Johnson Consulting representatives could not describe a reproducible method by which they arrived at their ranking.

**Evidence**: Pl. SJ Ex. 134 (Johnson 30(b)(6) 11/16/20 Tr.) at 228:10-229:11 ("You're looking for an engineer and you're talking to an artist."); *id.* at 239:17-242:21 ("I have a brain and it gets information in. I have data and it gets information in. . . . We sit down and talk about it and use our judgment to assign these."); Pl. SJ Ex. 133 (Emmerton 12/9/20 Tr.) at 161:10-164:20 ("[T]here's . . . a myriad of more complicated tools that we have used on other assignments . . ."); *id.* at 165:7-169:11 (process of creating score matrix was "primarily a conversation" between Johnson and Emmerton); *id.* at 181:24-182:18 (scores were a collaboration where Emmerton worked under Johnson's tutelage).

61. On October 15 and 16, 2019, after discussing the issue with Cunningham and senior City staff, Long advised Johnson Consulting that it could not consider supplemental information from applicants, including Potawatomi's October 4, 2019 letter supplement, unless the information was specifically requested by the City.

**Evidence:** Pl. SJ Ex. 134 (Johnson 30(b)(6) 11/16/2020 Tr.) at 165:13-167:15, 168:22-169:6, 173:18-174:17. Exs. 95, 96 (Dep. Exs. 27, 28).

## Developments in the Waukegan Gaming Litigation

62. By late July 2019, Waukegan Gaming had become a partner in the Rivers casino proposal, and was represented in the Waukegan Gaming litigation not

only by its own counsel but also by counsel to Rush Street Gaming, which was also a partner in the Rivers proposal.

**Evidence**: Pl. SJ Ex. 45 (7/31/2019 letter to Illinois Gaming Board) at 11 (7/30/2019 entry referencing call with "Chris Wilson and Adam Marchuk of Perkins Coie, who along with Churchill Downs, Inc., will be partnering with Waukegan Gaming, LLC for application to City of Waukegan"); Pl. SJ Ex. 97 (Dep. Ex. 319) at 2 (identifying Perkins Coie as counsel for Waukegan Gaming); Pl. SJ Ex. 98 (8/5/2019 Memo from Michael Moirano to Waukegan City Clerk).

63.    On September 20, 2019, as part of discovery in the Waukegan Gaming litigation, Cunningham sat for a deposition at which the exhibits included selected text messages between Bond and Cunningham that the City had produced in discovery, as well as the City's answers to Waukegan Gaming's interrogatories.

**Evidence**: Pl. SJ Ex. 99 (Dep. Ex. 317, interrogatory answers labeled Cunningham Exhibit 8, 9/20/2019); Pl. SJ Ex. 100 (Dep. Ex. 318) (text messages labeled Cunningham Exhibit 10, 9/20/2019) Pl. SJ Ex. 97 (Dep. Ex. 319) (Cunningham 9/20/2019 transcript excerpt).

64.    In the Waukegan Gaming litigation, Cunningham provided the following deposition testimony regarding the City's answers to Waukegan Gaming's interrogatories:

> Q.    I asked you this before we took a
> break, Mayor, but when did this group of people
> developing the requests for qualifications and
> proposals start meeting?

A.      Early June, late May, early June.

. . .

Q.      If we can look on Interrogatory No. 5, Exhibit 8, these are the answers to Waukegan Gaming's interrogatories.

A.      Which page is that, sir?

Q.      I'm directing you specifically to Page 3.

A.      Interrogatory No. 5.

Q.      Yes. Identify all persons who were involved in the negotiation, drafting and distribution of the RFP and for each person listed, describe the timing, role and substance of his or her involvement.
        Answer, the City objects, but then says:
        Notwithstanding its objection, the City advises as follow: Robert Long and Douglas Dorando, corporation counsel.
        Do you see that?

A.      Uh-huh.

. . .

Q.      My question is are these other three people, Noelle Kischer-Lepper, Tina Smigielski and Thomas Maillard, the other members of the team you described earlier?

A.      No.

MR. KESSLER:      For the RFQ?

THE WITNESS:      For the RFQ all there except Thomas Maillard. It should have been Marcus Pitchford.

. . .

Q.     Thomas Maillard is listed here, but he was not involved in the RFP process?

A.     No, not part of the team, no.

. . .

Q.     So as I understand it, it should read Marcus Pitchford. That was in error?

A.     Yes.

Q.     Did Mr. Maillard have any responsibility for the RFPs in any way?

A. No.

. . .

Q.     I want to look real quickly at Exhibit 8 [the interrogatory answers].

A.     Which page are you looking at?

Q.     Page 3, Interrogatory 5.

A.     Uh-huh.

Q.     I see that we have Ms. Kischer-Lepper, Ms. Smigielski, Mr. Maillard listed.
          Is it possible that Mr. Mailard had any involvement in this other than – along with Mr. Pitchford? Is there a reason why they would be listed in error here?

A.     Don't know why. I do specifically know Mr. Maillard – I'm sorry, Marcus was a part of that.

Q.     Marcus was the person?

A.     Yeah, I know that.

Q.     You just recall that from the process?

A.     Yes.

*Evidence*:  Pl. SJ Ex. 97 (Dep. Ex. 319) at 5-8, 10, 13-14; *see also* Pl. SJ Ex. 99 (Dep. Ex. 317) at 3.

65.    In the Waukegan Gaming litigation, the parties' attorneys exchanged summary judgment briefs and submitted courtesy copies to the presiding judge on or about October 15, 2019, but did not file the briefs such that the fact of their filing appeared on the public docket.

*Evidence*:  Pl. SJ Ex. 48 (docket); Pl. SJ Ex. 122 (Long 4/27/2021 Tr.) at 141:3-141:17; Pl. SJ Ex. 49 (10/15/19 email chain discussing delivery of courtesy copies of summary judgment papers to court).

66.    On the afternoon of October 17, 2019, Waukegan Gaming's counsel sent an email to the City's counsel stating as follows:

> As we have previously discussed, please be advised that if our client is not Certified by the City tonight, we will be filing a TRO and presenting the TRO for hearing tomorrow morning at our scheduled court date and time at 9:00 am.
>
> The TRO will seek an order enjoining the City of Waukegan from submitting any certifications to the gaming board until after the ruling(s) on the motions for summary judgment that are set for hearing on Monday, October 24. . . .

*Evidence*:  Pl. SJ Ex. 50 (10/17/2019 email) at 1.

**October 17, 2019 Special City Council Meeting**

67.    The City did not engage in negotiations to any extent with the casino applicants during the RFQ process.

*Evidence*:  Pl. SJ Ex. 122 (Long 4/27/2021 Tr.) at 107:19-108:7.

68.    The City did not mutually agree with any casino applicant on the items as to which items SB 690, as codified at 230 ILCS 10/7(e-5), requires certification of mutual agreement. *See* 230 ILCS 10/7(e-5) (requiring certification that applicant and corporate authority have "mutually agreed" on "the temporary location of the riverboat or casino," "the percentage of revenues that will be shared with the municipality or county," and "any zoning, licensing, public health, or other issues . . . within the jurisdiction of the municipality," and mandating that City's corporate authority "memorialize the *details* concerning the proposed riverboat or casino in a resolution that must be adopted by a majority of the corporate authority or county board *before* any certification is sent to the Board") (emphasis added).

*Evidence*:  Pl. SJ Ex. 101 (Dep. Ex. 207) at 3, 7, 11 (certifying that City and applicant have mutually agreed "in general terms" on statutory items); Pl. SJ Ex. 122 (Long 4/27/2021 Tr.) at 96:5-98:6, 99:22-103:2 (resolutions' language concerning "mutual agreements" "might have been better phrased as mutual representations"; it was "fundamentally impossible" to agree on statutory items with multiple applicants; "All we can do, [Gaming] Board, is give you the stuff. . . . You decide whether or not you're going to give . . . this particular applicant, the license and then send them back to us and we'll complete our negotiations."); Pl. SJ Ex. 123

(Long 8/11/2021 Tr.) at 46:2-48:24, 50:5-53:12 ("That statute stinks . . . . I don't even see how you can possibly do it [enter into agreements with multiple bidders] . . . I think it would have been highly impractical to try to find a way to do that [reach mutual agreement on statutory items].").

69. Alderman Keith Turner testified at deposition that he had the following exchange with Cunningham just before the start of the October 17, 2019 special City Council meeting to consider casino proposals:

> A.   . . .So my thought was to only send one. Somebody offered 33 million. And I don't recall, I think, I think that was North Point, but I'm not certain. . . . And that was my choice. Only.
>
> And shortly before we took the vote—Again, I'm a new guy and, you know, I'm not a go-along get-along guy, by any means, but not to rock the boat. As we were preparing for the meeting, I was seated on the dais. As others came in, the mayor came in to me and he said, we want to send these three down to Springfield for them to decide, these are the choices.
>
> Q. . . . It was getting a little faint there, so I'm going to ask if you could repeat that part of your answer again.
>
> A.    So as I sat on the dais waiting for the meeting to start, preparing, as the mayor entered, he came by, he had to pass by my chair, and he said to me, these are the three that we want to send to Springfield. Right. And that was what the vote was going to be. Right. Put those three down there.
>
> Q.    . . . And how did he identify the three that they wanted to send down, did he name them or did he point to something?
>
> A.    No. He named them.

***Evidence***: Pl. SJ Ex. 130 (Turner Tr.) at 46:2-47:7.

70. During the October 17, 2019 special City Council meeting, the City did not allow time for public comment.

**Evidence**: Pl. SJ Ex. 102 (City Answer to Count III, Doc. 14) at 33 ¶ 129.

71. During the October 17, 2019 special meeting, which Cunningham presided over and Long attended in his capacity as corporation counsel, Johnson Consulting's representative, Charles Johnson, advised that "the process does not allow for supplemental information [provided after the RFQ's submittal date] to be considered," and that such information therefore was not reflected in Johnson Consulting's report to the City, "nor from a purchasing standpoint can it be from a technical standpoint included in our analysis."

**Evidence**: *See* video of 10/17/19 special City Council meeting at 14:50-15:33, available at https://www.youtube.com/watch?v=7RF7mZ_8r2c (last visited 10/8/2021).

72. During the October 17, 2019 special meeting, in response to the question whether any applicant raised "ethical considerations," Johnson stated: "We certainly did our due diligence in looking at the nature of the quality of the companies and all of them have high integrity and we did not see any ethical components at the principal level of the proposals. . . ."

**Evidence**: *See* video of 10/17/19 special City Council meeting at 27:57:28:20-, available at https://www.youtube.com/watch?v=7RF7mZ_8r2c (last visited 10/8/2021).

73.     During the October 17, 2019 special meeting, Johnson also stated that all four bidders were "qualified" and "able to deliver the project," and also remarked, "I think we provided a ranking based upon the information that was available to us based upon the proposals, which we've supplied in our report; but you can't go wrong with either—all four of these bidders, in our judgment."

**Evidence**:  *See* video of 10/17/19 special City Council meeting at 15:33-16:40, available at available at [https://www.youtube.com/watch?v=7RF7mZ_8r2c](https://www.youtube.com/watch?v=7RF7mZ_8r2c) (last visited 10/8/2021); *see also* Pl. SJ Ex. 81 (Dep. Ex. 7) at 10 ("[A]ll teams include seasoned professionals with skills and resources necessary to deliver a high-quality project to the Waukegan market.").

74.     At the October 17, 2019 special meeting, upon consideration of resolutions for the four remaining casino proposals, drafted under Long's supervision, the City Council passed the resolutions included in Plaintiff's Summary Judgment Exhibit 101 (for Rivers, North Point, Full House), and did not pass the resolution in Plaintiff's Summary Judgment Exhibit 103 (for Potawatomi), by the votes indicated below.

| Council Member | Potawatomi | North Point (Lakeside) | Full House | Rivers |
|---|---|---|---|---|
| Bolton | No | Yes | Yes | Yes |
| Seger | No | Yes | Yes | Yes |
| Moisio | Yes | Yes | Yes | No |
| Kirkwood | No | Yes | Yes | Yes |
| Newsome | Yes | Yes | Yes | Yes |
| Turner | No | Yes | Yes | Yes |
| Rivera | No | No | No | No |
| Florian | No | No | No | No |
| Taylor | No | No | No | No |

*Evidence*:  Pl. SJ Ex. 101 (Dep. Ex. 207, resolutions passed); Pl. SJ Ex. 103 (resolution for Potawatomi); Pl. SJ Ex. 104 (10/17/2019 minutes); Pl. SJ Ex. 122 (Long 4/27/2021 Tr.) at 19:21-20:23, 96:2-96:9, 97:3-98:6, 99:22-100:12; Pl. SJ Ex. 123 (Long 8/11/2021 Tr.) at 34:17-36:8; *see also* City Council minutes available at https://go.boarddocs.com/il/cowil/Board.nsf/Public.

75.    After the October 17, 2019 special City Council meeting, Cunningham stated to a reporter, in substance, that the city had no specific problems with Potawatomi, but he felt its last-place rankings in the Johnson Consulting Report played into the vote.

*Evidence*:  Pl. SJ Ex. 105 (Dep. Ex. 308) at 3; Pl. SJ Ex. 119 (Cunningham Tr.) at 118:24-120:15.

76.     Subsequent to the October 17, 2019 special City Council meeting, the parties to the Waukegan Gaming litigation stipulated to the dismissal of all claims and defenses without prejudice.

*Evidence*:  Pl. SJ Ex. 52 (Joint Stipulation and Consent Motion for Voluntary Dismissal Without Prejudice); Pl. SJ Ex. 53 (Dismissal Order); Pl. SJ Ex. 51 (10/29/2019 email).

## Potawatomi's Request for Reconsideration

77.     At approximately 3:43 p.m. on Friday afternoon, October 18, 2019, Potawatomi's attorney hand-delivered to the City Clerk a request for agenda item signed by City Council members Moisio, Florian, and Taylor requesting that the agenda for the City Council's next regular meeting, on October 21, 2019, include a motion to reconsider the City Council's vote against the Potawatomi certification resolution.

*Evidence*:  Pl. SJ Ex. 106 (10/18/2019 email from Bryan Winter attaching request for agenda item with handwritten note "delivered 10/1819 at 3:43 pm"); Pl. SJ Ex. 107 (10/21/2019 email from City clerk attaching agenda item with handwritten notes indicating "10-18-2019 Brian Winter, hand del'vered" and "10-18-19 4:20 p.m. disc w/ Robt Long reconsider from floor").

78.     The agenda the City issued for the October 21, 2019 City Council meeting did not include Potawatomi's motion to reconsider.

*Evidence*:  Pl. SJ Ex. 113 (10/21/2019 City Council agenda).

79.     During a phone call shortly after Florian signed the request for agenda item, Cunningham and the City clerk yelled at her, said they weren't changing the agenda for the October 21 meeting, and gave her the impression they were very upset about the fact that she had signed the document.

*Evidence*:  Pl. SJ Ex. 126 (Florian Tr.) at 168:5-169:14.

80.     Among other relief, Potawatomi is seeking return of the $25,000 of the "non-refundable application fee" paid to the City on its behalf, as well as expenses incurred in the preparation of its proposal.

*Evidence*:  Pl. SJ Ex. 136 (Hanson 30(b)(6) 3/2/2021 Tr.) at 28:16-29:22, 30:11-31:7.

Dated:  October 29, 2021

Respectfully submitted,

/s/ Dylan Smith
Michael J. Kelly
Dylan Smith
Martin Syvertsen
FREEBORN & PETERS LLP
311 S. Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 360-6000
mkelly@freeborn.com
dsmith@freeborn.com
msyvertsen@freeborn.com

Robert T. O'Donnell
Hayleigh Herchenbach
O'DONNELL CALLAGHAN LLC
28045 N. Ashley Circle, Suite 101
Libertyville, Illinois 60048
(847) 367-2750
rodonnell@och-law.com
hherchenbach@och-law.com

*Counsel for plaintiff Waukegan
    Potawatomi Casino, LLC*

# ADDENDUM

## Index of Plaintiff's Summary Judgment Exhibits

| Pl. SJ Ex. No. | Date | Description | Deposition Ex. No. |
|---|---|---|---|
| 1 | 11/8/16 | Video Gaming United PAC Form D-1 | |
| 2 | 7/9/19 | Video Gaming United PAC Form D-2, 11/8/2016 – 12/31/2016 | |
| 3 | 7/9/19 | Video Gaming United PAC Form D-2, 1/1/2017 – 3/31/2017 | |
| 4 | 7/9/19 | Video Gaming United PAC Form D-2, 4/1/2017 – 6/30/2017 | |
| 5 | 7/9/19 | Video Gaming United PAC Form D-2, 1/1/2019 – 3/31/2019 | |
| 6 | 7/9/19 | Video Gaming United PAC Form D-2, 4/1/2019 – 6/30/2019 | |
| 7 | 4/18/17 | Cunningham Campaign Committee Form D-2, 1/1/2017 – 3/31/2017 | Dep Ex. 300 |
| 8 | 7/16/17 | Cunningham Campaign Committee Form D-2, 4/1/2017 – 6/30/2017 | Dep Ex. 301 |
| 9 | 4/11/17 | Waukegan Democratic Organization Form D-2, 1/1/2017 – 3/31/2017 | |
| 10 | 7/14/17 | Waukegan Democratic Organization Form D-2, 4/1/2017 – 6/30/2017 | Dep Ex. 143 |
| 11 | 4/15/19 | Waukegan Democratic Organization Form D-2, 1/1/2019 – 3/31/2019 | |
| 12 | 7/9/19 | Waukegan Democratic Organization Form D-2, 4/1/2019 – 6/30/2019 | |
| 13 | 9/26/21 | Certificate of Good Standing - Continum Financial, LLC., | |
| 14 | 9/26/21 | Certificate of Good Standing - North Riverside Corp. | |

| Pl. SJ Ex. No. | Date | Description | Deposition Ex. No. |
|---|---|---|---|
| 15 | 6/10/19 | Secretary of State: Video Gaming United Ass. | |
| 16 | 1/2/19 | Chicago Tribune article - Most incumbents leading in Waukegan City Council, District 60 school board races | |
| 17 | 1/2/19 | Waukegan Voter Alliance Form D-1 | |
| 18 | 4/15/19 | Waukegan Voter Alliance Form D-2, 1/2/2019 – 3/31/2019 | |
| 19 | 8/27/19 | Waukegan Voter Alliance Form D-2, 4/1/2019 – 6/30/2019 | |
| 20 | 3/18/20 | Citizens for Annette Darden Form D-2, 4/1/2019 – 6/30/2019 | |
| 21 | 7/1/19 | Small Business Coalition Form D-2, 4/11/2019 – 6/30/2019 | |
| 22 | 3/7/19 | Citizens for Sylvia Form D-1 | |
| 23 | 4/12/19 | Citizens for Sylvia Form D-2, 3/7/2019 – 3/31/2019 | |
| 24 | 10/8/19 | Citizens for Sylvia Form D-2, 4/1/2019 – 6/30/2019 | |
| 25 | 1/14/20 | Citizens for Sylvia Form D-2, 10/1/2019 - 12/31/2019 | |
| 26 | 2/15/19 | Friends of Patrick Seger Form D-1 | |
| 27 | 4/11/19 | Friends of Patrick Seger Form D-2, 2/15/2019 – 3/31/2019 | |
| 28 | 7/9/19 | Friends of Patrick Seger Form D-2, 4/1/2019 – 6/30/2019 | |
| 29 | 3/20/19 | Friends of Roudell Kirkwood Form D-1 | |
| 30 | 5/16/19 | Friends of Roudell Kirkwood Form D-2, 3/20/2019 – 3/31/2019 | |
| 31 | 7/10/19 | Friends of Roudell Kirkwood Form D-2, 4/1/2019 – 6/30/2019 | |

| Pl. SJ Ex. No. | Date | Description | Deposition Ex. No. |
|---|---|---|---|
| 32 | 1/14/20 | Friends of Roudell Kirkwood Form D-2, 10/1/2019 - 12/12/2019 | |
| 33 | 12/12/18 | Friends of Keith Turner Form D-1 | Dep Ex. 113 |
| 34 | 7/11/19 | Friends of Keith Turner Form D-2, 1/1/2019 – 3/31/2019 | Dep Ex. 117 |
| 35 | 7/23/19 | Friends of Keith Turner Form D-2, 4/1/2019 – 6/30/2019 | Dep Ex. 119 |
| 36 | 5/31/19 | Friends of Keith Turner Statement Account | |
| 37 | 12/21/18 | Illinois Gaming Board, Video Gaming Location Disclosure or Records | Dep Ex. 101 |
| 38 | 6/27/19 | Form BCA-4.15/4.20 - MAC Dynasty, Inc. | Dep Ex. 104 |
| 39 | 3/03/21 | Page Vault - Facebook | Dep Ex. 105 |
| 40 | 3/02/21 | Illinois Gaming Board video gaming report, Mac Dynasty, 3/2/2021 | Dep Ex. 106 |
| 41 | 11/27/18 | Text message string with Tom Maillard | Dep Ex. 145 |
| 42 | 9/20/18 | Text message string with Michael Bond | Dep Ex. 144 |
| 43 | 4/29/19 | Text message string with Michael Bond | Dep Ex. 304 |
| 44 | 7/3/19 | City of Waukegan – Request for Qualifications and Proposals Casino Development & Operator, 7/3/2019 | Dep Ex. 5 |
| 45 | 7/31/19 | Letter from R. Long to IGB re Requirement Compliance | |
| 46 | 6/28/19 | Complaint - Waukegan Gaming litigation | |
| 47 | 7/18/19 | Counterclaim - Waukegan Gaming litigation | |
| 48 | 11/4/19 | Court Docket - Waukegan Gaming litigation | |
| 49 | 10/15/19 | Email from R. Kessler re City of Waukegan v. Waukegan Gaming courtesy copies | |

| Pl. SJ Ex. No. | Date | Description | Deposition Ex. No. |
|---|---|---|---|
| 50 | 10/17/19 | Email from D. Morrison re Waukegan Gaming TRO | |
| 51 | 10/29/19 | Email from D. Morrison re Joint Stipulation and Dismissal Order | |
| 52 | 11/1/19 | Joint Stipulation and Consent Motion for Voluntary Dismissal Without Prejudice - Waukegan Gaming litigation | |
| 53 | 11/1/19 | Dismissal Order - Waukegan Gaming litigation | |
| 54 | 7/16/19 | Chicago Tribune article, Waukegan's search for casino developer continues as firm from 2009 effort claims exclusive development rights | Dep Ex. 307 |
| 55 | 7/12/19 | Email from N. Kischer-Lepper re RFQ/P Draft #5 | Dep Ex. 182 |
| 56 | 7/12/19 | Email from N. Kischer-Lepper re Casino RFQ/P Draft #5 | Dep Ex. 198 |
| 57 | 7/25/19 | Email chain re Casino questions | Dep Ex. 163 |
| 58 | 8/6/19 | Email from D. Dorando re Scoring Sheets with pdf printout of attached native file | Dep Exs. 164, 164A |
| 59 | 8/7/19 | Email from N. Kischer-Lepper re Score sheets V2 with pdf printout of attached native file | Dep Exs. 165, 165A |
| 60 | 8/7/19 | Email from N. Kischer-Lepper re review/scoring sheet with pdf printout of attached native file | Dep Exs. 166, 16A |
| 61 | 8/7/19 | Email from N. Kischer-Lepper re review/scoring sheet with pdf printout of attached native file | Dep Exs. 167, 167A |
| 62 | 7/23/19 | Email from E. Winkofsky re Waukegan Casino RFP Questions | Dep Ex. 162 |
| 63 | 7/24/19 | Email chain re Casino questions | Dep Ex. 163 |
| 64 | 6/21/19 | Email from T. Maillard re Casino RFQ | Dep Ex. 194 |
| 65 | 7/1/19 | Email from T. Maillard [Ticket#24064] Casino email | Dep Ex. 196 |

| Pl. SJ Ex. No. | Date | Description | Deposition Ex. No. |
|---|---|---|---|
| 66 | 7/12/19 | Email form N. Kischer-Lepper re Casino RFQ/P draft | Dep Ex. 198 |
| 67 | 8/12/19 | Email from R. Long re Waukegan Casino | Dep Ex. 199 |
| 68 | 8/14/19 | Email from R. Long re Waukegan Casino | Dep Ex. 200 |
| 69 | 8/6/19 | Email from J. Grotto re ProPublica story about Waukegan casino | Dep Ex. 216 |
| 70 | 8/7/19 | Email from R. Long re Casino consultant | Dep Ex. 214 |
| 71 | 8/8/19 | ProPublica article: From Truck Stops to Elections, a River of Gambling Money is Flooding Waukegan | Dep Ex. 57 |
| 72 | 8/27/19 | Email from S. Emmerton re Key Dates – Waukegan Project | Dep Ex. 8 |
| 73 | 9/18/19 | Email from R. Long re Tonight | Dep Ex. 31 |
| 74 | 9/4/19 | Email from C. Johnson | Dep Ex. 9 |
| 75 | 10/7/19 | Email from S. Enmerton re Checking in - Casino | Dep Ex. 37 |
| 76 | 10/9/19 | Email from S. Emmerton re CHJC Waukegan Report Working Draft | Dep Ex. 42 |
| 77 | 10/16/19 | Email from R. Long re Phone Call | |
| 78 | 9/6/19 | Email from S. Emmerton re Waukegan Casino Proposal Evaluation | Dep Ex. 10 |
| 79 | 9/6/19 | PDF printout of Excel spreadsheet attached to Pl. SJ Ex. 78/Dep. Ex. 10 | Dep Ex. 10A |
| 80 | 9/7/19 | Email from S. Emmerton re CHJC Waukegan Casino Proposal Summary | Dep Ex. 170 |
| 81 | 10/19 | Johnson Consulting – Casino Developer and Operator Solicitation - Advisory Services Report | Dep Ex. 7 |
| 82 | 9/11/19 | Email from S. Emmerton re Follow up information Request – Waukegan Casino | Dep Ex. 15 |

| Pl. SJ Ex. No. | Date | Description | Deposition Ex. No. |
|---|---|---|---|
| 83 | 9/12/19 | Email from S. Emmerton re Follow up information Request – Waukegan Casino | Dep Ex. 16 |
| 84 | 9/13/19 | Email from S. Emmerton re Follow up information Request – Waukegan Casino | Dep Ex. 17 |
| 85 | 9/13/19 | Email from S. Emmerton re Follow up information Request – Waukegan Casino | Dep Ex. 18 |
| 86 | 9/16/19 | Email from S. Emmerton re Follow up information Request – Waukegan Casino | Dep Ex. 19 |
| 87 | 9/20/19 | Email from P. Wierbicki re Rivers Waukegan Charitable Contribution Analysis | Dep Ex. 20 |
| 88 | 9/30/19 | Email from S. Emmerton re Follow up information Request – Waukegan Casino | Dep Ex. 21 |
| 89 | 9/30/19 | Email from S. Emmerton re Follow up information Request – Waukegan Casino | Dep Ex. 22 |
| 90 | 9/13/19 | Email from T. Smigielski re 07-36-104-001 Real Estate Appraisal | Dep Ex. 25 |
| 91 | 7/18/19 | Email from E. Winkofsky re Waukegan Casino RFP Questions | Dep Ex. 161 |
| 92 | 10/7/19 | Email from M. Shriver re Urgent North Point Casino Memorandum of Understanding | Dep Ex. 336 |
| 93 | 10/30/19 | Letter from R. Long to IGB re Monthly Reporting | Dep Ex. 337 |
| 94 | 10/10/19 | Email from S. Emmerton re CHJC Waukegan Casino Developer Memo Report 10/10/19 | Dep Ex. 43 |
| 95 | 10/15/19 | Email from S. Emmerton re Waukegan Addendums/Supplemental Information Packets | Dep Ex. 27 |
| 96 | 10/16/19 | Email from C. Johnson re River Waukegan – Updated Consultant Report | Dep Ex. 28 |
| 97 | 9/20/19 | Samuel Cunningham deposition transcript excepts – Waukegan Gaming litigation | Dep Ex. 319 |

| Pl. SJ Ex. No. | Date | Description | Deposition Ex. No. |
|---|---|---|---|
| 98 | 08/05/19 | Memo from M. Moirano re Waukegan Gaming, LLC Response to City of Waukegan Casino Request for Qualification and Proposals. | |
| 99 | 9/15/19 | City of Waukegan First Amended Answer to Waukegan Gaming Interrogatories | Dep Ex. 317 |
| 100 | 2/10/19 | Text Message string with M. Bond | Dep Ex. 318 |
| 101 | 10/17/19 | City of Waukegan Resolution No. 19-R-96 | Dep Ex. 207 |
| 102 | 02/14/20 | City of Waukegan Answers to count III of Plaintiff's First Amended Complaint | |
| 103 | 10/__/19 | Resolution No. 2019 R-___ for Potawatomi | |
| 104 | 10/17/19 | Special City Council Meeting Minutes | |
| 105 | 10/18/19 | Chicago Tribune article, Waukegan sends three of four casino proposals to Illinois Gaming Board; Potawatomi request rehearing after rejection | Dep Ex. 308 |
| 106 | 10/18/19 | Email from B. Winter re Written Alderman Request to add Agenda item for October 21st Meeting | |
| 107 | 10/21/19 | Email from J. Kilkelly re Potawatomi communication 10/18 | |
| 108 | 10/21/19 | City of Waukegan Meeting Agenda | |
| 109 | 2/19/21 | Defendant's supplemented answers to plaintiff's second set of interrogatories | Dep Ex. 90 |
| 110 | 10/9/21 | Full House Resorts Market Cap 2006-2021-Macrotrends | |
| 111 | 9/18/19 | City of Waukegan Meeting Minutes | |
| 112 | 9/18/19 | Public Hearing Notice: Casino Proposals | |
| 113 | 10/17/19 | City of Waukegan Special City Council Meeting Agenda | |

| Pl. SJ Ex. No. | Date | Description | Deposition Ex. No. |
|---|---|---|---|
| 114 | 10/4/19 | Email from Drehkoff re: Rivers Waukegan Revised Proposal | Dep Ex. 338 |
| 115 | 7/1/19 -10/7/19 | City of Waukegan Regular Meeting Minutes (compilation) | |
| 116 | 10/4/19 | Email from B. Winter re: Potawatomi Supplemental Submission | Dep Ex. 26 |
| 117 | 8/30/21 | Potawatomi's Expert Rebuttal Disclosures | Dep Ex. 341 |
| 118 | 7/19/19 | John Repa Feasibility Analysis Report | Dep Ex. 249 |
| 119 | 5/12/21 | S. Cunningham deposition transcript excerpts | |
| 120 | 4/22/21 | D. Dorando deposition transcript excerpts | |
| 121 | 4/14/21 | N. Kischer-Lepper deposition transcript excerpts | |
| 122 | 4/27/21 | R. Long deposition transcript excerpts | |
| 123 | 8/11/21 | R. Long deposition transcript excerpts | |
| 124 | 4/23/21 | T. Maillard deposition transcript excerpts | |
| 125 | 3/8/21 | S. Bolton deposition transcript excerpts | |
| 126 | 2/4/21 | L. Florian deposition transcript excerpts | |
| 127 | 3/5/21 | R. Kirkwood deposition transcript excerpts | |
| 128 | 2/17/21 | P. Seger deposition transcript excerpts | |
| 129 | 3/4/21 | Ann Taylor deposition transcript excerpts | |
| 130 | 3/19/21 | K. Turner deposition transcript excerpts | |
| 131 | 4/7/21 | M. Bond deposition transcript excerpts | |
| 132 | 4/6/21 | J. Kozlowski deposition transcript excerpts | |
| 133 | 12/9/20 | S. Emmerton deposition transcript excerpts | |

| Pl. SJ Ex. No. | Date | Description | Deposition Ex. No. |
|---|---|---|---|
| 134 | 11/16/20 | C. Johnson 30(b)(6) deposition transcript excerpts | |
| 135 | 2/23/21 | J. Crawford deposition transcript excerpts | |
| 136 | 3/2/21 | K. Hanson 30(b)(6) deposition transcript excerpts | |
| 137 | 3/2/21 | K. Hanson deposition transcript excerpts | |
| 138 | 9/14/21 | K. Hanson deposition transcript excerpts | |
| 139 | 5/6/21 | J. Repa deposition transcript excerpts | |