**PUBLIC HEARING: CASINO PROPOSALS - SEPTEMBER 18, 2019**
***OFFICE OF THE WAUKEGAN CITY CLERK***
***JANET E. KILKELLY***

---

**The Council of the City of Waukegan met in Special Session for a Public Hearing, on the Casino Proposals, on Weds, September 18, 2019 at 4:00 PM**
**City Council Chambers, City Hall. 100 N. Martin Luther King Jr. Ave, Waukegan.**
**Mayor; Samuel D. Cunningham Jr, City Clerk; Janet E. Kilkelly, Treasurer; and Corporation Counsel; Robert J. Long, were present.**
**Dr. John R. Schwab was absent.**

---

**1. Procedural Items**
**A. Call To Order**
**B. Roll Call**
**PRESENT:** Ald Bolton, Ald Seger, Ald Moisio, Ald Newsome, Ald Turner, Ald Florian, Ald Taylor, Ald Rivera, Ald Kirkwood.
**ABSENT:** None.
**C. Opening Statement and Explanation of Procedures by Mayor**
*At this time, Mayor Cunningham shared his opening comments. Robert J. Long, Counsel for the City of Waukegan, explained the process of the hearing. He explained that 30 Minutes will be given for each presenter. He explained the order of the hearing.*

---

**2. Public Hearing**
**A. PUBLIC HEARING ON CASINO PROPOSAL.**
*At this time Waukegan City Clerk Janet E. Kilkelly pulled the names of those giving their proposals, at a random order. The following were pulled, in the following order: Waukegan Development Associates, Potawatomi, CDI - RSG (Rivers), NorthPoint, Full House. Shortly after pulling names, the presentations began. Each presenter had 30 minutes (15 minutes for presentation time, and 15 minutes for Aldermen to ask questions). All proposals can be viewed using the following link: https://youtu.be/eAnOTvOxsW0. Johnson Consulting shared their presentation, shortly after.*

The Mayor of Park City, Steve Parnell, and the Chief of Staff for The City of North Chicago, Deb Wazwiak, (on behalf of the Mayor Rockingham of North Chicago), shared their recommendations regarding the proposed casino.

*At this time, the floor was open for public comments. The following signed up to speak: Jennifer Taylor, Paula Michalek, Christian Gomez, Felicia Dixon, Noelia Patino Rodriguez, Devin Maddox, Kristin Kaloyanides, Cressida Montgomeky, Rebecca Banks, Colin Byers, James Martin, Dr. Mukesh Bheda, Jeremiah Johnson, Kricely Calderer, Janet Nagera, Stacy Bullard, Joseph Webb, Maurice 'Stretch' Barnett, Patricia Handy, Christell Ayers, Holli Rosenberg, Margaret Carrasco, Juan Curael, Elizabeth Thielen - Nicasa, Liz Albarran, Lydia Lewis, Shawn T. White, Alyssa Pimehlel, John B. Patterson, J. Carlos Hernandez, Erica Thomas, Tasha Evans, Karen Papp, Palmer Suanders, Ralph Peterson Jr, Elizabeth Laura, Jack Dye, Miriam Graham, Oscar Hernandez, and Diana Burdette.*

---

**3. Closing**
Adjourned at **8:00 PM** by Mayor Cunningham

---

**These minutes were transcribed by the Office of the Waukegan City Clerk:**

______________________________

**JANET E. KILKELLY, CITY CLERK**
**Office of the City Clerk**
**City of Waukegan**
**Waukegan, Illinois**

*ATTEST:*

______________________________

**DAVID A. PATTERSON, DEPUTY CITY CLERK**
**Office of the City Clerk**
**City of Waukegan**
**Waukegan, Illinois**

}

WAUKEGAN City of Progress Illinois

## Event Details

### Public Hearing: Casino Proposals

**Wednesday, September 18, 2019**

The City of Waukegan will hold a public hearing on September 18th beginning at 4pm and ending at 8pm at the Genesee Theatre, 203 N. Genesee Street. The hearing will consist of public presentations by each of the six prospective developers and operators. The public is invited to attend and will have an opportunity to comment on the proposals. No final action or recommendation to the Illinois Gaming Board will be taken by the City Council at the September 18 meeting—the City Council's recommendations will be made at a future meeting. Written comments will also be accepted

| | |
|---|---|
| **Date:** | September 18, 2019 |
| **Time:** | 4:00 PM - 8:00 PM |
| **Location:** | Genesee Theatre |
| **Address:** | 203 N. Genesee Street<br>Waukegan, IL 60085 |

Select Language

until 5pm on October 4, 2019 and should be directed to casino@waukeganil.gov. Hard copy written comments may also be dropped off at the City Clerk's office on the first floor, window #1 in City Hall.

Government Websites by CivicPlus®

Select Language



**Thursday, October 17, 2019**
**Special City Council Meeting**

**Time of Special Meeting: 6:00 pm**
**Waukegan City Hall ~ Council Chambers**
**100 N MLK Jr. Ave - Waukegan IL 60085**
**Telephone: (847)599-2513**

## 1. Open Items

| **Subject** | **A. Roll Call** |
|---|---|
| Meeting | Oct 17, 2019 - Special City Council Meeting |
| Category | 1. Open Items |
| Type | Procedural |

| **Subject** | **B. Pledge of Allegiance** |
|---|---|
| Meeting | Oct 17, 2019 - Special City Council Meeting |
| Category | 1. Open Items |
| Type | |

| **Subject** | **C. Mayor's Comments** |
|---|---|
| Meeting | Oct 17, 2019 - Special City Council Meeting |
| Category | 1. Open Items |
| Type | |

| **Subject** | **D. Recap of public comments received during comment period** |
|---|---|
| Meeting | Oct 17, 2019 - Special City Council Meeting |
| Category | 1. Open Items |
| Type | Information |

Robert Long, Corporation Counsel
Noelle Kischer-Lepper, Director of Planning & Economic Development

The formal public comment period was open from September 18, 2019 through 5:00 p.m. on Friday, October 4, 2019. Comments were to be submitted via email to casino@waukeganil.gov, or delivered to the City Clerk's office in person or by mail.

File Attachments

Comment delivered to City Clerk's office.pdf (4,274 KB)
Comments from public hearing Sept 18 2019.pdf (4,597 KB)
Comments in opposition to a casino.pdf (3,957 KB)
Public comments.pdf (2,273 KB)
Potawatomi part 1.pdf (8,316 KB)
Potawatomi part 2.pdf (5,945 KB)
Potawatomi part 3.pdf (10,887 KB)
North Point part 1.pdf (3,166 KB)
North Point part 2.pdf (2,837 KB)
North Point part 3.pdf (4,147 KB)

## 2. New Business

| | |
|---|---|
| **Subject** | **A. Presentation by Johnson Consulting, consultant to the City of Waukegan** |
| Meeting | Oct 17, 2019 - Special City Council Meeting |
| Category | 2. New Business |
| Type | |

File Attachments
CHJC Waukegan Casino Developer_Memo Report 101019.pdf (1,216 KB)

| | |
|---|---|
| **Subject** | **B. Resolution for CDI-RSG (Rivers)** |
| Meeting | Oct 17, 2019 - Special City Council Meeting |
| Category | 2. New Business |
| Type | Action |

File Attachments
Resolution Certifying CDI RSG.docx (14 KB)
Rivers Waukegan - Updated Proposal Letter 10.04.2019.pdf (615 KB)
CDI RSG Waukegan LLC - CDI RSG RFP (Redacted)_20190903l757146329.pdf (27,339 KB)
CHJC Waukegan Casino Developer_Memo Report 101019.pdf (1,216 KB)

**Motion & Voting**

(not specified)

Motion by Ald Moisio, second by Ald Kirkwood.
Final Resolution: MOTION APPROVED
AYE: Ald Bolton, Ald Seger, Ald Kirkwood, Ald Newsome, Ald Turner
NAY: Ald Moisio, Ald Rivera, Ald Florian, Ald Taylor

| | |
|---|---|
| **Subject** | **C. Resolution for Full House** |
| Meeting | Oct 17, 2019 - Special City Council Meeting |
| Category | 2. New Business |
| Type | Action |

File Attachments
Resolution Certifying Full House Resorts.docx (14 KB)

Full House Resorts - FullHouseResorts-RFQ Response Book_Redacted_201909041506232942.pdf (14,822 KB)
CHJC Waukegan Casino Developer_Memo Report 101019.pdf (1,216 KB)

**Motion & Voting**

(not specified)

Motion by Ald Bolton, second by Ald Seger.
Final Resolution: MOTION APPROVED
AYE: Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome, Ald Turner
NAY: Ald Rivera, Ald Florian, Ald Taylor

| **Subject** | **D. Resolution for Lakeside Casino LLC** |
|---|---|
| Meeting | Oct 17, 2019 - Special City Council Meeting |
| Category | 2. New Business |
| Type | Action |

File Attachments
NPC Letter to City 09262019.pdf (244 KB)
Lakeside Casino LLC - North Point Casino Proposal (digital) (FOIA redactions 08-30-2019)_Redacted_201909031456322081.pdf (46,394 KB)
CHJC Waukegan Casino Developer_Memo Report 101019.pdf (1,216 KB)
Resolution Certifying LakesideCasinoLLC.docx (14 KB)

**Motion & Voting**

(not specified)

Motion by Ald Newsome, second by Ald Turner.
Final Resolution: MOTION APPROVED
AYE: Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome, Ald Turner
NAY: Ald Rivera, Ald Florian, Ald Taylor

| **Subject** | **E. Resolution for Potawatomi** |
|---|---|
| Meeting | Oct 17, 2019 - Special City Council Meeting |
| Category | 2. New Business |
| Type | Action |

File Attachments
Resolution Certifying Potawatomi.docx (14 KB)
Supplemental Letter to Waukegan Casino Review Team 10-4-19.pdf (248 KB)
10.08.19 Letter to Corporation Counsel re_Correct Purchase Price.pdf (183 KB)
Potawatomi Hotel and Casino - Final Application_Redacted and Ex 1 - 9.pdf (24,513 KB)
Exhibit 1 Hospitality and Gaming Solutions Comments.pdf (183 KB)
Exhibit 2 Letter to P. Olson from R. Ferguson 9-30-19.pdf (461 KB)
Exhibit 3 Redevelopment in Milwaukee's Menomonee Valley. What Worked and Why (00477001xB15CF).pdf (4,511 KB)
CHJC Waukegan Casino Developer_Memo Report 101019.pdf (1,216 KB)

**Motion & Voting**

(not specified)

Motion by Ald Kirkwood, second by Ald Moisio.
Final Resolution: MOTION FAILED
AYE: Ald Moisio, Ald Newsome
NAY: Ald Bolton, Ald Seger, Ald Kirkwood, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor

| **Subject** | **F. Resolution requesting consideration of local interests** |
|---|---|
| Meeting | Oct 17, 2019 - Special City Council Meeting |
| Category | 2. New Business |
| Type | Action |

File Attachments
Accompanying resolution, final.docx (16 KB)

**Motion & Voting**

(not specified)

Motion by Ald Florian, second by Ald Rivera.
Final Resolution: MOTION APPROVED
AYE: Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome, Ald Florian, Ald Taylor
NAY: Ald Turner, Ald Rivera

## 3. Closing Items

| **Subject** | **A. Motion to Adjourn** |
|---|---|
| Meeting | Oct 17, 2019 - Special City Council Meeting |
| Category | 3. Closing Items |
| Type | Procedural |

City of Progress

**From:** Tim Drehkoff <tdrehkoff@rushst.com>
**Sent:** Friday, October 4, 2019 2:23 PM
**To:** casino@waukeganil.gov
**Cc:** cjohnson@chjc.com; semmerton@chjc.com; wierbicki@lamblc.com; Jacob Oberman <joberman@rushst.com>
**Subject:** Confidential Communication - Rivers Waukegan Revised Proposal
**Attach:** Rivers Waukegan - Updated Proposal Letter 10.04.2019.pdf

---

**Confidential Communication**

City of Waukegan Review Team and Charles and Sarah:

Please find the attached revised proposal from Rivers Waukegan.

Thank You

**Exhibit**
0338



RIVERS
CASINO
WAUKEGAN

**Confidential**

October 4, 2019

**Re: Updates to Waukegan Casino Proposal**

Members of the City of Waukegan Review Team and Charles Johnson,

We write to submit certain updates to the proposal for a Waukegan casino that we, CDI-RSG Waukegan, LLC ("Rivers Waukegan"), provided to the City of Waukegan (the "City") Review Team on August 5, 2019. These updates, which we set forth below, will provide enhanced financial resources to the City and its residents and further our objective of being a good community partner with the City.

*Proposal Updates*

- Increased Land Purchase Price. In our August 5th proposal, we offered to pay a minimum upfront, lump sum payment of $11 million for the land at Fountain Square, but indicated we were willing to negotiate that price and structure. In addition to the $11 million upfront payment we already have offered, we are now also offering to pay the City $1 million per year for twelve years, starting with the first year we are open, for a total payment of $23 million for the land.
- Revenue Share to the City. In addition, we are now proposing to provide the City with a share of our revenues above certain thresholds. For each year in which Rivers Waukegan's annual adjusted gross receipts, ("AGR") exceed $200 million up until they reach $250 million for that year, we will pay 2% of such excess amount (*i.e.*, the amount of AGR between $200 million and $250 million) to the City, and, should our AGR in any year exceed $250 million, we will pay 3% of such excess amount (*i.e.*, the amount by which AGR exceeds $250 million) to the City. Beginning in the fourth full calendar year in which Rivers Waukegan is open to the general public, the $200 million and $250 million revenue threshold amounts shall be adjusted each year to account for any inflation. Please note that our $200 million revenue threshold is below the stabilized annual gaming revenues our independent consultant projects Rivers Waukegan would earn. This contrasts with the other applicants who are offering revenue share payments to the City as their revenue threshold levels are higher than the revenue they have projected they will earn.
- Increased Funds for Charity. Our August 5th proposal provided that we will pay 2% of our annual pre-tax income to the City to fund charitable causes, with a guarantee that such payment shall be at least $250,000 each year. As shown in the information we provided you on September 20, 2019, these payments are expected to provide $26 million over twenty years for charitable use. We are now proposing to increase our annual guarantee from $250,000 to $400,000 and to further

guarantee that, for the period in which the casino is operating, at least $20 million of funds will be made available to allocate to charities.

As noted, we believe these updates to our proposal will provide enhanced benefits for the City and its residents, which are further buttressed (as we discussed at the September 18th public hearing) by the additional up to $5 million per year the City and its surrounding communities will receive in their share of gaming tax revenue as a result of the higher annual gaming revenues Rivers Waukegan expects to earn compared to the other applicants. Over twenty years, this results in an additional up to $100 million for the City. We believe this is a strong differentiating component of our proposal that along with our updated proposal (as described in this letter) will provide substantial funds for the City.

Should you have any questions regarding the updates to our proposals, please let us know. We look forward to developing a long-term partnership with Waukegan.

Sincerely,

CDI-RSG Waukegan, LLC

By: ______________________
Neil Bluhm

# REGULAR MEETING MINUTES - JULY 1, 2019
## *OFFICE OF THE WAUKEGAN CITY CLERK*
## *JANET E. KILKELLY*

---

**The Council of the City of Waukegan met in regular session on Monday, July 1st, 2019 at 7:00 PM**
**City Council Chambers, City Hall. 100 N. Martin Luther King Jr. Ave, Waukegan.**
**Mayor; Samuel D. Cunningham Jr, City Clerk; Janet E. Kilkelly, Treasurer; Dr. John R. Schwab, and Corporation Counsel; Robert J. Long, were present.**

---

**1. Opening Items.**
**Procedural: A. Roll Call**
**PRESENT:** Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**ABSENT:** None.

**Procedural: B. Invocation** by Dr. Patricia D. Hymon Kidd Power Prayer Partners Ministries for Prosperity (PPPMP) in Waukegan / **Pledge of Allegiance**

**Information: C. Mayor's Comments**

At this time, Mayor Cunningham shared his comments.

---

**2. Minutes.**
**Action: A.** Motion by Ald Kirkwood, second by Ald Taylor to approve the regular meeting minutes from Monday, June 17, 2019.

**MOTION APPROVED**

---

**3. Audience Time.**

Ken Endress: Introduced himself to the Waukegan City Council, and mentioned his recent appointment. He thanked Mayor Cunningham. He shared that he is a representative from the Great Lakes Naval Station.

Carol Stewert: She shared her concern regarding her property across from Twin City Park, and the people that throw trash and litter there. She explained that garbage gets in her yard, and that she would like to see extra garbage cans in the park. *Mayor Cunningham asked Mike Hewitt to get in contact with Stewert.*

Selina Gomez-Beloz: She is the Executive Director of the Waukegan Public Library. She shared some updates from the Waukegan Public Library. She also explained that the Waukegan Library is looking for Trustees, and that they should inquire with the Waukegan Mayor's Office, if they are interested.

Deborah Zlotnik: She shared her concerns regarding the recent 'Whitmore Block Party' in the 6th Ward. She shared that she is a resident of Glendenning Neighborhood.

Brother Blanks: He shared his concerns with the recent Southside shooting involving a man allegedly taking a substance, who died in Waukegan Police custody. He also shared his concerns with the lack of diversity of the Waukegan Police Department, especially at that incident.

Josh Bedle: Waukegan Main Street. Talked about Scoop, and shared some information and updates.

Wygenia Brisco: She shared her concerns regarding ETO, and Garage Sales. She talked about her proposal at a prior City Council meeting, for Garage Sale fees and permits.

Charles Rush: He shared his opinion on gaming in the City of Waukegan - and explained the Mayor's stance on it. He shared his opinion, and mentioned that the City of Waukegan needs a city manager form of government.

Brandon Ewing: He shared his support for the Zoning Calender regarding lights at Weiss Field. He encouraged the City Council to vote in favor of the lighting at Weiss Field.

Margaret Carrasco: She shared her opinion regarding ICE action, in the area, and stated that she is still waiting on the Mayor's response. She explained that it is the civic duty of the Aldermen and Mayor to show to to the parades. She explained that she feels Mayor Cunningham is obsessed with gaming, and that he works for the people of Waukegan, not Springfield. She stated that she gives him an F for his civic duty, and an A+ to the Fire Chief for his civic duty. She talked about an alleged intoxicated Alderman, and how they need help.

Jonathan: He shared that he is the Head Football Coach for Waukegan High School - he reiterated Brandon Ewing's comments. He shared his support for the lighting at Weiss Field.

Diana Burdett: Started off explaining how she was becoming ill when living in the 2nd ward and continued by saying that the City of Waukegan ethylene oxide levels are 500 times the actual level required by the EPA. Expressed that Sryogenics was shut down the day their levels of ethylene oxide came to light. Stated that the City should be outraged about this issue and that our children are the most effected by these high levels and that the City should be calling the governor and the elected officials should be helping shut it down.

Dylan Burdett: Started off my mentioning what his wife said before about the levels of ethylene oxide. Expressed that winds from the northwest have resulted in the levels being five to six times higher than local controls. Stated with calls urging the governor to seal the Medline plant or seal it until upgrades are completed, that there has been no movement from the governor. Then said the property where the casino is going to be built will be effected by the high levels of ethylene oxide and that representative Mayfield said the authority to seal the plant is by the county and municipality

Edger Sanderval: Explained about the video gaming expansion in downtown Waukegan and he appreciated the conversation in the last meeting about how the vote turned out because he thinks it would give people time to think and give more feedback about it. One of his concerns is the way tourism and economic growth are used as rhetoric to justify the casino especially since there aren't any metrics or measurements in place of how we're going to measure the success of it. Wants to know what the City is considering success of the casino such as job opportunities, investments, GDP, program opportunities, etc. Thinks the casino doesn't address the underlying social inequities such as inadequate access of transportation or the ethylene oxide emissions.

Celeste Flores: Wanted to thank the members of council who came to the Clean Power of Lake County Rally. Stated that they are gong to continue working trying to talk about renewable energy and to have a transition for the plant in Waukegan. Wanted to inform the council that Safeplace has hired two part-time staffers to work specifically with the community about energy efficiency such as changing behavior, working with ComEd, and using the most effective energy efficiency appliances they have. Making sure ComEd is putting in their money with help since the population is already paying for it and will host public meeting about it as well.

Ester Harren: Stated that she will be discussing three topics. Expressed that there was a five-year-old girl living in bad conditions and the parents were sick and alcoholics and that the family lived in a basement full of trash and cockroaches and people using drugs. There were multiple times the child was left alone without food and the homeowner said the house was left, not inspected. Explained that according to the City all houses are supposed to be inspected and that there is a negligence of following code and compliancies in the City. Even though the homeowners and renters moved everything, it still looks like an empty apartment. Feels as if transparency is an important solution in order to control the situation

Bob Calimore: Addressed a last minute issue about paying someone 48,000 dollars a year to help to assist with FOIA request. Thinks the Mayor has hit the jackpot with this gambling bill, but suggest it's early to hand out party favors. Wants to get some perspective with what this bill means. States that 5% of 1 million dollars is $50,000 divided four ways and talks about the process of FOIA's. Asking the City Council to vote it down.

Ralph Peterson Jr: To speak tonight, first ward Alderman and Mayor about tearing down and rebuilding the Genesee projects and feels as if everyone has tunnel vision about the casino and that now we have the casino deal out of the way and its a go. He thinks that we can start putting the projects back on the drawing board because when Motley was in it was in the drawing board and his intentions were to take them down and rebuild. Asking the first ward Alderman and Mayor to put that back on the drawing board because those people deserve better. Now that we have the casino coming, he suggested that maybe we can do those projects.

---

**4. Resolutions/Proclamations/Presentations/Appointments.**
**Proclamation: A.** Motion by Ald Kirkwood, second by Ald Rivera - Proclamation 'July 7-13 is Chi Eta Phi Week'

Mayor Cunningham presented the Proclamation.

**MOTION APPROVED**

---

**5. Reports and Communication.**
Treasurer Dr. John R. Schwab, gave an update on Yeoman Creek.

---

**6. Community Development Committee.**
**Action A**. Motion by Ald Moisio, second by Ald Seger to approve/deny a liquor license request for 'OohWee Sweet Tea #29' located at 29 N. Genesee Street, Waukegan, IL 60085

**AYE:** Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** Ald Newsome.
**ABSTAIN:** Ald Kirkwood.
**ABSENT:** None.
**MOTION APPROVED**

**Action B**. Motion by Ald Moisio, second by Ald Seger to approve/deny a liquor license request for 'Win Win Restaurant and Bar Inc' located at 30 N. Genesee Street, Waukegan, IL 60085

**AYE:** Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** Ald Newsome.
**ABSTAIN:** Ald Kirkwood.
**ABSENT:** None.
**MOTION APPROVED**

**Action C**. Motion by Ald Moisio, second by Ald Seger to approve/deny a liquor license request for 'Great Lakes Burger & Bourbon' located at 1508 Washington Street, Waukegan, IL 60085

**AYE:** Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** Ald Newsome.
**ABSTAIN:** Ald Kirkwood.
**ABSENT:** None.
**MOTION APPROVED**

**Action D.** Motion by Ald Moisio, second by Ald Kirkwood Zoning Calendar #2584 - 100 N. Lewis Avenue - Conditional Use Permit for Lighting at Weiss Field

Ald Florian shared her concerns regarding the concerns of homeowners in the area, and raised other concerns regarding the lighting at Weiss Field. A representative from the Waukegan Public School District came forward to explain. Mayor Cunningham passionately shared his opinion on the subject matter. Ald Florian raised a few more concerns, and shared some comments. Waukegan Public School Districit explained the benifits to the lighting.

**AYE:** Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** Ald Florian.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

**Action E**. Motion by Ald Moisio, second by Ald Taylor Zoning Calendar #2585 - Southwest Corner of Waukegan Road & Bur Wood Drive - Site Plan Approval per the McGaw Business Park Overlay District

**AYE:** Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

**Action F**. Motion by Ald Moisio, second by Ald Taylor Zoning Calendar #2586 - 1550 Bridge Drive - Site Plan Approval per the McGaw Business Park Overlay District

**AYE:** Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

**Action G**. Motion by Ald Moisio, second by Ald Taylor Zoning Calendar #2587 - Northwest Corner of Waukegan Road and Lakeside Drive - Site Plan Approval per the McGaw Business Park Overlay District

**AYE:** Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

**Action H**. Motion by Ald Moisio, second by Ald Seger to adopt an Ordinance Amending Prohibited Parking Zones on Pine Street

**MOTION APPROVED**

**Action I**. Motion by Ald Moisio, second by Ald Bolton to adopt an Ordinance Adding Handicapped Parking at 843 McAlister Ave

Ald Moisio explained that the motion had a typeo in it, and that it will be corrected to reflect the Ordinance.

**MOTION APPROVED**

**Action J**. Motion to adopt as presented, an Ordinance amending Chapter 21 'Parking Prohibited at all times on Specific Streets'

Item J was skipped, as it was similar to Item H, per Corporation Counsel Robert J. Long.

**7. Old Business.**
**Action A.** Motion by Ald Bolton, second by Ald Moisio to Reconsider the Council's Vote of June 17, 2019 on item 9.A, a Motion to Approve Ordinance Amending the City of Waukegan Liquor and Video Gaming Code by Establishing a Downtown Entertainment District.

Ald Moisio shared his concern regarding distance requirement, and shared other ways to regulate, rather than distance, including regulation by sq footage, instead of distance. Ald Taylor shared an idea, and explained that the reason we gave out gaming licenses was to help businesses stay afloat. Ald Moisio continued to share his thoughts, including terminal charge fees.

**AYE:** Ald Turner, Ald Rivera, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** Ald Newsome Ald Florian, Ald Taylor.
**ABSTAIN:** Ald Kirkwood.
**ABSENT:** None.
**MOTION APPROVED**

**Action B.** Motion by Ald Bolton, second by Ald Moisio to approve an Ordinance Amending the City of Waukegan Liquor and Video Gaming Code by Establishing a Downtown Entertainment District. (REQUIRES PASSAGE OF ITEM 8.A TO CONSIDER)

Ald Taylor shared her concerns regarding this agenda item. She doesn't feel this process was transparent. Ald Taylor, and Mayor Cunningham had a brief discussion regarding this Entertainment District. Mayor Cunningham explained why he felt this needed to be done.

**AYE:** Ald Turner, Ald Rivera, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** Ald Newsome, Ald Florian, Ald Taylor,
**ABSTAIN:** Ald Kirkwood,
**ABSENT:** None.
**MOTION APPROVED**

**8. Government Operations & Oversight.**
**Action A.** Motion by Ald Bolton, second by Ald Taylor to adopt Ordinance #19-O-__, an ordinance fixing the salaries and wages to be paid to Management and Non-Union employees of the City of Waukegan, Illinois effective May 1, 2019.

Ald Turner stated that this information is avilable for viewing online, through BoardDocs, and that a hard copy is in the City Clerk's office.

**AYE:** Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

**9. New Business.**
**Action A**. Motion by Ald Rivera, second by Ald Florian to approve an Ordinance Modifying the Order of Business to Create a Consent Agenda for Meeting of the City Council

Corporation Counsel Robert J. Long, clarified the meaning of a Consent Agenda.

**AYE:** Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

**Action B**. Motion by Ald Florian, second by Ald Taylor to approve an Ordinance Permitting Alcoholic Beverages in the Scoop Festival Zone

**AYE:** Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** Ald Newsome,
**ABSTAIN:** Ald Kirkwood,
**ABSENT:** None.
**MOTION APPROVED**

**Action C**. Motion by Ald Taylor, second by Ald Bolton to approve an Ordinance Establishing a Special Curfew for Scoop

Ald Taylor asked for clarification, asking if this Ordinance can also include Special Curfew for Blues Fest. Mayor Cunningham stated that it can, and a unamimus vote was taken on an amendment. Ald Turner had concerns prior to the vote. Mayor Cunningham clarified.

**MOTION APPROVED** *on the amendment of the ordinance.*

**AYE:** Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

**Action D**. Motion by Ald Seger, second by Ald Moisio to Approve an Ordinance Creating a Class E Liquor License for Lucky Food (38 N. Genesee Street, Waukegan, IL 60085)

**AYE:** Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** Ald Newsome.
**ABSTAIN:** Ald Kirkwood.
**ABSENT:** None.
**MOTION APPROVED**

**Action E**. Motion by Ald Moisio, second by Ald Seger to Approve an Ordinance Creating Video Gaming Licenses for Lucky Food (38 N. Genesee Street, Waukegan, IL 60085) (REQUIRES APPROVAL OF ITEM 8.B TO CONSIDER)

**AYE:** Ald Turner, Ald Rivera, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** Ald Newsome, Ald Florian, Ald Taylor.
**ABSTAIN:** Ald Kirkwood.
**ABSENT:** None.
**MOTION APPROVED**

**Action F**. Motion by Ald Moisio, second by Ald Rivera to approve vendor payments dated July 1, 2019 in the total amount of $3,509,448.89.

**AYE:** Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

**Action G**. Motion by Ald Turner, second by Ald Florian to approve regular payroll dated June 21, 2019 in the total amount of $1,576,396.16.

**AYE:** Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

**Action H**. Motion by Ald Kirkwood, second by Ald Turner to approve police uniform allowance & holiday cash-out payroll dated June 21, 2019 in the total amount of $132,761.81.

**AYE:** Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

**Action I.** Motion by Ald Newsome, second by Ald Taylor to approve final cash-out (Robins, E.) payroll dated June 21, 2019 in the total amount of $9,331.18.

**AYE:** Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

**Action J.** Motion by Ald Moisio, second by Ald Bolton to approve all raffle sale applications

**MOTION APPROVED**

**Action K. Seger, Moisio BLOCK PARTY**

**MOTION APPROVED**

---

**10. Ordinances.**

---

**11. Closing Items.**

**A. Aldermen's Time:**

Ald Kirkwood: Thank all the residents for coming out the parade and thought it was a good turn out despite the rain. Also, for the residents of the 4th ward for putting out information regarding the Operation Clean Sweep.

Ald Newsome: No Comment.

Ald Turner: Had a 6th ward meeting and received good information and questions from neighbors and reached out to the 6th ward about having meetings at their house and is looking forward to working with the community policing officer to schedule more meeting with neighborhood watch groups. Got another dumpster clean up sweep on Franklin St. in front of North school August 17th between 7 AM-10AM. Responded to a citizen's complaint about how another neighbor's dog was unleashed and was almost hit by a car. Keep your dogs on a leash and cautioned speedy drivers.

Ald Rivera: Park district does a fine job putting on the 4th of July Parade, but was unfortunate that Mother Nature didn't help us with the rain. Made a comment regarding earlier comments with Glendenning and Whitemore's issue with the block party and parking. Does support community parties, but they need to be done properly. I look forward to proper applications and events next year. Garage Sales that are occurring in all of the wards, we do have a serious issue with that because they know that code enforcement is not around at this time. Did discuss with Mike Purtell about working with code enforcement so when their contract comes up they rotate the shift so that there is someone working the weekends. Up to the Aldermen to see what is happening and not happening and there is a permit process and fee that needs to be done.

Ald Florian: Held her ward meeting and had great attendance and the staff was good at answering questions. Received good feedback from residents and plans on making it an annual event

Ald Taylor: In addition to Scoop, there is Greek Fest off of O'Plaine Rd. Agreed with a resident about the Whitmore's event and seeing it more as a special event than a block party. Wanted to remind people to please watch their dogs because of the fireworks and wanted to wish everyone a great holiday.

Ald Bolton: Announced that the 1st ward is having their Operation Clean Sweep, Monday July 15th at 8AM- 3PM on 10th St. and Adams. Thought the parade was exciting and sent her condolences to an individual's family. Stated the housing project has never left the agenda and how she is ecstatic with what's about to take place.

Ald Seger: Said that even though is poured on the parade that everyone still had fun and thanked those in parade.

Ald Moisio: Felt that they need to move up on the issue of the ETO with all the evidence they have received and to put pressure on these companies and agencies. Thinks that the City Council needs to do something about it.

Mayor Cunningham shared closing comments, at this time.

---

**12. Adjournment**

Motion by Ald Moisio, second by Ald Taylor to Adjorn.

**MOTION APPROVED**

---

**These minutes were transcribed by the Office of the Waukegan City Clerk:**

________________________________

**JANET E. KILKELLY, CITY CLERK**
**Office of the City Clerk**
**City of Waukegan**
**Waukegan, Illinois**

*ATTEST:*

________________________________

**DAVID A. PATTERSON, DEPUTY CITY CLERK**
**Office of the City Clerk**
**City of Waukegan**
**Waukegan, Illinois**

**REGULAR MEETING MINUTES - JULY 15, 2019**
***OFFICE OF THE WAUKEGAN CITY CLERK***
***JANET E. KILKELLY***

---

**The Council of the City of Waukegan met in regular session on Monday, July 15, 2019 at 7:00 PM**
**City Council Chambers, City Hall. 100 N. Martin Luther King Jr. Ave, Waukegan.**
**Mayor; Samuel D. Cunningham Jr, Deputy City Clerk; David A. Patterson, Treasurer; Dr. John R. Schwab, and Corporation Counsel; Robert J. Long, were present.**
**City Clerk; Janet E. Kilkelly, was absent.**

---

**1. Opening Items.**
**Procedural: A. Roll Call**
**PRESENT:** Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood.
**ABSENT:** None.

**Procedural: B. Invocation** by Pastor Seth Haakenson of Immanuel Evangelical Lutheran Church in Waukegan / **Pledge of Allegiance**

**Information: C. Mayor's Comments**

At this time, Mayor Cunningham shared his comments.

Presentations, and awards, took place after Mayor Comments: Waukegan to College, Police Chief Wayne Walles, kids from the community, and talked about a police program helping these kids. Fire Chief bridges gave a presentation along with his team and awarded everyone involved in an incident that took place on June 30, 2019.

---

**2. Audience Time.**
Eurice Cotton: She introduced herself as family of Avion, who died in an incident, while in police custody, they are requesting the police camera footage to get closure for their family. Requesting Mayor's assistance.

Ruthie Cotton: She also introduced herself as a family member of Avion, who died in an incident, while in police custody, they are requesting the police camera footage to get closure for their family. Requesting Mayor's assistance.

Brother Blanks: He is here also on behalf of Avion's family. He is requesting police camera footage and documents, received information from the City of Waukegan. Claims he did not receive anything he requested on the FOIA, and the community needs closure, as well as the family. He shared that he appealed the FOIA information with the Attorney General's Office.

Anita Johnson: She shared that she is a resident for 45 years in Waukegan, and wants to see justice for Avion, she said she wants the truth, and for justice.

Pamela Johnson She stated that she was at the scene of the accident, involving Waukegan Police and Avion. She claims people went about the situation incorrectly, and explained that she has yet to see Avon's body, and that maybe the footage has been deleted. She explained that someone has to be at fault, and that respect is needed.

Wygenia Brisco: She explained that she couldn't address all of her concerns at the last City Council Meeting, but will try to pick up where she left off. She stated that the way the potholes where fix, was wrong, and the company that fixed them did not do a good job. She questioned audience

time/comments/recommendation that come from the residents. She has been in Waukegan for 25 years, she would like everyone to see where the community is going.

Tom Kimmel: He stated that we have a wonderful beach, but improvements are needed.

Diana Burdette: She explained that she submitted a report about EPA, and sent it to the Mayor's Office, and wants to know if those comments have been used. She went on to explained the benefits of those reports. She asked for protection for her family and the community, against ETO. She wants Waukegan to step in and help the community because nothing has been done to help.

Dylan Burdette: He discussed his background, and ETO issues in Waukegan. He has been working along with other people and continue to fight against ETO.

Joe Kopsick: He discussed immigration, and does not plan to participate in the 2020 census. He asked the City to take a look at the constitution, bible, talked about the Casino, and tax dollar allocation.

Jon Gaskill: Assistant Director of the Waukegan Library. Explained that the summer reading had a great turn out and encouraged everyone to sign up before it's too late. Stated that they have served over 600 lunches to young people in the community. Wanted to thank everyone for helping with the first performance on the Waukegan Library Patio. Wants to continue to provide services to the community and encouraged everyone to get a library card.

*At this time, Gerry Cook, and other members from Waukegan's Scoop, approached.*

Margaret Carrasco: Kuddos to everyone tonight, but also mentioned the Electronic Rock group. She suggested doing more events for the youth. Mentioned an issue with trying to get out of the beach and said that there needs to be another exit. Stated that taxpayers are paying for Mayor Cunningham's Blues Night and that the event was considered a political event and is illegal to do that. She explained further, and shared her concerns.

Edgar Sandaval: Referred to a comment made about children, earlier, and said that every kid is valuable. Feels as if the community can find a better solution for punishment such as curfew or garage sales and try to find the problem from the root. Suggest that society should move away from punishment and look at a more caring model. Mentioned the detention camp crisis dealing with ICE and many people are living in poverty in their home country. Asked what everyone doing about this situation. Wants the elected officials to make noise about the situation.

Giselle Rodrigues: Stated that she's a Member of Lake County Immigrant Advocacy. LCIA has spent hours working with families to give out temporary guardianship of their children to other people. Explained that the community has a responsibility for the protection of people. Request for the Mayor and elected officials to play a stronger role and vocalizing their support for immigrant families. Requesting to notify the community when ICE is present and to not share information with ICE, to work with local immigration about new policies being added, develop a plan, support the community. Said that police should be more vocal about not working with ICE. Asked officials to sign on to the LCIA memo and ensure that something is being done.

Shaun T. White: Thanked everyone for their work at Waukegan's Scoop. He also thanked Clerk Kilkelly, and her office for their help with processing his liquor license application, and explained that he will have to come back and talk to Corporation Counsel Robert J. Long, regarding the remaining steps.

---

**3. Consent Agenda (Items under the Consent Agenda are considered routine and/or non-controversial and will be approved by one motion. If any one board member wishes to have a separate vote on any item, it will be pulled from the Consent Agenda and voted on separately).**

***Action L is pulled from the Consent Agenda, at the request of Ald Florian.***

**Action A.** Motion to Approve the Regular Meeting Minutes from Monday, July 1, 2019

**Action B.** Motion to approve vendor payments dated July 15, 2019 in the total amount of $821,610.66.

**Action C.** Motion to approve regular payroll dated July 5, 2019 in the total amount of $1,585,092.48

**Action D.** Motion to approve uniform and comp-time cash out payroll dated July 5, 2019 in the total amount of $1,029.08.

**Action E.** Motion to approve final cash out (Avalos & Grosskopf) payroll dated July 5, 2019 in the total amount of $6,799.68.

**Action F.** Motion to approve final cash out (Avalos & Grosskopf) payroll dated July 5, 2019 in the total amount of $6,799.68.

**Action G.** Motion to approve a fee waiver and a waiver for noise to exceed 50 decibels 8/2/2019 to 8/4/2019 from 11:00AM-10:00PM for Kermes at Most Blessed Trinity Parish. Special Events Permit pending staff approval.

**Action H.** Motion to approve use of City property 7/20/2019 and 7/21/2019 from 6:00AM-6:00PM for Pro-Am Beach Soccer Windy City Qualifier at Waukegan Municipal Beach. Special Events Permit pending staff approval.

**Action I.** Motion to approve fee waiver, use of City property, and waiver for noise to exceed 50 decibels 8/11/2019 from 9:30AM-12:30PM for First United Methodist Church Beach Worship Service at Stiner Pavilion. Special Events Permit pending staff approval.

**Action J.** Motion to approve a fee waiver and a waiver for noise to exceed 50 decibels 9/6/2019 to 9/7/2019 from 9:30AM-5:00PM for Waukegan Regional Airshow Inc. dba Northern Illinois Airshow at Waukegan National Airport. Special Events Permit pending staff approval.

**Action K.** Motion to approve use of City property and waiver for noise to exceed 50 decibels 9/7/2019 from 8:00AM-9:00PM for Barnes Vow Renewal at Stiner Pavilion. Special Events Permit pending staff approval.

***Action L.** Motion authorizing the retention of McDonald Hopkins, LLC. to provide specialized legal services under the direction and supervision of Corporation Counsel. This matter was heard in the Finance & Purchasing Committee.

This item was voted on separately, after being pulled out of the consent agenda, at the request of Ald Florian.

> **AYE:** Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood.
> **NAY:** None.
> **ABSTAIN:** None.
> **ABSENT:** None.
> **MOTION APPROVED**

**Action M.** Motion to grant a bona fide operating emergency waiver to the competitive bidding process pursuant to Sec. 2-458 (i)(2), and retroactively approve the award of a contract to Northern Divers USA relative to flooding repairs at the Water Plant for a not to exceed amount of $56,270. This project utilizes 2018C Water & Sewer Bond funds. This matter was heard in Finance & Purchasing Committee.

**Action N.** Motion to grant a good faith waiver to the competitive bidding process pursuant to Sec. 2-458 (i)(7), and approve the award of a contract to Campanella & Sons in order to make sewer repairs as necessary during the 2019-2020 fiscal year for a not to exceed amount of $100,000. This project utilizes 2018C Water & Sewer Bond funds. This matter was heard in the Finance & Purchasing Committee.

**Action O.** Motion to approve the award of four contracts during the 2019-2020 fiscal year to the lowest responsible bidder, G&S Services, relative to mowing services as follows: $9,300 6-week contract;

$18,800 cemeteries; $25,600 bi-weekly contract; and, $27,700 weekly contract. This matter was heard in the Finance & Purchasing Committee.

**Action P.** Motion to grant a sole source waiver to the competitive bidding process pursuant to Sec. 2-458 (i)(1), and approve the award of a contract to Covanta to perform Leachate Pumping during the 2019-2020 fiscal year for a not to exceed amount of $50,000. This matter was heard in the Finance & Purchasing Committee.

**Action Q.** Motion to approve a contract with Global Group, Inc. for employee insurance benefits brokerage and consultant services for a period from July 15, 2019 through December 15, 2020 in an amount not to exceed $5,416.67 per month pursuant to a request for information issued by the Human Resources Director. This matter was heard in the Finance & Purchasing Committee.

**Action R.** Motion to authorize the City Treasurer to secure a Letter of Credit with First Midwest Bank as required by the EPA relative to Yeoman Creek. This matter was heard in the Finance & Purchasing Committee.

**Action S.** Motion to approve all Raffle Sale Applications

**AYE:** Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

---

**4. Resolutions/Proclamations/Presentations/Appointments**

**Action: A.** Motion by Ald Moisio, second by Ald Newsome to ratify appointment of Josue I. Pasillas to Waukegan Public Library Board

**AYE:** Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

**Action: B.** Motion by Ald Moisio, second by Ald Newsome to ratify appointment of Cynthia Springfield to Waukegan Stakeholder Participation Panel

**AYE:** Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

**Action: C.** Motion by Ald Moisio, second by Ald Newsome to ratify appointment of Victor Gonzalez to Waukegan Planning and Zoning Commission

**AYE:** Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood.
**NAY:** Ald Taylor.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

---

**5. Reports and Communication.**
**Information A.** Open Bids and Requests for Proposal (RFP)

---

**6. Special Community Development Committee.**
**Action A**. Motion by Ald Moisio, second by Ald Seger to adopt, as presented, an Ordinance creating a class A-3 liquor license for Windy City Distilling, Inc., located at 220 Clayton Street, Waukegan

**AYE:** Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** Ald Newsome.
**ABSTAIN:** Ald Kirkwood.
**ABSENT:** None.
**MOTION APPROVED**

**Action B**. Motion by Ald Moisio, second by Ald Seger to Adopt, as presented, an Ordinance creating a class A-2 Liquor License for Nightshade & Dark's Pandemonium Brewing, 216 Clayton Street, Waukegan

**AYE:** Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** Ald Newsome.
**ABSTAIN:** Ald Kirkwood.
**ABSENT:** None.
**MOTION APPROVED**

---

**7. Finance & Purchasing Committee.**
**Action A.** Motion by Ald Bolton, second by Ald Moisio to approve the 2018 Consolidated Annual Performance and Evaluation Report (CAPER) Program Period from May 1, 2018 through April 30, 2019, and to further authorize the CDBG Director to make amendments as necessary and required by HUD.

**AYE:** Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

---

**8. Old Business**

---

**9. New Business.**
**Action A**. Motion by Ald Rivera, second by Ald Florian to approve the allocation of $711,603 in federal HOME funding to the Waukegan Housing Authority Barwell Redevelopment Project, $152,509 from the Program Year 2017 Award, $294,858 from the Program Year 2018 Award, and $264,236 from the Program Year 2019 Award, conditioned upon final approval from Lake County and US Department of Housing and Urban Development.

**AYE:** Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

---

**10. Ordinances.**

**Action A**. Motion by Ald Turner, second by Ald Rivera to adopt as presented, an Ordinance Creating a Class E liquor license for 'Win Win Restaurant and Bar Inc' located at 30 N. Genesee Street, Waukegan, IL 60085

**AYE:** Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** Ald Newsome.
**ABSTAIN:** Ald Kirkwood.
**ABSENT:** None.
**MOTION APPROVED**

**Action B**. Motion by Ald Kirkwood, second by Ald Rivera to adopt as presented, an Ordinance creating a Class E liquor license for 'Great Lakes Burger & Bourbon' located at 1508 Washington Street, Waukegan, IL 60085

**AYE:** Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio.
**NAY:** Ald Newsome.
**ABSTAIN:** Ald Kirkwood.
**ABSENT:** None.
**MOTION APPROVED**

---

**11. Closing Items.**
**A. Aldermen's Time:**

**Ald Newsome:** No Comment.

**Ald Turner:** Talked about a ward alley clean up coming this Thursday this week. Thanked Mike Hewitt and the entire public works team. Explained that some residents inform him about things that need to be addressed. Said there will be another dumpster for the Sweep on August 17th in front of North School on Franklin St at 7am-10am. Recognized new city code officer in 6th Ward, Josh Nickerson. Requesting an ordinance to repeal the ordinance stipulating the liquor licenses, regarding distance requirements. After the Aldermen chimed in, they agreed it should be disscussed during the next Community Development Committee.

**Ald Rivera:** Said the City approved a lease for brewery at Urban Edge Gallery. When the application was submitted the City realized that there were violating an ordinance. To avoid the ordinance to not get into legal issues, Mayor Cunningham presented an entertainment district to lower the distance to 100ft. Said he changed his vote to prevent the City from any legal action. Clarifying that he does not support any additional gaming in Waukegan. He hopes to work with the city to avoid legal conflicts.

**Ald Florian:** Attended the fireworks and Scoop and both events were awesome. Thanked Jane ferry and David Motley and everyone involved in the events. She wanted to address the there be an Environmental Justice committee, and volunteered herself to be the Chairman of it.

**Ald Taylor:** Reminded residents about tree branches hanging over the sidewalks and encourage the residents to cut down in order not to cause harm. She also talked about how she hasn't received any 9th Ward block parties. Stated there will be another neighborhood watch community meeting on July 23rd. Talked about attending a United Way program at the Waukegan Library titled “A Day in the Life of Poverty". Hoped to get it at the library to encourage the community about what poverty really is, and she is going to work with the director of the library.

**Ald Bolton:** Thanked everyone in the 1st Ward with Operation Clean Sweep and Public Works and everyone else that contributed. Said it was her first time participating in Scoop and thanked police, fire, and every one that helps serve the community.

**Ald Seger:** No Comment.

**Ald Moisio:** No Comment.

**Ald Kirkwood:** No Comment.

**12. Adjournment**

Motion by Ald Moisio, second by Ald Taylor to Adjourn at **9:41PM**

**MOTION APPROVED**

---

**These minutes were transcribed by the Office of the Waukegan City Clerk:**

______________________________

**JANET E. KILKELLY, CITY CLERK**
**Office of the City Clerk**
**City of Waukegan**
**Waukegan, Illinois**

*ATTEST:*

______________________________

**DAVID A. PATTERSON, DEPUTY CITY CLERK**
**Office of the City Clerk**
**City of Waukegan**
**Waukegan, Illinois**

# REGULAR MEETING MINUTES - AUGUST 5, 2019
## *OFFICE OF THE WAUKEGAN CITY CLERK*
## *JANET E. KILKELLY*

---

**The Council of the City of Waukegan met in regular session on Monday, August 5, 2019 at 7:00 PM**
**City Council Chambers, City Hall. 100 N. Martin Luther King Jr. Ave, Waukegan.**
**Mayor; Samuel D. Cunningham Jr, City Clerk; Janet E. Kilkelly, Treasurer; Dr. John R. Schwab, and Corporation Counsel; Robert J. Long, were present.**

---

**1. Opening Items.**
**Procedural: A. Roll Call**
**PRESENT:** Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome.
**ABSENT:** None.

**Procedural: B. Invocation** by Pastor Jesus Gerena / **Pledge of Allegiance**

**Information: C. Mayor's Comments**

At this time, Mayor Cunningham shared his comments.

---

**2. Audience Time.**

Ralph Peterson Jr: He explained that he experienced a culture shock, today, while attending a meeting in Libertyville, IL, in reference to the reenactment of the Civil War. He explained the attitudes of those at the event as stubborn, selfish, and racist. He explained that he has not encountered this the way he encountered it today. He shared that it shocked him. He explained that he is speaking from his heart tonight, and shared that he acknowledges that he has had a lot of misunderstanding with the Mayor, and that he does not agree with a lot of his decisions, but explained that in order for him to feel good about himself, and to try to have some understanding because things are not fair nor right in Lake County and explained that it is purposed that way. Peterson apologized to the Mayor, and explained that he has said some rough things. He continued his comments, and stated that it's the Mayor's personal business whether he'll accept, and that it is not important to him if he accepts, but rather that he did apologize, and he explained the same about Commissioner Ross Cunningham. He explained that she was also in attendance at the event and witnessed the same thing he did. He talked more about the event, what took place, and who was in attendance.

Les Deffner: He shared his concerns regarding the proposed casino idea.

Diana Burdette: She shared her concerns regarding ETO issues in Waukegan, and the facilities that should be shut down.

Dylan Burdette: He shared his concerns, and wanted to spread the word about the dangers of ETO.

Selina Gomez-Beloz: She gave an update from the Waukegan Public Library, including upcoming events at the Library.

Anita Hanna: She introduced herself as a District 60 School Board Member. She discussed recent talks of a casino possibly coming to Waukegan, and how plans back under Mayor Hyde showed 3 million dollars going to District 60. She asked what processes and procedures need to happen in order for the school district to receive funds. Overall, she came forward representing the school district, hoping they could receive funds should a casino come.

Chris Fosberg:  Born and raised here, and owns multiple properties.  He explained that he is here to talk about gambling, people have talked about the casino already, talk about the machines and how they are successful, and how that is somehow an illusion.  He explained that he believes they take a lot of money away from the community, and that they are also highly addictive, and are drawn to the most vulnerable people who cannot afford it.  He asked City Council to please visit the top 5 gambling establishments, and see the people pouring money into these machines.  He touched base on what we need to do for job creation, and keeping money in the community, and explained what helps and doesn't help the community.

Bill Powers:  Talk about establishments in the city with gaming machines, and talked about raising the fees per machine.  He explained that bar owners aren't paying enough for the dollars they are earning.

David Villalobos:  He introduced himself as a former Alderman for the City of Waukegan.  He asked City Council to keep in mind the social impact of a casino.  He talked about the process of what we are going to do, talked about the land/space, and encouraged the City Council to talk to the community, and do a survey.

Jack Dye:  He talked about former Sen. Micheal Bond, CEO of Tap Room Gaming, and money put in to former Campaigns.  He thanked Ald Kirkwood for clarifying the correction he made two days ago.  Talked about gaming money concerns, within campaigns, and asked, how is it okay if gaming pays for campaigns, he continued his thoughts on this matter.

Lisa May:  She encouraged the City Council to reach out to residents regarding casinos, and gaming in the area.  She talked about how gaming has fallen short.  She explained that there are representatives from each ward, and talked about Newsome strong record on opposing gambling.  She shared some history lessons from council, including Ald TenPas, stating that lottery would save schools, and talked about infrastructure, and money borrowed from gaming revenue.  She shared statistics on gaming, and talked about money brought in, and talked about casinos during their peek time, and how they have since declined.

Joe Kopsick:  He talked about elected officials, and use of advertising for community events, and explained that the Mayor should recuse himself, regarding Blues Night, and explained that it is the people's festival not the Mayor's festival.  Last meeting, he explained that the City Council celebrated the census citizenship question, not being added to the census.  He encouraged residents to not to do the census.

Brother Blanks:  He discussed a letter address from Daniels, Long, and Pinsel law firm, regarding a FOIA request, and explained the information requested, and what he is trying to do to help the family, seeking answers to the situation.

Kim Handy:  She introduced herself as a cousin of Avion.  She explained that transparency is needed, and that she is a mom that lost a child to police brutality.  She explained how she feels about police brutality, and how she believes the police feel they are bigger than the law.  She thanks the Mayor on upcoming work on the south side. She explained that no matter where she goes, she will never forget where she come from.  She shared her position on recent talks of a Casino, and explained that when she goes in gaming rooms, she doesn't play, keeps the money in her pocket, and might order something to eat.  She continued her thoughts on the matter, and explained how she feels about the community.

Patricia Shelley:  She introduced herself as a south side resident, of Waukegan.  She expressed that she tilts her hat to the Mayor.  She explained that things in the community do not go unnoticed.  She explained that she has been in Waukegan all of her life, and is now in Zion, but said that a lot of things are happening in the community.  She shared memories of going to events with her grandmother.  She remembers all of that.  She explains that she hears a lot about the casino.  She spoke in favor of a casino.

Rev Mark Rollenhager:  He thanked the Waukegan City Council for the opportunity to do invocation.  Talked about gaming, and how it will affect the lives of vulnerable people.  He is opposed to the establishment of a casino in gambling.

Margaret Carrasco: She discussed the DUI's and explained that she submitted a FOIA request, on an officer. She explained that she has over 500 pages of evidence. She explained that police officers in Waukegan are outraged, and went into details about the findings, and about an officer that she called identified as 'CK.' She asked Aldermen to also vote 'no' on Annette Darden for Waukegan Public Library Board.

Robb Collimore: He shared his opinion on a casino, and explained if the City of Waukegan is going to do it, it should be done right. He expressed his concern on video gaming, and the flooding of video gaming. Talked about developers.

---

**3. Consent Agenda (Items under the Consent Agenda are considered routine and/or non-controversial and will be approved by one motion. If any one board member wishes to have a separate vote on any item, it will be pulled from the Consent Agenda and voted on separately).**

Motion by Ald Moisio, second by Ald Taylor **to TABLE items K, L, M, N, O, & P from the Consent Agenda.**

**MOTION APPROVED**

Motion by Ald Moisio, second by Ald Taylor **to remove items *B, *C, *D, *E, *NN from the of consent agenda, to be voted on separately.**

**MOTION APPROVED**

**Action A.** Motion by Ald Moisio, second by Ald Taylor to approve the Regular Meeting Minutes from July 15, 2019, as amended

***Action B.** Motion by Ald Moisio, second by Ald Kirkwood to ratify appointment Tatiana Amorella to Waukegan Library Board

**AYE:** Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

***Action C.** Motion by Ald Turner , second by Ald Bolton to ratify appointment Annette Darden to Waukegan Library Board

**AYE:** Ald Turner, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome.
**NAY:** Ald Rivera, Ald Florian, Ald Taylor.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

***Action D.** Motion by Ald Newsome, second by Ald Rivera to ratify appointment Tracey E. Ambrose to the Waukegan Stakeholder Participation Panel

**AYE:** Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

***Action E.** Motion by Ald Moisio, second by Ald Seger to ratify appointment Kate Collimore to the Waukegan Stakeholder Participation Panel

**AYE:** Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

**Action F.** Motion by Ald Moisio, second by Ald Taylor to approve an Ordinance authorizing execution of an Annexation Agreement for 12560 W. Lee Avenue.

**Action G.** Motion by Ald Moisio, second by Ald Taylor to approve an Ordinance Annexing certain territory into the City of Waukegan, namely 12560 W. Lee Avenue. A Public Hearing was held today prior to the Council meeting.

**Action H.** Motion by Ald Moisio, second by Ald Taylor to Approve Zoning Calendar #2588 - Map Amendment of 12560 W. Lee Avenue from CR Conservation Recreation to R1 Single-Family Residence pursuant to an Annexation Agreement. A Public Hearing was held today prior to the Council meeting.

**Action I.** Motion by Ald Moisio, second by Ald Taylor to Authorize the proper City officials to execute an Intergovernmental Agreement to join the Lake County Land Bank Authority. This matter was heard in the Community Development Committee.

**Action J.** Motion by Ald Moisio, second by Ald Taylor to Approve a Resolution to appoint a representative as a Local Government Director to serve on the Lake County Land Bank Board representing the City of Waukegan. This matter was heard in the Community Development Committee.

**Action K.** Motion to Approve an Ordinance vacating Hillside Avenue in Frederick H. Bartlett’s Green Bay Road Addition Subdivision. This matter was heard in the Community Development Committee.
**TABLED**

**Action L.** Motion to Approve an Ordinance vacating Ridge Avenue in Frederick H. Bartlett's Green Bay Road Addition Subdivision. This matter was heard in the Community Development Committee.
**TABLED**

**Action M.** Motion to Approve an Ordinance vacating three alleys along the ComEd right-of-way in Frederick H. Bartlett's Green Bay Road Addition Subdivision. This matter was heard in the Community Development Committee.
**TABLED**

**Action N.** Motion to Approve an Ordinance vacating three alleys west of Green Bay Road between Central and Darrow Avenues in Frederick H. Bartlett's Green Bay Road Addition Subdivision. This matter was heard in the Community Development Committee.
**TABLED**

**Action O.** A Resolution Authorizing the Sale of Property Located at 1402 Washington (REQUIRES 7 VOTES). This matter was heard in the Community Development Committee.
**TABLED**

**Action P.** A Resolution Authorizing the Disposal of Property Located at 415 W McKinley Avenue (REQUIRES 7 VOTES). This matter was heard in the Community Development Committee.
**HELD OVER IN COMMITTEE, TABLED AT CITY COUNCIL**

**Action Q.** Motion by Ald Moisio, second by Ald Taylor An Ordinance Amending Chapter 21 by Adding 8th Street and Lincoln Avenue to the List of Angle Parking Established. This matter was heard in the Government Operations & Oversight Committee.

**Action R.** Motion by Ald Moisio, second by Ald Taylor A Resolution authorizing Corporation Counsel to Prosecute Certain Nuisance Abatement Lawsuits and Seeking Declarations of Abandonment Against Certain Real Property. This matter was heard in the Community Development Committee.

**Action S.** Motion by Ald Moisio, second by Ald Taylor to approve waiver for noise to exceed 50 decibels 8/10/2019 from 12:00PM-9:00PM for Party in the Parking Lot at TR's Front Row on Greenwood. Special Events Permit pending submission of proper paperwork and staff approval. This matter was heard in the Community Development Committee.

**Action T.** Motion by Ald Moisio, second by Ald Taylor to approve application fee waiver, waiver for noise to exceed 50 decibels 8/17/2019 from 12:00PM-5:00PM for Real Men Grill at Lion's Math & Science Christian Academy. Special Events Permit pending submission of proper paperwork and staff approval. This matter was heard in the Community Development Committee.

**Action U.** Motion by Ald Moisio, second by Ald Taylor to approve use of City property, gate fee waiver, and waiver for noise to exceed 50 decibels 8/17/2019 from 11:00AM-7:00PM for AfroFest at Stiner Pavilion. Special Events Permit pending submission of proper paperwork and staff approval. This matter was heard in the Community Development Committee.

**Action V.** Motion by Ald Moisio, second by Ald Taylor to approve waiver for noise to exceed 50 decibels 8/17/2019 and 8/18/2019 from 10:00AM-6:00PM for Festival Emanuel at Iglesia Emanuel. Special Events Permit pending submission of proper paperwork and staff approval. This matter was heard in the Community Development Committee.

**Action W.** Motion by Ald Moisio, second by Ald Taylor to approve waiver for noise to exceed 50 decibels 8/31/2019 and 9/1/2019 from 12:00 PM-11:00PM for Labor Day Party at Puerto Rican Society. Special Events Permit pending submission of proper paperwork and staff approval. This matter was heard in the Community Development Committee.

**Action X.** Motion by Ald Moisio, second by Ald Taylor authorizing the proper City Officials to settle Public Works Workers Compensation Claim C645-17-10353-01 for a total of $37,636.20. This matter was heard in the Government Operations & Oversight Committee.

**Action Y.** Motion by Ald Moisio, second by Ald Taylor authorizing the proper City Officials to settle Police Workers Compensation Claim C645-18-10453-01 for a total of $55,000.00. This matter was heard in the Government Operations & Oversight Committee.

**Action Z.** Motion by Ald Moisio, second by Ald Taylor to approve, as presented, a Resolution Authorizing an Intergovernmental Agreement between the City of Waukegan and the Waukegan Park District for the purpose of Special Events. This matter was heard in the Government Operations & Oversight Committee.

**Action AA.** Motion by Ald Moisio, second by Ald Taylor to approve a proposed third amendment to the cell tower lease with Vogue Towers I, LLC. This matter was heard in the Finance & Purchasing Committee.

**Action BB.** Motion by Ald Moisio, second by Ald Taylor to grant a professional services waiver and high degree of skill waiver to the competitive bidding process pursuant to Sec. 2-458 (i)(4) and Sec. 2-458(i)(5), and approve the award of a contract to Sierra Technology Staffing to augment the Information Technology Department with contract staffing for a period of one-year or less for a not to exceed amount of $108,000. This matter was heard in the Finance & Purchasing Committee.

**Action CC.** Motion by Ald Moisio, second by Ald Taylor to approve the award of a contract to Peter Baker for Roadway improvements for an amount not to exceed $3,475,203 of this project utilizing 2018A GO Bond funds. This matter was heard in the Finance & Purchasing Committee.

**Action DD.** Motion by Ald Moisio, second by Ald Taylor to determine lowest responsible bidder pursuant to Sec. 2-459(a)(1-9) and approve the award of a contract to Superior Paving, Inc. to complete the 2019 Alley Resurfacing Project for an amount not to exceed $1,420,000. This project is utilizing 2018B GO Bonds. This matter was heard in the Finance & Purchasing Committee.

**Action EE.** Motion by Ald Moisio, second by Ald Taylor to approve regular payroll dated July 19, 2019 in the total amount of $1,649,262.66.

**Action FF.** Motion by Ald Moisio, second by Ald Taylor to approve Non-Union Police retro payroll dated July 19, 2019 in the total amount of $7,204.38.

**Action GG.** Motion by Ald Moisio, second by Ald Taylor to approve Non-Union Fire retro payroll dated July 19, 2019 in the total amount of $3,656.75.

**Action HH.** Motion by Ald Moisio, second by Ald Taylor to approve Non-Union Non-Sworn retro payroll dated July 19, 2019 in the total amount of $16,796.04.

**Action II.** Motion by Ald Moisio, second by Ald Taylor to approve Elected Official stipend payroll dated July 19, 2019 in the total amount of $5,941.66.

**Action JJ.** Motion by Ald Moisio, second by Ald Taylor to approve regular payroll dated August 2, 2019 in the total amount of $1,621,810.69.

**Action KK.** Motion by Ald Moisio, second by Ald Taylor to approve Ravinia-retro and Police Holiday Cash Out payroll dated August 2, 2019 in the total amount of $2,710.28.

**Action LL.** Motion by Ald Moisio, second by Ald Taylor to approve vendor payments dated August 5, 2019 in the total amount of $2,261,582.46.

**Action MM.** Motion by Ald Moisio, second by Ald Taylor to approve all raffle sale applications

**AYE:** Ald Turner, Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome.
**NAY:** None.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

***Action NN.** Motion by Ald Taylor, second by Ald Bolton to Approve all Block Party Applications

Ald Florian, Ald Rivera, and Ald Moisio shared their concerns.

**MOTION APPROVED**

---

**4. Resolutions/Proclamations/Presentations/Appointments**

---

**5. Reports and Communication.**

---

**6. Code Revisions, Appeals, & Negotiations**
**Action A**. Motion by Ald Turner, second by Ald Moisio An Ordinance Amending the City of Waukegan Liquor and Video Gaming Codes by Repealing Location Restrictions

Ald Moisio stated that distance is not the way to go, and suggested possibly having a moratorium on any other gaming licenses.

Ald Taylor explained that she is not willing to take the distance requirement away until we have something else in place. She explained how the item was brought to city council, and how it was suddenly put on the agenda. Ald Taylor explained that it is way too early to put it on the agenda, and that there has to be some restriction - she explained that this is talked about this all the time, and that we have an entertainment district, and that once this goes through, every establishment in Waukegan will be asking for gaming licenses. She explained that we have all of these mini casinos, and that we are taking money away from other little places. She explained that the City Council needs to have these discussions and not just flat out make these decision tonight.

Ald Florian shared that she agrees with Ald Taylor, and that we cannot repeal this requirement until we have something in its place.

Ald Moisio and Ald Turner had a discussion regarding where to go from here. Mayor Cunningham explained the reasoning behind this ordinance, and shared some information, regarding the history when restrictions were originally put into place by the City Council. Mayor Cunningham explained what he believes the ultimate goal of the City Council should be, as a legislative body.

**Motion by Ald Moisio, second by Ald Taylor to TABLE item 6 A under the Code Revisions, Appeals, & Negotiations Committee.**

**AYE:** Ald Rivera, Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome.
**NAY:** Ald Turner.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**

---

**7. Old Business**

---

**8. New Business.**

---

**9. Ordinances.**

**Action A.** Motion by Ald Turner, second by Ald Seger to create an Ordinance creating a Class A-2 craft brewery liquor license for 'OohWee Sweet Tea #29' located at 29 N. Genesee Street, Waukegan, IL 60085

**AYE:** Ald Turner, Ald Bolton, Ald Seger, Ald Moisio, *Mayor Cunningham*.*
**NAY:** Ald Rivera, Ald Florian, Ald Taylor, Ald Newsome.
**ABSTAIN:** Ald Kirkwood.
**ABSENT:** None.
**MOTION APPROVED**
***When a tie occurs after the Aldermen vote, the Mayor of Waukegan breaks the tie. Mayor Cunningham voted in favor of this Ordinance. Motion passed, and carried.**

**Action B.** Motion by Ald Bolton, second by Ald Seger to create an Ordinance creating video gaming licenses for 'Win Win Restaurant and Bar' located at 30 N. Genesee Street, Waukegan, IL 60085

**AYE:** Ald Turner, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood.
**NAY:** Ald Rivera, Ald Florian, Ald Taylor, Ald Newsome.
**ABSTAIN:** None.
**ABSENT:** None.
**MOTION APPROVED**
***Mayor Cunningham expressed his support for this ordinance**

---

**10. Closing Items.**
**A. Aldermen's Time**

**Ald Turner:** Condolences to Smoke n' Gun, for being 'taxed out of business' after being in business for over 51 years. He explained that Smoke n' Gun was a local family owned establishment, with dozens of employees, that went out of business due to regulations. He talked about his upcoming Operation Clean Sweep, and explained that he will have another dumpster in his 6th Ward, on August 17 from 7:00 AM - 10:00 AM in front of North School on Franklin St. He encouraged neighbors to keep their neighborhoods clean. He explained the many efforts to keep the 6th Ward, clean. He encouraged neighbors to please contact him if any sidewalks need repairs, along with any trees that need attention in his ward. He thanked the Public Works Department for the fantastic job they have done in the 6th Ward, repairing

potholes.  He encouraged all his neighbors to do block parties, and neighborhood watch committees.  He mentioned that he would like to make a motion for a wavier, regarding the distance requirement for gaming machines at Sunset House Restaurant located at 1451 Golf Road.  He explained that this is a local family owned business that has been in business for over 43 years.  He shared that they are on the verge of closing their business, and that having gaming machines is a lifeline for them.  He stated that without their establishment having gaming, he believes Waukegan will lose another business.  At this time, Ald Turner made a motion to waver the distance requirement for gaming at Sunset House Restaurant.

Mayor Cunningham explained that the motion is not on the agenda, so action cannot be taken on that motion.  Mayor Cunningham stated that Sunset House has been very patient, and he explained that everyone knows they have been an anchor for our community, for a long time.  He stated that his suggestion tonight is that the Alderman can come together to come up with something they can all agree on.  Mayor Cunningham explained that this is critical to some of the long time businesses in Waukegan.  He stated that we need to try to work on this process, and have something ready for the City Council that we can move forward with.  Ald Turner thanked Mayor Cunningham for the suggestion, but wanted to make it clear that we already have state statues that define distance requirements for gaming and alcohol.  He stated that the idea that Waukegan should have additional burdensome regulations on businesses, doesn't make sense.  He believes that this ordinance should be repealed, and wanted to make it clear that he does not support any distance regulations on gaming and alcohol licenses.

**Ald Rivera:**  He thanked the residents who came out tonight to speak tonight, and stated that although its only three minutes of time, it is very valuable.  He encouraged residents to speak.

**Ald Florian:**  She echoed Mayor Cunningham's sentiments on the recent horrific events in Dayton, OH and El Paso, TX.  She talked about a couple awesome city events that took place last week in Waukegan, including touch a truck at the Lake Front.   She touched base on the WCC Alley Clean Up, and sent a shout out their way.  She explained that she is excited to see what CLC has in plan for Downtown Waukegan.  She asked Mayor Cunningham if there would be public hearings for the proposed casino, during the process.  Mayor Cunningham stated that, that was correct.

**Ald Taylor:**  She thanked everyone that came out tonight, and made comments.  She explained that the casino is not a done deal, and it is noted that resident's opinions matters.  She talked about some of the gaming restrictions that have been made by Aldermen, and explained the history of gaming decisions made by City Council, and explained that Aldermen did not think we would have the amount of gaming we have today.  She explained that the City Council needs to come up with a solid plan that does not discriminate against any particular business owners.  She explained that the City Council is not at that compromise yet, and that it is time that the City Council comes together to make a plan.  She encouraged residents to reach out to her with their ideas/concerns at 847-212-4762 - she again, thanked the community for coming out tonight.

**Ald Bolton:**  She thanked her constituents for reaching out to her when things need to be done, such as clean-ups.  She also thanked her constituents for filling out block party, and special event applications.  She gave a shout out to Risk Manager Katie Dibble for her work.  She shared that the block parties in the 1st Ward have been awesome.  She thanked WCC for their work for Operation Clean Sweep.

**Ald Seger:**  He talked about Operation Clean Sweep, and a dumpster that will be in his 2nd Ward on Aug 9.

**Ald Moisio:**  He explained that he will have a Clean Sweep sometime soon.  He echoed some of Ald Taylor's comments.  He explained that the best way to communicate, is to talk to him directly, one on one.  He shared his phone number: 847-997-7376.  He explained that he will meet with any number of people, one on one or a group.  He explained that he has talked to a lot of people about these issues, and explained that Facebook isn't the best way to reach him, and that talking face to face is more effective, and that more input is needed.

**Ald Kirkwood:** He talked about Clean Sweep, and the cleaning of alley ways in his 4th Ward. He encouraged residents to do block parties. He gave his condolences to Fmr. Ald May, as she lost her father recently.

**Ald Newsome:** She talked about some of the water main breaks that took place in her ward, and the precautions taken to correct the matter, and those involved who helped.

---

**11. Adjournment**

Motion by Ald Taylor, second by Ald Bolton to Adjourn at **9:24 PM**

**MOTION APPROVED**

---

**These minutes were transcribed by the Office of the Waukegan City Clerk:**

__________________________________

**JANET E. KILKELLY, CITY CLERK**
**Office of the City Clerk**
**City of Waukegan**
**Waukegan, Illinois**

*ATTEST:*

__________________________________

**DAVID A. PATTERSON, DEPUTY CITY CLERK**
**Office of the City Clerk**
**City of Waukegan**
**Waukegan, Illinois**



## Monday, August 19, 2019
## Regular City Council Meeting

**Time of meeting: 7:00 pm**
**Waukegan City Hall ~ Council Chambers**
**100 N MLK Jr. Ave - Waukegan IL 60085**
**Telephone: (847)599-2513**

### 1. Opening Items

A. Roll Call

B. Invocation by Pastor Todd E. Fletcher from First Baptist Church of Lake Forest / Pledge of Allegiance

C. Mayor's Comments

### 2. Audience Time

A. Audience Time

### 3. Resolutions/Proclamations/Presentations/Appointments

A. Motion to adopt as presented, Resolution 19-R-83, Honoring the Lives and Work of The Donovans

### 4. Consent Agenda (Items under the Consent Agenda are considered routine and/or non-controversial and will be approved by one motion. If any one board member wishes to have a separate vote on any item, it will be pulled from the Consent Agenda and voted on separately)

A. Motion to approve the Regular Meeting Minutes from August 5, 2019

B. Motion to approve the Committee of the Whole Meeting Minutes from August 5, 2019

C. Motion to ratify re-appointment of Sylvia England to Waukegan Public Library Board

D. Motion to approve vendor payments dated August 19, 2019 in the total amount of $1,957,077.08.

E. Motion to approve regular payroll dated August 16, 2019 in the total amount of $1,593,184.80.

F. Motion to approve Elected Official and Civil Service Stipend Payroll dated August 16, 2019 in the total amount of $7,191.66.

G. Motion to approve PBLC Holiday Cashout Payroll dated August 16, 2019 in the total amount of $2,715.05.

H. Motion to approve Local 150 Comp Time Cash Out Payroll dated August 16, 2019 in the total amount of $665.98.

I. Motion to approve applicaiton fee waiver for Labor Day Party at Puerto Rican Society. Special Events Permit pending submission of proper paperwork and staff approval.

J. Motion to approve the award of a contract to P&H Senesac, Inc., the lowest qualified bidder, relative to Water Plant sludge dewatering and disposal in the amount of $132,762 for each of the 2019/2020 and 2020/2021 fiscal years, for a grand total of $265,524. This matter was heard at the Finance & Purchasing Committee.

K. Motion to grant an exception to the competitive bidding process pursuant to Sec. 2-458 (i)(3) Government Joint Purchasing Act, and approve the award of a contract to Burris Equipment in the amount of $120,510.30 for the purchase of a Water Department Backhoe. This project utilizes 2018C Water & Sewer Bond funds. This matter was heard at the Finance & Purchasing Committee.

L. Motion to approve the award of a contract to Campanella & Sons, the lowest qualified bidder, relative to demolition of a structure in order to make stormwater improvements in an amount of $127,365. This project utilizes 2018C Water & Sewer Bond funds. This matter was heard at the Finance & Purchasing Committee.

M. Motion to grant an exception to the competitive bidding process pursuant to Sec. 2-458 (i)(3) Government Joint Purchasing Act, and approve the award of a contract to Sutton Ford in the amount of $148,019.00 for the purchase of a Water Department Truck. This project utilizes 2018C Water & Sewer Bond funds. This matter was heard at the Finance & Purchasing Committee.

N. Motion to grant a good faith waiver to the competitive bidding process pursuant to Sec. 2-458 (i)(7), and approve the award of a contract to Burris Equipment in order to make vehicle and equipment parts purchases as necessary during the 2019-2020 fiscal year for a not to exceed amount of $45,000. This matter was heard at the Finance & Purchasing Committee.

O. Motion to grant a good faith waiver to the competitive bidding process pursuant to Sec. 2-458 (i)(7), and approve the award of a contract to Thelen Materials in order to make sand and materials purchases as necessary during the 2019-2020 fiscal year for a not to exceed amount of $45,000. This matter was heard at the Finance & Purchasing Committee.

P. Motion to approve the award of a contract to Kluber Architects & Engineers following a Request-for-Proposal (RFP) process, relative to City Hall, Public Works and Police Station facility improvement project oversight in an amount not to exceed $160,000. This project utilizes 2018B GO Bond funds. This matter was heard at the Finance & Purchasing Committee.

Q. Motion to authorize the proper City Officials to execute grant agreement with the Department of Justice, and further to enter into a related Memorandum of Understanding (MOU) between the City of Waukegan, County of Lake, and City of Zion relative to the 2019 Byrne Justice Assistance Grant (JAG) Program. This matter was heard at the Finance & Purchasing Committee.

R. Motion to authorize the proper City Officials to execute grant agreement with the Illinois Department of Transportation for the 2020 STEP grant for highway safety purposes. This matter was heard at the Finance & Purchasing Committee.

S. Motion to retain Johnson Consulting to provide developer submission review and advisory services for the 2019/2020 fiscal year for a total retainer of $45,000 plus reasonable out-of-pocket expenses. This matter was heard at the Finance & Purchasing Committee.

T. An Ordinance Amending the Vacant Structure Registry

U. Motion to Approve a Contract with Prochamps for Vacant Structure Registry monitoring

V. Resolution Ratifying the Collective Bargaining Agreement with the International Association of Firefighters, Local 473

W. Motion to approve all raffle sale applications

X. Motion to approve all Block Party Applications

**5. Reports and Communication**

A. Monthly Treasurer's Report

**6. Old Business**

A. A Resolution Authorizing the Disposal of Property Located at 415 W McKinley Avenue (REQUIRES 7 VOTES). This matter was heard in the Community Development Committee.

**7. New Business**

**8. Ordinances**

**9. Closing Items**

A. Alderman Time

**10. Adjournment**

**11. Committee Times**

A. 5:00 PM Public Works & Infrastructure Committee

B. 5:05 PM Finance & Purchasing Committee

C. 5:10 PM Code Revisions, Appeals, & Negotiations Committee

City of Progress

**REGULAR MEETING MINUTES - SEPTEMBER 3, 2019**
***OFFICE OF THE WAUKEGAN CITY CLERK***
***JANET E. KILKELLY***

---

**The Council of the City of Waukegan met in regular session on Tuesday, September 3, 2019 at 7:00 PM**
**City Council Chambers, City Hall. 100 N. Martin Luther King Jr. Ave, Waukegan.**
**Mayor; Samuel D. Cunningham Jr, City Clerk; Janet E. Kilkelly, Treasurer; Dr. John R. Schwab, and Corporation Counsel; Robert J. Long, were present.**

---

**1. Opening Items**
**Procedural: A.** Roll Call
**PRESENT:** Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera
**ABSENT:** None.

**Information: B.** Invocation by Pastor Anthony Morgan of Christian Valley Missionary Baptist Church, located at 2690 Argonne Dr., North Chicago, IL 60064 / Pledge of Allegiance

**Mayor's Comments: C.**

*At this time, Mayor Cunningham shared his comments. Lake County Commissioner Diane Hewitt spoke about the new Dog Park in Waukegan, which will open on Friday, September 13, 2019. A student was recognized for her work, teaching cursive writing, every Sunday- the Mayor thanked her for a job well done. Wrapping up Mayor's Comments, State Rep Rita Mayfield, spoke about the issue of ETO, and the IL EPA, and explained.*

---

**2. Resolutions/Proclamations/Presentations/Appointments**
**Motion by Ald Moisio, second by Ald Rivera to move item 5A. to section 2. Resolutions/Proclamations/Presentations/Appointments.**
**MOTION APPROVED**

**5. Community Development Committee (Please note, some items may be located in the consent agenda)**
**Action: A.** Motion Ald Florian, second by Ald Taylor to deny Zoning Calendar #2589, a Conditional Use Permit for Variance on Stack Height for 1160 Northpoint Boulevard, pursuant to Section 10.2-7 of the Zoning Ordinance. This matter was heard in the Community Development Committee.

**AYE:** Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera.
**NAY:** None.
**ABSENT:** None.
**ABSTAIN:** None.
**MOTION APPROVED**

---

**3. Audience Time**

Margaret Carraso: She invited the community to attend the 2019 Fiesta Patrias parade in Waukegan, on Sunday, September 15. She explained it is a huge production, and huge estravaganza as Alderman Moisio, explained. She encouraged everyone to attend. Ximena Mendoza, introduced all the Waukegan Queens present during the meeting.

Gloria Charland: She introduced herself, and shared that she is from the Sierra Club. She submitted her official comment to the City Clerk's Office.

Tea Tanaka: She introduced herself as a core member of Stop ETO Lake County. She explained that she had a speech prepared. She explained that we should not trust the IL EPA's statement, and shared her thanks for tonight's vote against the Medline stack.

Diane Suryfka: She thanked the Aldermen for their support - and for their vote against the Medline stack.

Donna Handy: She discussed an issue with her daughter being jumped by a group of students from District 60. She explained the issue, and that she has tried to reach out to the Chief of Police. Mayor Cunningham stated he would get Ms. Handy in contact with Chief Walles.

Barb Hernadez: She thanked the city council for being leaders tonight, and for their vote.

Rob Collimore: He shared his opinion on the agenda item regarding 415 McKinley. He expressed his concern on gaming in the community, and the expected number of bids Mayor Cunningham believed he would have for the casino. He wrapped up his comments and made another comment on 415 McKinley.

Pablo Calix: Introduced himself as the President of the CLC environmental club. He thanked the City Council for denying the Medline stack.

Diane Burdett: She shared her support for tonight's vote against the Medline stack increase, and shared words of encouragement to those fighting for this movement.

Dylan Burdett: He shared his support for tonight's vote against the Medline stack increase, he shared his words of encouragement, and explained that tonight's vote against the stack increase was a good thing.

Lara Simmons: She thanked the city council for their consideration. She explained that Medline is willing to wait, and revisit the concern. She thanked the city council for their time.

Celeste Flores: Thanked the city council for their time. Talked a bit about the IL EPA and when they will be coming to Waukegan. Explained location and dates. Explained that voicing concerns and needs for the community is important, and shared more information on upcoming dates.

Brother Blanks: He thanked the city council for the denial of the variance. He shared his feelings on the family that spoke earlier today about their child suffering from cancer, and explained that these are serious issues. He spoke, regarding Avion Cotton.

Yolanta Pomiotlo: She shared that she is a part of the 'Stop ETO Lake County' movement, and thanked the city council for siding with the community. She explained that Waukegan has showed leadership with independent air testing, and that waukegan is showing leadership. She explained that Stop ETO Lake County is watching, and supporting the city council's decision.

Diane Verratti: She shared information on the cemetery walk, on September 14, she shared where tickets can be purchased. She shared information on upcoming events, and explained her role.

Mary Williams: She shared her opinion on the proposed casino.

Nelson Patterson: He shared his opinion on the proposed casino.

Carol Alleman: She expressed that this is her first time speaking at a meeting. She shared her concern regarding gaming in the City of Waukegan.

---

**4. Consent Agenda (Items under the Consent Agenda are considered routine and/or non-controversial and will be approved by one motion. If any one board member wishes to have a**

**separate vote on any item, it will be pulled from the Consent Agenda and voted on separately)**

**Motion by Ald Kirkwood, second by Ald Turner to approve items 4.A - 4.Q under the consent agenda.**
**MOTION APPROVED**

**Action (Consent), Minutes: A.** Motion to approve the Regular Meeting Minutes from Monday, August 19, 2019

**Action (Consent): B.** Resolution 19-R-86 "Run With the Bulldogs 5K - Sunday, September 22, 2019"

**Action (Consent): C.** Proclamation: 'Phi Beta Sigma Fraternity Nu Lambda Sigma Chapter Day - September 14, 2019'

**Action (Consent): D.** Motion to Approve an Intergovernmental Agreement with Lake County Storm Water Management Commission and the Waukegan Park District for the purchase and demolition of 219 Carnation Ct. and 549 Bluff St.

**Action (Consent): E.** Motion authorizing the proper City Officials to settle Fire Department Workers Compensation Claim C645-19-10700-01 for a total of $16,277.40. This matter was heard in the Government Operations & Oversight Committee.

**Action (Consent): F.** Motion authorizing the proper City Officials to settle Building Department Public Officials Liability Claim 190722W033 for a total of $50,000.00. This matter was heard in the Government Operations & Oversight Committee.

**Action (Consent): G.** Motion to approve, as presented, an Ordinance Extending a Moratorium on Single Room Occupancy Units through October 22, 2019. This matter was heard in the Community Development Committee.

**Action (Consent): H.** Motion to approve use of City property and waiver for noise to exceed 50 decibels 9/14/2019 from 12:00PM-11:30PM and 9/15/2019 from 12:00PM-9:00PM for Fiestas Patrias at Lot F with temporary road closure on 9/15/2019 for a parade from 10:00AM- 3:00PM from Butrick heading East on Washington and ending at Genesee St. Special Events Permit pending submission of proper paperwork and staff approval. This matter was heard in the Community Development Committee.

**Action (Consent): I.** Motion to approve use of City property and waiver for noise to exceed 50 decibels 9/25/2019 from 6:00PM-8:00PM for Waukegan High School Homecoming Bonfire at Waukegan Municipal Beach. Special Events Permit pending submission of proper paperwork and staff approval. This matter was heard in the Community Development Committee.

**Action (Consent): J.** Motion to approve use of City property 9/28/2019 from 9:30AM-1:00PM for Waukegan High School Homecoming Parade at Waukegan High School Homecoming Parade starting at Brookside Campus heading West on Monroe Street to Lewis heading South to turn and heading East on Washington to McAcree and ending at Brookside Campus on Monroe Street. Special Events Permit pending submission of proper paperwork and staff approval. This matter was heard in the Community Development Committee.

**Action (Consent): K.** Motion to approve Waukegan Firefighters request to hold a fundraiser (Fill the Boot) for the Muscular Dystrophy Association on September 12, 2019 at Grand/Green Bay and Washington/Green Bay from 9am to 3pm collecting donations at the stop lights

**Action (Consent): L.** Motion to approve the Door to Door Cookie Ordering Solicitation, from January 1 to January 19, 2020 by the Girl Scouts of Greater Chicago and Northwest Indiana

**Action (Consent): M.** Motion to approve Halloween Trick or Treat Hours for Sunday October 27, 2019 from 2pm-5pm.

**Action (Consent): N.** Motion to approve all Block Party Applications

**Action (Consent): O.** Motion to approve Regular Payroll dated August 30, 2019 in the total amount of $1,617,362.96.

**Action (Consent): P.** Motion to approve PBLC Holiday Cashout dated August 30. 2019 in the total amount of $3,248.70.

**Action (Consent): Q.** Motion to approve vendor payments dated September 2, 2019 in the total amount of $1,727,653.27.

***Consent Vote:***
**AYE:** Ald Florian, Ald Taylor, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera.
**NAY:** None.
**ABSENT:** None.
**ABSTAIN:** None.
**MOTION APPROVED**

---

## 6. Reports and Communication

---

## 7. Old Business

**Action: A.** Motion to Reconsider a Resolution Authorizing the Disposal of Property Located at 415 W McKinley Avenue (Must be made by Alderman who voted No on 8/16/19).

Ald Florian explained why she would like to reconsider this resolution, and shared that she spoke to Ald Bolton and Mayor Cunningham. Ald Florian explained further.

**MOTION APPROVED**

**Action: B.** A Resolution Authorizing the Disposal of Property Located at 415 W McKinley Avenue (REQUIRES 7 VOTES). This matter was heard in the Community Development Committee.

**AYE:** Ald Florian, Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome, Ald Turner.
**NAY:** Ald Taylor, Ald Rivera.
**ABSENT:** None.
**ABSTAIN:** None.
**MOTION APPROVED**

---

## 8. New Business

---

## 9. Ordinances

**10. Closing Items**
Aldermen Time

**Ald Florian:** She shared that she is excited for the dog park opening in her ward, and the upcoming air show. She thanked the city council for their vote denying the stack increase. She stated that she is not saying its never happening, but is won't be happening now.

**Ald Taylor:** She thanked those for coming out regarding the stack increase agenda item. She stated that she was at the Planning & Zoning meeting, where this matter was discussed. She explained that the IL EPA did not convince her. She explained what needs to be accomplished. She explained her votes tonight, specifically her vote on 415 McKinley. She explained that she has never supported the amount that we have paid for this property. She shared that there are two upcoming black parties in her 9th Ward.

**Ald Bolton:** She talked about an upcoming clean up in her ward. She talked about an event happening in her ward, at 642 MLK Ave. She shared that a Block Party will be happening in her 1st Ward on September 7, and that the application will be listed on the next agenda.

**Ald Seger:** He thanked everyone for speaking tonight, regarding the stack height. He thanked his fellow aldermen for their work, and for getting things done. He thanked state Rep. Rita Mayfield for speaking tonight.

**Ald Moisio:** He mentioned that a decision still has to be made on gaming regulations, as far as slot machines go. He explained that he will consider making a motion for a moratorium. He expressed his concern with the Special Event and Block Party process.

**Ald Kirkwood:** He congragulated the Purto Rican Society for their re-grand opening. He discussed Operation Clean Sweep in his 4th Ward, and talked about Block Parties in his 4th Ward.

**Ald Newsome:** She mentioned that the City is having a bunch of clean sweeps, and shared when her clean sweep would be happening, and explained that certain items will be going to public works, after the clean up. She encouraged residents to call her with any questions or concerns.

**Ald Turner:** He thanked public works for their work and continued efforts for maintaining the 6th Ward neighborhood areas. He explained that he assisted Public Works in cleaning gutters and drains, and saw a lot of flooding in the 6th Ward area - he explained that he called Public Works, and that they came immediately to help. He explained that Public Works assisted with patching road ways in his ward. He gave kudos to Public Works for all they have been doing. He also mentioned that PW has repainted all the crosswalks in the 6th Ward. He explained that the Code and Building Department has been assisting, as his Ward has seen constant illegal dumping. He explained that neighborhood cleanliness is important to him. He encouraged residents to call the police, himself, and public works if you see illegal dumping - He encouraged residents to call him directly at 847-445-3788.

**Ald Rivera:** He thanked all the citizens that came and spoke today, and explained that the information was valuable, and that this is how we get things done. He shared information on the tornado that touched down tonight outside the 7th and 8th Ward - near Yorkhouse and Lewis Ave.

**11. Adjournment**

Motion by Ald Moisio, second by Ald Taylor to Adjourn at **9:15 PM**

**These minutes were transcribed by the Office of the Waukegan City Clerk:**

**JANET E. KILKELLY, CITY CLERK**
**Office of the City Clerk**
**City of Waukegan**
**Waukegan, Illinois**

*ATTEST:*

______________________________
**DAVID A. PATTERSON, DEPUTY CITY CLERK**
**Office of the City Clerk**
**City of Waukegan**
**Waukegan, Illinois**

**REGULAR MEETING MINUTES - SEPTEMBER 16, 2019**
***OFFICE OF THE WAUKEGAN CITY CLERK***
***JANET E. KILKELLY***

---

**The Council of the City of Waukegan met in regular session on Monday, September 16, 2019 at 7:00 PM**
**City Council Chambers, City Hall. 100 N. Martin Luther King Jr. Ave, Waukegan.**
**Mayor; Samuel D. Cunningham Jr, City Clerk; Janet E. Kilkelly, and Corporation Counsel; Robert J. Long, were present.**
**Dr. John R. Schwab was absent.**

---

**1. Opening Items**
**Procedural: A.** Roll Call
**PRESENT:** Ald Bolton, Ald Seger, Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor.
**ABSENT:** Ald Moisio.

**Information: B.** Invocation / Pledge of Allegiance

**Information: C.** Mayor's Comments - *At this time, Mayor Cunningham shared his comments with residents.*

---

**2. Resolutions/Proclamations/Presentations/Appointments**

---

**3. Audience Time**
Dylan Burdett: He explained that as the local 'Ethylene Oxide Expert' he has been asked to weigh in on the new House Bill. He stated that unfortunately, this bill was written without any input from the environmental justice committee, or organizations. He explained the details to the bills, and the amendments needed to this bill.

Kathy Charity: She introduced herself as a 1st Ward Resident, and explained her concerns with people driving illegally in Waukegan. She explained the issues she has had with uninsured drivers, including collisions. He explained that she brought her concerns up to 1st Ward Alderman Bolton, and explained that the 1st Ward needed a massive makeover and that many of the 1st Ward Residents will be forced to move out.

Diana Burdett: She explained that she would like to take advantage of this time, while the room is filled, to let those know a little more about 'Ethylene Oxide' - she explained the efforts that have been made providing information to the community - and explained some upcoming events, on multiple days, for the community, regarding these issues, available in both Spanish and English. She encouraged residents to reach out to Clean Power Lake County, if they have any questions or concerns, or to talk to her directly, after the meeting.

Colin Byers: He shared that he was born and raised here in Waukegan, and explained his studies in climate change. He explained elections in the Philippines, and how seats are often bought. He explained that he was disappointed to find out that special interest money played a role in our local election, and 'paid' for some seats on the dias. He explained that casinos are known to be harmful to the community, and environment. He explained that the community is telling their Aldermen that they do not want the casino in town, and that they should be listening to their people. He explained the problems the casino would cause.

Charles Rush: He explained that at previous meetings, it was decided that Aldermen would not be able to question the developers on their proposals, regarding the casino, and that Audience would only be

able to speak.  He hopes that there many be a change, and that Aldermen would be allowed to speak.

Patrick Cosgrove:  He introduced himself as a Resident living at 10 N. Sheridan Rd #903 - He explained that he has been teaching at Waukegan High School for the past 27 years.  He explained that during his first couple years, he rented at Waukegan Fox Crest Apartments, and moved back to Waukegan in 2008, when he had the opportunity to purchase a condo at the old 'Hotel Waukegan'.  He explained that currently, Harbor View Waukegan, owns 56 of the 58 units in that building.  He explains that they are now threatening to force him to sell at 130,000 dollars below what he purchased for.  He explained that he doesn't want to sell his home for any price, and that he owns it free, and clear.  He explained that for the past 11 years, living in Downtown Waukegan, have been the happiest years of his life.  He explained, and mentioned his involvement in Waukegan.  He asked Waukegan to help him keep his home.

George Butenath:  He explained that it is his first time speaking at a Waukegan City Council Meeting, and that he has been a resident for 30 years.  He shared his concerns, including those of the proposed casino.

Jack Dye:  He shared his concerns with the money put in to the last Aldermanic Election, and explained that 4 of the Aldermanic candidates received lots of money from the same person that applied for the casino.  He talked about the proposed casino, and the important information redacted from the public, on those proposals.  He explained that all nine have to make a decision, and that the city council chambers have been packed for months, and that they should do what is right by the citizens of Waukegan.

Margaret Carrasco:  She encouraged Waukegan Tax Payers to 'wake up' and explained that the casino is not a done deal, and that a super majority vote to sell the land is needed.  She explained that Waukegan tax payers will unite to prevent the Mayor's 'good friend' Bond, from getting the casino deal.  She explained that she has been speaking with a lot of people in the 1st Ward, that really know what is going on in the City of Waukegan, a group of African American men in the 1st Ward.  She explained that they know things that our City Council members don't know.  She proposed that she will not speak at a City Council Meeting until the end the year, if the Mayor of Waukegan agrees to take a drug test, and pass it.

---

**4. Consent Agenda (Items under the Consent Agenda are considered routine and/or non-controversial and will be approved by one motion. If any one board member wishes to have a separate vote on any item, it will be pulled from the Consent Agenda and voted on separately)**

Motion by Ald Kirkwood, second by Ald Taylor to approve the Consent Agenda items, excluding items **4. D, H, I, M, L, R, and an amendment to P.**

**Action (Consent): A.** Motion to approve regular payroll dated September 13, 2019 in the total amount of $1,644,767.51.

**Action (Consent): B.** Motion to approve Elected Official and Civil Service Stipend Payroll dated September 13, 2019 in the total amount of $6,566.66.

**Action (Consent): C.** Motion to approve vendor payments dated September 16, 2019 in the total amount of $1,853,335.42.

**Action: D.** Motion by Ald Bolton, second by Ald Seger to ratify reappointment Lawrence E. McShane to Waukegan Public Library Board

Lawrence E. McShane shared a few words, and thanked the City Council and Mayor for his reappointment.

Ald Turner shared a few words, and thanked the Library Board Members for their service.

**AYE:** Ald Taylor, Ald Bolton, Ald Seger, Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian.
**NAY:** None.
**ABSENT:** Ald Moisio.
**ABSTAIN:** None.
**MOTION APPROVED**

**Action (Consent): E.** Proclamation - 'Diaper Need Awareness Week - September 23-29, 2019'

**Action (Consent): F.** Motion to approve The Little Fort Lions Club request to hold its "Candy Days" on October 11th and 12th, 2019, in accordance with the Lions of Illinois statewide fundraising.

**Action (Consent): G.** An Ordinance Increasing the Age of Sale and Purchase of Tobacco Products from Eighteen (18) Years of Age to Twenty-One (21) Years of Age to Comply with State Law

**Action: H.** Motion by Ald Bolton, second by Ald Seger to approve A Resolution Authorizing the Purchase of 403 Besley Place pursuant to a Settlement Agreement

Ald Florian shared her concerns regarding the property. Ald Rivera asked for clarification if this went through committee. Ald Taylor shared her thoughts.

**AYE:** Ald Taylor, Ald Bolton, Ald Seger, Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian.
**NAY:** None.
**ABSENT:** Ald Moisio.
**ABSTAIN:** None.
**MOTION APPROVED**

**Action: I.** Motion by Ald Newsome, second by Ald Turner to approve A Resolution Authorizing the Conveyance of the Carnegie Library to the Waukegan Park District (REQUIRES 7 VOTES)

Ald Newsome shared her questions and concerns regarding fees, and condition of the building. Mayor Cunningham, and Robert J. Long, City Counsel, explained the negotiation process with the Waukegan Park District.

**MOTION APPROVED**

**Action (Consent): J.** A Resolution Authorizing a Recapture Agreement between the City of Waukegan and Nicolas Nicketakis.

**Action (Consent): K.** Motion to approve an Intergovernmental Agreement between the City of Waukegan and the Village of Wadsworth for snow plowing.

**Action: L.** Motion by Ald Florian, second by Ald Rivera to approve use of City property, fee waiver, and waiver for noise to exceed 50 decibels 10/5/2019 from 4:00PM-5:45PM for Most Blessed Trinity's Walk for Life. Special Events Permit pending submission of proper paperwork and staff approval.

Ald Turner shared his concerns with fee wavers for Special Event Permits. Mayor Cunningham stated the process is being looked at, regarding not for profit. Ald Turner clarified.

**MOTION APPROVED**

**Action: M.** Motion by Ald Turner, second by Ald Rivera to approve use of City property, fee waiver, and waiver for noise to exceed 50 decibels 10/20/2019 from 11:00AM-4:00PM for Crop Hunger Walk. Special Events Permit pending submission of proper paperwork and staff approval.

**MOTION APPROVED**

**Action (Consent): N.** Motion to approve the award of a contract to D'Land Construction LLC the lowest qualified bidder, in order to make sidewalk improvements in an amount of $869,628. This project

utilizes 2018B General Obligation Bond funds. This matter was heard at the Finance & Purchasing Committee.

**Action (Consent): O.** Motion to approve the award of a contract to Kelso-Burnett Co. the lowest qualified bidder, in order to make street lighting improvements at Norman Drive and Northpoint Blvd., in an amount of $258,580. This project utilizes 2018B General Obligation Bond funds. This matter was heard at the Finance & Purchasing Committee.

**Action: P.** Motion by Ald Newsome, second by Ald Taylor to grant, as amended, an exception to the competitive bidding process pursuant to Sec. 2-458 (i)(8) Utilities, and approve the award of a contract to Comcast Enterprise Services in the amount of ~~$412,800~~ **$320,125** for the period of November 1, 2019 to November 1, 2024 to provide dedicated fiber optics connections from City Hall to the **Water Plant** ~~and Fire Stations~~. This matter was heard at the Finance & Purchasing Committee. - Ald Newsome explained the amendment

> **AYE:**  Ald Taylor,  Ald Bolton,  Ald Seger,  Ald Kirkwood,  Ald Newsome,  Ald Turner,  Ald Rivera, Ald Florian.
> **NAY:**  None.
> **ABSENT:**  Ald Moisio.
> **ABSTAIN:**  None.
> **MOTION APPROVED**

**Action (Consent): Q.** Motion to grant an extension to the contract awarded to StrategicIT Staffing LLC on November 19, 2018 for a total amount of $108,000 and a revised end date of April 30, 2020 in order to provide IT staff augmentation services. This matter was heard at the Finance & Purchasing Committee.

**Action: R.** Motion Newsome, Kirkwood to grant an exception to the competitive bidding process pursuant to Sec. 2-458 (i)(3) Government Joint Purchasing Act, and approve the award of a contract to Currie Motors Chevrolet in the amount of $295,000 for the purchase of eight (8) 2019 Fored Chevrolet Tahoe SUVs, and a contract to Havey Communications to equip the acquired SUVs with certain police equipment in an amount not to exceed $95,000. This matter was heard at the Finance & Purchasing Committee.

Ald Turner shared his thoughts on this motion.

> **AYE:**  Ald Taylor,  Ald Bolton,  Ald Seger,  Ald Kirkwood,  Ald Newsome,  Ald Turner,  Ald Rivera, Ald Florian.
> **NAY:**  None.
> **ABSENT:**  Ald Moisio.
> **ABSTAIN:**  None.
> **MOTION APPROVED**

**Action (Consent): S.** Motion to approve the attached Resolution for Maintenance prepared by the City Engineer and file with the Illinois Department of Transportation as required by the Illinois Highway Code for the period of January 1 to December 31, 2019. This matter was heard at the Finance & Purchasing Committee.

**Action (Consent): T.** Motion to approve all raffle sale applications

**Action (Consent): U.** Motion to approve all block party applications

**Consent Items Vote:**

> **AYE:**  Ald Taylor,  Ald Bolton,  Ald Seger,  Ald Kirkwood,  Ald Newsome,  Ald Turner,  Ald Rivera, Ald Florian.
> **NAY:**  None.
> **ABSENT:**  Ald Moisio.
> **ABSTAIN:**  None.
> **MOTION APPROVED**

**5. Reports and Communication**
**Reports: A. Treasurer's Report**

**6. Old Business**

**7. New Business**

**8. Ordinances**

**9. Closing Items**
**A. Aldermen's Time**
**Ald Taylor:** She expressed her appreciation, and stated that the City of Waukegan now matches the state law, regarding tobacco sales to adults 21 years of age. She thanked everyone that came out to speak tonight, and explained that they might not always agree on everything, but she wanted to thank them for stating their opinion. She explained that it is nice when young people come out and share their concerns for the community, especially for the community's environment. She explained that lots of garbage has been blowing around in her 9th Ward, and that she would like her residents to do their part, and clean up trash if they see it.

**Ald Bolton:** She shared her condolences to the Bonds family. She talked about upcoming clean up in her 1st Ward - and mentioned that the hearing on the casino, will take place weds. She explained that every ward has their own Code Officer assigned to them. She stated that she would give that information to anyone that requests it. She mentioned the work being done for the Carnegie Library,

**Ald Seger:** He shared his congratulations, to Lawrence E. McShane, for his reappointment to the Library Board. He thanked everyone for coming out to speak tonight.

**Ald Kirkwood:** He discussed Operation Clean Sweep in his 4th Ward - he explained where dumpster will be located, and the time of his clean up. He shared his condolences to the Bonds family, and talked about the Mexican Independence Day Parade, in his Ward.

**Ald Newsome:** Pass

**Ald Turner:** He discussed the many improvements in the 6th Ward, including improvements to sidewalks, and curbs. He shared that he has been receiving calls from residents, regarding trees that need attention in his 6th Ward. He announced an upcoming program, regarding a tax assessment program, with State Rep Mayfield. He mentioned that State Rep Mayfield was present during tonight's meeting. He shared his condolences to the Walton family.

**Ald Rivera:** He mentioned that his 7th Ward Meeting will take place tomorrow, in the City Council Chambers. He talked about the Fiestas Patrias Parade in Downtown Waukegan, and explained that it showcased the diversity of Waukegan. He thanked everyone who participated tonight, from the Audience, and made their voices heard.

**Ald Florian:** She thanked everyone for speaking up, and explained that it is important. She explained that she is disappointed with the process the City Council is going through, and she explained that she would of liked to see this put on a ballot. She asked people to stay engaged and to make their voices heard. She talked about the upcoming Casino Hearing on Weds, and encouraged residents to attend. She ended her comments with her favorite quote.

Mayor Cunningham explained that City Hall has been receiving 100's of calls regarding the Casino Hearing. He explained that the location is subject to change. He touched base on the water rebate,

and explained that the deadline is September 30th for Seniors to apply.

---

**10. Adjournment**

Motion by Ald Taylor, second by Ald Kirkwood to adjourn at **8:21 PM.**

---

**These minutes were transcribed by the Office of the Waukegan City Clerk:**

______________________________

**JANET E. KILKELLY, CITY CLERK**
**Office of the City Clerk**
**City of Waukegan**
**Waukegan, Illinois**

*ATTEST:*

______________________________

**DAVID A. PATTERSON, DEPUTY CITY CLERK**
**Office of the City Clerk**
**City of Waukegan**
**Waukegan, Illinois**

**REGULAR MEETING MINUTES - OCTOBER 7, 2019**
***OFFICE OF THE WAUKEGAN CITY CLERK***
***JANET E. KILKELLY***

---

**The Council of the City of Waukegan met in regular session on Monday, October 7, 2019 at 7:00 PM**
**City Council Chambers, City Hall. 100 N. Martin Luther King Jr. Ave, Waukegan.**
**Mayor; Samuel D. Cunningham Jr, City Clerk; Janet E. Kilkelly, and Corporation Counsel; Robert J. Long, were present.**
**Dr. John R. Schwab was absent.**

---

**1. Opening Items**
**Procedural: A.** Roll Call
**PRESENT:** Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor.
**ABSENT:** None.

**Information: B.** Invocation by Fr. Justo Espinoza Perez and Fr. Hector Carrasquillo from Sagrado Corazon Lutheran Parish / Pledge of Allegiance

**Information: C.** Mayor's Comments - *At this time, Mayor Cunningham shared his comments with residents.*

At this time, Chip Pew, the State of Illinois Lifesaver Coordinator and Gordon Bowe, Illinois Operation Lifesaver President, spoke about Waukegan Officer Harris, and life saving efforts. An award was presented by Mayor Cunningham.

---

**2. Resolutions/Proclamations/Presentations/Appointments**

**Action: A.** Motion by Ald Newsome, second by Ald Kirkwood to ratify reappointment of Lawrence J. Stanley to Waukegan Firefighters' Pension Board

**MOTION APPROVED**

**Action: B**. Motion by Ald Taylor, second by Ald Bolton to approve a Proclamation: 'October 6 - 12 is Waukegan Fire Prevention Week'

**MOTION APPROVED**

---

**3. Audience Time**
Matthew Debroski: He explained that he is in attendance tonight for Park City Mayor, Steve Pannell. He explained that Mayor Pannell expressed his support for a casino in Waukegan.

Tom Labrian: He explained that the Waukegan Chamber of Commerce is in favor of a casino in Waukegan. He explained the benefits a casino may bring to Waukegan.

Ruben Soto: He introduced himself as an owner of several businesses. He explained that he has seen the City go through different changes. He explained that it is time the City did something to make a change. He spoke on property values, and explained that businesses owners he has spoken to, have been in favor of a casino in Waukegan. He explained that we need to attract people, and have them come to the City of Waukegan. He explained that the City Council should pick a casino proposal that will best attract people, and explained that the plan should consider entertainment. He shared his support for North Point Casino.

Harry Stackhouse:  He introduced himself as a Life-Long Resident of Waukegan, an entrepreneur and a pastor for 30 years.  He explained that he is here with mixed emotions.  He explained that he has had many good years in Waukegan making money, as an entrepreneur, and has had many years as a pastor helping those who had a problem with gambling.  He shared his opinion on the matter, simply stating that he is here to do what is best for Waukegan.  He explained that he, and others that are with him, want to do what is best for Waukegan.  He explained that the future is not gaming, and the future is what we do together. He explained that for those that are here in support of gambling, he believes there is a better way, and he believes everyone can come together as a community and talk about what that looks like.  He believes that this has not been addressed yet.  He believes the gambling is not going to work, and that there are other things we need to be looking at.

Daniel Hartman:  He came before the City Council to explain that he has not spoken up, and that the silence has been costly.  He explained that he has neglected his pastoral and prophetic duties.  He explained that he opposes a casino in Waukegan, for multiple reasons.

Raul Ochoa:  He explained that he was raised in Waukegan, and currently lives in Grayslake, IL.  He shared his experiences with the democratic process, in Waukegan, and explained how the community needs to be heard.

Dean Langehan:  He explained his life in Waukegan, and explained that a casino is not in the best interest of the community.

Selina Gomez Beloz:  Executive Director of the Waukegan Public Library - She shared an update from the Waukegan Public Library.

Dylan Burdette:  He talked about ETO issues, and talked about the Town Hall Meeting in Grayslake IL, regarding ETO, and mentioned the upcoming event at Whittier Elementary School.

Diana Burdette:  She talked about ETO issues, and explained the risks of being exposed.  She invited everyone to an upcoming event at Whittier Elementary School, regarding ETO.  She expressed that the casino would be a downfall for the City of Waukegan, and that the casino is dead, and that it would fall on our shoulders.

Ray Vockavich:  He expressed his support for Potawatami Casino in Waukegan Illinois, and gave some background information.

Pastor Gass:  Came in support of North Point Casino proposal for a Casino in Waukegan.

Dr. Winfred Obleton:   He explained that he is against a casino in Waukegan.

Shawn T. White:  He stood in support of economic development in Waukegan.

Colin Byers:  Expressed his opinion regarding the proposed casino in Waukegan.

David Cargesty:  He introduced himself as the owner of Piggly Wiggly in Zion and Antioch.  He explained his opinion on local development, and explained that it is in the best interest for this area.  He asked the City Council to pick a group that has the best plan.

Nelson Patterson:  He explained the downfall of a casino in Waukegan, and expressed how he is against a casino in Waukegan.

Danny Caldwell:  Shared his support for North Point Casino, in Waukegan.

Margaret Carrasco:  She shared that she would like to start off tonight tonight with a moment of silence, for a man that lost his life tragically.  She explained that human life is much more important that a casino or anything else.  She explained that her email to casino@waukeganil.gov was rejected - she stated she was here tonight to make sure her comments were heard.  She called for a disqualification of a bidder.

Mary Williams: She introduced herself as a resident of the Pleasant Hill Subdivision in the 9th Ward. She stood before the City Council, not in favor of casino.

Josh VanDyke:  He spoke about the upcoming IL EPA meeting at Whittier Elementary School.

Susan Kidwell:  She talked about the upcoming fundraiser 'Pasta and Pop's' at Waukegan High School. She explained that tickets are $20.00 each, and that she will be selling them on the way out.

Rob Proce:  He shared an exhibit with the City Council, and explained some highlighted details.  This exhibit supported his argument against a casino in Waukegan.

Julie Contreras:  She came tonight to call for immediate action to stop second hand smoke from coming into her building on 117 N. Genesee Street.  She explained that the second hand smoke is allegedly coming from 'A Cuban Experience' - She continued to explain.  She closed her comments stating that she was not in favor of a casino.

Mark Allard:  He shared that he lived on the Southside of Waukegan, and has lived in Waukegan for 17 years.  He explained that he is from WI, and preferred WI over IL, because many things are not going well in IL.  He explained that putting a casino in Waukegan would not be beneficial, and explained his opinion.

Clyde McLemore:  Founder of LCCBLM and an activist for over 25 years. He said Waukegan, Zion and North Chicago all look like ghost towns, talked about Vegas being a desert once. He mentioned that he helps people find jobs and said the casino will generate jobs for people therefore, he supports the casino. Lastly, he invited everyone Nov 3rd  to the Black Lives Matter Annual Fundraiser.

Lisa May:  She addressed Mayor Cunningham and said he went to Springfield to pass a massive gambling bill without soliciting feedback. She said  the residents of Waukegan own the land and per city ordinance, every sale of city land requires approval and current council have not yet discussed the sale of Fountain Square. She addressed the Mayor and asked Aldermen if they are going to make this decision on behalf of their resident without soliciting their opinions? She also mentioned that 7 Aldermen will have to vote yes for the sale. She said the casino is not a done deal, the land has never been marketed for other development activities and talked about Bridge Point North. Lastly, asked the elected officials and Mayor to solicit input from the residents to encourage new ideas.

Ellen Montgomery:  She mentioned she recently was reminded of government corruption. She said the sale of a land must be approved by the majority of the council and said someone is lumping the sale. She stated  a casino proposal must come from a land proposal. She said the residents do not want the casino and asked council not complicate the issue.  She expressed that gambling has never lived up to its promise and that  why would the casino do what that the lottery, first 9 casinos, and the video gaming have not done? She stated that  4 aldermen have had their seats bought by gaming and 1 owns gaming machines and also talked about corruption.

Rosalind Munoz:  She said God bless everyone who attended the City Council and mentioned that everyone is here tonight for the same reason. She shared that she has been a resident of Waukegan along with her parents and grandparents/great parents. She talked about the Mayor of Park City and North Chicago supporting Riverside Casino and asked if the casino seek out their endorsement and whether this was a violation of the RFP. Finally, she asked the elected officials to decide what is best for Waukegan.

Joseph Webb:  He said that in 2008 he opened Epoxy Flooring Company in Waukegan to bring jobs to the minority.  He talked about the casino having some dark elements and encouraged the council to look at who we are partnering with in order to be fair.  He supports the casino if it will done under North Point.

Stacy:  He said the understands the dark elements of the casino and the fact that Waukegan needs revenue.  He also thanked the council for allowing him to address them tonight.  He shared that after listening to all the casino presenters, that North Point Casino already signed Waukegan local businesses to operate within their destination, received the support of 26 local unions, committed to hiring minorities and local/minorities contractors, asked for no waivers, had the best offer for the land and more.  He asked not to bring the outsiders and keep it at home, he supports North Point.

Blake: He Urged the Waukegan citizens to pick North Point developer. He referenced the bids and what each developer offers to Waukegan and ensured that North Point offers the best. He asked not to send more than one proposal to the state because the city will then loose money and delayed the process.

---

**4. Consent Agenda (Items under the Consent Agenda are considered routine and/or non-controversial and will be approved by one motion. If any one board member wishes to have a separate vote on any item, it will be pulled from the Consent Agenda and voted on separately)**

**Motion by Ald Florian, second by Ald Seger to approve the Consent Agenda items A-J, & L - excluding item K.**

**MOTION APPROVED**

**Action (Consent), Minutes: A.** Motion to approve the Regular Meeting Minutes from Tuesday, September 3, 2019

**Action (Consent), Minutes: B.** Motion to approve the Regular Meeting Minutes from Monday, September 16, 2019

**Action (Consent), Minutes: C.** Motion to approve the Special Meeting Minutes from Wednesday, September 18, 2019

**Action (Consent): D.** Motion authorizing the proper City Officials to settle Public Works Department Auto Liability Claims 201705100002 & 201705100003 for a total of $300,000.00. This matter was heard in the Government Operations & Oversight Committee.

**Action (Consent): E.** Motion to amend the Waukegan Code of Ordinances, Section 21-122 Limited Parking to allow for two-hour parking, 8:00 a.m. to 5:00 p.m., for Lincoln Avenue and 8th Street. This matter was heard in the Community Development Committee.

**Action (Consent): F.** Motion to approve IAFF Retro Payroll dated September 13, 2019 in the total amount of $429,155.74.

**Action (Consent): G.** Motion to approve Regular Payroll dated September 27, 2019 in the total amount of $1,638,413.09.

**Action (Consent): H.** Motion to approve PBLC holiday buy back dated September 27, 2019 in the total amount of $2,350.46.

**Action (Consent): I.** Motion to approve final payouts (Marocco B, Santiago L, Kumar R) dated September 27, 2019 in the total amount of $15,987.88.

**Action (Consent): J.** Motion to approve Non-union Retro (Ona) dated September 27, 2019 in the total amount of $557.39.

**Action: K.** Motion by Ald Florian, second by Ald Rivera to approve vendor payments dated October 7, 2019 in the total amount of $3,065,780.36.

Ald Florian, Ald Rivera, and Ald Turner raised some concerned regarding a few items on the vendor payment list. Mayor Cunningham encouraged Aldermen to call the Finance Director, if they have concerns regarding where funds are coming from.

**AYE:** Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome, Ald Rivera, Ald Florian, Ald Taylor.
**NAY:** Ald Turner.
**ABSENT:** None.
**ABSTAIN:** None.
**MOTION APPROVED**

**Action (Consent): L.** Motion to approve all raffle sale applications

**Consent Items Vote:**

**AYE:** Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor.
**NAY:** None.
**ABSENT:** None.
**ABSTAIN:** None.
**MOTION APPROVED**

---

**5. Reports and Communication**
**Information, Procedural: A.** City of Waukegan officials' estimate the Aggregate Levy to be $25.334 million for the 2019 Tax Year per 35 ILCS 200/18-60.

---

**6. Special Finance & Purchasing Committee**
**Action: A.** Motion by Ald Moisio, second by Ald Turner to approve a Cooperative Agreement with the Environmental Protection Agency (EPA) to provide funding to the City of Waukegan to clean up Brownfield site, Fan Steel located at 801 South Market Street in Waukegan, Lake County, Illinois. This matter was heard in the Finance & Purchasing Committee.

Mayor Cunningham took a moment to explains his excitement for this project - and explained it is a major step.

**AYE:** Ald Bolton, Ald Seger, Ald Moisio, Ald Kirkwood, Ald Newsome, Ald Turner, Ald Rivera, Ald Florian, Ald Taylor.
**NAY:** None.
**ABSENT:** None.
**ABSTAIN:** None.
**MOTION APPROVED**

---

**7. Community Development Committee**
**Action: A. Motion by Ald Turner, second by Ald Newsome** Landmarking of the Robert Smart Residence - 817 Oakley Avenue

**MOTION APPROVED**

---

**8. Old Business**

---

**9. New Business**

---

**10. Ordinances**

---

**11. Closing Items**
**Procedural: A. Aldermen's Time**

**Ald Bolton:** She thanked Public Works for the efforts during a clean up. She shared her condolences to the Buckner family. She talked about the upcoming leaf collection in her Ward. She thanked everyone for their passionate comments, tonight.

**Ald Seger:** He announced the upcoming leaf pick up, in his Ward, and encouraged residents to rake they leaves to the parkway, and not the street. He explained the drainage gets clogged when you rake them into the street. He thanked everyone for their comments.

**Ald Moisio:** He explained the current situation the City of Waukegan is facing, and explained some of the biggest challenges, including stretching a dollar. He explained what he believes needs to be done to help eliminate the issues at hand, and explained details on his stance.

**Ald Kirkwood:** He thanked Ald Moisio for his comments. He explained that an event 'Family Photo Day' will take place on Saturday, November 9, at the East (Washington) Campus. He shared the dates for his leaf collection, and encouraged residents to rake their leafs to the parkway. He explained that the Aldermen are here to represent all the residents of Waukegan.

**Ald Newsome:** She talked about her upcoming clean sweep - and encouraged residents to give her a call with any concerns. She talked about the upcoming leaf pick up in her Ward.

**Ald Turner:** He talked about an upcoming Property Tax Seminar. He explained the progress being made in his Ward, regarding beautification. He explained his thoughts on the casino, and explained his stance.

**Ald Rivera:** He thanked everyone that came, and for their comments. He explained that he ran on being a representative for the citizens, and for listening. He explained that a casino is a go no in his Ward. He explained that alternatives have been pushed aside, and that we are trying to stretch the dollar. He explained that we have to stretch the dollar, and we have been focused on this one enterprise. He explained it would be in our best intrest to look at other alternatives and that we need to pay attention to our residents.

**Ald Florian:** She explained that a majority of her Ward does not support a casino in Waukegan. She explained that it would be wise for the City of Waukegan to do an economic development study, and explained that the city is betting on a bet. She continued her thoughts on the casino. She talked about the leaf clean up in the 8th Ward, and stated the dates. She talked about an upcoming clean up in the 8th Ward as well.

**Ald Taylor:** She explained that she is going to pass on casino comments tonight, since it was discussed for a majority of the meeting. She stated the dates for the upcoming leaf clean up in the 9th Ward. She explained that she has also posted it to her Facebook Page. She talked about an upcoming clean up in her Ward. She thanked everyone for coming out tonight, and explained that it (casino) has been an emotional topic for oth sides, and that she wishes there was more time to deal with it.

At this time, Ald Moisio, Ald Florian and Mayor Cunningham shared some comments regarding the casino topic. Ald Moisio directed a comment to Ald Rivera, regarding the casino. Mayor Cunningham explained his thoughts on Ald Florian's comments. Ald Turner explained he would not vote in favor of any property tax increases.

**12. Adjournment**
Motion by Ald Moisio, second by Ald Taylor to Adjourn

---

**These minutes were transcribed by the Office of the Waukegan City Clerk:**

______________________________

**JANET E. KILKELLY, CITY CLERK**
**Office of the City Clerk**
**City of Waukegan**
**Waukegan, Illinois**

*ATTEST:*

______________________________________

**DAVID A. PATTERSON, DEPUTY CITY CLERK**
**Office of the City Clerk**
**City of Waukegan**
**Waukegan, Illinois**

**From:** Douglas Dorando <ddorando@dlplawyers.com>
**Sent:** Friday, October 4, 2019 8:37 PM
**To:** cjohnson@chjc.com; semmerton@chjc.com; casino@waukeganIL.gov; Robert Long <rlong@dlplawyers.com>
**Subject:** Fwd: Potawatomi Supplemental Letter To Waukegan Casino Review Team Attached
**Attach:** image003.jpg; ATT00001.htm; Supplemental Letter to Waukegan Casino Review Team 10-4-19.pdf; ATT00002.htm; Exhibit 1 Hospitality and Gaming Solutions Comments.pdf; ATT00003.htm; Exhibit 2 Letter to P. Olson from R. Ferguson 9-30-19.pdf; ATT00004.htm; Exhibit 3 Redevelopment in Milwaukee's Menomonee Valley, What Worked and Why (00477001xB15CF).pdf; ATT00005.htm

---

Please see the supplemental letter delivered to us on behalf of Potawatomi. I'm not sure yet how we will want to handle this l, but it should be discussed as part of our planning meeting on Thursday.

Sent from my iPhone, please excuse my brevity

Begin forwarded message:

> **From:** Bryan Winter <bwinter@fuquawinter.com>
> **Date:** October 4, 2019 at 16:00:47 EDT
> **To:** Robert Long <rlong@dlplawyers.com>, Douglas Dorando <ddorando@dlplawyers.com>
> **Cc:** "Eric N. Dahlstrom" <edahlstrom@rothsteinlaw.com>, Jeff Crawford <Jeffrey.Crawford@fcpotawatomi-nsn.gov>
> **Subject: Potawatomi Supplemental Letter To Waukegan Casino Review Team Attached**
>
> Attached please find the digital versions of the Supplemental Submission, which was hand delivered to your office today.
>
> Thank you,
> Bryan Winter, Local Counsel for Potawatomi Hotel & Casino
> bwinter@fuquawinter.com

EXHIBIT
0026



Fuqua Winter Ltd.

ATTORNEYS AT LAW

100 YEARS | FOUNDED 1919

Confidential - Subject to Protective Order

CHJC_0000993

Pl. SJ Ex. 116, Page 2 of 88

9 N. County Street
Waukegan, IL 60085
(847) 244-0770

NOTICE: This message (including any attachments) from Fuqua Winter Ltd. may constitute an attorney-client communication and may contain information that is PRIVILEGED and CONFIDENTIAL and/or ATTORNEY WORK PRODUCT. If you are not an intended recipient, you are hereby notified that any dissemination of this message is strictly prohibited. If you have received this message in error, please do not read, copy or forward this message. Please permanently delete all copies and any attachments and notify the sender immediately by sending an e-mail to bwinter@fuquawinter.com.



October 4, 2019

Waukegan Casino Review Team
100 N. Martin Luther King Jr. Ave.
Waukegan, IL 60085

**PROPRIETARY AND NEGOTIATION FOIA EXEMPTIONS CONFIDENTIAL**

With Hand Delivery to:

Attorney Robert Long
Daniels Long & Pinsel LLC
Corporation Counsel for City of Waukegan
19 N. County Street
Waukegan, IL 60085

RE: Waukegan Potawatomi Casino Letter Supplement

Dear Waukegan Casino Review Team:

The Potawatomi Hotel Casino ("PHC") submits this Letter Supplement to the Waukegan Casino Review Team ("Review Team") in support of its request for certification by the City of Waukegan ("City") to the Illinois Gaming Board ("IGB") under 230 ILCS § 10/7(e-5) for the Waukegan Potawatomi Casino. We have hand-delivered this Letter Supplement for distribution purposes as recommended by the Waukegan Assistant Corporation Counsel. This Letter Supplement addresses new information and issues that arose during and after the public hearing held on September 18, 2019 ("Public Hearing").

1. Downtown Development Project.

Community partners do not harm each other, they look for opportunities to help each other. By not including a hotel or an entertainment venue in the PHC application the City benefits from a right sized casino that does not harm struggling Waukegan hotels or the downtown business district. To further build our partnership with Waukegan, Potawatomi proposes to enter into negotiations for a Downtown Development Agreement with the City. Potawatomi would like to do an economic development project which complements and nurtures the revival of downtown Waukegan. Potawatomi has identified sites in the downtown and the harbor areas which can be successfully redeveloped. One or more of these parcels is owned by the City, another is privately owned. We have already begun our due diligence on these sites. As we have not made a decision on which site we would like to develop and we do not have any of the properties under contract we will not disclose their locations until we have a chance to meet to discuss our proposal.

Potawatomi knows how to partner with governments and private interests to spur redevelopment. Our successful twenty year partnership with the City of Milwaukee is

documented in the attached Redevelopment in Milwaukee's Menomonee Valley: *What Worked and Why*, Public Policy Forum (2014), attached as Exhibit 1. This independent report identifies what they believe are important factors to spur redevelopment:

> We find that several strategies utilized in the Menomonee Valley could be adapted and applied to other large-scale redevelopment efforts. Specifically, we urge public and private sector economic development leaders to consider the following lessons from the Valley's revival as they pursue redevelopment in other priority areas in the region:
>
> 1) Major redevelopment initiatives need to be accompanied by a robust set of planning and design activities that establish both a common vision for the initiative and a detailed roadmap to achieve that vision.
>
> 2) Strong intergovernmental cooperation and public-private partnerships will be essential for large-scale redevelopment efforts to succeed.
>
> 3) Funding must be pursued and creatively assembled from numerous sources to address the many barriers that impede brownfield redevelopment projects.
>
> 4) Given the key advantages involved with public or public-private ownership of re-developable brownfield properties, the City likely will need to assume considerable financial risk to advance major redevelopment projects.
>
> 5) Major redevelopment projects must be accompanied by aggressive marketing of the area's existing strengths and amenities.
>
> 6) Major redevelopment projects should be viewed as opportunities to address multiple community objectives.
>
> 7) Using redevelopment projects to create jobs for neighborhood residents may require greater emphasis on workforce development.

*Id.* at 3-5.

2. <u>Letter from Hospitality and Gaming Solutions to the Review Team</u>.

PHC engaged Hospitality and Gaming Services ("HGS") to comment on various financial projections discussed at the Public Hearing. John Repa, HGS, has prepared numerous studies of the Illinois gaming market over the past twenty years for many of the Illinois casinos. John Repa relied on that knowledge and he attended the Public Hearing, reviewed video, audio, and written transcripts of the Public Hearing, and conducted additional research and analysis, which is reflected in his letter report attached as Exhibit 2. The HGS report discusses key business and economic facts which differentiate the four remaining applicants including gross revenue,

cannibalization of revenue, operating expenses, construction costs, financing and feasibility, and jobs and economic impact.

PHC would be happy to arrange for John Repa to meet with the Review Team or other City officials to explain and answer any questions regarding the contents of his letter report or the feasibility study he conducted for PHC.

3. Revised Offer for Fountain Square Parcel.

City consultant, C.H. Johnson, reported at the Public Hearing that PHC had offered to purchase the proposed Fountain Square casino site from the City for $5.6 million. This was incorrect. The PHC proposal offered to negotiate a contract for sale of the property at fair market value ±15%. PHC Application at 4. Earlier media reports indicated that the City had commissioned a new appraisal of the Fountain Square parcel. PHC made its offer assuming the City and PHC would negotiate in good faith to agree on terms for purchase of the land. It now appears the City may make a certification decision without negotiating or reaching an agreement with any applicant on the price of the land or any other elements of the proposals. As a result, PHC hereby supplements its application to correct the purchase price error reported at the hearing. PHC will enter into a contract for the sale of the Fountain Square casino site for $12,000,000 with full payment when IGB issues an owner's license to Waukegan Potawatomi Casino, LLC. We presume the City will negotiate the terms of a contract for sale with any certified applicant and other elements of the casino proposal after it makes a certification decision, but before the IGB issues the owner's license for the Waukegan casino. 230 ILCS 10/7(e-5).

4. *City of Waukegan v. Waukegan Gaming*.

PHC has been monitoring the litigation filed in the Lake County Circuit Court by the City of Waukegan against Waukegan Gaming, LLC, in which the city seeks a declaratory judgment that Waukegan Gaming's rights under a 2004 Redevelopment Agreement have expired and that the agreement has no application to or effect on the City's RFQ/P and certification process under Senate Bill 690. If PHC is certified by the City under SB 690, PHC is willing to intervene in the litigation in support of the City's position. The particular assistance provided by PHC will be on terms mutually acceptable to the City and PHC.

Waukegan Gaming, LLC submitted a memorandum to the City Clerk dated August 5, 2019 which announced that it has agreed to become a member of CDI-RSG Waukegan, LLC ("CDI-RSG"), an RFQ/P applicant for certification by the City. The Waukegan Gaming, LLC memorandum also stated that the CDI-RSG response to RFQ/P, § 3A, identifies Waukegan Gaming, LLC as a member of the CDI-RSG. CDI-RSG has not acknowledged publicly that Waukegan Gaming, LLC is a member of its LLC. The City is painfully aware that Waukegan Gaming, LLC applied to the IGB for the 10th license to operate a casino in Lake County. The IGB selected Rivers Casino to operate a casino in Des Plaines and not Lake County in part because of William Cellini's interest in Waukegan Gaming, LLC. The IGB decision in favor of Des Plaines noted that Waukegan Gaming, LLC provided inaccurate information to the IGB. The IGB may not approve a license for CDI-RSG Waukegan if it concludes a key person with Waukegan

Gaming, LLC has previously submitted false information to the IGB. 230 ILCS § 10/7(a)(3). The City should consider if Waukegan Gaming's proposed membership in the CDI-RSG application will affect IGB's choice for a Waukegan owner's license.

5. Background Due Diligence.

The IGB will conduct a comprehensive investigation of the background of each license applicant. As discussed in Item 4, above, the City suffered the consequence of this careful IGB background investigation which contributed to the loss of the contest for the 10th gaming license in 2009. The Review Team should endeavor to evaluate the extent to which the IGB may downgrade any of the applicants based on background considerations. The IGB may downgrade the North Point application based on the reported notorious political contributions made to candidates for the City Council by or on behalf of the North Point applicant. The IGB scrutiny will likely be heightened if the City certifies the North Point application despite the obvious objective evidence that it will not be the best performing casino for the City. The IGB could well conclude that the North Point applicant was certified because of the political contributions, not the merits of its application.

PHC recommended in its application that the City contact references listed in its application. The Review Team should conduct its own background due diligence for any applicant that may be certified. A review of references and the results of that review should be provided to the members of the City Council. PHC urges the Review Team to contact other independent references who are in a position to know the character and business practices of PHC as well as any other applicant under serious consideration. A failure to know your potential applicant puts the City in a vulnerable position. It now appears that the City will certify one or more applicants before it negotiates definitive agreements with any applicant. Thus, the City will not know whether an applicant will honor its promises when it is certifying an applicant. The City may negotiate definitive agreements with a certified applicant after the applicant is certified. Only in this negotiation process will the City learn whether or not an applicant is willing to be contractually bound to the terms of its promises. The very short time periods imposed by SB 690 suggests that the City should certify more than one applicant to protect against a single applicant reneging on a promise after it is certified. Having multiple applicants certified will improve the City's bargaining position in reaching definitive agreements post certification. The IGB will likely give weight to the extent of an applicant's good faith negotiation after certification and before the IGB makes a selection under 230 ILCS § 10/7(e-5).

6. Competition and Cannibalization.

PHC is in a substantially better position than is Rivers to benefit from the expanded market opportunity from the Waukegan casino. Figure 1 in the HGS report, Exhibit 2, demonstrates the large new market opportunity for the Waukegan Potawatomi Casino to develop new customers in the heavily populated area south of Waukegan. PHC recognizes Waukegan Potawatomi as a growth opportunity for its brand and its business. Most of the heavily populated market to be served by the Waukegan casino is already in the primary market area of the Rivers Casino. This is not the case for Potawatomi. This fact, together with the substantial investment PHC will make

Confidential - Subject to Protective Order

in building and operating a first class Waukegan casino makes it the clear best choice to operate a Waukegan casino.

At the Public Hearing, the Rivers' spokesperson argued that a lower tax rate at the Waukegan casino provided an economic motivation for Rivers to send its current customers to Waukegan. Rivers contended that the State tax rate was lower at Waukegan than at Des Plaines. In fact, the tax rates that Rivers will pay at a Waukegan casino are exactly the same as at the Des Plaines casino. 230 ILCS § 10/13(a-4) & (a-5). Rivers also stated at the Public Hearing, but in this case correctly, that the tax rate paid by PHC at its Milwaukee facility is substantially lower than the Illinois tax rates. This is correct, which is why PHC has such a strong financial statement and is able to invest substantial funds in a Waukegan casino which is necessary to create a spectacular casino experience that will attract customers away from Rivers and will generate more gaming revenue for the benefit of Potawatomi and the City.

7. Sioux City: Orpheum – Battery Park Comparison. Sioux City's Orpheum Theatre saw a decline in ticket sales after Hard Rock Casino opened an outdoor amphitheater.

Alderman Moisio asked the North Point Casino representatives at the Public Hearing whether their proposal for Waukegan is similar to Hard Rock Casino's development in Sioux City. Both the North Point proposal and Sioux City's Hard Rock Casino feature an outdoor amphitheater. Both Sioux City and Waukegan have historic theatres which have received financial support from their respective cities - the Orpheum Theatre in Sioux City and Genesee Theatre in Waukegan. Responding to Alderman Moisio's question, North Point claimed that the outdoor amphitheater in Sioux City did not compete with existing venues, including the Orpheum Theatre, but instead grew the market. Importantly, he did not say that the Orpheum Theatre was not harmed by the casino amphitheater. The facts are that the Hard Rock facility grew, but Sioux City's historic Orpheum Theatre suffered. Apparently, to North Point, this is what market growth means.

In July of 2015, the Hard Rock Casino in Sioux City opened a new entertainment facility – the Battery Park outdoor concert venue. Despite North Point's claims that Battery Park does not compete with or cannibalize sales from existing concert venues in Sioux City, the data shows that Sioux City's Orpheum Theatre has struggled considerably in the years since Battery Park's debut.

| **Percent of capacity: Orpheum Theatre** | |
|---|---|
| 2010 - July 2015 | 68% |
| 2015 - Present | 60% |

According to Pollstar box office data, between 2010 and July of 2015, the Orpheum Theatre in downtown Sioux City sold roughly 68% of available tickets for shows, despite the economic downturn occurring nationally at the time. Since the opening of Battery Park, however, the Orpheum has seen a decline in attendance. They've sold only 60% of available tickets – an 8%

Confidential - Subject to Protective Order

drop. This decline is especially troubling considering that the national economy has rebounded since 2015.

Declining attendance at the Orpheum Theatre has been especially problematic for Sioux City, as it has subsidized the Orpheum Theatre through its struggles over the years. At one point in 2017, Sioux City's Event Facilities Department, which was managing the Orpheum, was receiving a $1.7 million city subsidy while running a $270,000 operating deficit. As a result, Sioux City began reexamining the Orpheum's operation. In January of 2018, the City turned to Spectra Venue Management to take over management of the Orpheum Theatre. *Sioux City panel recommends moving to new management firm for Orpheum*, Sioux City Journal, September 22, 2017. https://siouxcityjournal.com/news/local/govt-and-politics/sioux-city-panel-recommends-moving-to-new-management-firm-for/article_6cb7374e-d6d2-5a25-9f6a-c72ee42f7ec9.html?utm_medium=social&utm_source=email&utm_campaign=user-share

Despite the best efforts of the city and management team for the Orpheum Theatre, the opening of Hard Rock Casino's nearby Battery Park has had a noticeably negative effect on attendance at the Orpheum Theatre. Time will tell whether Spectra will be successful in building the Orpheum's audience base, but it is clear that increased competition from Battery Park presents a serious obstacle to overcome in achieving progress.

The Waukegan Potawatomi Casino will use its players club to drive customers to the Genesee Theater, not lure them away.

8. Noise from Entertainment Venue at Fountain Square.

The proposed North Point Casino amphitheater would harm Waukegan residents. The North Point Casino proposal includes a two acre outdoor amphitheater. In addition to harming the Genesee Theater as described in Item 7 above, this outdoor amphitheater would disrupt city residents within several miles of Fountain Square.

A close parallel to North Point's amphitheater proposal can be found in Sioux City, Iowa at the Hard Rock Hotel & Casino. The Hard Rock Hotel & Casino began hosting outdoor concerts and events in a large grassy space in 2014, known as 'The Backyard', before upgrading the facilities and renaming the venue 'Battery Park'. However, noise from the casino's open-air shows has been heard nearly 4 miles away from the venue and caused 40 noise complaints in one night.[1] Although Hard Rock officials took steps to reduce noise from concerts, Sioux City's police department continued to be plagued with complaints.[2] Sioux City's police chief went so far as to comment that as long as there are outdoors concerts, his office would continue to receive complaints.

Various complaints on outdoor events generating noise has led to significant policy differences among the Sioux City council members, as they've recently begun considering an ordinance that

---

[1] *Hard Rock adjusts after concert noise complaints*, Sioux City Journal, August 29, 2014

[2] *Despite improvement, complaints made over Hard Rock loudness*, Sioux City Journal, July 13, 2015

would limit sound permits to an 11:00 p.m. cutoff.[3] While the council initially voted in favor of the measure, numerous downtown businesses spoke against it – leading to a delay in changes to the ordinance.[4] Sioux City is still considering how to resolve the issue, but is having difficulty weighing the concerns of city residents and businesses against the interests of outdoor event organizers and entertainment venues such as Battery Park.

**Figure 1**

As shown in Figure 1, an outdoor amphitheater at Fountain Square should be expected to trigger a similar debate in Waukegan. Within just a 1-mile radius of the proposed amphitheater are multiple neighborhoods and apartment buildings including Emhurst Lake Apartments, the Landings at Amhurst Lake, Colonial Park Apartments, Park Terrace Apartments, and the Park City Mobile Home Park. Expanding the noise zone to a more realistic two mile radius shows that an outdoor amphitheater would impact residents in neighborhoods in Gurnee, Park City, Waukegan

---

[3] *Sioux City Council advances ordinance limiting how late noisy events could go on; split decision on parking fee hikes*, Sioux City Journal, August 5, 2019

[4] *Discussion over noise ordinance changes delayed*, KMEG News, August 12, 2019

and North Chicago including those living near Serenity Park, Arbor Park, Diversity and Kings Park.

9. Project Labor Agreement with Building Trades.

PHC advised Mr. Pete Olson, Lake County Building & Construction Trades Council, in a September 30, 2019 letter, attached as Exhibit 3, that, "If Potawatomi is chosen to develop the new casino in Waukegan, we commit to signing a Project Labor Agreement to ensure that union labor is used in the construction of our facility."

10. The North Point Casino Proposal does not Qualify for Certification by the City.

The North Point Casino proposal submitted by Lakeside Casino, LLC does not satisfy the requirements of the City's RFQ/P and the conditions for its certification established by SB 290. 230 ILCS § 10/7(e-5). Michael Bond's cover letter states expressly that the proposal is conditional, "If we are the only proponent selected by the City." The condition is then repeated in bold relief, " . . . **if we're the City's sole selection**." North Point Application at 1. The North Point applicant does not want the IGB to compare the merits of its application to any of the other casino applications.

The North Point proposed temporary casino is also dependent on the condition that it be the sole selection. The North Point temporary casino proposal does not comply with the City's RFQ/P. The RFQ/P, Items 1 and 2E require that an applicant identify whether [a] temporary site is located on City-owned or privately held property, describe the plan to acquire the development location, and provide detail of property size and access requirements. In addition, the RFQ/P states that, "Because of the 120 day limitation on local vetting, project teams are cautioned to consider zoning and special use issues that may require public hearings and to investigate entitlements on specific parcels under consideration." The North Point temporary casino proposal satisfies none of these requirements. Despite this failure to satisfy the RFQ/P requirements, the North Point application asserts, "The plan is to be operational in such temporary facility within 4-6 months after a determination is made that North Point casino is the sole proponent for the City of Waukegan." Application Section 2-35. At the same time, the application admits that, "we would need the City to rezone the temporary facility site in a timely manner to accommodate a temporary casino. Our primary choice for a temporary site is not within the Gateway District at this time, so we would ask for the City's help accommodating a casino site." *Id.* at Section 2-71.

A temporary facility simply cannot be operational in the time promised by North Point. The temporary facility would require City zoning approval and the IGB to grant North Point a gaming license for the temporary facility. The Waukegan Planning and Zoning Commission meets next on October 10, 2019 and the agenda does not include any requests for action by North Point or any other gaming use. The next meeting of the Commission is on November 14, 2019. It would take several months to obtain approval through the Planning and Zoning Commission, the Judiciary Committee, and finally the City Council. Our advisors inform us that the best case for a zoning action, even in a non-controversial case, is 90 to 120 days. In addition, our gaming licensing experts advise us that a gaming license will not be issued by the IGB in any less than six

months. There is a huge disparity between the representations and promises in the North Point application and what will actually occur. Certainly, the City has not "agreed to" this planned temporary facility.

The City Council will not be able to timely certify to the IGB that North Point, ". . . [the applicant] and the corporate authority . . . have mutually agreed on the temporary location of the riverboat or casino" or "that the applicant and the corporate authority . . . have mutually agreed on any zoning, licensing, public health, or other issues that are within the jurisdiction of the municipality or county." 230 ILCS § 10/7(e-5)(iii) & (v).

Conclusion

PHC stands ready to negotiate in good faith with the City regarding its request that the City certify its Waukegan Potawatomi Casino proposal to the IGB in time for PHC to submit an application to the IGB for an owner's license before the statutory deadline.

Very truly yours,

Rodney Ferguson
CEO/General Manager

PROPRIETARY AND NEGOTIATION
FOIA EXEMPTIONS

Confidential - Subject to Protective Order



Confidential - Subject to Protective Order

CHJC_0001004

Pl. SJ Ex. 116, Page 13 of 88



October 4, 2019

Waukegan Casino Review Team
100 N. Martin Luther King Jr. Ave.
Waukegan, IL 60085

Dear Waukegan Casino Review Team:

Following the public hearing conducted on September 18, 2019, Hospitality and Gaming Solutions ("HGS") has had the opportunity to evaluate information publicly provided for the first time by other applicants.

**Revenue**

In C.H. Johnson's presentation at the Waukegan public hearing, he projected gross revenue for each applicant[1] in the fifth year of operation as shown in Table 1.

**Table 1**

| Applicant Revenue- 5th Year of Operation<br>Proposed Waukegan Casino | |
|---|---|
| **Gaming Applicant** | **Gross Revenue** |
| Full House Resorts | $173 million |
| Lakeside Development (North Point Casino) | $190 million |
| Rivers Casino Waukegan | $282 million |
| Waukegan Potawatomi Casino | $284 million |

Sources: Waukegan Casino Applicants

As shown in Table 1, Rivers Casino Waukegan and Waukegan Potawatomi Casino are the two proposals with the highest projected revenue. Both are existing regional operators with established Player's Club databases that will optimize gaming revenue for the host city, North Chicago and Park City. HGS prepared a full feasibility study of the Waukegan Potawatomi Casino utilizing a customized gaming gravity model that estimates where a population will gamble based on the travel distance and the size and quality of competing facilities. One of the gravity model's strengths is its malleability; the model can simultaneously incorporate many different variables such as population, geographic location, income, propensity to gamble, and frequency of gaming trips, and measure the impact of new competitors. The Potawatomi

[1] HGS has not discussed the WDA application, which was withdrawn by the applicant.

projections incorporated actual data from the Player's Club data base and are highly reliable; the projections of other applicants utilize many hypothetical assumptions which are not accurate.

Rivers Casino projections, in particular, are questionable. Rivers Casino released proposed gaming revenue estimates at the public hearing, but Rivers has not unredacted from its original application the basis or methodology for the projections presented. The Waukegan Potawatomi Casino revenue projections are dependent on the number of positions, size of the casino floor, quality of the casino finishes, capacity of the parking structure, and the level of promotional expense. The fact that both applicants project similar revenue does not mean the Rivers Casino estimates are accurate. The Rivers Casino proposal may project revenue similar to the Waukegan Potawatomi Casino, but with at least 265 fewer gaming positions, a smaller gaming floor, and a lower level of investment. Rivers reported at the Public Hearing that it would construct a 180,000 square foot casino. Rivers has not disclosed the casino floor size they propose. PHC will build a 210,000 square foot casino with 110,000 to 130,000 square feet of casino floor. In our opinion, Rivers' projected $282 million in revenue is not possible without more gaming positions and the greater level of investment in the property and the level of promotional expenses as proposed for the Waukegan Potawatomi Casino.

This would not be the first time Rivers overestimated revenue. The original projections for the Rivers Casino, Des Plaines submitted to the Illinois Gaming Board were significantly overestimated at $500 million annually versus the achieved level ranging from $416 million to $441 million annually.

**Cannibalization of Revenue**

The Waukegan Potawatomi Casino is not a defensive project; it will not unduly cannibalize revenue from the Potawatomi Hotel Casino in Milwaukee. The vast majority of revenue generated at the Waukegan Potawatomi Casino will be generated within 30-35 miles of the casino. Most of these players will come from the densely populated areas south of Waukegan. In Milwaukee, over 70% of the revenue is generated by Milwaukee County residents. Figure 1 shows 30 mile concentric rings around the Waukegan Potawatomi Casino, Potawatomi Hotel Casino in Milwaukee and the Rivers Casino in Des Plaines. The Waukegan Potawatomi Casino provides the opportunity to substantially expand the Potawatomi player base.

**Figure 1**

Comparing the market overlap areas of Potawatomi and Rivers is instructive. As shown on Figure 1, the Waukegan Potawatomi Casino will primarily compete for players within the heart of the Rivers Casino market area, which is less than 30 miles away from the Waukegan Potawatomi Casino. The Potawatomi overlap area is much smaller and not densely populated.

At the Public Hearing on September 18, 2019, Neil Bluhm stated, "we will promote Waukegan over our Des Plaines location to make our numbers more promising." Rivers has conflicting interests in Illinois which include Des Plaines and the Arlington Racecourse. Rivers also has other interests including proposed expansions in New York and Pennsylvania. On the other

HOSPITALITY AND GAMING SOLUTIONS

hand, Potawatomi is strategically focused entirely on the greater Chicago area. Potawatomi is committed to a long-term strategic partnership with the City of Waukegan.

**Operating Expenses**

The Waukegan Potawatomi Casino pro-forma includes an above market allocation for promotional expenses. Promotional allowances consist of various expenses associated with the issuance of complimentary cash, goods, and services provided to gaming patrons. The primary factor impacting the issuance of promotional allowances is typically the level of play by gaming patrons. Specific promotional allowances include: complimentary food, hotel rooms and coupon redemption programs. This higher than normal level of promotional expenses is necessary to produce the higher projected revenue.

Waukegan Potawatomi Casino will use its promotional expense budget for players' club members to stay at local hotels and will drive more demand to local hotels than is customary for Rivers. At a Des Plaines City Council Meeting on September 13, 2013, Bill Kenna, Rivers Casino General Manager, stated "Rivers has paid adjacent hotels for patrons to stay a total of 1,600 nights, so far this year." *Des Plaines Casino to share expansion plans with City,* Chicago Tribune (Sept. 13, 2013). This equates to 200 room nights a month. By comparison, within the Waukegan Potawatomi Casino application (page 33), the number of purchased monthly room nights ranges from 1,950 nights in the first year increasing over time to 3,900 room nights in the third year of operation, creating additional benefits to Fountain Square hotels and the Genesee Theatre. The induced demand for a greater number of hotel rooms will also generate increased occupancy taxes for the City of Waukegan.

Promotional allowances in the Waukegan Potawatomi Casino are forecasted to be 10% of gaming revenue throughout the projection period. This amount is significantly higher than what existing Illinois casinos are currently allocating for promotional allowances. Waukegan area casino players interviewed during recent PHC focus groups indicated their decision process regarding which casino to visit is heavily influenced by coupons received via direct mail, the amount of free play received, number and frequency of promotional gifts and complimentary hotel rooms to extend their overall casino gaming experience. Potawatomi received high praise from these players for offering free play of greater value/frequency, and direct mail coupons of higher value/frequency compared to area competitors particularly Rivers Casino Des Plaines. It is necessary to invest more in your patrons in a highly competitive gaming market, to achieve higher gaming revenue projections. A proposal projecting high revenue but without the needed promotional expenses to generate the revenue will disappoint the City.

North Point is not a casino operator and therefore will purchase management through a management agreement with Warner Gaming. The necessity of paying a substantial management fee further reduces the financial viability of the North Point proposal. As a publicly traded company, Full House will also pay a management fee to its parent company.

Hospitality and Gaming Solutions

**Construction Cost**

To the extent information is available, Table 2 illustrates the estimated construction costs submitted by each applicant.

**Table 2**

| Estimated Construction Cost<br>Proposed Waukegan Casino | |
|---|---|
| **Applicant** | **Construction Cost** |
| Full House Resorts | $315 million to $375 million |
| Lakeside Development (North Point Casino) | $420 million |
| Rivers Casino Waukegan | Not Disclosed |
| Waukegan Potawatomi Casino | $345.6 million |

Sources: Waukegan Casino Applicants

The two multi-phased developments (Full House Resorts and Lakeside Development) are the developments with the lowest projected amount of gaming revenue. The influx in gaming positions (stemming from both new and expanded casinos and VGT's) are contributing factors that will make the greater Chicago area a highly competitive gaming market. The combination of increased competition, a high gaming tax structure, and minimum wage levels increasing to $15 per hour, will affect operating margins for all of the operators. As a result, the additional project components in the multi-phased developments (hotel, entertainment venues, etc.) are not likely to ever be financially feasible.

In addition, multi-phased developments result in construction disruption which would adversely impact revenue and expenses.

**Financing**

All of the applicants in their presentations and applications claim that they are capable of securing financing. With projects ranging in cost from $315 million to $420 million for construction plus initial state fees of approximately $50 million, it begs the question: At what interest rate? The combination of projected revenue, project cost, fees and taxes, promises made and the cost of capital all need to be weighed in determining whether or not each applicant has submitted a feasible proposal to the City of Waukegan. Full House Resorts and the North Point proposal face substantial challenges.

HOSPITALITY AND GAMING SOLUTIONS

**Full House Resorts**

According to Chad Beynon, a Gaming Analyst of Macquarie Securities, "Full House is in a tough position, in our view," Beynon said. *(September 12, 2019, Macquarie Securities, research note).* The company's leverage is five times its cash flow and the stock price is down 4% year-to-date, "which leaves investors worried about potential dilution." Beynon said the concern for Full House is the Indiana Rising Star property. The property has seen cash flow decline from $10 million in 2012 to $2.8 million in 2018.

**Lakeside Development (North Point Casino)**

The North Point Casino is the applicant with the highest projected construction costs, yet this applicant is projecting gaming revenues of only $190 million in the fifth year of operation. This multi-phased development lists Clairvest, as a strategic business lender for the North Point Casino. Clairvest is a private equity management firm. The required return for private equity firms of this type is substantially higher than traditional bank lenders, especially for an evergreen project in a competitive and untested market by a firm with no business history. At current rates, the North Point project may be required to pay a rate of 9% to 12% with a five to seven year term. PHC will fund the project internally based on the credit worthiness of its Milwaukee casino. The cost of construction, projected revenue, management fees, high cost of financing, State fees and expenses, and other promises made to the City of Waukegan makes the financial viability of the North Point proposal questionable. It would be very risky for the City to bank on this project actually opening, let alone thriving.

**Promises Kept and Transparency**

The City of Waukegan is seeking a strategic partner. Potawatomi has a proven track record of honoring all its commitments made to the City and County of Milwaukee as well as to the Wisconsin business community. What you see is what you get—which is not the case for the other applicants.

Before Rivers Casino opened, the ownership of Rivers Casino Des Plaines planned a casino, "which would be complemented by a new hotel, shops, restaurants and an entertainment venue." Nearly a decade later, none of the subsequent proposed phases have been built. Rivers announced at the public hearing that it plans to build a hotel in Pittsburgh, but it has not kept its promise to Des Plaines.

Rivers Casino also successfully appealed its property tax payments in 2011 and 2012. According to Cook County assessment records, the assessed value of the Rivers Casino property has been reduced by $4 million in 2012 and $1.5 million in 2011, diminishing the economic benefit the City of Des Plaines expected to receive from the Rivers Casino.

HOSPITALITY AND GAMING SOLUTIONS

In addition, Rivers Casino negotiated an Agreement with the City of Des Plaines, after receiving its Illinois Gaming License, which requires the City of Des Plaines to relinquish $10 million a year for 30 years of its host community tax income to satisfy payments owed by Rivers to the State of Illinois for its gaming license. Rivers Casino also included provisions in the agreement which require Des Plaines to pay 40% of its remaining casino tax revenue to 10 south suburban communities. Local officials said they accepted those terms with the promise that Rivers would be the 10th and final casino in the State. Senate Bill 690 provides for the development of five additional casinos throughout the State. Those casinos, along with a Chicago casino, are expected to reduce the Rivers Casino revenue, which will result in the City of Des Plaines receiving even less revenue. For the last several years, the City's revenue has stagnated at approximately $9 million. *See* the annual audited reports for the City of Des Plaines.

**Jobs and Economic Impact**

Finally, based on the information publicly released by each applicant the Waukegan Potawatomi Casino will provide the most jobs as an on-going operation with 1,382, employees. C.H. Johnson reported that Rivers would employ only 1,092; Full House only 820; and North Point only 685 individuals. HGS also prepared an Implan economic impact analysis which shows the number of direct, indirect and induced jobs for the Waukegan Potawatomi Casino totals nearly 2,600; which is greater than 1,000 more jobs than any of the other three applicants. The net direct economic output from the operation of the Waukegan Potawatomi Casino is estimated to be $236.4 million on an annual basis, which is the highest among all the applicants.

If you have any questions, please contact me directly at (612) 251-1343.

Very truly yours,

***HOSPITALITY AND GAMING SOLUTIONS***

John J. Repa
President



Confidential - Subject to Protective Order

CHJC_0001012

Pl. SJ Ex. 116, Page 21 of 88



1721 WEST CANAL STREET
MILWAUKEE, WI 53233
1-800-PAYSBIG • PAYSBIG.COM

September 30, 2019

Mr. Pete Olson
Lake County Building & Construction Trades Council
31855 North U.S. Highway 12
Volo, Illinois 60073

Mr. Olson,

Thank you for taking the time to meet with me on Thursday, September 19. We appreciated the opportunity to provide more details on our Waukegan Potawatomi Casino proposal and discuss how we can partner with the Lake County Building Trades.

As you are already aware, Potawatomi Hotel & Casino has had strong relationships with the Milwaukee Building Trades for many years. All of our recent major expansion projects were completed with union labor through signed Project Labor Agreements. This includes:

- 2008: $240 million casino expansion which added 500,000 square feet of entertainment space.
- 2014: $150 million, 381-room hotel tower
- 2019: $80 million, additional 119-room hotel tower

Our proposed Waukegan Potawatomi Casino would be no different. We have had great experiences and successes working with the local building trades. If Potawatomi is chosen to develop the new casino in Waukegan we commit to signing a Project Labor Agreement to ensure that union labor is used in the construction of our facility.

Thank you again for taking time to meet. If you have any questions, please don't hesitate to contact me at 414-847-7733.

We look forward to working with you in the near future.

Sincerely,

Rodney E. Ferguson 13508

Rodney E. Ferguson
CEO & General Manager
Potawatomi Hotel & Casino

Confidential - Subject to Protective Order

CHJC_0001014

Pl. SJ Ex. 116, Page 23 of 88



Public Policy Forum
Impartial research. Informed debate.

# Redevelopment in Milwaukee's Menomonee Valley:

*What Worked and Why?*

Confidential - Subject to Protective Order

CHJC_0001015

Pl. SJ Ex. 116, Page 24 of 88

## ABOUT THE PUBLIC POLICY FORUM

Milwaukee-based Public Policy Forum – which was established in 1913 as a local government watchdog – is a nonpartisan, nonprofit organization dedicated to enhancing the effectiveness of government and the development of southeastern Wisconsin through objective research of regional public policy issues.

## PREFACE AND ACKNOWLEDGMENTS

This report was undertaken to provide citizens, policymakers, and business leaders in the Milwaukee area with a better understanding of the key factors that contributed to the Menomonee Valley's recent redevelopment. We hope that policymakers and community leaders will use the report's findings to inform discussions about economic development strategies that might be used to ensure the success of other major redevelopment projects in our region.

Report authors would like to thank the leadership and staff of the City of Milwaukee's Department of City Development (DCD) and the Redevelopment Authority of the City of Milwaukee (RACM) for patiently answering our questions and providing us with financial information about recent Menomonee Valley projects. We also would like to thank the many public and private sector individuals interviewed for this report for providing additional information and insight, and Eddee Daniel for providing many of the report's photos, including the cover photo.

Finally, we wish to thank Menomonee Valley Partners, Inc. for commissioning this research and for helping to fund it, as well as the Helen Bader Foundation for its grant to the Forum for economic and workforce development research, which also helped make this report possible.

 

# Redevelopment in Milwaukee's Menomonee Valley:

## What Worked and Why?

September 2014

**Joe Peterangelo, Senior Researcher**
**Rob Henken, President**

Public Policy Forum
Impartial research. Informed debate.

Confidential - Subject to Protective Order

CHJC_0001017

Pl. SJ Ex. 116, Page 26 of 88

# Table of Contents

Executive Summary.....3
Introduction.....6
Valley Timeline.....9
Key Outcomes to Date.....10
Economic Development.....10
Environmental Improvements.....14
Community Integration and Engagement.....15
Success Factors.....18
Planning and Visioning.....19
Leadership and Collaboration.....27
Utilization of Funding.....34
Project Management.....42
Location and Timing.....57
Policy Observations.....59

Confidential - Subject to Protective Order

## Executive Summary

The revitalization of Milwaukee's Menomonee Valley as an industrial, recreational, and entertainment district has been lauded both locally and nationally as a successful and sustainable urban redevelopment project. In this report, the Public Policy Forum explores how the Valley's major improvements over the last 15 years were achieved, including an examination of the public policies, financial resources, and partnerships that were crucial to the redevelopment effort.

The purpose of this research effort is *not* to evaluate the success of Valley redevelopment. Indeed, we start with the premise that Valley redevelopment *has* been successful. Our objective, instead, is to identify and analyze the ingredients of success so that consideration can be given to replicating them elsewhere. Through analysis of Valley data and documents, and through an extensive series of interviews with public and private sector leaders, we are able to cite the major barriers that inhibited Valley redevelopment, and examine the policies, activities, and strategies that helped to overcome those barriers and facilitate private sector investments.

The report begins with a brief overview of the economic, environmental, and community improvements that have occurred in the Menomonee Valley since the late 1990s. We then explore the work that brought about those outcomes by examining five "success factors" deemed critical to the Valley's revitalization, and by presenting four major Valley projects as case studies.

We find that several strategies utilized in the Menomonee Valley could be adapted and applied to other large-scale redevelopment efforts. Specifically, we urge public and private sector economic development leaders to consider the following lessons from the Valley's revival as they pursue redevelopment in other priority areas in the region:

1) **Major redevelopment initiatives need to be accompanied by a robust set of planning and design activities that establish both a common vision for the initiative and a detailed roadmap to achieve that vision.**

   The Valley's extensive planning and visioning process engaged stakeholders, local design professionals, and the larger community to an unusually high degree. The plans and policies subsequently established were specific in nature, with tangible actions and guidelines that addressed key redevelopment barriers and emphasized economic, environmental, and social equity goals simultaneously. Having a detailed plan and being able to articulate a vision for the future is essential to generating support for major redevelopment projects from funders, political leaders, and the community as a whole.

Confidential - Subject to Protective Order

**2) Strong intergovernmental cooperation and public-private partnerships will be essential for large-scale redevelopment efforts to succeed.**

While specific individuals and organizations stand out as essential to the Menomonee Valley's revitalization, the process of redeveloping the Valley has been exceptionally collaborative. Indeed, intergovernmental and public-private partnerships have been essential to most major Valley projects and to the success of the effort as a whole. Moreover, the Valley's story illustrates that rather than being led ***only*** by city government, major redevelopment efforts may stand the best chance for success if they are collaboratively led by multiple public and private sector stakeholders.

**3) Funding must be pursued and creatively assembled from numerous sources to address the many barriers that impede brownfield redevelopment projects.**

The City's willingness to invest heavily in infrastructure, environmental cleanup, and other pre-development work through tax increment financing (TIF) and other financial contributions, as well as the aggressive pursuit of funding by the City and Menomonee Valley Partners, Inc. (MVP) from numerous state, federal, and private sources, were critical to the Valley's redevelopment. In particular, early engagement of state and federal agencies in the project proved an effective strategy that helped the City and its partners to identify and pursue needed funding throughout the redevelopment process.

**4) Given the key advantages involved with public or public-private ownership of re-developable brownfield properties, the City likely will need to assume considerable financial risk to advance major redevelopment projects.**

The success of several major Valley projects was attributed largely to the ability of the City or MVP – as property owners – to expeditiously and effectively assemble project funding and address cleanup and infrastructure issues to make sites "shovel ready." Since it likely will be much more challenging to assemble, prepare, and market land in priority redevelopment areas that are privately owned, the City may need to continue to assume property ownership risk in other parts of the city to meet redevelopment goals. In addition, State leaders may need to provide funding assistance – as they did for the Valley – to help project leaders acquire properties and assist in pre-development work.

**5) Major redevelopment projects must be accompanied by aggressive marketing of the area's existing strengths and amenities.**

Leaders of the Menomonee Valley redevelopment effort capitalized on the unique strengths of the area, which were evident to them but required comprehensive visioning and effective public relations to convey to others. The Valley experience illustrates the need to take advantage of locational strengths in redevelopment work, which may include transportation infrastructure, existing industry clusters, available business resources, workforce proximity, neighborhood

amenities, and other factors. Lessons can be learned not only from the manner in which Valley redevelopment leaders identified those strengths, but also from the creative strategies they employed to make them known in the broader community.

6) **Major redevelopment projects should be viewed as opportunities to address multiple community objectives.**

One of the most striking components of the Valley's recent revitalization is the varied range of improvements it has produced. The "triple bottom line" approach to sustainable development not only achieved several economic development objectives, but also enhanced the natural environment and generated quality-of-life amenities that benefit the broader community. In light of this success, City leaders should seek other opportunities to achieve multiple goals through individual redevelopment projects. While job creation and growth in tax base may be the foremost priorities, opportunities to link those goals with simultaneous improvements in flood control, multi-modal transportation infrastructure, environmental health conditions, and recreational amenities for nearby residents also should be sought.

7) **Using redevelopment projects to create jobs for neighborhood residents may require greater emphasis on workforce development.**

Valley redevelopment leaders emphasized the need to foster development that would provide employment opportunities for the local workforce. While that objective was achieved somewhat, the recent decision by Cargill, Inc. to close its meatpacking facility in the Valley means that Palermo's and the Potawatomi Hotel and Casino are the only Valley businesses that employ large numbers of residents of nearby neighborhoods. For future redevelopment efforts that share a similar goal, greater emphasis may need to be placed on workforce training of area residents and on specific recruitment of businesses that have a need for workers with the types of skill sets possessed by those residents.

Like all urban business districts, the Menomonee Valley is a dynamic place and its redevelopment is never complete. Indeed, the City of Milwaukee currently is working on an updated land use plan to guide future redevelopment in the Valley – an effort that may have gained further urgency with the Cargill decision. At the same time, efforts are progressing to redevelop other industrial areas in Milwaukee, including the 30th Street Industrial Corridor and the Inner Harbor. We hope that by promoting a greater understanding of the critical elements of the Valley's last 15 years of redevelopment, we can help guide current and future planning in the Valley and inform policy and practice for similar efforts in Milwaukee and beyond.

Confidential - Subject to Protective Order

# Introduction

Over the past 15 years, Milwaukee's Menomonee Valley has undergone a remarkable renaissance, transformed from a blighted and largely abandoned industrial corridor into an increasingly vibrant center of industry, entertainment, and recreation. Where vacant and dilapidated buildings once stood – visible from the state's busiest stretch of freeway – new businesses have sprouted and new infrastructure has been developed to improve connections between the Valley and the surrounding community. Meanwhile, a new park, state trail, and Urban Ecology Center branch have created enhanced natural and recreational opportunities for area residents. While still a work in progress, the Menomonee Valley has become a national model of sustainable urban redevelopment.

Much has been written about what has been accomplished in the Menomonee Valley. In this report, we seek to identify *how* those accomplishments were achieved. What were the key public policies that drove change in the Menomonee Valley? How were financial resources and public-private collaborations secured that were needed to foster redevelopment? It is our hope that by promoting a greater understanding of the critical elements of the Menomonee Valley's first phase of redevelopment, we can help guide future planning in the Valley and inform policy and practice for similar efforts in Milwaukee and beyond.

The key research questions guiding our analysis include the following:

- *What were/are the greatest barriers to redeveloping the Menomonee Valley, and how have those barriers been overcome?*
- *What role did individual organizations and partnerships play in accomplishing Valley goals? For example, what was the role of the City of Milwaukee versus that of Menomonee Valley Partners, Inc. (MVP), a nonprofit organization formed to foster Valley redevelopment?*
- *Which particular policies, activities, and financial tools have proven most effective in encouraging private sector investment?*
- *Was the Valley's recent success the product of its unique location and good fortune, or are there important lessons learned that should be applied to continued work in the Valley and to other major redevelopment efforts in Milwaukee?*

We sought to answer these questions through two stages of research. First, we conducted archival research, gathering and reviewing numerous documents pertaining to the Menomonee Valley redevelopment efforts to date. Those resources include planning documents and development guidelines; grant data and related documents; previous reports and market studies; articles in academic journals and in the local and national news media; and data provided directly from organizations active in the Menomonee Valley.

Confidential - Subject to Protective Order

Through a series of key stakeholder interviews, we then vetted the findings from our archival research and gathered valuable on-the-ground perspectives. The individuals we interviewed include representatives of city, state, and federal government agencies, Valley businesses, and community organizations that have played significant roles in Valley redevelopment.

**Figure 1: Milwaukee's Menomonee Valley** [1]

The purpose of this report is not to evaluate or quantify the success of the Menomonee Valley redevelopment. Indeed, our research begins with the premise that Valley redevelopment *has* been

[1] The solid green line on the first map above represents the boundaries of the study area used by the City of Milwaukee for the 1998 plan for the Menomonee Valley. The second map, which displays the neighborhoods in the area, was provided by Landscapes of Place, LLC.

Confidential - Subject to Protective Order

successful, as reflected by the fact that it is frequently held up both locally and nationally as a model to be replicated elsewhere.[2] Our purpose, rather, is to shed light on the ingredients that produced this success and contemplate whether and how they might be applied to other major redevelopment efforts in Milwaukee and elsewhere.

The report begins with a brief overview of the accomplishments that have occurred in the Menomonee Valley since the late 1990s. Those accomplishments are organized into economic, environmental, and social metrics. We then explore the work that brought about those outcomes, identifying the core activities and strategies undergirding the redevelopment effort and presenting several specific Valley projects as case studies.

The City of Milwaukee currently is in the process of developing an updated land use plan that will guide future redevelopment in the Menomonee Valley. Simultaneously, efforts are underway to redevelop other industrial areas in Milwaukee, including the 30th Street Industrial Corridor and the Inner Harbor. We hope that this report can inform those efforts and similar Milwaukee redevelopment projects in the future.

[2] For example, the U.S. Environmental Protection Agency recognized the Valley as one of the best brownfield redevelopment projects in the country in 2009. *Milwaukee Business Journal*. "Menomonee Valley wins top brownfields honor." November 3, 2009. http://www.bizjournals.com/milwaukee/stories/2009/11/02/daily41.html

Confidential - Subject to Protective Order

## Valley Timeline

Numerous events have taken place and significant milestones reached in the Menomonee Valley throughout the course of its recent revitalization. The timeline below lists many of those developments and the dates when they occurred, and can be used as a helpful reference in navigating this report.

City of Milwaukee completes Menomonee Valley market study, engineering, and land use plan
1998
City of Milwaukee receives first EPA grant for environmental analysis in Valley
US EPA sponsors Valley funding roundtable event, bringing state and federal agencies to the table
Menomonee Valley Partners, Inc. created based on recommendation in City's 1998 plan
1999
Menomonee Valley Business Improvement District (BID 26) forms
Sixteenth Street Community Health Center coordinates sustainable development design
Hank Aaron State Trail opens (first four miles)
2000
Potawatomi builds new 255,000 sq. ft. facility, replacing their original bingo hall
Miller Park completed on the Valley's west end
2001
Completion of reconstructed Sixth Street viaduct
2002
Sixteenth Street Community Health Center coordinates national design competition for Milwaukee Road shops
2003
City of Milwaukee condemns Milwaukee Road site and acquires it for $3.55 million
Sustainable design guidelines completed and adopted by City of Milwaukee
Development guidelines with job density and wage recommendations created by MVP
City establishes $16 million TIF district for former Milwaukee Road site (now $24 million)
2004
City lifts former Milwaukee Road site out of floodplain using fill from Marquette Interchange project
MVP acquires vacant stockyards site and devises redevelopment strategy
2005
$52 million Canal Street extension completed, linking Sixth Street to Miller Park
Introduction of MCTS bus route 17, which traverses the Valley along Canal Street
2006
Palermo's is first business to open in Menomonee Valley Industrial Center
Stormwater Park is completed, designed to handle all stormwater in the Menomonee Valley Industrial Center
2007
Harley Davidson Museum opens on the Valley's east end
Stormwater Park successfully manages a 100-year flood
2008
Potawatomi Bingo Casino completes major expansion, tripling in size to 780,000 sq. ft.
Canal Street Commerce Center is built at stockyards site with Proven Direct as anchor tenant
2009
Valley wins EPA Phoenix Award, a top regional honor for brownfields redevelopment
UEC/MVP Project Inc. forms to raise funds for new Urban Ecology Center branch and Three Bridges Park
2010
Valley achieves one million square feet of new developments built using sustainable design guidelines
Valley Passage opens, providing south side residents with bicycle and pedestrian access to Valley
2011
Hank Aaron State Trail expanded to Waukesha County
New Urban Ecology Center opens in Valley
2012
Total number of employees in Menomonee Valley Industrial Center exceeds 1,200
Opening of Three Bridges Park on former Airline Yards site
2013

Confidential - Subject to Protective Order

CHJC_0001025

## Key Outcomes to Date

Though redevelopment of the Menomonee Valley is not complete, the efforts undertaken thus far are considered successful from multiple perspectives. The Valley is best known for its recent economic turnaround, but its environmental improvements and community development also are noteworthy. In fact, since the late 1990s, the "triple bottom line" definition of sustainable development – balancing the needs of the economy, the environment, and the community – has been a frequently cited mantra guiding Valley redevelopment efforts.

### Economic Development

Originally the home of wild rice fields and a river transportation system inland from Lake Michigan, the Menomonee Valley rose to prominence in the late 1800s as an industrial hub for tanneries, metal shops, stockyards, and other industries, which were supported by an extensive rail transportation network.[3] At its peak in the 1920s, the Valley housed more than 50,000 jobs.[4] Despite that initial success, however, the Valley later suffered from several decades of job movement overseas and disinvestment. By the beginning of the 21st century, the number of jobs in the area had dwindled to less than 14,000,[5] and prospects of a significant turnaround seemed improbable.

While it is unlikely that the concentration of economic activity in the Menomonee Valley ever will return to its 1920s peak, economic data document the significant surge of economic growth that has taken place in the Valley in recent years. Between 2002 and 2011 (the most recent year for which jobs data are available at the Census tract level), an estimated 3,244 net new jobs were added to the Valley (from 13,853 to 17,097), as compared to a net gain of 872 jobs in the City of Milwaukee as a whole (**Figure 2**).[6] Thus, without the job growth in the Valley, the City of Milwaukee would have *lost* jobs during that timeframe. Notably, the expansion of Potawatomi Bingo Casino in 2008 added roughly 1,000 of the new jobs to the Valley.[7]

In some portions of the Valley, new development has been characterized by a maximization of available space. Indeed, the *job density* of new development in those areas of the Valley has surpassed an established goal of 1.5 jobs per 1,000 square feet of buildable land, which was based on the city's

---

[3] Gurda, John. "The Menomonee Valley: A Historical Overview." http://www.renewthevalley.org/media/mediafile_attachments/04/4-gurdavalleyhistory.pdf
[4] De Sousa, Christopher. "Milwaukee's Menomonee Valley: A Sustainable Re-Industrialization Best Practice." University of Illinois at Chicago, Institute for Environmental Science and Policy. 2012. http://www.uic.edu/orgs/brownfields/research-results/documents/MenomoneeValley.pdf
Menomonee Valley Benchmarking Initiative. "State of the Valley Report: Ten Years Benchmarking Change in the Valley." 2013. http://www.renewthevalley.org/documents/157-menomonee-valley-benchmarking-initiative-report
[5] Ibid.
[6] Ibid. Data extracted from the U.S. Census Bureau's On the Map tool, which uses Longitudinal Employer-Household Dynamics (LEHD) data.
[7] Menomonee Valley Partners, Inc.

average job density for land sales to manufacturers at the time.[8] Depending on the percentage of buildable land on a given site, that goal worked out to roughly 16-22 jobs per acre. In the Menomonee Valley Industrial Center (MVIC) on the Valley's west end, where the job density goal was 22 jobs per acre, approximately 1,480 jobs will be located on 57 acres once current and planned projects are completed, resulting in a density of 26 jobs per acre.[9]

**Figure 2: Job growth in the Menomonee Valley and the City of Milwaukee, 2002-2011**

*Note: Data are indexed to compare relative growth over time. Values in 2002 are set to 100%.*

Additional examples of economic growth include the following:

- Since 1999, 49 companies have moved to the Valley or expanded within the Valley.[10]
- Between 2002 and 2012, taxable property values in the Menomonee Valley business improvement district (BID) increased by an inflation-adjusted 94.4% to a total of $154 million.[11] By comparison, the total assessed value of all commercial and manufacturing property in the City of Milwaukee increased by 9.5% during that timeframe (**Figure 3**).[12]

[8] Menomonee Valley Partners, Inc. "Development Objectives for the Menomonee Valley Stockyards." 2004. http://www.renewthevalley.org/media/mediafile_attachments/00/300-mvpdevelopmentobjectives.pdf

[9] Public Policy Forum analysis of MVP data. Planned projects include Rishi Tea, whose facility currently is being constructed, and Solaris, for which the land sale recently closed.

[10] Menomonee Valley Partners, Inc.

[11] Public Policy Forum analysis of City of Milwaukee BID 26 and City Assessor's Office data. BID 26 covers a majority of the Menomonee Valley land area. http://city.milwaukee.gov/ImageLibrary/User/dmalqu/PDF/2012ASSMTandTAXESBOOKLET.pdf

[12] Public Policy Forum analysis of Department of Revenue data.

Confidential - Subject to Protective Order

- The percentage of Valley workers who earn at least $3,333 per month ($40,000 per year) increased from 31.2% in 2002 to 47.7% in 2011.[13]

- Visits to Valley entertainment venues and tourist attractions have more than tripled in the past two decades, from 2.8 million visits in 1994 to more than nine million annual visits today.[14]

**Figure 3: Growth of total assessed value of commercial and manufacturing property, 2002-2012**

*Note: Data are indexed to compare relative growth over time. Values in 2002 are set to 100%.*

The Valley's economic revival not only has benefited the City of Milwaukee, but also has meshed with efforts to promote job growth in industries that are *economic drivers* for the region. Sectors that are export-driven or otherwise bring in revenue from outside the community, such as manufacturing, are considered such drivers because they create new sources of regional income. The Valley now competes favorably with the region's other business districts in attracting businesses, as evidenced by the MVIC nearly filling up within 10 years. With an increase in manufacturing, tourism, and other services that produce income from outside of Milwaukee, the Valley has strengthened its position as a hub of income-generating activities.

The Valley's economic growth also is distinctive in that its industrial occupants sit side-by-side with major tourist destinations, as well as natural and recreational amenities. Valley leaders believe this distinction offers a competitive advantage over suburban business parks, which tend to be exclusively used for industrial or office uses. According to former city planning director Peter Park, "*the intention in*

[13] Menomonee Valley Benchmarking Initiative. 2013. Data extracted from the U.S. Census Bureau's LEHD Origin-Destination Employment Statistics (LODES).

[14] Data provided by the organizations or available on their websites. Attendance at Miller Park has averaged 2.85 million for the last five years, Potawatomi now has approximately six million visitors per year, and the Harley Davidson Museum attracts around 350,000 visitors per year. By comparison, in 1994 the Milwaukee Brewers attracted 1.3 million fans to County Stadium and Potawatomi Bingo had 1.5 million visitors.

*the Valley was to create a place where more than one thing was happening, which is what an urban environment is all about."*

Recent Valley redevelopment has enhanced the diversity of land uses and activities in the area. Based on mapping and analysis conducted by URS Corporation, which is displayed in **Figure 4**, approximately 19% of the land in the Menomonee Valley currently is being used for manufacturing, while 14% is being used for entertainment and 8% for recreation and open space. With the active railroad in the Valley, an additional 18% is being used for transportation-related infrastructure and operations. (Zoning prevents housing in most of the Valley; the intention is for economic development in the Valley to support housing redevelopment in surrounding neighborhoods.) Several key stakeholders interviewed for this report pointed to the Valley's diversity as a key part of what makes the area unique and vibrant, though it is also a source of ongoing tension with regard to the future direction of Valley redevelopment.

**Figure 4: Current land use in the Menomonee Valley**[15]

One frequently cited economic development objective that has been challenging to achieve is that of using the redevelopment effort to create jobs for residents of surrounding neighborhoods, which suffer from high rates of unemployment. Only a few Valley businesses employ large numbers of workers from those neighborhoods. With the recent loss of Cargill's slaughterhouse in the Valley, the need to further

[15] This map was created by URS Corporation, the consultant in charge of the market study for the City of Milwaukee's Menomonee Valley 2.0 plan. The area included in the Valley 2.0 plan is notably smaller than that included in the 1998 Valley plan.

this objective now may be an even greater priority.[16] Some would argue, however, that adding high-paying jobs to the Valley is beneficial regardless of who fills them, because the added wealth that comes with those jobs creates demand for services in other parts of the city and region, including the adjacent neighborhoods.

## Environmental Improvements

Much of the national focus on the Valley's redevelopment efforts stems from its successful reuse of polluted or contaminated properties, which often are referred to as "brownfields." In 1999, when concerted efforts to redevelop the Menomonee Valley were launched, most of the vacant and underutilized parcels of land in the area were considered brownfields due to past industrial uses. Since that time, nearly 300 acres of brownfields have been remediated and redeveloped for business and recreational uses.[17] (The work is not finished, however, as at least 75-100 acres of undeveloped or underdeveloped land remain in the Valley, all of which likely have brownfield issues that will need to be addressed.)

As redevelopment has occurred, considerable efforts have been undertaken to replace detrimental environmental practices of the past with more sustainable practices. According to Menomonee Valley Partners, more than one million square feet of sustainably designed buildings have been built on former brownfield sites in the Menomonee Valley over the past 10 years, including several buildings that have been recognized by the U.S. Green Building Council as LEED certified buildings.[18] All stormwater from the new Menomonee Valley Industrial Center is now managed by Stormwater Park, an innovative amenity constructed in 2006 that successfully handled a 100-year flood in 2008. In addition, at the Reed Street Yards site on the Valley's southeastern edge, "green infrastructure" features have been installed to manage the site's stormwater and wastewater sustainably, including bio-swales, rain gardens, and a grey water recapture system.[19]

Additional efforts have added open space, restored the natural environment, and raised environmental awareness in the area. For example, the Urban Ecology Center's new facility in the Menomonee Valley, which is a showcase of green building practices, provides environmental education for thousands of children each year in the newly created Three Bridges Park. All together, more than 60 acres of new

---

[16] Mendez, Edgar. "South Side residents hit hard by closing of Menomonee Valley Cargill facility." *Milwaukee Neighborhood News Service.* August 1, 2014. http://www.milwaukeenns.org/2014/08/01/south-side-residents-hit-hard-by-closing-of-menomonee-valley-cargill-facility/?pcat=211

[17] Data provided by Menomonee Valley Partners, Inc.

[18] The U.S Green Building Council's Leadership in Energy and Environmental Design (LEED) program is the nation's most prominent certification system for sustainably designed buildings.

[19] Reid, Dave. "Transforming Reed Street Yards." *Urban Milwaukee*. April 18, 2014. http://urbanmilwaukee.com/2014/04/18/friday-photos-transforming-reed-street-yards/

Confidential - Subject to Protective Order

parks and trails have been added to the Valley since 1999,[20] and native plants have been re-introduced throughout Three Bridges Park and around many Valley businesses, totaling 45 acres to date.[21]

Finally, while it is beyond the scope of this report to analyze in depth the efforts that have been undertaken to restore the Menomonee River, those efforts have occurred alongside the Valley redevelopment effort. River restoration efforts have involved several public and nonprofit organizations, including the Milwaukee Metropolitan Sewerage District (MMSD), the Wisconsin Department of Natural Resources (DNR), Milwaukee Riverkeeper, and other environmental organizations. In addition to producing environmental and recreational benefits, those efforts have helped to make the Valley more attractive to businesses.

### Community Integration and Engagement

Over the past 10 years, physical infrastructure improvements have led to increased connectivity between the Menomonee Valley and adjacent neighborhoods, including downtown Milwaukee and the south side neighborhoods of Silver City, Clarke Square, and Walker's Point. Since 2004, four new roads providing automobile access to the Valley floor have been created, including the reconstructed Sixth Street viaduct and improved Canal Street, which now extends from Sixth Street to Miller Parkway.[22]

Several major bicycle and pedestrian amenities and a new bus route have been introduced recently as well, creating additional opportunities for residents to access the Valley for work and play. The Hank Aaron State Trail, which first opened in 2000, now traverses the entire Menomonee Valley and extends for a total of 12 miles out to Waukesha County. Two new bridges along a recent extension of the Hank Aaron State Trail provide new connections for Clarke Square and Silver City residents to access the Valley. Also, while previously the only way to access the Valley by public transit was via stairways from the 16th, 27th, and 35th Street viaducts, south side residents now can access the Valley floor by transit via Milwaukee County Transit System (MCTS) route 17, which travels along Canal Street.[23]

With Interstate 94 to the north of the Valley, pedestrian and bicycle access remains a challenge from north side neighborhoods such as Avenues West (though one new connection at N. 32nd Street offers a point of connection from the Merrill Park neighborhood). Overall, however, the Valley's connectivity with surrounding neighborhoods has improved significantly.

The ongoing development of the Hank Aaron State Trail and the opening of the Menomonee Valley branch of the Urban Ecology Center in 2012 have infused the area with additional recreational activity.

---

[20] Menomonee Valley Partners, Inc. http://www.renewthevalley.org/documents/4-welcome-to-the-menomonee-valley-partners
[21] Ibid.
[22] Menomonee Valley Benchmarking Initiative. 2013.
[23] Milwaukee County Transit System: http://www.ridemcts.com/routes-schedules/routes/17#Weekday

Confidential - Subject to Protective Order

Over 20,000 people participated in the Urban Ecology Center's programs in the Valley in its first year.[24] The Urban Ecology Center also conducts park use surveys to estimate how many people use Three Bridges Park and the Hank Aaron State Trail nearby. The organization estimates that during the 2012-2013 fiscal year, in addition to those who participated in Urban Ecology Center programming, 45,372 adults and 8,126 children used the parks and trail. The Friends of the Hank Aaron State Trail also hosts an annual 5k Run/Walk event on the trail that attracted 1,744 participants in 2013.[25]

With regard to community engagement, it is clear that more people contribute to Valley improvements than ever before. Milwaukee area residents and employees of Valley businesses invest thousands of hours of their collective time each year into making the Valley a cleaner and more vibrant place. For example, MVP, Friends of the Hank Aaron State Trail, and the Urban Ecology Center – three organizations that were not present in the Valley 15 years ago – each attract hundreds of volunteers every year for environmental cleanup and restoration work.

The opening event for Three Bridges Park in 2013 illustrates the extensive change in perception that has taken place in the Menomonee Valley. After 777 name suggestions were submitted for the new park, more than 1,000 people showed up for the park opening.[26] The event drew a wide-ranging group of participants, including representatives from neighborhood groups, Valley and National Avenue businesses, community organizations, area schools, environmental organizations, the Milwaukee Police Department, bicycle clubs and organizations, and more.

A summary of performance metrics that speak to the success of Valley redevelopment efforts is shown in **Figure 5.**

[24] According to the Urban Ecology Center, their programs served 9,832 adults and 10,774 children during the 2012-2013 fiscal year, for a total of 20,606 individuals.
[25] Figure provided by Friends of the Hank Aaron State Trail.
[26] Menomonee Valley Partners, Inc.

Confidential - Subject to Protective Order

**Figure 5: Summary of recent Menomonee Valley redevelopment accomplishments**[27]

| Economic Development | |
|---|---|
| Businesses moving to or expanding within Valley, 1999-2014 | 49 businesses |
| Net change in jobs located in the Valley, 2002-2011 | +3,244 jobs |
| Job density in Menomonee Valley Industrial Center, 2014 | 26 jobs/acre (goal was 22) |
| Change in taxable property values in Valley BID, 2002-2012 | +94.4% |
| Valley workers earning at least $40,000 per year, 2011 | 47.7% (31.2% in 2002) |
| Visits to Valley entertainment venues, 2012 (estimated) | 9,200,000 (2,800,000 in 1994) |
| **Environmental Improvements** | |
| Acres of brownfields remediated and redeveloped in Valley, 1999-2014 | 300 acres |
| Acres of brownfields that remain undeveloped in Valley (estimated) | 75-100+ acres |
| Square footage of sustainably designed buildings constructed, 2004-2014 | Over 1 million sq. ft. |
| Number of LEED-certified buildings constructed, 2004-2014 | 3 buildings |
| Acres of new parks and trails developed, 1999-2014 | 60 acres |
| Acres of native plants installed, 1999-2014 | 47 acres |
| **Community Integration & Development** | |
| New pedestrian/bicycle connections into Valley | 4 new connections |
| New automobile connections into Valley | 4 new connections |
| New sidewalks added to Valley | 10.8 miles |
| Change in transit ridership on MCTS bus routes in Valley, 2001-2011 | Up 30% |
| Traffic counts on Canal Street at 16th St., 2001-2012 (Wisconsin DOT counts) | Up 39% |
| Parks and trails users (Urban Ecology Center estimate) | 50,000+ per year |
| Participation in Urban Ecology Center programs | 20,000+ in first year |
| Volunteers with MVP, Urban Ecology Center, Friends of the Hank Aaron State Trail | Over 1,000 per year |
| Volunteer hours: MVP, Urban Ecology Center, Friends of the Hank Aaron State Trail | Over 9,000 per year |

[27] All figures not cited previously were taken from the Menomonee Valley Benchmarking Initiative's 2013 "State of the Valley" report.

Confidential - Subject to Protective Order

## Success Factors

Our analysis of the outcomes and accomplishments cited in the previous section yielded five major factors that we deem most crucial to the Menomonee Valley's redevelopment success:

1) Extensive *planning and visioning* that engaged the community and built consensus around key objectives.

2) Strong *leadership and collaboration* among organizations and individuals working to bring the vision for the area to life.

3) Access to and creative *utilization of available funding* in order to address key barriers to redevelopment.

4) Effective *project management* that capitalized on the Valley's existing strengths and on infrastructure-related opportunities.

5) A unique *location and good timing* that facilitated redevelopment and allowed the Valley's mix of businesses and natural amenities to comingle and thrive.

In this section, we describe and analyze those factors and how they played a prominent role in the Valley's recent revival.

Confidential - Subject to Protective Order

### Planning and Visioning

Numerous individuals interviewed for this report noted the vital role of planning and community engagement in the Menomonee Valley's revival. A strong vision for the area with wide-ranging support from those affected was critical to fostering collaboration among the Valley's many stakeholders and to attracting financial support for Valley projects.

> ***"In the Valley, a lot of time was spent on planning, because they wanted to 'get it right.' They created an ambitious vision for the Valley and built support for that vision with the community. That is the way to make change happen."***
>
> ***-Leo Ries, LISC Milwaukee***

***1998 Valley plan***

While several key documents shaped the recent wave of redevelopment in the Menomonee Valley, the City of Milwaukee's 1998 *"Market Study, Engineering, and Land Use Plan for the Menomonee Valley"* was the foundational blueprint.[28] The plan – which was co-sponsored by MMSD and the Menomonee Valley Business Association – presented information about the existing conditions and future redevelopment potential of Valley land and recommended specific actions needed to promote redevelopment.

According to the City's former planning director, Peter Park, the 1998 Valley plan changed the City's approach to planning in two important ways. First, the City diligently followed the plan and used it to evaluate and implement actual redevelopment projects as they originated, which had not always been the case with previous plans. Second, a much greater emphasis was placed on stakeholder engagement activities than in previous planning efforts. Interviews, workshops, and surveys were conducted with area residents and Valley businesses, giving them numerous opportunities to participate in shaping the plan.

A key goal of the plan was to clarify the role of government in Menomonee Valley redevelopment efforts. City leaders described that role as creating the conditions needed to facilitate high-quality private sector investments by establishing and enforcing regulations, building and improving infrastructure, and supporting partnerships between public and private sector entities.

The notion of "partnership" was reflected by two of the plan's eight "action agenda" recommendations, the first of which called for creation of a nonprofit organization to implement the plan and lead Valley redevelopment activities alongside the City. City leaders embraced that notion, acknowledging that the challenges of redeveloping the area were beyond the capacity of city government and its resources alone. Soon after the plan's creation, Menomonee Valley Partners, Inc. (MVP) was formed as a 501(c)(3)

---

[28] City of Milwaukee. *Market Study, Engineering, and Land Use Plan for the Menomonee Valley*. October, 1998. http://city.milwaukee.gov/ImageLibrary/Groups/cityDCD/planning/plans/valley/plan/MRVplan.pdf

Confidential - Subject to Protective Order

organization to fill that role, with early support provided in part by grant funds the City had received from the EPA.[29]

Market Study, Engineering, and Land Use Plan for the Menomonee Valley

Final Report
Prepared for the Department of City Development
City of Milwaukee

City of Milwaukee

Co-Sponsors:
Milwaukee Metropolitan Sewerage District
Menomonee Valley Business Association

Lockwood Greene Consulting
Fluor Daniel Consulting
Trkla, Pettigrew, Allen & Payne, Inc.
Edwards & Associates, Inc.

October 1998

Another important goal of the plan was to establish clarity about the nature of environmental contamination in the Valley. At the time, the common perception was that the entire Valley was heavily polluted due to decades of industrial use. The high cost associated with remediating contaminated parcels was identified as a significant barrier to redevelopment. Two plan recommendations called for extensive environmental testing to be undertaken on Valley parcels and for public funding to be made available to pay for environmental cleanup.

Following the plan's adoption, the City of Milwaukee aggressively pursued federal and state grants and established several tax increment financing (TIF) districts in the Valley to pay for environmental testing, cleanup, and other site improvements.[30] Two early grants from the EPA totaling $350,000 allowed for environmental testing to be conducted in the area, including a study by the U.S. Geological Survey that showed that groundwater contamination was less of an issue than land contamination.[31] Knowing that cross-contamination among properties via groundwater was not a significant risk boosted confidence among stakeholders in the Valley's redevelopment potential, as environmental issues could be addressed on a parcel-by-parcel basis.

Two other plan recommendations proposed land use and zoning modifications to promote more environmentally sustainable and visually appealing land uses. Much of the Valley was covered by a single zoning code (A-125 Industrial District) at the time, which allowed for heavy manufacturing and other land uses that produced air, groundwater, and noise pollution. The City followed up on the plan's recommendations by establishing more restrictive zoning regulations for many Valley parcels.

Other recommendations addressed the established need to develop new infrastructure, green space, and other amenities to improve vehicular and pedestrian access to and through the Valley and to improve the area's physical appearance. At the time, access to the Valley was extremely limited. Canal Street, for example, only extended west as far as 25th Street. Bicycle and pedestrian access was equally inadequate. The City and State were considering proposals to extend Canal Street west to Miller Park and to reconstruct the Sixth Street viaduct such that it would be lowered to connect with Canal Street. The plan supported both of those proposals and made the case that improved connections were

---

[29] De Sousa, Christopher. 2012.
[30] A description of tax increment financing is provided on page 31 of this report.
[31] U.S. Geological Survey. "Simulation of Ground-Water Flow, Surface-Water Flow, and a Deep Sewer Tunnel System in the Menomonee Valley, Milwaukee, Wisconsin." 2004. http://pubs.usgs.gov/sir/2004/5031/pdf/2004-5031_Menomonee.pdf

Confidential - Subject to Protective Order

essential to making the redevelopment of the area viable. The City followed up on that recommendation as well by paying for a large share of the cost of resurfacing and extending Canal Street and by developing and improving internal streets in order to make available parcels accessible.

In addition to the recommendations included in the "action agenda," the plan supported the continued presence and expansion of manufacturing in the Valley, which provided clarity to businesses with regard to the City's intentions for the area. The market study included in the plan identified manufacturing as the highest and best use for the Valley, demonstrating the existing strength of manufacturing in the area and the continued importance of manufacturing in the Milwaukee region. Stakeholder feedback confirmed that the public and businesses already located in the Valley preferred that the area maintain its focus on manufacturing.[32] The plan also noted that the export-oriented nature of manufacturing would provide the greatest economic benefit to the City among potential land uses.

The City's plan identified four "priority redevelopment areas," which are displayed in **Figure 6**. Priority areas were selected based on their potential to catalyze redevelopment throughout the Valley. As described below, those areas currently are at various stages of redevelopment. The development that has occurred in the priority areas demonstrates the progress that has been made in the Valley since the plan was completed. Still, it is important to note that two of the four areas continue to have large vacancies, and that a second set of priority areas is emerging through the City's current effort to update the Valley plan.[33]

**Figure 6: Priority development areas identified in the City's 1998 plan for the Menomonee Valley**

[32] De Sousa, Christopher. 2012.
[33] Information about "Menomonee Valley 2.0," the City of Milwaukee's current project that will update the land use and marketing plan for the Menomonee Valley, can be found at http://www.planthevalley.org/.

Confidential - Subject to Protective Order

A) The largest of the plan's four priority areas was the 140-acre site of the **former railroad shops of the Milwaukee Road** on the Valley's west end. That site was an early priority because it was the largest and most visible brownfield in the area and because the abandoned buildings on the site had raised significant health and safety concerns for many years. Previously owned by CMC Heartland Partners – the company that was created to own certain assets of the Milwaukee Road after it filed for bankruptcy – the site was condemned and acquired by the Redevelopment Authority of the City of Milwaukee (RACM) in 2003. RACM and MVP then led efforts to redevelop the site into the Menomonee Valley Industrial Center and Stormwater Park, which is nearly complete. The process of redeveloping this site is described in detail in the "Project Management" section of this report.

B) The priority area where the least progress has been made to date is **Reed Street Yards**, a privately owned, 17-acre site east of Sixth Street in the southeastern corner of the Menomonee Valley. With the recent development of the Global Water Center in an adjacent building, and new infrastructure currently being constructed by the City, momentum is building to redevelop Reed Street Yards into a business park with a water technology focus. In fact, General Capital Management Group is planning to begin construction on the first new building in Reed Street Yards in fall 2014.[34]

C) A portion of the **properties along Canal Street just east of Emmber Lane**, known as the former Milwaukee Stockyards, was purchased by MVP and redeveloped for commercial and light industrial use. The complex redevelopment of that site, which now is known as the Canal Street Commerce Center, also is highlighted as a case study in the "Project Management" section of this report. Cargill – the former owner of the Milwaukee Stockyards – continues to own a small parcel of land along Emmber Lane.

D) The **properties near Sixth and Canal Streets** – another highly visible location – also have been partially redeveloped, highlighted by the Harley Davidson Museum. The City had previously owned much of the site where the museum now stands, and Morton Salt also had an operation there. MVP purchased Morton Salt's parcel with the support of a state grant, which paved the way for the redevelopment of the entire parcel. Lakefront Brewery recently considered the possibility of developing a second brewery on a nine-acre parcel also located in this area, but cost estimates to build and equip the brewery and to finance the proposal were higher than expected and those plans were dropped.[35] Significant environmental and geotechnical issues stand in the way of redeveloping the remaining vacant land in this area. The geotechnical issues result from the fact that the Valley was originally a marsh and contains soft soils that are not

---

[34] Daykin, Tom. "Water business park expects first building in 2014." *Milwaukee Journal Sentinel*. February 6, 2014. http://www.jsonline.com/blogs/business/243750561.html

[35] Daykin, Tom. "Lakefront drops plan for Menomonee Valley brewery." August 7, 2014. *Milwaukee Journal Sentinel*. http://www.jsonline.com/blogs/business/270222991.html

Confidential - Subject to Protective Order

stable enough for development. Due to the challenges of redeveloping these properties and their significance as a gateway to the Valley, this area remains a priority.

Prior to the 1998 plan, the City had created several plans for the Menomonee Valley that had never been put into action. In contrast, each of the 1998 plan's eight major "action agenda" recommendations have been addressed by the City and its partners in a significant way since the plan was adopted, and major progress has been made toward redeveloping each of the four priority areas identified in the plan. In fact, the current effort to update the Menomonee Valley plan was precipitated by the perception that much of what was envisioned in the 1998 plan now has been realized.

***Additional planning efforts***

While the 1998 plan proposed solutions to significant redevelopment barriers and identified priority areas within the Valley, it provided relatively little detail regarding what a revitalized Valley could look like. Several community leaders felt that additional vision and energy was needed to fill in those details and move the effort forward. With the 1998 plan as a foundation, community organizations stepped in to facilitate additional activities and studies that further developed and enhanced the collective vision for the area.

One of the earliest of those efforts was a report produced for the newly formed Menomonee Valley Partners by the Center on Wisconsin Strategy (COWS). The 2000 report, entitled *"At the Center of it All,"* reinforced the City's proposal that the former Milwaukee Road site on the Valley's west end should be redeveloped into an eco-industrial park and suggested that efforts be made to attract businesses in industries that were economic drivers for the region.[36] It also specified that the new business park should provide family-supporting wages to workers and emphasized the potential for the site to provide much-needed jobs to residents of adjacent neighborhoods.

A driving force behind the Menomonee Valley visioning process following the 1998 plan was the Sixteenth Street Community Health Center, a nonprofit health care and social service provider on Milwaukee's south side. Between 1999 and 2003, Sixteenth Street played a lead role in coordinating a sustainable development design charrette and a national design competition that many describe as hugely influential in shaping the Menomonee Valley Industrial Center and other parts of the Valley.[37] Sixteenth Street collaborated with MVP and the City on these projects, which one key stakeholder described as helpful in creating buy-in from civic leaders and public officials.

In 1999, Sixteenth Street received a $200,000 Sustainable Development Challenge Grant from the EPA to conduct a design charrette aimed at generating ideas for the Valley's future.[38] The event brought

---

[36] Center on Wisconsin Strategy. *At the Center of it all: The High-Road Strategy for Milwaukee's Menomonee Valley.* June 2000. http://www.cows.org/_data/documents/966.pdf
[37] A design charrette brings together multiple designers to draft a solution to a design problem.
[38] MVP funding database.

Confidential - Subject to Protective Order

together over 140 leading design professionals from the Milwaukee area and a wide variety of other experts and stakeholders to discuss and design a sustainable future for the Valley.[39] Their work provided visual ideas of how individual parcels could be transformed and generated energy around the prospect of revitalizing the area as a whole.

The 2000 report that resulted from the event – *"A Vision for Smart Growth"* – added support to previous recommendations that the former Milwaukee Road site become an eco-industrial park featuring high-quality manufacturing jobs that would be accessible to area residents. The report also set a much stronger vision for environmental improvement and green building than previously had been established. An emphasis on sustainable development that balances the needs of the economy, the environment, and the community – which became a central theme of the Valley's redevelopment efforts – was fortified through the design charrette.

Sixteenth Street also coordinated the process of developing a detailed plan for the site of the former Milwaukee Road shops and Airline Yard sites on the Valley's west end, which further strengthened the vision for that area and its emphasis on sustainability. In 2002, Sixteenth Street worked with the City of Milwaukee, MVP, and other organizations to coordinate a national design competition for that site. The competition was facilitated by Larry Witzling, a professor in UW-Milwaukee's School of Architecture and Urban Planning, who had a great deal of credibility in the region and experience leading national design competitions. It was supported by a $50,000 grant from the National Endowment for the Arts (NEA) and by contributions from the City, the Wisconsin DNR, and many private sector contributors.[40] An expert jury with members selected by the NEA judged the proposed designs.

The design competition brought national talent in landscape architecture to the table to design the new Menomonee Valley Industrial Center and Stormwater Park. From 24 initial proposals, the jury

[39] Sixteenth Street Community Health Center and PDI, Inc. *A Vision for Smart Growth.* 2000. http://renewthevalley.org/media/mediafile_attachments/05/135-charettebook.pdf

[40] Gould, Whitney. "Plans for Menomonee Valley are Far and Wide." *Milwaukee Journal Sentinel.* 3/24/02 http://articles.chicagotribune.com/2002-03-24/business/0203240327_1_wisconsin-department-landscape-coalition

chose four finalists whose detailed designs for the area were presented in the 2003 report, *"Menomonee River Valley National Design Competition: Natural Landscapes for Living Communities."*[41] The winning design from Denver-based Wenk Associates envisioned an industrial park interlaced with green spaces. Wenk's designs also included plans for what would become Stormwater Park and Three Bridges Park.

The Wenk design was realized almost exactly as proposed. An important feature of the national design competition was that it offered the winning design team the right to negotiate a contract with the City of Milwaukee to build their design, and Wenk Associates was given that opportunity. In 2003, the Milwaukee Common Council approved a proposal to have Wenk create a detailed design and engineering plan for the Valley's west end based on their proposal. The detailed design they created ultimately was implemented.

***Development guidelines***

Another important component of Valley planning was the creation of development guidelines and objectives, which established standards for development in the Valley with regard to job density, wages, and site and building design. At the time, there was tension over the wisdom and practicality of establishing such standards in an area that was having trouble attracting businesses, but they appear to have been effective in encouraging high-quality, sustainable development.

In 2004, the City, Sixteenth Street, and MVP worked together to create "*Sustainable Development Guidelines for the Menomonee River Valley*," with technical support provided by a broad group of local architecture and engineering firms, developers, and nonprofit organizations, and funding support from several public and private sector sources.[42] The guidelines were developed based on national standards, which were modified to create realistic and achievable criteria for the Valley. The goal was for businesses to be able to pay back incremental costs associated with their buildings' sustainability features relatively quickly.

The sustainable development standards included in the guidelines related to site design; building design and energy use; materials and resources; construction and demolition; indoor environmental quality; and operations and maintenance. The guidelines modified underlying zoning by specifically prohibiting land uses that negatively affect the environment. In this way, the City followed up on a major recommendation of the 1998 plan.

---

[41] Sixteenth Street Community Health Center. *Menomonee River Valley National Design Competition: Natural Landscapes for Living Communities.* 2003. http://renewthevalley.org/media/mediafile_attachments/02/142-nationaldesigncompetition.pdf

[42] City of Milwaukee, Department of City Development: http://city.milwaukee.gov/ImageLibrary/Groups/cityDCD/planning/plans/valley/pdfs/MenomoneeValleySustainableGuid.pdf

Confidential - Subject to Protective Order

The sustainable development guidelines originally were adopted by the City for the Menomonee Valley Industrial Center site on the Valley's west end, but since have become standard for much of the Valley's redevelopment.[43] They were utilized by MVP, for example, for two properties it acquired at different periods of time – the sites where the Harley Davidson Museum and Canal Street Commerce Center now stand. Later, the City also applied the guidelines to the east end of the Valley as part of a Development Incentive Zone (DIZ).[44] Thus, the standards have been applied to much of the land in the four priority areas identified in the 1998 plan.

According to MVP leaders, it was difficult to convince some of the first businesses that moved to the Valley to follow the sustainable design guidelines. Once they did so successfully, however, business-to-business connections helped encourage other businesses to incorporate sustainability features. The Valley also started to attract businesses for which sustainability was a core principle; compliance with the standards was a non-issue for those businesses.

The City and MVP did not offer subsidies to businesses that followed the sustainable design standards, though incentives available through Wisconsin's Focus on Energy program were helpful in encouraging companies to implement features that would improve energy efficiency. We Energies worked with prospective businesses to connect them with those opportunities. In addition, construction companies became familiar with the guidelines over time, which made meeting the guidelines easier to accomplish for later projects.

Also in 2004, MVP led an effort to create "*Development Objectives for the Menomonee Valley Stockyards' Redevelopment*," which included job density and wage guidelines for that property.[45] According to key stakeholders, while the *sustainable design guidelines* had been created to promote environmental sustainability, the *development objectives* were meant to address all three elements of sustainable development simultaneously by fostering compact, job-intensive development that provided living wages for Valley workers.

The development objectives called for a job density standard of 1.5 jobs per 1,000 square feet of buildable land for the former Milwaukee Stockyards site, which had been acquired by MVP. The standard was based on "the average job density of Northwest Land Bank sales to manufacturers as reported by the City of Milwaukee Department of City Development in 2000."[46] Based on the amount of buildable land available on the site, the standard added up to 16.4 jobs per acre for the project. The

[43] Redevelopment Authority of the City of Milwaukee (RACM). March 2006. http://city.milwaukee.gov/ImageLibrary/Groups/cityDCD/planning/plans/valley/pdfs/MVDevelopmentGuidelines.pdf
[44] A DIZ is a development tool used by cities to encourage high quality developments by modifying zoning, lot, and density requirements for a designated zone. Developments that meet the DIZ standards are able to receive expedited permits for their projects. http://city.milwaukee.gov/ImageLibrary/Groups/cityDCD/build/pdfs/devincen.pdf
[45] Menomonee Valley Partners, Inc. 2004.
[46] Ibid.

Confidential - Subject to Protective Order

objectives also established an average wage target of $11.83 per hour for the site based on research demonstrating that it was the minimum wage needed to support an average Milwaukee household. It was recommended that prospective employers who failed to meet those standards be required to have a plan in place to meet them in the near future.

As with the sustainable design guidelines, the development objectives have been used extensively in the Valley since their creation. Originally created for the former Stockyards site, the objectives later were applied to RACM-owned properties in the Menomonee Valley Industrial Center as a requirement of land sales and have been used for many other Valley redevelopment projects.

***Summary***

Key stakeholders point to the importance of planning and consensus building to the Menomonee Valley's transformation. Beginning with the 1998 plan, significant time and resources were committed to planning-related activities in the Valley, which produced several important documents and designs that have guided Valley redevelopment over the past 15 years. Those guiding documents pointed the way to overcoming major barriers to redevelopment, including access, environmental, and geotechnical challenges. They also established strong sustainable development standards for Valley projects.

Throughout the process of developing a vision for Valley renewal, government agencies, businesses, design professionals, community organizations, and citizens were brought together to establish a common vision and set of objectives for the area, a course of action many describe as critical to creating the community buy-in and financial support needed to drive change. The fact that the plans and guidelines produced for the Menomonee Valley have been largely applied and implemented speaks both to the strong content of the plans and to the success of the community engagement process that contributed to their development.

## Leadership and Collaboration

Another theme raised consistently in key stakeholder interviews was the value of effective leadership and collaboration in implementing the vision that had been created for the Valley. It was essential to have the right individuals in leadership roles and the right mix of organizations engaged as partners to make projects work and keep the overall effort moving forward. It was also important to manage conflicting interests and avoid the kind of turf battles that have dragged down large-scale redevelopment projects elsewhere. Though not a painless process, those objectives were largely met in

> ***"The quality of people involved in the Menomonee Valley redevelopment — from the city, the state, and the private sector — has been outstanding. Really, off the charts. Without those individuals and their ability to work together, the Valley wouldn't be what it is today."***
>
> ***– Jim Van der Kloot, U.S. EPA***

Confidential - Subject to Protective Order

the Valley.

Particularly striking was the fact that several distinct organizations played leadership roles in different capacities and at different points in time. As demonstrated in the previous section of this report, for example, several entities took the lead throughout the planning process in the late 1990s and early 2000s. The City of Milwaukee, Sixteenth Street, and MVP each facilitated efforts that built on one another's work and combined to produce a detailed vision for the area.

Redevelopment projects in the Valley have involved numerous organizations representing all levels of government, the Forest County Potawatomi, area businesses, and community organizations.[47] While it is beyond the scope of this report to identify each of those organizations and their roles, we describe here the respective roles of a few of the major players. Later in this report, we highlight several Valley projects as case studies that show how these partners and many others contributed to the area's revival.

***Sixteenth Street Community Health Center***

Many key stakeholders recognized Sixteenth Street as a vital leader who focused community attention on the Valley and infused the redevelopment effort with an emphasis on sustainability and quality of life issues. Rather than seeking redevelopment in any way possible, Sixteenth Street leaders promoted sustainable development that took into account the varied needs of the surrounding community. Those leaders emphasized the need to attract businesses that would provide jobs that were accessible to central city residents, to make infrastructure improvements that could stitch the Valley together with its adjacent neighborhoods, and to restore and protect the natural environment for the long-term health of the community.

Through the sustainable development design charrette and the national design competition, Sixteenth Street brought energy to the Valley redevelopment effort and helped to develop community buy-in. At the time, MVP was just becoming established and Sixteenth Street already was a well-known and respected community organization with experience in brownfields redevelopment projects on Milwaukee's south side.

Sixteenth Street played a leadership role in the Valley in other important ways as well. For example, the organization's former director of environmental health, Peter McAvoy, served as the vice president of MVP's board of directors for several years and worked closely with the City to implement the Valley plan. Sixteenth Street also has been actively involved in the Menomonee Valley Benchmarking Initiative, an effort to track metrics related to the economic, environmental, and social health of the Valley, which began in 2003 and continues today.[48]

[47] The Forest County Potawatomi operate the Potawatomi Hotel and Casino in the Menomonee Valley.
[48] Menomonee Valley Benchmarking Initiative. http://epic.cuir.uwm.edu/mvbi/

Confidential - Subject to Protective Order

***City of Milwaukee***

The City's early and ongoing leadership in the Valley is viewed by many as fundamental to the area's revival. City leaders are credited for their diligence in implementing the 1998 Valley plan by following up on each of the plan's major recommendations and by leading efforts to address key barriers to redevelopment, including access challenges, unstable soil conditions, frequent flooding, and environmental contamination. Indeed, without the City's investments in infrastructure, environmental cleanup, and site preparation, it is unlikely that much redevelopment would have occurred.

The City has dedicated significant staffing resources to Valley planning and pre-development work. After work on the 1998 plan was completed, for example, DCD hired a staff person, Brian Reilly, whose work was focused exclusively on the Valley for seven years. At the same time, RACM – and its Assistant Executive Director, Dave Misky – was intensively involved in environmental assessment and cleanup work in the area, and the City's Department of Public Works (DPW) managed several infrastructure projects, including the extension of Canal Street, a project that was largely financed by the City.

As previously mentioned, RACM also took ownership of several key properties, including the largest brownfield in the area – the Milwaukee Road site – and made the improvements needed to prepare those sites for private sector redevelopment. In that regard, the City played the role of the "developer of last resort" in many parts of the Valley, as characterized by Brian Reilly.

The City also is credited with ensuring that the former Milwaukee Road site maintained a focus on manufacturing, as opposed to retail or other lower-wage land uses. In 2001, for example, DCD commissioner Julie Penman objected to a proposal before the City's Board of Zoning Appeals to allow the owner of the former Milwaukee Road site to develop an indoor go-kart facility on the site.[49] The commissioner's opposition was based on the proposal's incongruity with the 1998 Valley plan, and she argued the importance of preserving the limited industrial land located within the city that was suitable for manufacturing. Most of the land that has been redeveloped on that site is being used for manufacturing today.[50]

The City also has been praised for promoting a collaborative approach to Valley redevelopment that is believed to have facilitated successful outcomes. In addition to its support of MVP and its ongoing

---

Menomonee Valley Partners, Inc. http://www.renewthevalley.org/documents/157-menomonee-valley-benchmarking-initiative-report

[49] Memo to the City of Milwaukee's Board of Zoning Appeals. February 8, 2001.

[50] While the City rejected several proposals for non-manufacturing uses in the Valley, one prominent exception was a proposed development by BuySeasons Inc., a costume distribution company. The project had the support of Mayor Tom Barrett and Commissioner of City Development Rocky Marcoux, but faced vocal opposition from other elected officials because the company was a distributor rather than a manufacturer. BuySeasons ultimately decided to develop its distribution center in New Berlin rather than in the Menomonee Valley. Source: Romell, Rick. "Milwaukee's industrial legacy played against BuySeasons' move." *Milwaukee Journal Sentinel*. April 20, 2013. http://www.jsonline.com/business/a-time-to-build-milwaukees-industrial-legacy-played-against-buyseasons-move-203926461.html

Confidential - Subject to Protective Order

involvement in the partnership, the City promoted collaboration by bringing state and federal agencies to the table early on in the redevelopment effort. In 1999, the City and the EPA organized a daylong roundtable event that brought representatives of numerous state and federal agencies to Milwaukee to discuss the Valley plan and to explore opportunities to tap into available funding for Valley projects. Several key stakeholders identified that event as one of the most important activities in the Valley's revival story, because it engaged state and federal agencies from the beginning as important partners.

Key stakeholders described DCD and RACM leaders who have played active roles in the Menomonee Valley as hands-on, creative, and tenacious in their efforts to turn the area around. According to a representative of the EPA, for example, the City of Milwaukee's staff stands out nationally in its level of engagement in brownfields redevelopment work. Recognition was given both to City staff who brought energy and creativity to the planning process and to those who have worked more recently on Valley redevelopment projects.

City staff continue to be active in the Valley, but with the rise of MVP and with other priorities stretching the City's resources, staffing has spread out to focus on other geographic areas.

***Menomonee Valley Partners***

While the City of Milwaukee and Sixteenth Street played lead roles in setting the stage for redevelopment in the Valley, the

## Menomonee Valley Partners, Inc. organizational overview

MVP was established in 1999 with the mission of "revitalizing the Menomonee Valley for the benefit of the entire Milwaukee community." In the beginning, the organization was primarily volunteer-led, but over time, it has grown to have a staff of five and an annual budget of over $750,000. MVP is overseen by a 21-member board of directors that includes representatives of businesses, government agencies, and community organizations.

MVP is led by its executive director, Laura Bray, who has been with the organization for 10 years and associate director, Corey Zetts, who has been on staff for nine years. Additional staff positions include a business resources manager, a fund development manager, and a communications coordinator.

The organization's active committees include a management committee, finance committee, nominating and governance committee, and strategic planning committee. MVP also has recently reestablished a committee that is focused on the organization's pre-development efforts. Other committees exist on an ad hoc basis, but are not currently active.

In the early years, annual contributions from four organizations were the primary source of financial support for MVP's operations. Those organizations are the Helen Bader Foundation, Forest County Potawatomi Foundation, the Menomonee Valley BID, and We Energies. Since that time, MVP has diversified its revenue sources and today is supported by 20-30 local foundations and corporations annually. The Menomonee Valley BID continues to represent a significant source of support; in fact, a majority of the funding that the Menomonee Valley BID levies from its member businesses supports MVP operations. In return, MVP provides staffing for the BID.

Source: Menomonee Valley Partners: http://www.renewthevalley.org/about

Confidential - Subject to Protective Order

leadership of Menomonee Valley Partners, Inc. (MVP) was identified by many key stakeholders as one of the essential factors contributing to the success of the redevelopment process itself.[51] They credit the public-private partnership structure of MVP and the organization's continuity and persistence as crucial to keeping the Valley's many stakeholders coordinated and working together toward achieving common goals. As former city planning director Peter Park put it, *"We can make plans all day long, but ultimately there needs to be an entity outside of city government that persists – that advocates for the plan and focuses on implementation."*

MVP provides a range of services for prospective and existing Valley businesses. For example, the organization takes a leadership role in recruiting businesses to the Valley, often serving as the first point of contact for developers and businesses interested in the area. In fact, rather than working with an individual broker to market the Menomonee Valley Industrial Center site, the City contracted with MVP, which worked with many brokers to promote redevelopment. MVP also assists prospective new businesses or those looking to expand within the Valley to work through development challenges and access available grants and tax credits. The organization links businesses with one another to foster partnerships through its Business to Business Connector program, and works with existing Valley businesses on district improvement projects through its work in staffing the Menomonee Valley BID.[52] MVP also assists Valley businesses with their workforce development needs, though some key stakeholders noted that the organization could consider expanding its role in that regard.

Perhaps the most important role MVP plays in the Valley is that of convener and independent intermediary between public and private sector entities. MVP facilitates communication and collaboration among Valley stakeholders and builds consensus around Valley goals. As a nonpartisan organization, MVP has been able to avoid political obstacles and "work both sides of the aisle," according to key stakeholders. Business leaders interviewed for this report also noted that having an intermediary like MVP has been attractive for businesses considering the area, as the organization is perceived by many as not benefitting directly from development that occurs.

In addition to its business recruitment and consensus-building activities, MVP has stepped in to take a leadership role in other ways. Like the City, for example, MVP has been an occasional Valley landowner, purchasing properties that were difficult to redevelop or potentially subject to an undesirable use, performing pre-development work, and selling them to businesses whose development projects met established design, job density, and wage standards.

A unique characteristic of public-private partnerships like MVP is that they have greater ability than local governments to solicit philanthropic donations for use on specific projects. When it was unclear who

[51] On September 17, 2014, MVP Executive Director Laura Bray was named the incoming CEO of BIOforward, Inc., a biotech trade association working to advance Wisconsin's position as a leading life science community. On the same day, Corey Zetts was named MVP's Acting Executive Director by its Board of Directors.

[52] Menomonee Valley Partners, Inc. http://www.renewthevalley.org/media/mediafile_attachments/03/123-ourprograms.pdf





Confidential - Subject to Protective Order

would pay for the development and maintenance of Three Bridges Park, for example, MVP took a leadership role in fundraising alongside the Urban Ecology Center. Together, the two entities have raised more than $23 million for the development of Three Bridges Park and for a new Urban Ecology Center facility in the Valley, which is described in detail later in this report.

Key stakeholders cite the credibility of the individuals who have served on MVP's board of directors as contributing significantly to the organization's effectiveness. For example, Don Schuenke, a former CEO of Northwestern Mutual Life Insurance Company, was the first president of MVP's board of directors, and his early leadership was frequently cited as crucial to MVP's early development. Having a well-known and respected board president with strong connections to business and civic leaders gave MVP legitimacy from the beginning. In addition, the organization's board always has included partners of the law firm of Foley and Lardner LLP, including Mick Hatch and Bruce Keyes, who have brought real estate expertise to the table. Several key stakeholders pointed to their involvement as extremely valuable to making development deals work.

Indeed, ensuring that its board includes members with diverse and specific skill sets has been a priority for MVP. In 2004, MVP formalized guidelines to ensure that the board included a mix of Valley stakeholders with broad skills, temperaments, and connections. Currently, MVP's policy is to have between six and eight board members who are representatives of Valley businesses, five members who are representatives of community organizations, four representatives of city, state, and county governments, and between three and five "at large" members.[53] The organization's policy also calls for board members to bring desired skills to the table, specifying that they must have expertise in economic development and finance; business recruitment; transportation; entrepreneurship; workforce development; and/or fundraising.

The effectiveness and stability of MVP's current and former staff members also is widely viewed as important to the Valley's recent success. Many key stakeholders credited the organization with hiring staff members who not only have the skills and backgrounds needed to be effective, but who also are enthusiastic about their work. MVP's lead staff was characterized as persistent yet patient and realistic – qualities many viewed as essential to leaders of public-private intermediaries.

***State of Wisconsin***

Several state agencies have played major roles in Valley projects over the past 15 years, both as funders and as project partners. The Wisconsin DNR, for example, has provided oversight and approval for all brownfields cleanup projects and led the ongoing development and maintenance of the Hank Aaron State Trail. The Wisconsin DOT collaborated with the City in the Canal Street extension project and worked with several partners to develop Three Bridges Park. Those departments – as well as the Department of Commerce, Wisconsin Housing and Economic Development Authority (WHEDA), and Wisconsin Economic Development Corporation (WEDC)—also provided funding for Valley projects.

[53] Menomonee Valley Partners, Inc. "Guide to Board Structure and Composition." July 11, 2006.

Confidential - Subject to Protective Order

Many key stakeholders described DNR and DOT staff members involved in the Valley as important partners who were helpful in moving projects forward. As with MVP, the continuity of many of those lead staff members also is viewed as vital to the success of many Valley projects, as they understood the overarching vision for the Valley and became increasingly knowledgeable about the area over time, which facilitated project development efforts.

DNR staff members, for example, are viewed as having helped to move Valley projects through necessary brownfields cleanup approval processes in a collaborative and timely fashion. The positive impact of the DNR's increased "flexibility, cooperation, and willingness to negotiate" in recent years in working through brownfields cleanup approval processes also was a key finding of national research on Wisconsin's brownfields redevelopment efforts.[54]

***Valley Businesses***

Businesses in the Valley also have been important partners in the area's revival. According to City leaders, Valley businesses have relatively strong connections with one another and many have been willing to become actively involved and contribute to the area's improvement.

The Menomonee Valley Business Association (MVBA) has existed for many years, providing business-to-business networking opportunities. Valley business leaders interviewed for this report noted how much they value the MVBA as an entity that offers opportunities for participating businesses to share ideas and resources and to know what is happening in the area. The MVBA was a co-sponsor of the 1998 Valley plan, which reflected their support for creating a consensus plan for the Valley's future.

In 1999, Valley businesses formed a business improvement district (BID), which levies an additional property assessment on commercial and industrial properties located within the district boundaries, based on assessed property values, and invests those funds in Valley improvement projects. Several key stakeholders cited the leadership of one small business owner in the Valley as essential to building support for the BID among Valley businesses, many of whom were opposed to the idea initially. A majority of the BID's revenues are used to support MVP's operations, as MVP manages most of the BID's projects. In 2010, the BID adopted the MVBA as one of its committees, and it continues to operate networking events for area businesses today.

Individual Valley businesses have taken leadership roles in Valley redevelopment efforts and/or contributed to specific community improvement projects. For example, the company with the longest history in the Valley, Falk/Rexnord, gifted a piece of its property to the City to allow for the installation of one of the bridges in Three Bridges Park. Several business leaders serve on the MVP board and its committees, and many businesses have worked with MVP to form stewardship groups ("Stew Crews"), which do volunteer cleanup, restoration, and beautification work in the Valley.

[54] Resources for the Future. "Brownfields Redevelopment in Wisconsin: A Survey of the Field." December 2003. http://www.cpeo.org/pubs/RFF-DP-03-54.pdf

Confidential - Subject to Protective Order

***Summary***

One of the factors most frequently cited by key stakeholders as essential to the Menomonee Valley's turnaround was strong leadership and collaboration among numerous public and private sector organizations. Success in the Valley started with a few passionate leaders at Sixteenth Street Community Health Center and the City of Milwaukee, who used planning and community engagement efforts to build excitement for a new vision that emphasized sustainable development. From there, MVP stepped into a leadership role alongside the City, helping to foster collaboration among Valley stakeholders and partners, which many see as instrumental to the Valley's turnaround.

The City is credited with establishing a strong foundation for Valley redevelopment. After developing the 1998 Valley plan, the City led efforts to address key barriers to Valley redevelopment by using eminent domain to acquire the largest brownfield site in the area, investing in infrastructure and pre-development work, and engaging state and federal funding agencies as project partners. The City also showed commitment to its plan by "holding the line" to maintain the Valley's emphasis on manufacturing.

Alongside the City, MVP's leadership in filling the Valley with job-intensive businesses in economic driver industries – and with new recreational amenities – exemplifies the role a public-private partnership can play in development work. While governments have competing priorities throughout a city, and city administrations come and go, an intermediary like MVP can provide unique focus and dedication to a specific geographic area. As nonpartisan, neutral brokers, such intermediaries also have the potential to manage complex political dynamics. The Valley case study illustrates that with the involvement of individuals and organizations with the right mix of skills and connections, public-private partnerships are capable of fostering significant improvements.

Overall, the push to revitalize the Menomonee Valley as a sustainable urban business district exemplifies the importance of having committed leaders from all levels of government and the private sector in lead roles. It also demonstrates the importance of strong partnerships among numerous government agencies, businesses, and community organizations in initiating and completing major development projects, which is further illustrated in the "Project Management" section of this report.

## Utilization of Funding

Progress in the Menomonee Valley obviously has depended upon the availability and acquisition of a great deal of funding from both public and private sources. In addition to the infrastructure investments that were needed, most Valley parcels had significant environmental and geotechnical challenges that were costly to address. Those added costs often created financial "gaps" that had to be filled in order to make land attractive to developers. For example, it is very expensive to remove contaminated soil and

backfill sites with clean soil. Likewise, it is costly to drive deep piles in places where they are required in order to create stable conditions for development.

> ***"The potential for a revitalized Menomonee Valley to produce multiple significant benefits for the community was huge, which made it an ideal project to support for many funders."***
>
> ***–Ruben Anthony, Jr., Wisconsin Department of Transportation (former)***

The City of Milwaukee, State of Wisconsin, MVP, and other partners have contributed in various ways to secure funding from multiple sources to move projects forward. As previously mentioned, several key stakeholders described a funding roundtable event organized by the City and the EPA in 1999 as critical to engaging state and federal agencies early on in the Valley redevelopment effort. According to Julie Penman, the City's commissioner of development at the time, the City presented its Valley plan in the morning, which created excitement around the vision for turning the area around. In the afternoon, City staff met with the participating agencies to discuss their grant programs, which helped the City to understand available opportunities and move forward to pursue funding. Examples of how those partners contributed to specific Valley projects are included in the next section of this report.

The City and other lead organizations have been able to attract a substantial amount of public funding from numerous sources for Valley projects. Those investments have been followed by much greater investments made by private sector organizations and the Forest County Potawatomi. In fact, as shown in **Figure 7**, public sector entities have contributed at least $200 million in funding for Valley projects since 1998, which has facilitated at least $828 million of investments by private sector organizations and the Forest County Potawatomi, for an overall investment of more than $1 billion.

**Figure 7: Total investments in Menomonee Valley projects, 1998-present** [55]

[55] Menomonee Valley Partners, Inc. MVP's internal funding database is a comprehensive list of investments made in the Valley since 1998. Additional data included for City of Milwaukee TIF districts and for the UEC/MVP's From the Ground Up campaign.

The influence of the Forest County Potawatomi on these figures cannot be overstated, as roughly $536 million of the total investments have been made by that one entity (52%).[56] Thus, the Forest County Potawatomi have invested more in the Menomonee Valley than all other private and public sector entities combined. The vast majority of those investments went to expanding the Potawatomi Hotel and Casino and other Potawatomi facilities, but contributions also were made to MVP's operations and to several Valley projects. Notably, while the Potawatomi's casino is tax-exempt, all of its other properties are taxed, including its hotel, parking structure, and business administration building. The tribe also has revenue sharing agreements with the City, County, and State.

It is also worth noting that the cost of constructing Miller Park, which was completed on the Valley's west end in 2001 and paid for primarily by a regional sales tax, is *not* included in these figures. That investment was roughly $400 million.[57]

The largest single source of funding for pre-development work in the Menomonee Valley has been a set of six tax increment financing (TIF) districts established by the City of Milwaukee, which are shown in **Figure 8**. (See text box on the following page for a detailed description of TIF.) Proceeds from those TIF districts allowed the City to finance efforts to clean up land, prepare it for development, and install infrastructure and utilities. In fact, most of the Valley land that has been redeveloped over the last 15 years has benefited from TIF investments, including the Menomonee Valley Industrial Center and the Harley Davidson Museum.

**Figure 8: City of Milwaukee TIF districts located within the Menomonee Valley, 2004-present**

***Note: TIF districts are labeled above by District Number. See Table 1 or 2 on the following pages for the names of the TIF districts shown here and for additional information about each district.***

[56] This figure primarily reflects investments in the Potawatomi Casino and Hotel facilities, but also includes contributions made by the Forest County Potawatomi to MVP and to other Valley projects.
[57] *Milwaukee Journal Sentinel.* "Miller Park: Economic promises got it built. Has it paid?" April 4, 2008. http://www.jsonline.com/sports/brewers/29508084.html

Confidential - Subject to Protective Order

## What is TIF?

Tax incremental financing is an economic development tool used by local governments to redevelop "blighted" properties. Its basic function is to help generate equity for real estate ventures by leveraging future property tax revenues.

A TIF district is drawn around the site of the proposed development, the assessed base value of the property within the district is frozen, and an estimate of the development's impact on the future assessed value is determined. Based on the projected growth in assessed value within the district, the increased tax revenue attributable to that growth is determined. Those future property tax revenues are then used as up-front equity for the project.

Typically, a municipality will issue general obligation bonds at the beginning of the project and use the funds raised for public infrastructure improvements and/or developer incentives. All new property tax revenue (based on the TIF district's increased value, or "increment") is then used to pay off the initial bonds, and the TIF district is retired after the investment is repaid. At that time, all property tax revenues from the district return to the general tax rolls.

Source: Public Policy Forum. http://publicpolicyforum.org/sites/default/files/2009TIFBrief.pdf

**Table 1** shows that between 2004 and 2009, the City authorized total expenditures of approximately $47 million for six Valley TIF districts. (Authorized expenditures for each district are determined based on feasibility studies that define the scope of work, estimate costs, and project the length of time it will take to generate property tax revenues to pay off project-related debt.) During the same timeframe, the City authorized $154 million in total TIF expenditures citywide. At 30.5% of the total, this demonstrates the extent to which the Valley was prioritized among the City's economic development efforts.

Based on Wisconsin law, TIF districts can exist for a maximum of 27 years. The City's six TIF districts in the Valley are all projected to be paid back within that timeframe, as shown in **Table 2**.[58] One district, however – established for the Amtrak Intermodal Station (#60) – has not met expectations and will require substantial donations from other, more successful TIF districts elsewhere in the city to be paid back on time. Among the other Valley TIF districts, three (Harley Davidson Museum, City Lights, and Reed Street Yards) are on track to be paid off several years earlier than required. Another district – Falk/Rexnord (#63) – is a "developer financed" district, meaning that Falk/Rexnord paid for the project and assumed the financial risk that the increment would be sufficient for those investments to be paid back.

The first and largest Valley TIF district – the Menomonee Valley Industrial Center district (#53) – currently is projected to be paid back in the last year of its legal life. That district was amended twice to

[58] The "City Lights" TIF district covers an area along the Menomonee River between N. 25th and N. 17th Streets. The development that has occurred within that district to date includes a major historic rehabilitation project that now is home to Zimmerman Architectural Studios, Inc.

Confidential - Subject to Protective Order

provide additional funding to cover the substantial costs of making the site "shovel ready," which ultimately were determined to be more expensive than originally estimated. Despite those amendments, the district still is expected to be paid back on time. City leaders also note that the total property value of the district has consistently surpassed original estimates.

**Table 1: TIF districts created by City of Milwaukee, 2004-2009**[59]

| District Number | Name | Year Created | Authorized Expenditures | Valley? |
|---|---|---|---|---|
| 75 | Reed Street Yards | 2009 | $6,217,770 | X |
| 74 | N. 35th & Capitol Drive (Century City) | 2009 | $15,600,000 | |
| 73 | City Lights | 2009 | $2,038,000 | X |
| 72 | Bishop's Creek | 2009 | $1,585,000 | |
| 71 | Mitchell Street | 2008 | $3,116,600 | |
| 70 | 735 N. Water St. | 2007 | $3,253,992 | |
| 68 | Fifth Ward/First Place | 2007 | $4,402,966 | |
| 67 | The Brewery Project | 2007 | $29,002,272 | |
| 66 | Metcalfe Park Homes | 2007 | $1,475,000 | |
| 65 | North 20th/West Brown Streets | 2006 | $3,250,000 | |
| 64 | Direct Supply | 2006 | $13,350,000 | |
| 63 | Falk/Rexnord | 2006 | $2,500,000 | X |
| 62 | DRS Power & Technology | 2006 | $1,700,000 | |
| 61 | Chase Commerce Center | 2005 | $500,000 | |
| 60 | Amtrak Intermodal Passenger Station | 2005 | $6,250,000 | X |
| 59 | Bronzeville | 2005 | $3,288,500 | |
| 58 | 20th/Walnut | 2005 | $2,230,046 | |
| 57 | Harley Davidson Museum | 2005 | $5,965,000 | X |
| 56 | Erie/Jefferson Riverwalk | 2004 | $21,593,059 | |
| 54 | Stadium Business Park | 2004 | $2,810,000 | |
| 53 | Menomonee Valley Industrial Center | 2004 | $24,000,000 | X |
| | **Total Authorized Expenditures** | | **$154,128,205** | |
| | Valley Authorized Expenditures | | $46,970,770 | |
| | Valley as % of total | | 30.5% | |

**Table 2: Menomonee Valley TIF districts** [60]

| District Number | Name | 2014 Revenue Increment | Remaining cost after 2014[61] | Projected Payoff (levy year) | Maximum Legal Life |
|---|---|---|---|---|---|
| 75 | Reed Street Yards | $665,923 | $5,134,077 | 2033 | 2036 |
| 73 | City Lights | $141,473 | $2,221,756 | 2029 | 2036 |
| 63 | Falk/Rexnord | $100,047 | $1,822,365 | 2025 | 2026 |
| 60 | Amtrak Intermodal Station | $171,815 | $8,544,975 | 2017 | 2032 |
| 57 | Harley Davidson Museum | $646,547 | $4,096,311 | 2020 | 2031 |
| 53 | Menomonee Valley Industrial Center | $1,706,087 | $26,401,503 | 2029 | 2030 |

[59] City of Milwaukee. http://city.milwaukee.gov/MilwaukeeTIDprojectsummaries.htm#.U8AN7fldWSo
[60] Data provided by the City of Milwaukee at the request of the Public Policy Forum.
[61] Notably, the remaining cost of districts 53 and 60 are higher than the original authorized expenditures for those districts. That is due to interest accrued on the bonds that were issued by the City to support those projects.

Confidential - Subject to Protective Order

State and federal brownfields grants also were among the most important funding sources used to jumpstart redevelopment in the Valley. Brownfield assessment and cleanup grants from the EPA, HUD, Wisconsin Department of Commerce, and Wisconsin DNR, which totaled at least $5.7 million during that period, were critical to understanding the environmental conditions of Valley parcels and to preparing land for redevelopment.[62]

Key stakeholders raised concerns that because state brownfields grants are more difficult to access now than they were during the early-to-mid 2000s, efforts to complete the Valley's redevelopment and engage in major redevelopment efforts elsewhere in Milwaukee could be hampered. The Wisconsin Department of Commerce awarded more than $14 million in grants through the State's largest brownfields program during each biennium up until 2009, but less than $7 million was awarded from that program (now run by the Wisconsin Economic Development Corporation – WEDC) during the 2011-2013 biennium (**Figure 9**). According to key stakeholders, increased competition also has contributed to greater difficulty in acquiring grants.

Concerns also were raised that the maximum value of state brownfield grant awards has been reduced in recent years. The City of Milwaukee received state grants of as high as $1 million for individual brownfields projects in the Valley, but WEDC has established an administrative policy that caps its brownfields grants at $500,000.[63]

**Figure 9: Total value of grants awarded per biennium through Wisconsin's Brownfield Program**[64]

While access to state brownfields grants may pose a future challenge, federal funding for brownfields programs has remained stable and in some cases expanded in recent years, and RACM has been

[62] Public Policy Forum analysis of MVP funding database.
[63] Wisconsin Legislative Fiscal Bureau. http://legis.wisconsin.gov/lfb/publications/Informational-Papers/Documents/2013/93_WEDC.pdf
[64] PPF analysis of data provided by the Wisconsin Economic Development Corporation.

Confidential - Subject to Protective Order

extremely successful in accessing those funds. Based on our conversations with key stakeholders, in fact, it appears that Milwaukee has earned a high degree of trust with the EPA with regard to brownfields redevelopment efforts through the process of redeveloping the Valley, which may help the City in seeking support for additional projects. According to an EPA representative, however, federal funding for brownfields has become more institutionalized and its use has become more restricted. In addition, federal brownfields cleanup grants require that the City owns the land, which may limit their usefulness in some cases.

Other forms of flexible funding from the state and federal governments also were crucial to Valley projects. Federal earmarks, which were secured by Senator Herb Kohl and Representative Gwen Moore and funneled through HUD to the City and MVP, totaled at least $5.6 million between 2001 and 2008.[65] With the recent push by the U.S. Congress to eliminate federal earmarks, however, that funding source may be limited today.

The Wisconsin Department of Commerce contributed flexible funding for "pre-development" work on Valley parcels as well. In the 2001-2002 Wisconsin State Budget, MVP and the Milwaukee Economic Development Corporation (MEDC) – a close partner of the City of Milwaukee – each received grants of $750,000 for Valley redevelopment projects.[66] According to MVP leaders, that funding allowed them to acquire several parcels over time, perform environmental assessments, and recruit businesses. As funds were paid back through the sale of each parcel, they could be recycled into the next project. The pre-development funding provided by the State of Wisconsin was instrumental to several major catalytic projects in the Valley, including the Harley Davidson Museum, Canal Street Commerce Center, and the Urban Ecology Center's new Menomonee Valley facility. The grant was a unique, one-time opportunity, however, which may not be replicated in the future.

With reduced access to some forms of state and federal funding, the City of Milwaukee and its partners will have to find other means of financing pre-development work for remaining Valley parcels and for similar projects elsewhere in Milwaukee, such as Century City on the city's north side.[67] TIF undoubtedly will be one important tool, and indeed, a $15.6 million TIF district already was established for the Century City project in 2009, as shown in **Table 1**.

When contemplating the efficacy of using TIF, cities also should consider the full range of benefits the investment can generate. For example, industrial properties typically generate lower sales values and lower incremental growth in property taxes than retail properties, but often produce greater economic growth for the city and feature jobs with comparatively higher wages. These factors should not be

[65] Public Policy Forum analysis of MVP funding database.
[66] Wisconsin Legislative Fiscal Bureau. "Comparative Summary of Budget Provisions (Enacted as 2001 Act 16) -- Volume I." December, 2001. http://legis.wisconsin.gov/lfb/publications/Prior-Budgets/Pages/Prior%20Budgets.aspx
[67] Century City is the name of the 84-acre site the City of Milwaukee is working to develop where A.O. Smith was formerly located, near the intersection of N. 35th Street and Capitol Drive.

Confidential - Subject to Protective Order

dismissed in TIF district planning, which can focus too heavily on the growth in property taxes to pay off TIF-related debt.

Nevertheless, TIF must be used carefully. The Valley was a truly blighted area with significant issues that needed to be addressed to make land marketable, which is precisely the type of project for which the tool was created. In addition, even if TIF does prove to be a viable source of redevelopment funding, the Valley's experience shows that other funding sources will be needed as well.

A unique opportunity that may aid the City in accessing additional federal dollars is Milwaukee's recent designation by the U.S. Department of Commerce as one of 12 "Investing in Manufacturing Communities Partnership" (IMCP) cities.[68] The new program gives IMCP-designated cities priority when applying for funding from several federal programs administered by 11 different agencies.

***Summary***

Public sector investments of roughly $200 million in infrastructure, environmental cleanup, utility installation, and site preparation in the Valley over the last 15 years have leveraged private investments of more than four times that amount from the Forest County Potawatomi and private sector entities. The City of Milwaukee's contributions, which included investments in Canal Street and the establishment of six TIF districts in the Valley, account for almost half of the total public sector investments, while the combined contributions of state and federal government sources make up the remainder.

Several important state and federal funding sources – including state brownfields grants and federal earmarks – appear to be less available now than in the past, which may put pressure on the City to increase its use of TIF and/or to find other creative means of financing similar projects on brownfield sites with significant barriers to redevelopment. According to key stakeholders, the flexible grant funding provided by the State of Wisconsin to MVP and MEDC for pre-development work in the Valley was one effective financing tool that facilitated redevelopment. The State may wish to consider whether similar targeted pre-development investments may be an effective strategy for large-scale brownfields redevelopment projects in Wisconsin moving forward.

In many instances, creative and collaborative strategies were utilized to secure funding for Valley redevelopment projects. For example, the funding roundtable organized by the City and the EPA following the completion of the 1998 Valley plan was a unique event that connected City leaders with numerous state and federal programs. Having many partners working together on individual Valley projects allowed project leaders to combine resources and coordinate efforts to pursue state and federal financial support, as illustrated in the following section of this report. Key stakeholders also noted that the holistic approach to redevelopment that was taken in the Valley, which included goals

---

[68] *BizTimes Milwaukee.* "Feds name Milwaukee area one of 12 'manufacturing communities.'" May 29, 2014. http://www.biztimes.com/article/20140529/ENEWSLETTERS02/140529791

Confidential - Subject to Protective Order

ranging from economic development to ecological restoration to quality of life improvements, allowed the City and its partners to tap into funding from many different sources.

## Project Management

The revitalization of the Menomonee Valley is the product of numerous overlapping projects that each added momentum to the overall effort. While it is beyond the scope of this report to analyze every major project that has occurred in the Valley over the past 15 years, we examine several projects here to understand how specific aspects of project management – including policies, partnerships, and financial resources – contributed to their completion and the Valley's overall success.

***"The Valley's redevelopment involved a series of very complex and interconnected projects, which often required us to juggle multiple priorities. We worked on individual projects with an eye to the whole."***

***Julie Penman, former Commissioner of City Development***

***Canal Street extension***

The extension of Canal Street from Sixth Street to Miller Park is widely viewed as one of the projects that made the greatest impact in spurring Valley redevelopment. The project came on the heels of the $49.7 million Sixth Street viaduct reconstruction project, which was completed in 2002. That project lowered Sixth Street to connect with the Valley floor at Canal Street, thus improving accessibility to the Valley's east end.[69] Shortly thereafter, in 2006, the $52 million Canal Street project produced even greater accessibility, creating an extended thoroughfare that traverses the heart of the entire Valley from east to west.

*Project background*

Canal Street previously only extended from Sixth Street to 25th Street, providing access to a limited area. The Sixth Street viaduct stretched over the Valley, and though it included a spiral exit for Canal Street, it was awkward to utilize and by the mid-1990s it was dilapidated and badly in need of repairs. One could access Canal Street from 13th Street or 25th Street as well, but those were small city streets and required travel past heavily blighted areas along the way, such as a junkyard formerly located on 25th Street. In addition, CP Rail had active railroad lines running down the center of Canal Street, making travel by car confusing and uncomfortable.

[69] Mader, Becca. "Sixth Street Viaduct is model of new bridge technology." *Milwaukee Business Journal.* March 24, 2002. http://www.bizjournals.com/milwaukee/stories/2002/03/25/focus1.html?page=all

Confidential - Subject to Protective Order

The Canal Street extension project involved rerouting the rail lines, resurfacing the existing street, and extending it out to Miller Park. It also included extending the Hank Aaron State Trail for bicycle and pedestrian use, developing a new traffic roundabout at the intersection of 25th and Canal Streets, and creating a bio-retention facility for stormwater management near the new roundabout.[70]

*Leadership and collaboration*

The City of Milwaukee, Wisconsin DOT, Wisconsin DNR, and the Milwaukee Metropolitan Sewerage District (MMSD) were the major partners in the Canal Street extension project, providing funding support as well as project leadership. The City paid for engineering, design, construction, and utility work, totaling approximately $36.5 million. The DOT contributed $15 million for the project, despite the fact that Canal Street is not a state road. According to former DOT deputy secretary Ruben Anthony, who was active in the Valley project, the agency saw it as an opportunity to serve multiple purposes, because an extended Canal Street could open up the Valley for redevelopment, while also serving as a mitigation strategy for the Marquette Interchange reconstruction project, which would be launched soon after.[71] For the duration of that project as well as ongoing repaving and reconstruction of the east-west corridor, Canal Street would offer drivers an alternate route.

The DNR collaborated with the DOT and City to extend the Hank Aaron State Trail along the entire stretch of the new Canal Street, with the support of a mix of state and federal funds. The Hank Aaron State Trail was seen as a way to bring multi-modal transportation options to the Valley, while simultaneously providing recreational opportunities for the community along the Menomonee River corridor.

The Forest County Potawatomi, who had completed a significant expansion of their casino on Canal Street in 2000, also were a strong supporter of the Canal Street extension project.[72] The Potawatomi paid for a $250,000 study commissioned by MVP that examined expansion options for Canal Street and completed preliminary engineering for the project. In addition, a significant portion of the State's contributions to the Canal Street extension came from its share of Potawatomi gaming revenue. At the time, the Forest County Potawatomi had a compact with the State of Wisconsin through which they shared more than $6 million of gaming revenue with the State each year. According to a Potawatomi representative, the tribe advocated for a portion of those funds to be used for the Canal Street project, which ultimately was done.

[70] *BizTimes Milwaukee*. "Canal Street extension to open on Friday." March 28, 2006. http://www.biztimes.com/article/20060328/ENEWSLETTERS02/303289993/

[71] Menomonee Valley Partners, Inc. Internal funding database.

[72] Quigley, Kelly. "Casino says valley needs Canal Street expansion." *Milwaukee Business Journal*. November 5, 2000. http://www.bizjournals.com/milwaukee/stories/2000/11/06/story3.html?page=all

Confidential - Subject to Protective Order

**Images 1 and 2: Canal Street looking west from the 16th Street viaduct, 1980s (left) and today (right)**

The project also involved private sector partners, as the City had to work with CP Rail to remove and reroute rail lines. At the time, only two customers still used the rail line that ran down Canal Street. The City negotiated with CP Rail to adapt the connections to those customers, which allowed them to remove the tracks in the street. According to a CP Rail representative, those negotiations were amicable, which may have facilitated agreements between the two entities on other Valley projects that followed.

*Stormwater management*

One goal of the project that proved difficult to achieve fully was regional stormwater management. The idea had been to use stormwater infrastructure as a facilitator for redevelopment. According to key stakeholders, that proved too difficult to do for the entire Valley by way of the Canal Street extension project, largely because there were so many different landowners with whom to negotiate. Ultimately, shared stormwater management only was achieved by creating the bioretention facility near 25th and Canal Streets, which serves a relatively small area. Later, shared stormwater management was achieved in two other Valley parcels that were owned by the City and MVP through separate redevelopment projects. Those areas are the Menomonee Valley Industrial Center and the Canal Street Commerce Center, both of which are highlighted below. MMSD was instrumental in creating all of these facilities.

*Takeaway*

The City and State investments in the Canal Street extension project were crucial to opening up access to the Menomonee Valley, which facilitated the area's redevelopment. With the contributions of many public sector partners, this project exemplifies the type of intergovernmental cooperation that has been common in the Valley's revitalization story. It also illustrates the importance of strategically timing infrastructure projects to leverage unique funding opportunities, and it shows that holistic thinking can allow one project to make significant improvements to an area's economic, environmental, and social conditions concurrently.

Confidential - Subject to Protective Order

***Menomonee Valley Industrial Center (MVIC)***

As previously described, the 60-acre MVIC on the Valley's west end was the largest priority redevelopment area identified in the 1998 Valley plan. Today, it is the most prominent example of the economic growth that has occurred in the area since the plan was adopted. What was formerly a heavily blighted area is now home to eight businesses – primarily manufacturers – that collectively employ an estimated 1,323 workers.[73] The industrial center already is over 90% occupied, and two other businesses are in advanced stages of developing projects that will bring approximately 160 more jobs to the area and fill much of the remaining land there.[74] According to DCD's director of finance and administration, the sales price per acre has averaged around $114,000 at the MVIC site, which exceeds original estimates and is comparable to suburban greenfield sites. Furthermore, a park has been developed on the site that manages all of the stormwater from the MVIC and provides open space for recreation.

*Project background*

Several years of legal wrangling over the conditions at what was then the site of the Milwaukee Road shops led to the City's largest-ever property condemnation.[75] That move allowed RACM to acquire the MVIC property for $3.55 million in 2003.[76] When RACM acquired the property, it had numerous challenges that needed to be resolved, including poor access, lack of infrastructure, frequent flooding, unstable soil conditions, derelict buildings, and soil contamination.

*Leadership and collaboration*

Many partners contributed to the MVIC's development process in various ways, including various City departments and affiliates, MVP, MMSD, and the City's political leadership. Early on, the City and MVP both were influential in bringing about the condemnation of the Milwaukee Road shops site. At the time, the Milwaukee Road was in bankruptcy, having reached that point in part because of nearby Chicago's powerful position as a national rail hub. The company that acquired the Milwaukee Road after it filed for bankruptcy – CMC Heartland Partners – sold the land that was needed for rail operations to Soo Line/CP Rail and kept the remaining land and structures, allowing it to deteriorate for many years. City leaders felt there was little promise that CMC ever would redevelop the site.

---

[73] Menomonee Valley Partners, Inc.

[74] Daykin, Tom. "Rishi Tea plans September move to new building." *Milwaukee Journal Sentinel*. July 17, 2014. http://www.jsonline.com/blogs/business/267344941.html
Jannene, Jeramey. "Jobs, Jobs, Jobs Coming to Milwaukee." *Urban Milwaukee*. May 2, 2014. http://urbanmilwaukee.com/2014/05/02/friday-photos-jobs-jobs-jobs-coming-to-milwaukee/

[75] Millard, Pete. "Menomonee Valley: Cleaning up the backyard." *Milwaukee Business Journal*. April 11, 2004. http://www.bizjournals.com/milwaukee/stories/2004/04/12/focus1.html

[76] A change in state policy that had occurred previously made condemnations and redevelopments of brownfield properties like the MVIC easier for cities to accomplish. Wisconsin's Land Recycling Law, which passed in 1993, removed the risk of liability from cities wishing to redevelop brownfields.

Confidential - Subject to Protective Order

To catalyze the condemnation process, DCD and MVP organized a press conference that featured MVP's board president and the City aldermen who represented the area. In the background, the decaying Milwaukee Road site was visible, while prominent political and civic leaders stood in the foreground calling for change. According to key stakeholders, having that image on the front page of the newspaper, with public and private sector leaders standing up for the City's plan to condemn the site, led to a significant increase in public support for the effort.

Once the site was condemned and acquired by RACM, the City's Department of Public Works (DPW) worked alongside RACM to clean up the site and install new infrastructure and utilities. Key stakeholders also pointed to the collaborative work of MMSD as important in developing Stormwater Park, noting that MMSD is at the forefront nationally in its use of progressive "green infrastructure" to manage stormwater. As the site began to take shape, the City contracted with MVP to lead marketing efforts for the property.

**Image 3: Milwaukee Road shops, 1990s**

**Image 4: Menomonee Valley Industrial Center and Stormwater Park– 2010**[77]

[77] Additional development has occurred in the MVIC since this photo was taken, including the construction of a new LEED-certified building for JF Ahern and a new facility for Rishi Tea, both located on the largest vacant lot visible in this photo.

Confidential - Subject to Protective Order

*Plan implementation*

The MVIC is remarkably congruent with the vision that had been established for the area through the 1998 Valley plan and Wenk Associates' detailed site plan, the latter of which emerged from the national design competition held in 2002. In serving as the developer of the MVIC, RACM also was able to utilize the design and development guidelines that had been created for the Valley. Most of the development that has occurred in the MVIC over the last 10 years has followed the sustainable design guidelines created for the Valley, including several buildings that have become LEED certified through the U.S. Green Building Council. Similarly, the job density and wage guidelines developed by MVP were utilized by RACM in sales agreements for MVIC parcels.

RACM's ownership of the land also facilitated the creation of Stormwater Park, a shared stormwater management system for the entire MVIC that was included in the Wenk plan for the site. Stormwater Park, which was constructed beneath the 35th Street viaduct, is a key feature of the industrial center, as it allows businesses to maximize their building footprints without having to acquire and preserve open space on their individual sites for stormwater to be absorbed. The development of Stormwater Park thereby resulted in a higher density business park.

*Funding*

Numerous funding sources were pooled together to finance the development of the MVIC, as shown in **Table 3**. A TIF district established by the City for the MVIC site, with total authorized expenditures of $24 million, was the largest single source of financial support.[78] The TIF funds paid for building demolition, environmental remediation, site preparation, and the development of new internal roads and utilities. Federal and state funds, including brownfields grants and several federal earmarks, contributed a combined 34% of total project revenue. Two of the largest of those contributions were a $1.95 million HUD grant through its Brownfields Economic Development Initiative and a $1 million brownfields grant through the Wisconsin Department of Commerce.

In some cases, funding support for the project was increased by having different project partners pursue funding from different sources. For example, MVP was able to access several federal earmarks directly and invest those into the project, which allowed the City to use its TIF funds in other ways.

[78] The TIF district established for this project originally was authorized to spend up to $16.2 million, but it was later amended to have total authorized expenditures of $24 million.

Confidential - Subject to Protective Order

**Table 3: Funding sources used for Menomonee Valley Industrial Center pre-development work**[79]

| | Source | Federal | City | State | Total |
|---|---|---|---|---|---|
| 1 | Wisconsin Dept. of Commerce -- MEDC | | | $807,200 | $807,200 |
| 2 | Wisconsin Dept. of Commerce -- Brownfields | | | $1,000,000 | $1,000,000 |
| 3 | DNR -- Greenspace | | | $200,000 | $200,000 |
| 4 | DNR -- Sustainable Urban Development Zone | | | $397,018 | $397,018 |
| 5 | U.S. Economic Development Administration | $874,000 | | | $874,000 |
| 6 | EPA -- BFRLF sub-grant | $200,000 | | | $200,000 |
| 7 | EPA - Cleanup grant | $228,000 | | | $228,000 |
| 8 | HUD -- BEDI grant | $1,950,000 | | | $1,950,000 |
| 9 | HUD -- Earmark 1 | $1,197,000 | | | $1,197,000 |
| 10 | HUD -- Earmark 2 | $670,613 | | | $670,613 |
| 11 | HUD -- Earmark 3 (Neighborhood Initiative) | $1,000,000 | | | $1,000,000 |
| 12 | City of Milwaukee TIF district | | $24,000,000 | | $24,000,000 |
| 13 | Milwaukee Metropolitan Sewerage District | | $60,061 | | $60,061 |
| 14 | Wisconsin Coastal Management Program 1 | | | $111,330 | $111,330 |
| 16 | Wisconsin Coastal Management Program 2 | | | $101,890 | $101,890 |
| 17 | DOT -- Incoming soil receipt fees | | | $1,561,571 | $1,561,571 |
| 18 | DOT -- Stadium access road cleaning | | | $672,985 | $672,985 |
| 19 | DOT -- Management of incoming soil | | | $348,257 | $348,257 |
| 20 | MVP -- HUD earmark -- 2004 | $198,000 | | | $198,000 |
| 21 | MVP -- HUD earmark -- 2005 | $248,000 | | | $248,000 |
| 22 | MVP -- HUD earmark -- 2006 | $198,000 | | | $198,000 |
| 23 | Wisconsin Dept. of Commerce -- Valley grant | | | $365,000 | $365,000 |
| **Total** | | **$6,763,613** | **$24,060,061** | **$5,565,251** | **$36,388,925** |

The list of funding sources shown in **Table 3** includes those that the City or MVP utilized for the development of the MVIC. Additional funding sources were accessed by businesses in order to make their individual development deals work. Federal New Markets Tax Credits, which support business and real estate investments in low-income communities, are one of the key funding sources that businesses utilized. According to RACM officials, for example, Palermo's Pizza leveraged New Markets Tax Credits it received from MEDC for both initial construction and expansion projects, which helped the company to secure more favorable terms on loans. Palermo's, which opened its doors in the MVIC in 2006, was the first company to move into the industrial center.

*Intergovernmental cooperation*

Unique partnerships were established during the MVIC's pre-development process. One prime example was an agreement between the Wisconsin DOT and RACM to move clean soil from the Marquette Interchange project – which was being removed to make way for the new infrastructure – to the MVIC site, where it was used to create stable conditions for development.

Because of the MVIC site's unstable soil, RACM had to "surcharge" the site in order to fill and stabilize it. Surcharging involves heaping soil on top of land and allowing it to press down on the soil below until the land is stable enough that buildings can be developed without the need to drive deep piles.

[79] Financial summary provided by RACM.

Confidential - Subject to Protective Order

Since the site was in a floodplain, the added fill also needed to be sufficient to raise the entire site up several feet. According to RACM officials, the City used a total of 800,000 cubic yards from the Marquette Interchange project on the MVIC site and later for Three Bridges Park.

In a classic "win-win" situation, the DOT provided RACM with two vacant Valley properties valued at approximately $1.9 million in exchange for taking the fill, which RACM otherwise would have had to purchase. At the same time, the DOT saved money it would have spent to have the soil sent to a landfill. As noted by former DCD staff member Brian Reilly, whose work focused on Valley redevelopment, "*The lesson is to look beyond your project footprint to find these types of partnerships*."

*Takeaway*

The process of developing the largest piece of underutilized land in the Menomonee Valley into the Menomonee Valley Industrial Center illustrates the important role that land control played in those efforts. RACM owned the site, which allowed it to apply the plans and guidelines that had been established for the area with regard to infrastructure, land use, site and building design, job density, and wages. It may prove more difficult to achieve the same level of compliance with those guidelines in other parts of the Valley that remain to be redeveloped and are privately owned.

As was the case for the Canal Street project, the development of the MVIC shows how collaboration played a significant role in project success. In addition to the high degree of intergovernmental cooperation that was evident in this project, public-private partnerships also played a major role, as MVP worked closely with RACM and other government agencies to implement the plan for the area. MVP helped to coordinate the efforts of the many project partners throughout the redevelopment process, while also taking a leadership role in business recruitment and business support services. The collaborative approach taken to developing the MVIC also allowed the project to attract diverse funding support from many city, state, and federal sources.

For areas with great redevelopment potential, the lesson may be that a clear plan and strong collaboration are key ingredients needed to secure the funding support needed for projects to succeed.

***Canal Street Commerce Center***

The development of the Canal Street Commerce Center – a $15 million project that resulted in a multi-tenant building for light industrial users – is a prime example of how public-private partnerships were leveraged in the Valley to spur business growth. Unlike the MVIC, which was developed on City-owned land, a private developer built the Canal Street Commerce Center with the assistance of MVP. The project was completed in 2008 on the site of the former Milwaukee Stockyards, which had been owned by Cargill. That 13-acre site also had been identified in the 1998 Valley plan as a priority redevelopment area.

Confidential - Subject to Protective Order

**Image 5 and 6: Milwaukee Stockyards, 2005 (left); Canal Street Commerce Center, 2007 (right)**

*Project background*

The impetus for the Canal Street Commerce Center project was the need for the project's developers to accommodate a growing business located in one of their suburban properties. That business – Proven Direct (now First Edge) – provides on-demand marketing, document output services, and photo book publishing, which involves frequent trips to the region's main post office in downtown Milwaukee. The company was looking both to expand and to be located near downtown for ease of access to the post office. Proven Direct's average wage at the time was $19 per hour, but the company offered a range of employment types, from low skilled to professional positions.

MVP initiated efforts to redevelop the former Stockyards site, purchasing the property in 2005. After the property acquisition, MVP contracted for Phase 1 and Phase 2 environmental site assessments, which the Wisconsin DNR requires for brownfields projects to ensure that they are safe for redevelopment. MVP also secured "case closure" from the DNR, which means the site was approved for development, provided certain conditions were met in the development process to prevent human contact with contaminated soil. The property was sold to the developer in 2006.

During the same period, MVP created development guidelines for the project that were aimed at promoting higher job densities and family-supporting wages, which were utilized in the land sale agreement. As described previously, those development guidelines have been used extensively in the Valley ever since.

MVP and the Wisconsin DNR worked closely with the developer of the Canal Street Commerce Center to facilitate the project. According to the developer, MVP's familiarity with the City's policies and with potential funding sources helped considerably. Also, the DNR staff person involved in the project already had worked on several other Valley projects and understood how to facilitate necessary state approval processes.

Confidential - Subject to Protective Order

Proven Direct was committed to taking one-third of the space in the Canal Street Commerce Center immediately. The rest of the project was essentially speculative development, which was controversial at the time. Neither MVP nor the City knew how long it would take to fill the remainder of the space or what type of businesses the new owner would be able to attract. The center filled quickly, however, with primarily light industrial users. It is now completely full with six businesses that employ 195 individuals, including several small international companies.[80] The job density of the project is roughly 19.5 jobs per acre, which is slightly above the project goal of 16.4 jobs per acre.

*Site challenges*

Redeveloping the former Stockyards site involved costly work to address many site challenges, which created a financial "gap" that made the project difficult to realize. According to the developer, preliminary testing found that groundwater was only three feet below the surface, which made the soil on the site very unstable. In order to construct a building that could handle industrial users in such conditions, a very firm foundation was needed. Environmental contamination also was an issue, but fortunately, the contamination did not affect the groundwater, so it could be more easily addressed. In addition, because of the site's history as a marsh and former use as a stockyard, there also was concern that methane could be trapped underground.

In order to make the site capable of holding a building, the developers ultimately needed to drive 226 piles and create a solid base upon those piles with steel beams and concrete. About $3.5 million was invested in that foundation before building construction began.

To address environmental contamination, the entire site had to be covered with a "contact barrier" to eliminate risk of exposure to contaminated soil. The building and parking lot served as a contact barrier for part of the site, and the remainder had to be covered with a thick layer of clean fill and soil before plantings could be made.

With regard to concerns over the potential presence of methane, testing showed it was not a significant issue on the site. To be on the safe side, however, the developer installed an "active system" for methane extraction, which pumps air through the ground to remove any methane that may be trapped below.

*Funding*

MVP purchased the former Stockyards site with the use of the flexible pre-development funds it had received from the Wisconsin Department of Commerce in 2001 and 2002. It was their second use of those funds, which previously had been used for the Harley Davidson Museum project.

---

[80] Ziegler Bence Development

Confidential - Subject to Protective Order

For the developer, a primary source of funding was federal New Markets Tax Credits. Those credits are distributed to organizations designated as Community Development Entities, including the Milwaukee Economic Development Corporation (MEDC), a close partner of the City of Milwaukee. Those entities are then able to sell the tax credits to private investors who make investments in low-income communities.[81] Through the assistance of New Markets Tax Credits, the developer of the Canal Street Commerce Center was able to receive loans with favorable terms from both U.S. Bank and MEDC.

Other important funding sources for the project were brownfields grants from the Wisconsin Department of Commerce and DNR, which helped to cover the costs of bringing in clean fill and soil to cover the undeveloped portion of the site. MVP also contributed a $277,000 grant to the developer.[82]

*Takeaway*

The Canal Street Commerce Center project exemplifies the distinct challenges that likely will affect efforts to redevelop much of the remaining vacant land in the Valley. Unlike the 140-acre site where the MVIC, Stormwater Park, and Three Bridges Park now stand – which was owned by RACM – much of the land in the Central Valley has many different owners and vacant land is more dispersed, thus requiring redevelopment to occur parcel by parcel. It is more likely that private developers will need to take the lead for redevelopment projects in the Central Valley, as occurred in the case of the Commerce Center, but significant financial gaps resulting from geotechnical and environmental barriers to development may need to be filled with public funding in order to make projects viable.

MVP's pre-development funding from the Wisconsin Department of Commerce played a key role in making this and other projects a success. As previously suggested, the State may wish to explore whether and how to make similar flexible pre-development funds available to other development intermediaries as a means of facilitating additional large-scale brownfields redevelopment projects in Milwaukee and throughout the state.

***Valley Passage and Three Bridges Park***

The Valley Passage and Three Bridges Park projects on the Valley's southwestern edge serve as prime examples of the improved connectivity and enhanced recreational opportunities that have been generated in the Valley in recent years. Valley Passage, which was completed in 2010, opened up a new bicycle and pedestrian connection between the Valley and the Silver City neighborhood to the south. A focus of the project was to provide an opportunity for south side residents to walk or bike to Valley jobs. In 2012, a new branch of the Urban Ecology Center opened next door to Valley Passage, offering

[81] Low-income communities are defined as census tracts with a poverty rate of 20% or higher or where median family income is less than 80 percent of the area's median income. Source: New Markets Tax Credit Coalition. http://nmtccoalition.org/fact-sheet/

[82] Menomonee Valley Partners, Inc.

Confidential - Subject to Protective Order

environmental education programming to the surrounding community. The 2013 opening of Three Bridges Park, which extends from Valley Passage on the west to Mitchell Park on the east and includes an extension of the Hank Aaron State Trail, completed the project.

*Project background*

The concept of creating a park on the long and narrow 24-acre parcel of land formerly known as Airline Yards was included in the 1998 Valley plan and refined through the national design competition in 2002. The site, which stretches along the southern banks of the Menomonee River and is hemmed in on the south by rail lines, was considered too constricted to be feasible for other types of development. The vision was not only to create a new park, but also to use the development to reconnect the Valley with adjacent neighborhoods and to activate the space with educational and recreational activities.

RACM took ownership of the Airline Yards parcel as part of its acquisition of the 140-acre Milwaukee Road shops site. At the time, the Airline Yards site was essentially a landfill, having been used as a dumping ground for asbestos-containing materials from buildings that had been demolished on the former Milwaukee Road site and other sites nearby.

**Image 7 and 8: Three Bridges Park site, before (left) and after (right) park development**

*Leadership and collaboration*

As with other projects highlighted in this report, an extremely high level of collaboration between several public and private sector partners was instrumental in the creation of Valley Passage and Three Bridges Park. While RACM owned the land, several other public agencies and nonprofit organizations played major roles in the project's development.

The Wisconsin DOT was a major partner, managing the design and construction of the park and bridges. The DOT also facilitated the process of developing a "project charter," which laid out how the partners would contribute to the project, make decisions, and communicate with one another. The charter

Confidential - Subject to Protective Order

CHJC_0001069

emerged from a two-day workshop facilitated by a DOT staff person. According to one workshop participant, *"Everyone went into the process of developing the charter feeling frustrated and came out really feeling like a team. What we put on paper was helpful, but the process was the most important part."*

As owner and manager of the Hank Aaron State Trail, the DNR also was a primary partner on multiple aspects of the project. The DNR coordinated connections with the trail and signed off on the environmental safety of the site. To secure such approval for use as a park, project partners had to cover the entire site with a contact barrier, which was created largely with clean fill provided by the DOT from the Marquette Interchange project (such fill similarly was used on the MVIC site). The fill also was used to form hills that give Three Bridges Park its shape, designed to mimic the Kettle Moraine.

Additional public agencies involved in the project include the City's DPW, the Wisconsin Department of Administration (DOA), and the Miller Park Stadium District. The DPW now owns the bridges and maintains trail lighting and retaining walls in the area.[83] The DOA and Miller Park Stadium District were involved in creating an emergency access road into the site.

Nonprofit organizations also played major roles in developing Valley Passage and Three Bridges Park. MVP took an early leadership role in fundraising efforts. Rather than expanding its own mission to provide environmental programming in Three Bridges Park, MVP collaborated with the Urban Ecology Center, another local nonprofit with expertise in that area. The Urban Ecology Center has two other branches in Milwaukee parks, where they provide environmental education, land stewardship, and many other programs and services.[84] Together, the two organizations created a third entity called UEC/MVP Project Inc. and launched "From the Ground Up," a fundraising campaign that is now close to reaching its goal of raising $25 million for the project.[85]

Several key stakeholders noted that this "joint venture" between MVP and the Urban Ecology Center was both highly unusual and very effective. It gave local foundations, businesses, and citizens a clear and simple way to support the project as a whole. Rather than thinking about which organization or which piece of the project to support, they could donate to one joint organization. It also made funding distribution to the two organizations simple. Each quarter, each organization submits disbursement requests and the UEC/MVP Project Inc. board approves distributions.

The campaign's breakdown of how the $25 million goal will be used further illustrates the project's key features.[86]

---

[83] De Sousa, Christopher. 2012.
[84] Urban Ecology Center: http://urbanecologycenter.org/
[85] Menomonee Valley Partners, Inc. http://www.renewthevalley.org/documents/18-menomonee-valley-from-the-ground-up
[86] UEC/MVP Project Inc. http://www.menomoneevalley-fromthegroundup.org/a-unique-partnership.html

Confidential - Subject to Protective Order

- $8.29 million for three bicycle and pedestrian bridges connecting the park with the Valley and with the neighborhoods to the south
- $5.34 million for a new Urban Ecology Center facility and five years of programming there
- $4.25 million for environmental cleanup, site grading, and river improvements on the park site
- $3.13 million for land restoration and park construction
- $2.49 million for a six-mile addition to the Hank Aaron State Trail
- $1.5 million to establish an endowment for the park to support its long-term maintenance

Additional nonprofit organizations assisted with the Valley Passage and Three Bridges Park projects in other ways. For example, Layton Boulevard West Neighbors (LBWN), Journey House, and other neighborhood organizations gathered community input for the projects. LBWN also helped to coordinate pre-development meetings with the past owner of the Valley Passage parcel and acted as a "straw buyer" to facilitate the UEC/MVP's acquisition of the Urban Ecology Center building. In addition, the Wisconsin Bicycle Federation moved its offices near the new Urban Ecology Center and Valley Passage in 2012, which has helped to create a small hub of green organizations and businesses in the area.

To complete the Valley Passage project, the City and State had to work with CP Rail, which still owned land and several rail lines in the area, including one active line. The railroad also owned a tunnel where Valley Passage now stands. Ultimately, the City paid CP Rail to "stub" one of its tracks, which reduced the number of tracks crossing the Valley Passage area to one. CP Rail also had to approve another bridge in Three Bridges Park, which crosses over five sets of its tracks to connect with Mitchell Park. It appears that the relationship the City and CP Rail had developed through other projects may have aided their efforts on this project.

*Funding*

The UEC/MVP partnership has brought in funding from many private sector sources, including local foundations, businesses, and private citizens. While the campaign did not receive public funding directly, public sector contributions were included toward the $25 million goal. Overall, the projects have raised a total of $23.4 million to date, including $14.7 million in public funding primarily from the federal and state governments (**Figure 10**).

Confidential - Subject to Protective Order

**Figure 10: Funding sources for Valley Passage and Three Bridges Park**[87]

* The City also donated the land for this project and invested heavily in adjacent projects.

The U.S. DOT provided the bulk of the federal funds for the projects through a series of 11 grants, a majority of which came from the Congestion Mitigation and Air Quality Improvement (CMAQ) program in support of the Hank Aaron State Trail extension. The CMAQ program is designed to support surface transportation projects that reduce congestion and improve air quality in places that do not meet federal air quality standards, including Milwaukee. In addition, $1.4 million in federal stimulus funds from the American Recovery and Reinvestment Act (ARRA) helped to finance Valley Passage.

Federal funds require a 20% local match, which were largely provided through $3.8 million in state funding from the Wisconsin DNR's Knowles-Nelson Stewardship Program. The Stewardship program supports land preservation efforts for purposes of protecting wildlife habitat, improving water quality, and developing outdoor recreation opportunities.[88]

At the time, there was debate among project partners as to who could receive and manage the Stewardship funds. Typically, the City would have led park construction and managed project funding, but the Stewardship program stipulates that funding cannot be used for land that has been taken through eminent domain *by the entity that did the taking*. Thus, RACM, the landowner, could not accept or utilize these funds for the construction of the park. Private organizations, such as MVP, cannot receive Stewardship funds either. Consequently, MVP approached other public entities to find a partner willing to manage the funds and construction of the park. The DOT, which had been involved in the Valley from the beginning, accepted that role.

[87] PPF analysis of data provided by Menomonee Valley Partners, Inc. It should be noted that while the City's financial contributions to this project were relatively small, the City invested heavily in the adjacent and connected Menomonee Valley Industrial Center project.
[88] Wisconsin Department of Natural Resources: http://dnr.wi.gov/topic/stewardship/

Confidential - Subject to Protective Order

CHJC_0001072

*Takeaway*

The Valley Passage and Three Bridges Park projects exemplify how intergovernmental cooperation and public-private partnerships were leveraged in the Valley to create public improvements that extended beyond the realm of economic development, where they are more common. Improved connectivity, additional public space, and new opportunities for recreation and environmental education were created only through the combined efforts of many public and private sector partners. Given that the team charter created by the project's major partners played a key role in guiding that collaboration, this may be an effective strategy that could be used for other projects.

The unique way in which this project was funded also may be an example to follow for other projects with multiple lead organizations. The establishment of a joint organization created a unified fundraising effort that could market the project and its many goals in a clear and cohesive manner.

## Location and Timing

There is little question that the Menomonee Valley's recent revival is linked not only to the effectiveness of the individuals and organizations involved and the strategies they developed, but also to its unique location and fortuitous timing. Centrally located near downtown Milwaukee and along the busiest stretch of interstate highway in Wisconsin, the Menomonee Valley is an attractive location for many businesses that produce and transport goods and for those that provide services for a regional client base. At the same time, zoning, road, and rail infrastructure – as well as the Valley's natural bluffs – provide businesses with protection from competing and potentially conflicting land uses, including housing.

> ***"Timing played a big role. The City was moving ahead with its plan for the Valley's west end, the 6th Street viaduct project was in the works, Miller Park was being completed, MVP and the BID were forming. All of those things created momentum."***
>
> ***Jeff Crawford, Forest County Potawatomi***

In addition, the Valley provides relatively easy access to a large workforce from surrounding neighborhoods and the Milwaukee region as a whole. The neighborhoods immediately adjacent to the Valley are some of the most densely populated residential neighborhoods in the state, thanks largely to the Valley's historic position as a major job center.[89] Valley businesses also can draw their workforce from the larger Milwaukee region because of their close proximity to major highways.

[89] Gurda, John. "The Menomonee Valley: A Historical Overview." http://www.renewthevalley.org/media/mediafile_attachments/04/4-gurdavalleyhistory.pdf

Confidential - Subject to Protective Order

The redevelopment effort also benefited greatly from a confluence of outside events that were occurring at the very time the Valley plan was taking shape. Those included the reconstruction of the Sixth Street viaduct and the development of major cultural and entertainment attractions in the area. Miller Park was completed in 2001 and Potawatomi Bingo and Casino completed major expansions in 2000 and 2008, becoming the largest gaming facility in the state. Marquette University developed its athletic facilities on Canal Street in 1991, bringing students to the area. These projects added greater visibility to the Valley and made the area more attractive to many businesses.

As redevelopment progressed in the Valley, its highly visible location made the improvements clearly apparent to business leaders and the broader community who used the interstate highways and/or visited Valley entertainment destinations. This "constant reminder of progress" provided by the Valley's high degree of visibility likely added to the positive momentum in the area.

The Menomonee River – the Valley's central feature – adds yet another unique amenity to the area. In addition to cycling, walking, and running on the Hank Aaron State Trail, which was developed adjacent to the river throughout much of the Valley, river restoration efforts have allowed fishing and kayaking to become common activities in the Valley today. These recreational assets are not common features in business districts and add vibrancy to the area.

While many elements of the Valley's redevelopment effort may be replicable elsewhere, the area's unique locational attributes and the ability to time redevelopment initiatives with major infrastructure enhancements and cultural and entertainment projects are big pieces of the puzzle that cannot be reproduced. Nevertheless, the ways in which public and private sector leaders capitalized on the existing strengths of the Valley and took advantage of development and infrastructure-related opportunities provide insights for how similar strategies may be employed elsewhere.

Confidential - Subject to Protective Order

## Policy Observations

The Menomonee Valley's story still is being written, but its revitalization over the last 15 years has been heralded both locally and nationally as a model of sustainable development to be studied and replicated elsewhere. Our analysis has identified numerous policies, partnerships, and unique strategies that have been influential factors in the Valley's success. While some amount of that success also may be attributable to the Valley's unique location and the synchronicity of multiple infrastructure and entertainment-related development projects in the area, several strategies utilized in the Valley should be considered for adaptation and application to other large-scale redevelopment efforts in Milwaukee and beyond.

Specifically, we would urge public and private sector economic development leaders in southeast Wisconsin to consider the following lessons from the Menomonee Valley's revival as they seek to generate redevelopment in other challenged areas in the region:

1) **Major redevelopment initiatives need to be accompanied by a robust set of planning and design activities that establish both a common vision for the initiative and a detailed roadmap to achieve that vision.**

   Several aspects of the Valley's planning and visioning process were unique but could be applied elsewhere. For example, the process in the Valley engaged stakeholders, local design professionals, and the larger community to an unusually high degree, and community organizations played a major role in many influential planning and visioning activities. In addition, the plans and policies subsequently established were specific in nature, with tangible actions and guidelines that addressed key redevelopment barriers and emphasized economic, environmental, and social equity goals simultaneously. Overall, the planning and visioning process was one of the most comprehensive efforts ever undertaken for a priority redevelopment area of Milwaukee.

   According to the key stakeholders interviewed for this report, having a detailed plan for the Valley and being able to articulate a vision for the area generated needed support from funders, political leaders, and the community as a whole. The commitment of the City and other Valley leaders to seeing the plan implemented also played an important role in the Valley's success.

2) **Strong intergovernmental cooperation and public-private partnerships will be essential for large-scale redevelopment efforts to succeed.**

   While specific individuals and organizations stand out as essential to the Menomonee Valley's revitalization, the process of redeveloping the Valley has been exceptionally collaborative. In fact, many key stakeholders affirmed that the most important lesson from the Valley's success is the importance of intergovernmental and public-private cooperation in redevelopment work.

In particular, the Valley's success illustrates that rather than being led ***only*** by city government, major redevelopment efforts may stand the best chance for success if they are collaboratively led by multiple public and private sector stakeholders. To their credit, City leaders supported the creation of a public-private intermediary in the Valley, which was structured to involve influential leaders from Valley businesses, community organizations, and other governments in addition to the City itself. The ability of this intermediary to eliminate government "turf battles" and control tension between public and private interests was instrumental to the timely and successful completion of many of the Valley's key projects and to the broader revitalization it has achieved.

**3) Funding must be pursued and creatively assembled from numerous sources to address the many barriers that impede brownfield redevelopment projects.**

In the 1990s, the potential to redevelop the Menomonee Valley was hampered by many challenges that originally were deemed cost prohibitive, including poor access, limited infrastructure, unstable soil conditions, environmental contamination, frequent flooding, and blighted buildings. Those challenges were met by the City's willingness to invest heavily in Valley infrastructure, environmental cleanup, and other pre-development work through TIF and other financial contributions, as well as the City's and MVP's pursuit of funding from several different sources to supplement the City's own contributions, including numerous state and federal grants.

The effort by the City and MVP to engage state and federal agencies as partners early in the redevelopment process was a particularly effective strategy. While TIF and other City resources likely will need to play a prominent role in other major Milwaukee redevelopment projects, it is unlikely that those sources will be able to do the job alone. In the Valley, because of the personal connections made by City and private leaders, local representatives of state and federal agencies not only identified funding opportunities within their own purview, but also actively assisted the City and MVP to identify and pursue funding opportunities in other state and federal departments.

The Valley experience also demonstrates the need to combine government grant-seeking activities with private fund development strategies, and to do so as a team effort involving diverse project partners. For the Valley Passage and Three Bridges Park projects, for example, City and State partners secured funding from state and federal sources for the new bridges and trail extension. Meanwhile the UEC/MVP joint fundraising organization raised flexible private funds from local foundations, businesses, and citizens to pay for other components, including the new Urban Ecology Center facility and five years of programming there.

With diminished availability of certain state and federal funding sources that were utilized for past Valley projects, including federal earmarks and state brownfields grants, this type of creativity and collaboration may be even more necessary for future efforts to redevelop additional land in the Valley and in other priority areas in Milwaukee.

Confidential - Subject to Protective Order

**4) Given the key advantages involved with public or public-private ownership of re-developable brownfield properties, the City likely will need to assume considerable financial risk to advance major redevelopment projects.**

The success of several of the major redevelopment projects within the larger Valley revitalization effort was attributed largely to the ability of the City or MVP – as property owners – to expeditiously and effectively assemble project funding and address cleanup and infrastructure issues to make sites "shovel ready." In instances where a private entity owns the property where major redevelopment is desired – or where multiple private owners control a dispersed set of properties in a priority area – the challenges involved with assembling, preparing, and marketing sites for redevelopment likely will be much greater.

Consequently, while City government does not relish the role of buying and owning highly challenged properties because of the financial risk it entails, it may need to do so aggressively (particularly through the use of RACM) in areas where redevelopment is a top priority. The City has recognized that reality with regard to Century City and may need to continue to assume property ownership risk in other parts of the city to meet redevelopment goals. The City also may need to be more assertive in exercising its power of eminent domain in some cases. In addition, State leaders may need to step up with funding assistance – as they did for the Valley – should public-private intermediaries in other parts of Milwaukee seek the wherewithal to acquire properties and assist in pre-development work.

**5) Major redevelopment projects must be accompanied by aggressive marketing of the area's existing strengths and amenities.**

Leaders of the Menomonee Valley redevelopment effort capitalized on the unique strengths of the area, which were evident to them but required comprehensive visioning and effective public relations to convey to others. While access to the Valley in the 1990s was poor, these leaders saw the potential to take advantage of the area's proximity to the interstate highway system. Despite the loss of many businesses in the area, they recognized that a cluster of manufacturers remained. The Menomonee River was receiving renewed attention as well, including the plan to develop the Hank Aaron State Trail along its path. Valley redevelopment leaders capitalized on these advantages by reinforcing the area's manufacturing focus and supporting the restoration and enhancement of its natural features and recreational amenities.

Indeed, the Valley experience illustrates the need to take advantage of locational strengths, which may include transportation infrastructure, existing industry clusters, available business resources, workforce proximity, neighborhood amenities, and other factors. While this point may seem elementary, lessons can be learned not only from the manner in which Valley redevelopment leaders identified those strengths, but also from the creative strategies they employed to make them known in the broader community.

**6) Major redevelopment projects should be viewed as opportunities to address multiple community objectives.**

The Menomonee Valley redevelopment effort was designed to address the many challenges that previously existed in the Valley and its surrounding community. While there is still progress to be made, one of the most striking components of the Valley's recent revitalization is the varied range of improvements it has produced.

Indeed, the "triple bottom line" approach to sustainable development not only achieved several economic development objectives, but also enhanced the natural environment and generated quality-of-life amenities that benefit the broader community. This approach also allowed Valley leaders to diversify their financial support, as shown by their success in attracting funding from government agencies, businesses, local foundations, and private citizens.

In light of this success, City leaders should seek other opportunities to achieve multiple goals through individual redevelopment projects. While job creation and growth in tax base may be the foremost priorities associated with any such project, opportunities to link those goals with simultaneous improvements in flood control, multi-modal transportation infrastructure, environmental health conditions, and recreational amenities for nearby residents also should receive attention, and opportunities to assemble funding from diverse sources to support such improvements should be sought.

**7) Using redevelopment projects to create jobs for neighborhood residents may require greater emphasis on workforce development.**

While the above suggestions emanate from positive lessons learned from the Valley revitalization effort, one of the Valley's lingering challenges also offers some cautionary advice. Both public and private sector leaders of the Valley redevelopment effort emphasized the need to foster development that would generate economic growth while also providing employment opportunities for the local workforce. While that objective was achieved somewhat, the recent decision by Cargill, Inc. to close its slaughterhouse in the Valley means that Palermo's and the Potawatomi Hotel and Casino are the only employers in the Valley that employ large numbers of residents of nearby neighborhoods.

For future redevelopment efforts that share a similar goal, greater emphasis may need to be placed on workforce training of area residents and on specific recruitment of businesses that have a need for workers with the types of skill sets possessed by those residents. In the 30th Street Industrial Corridor, City and State leaders appear to have recognized that need, as evidenced by their efforts to create an advanced manufacturing training center at the Century City site. Additional workforce development efforts likely will be needed for other major redevelopment projects as well.

Confidential - Subject to Protective Order

Confidential - Subject to Protective Order

CHJC_0001079

Pl. SJ Ex. 116, Page 88 of 88

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

WAUKEGAN POTAWATOMI CASINO, LLC, an Illinois limited liability company,

Plaintiff,

vs.

No. 1:20-cv-750

CITY OF WAUKEGAN, an Illinois municipal corporation,

Defendant.

The discovery videotaped videoconference deposition of SAMUEL CUNNINGHAM, taken in the above-entitled cause, before SUSAN HASELKAMP, Certified Shorthand Reporter for the State of Illinois, on May 12, 2021, beginning at the hour of 9:30 a.m. and ending at the hour 3:37 p.m., via Zoom, pursuant to notice.

Reported by: Susan Haselkamp, CSR
License No. 084-004022
APPEARING REMOTELY FROM COOK COUNTY, ILLINOIS

REMOTE APPEARANCES:

FREEBORN & PETERS LLP, by
MR. DYLAN SMITH,
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 360-6000
dsmith@freeborn.com
Representing the Plaintiff;

HEPLER BROOM, LLC, by
MS. MEGHAN RIGNEY,
MR. GLENN E. DAVIS,
211 North Broadway
Suite 2700
St. Louis, Missouri 63102
(314) 241-6160
meghan.rigney@heplerbroom.com
glenn.davis@heplerbroom.com

Representing the Defendant.

ALSO PRESENT:

MR. RAMON SALINAS, videographer
VERITEXT LEGAL SOLUTIONS

INDEX

| WITNESS | EXAMINATION |
|---|---|
| SAMUEL CUNNINGHAM, | |
| By Mr. Smith | 6 |
| By Mr. Davis | 212 |
| By Mr. Smith | 222 |

EXHIBITS

| NUMBER | MARKED FOR ID |
|---|---|
| Cunningham Deposition Exhibit | |
| Exhibit No. 10A | 154 |
| Exhibit No. 90..> | 27 |
| Exhibit No. 116 | 121 |
| Exhibit No. 144 | 54 |
| Exhibit No. 145 | 97 |
| Exhibit No. 170 | 152 |
| Exhibit No. 184 | 139 |
| Exhibit No. 188 | 98 |
| Exhibit No. 211 | 142 |
| Exhibit No. 215 | 133 |
| Exhibit No. 300 | 21 |
| Exhibit No. 302 | 47 |
| Exhibit No. 303 | 99 |
| Exhibit No. 304 | 101 |
| Exhibit No. 305 | 102 |
| Exhibit No. 306 | 105 |
| Exhibit No. 307 | 111 |
| Exhibit No. 308 | 118 |
| Exhibit No. 309 | 129 |
| Exhibit No. 310 | 138 |
| Exhibit No. 312 | 144 |
| Exhibit No. 314 | 170 |
| Exhibit No. 315 | 172 |
| Exhibit No. 317 | 175 |
| Exhibit No. 318 | 177 |
| Exhibit No. 319 | 180 |

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:41 a.m. Central Standard Time on Tuesday, May 12, 2021.

Please note that audio and video recording will continue to take place unless all parties agree to go off the record. This is media unit number one in the video recorded deposition of Samuel Cunningham taken by counsel for Plaintiff in the matter of Waukegan Potawatomi Casino, LLC versus the City of Waukegan filed in the United States District Court for the Northern District of Illinois, the Eastern Division, Case Number 1:20-cv-750.

This deposition is being held via Veritext virtual remote. My name is Ramon Salinas from the firm Veritext Legal Solutions and I am the videographer. The court reporter is Susan Haselkamp, also from the firm Veritext Legal Solutions.

I am not authorized to administer an oath, I'm not related to any party in this action, nor am I financially interested in the outcome.

Counsel will now state their

appearances and affiliations for the record. If there are any objections to proceeding, please state them at the time of your appearance, beginning with the noticing attorney.

MR. SMITH: Good morning. Dylan Smith of Freeborn & Peters for Plaintiff, Waukegan Potawatomi Casino, LLC.

MR. DAVIS: Good morning. Glenn Davis, Hepler Broom here on behalf of Defendant, City of Waukegan.

MS. RIGNEY: Meghan Rigney of Hepler Broom here on behalf of the City of Waukegan.

THE VIDEOGRAPHER: All right. Will the court reporter please swear in the witness?

THE COURT REPORTER: Would you raise your right hand, please?

(Whereupon, the witness was duly sworn.)

THE COURT REPORTER: Thank you.

THE VIDEOGRAPHER: Thank you. We may proceed.

SAMUEL CUNNINGHAM,

having been first duly sworn, was examined and testified as follows:

Q. Okay. And, you know, if you don't recall, you don't recall.
A. No.
Q. Mayor Cunningham, if you could scroll to the page that has -- is numbered 8522 at the bottom. And I just have a quick question about one of the messages at the top of that page.
If you're there, it's the message where Mr. Bond says, can you call Paul, and provides a name Paul Frank. My question is who is Paul Frank?
A. Honestly, I don't know. I don't know right now. Again, I'm much better with a face than just a blanket name. Typically if you look at my -- my contacts, I always put, met at here, did deposition with, you know, so to help me remember so.
Q. All right.
A. And traveling north he wants to speak with you, I don't know what that means.
Q. So if you could turn to the next page, 8523. On February 10, 2019, Mr. Bond wrote, I'm at Waukegan campaign office. You around? You mentioned earlier there was a campaign office

set up at 116 North Genesee Street.
Did you understand Mr. Bond to be referring to that campaign office when he used the phrase campaign office -- Waukegan campaign office?
A. Well, I mean, at that time, we had two and I think both of those offices were open and I think they were interchangeable, so I can't necessarily say he was at one place or another.
Q. Can you explain just as an outsider to Waukegan Democratic politics, when you say those two offices were interchangeable, what do you -- what do you mean by that?
A. Well, the 118 is the Tenth Congressional District Office. So typically all Democrats who are running, have access to that office. And 116 I know Angela Ocayo (phonetic) have used that as a campaign office and a couple of other people have used that as a campaign office.
So whenever they do that, both offices are open to me at the same time because they could be running separate campaigns. One could be Waukegan Township or Lake County Democrats

want to focus in on the Waukegan area, but yet the person who's running this, his or her campaign, want to be somewhat separated from there because everybody gets to come in and out of there. So that's what I mean. If one is open, typically all of them are open at that time. I hope that explains it.
Q. Yeah, it gives me a sense. Thank you.
A. Okay.
Q. So at the bottom of this same page, Mr. Bond wrote to you, don't share the pole results with anyone, it's a winning issue. Let the naysayers get on the wrong side. What -- what pole results was Mr. Bond and you talking about at this point in time?
A. Mr. Smith, I swear, I don't know that. There was so many poles going on. It could have been -- I think the governor's pole was -- that might have been the governor's race at the time, it could have been aldermanic races. I don't know.
Q. This seems to relate to a polling on a particular issue. Does that do anything to refresh your memory?

A. No. Because it was -- I know at that time we were getting geared up for aldermanic races. The governor's race was coming, he had some hotly contested state races. So unless it was specifically mentioned in there, it would be tough for me to say exactly what that pole was.
Q. So scrolling to the next page, Mayor Cunningham, which has the got the Bates number 8524. Michael Bond writes to you, did Tina get a check to Koss or Jon? 2,500 to Waukegan Voter Alliance.
Am I right that you have a campaign or at least at this time had a campaign manager named Tina Sellers?
A. At that time, yes.
Q. Okay. And did you understand the reference here to Tina to be a reference to Ms. Sellers?
A. Yeah.
Q. And what conversation had you had with Mr. Bond, if any, about this text about contributing from your campaign to the Waukegan Voter Alliance?
A. Well, that comes from the candidates.

I did tell them I would support them and it looks like here Jon -- Jon and Mike was helping out. They had reached out to me and said, hey, we hear that you are going to be helping with the campaign of aldermen, what dollar amount. I told them the dollar amount that was supposed to -- that check was supposed to be, that that's what that really was.

Q. And Jon is Jon Koslowski?

A. Yes.

Q. All right. And with that explanation, explain to me where Mr. Bond fits into that.

A. I'm going to -- I'm going back to Bond -- it appears that Bond was working -- working or helping Jon with that -- all of those campaigns. That's as much as I can, so my relationship was with -- basically Koss was supposed to get the check from me on a certain date, that didn't happen.

So that's where my information really comes from. The so maybe they mentioned it to him, whatever. But Koss and Jon were the people who I -- we needed to get that to per Tina.

Q. And then Mr. Bond says, okay, please

make sure Jon or Koss gets it tomorrow and you say, okay.

Apart from what we're able to see in this e-mail, do you remember was there any discussion with Mr. Bond or Mr. Kozlowski or Mr. Koss about why there was urgency, some time sensitivity around getting this money to the Waukegan Voter Alliance?

MR. DAVIS: I object to the form of the question. You can answer if you can.

THE WITNESS: Man, listen. When you're running for campaigns and people tell you they're going to give you some money, you want to get the money in the bank as fast as you can. And that's -- somebody tell you they'll give you some money -- you know, I should -- when people want to contribute to your campaigns and they make those commitments, you make other commitments based on that. So you want to try to get those dollars into your campaign coffers so you can continue with the strategy you put in place.

That's all I can go from there. I mean, I make the same phone calls. And for

those others who in campaigns, Ms. May did it with the Sierra Club.

Q. Excuse me.

A. Sure.

Q. Mr. Bond, just below the portion I just read on February 15, 2019 writes to you, will you be at rally at 10:00 a.m. tomorrow at the campaign office? Make sure your guys are coming and ready to canvass. And you say -- I think there are probably some typos in your response. It seems to say, Becky yes. I'm so plumped, by which I assume you meant pumped.

But let me focus on the message from Mr. Bond for a moment. When Mr. Bond said, make sure your guys are coming, who did you understand him to be referring to?

A. That, I don't know because I was the only guy. And it was a pep talk to those candidates who were running for alderman who were Democrats. And typically those who were existing elected officials will go to a campaign office to pump people up to get them excited about canvassing that day and being enthusiastic about not only the campaign, about the

candidacy, but the future of the city. That was -- I don't know what guys. I mean, I didn't bring anybody there.

Q. Okay. Do you actually have a -- do you have a memory of the -- of going to the rally and giving a pep talk?

A. I won't necessarily -- when we get together -- well, let me go back.

Every Saturday you try to get all your volunteers, your phone callers and things like that and you get them into a room and you -- you know, you pump them up, you give them the old, you know, let's go win the game conversation. Some call it a rally, I call it, you know, let's get it done.

So that's the only rally slash pump up message that I gave the candidates. They have people on the phones, candidates walking canvassing, et cetera. So that's what that was.

Before you answer that. Do you want me to close the window? Someone's cutting grass. Can you hear that in the background? Is that okay?

Q. I'm not hearing it. But if it's

Pl. SJ Ex. 119

out and encourage them to vote for the Democrat for alderman.

Q. Mayor Cunningham, on -- if you scroll to the page marked 8528.

A. Okay.

Q. Mr. Bond is proposing a planning session for your reelection with Delgado and Cousineau and Jon and Tom. First, the question for you is do you recall that planning session actually taking place?

A. Yeah, I don't know what you call a -- I know they called it an planning session, but that was -- for me it was to go see this house -- this lake out Antioch that they had just rehabbed and refurbished and things like that. There were people -- some people I knew and some I didn't and some were introduced. That's how I looked at it.

Q. Okay. Was there a discussion at that meeting of your reelection efforts?

A. That's the crazy part about it, was we had many discussions not only about things I should be doing as we lead to the election, we got to talking about the governor's election,

got to talk about other candidates. So it was -- you know, I call it a fellowship type meeting with individuals we all knew. So we got into multiple conversations, not specifically about my reelection. And understanding you're talking 2019? That's pretty premature but --

Q. So Cousineau I take is a reference to Will Cousineau; is that correct?

A. Yeah, Will.

Q. Okay. And I take it you knew Will prior to the April meeting at -- April 2019 meeting at Mr. Bond's lake house?

A. Yeah. I think I knew him about -- back then about three -- maybe three or four years prior to. Well, I knew of him and, you know, in his various roles in state government and things like that.

Q. Okay. Had he played any previous role, formal/informal in giving you political advice during your campaigns?

A. No. Not me directly, no.

Q. Okay. Am I right that the reference to Delgado here, which I think may be a misspelling is a reference to Michael Delgado?

A. Yeah, money Mike.

Q. Okay. Did you know -- did Mr. Delgado attend the meeting at the lake house in April of 2019?

A. Yeah, Mike was there.

Q. Okay. And did you know Mike before that meeting?

A. I knew of Mike. Not through Bond but through other relationships and throughout the Cook County area, a couple of friends. Mike is pretty well known throughout the Northern Lake County and certainly throughout the Cook County area.

Q. Yeah. So was this the meeting at the lake house the first time you actually met Mike Delgado?

A. No, no, no. I met Mike prior to. I met Mike prior to, so I knew of him and talked to him before and -- you know, I knew Mike pretty well.

Q. All right. And was he someone you regarded as someone who played some role as a political advisor or ally to your past campaigns?

A. Yeah, I would say that. I mean, I knew Mike more so as I was running for Mayor, a little bit towards the last time I ran for Mayor in 2013. But, I mean, he's got a good political mind, knew a lot of state -- a lot of state elections and things like that.

Q. And this may -- I may have a misimpression. I think of Mike Delgado as being more of a west, south, southwest suburbs guy. How did -- how did you get linked up with Delgado as best you can remember?

A. Well, like I said, when I met Mike the first time, he knew I was running for Mayor of Waukegan and went from there.

Q. Do you remember who introduced you?

A. No. As a matter of fact, I think I was -- I had attended something else for somebody. I attended something else for somebody and that's how that relationship started.

Q. So, Mayor Cunningham, on the same page, on April 8th, which is I think a few days after the election in April 2019, Mr. Bond wrote to you, let's think through your committee

Page 82

assignments when we get together on Tuesday. Hold off on commitments if you can. And he goes on. Do you see where I am?
A. Yes.
Q. Okay. And then you say, will do and I think we have done that. I'll show you the list today. Did you, in fact, get together with Mr. Bond after this text message to discuss your committee assignments?
A. No. No. It's -- no, I did not. I know that specifically as we went through those committees -- and just to be clear, my experience in picking committee assignments was based on years of experienced, understanding city government, a person's expertise in the various committees they were on. That's what I was really moving for.
My operations experience has always been to put people where their expertise lies and you will get more out of them. And that's something -- that's what we did as it relates to chairmanship committees.
Again, I think that those are just suggestions on how to position individuals and

Page 83

that's -- that's what they are. Not only from Mike, I received that from past mayors, individuals within the Democratic Party. You know, the goal -- my goal has always been, will continue to be is good government. Good government comes, having the right people in the right place that can help you make the best decisions.
And sometimes that means putting people who don't always agree with you on certain things; however, their level of experience their level of knowledge, whether it be public works finance, water, sewer will ultimately help me lead the City to greatness. And that was my goal and objective.
Q. I appreciate that. Let me just make sure just so the record is clear. Mr. Bond said, let's think through your committee assignments when we get together on Tuesday. And you say, will do, and I think we've done that.
Is it your testimony that you did not in any point discuss your committee assignments with Mr. Bond?

Page 84

A. I can't -- to be -- I cannot recall me sitting down and saying here, here it is. I can't recall that. No, sir.
Now, he might have -- he might have received a copy of what the committee -- committee assignments were once they were announced on council floor and made public, could have said that. But I can't -- I don't see where I sat down with him to go over A, B, C and D, and who's where. I don't see that, no. I can't recall that, should I say.
Q. Okay. So when you say you can't recall, you just don't recall that happening one way or the other?
A. No, sir.
Q. And you on April 29, 2019 texted Mr. Bond and said, hey, I'm speaking in front of the subcommittee, your thoughts or ideas. Am I right that around this time you spoke to a house subcommittee about gaming issues?
A. Yes, sir.
Q. And in particular, you spoke in favor of bringing a casino to Waukegan?
A. Hard and heavy.

Page 85

Q. And why did you reach out to Mr. Bond about that?
A. Well, again, it goes back to my point of people's expertise. And Mike was a -- he was a State Senator, understands how those -- those hearings go. Just trying to get some insight on how to prepare myself, what my presentation should be like, just getting his thoughts, you know. I did that with him, I called Rita, I called Terry. Who else did I speak with? That's -- that's who I can recall. Because this is their wheelhouse, this wasn't mine's. I was going in with passion and trying to give a -- get them to move the legislation along. That was my goal.
Q. And do you remember any input that Mr. Bond gave you about your remarks?
A. I don't remember anything. But if I'm -- if I'm -- me knowing what Mike and hearing him in the past coach other people, be pretty direct, be passionate, know the material which they're asking, be brief on your -- you know, what you laws do, get you prepared. That's, you know.

Page 86

Q. And you mentioned Rita and Terry in your previous answers. I obviously understand what you're referring to. But just for the sake of completeness, that's the reference to Representative Mayfield and Senator Terry Link?
A. Yes.
Q. And, Mayor Cunningham, on the following page, which is 8529 on May 15, 2019, there's a text message from Mr. Bond saying, I'm in Las Vegas traveling to Hard Rock Casino in Tulsa later today. I'm not sure we need the Hard Rock brand, but I want to make sure we have the option. They basically take a licensing fee and this just makes the economics more challenging. I'll tell you -- I'll let you know how it goes. Sorry. And you respond, awesome.
I take it you understood Mr. Bond to be describing for you activity he was undertaking relative to his goal to develop a casino in Waukegan?
A. What I was taking is a person who is looking to put a proposal in and he's out doing his marketing. You know, that's -- that's what I -- cool.

Page 87

Q. Did you also -- how frequently during this period we've been looking at, the 2018/2019 time period, how frequently would you say you spoke on the phone to Mr. Bond?
A. I can't -- I don't know, man. Most of our -- most of it -- appears like most of my conversation would come through the casino, there was -- I mean, not casino. But through a text if there was something of great concern. But I'm not concerned, but interest. This was -- this was my form of communication, honestly.
Q. Okay. So you've viewed Texting -- just to make sure I follow that answer. Texting was kind of a prime way you used to stay in touch with people?
A. Yes. If there -- you know, if there needs to be something said.
Q. And if you could scroll to 8531. At the bottom of 8531, Mr. Bond writes, are you aware the IGB license fee for Waukegan is estimated to be 90 to 100 million? It's 75 percent of highest 12 months over first 3 years. Approximately 45 million is due when

Page 88

license is awarded plus another approximately 45 million after a third year. Host communities will need to take this into consideration when working with developers.
What did you understand Mr. Bond to be communicating to you there?
A. That it will cost 90 to 100 million to get a license from the Illinois Gaming Board.
Q. And what about this statement that host communities will need to take this into consideration when working with developers?
A. I really didn't -- I really didn't really pay that too much attention because if I go back to 203 [sic] and 204 [sic], I remember what we paid -- what we had bidded for in the license. It was 400 -- 400 to 450 million. So 90 to 100 million was peanuts compared to those numbers then. This stuff right here, 45 million due to license, the host communities will need to take that into consideration. Honestly, I didn't know what that means anyway. I knew what the 90 to 100 to pay for a license meant.
Q. And then you say, okay, and I think there may be a typo. It says, for the heads up

Page 89

the rules. Then you wrote, and this is at the top of the following page, 5832. You say, we are getting our RFQ info together as we speak.
That was a reference to the preparation of the request for qualifications and then proposals that the City ultimately issued at the beginning of July?
A. Yeah. And it was pretty common knowledge we were getting that together.
Q. Mayor Cunningham, at the bottom of the page, again, we're on 8532, you text Mr. Bond, are you interested in the Milan Banquet Hall. Do you see that?
A. Yeah, yeah, yeah, yeah.
Q. Okay. And then just so you're able to get the context, it continues on -- that sort of discussion continues onto the next page. Mr. Bond responds, yes. And then you say, okay, they might be open to sales. And he says, can you send me contact info, and you say, yes. What is the Milan Banquet Hall, Mayor Cunningham?
A. Milan Banquet Hall is a banquet hall that's directly across from the vacant

Pl. SJ Ex. 119

Page 90

property -- from the vacant property -- I'm thinking. I should be looking, too, at this. The vacant property directly across from the 32 acres of the City of Waukegan.

I do my -- I had my annual New Year's Eve bash there the last, Jesus, 10 years, 15 years. And they called me up, hey, do you know anybody who might want to buy this? And I had asked -- I had asked the young lady, you know, what's the dollar amount, she then told me. I was like, well, there might be one person that might. So, you know, Michael was thinking about moving his operations, hey.

Q. And just so that's clear. When you say it's across the Milan Banquet Hall, the City owned lot, it's across Lake Hurst Road from the Fountain Square site, correct?

A. Yes. I'm sorry --

Q. And --

A. -- for the court reporter thinking. I'm sorry.

Q. And you say you spoke to a young lady. Who is that that you spoke to?

A. Wendy, Wendy. I had called -- Wendy

Page 91

called -- I think she called me. It was letting me know that the existing owners were thinking about selling and she wanted to find some investors. And I had reached out I know to Mike and I reached out to a couple of other people, too. Oh, jeez. I forget. I had forgotten about this. I would have forgotten about this if it I wasn't sitting here. But, you know, a couple of people who are interested in buying property.

Q. What is -- what is Wendy's last name?

A. I don't know. Wendy.

Q. Are you able to describe what her -- what her role is at the Milan banquet Hall?

A. She was the booking agent for the -- their booking agent. She will book the hall and set up what you needed for. She's listed as Wendy Milan Banquet Hall on my contacts.

Q. Okay, okay. And was it your under -- it was your understanding that Mr. Bond was looking to move the headquarters of Taproom?

A. Yes, I thought. I knew he had mentioned that one time. He said they were growing too big and might be looking for another

Page 92

spot so.

Q. Wasn't his headquarters in Libertyville relatively new headquarters?

A. I don't know.

Q. And, Mayor Cunningham, didn't you also believe that that location might be helpful for Mr. Bond's casino proposal aspirations?

A. I wasn't necessarily thinking that. I was just thinking about what Wendy was looking for, an investor to buy the spot. I mean, that -- that didn't really come to mind for me.

Q. I just want to be clear. It's your testimony it didn't come to mind at all that if Michael Bond was looking to develop a casino at Fountain Square, the property -- the three-acre property directly across the street might be helpful to him in that endeavor? That didn't across your mind?

A. Well, I -- my -- I guess the question you're asking me, my primary objective is to help her find some investor. What Michael Bond's portion of what he wants to do with it post or pre will be up to him and them.

Now, I think being practical here, if

Page 93

he was going to be moving toward a casino, would that property be an asset for him or be -- will be helpful with an addition? Of course it would be. Also the other property, as well. John's property, John from Full Moon, which is the old -- jeez, what is that? Toys "R" Us location, it's the same thing.

My primary objective in that area was to make sure that we had those vacant -- one was a vacant building, and if that building was to come up for sale or they would lose the building not to have those vacant, have somebody occupying. That was my primary objective, certainly as the Mayor of Waukegan at the time.

Now, what other people's ultimate plan will be, well that's -- you know, that's part of their marketing. That's not part of mine's. Silverman. I think, Silverman. Is it Jeff Silverman? Did we call him Jeff, let Jeff know about that, too?

Q. That was -- you're maybe answering a question I was going to ask you, which is who besides Mr. Bond did you contact about the Milan Banquet Hall property?

Q. The e-mail that should have been directed to Noelle?
A. Yeah. And --
Q. Okay.
A. -- I could have hit wkpurchasing --
Q. Okay. I got you.
A. Yeah.
Q. So apart from where it should have been actually routed to this e-mail, what was your purpose in adding Thomas as project manager for their casino RFQ -- RFP/PQ for wkpurchasing?
A. Just to let everybody know that he will be a part of the process for right now and -- because the way it was communicated to everyone is that Noelle sends out all communications, so -- and Noelle probably should have been the one, but sometimes people like to hear it from the Mayor so there was no confusion.
But yeah, Thomas was reporting to Noelle as it relates to this project and things that are going on. So I must assume Noelle had directed him to go ahead and do that.

(Whereupon, Cunningham Deposition Exhibit No. 307 was marked for identification.)
BY MR. SMITH:
Q. Let me ask you if you would, Mayor Cunningham, to open up what's been marked as Exhibit 307, I believe. And I'll just note while you're pulling that up that Exhibit 307 is a printout from the web of a Lake County News-Sun slash Chicago Tribune article entitled Waukegan's Search For Casino Developer Continues As Firm From 2009 Effort Claims Exclusive Development Rights, and it's dated July 16, 2019.
So feel free to kind of scroll through that, Mayor Cunningham. But I'm going to be directing you to a particular portion of that article.
A. I might know where you're going, but let's roll. We're ready.
Q. Okay. I guess -- I guess the first question is if you've had a chance to look at this article, do you believe you reviewed it at about the time it came out in July of 2019?

A. (Sneezing).
Q. Bless you?
A. Thank you. Yes. Did I -- did I read that article? Yes, I did.
Q. Okay, all right. So among other things, this article seems to discuss allegations that someone named Alan Ludwig had made in litigation against the City. I take it you're generally familiar with Mr. Ludwig and the litigation involving his entity Waukegan Gaming?
A. Yes. Yeah, I'm familiar with that.
Q. All right. There are just some statements attributed to you, and I just want to ask you about those. So if you go to what is labeled Page 2 of 6 in this article, there's -- and this is toward the bottom of the page, Mayor Cunningham.
The reporter says, Mayor Sam Cunningham told aldermen Monday evening that the City had to take that step immediately, otherwise the City's ability to meet a 120-day deadline to present potential casino developers to the Illinois Gaming Board would have been, quote,

jeopardized. And obviously that's a paraphrase or a summary of the statement that's attributed to you. But do you remember generally expressing that sentiment to the City Council?
A. At the advice of counsel, corporate counsel at the time, it was -- yes.
Q. Okay. And I don't want to get into obviously the discussions that you had with corporate counsel but -- and let me -- I'm going to reference this allegation just for providing context, but I'm not asking you to agree or disagree with it.
Do you recall generally that one of the allegations that Waukegan Gaming made in its countersuit against the City in the summer of 2019 was that it appeared that Mr. Bond had an inside track or his casino proposal had an inside track with the City? Do you generally recall, excuse me, Waukegan Gaming making that -- that allegation?
A. No, I do not.
Q. Okay, all right. So let me then -- just because I want you to have context for the statement that the reporter attributes to you.

So if you look toward the top of Page 3, I think the reporter is referring to Waukegan Gaming's allegations. And it says, the firm argues that the 20-year contract still stands. I think that's a reference to Waukegan Gaming's claims under its old redevelopment agreement. And that the City is attempting to kill the agreement to benefit another developer, former State Senator Michael Bond, according to a copy of the counter complaint that the company plans on filing.

Do you recall generally the tenor of those allegations by Mr. Ludwig?

A. No. And I -- and I'm going to qualify that no with Mr. Ludwig, from my understanding, had the notion that he had first right of refusal or something like that and that's the premise of where his complaint or lawsuit stemmed from. Not necessarily benefiting anybody, but the mere fact that his 203 [sic], 204 [sic] contract was still standing, and per Bob, that just did not exist.

So that is where my mindset was and my response is -- and my response to his complaint were formulated from that. Not -- he doesn't

say Bond or anyone else had an inside track, just it was more of his -- his position that we should be dealing with him and him only as it relates to casino gaming in Waukegan.

Q. And to be fair, the thrust of the City's complaint against Waukegan Gaming clearly was to ask the Court to declare that Mr. Ludwig did not have that exclusive right?

A. Yes.

Q. Okay.

A. Yes, sir.

Q. And -- and these are Mr. Ludwig's allegations, so I don't want to -- I don't want to get bogged down here.

But do you remember generally that in his counterclaim against the City, in addition to asserting that his development right remained valid, Mr. Ludwig sprinkled in these allegations about Mr. Bond. Do you have any recollection of that?

A. Vaguely.

Q. Okay.

A. Vaguely. I mean, my position, at least my mindset was to have us -- you know, I'm going

to say -- say that his claims were not true to the best of our knowledge and based on the contract that he presented.

Q. Understood, okay. So here's -- just with that context, I wanted to direct your attention on Page 3 of this Exhibit 307. There's some -- and, again, I think the reporter is not directly quoting you but paraphrasing, to be fair. But there's some -- the statements attributed to you or thoughts attributed to you, so I wanted to direct your attention to those.

The reporter says, and this is kind of toward the bottom third of Page 3. Cunningham said the process was designed to be as open and transparent and possible with the City leaving many of the choices on where the casino is located and what it would look like up to potential developers. Do you remember speaking to the author of this article and expressing those sentiments to her?

A. Yes, yeah.

Q. Okay.

A. I mean, I -- and I want to somewhat qualify that response. I have been through this

process since -- since '99 to current.

Q. Yeah.

A. Considering all the things we've gone through with competing with Rivers for the last and some of the negative publicity that was around that process, my goal was to make sure that the integrity of the process stayed well above approach. And it was fair and I said transparent as humanly possible for two reasons. One, the brand Waukegan was on the line; two, we did not want to make any mistakes, give any reason that we were in this space of helping one person over another. Because it would have jeopardized what? It would have potentially jeopardized them issuing a license to a developer for Waukegan. That was the premise of everything that I was doing, our team was doing and what we wanted to project for the City of Waukegan.

Q. Understood. So that was -- that was, if you will, the sentiment behind what you voiced to the reporter there in that paragraph that I just read?

A. Exactly.

Q. Okay. Fair enough. I'm following you. So then the next paragraph, I wanted to kind of see if this is also consistent with your recollection of what you said to the reporter.

The paragraph after the one I just read to you said, the City's plan is to identify three or four potential developers to recommend to the Illinois Gaming Board, comma, which will ultimately select the final developer. That setup quashes the argument Ludwig is trying to make, comma, Cunningham said. Do you recall expressing that sentiment in substance to the reporter?

A. Yes.

Q. Okay, okay. While we're -- since we're on newspaper articles, I'm going to ask you to jump a ahead a little bit in time. Close out of this, if you would, and take a look at what's been marked as Exhibit 308, Mayor Cunningham.

(Whereupon, Cunningham Deposition Exhibit No. 308 was marked for identification.)

BY MR. SMITH:

Q. All right. And while you're pulling

that up, again, just for the record I'll note that Exhibit 308 is a Lake County News-Sun article dated October 18, 2019 with the title Waukegan Sends Three of Four Casino Proposals to Illinois Gaming Board, semi colon, Potawatomi Requests Rehearing After Rejection. And Mayor Cunningham, once you've had a chance to kind of look this over, do you believe you reviewed this article at the time it came out?

A. I'm good. We're ready.

Q. Okay. And do you believe you read this article about the time it came out in the paper?

A. Yes.

Q. Okay. There's a -- there's a statement attributed to you. This is on -- and do you recall speaking to the reporter on this story, Jim Newton, around that time?

A. Was it Jim?

Q. That's what it -- but he's got the byline --

A. Yeah. Emily had just left, yes.

Q. Okay. So there's a statement attributed to -- this is on Page 3 of 10. It says, after Thursday's meeting, and you'll

recall I think that the special City Council meeting on October 17, 2019 was a Thursday.

A. Yes.

Q. After Thursday's meeting, comma, Mayor Cunningham said, the City had no specific problems with Potawatomi, but he felt its last-place rankings in the consultant's report played into that vote.

Do you recall expressing that sentiment in substance to Mr. Newton?

A. Not necessarily caused but, I mean, generally, yes.

Q. Okay. No reason to question that that was the gist of what you told Mr. Newton?

A. No.

Q. Okay, okay. Mayor Cunningham, let me ask you to take a look at what was marked at a previous deposition -- actually, I am going to have to pull something up for you. It will just take a moment because I did not preload it. But it won't take long.

A. Sure.

Q. Bear with me for a moment.

A. Sure.

(Whereupon, Cunningham Deposition Exhibit No. 216 was marked for identification.)

BY MR. SMITH:

Q. You may need to refresh your browser. But you should now in the marked exhibits have what was marked at an earlier deposition as Exhibit 216. Let me know when you're --

Okay. Do you have Exhibit 216 up?

A. I'm refreshing. I hope you don't lose everything.

MR. DAVIS: You won't.

THE WITNESS: All right. Here we go. There we go, man.

BY MR. SMITH:

Q. All right.

A. We have lift off.

Q. So while you're looking at it, I'll just mention Exhibit 216 is an e-mail from Jason Grotto dated August 6, 2019 to mayor.cunningham@waukeganil.gov.

A. Okay.

Q. All right. So the first question, Mayor Cunningham, do you recall receiving this

e-mail from Mr. Grotto on August 6, 2019?
A. No, not really.
Q. Okay. Do you have any reason to question that this was an e-mail that came in to you from Mr. Grotto?
A. It could be. I get a lot of e-mails. But it could be. Let me see what it says.
Q. All right. Shortly after the date of this e-mail, I think on August 8 or August 9, 2019, there's a -- there was pretty long story in Pro Publico, which Mr. Grotto mentions is his publication that I think was run jointly with WBZ and the Sun Times talking about Taproom's influence, at least according to the article, on Waukegan politics and gaming policy. Do you remember that article generally?
A. No, I do not.
Q. So, Mayor Cunningham, this may -- well, let me -- I'll ask the question. I take it since you don't -- your testimony is you don't recall receiving this e-mail from Mr. Grotto, if I were to ask you what, if anything, you did once you received this e-mail, you don't have anything that you can tell me on that front?

A. Yeah, I don't know if I would have responded to this guy with all these different type of allegations. Because my opinion, I think he was just being pushed up by the Sierra Club, Lisa May and that whole faction of being disgruntled because I was the Mayor of Waukegan, and that's how I took it.
Q. Okay.
A. And then compounding with Ann Taylor and, you know, partner with this whole group that Waukegan is corrupt and I just really wasn't listening to that, because it wasn't true.
Q. So am I right Mr. -- Mr. Grotto mentions that he tried to speak with you I think after a City Council meeting. Am I right that you were generally aware that Mr. Grotto was making inquiries for purposes of some kind of story?
A. I don't know the guy's last name.
Q. Okay.
A. But I know there was a person who was always asking about this, these type of questions. And listen, we have been

transparent, upfront. Anything he needed, he could find just like you have to get the information. And then, again, it was pretty clear where he was coming from.
Q. Let me ask you this. Given what you've expressed, that -- and tell me if I'm -- if I'm misunderstanding what you said.
But I took your answer a moment ago to be that you kind of viewed this reporter as being -- being put up to things by your political opponents; is that a fair --
A. Yeah. That's how I -- that's how I positioned it and it turned out to be probably true.
Q. And given that, was there a reason you didn't decide to make an effort to try to bring the reporter around to -- to what you viewed as the reality of the situation?
A. I think if you take a look at all the previous articles that you just referred to, what he's asking or -- I shouldn't say what he's asking. The narrative of how would this casino benefit the City of Waukegan, how was our process open and fair for everyone to apply,

that is the questions I'm looking for because that is -- that's the task that we're charged with.
All of these other things, where is this, where is that, I mean, if I wanted to go and talk about anybody's campaign, who donated, who didn't donate, who was in kind, we can go all day and night on that. I just didn't think they were relevant to what our goal was as it relates to the entertainments and casino. And I just believed that he was doing a fishing expedition. And if you take a look at the campaign that was ran by Ann Taylor, narrated by Keith Turner, Lynn Florian, Felix Rivera, they were looking to cast stones and put a negative image on the City of Waukegan.
Personally, I just wasn't -- I wasn't going to -- I wasn't going to contribute to that -- to that narrative about my community, so that's how I looked at this. And it is what it is.
Q. I appreciate that. Given your feelings about the motives of this journalist, did you -- did you read his article when it came out?

                                                    IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAUKEGAN POTAWATOMI CASINO, LLC, )
an Illinois limited liability )
company, )
)
Plaintiff, )
)
-vs- ) Case No. 1:20-cv-750
)
CITY OF WAUKEGAN, an Illinois )
municipal corporation, )
)
Defendant. )

Videotaped deposition via videoconference of DOUGLAS DORANDO taken before TRACY L. BLASZAK, CSR, CRR, and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 7 South County Street, in the City of Waukegan, Lake County, Illinois at 9:36 a.m. Central Daylight Time on the 22nd day of April, A.D., 2021.

There were present at the taking of this deposition via videoconference the following counsel:

FREEBORN & PETERS LLP by
MR. DYLAN SMITH
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 360-6394
dsmith@freeborn.com

on behalf of the Plaintiff;

HELPER BROOM LLC by
MR. GLENN E. DAVIS
MR. CHARLES N. INSLER
30 North LaSalle Street
Suite 2900
Chicago, Illinois 60602
(312) 230-9100
gdavis@heplerbroom.com
cinsler@heplerbroom.com
on behalf of the Defendant;

ALSO PRESENT: Mr. Matthew Richichi
Legal Videographer.

- - - - -

VIDEOTAPED DEPOSITION OF
DOUGLAS DORANDO

April 22, 2021

| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Dylan Smith | 7 |

* * * * * *

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 4 | E-mail from Long to Johnson 8/20/19 | 56 |
| Exhibit 10A | Waukegan casino RFQ/P list of proposals received spreadsheet | 60 |
| Exhibit 14 | Typed notes | 63 |
| Exhibit 26 | E-mail from Dorando to Johnson 10/4/19 | 71 |
| Exhibit 60 | Handwritten notes WKGN 010854-011067 | 67 |
| Exhibit 150 | E-mail from Kischer-Lepper to Cunningham 6/27/19 | 27 |
| Exhibit 153 | E-mail from Kischer-Lepper to Cunningham 7/1/19 | 29 |
| Exhibit 160 | Google calendar invite sent 7/2/19 | 30 |
| Exhibit 164 | E-mail from Kischer-Lepper to Dorando 8/6/19 | 47 |
| Exhibit 164A | Scoresheet WKGN 28933 | 47 |

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 165 | E-mail from Kischer-Lepper to Dorando 8/7/19 | 47 |
| Exhibit 165A | Scoresheet WKGN 28917 | 47 |
| Exhibit 166 | E-mail from Kischer-Lepper to Long 8/7/19 | 47 |
| Exhibit 166A | Scoresheet WKGN 28907 | 47 |
| Exhibit 167 | E-mail from Kischer-Lepper to Smigielski 8/7/19 | 47 |
| Exhibit 167A | Scoresheet WKGN 28886 | 47 |
| Exhibit 170 | E-mail from Long to Cunningham 9/7/19 | 59 |
| Exhibit 173 | E-mail from Kischer-Lepper to Johnson 9/27/19 | 78 |
| Exhibit 173.1 | E-mail from Dorando to Kischer-Lepper 9/27/19 | 79 |
| Exhibit 178 | E-mail from Dorando to Kischer-Lepper 6/21/19 | 24 |
| Exhibit 179 | E-mail from Dorando to Maillard 7/3/19 | 33 |
| Exhibit 180 | E-mail from Dorando to Maillard 7/3/19 | 34 |
| Exhibit 181 | E-mail from Dorando to Kischer-Lepper 7/8/19 | 36 |
| Exhibit 182 | E-mail from Dorando to Maillard 7/12/19 | 38 |
| Exhibit 183 | E-mail from Smigielski to Dorando 8/8/19 | 52 |
| Exhibit 184 | E-mail from Dorando to Cunningham 8/17/19 | 95 |

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 185 | E-mail from Dorando to Cunningham 10/11/19 | 81 |
| Exhibit 186 | Meeting invitation for 10/17/19 | 84 |

* * * * * *

to?
A Not immediately, no.
Q What other municipalities did you look at to try to find guidance about how to draft an RFP?
A I don't recall the specific communities. I know there was some in Louisiana, mostly in the south.
Q And how did you go about researching what they had done? Was that web-based research primarily?
A Primarily.
Q And did you maintain some kind of file or something with the fruits of this preliminary research?
A I don't believe so.
Q It was more just the process of kind of educating yourself about sort of what other municipalities had done?
A Yes.
Q At this point in time reflected in Exhibit 178 did it -- I'm really asking about your thought process personally at this point.
Did it occur to you that, gee, you know, this is a significant project for the City of Waukegan, perhaps we should bring in an outside consultant for purposes of helping us with an RFP?
A I don't believe.

Q As best you can recall at this point in time of this e-mail, you know, late June, 2019, to your knowledge was there any discussion within the City about bringing in an outside consultant to help with the casino solicitation and review process?
A I was not aware of any conversation.
Q And, Mr. Dorando, you were very frank about not having finance experience. Does the bottom of this e-mail where you say, eff if I know, sort of reflect a candid self-assessment in that regard?
A It was probably an attempt at humor, but, yes.
Q Well, even attorneys are entitled to moments of irreverence.
MR. SMITH: All right. Mr. Dorando, let's move past Exhibit 178. There should be within the folder of marked exhibits an exhibit that was marked at a previous deposition as Exhibit 150, if you're able to pull that open.
(Exhibit 150 marked and tendered.)
THE WITNESS: Sure. It's open.
MR. SMITH: Q Okay. So Exhibit 150 is a multipage document consisting of an e-mail chain that ends on June 27th, 2019, with an e-mail from Ms. Kischer-Lepper to Mayor Cunningham, you, Mr. Long, and Thomas Maillard.

I guess the first question for you, Mr. Dorando, I take it you recall being a party to the exchanges reflected in this e-mail chain?
A Yes.
Q And do the e-mails as you look through this chain reflect the ongoing effort in the late June, 2019, period within the City to draft a casino RFP?
A Yes.
Q And does seeing the people who are copied on these e-mails, Mayor Cunningham, Ms. Kischer-Lepper, you, Mr. Long and Mr. Maillard, refresh your memory about people within the City who were involved in the drafting of the RFP at least at this point in time?
A Yes.
Q And having had your memory refreshed, is it consistent with your memory that Mr. Maillard, Mr. Long, and to some extent Mayor Cunningham were involved in that process of providing input into the draft RFP?
A Yes.
MR. SMITH: Mr. Dorando, take a look at what, if you would, we're going to -- I'm not going to ask you anything else about Exhibit 150.
If you could take a look at what you should be able to pull up, which was marked at an earlier

deposition as Exhibit 153.
(Exhibit 153 marked and tendered.)
MR. SMITH: Q And while you're pulling it up, I'll just note Exhibit 153 is another e-mail chaining ending with a July 1st, 2019, e-mail from Ms. Kischer-Lepper to Mr. Dorando, Mayor Cunningham, Mr. Maillard, Mr. Long, and then, as well, Mr. Vasselli and David Motley.
Mr. Dorando, this e-mail in Exhibit 153 is a little bit later in time than the e-mail that we looked at in Exhibit 150.
Seeing this e-mail, does it refresh your memory that at some point Mr. Vasselli and Mr. Motley also provided some input in connection with the effort to prepare an RFP for casinos?
A It refreshes my recollection Mr. Vasselli providing some input. I don't recall Mr. Motley providing any input.
Q Okay. And just from a general standpoint, if you're able to categorize it this way, was there a particular aspect of the RFP that Mr. Vasselli was responsible for commenting on, or was he just an additional set of eyes on the RFP, as far as you knew?
A I wouldn't characterize his involvement as either, necessarily.

responding to those questions.
MR. SMITH: Let me ask you to take a look at what's been marked as Exhibit 182.
(Exhibit 182 marked and tendered.)
MR. SMITH: Q Exhibit 182 is an e-mail chain with the most recent e-mail dated July 12th, 2019, from Mr. Dorando to Mr. Maillard. The subject is casino RFQ/P e-mails.
Mr. Dorando, just take a look moment to look over this chain. It's some pages in length. I'm probably going to have very limited questions about it for you. But just let me know when you've had a chance to kind of orient yourself.
A Okay.
Q I take it Exhibit 182, the e-mail that's most recent in the chain, is, in fact, an e-mail you sent to Mr. Maillard on July 12, 2019?
A Yes.
Q And a few e-mails down Mayor Cunningham appears to e-mail an e-mail address called wkpurchasing@waukeganil.gov, and he says, please add Thomas with Noelle as project managers to the casino RFP/Q for WKPurchasing.
Are you familiar with the WKPurchasing e-mail

address?
A I'm familiar that it exists. I don't know that I will be able to answer specific questions regarding it.
Q Okay. Well, let me give a try with a very general question.
Can you describe what your understanding of what that e-mail address, what its general purpose is and who actually gets e-mails sent to that address?
A I don't know that I know the answer on the purpose.
With regard to it, I know that it is a distribution list set up primarily in the finance department. They added me to that list as many of the documents that were provided on that list were things like draft bids, draft RFPs, documents that I would need to review prior to the posting.
Q And is that what you were referring to when you said to Mr. Maillard, just FYI, that's not how the distribution list works, you're on it or you're not. And you go on to say, you'll get all the purchasing and vendor information for everything.
In your ideal world you very much like not to be on the list. You are basically -- Am I right in

understanding you were explaining to Mr. Maillard you're just now going to be a recipient of all of this stuff that you just described to me?
A Yes, it was a lot of -- there was a lot of, as I would characterize it, garbage e-mails, stuff that didn't need to be reviewed and certainly didn't include.
Q And then Mr. Maillard writes back to you and says in the e-mail below from Tina, she says that she won't take RFP/Q update from me but will from Noelle. Mayor says that is not how that is going to work. They can update the RFP/Q based on my request.
And you respond, she is on a terror lately. I don't know what's going on.
What did you mean, first off, when you said she is on a terror lately?
A She went through -- she's gone through periods where she has restricted access and held fast to City policy perhaps with a very heavy hand.
Q Okay. And just so the record is clear, the she that is referred to at the top of your e-mail and in my question to you and your answer is Ms. Smigielski, correct?
A Yes.
Q Mr. Dorando, based on your involvement in the

RFQ process, did you perceive there to be any tension between Ms. Smigielski and the mayor about the way the casino RFQ process was being handled?
A No.
Q Mr. Dorando, focusing on this same period of time that we've been looking at, so June, July, 2019, not asking about things you may be aware of now, but as of that point in time, were you aware that Mr. Maillard had previously worked at Tap Room Gaming?
A I don't recall specifically when I became aware of that information.
Q Did you become aware of it during the RFQ -- at some point before the City Council voted on certifying casino proposals?
A Yes.
Q Again, focusing on this point in time when you were working on the RFQ drafting process in early June, 2019, early July of 2019, did you know that Mr. Maillard had before the passage of SB690 visited Tap Room to receive a pitch from Michael Bond about his vision for casinos in Waukegan?
MR. DAVIS: Object to the form of the question, assumes facts not in evidence.
Subject to that, you can answer if you have any

consultant?
A I have no knowledge.
Q Am I correct in understanding from your answer that at some point you were made aware that an outside consultant was going to be brought in, but you weren't part of the deliberations that went into that decision being made?
A That sounds correct.
Q That helps. I won't ask you about those deliberations, then.
All right. Mr. Dorando, this is where the electronic presentation of exhibits gets a little cumbersome.
A Okay.
MR. SMITH: I'm going to ask you to take a look at a few exhibits. And I really don't have a ton of questions on them, but by way of preface I will say that I think you will see these exhibits reflect the drafting and evolution of the scoresheets that were going to be used by City personnel to review the casino proposals.
So I'm going to point out what those exhibit numbers are and ask you to kind of take your time and look through them. And then let us know once you've had a chance to do that.

And I'll tell you in advance my question is going to be: Do you have knowledge about who provided the input that led to the changes that we see in the draft, the draft scoresheets?
So I'm trying to do this in a way that, you know, isn't cumbersome. We will see if it works out.
So the exhibits that relate to this topic are Exhibits 164 through 167. And I'll just offer one other word of explanation. You will see that for Exhibits 164, 165, 166, and 167, those are sort of cover e-mails. And then there is a 164A, 165A, 166A, et cetera, those are the, as I understand it, the draft scoresheets appended to those e-mails at that point in time.
If you could just take a moment to scroll through those exhibits, I think it will kind of make sense as you look through them. Let us know when you've had a chance, and then I'll ask you, you know, particular questions about those, if that's okay.
(Exhibit 164, Exhibit 164A, Exhibit 165, Exhibit 165A, Exhibit 166, Exhibit 166A, Exhibit 167 and Exhibit 167A marked and tendered.)
THE WITNESS: You said 164 to 167?
MR. SMITH: Q Yes. So, really, it would be 167A

would be the last kind of scoresheet in the chain.
A Okay. I've reviewed them all at this point.
Q Okay. So, Mr. Dorando, if we look at 164A, which appears to be Ms. Kischer-Lepper's first stab, if you will, at a scoresheet, will you agree with me that 164A seems to largely track the various categories in the request for proposals that the City sent out?
A I would agree with that.
Q Okay. The next iteration which seems to occur after she's shared this draft with you is, at least in the marked exhibits, is 165A, which Ms. Kischer-Lepper is again sharing with you, this, now, is a more scaled-down scoresheet with slightly -- you know, different headings, different organizational structures to some extent.
Do you have an understanding of -- Let me ask you this: Did you provide the input that led to the change between 164A and 165A as you can recall?
A I would often have conversations with Ms. Kischer-Lepper about drafts like this, yes, and so it's likely.
Q Sitting here today, do you actually, you know, have a memory of, you know, a specific, not verbatim, but in substance what your exchange was with her around

these scoresheets?
A I have a general recollection.
Q Can you share that?
A I believe I had a phone call with her where I discussed that we should probably look specifically at the factors in the RFP, focus on the ones that we specifically were asking for. I believe that's where this second version came from.
Q Would you agree with me that this second iteration in Exhibit 165A seems to be less tied to the specific headings in the RFP?
A I don't recall.
Q In providing input to Ms. Kischer-Lepper on these scoresheets, were you channeling any input you had received from anyone else in the City government?
A No.
Q If we look, Mr. Dorando, at Exhibit 166A, which is a subsequent version of this scoresheet, there is now a category called alignment with State and City objectives.
Do you see that?
A Yes.
Q And it says, the RFP identified five areas and objectives of the City largely encapsulated by the

mayor's stated desire to make Waukegan a destination spot.

Do you, as you sit here today, have a recollection of where the language for this section when aligned with State and City objectives came from?

A I believe Ms. Kischer-Lepper and I had a conversation about her desire that we consider, you know, the ultimate purpose of the RFP as part of the scoring.

Q Sitting here today, do you recall in the objective section at the beginning of the RFP whether it focused on making Waukegan a destination spot?

A That was the buzz word of the day.

Q I'm sorry, did you say that was the buzz word of the day?

A Right.

Q When you say that was the buzz word, who used that buzz word?

A That was the mayor's way he framed it.

Q So was this language in Exhibit 1 an effort on your and Ms. Kischer-Lepper's part, as you recall it, to reflect your understanding of the mayor's priorities?

A Yes.

Q And I take it from your earlier answer you were

not aware at this point that the mayor had been privy at some point to Mr. Bond's vision for a casino prior to this point in time?

MR. DAVIS: Objection, foundation, I think without referencing a situation where that could happen, but go ahead.

THE WITNESS: I recall very nebulously a conversation about the mayor's desire to have a casino in Waukegan. I don't recall specifically any sort of proposal by Mr. Bond.

MR. SMITH: Q When you say nebulously, what is the conversation that you're recalling?

A I mean, certainly the mayor had expressed his desire, coming out of the 1990s, desire to have a casino in Waukegan to make it his destination city plan.

Q And then looking at 167A, Mr. Dorando, this version has more or less that same alignment with State and City objectives section, but in this version the reference to the mayor is omitted.

Do you see that?

A Yes.

Q Do you have a recollection as you sit here today how that reference to the mayor's stated desire came to be omitted?

A No.

MR. SMITH: Let me ask you, Mr. Dorando, to take a look at what's been premarked as Exhibit 183.

(Exhibit 183 marked and tendered.)

MR. SMITH: Q Exhibit 183 is an e-mail chain with the most recent e-mail dated August 8th, 2019, and it's from Ms. Smigielski to you, Mr. Dorando, with a cc to Ms. Kischer-Lepper stating assessment.

And, Mr. Dorando, once you've had a chance to look that over, am I correct that this is an e-mail exchange you had with Ms. Smigielski on August 8th, 2019?

A Yes.

Q And the Bates numbers are WKGN 28359 through 28360.

Ms. Smigielski raised the question of whether it would make sense to use a certain type of scale for purposes of trying to make the scoring uniform, if I'm understanding the point.

And you respond, an interesting question you've raised, but I think we just want a numerical score.

Do you see where I am?

A Uh-huh.

Q Okay. Just remember to use words when you

answer.

Mr. Dorando, you said, although I personally like your suggestion, again, you're responding to Ms. Smigielski's suggestion here, you say, based on the amount of convincing it took to get to a quantifiable score, I don't see being able to sell this group at limiting their ability to assign the scores themselves would be easier or more preferable.

What were you referring to there when you talked about the amount of convincing it took to get to a quantifiable score?

A I don't specifically recall the conversation. I have a sense that there was a discussion in the planning and zoning department with various staffers regarding scoring of these proposals and that I believed and I believe Ms. Kischer-Lepper believed that numerical scoring would be the preferable way to score these as that's how we had scored similar economic development proposals.

Q Do you remember who else was a party to those discussions?

A Specifically, no. I would -- I believe that Ms. Kischer-Lepper would have been present. I believe Mr. Maillard would have been present. I don't know if

Mr. Pitchford was present.
Q And that's based on just your recollection of who was involved in those types of discussions at this point in time?
A We had a number of conversations, and those were generally the players in the room.
MR. SMITH: Got you. Okay. We've been going a little over -- I think about an hour and 15 minutes maybe. Would it be a good time to just take a five-minute break?
THE WITNESS: That would be great.
THE VIDEOGRAPHER: Okay. Going off the record. The time is 10:51 a.m.
(a brief recess was taken)
THE VIDEOGRAPHER: We're back on the record. The time is 11:00 a.m.
MR. SMITH: Q Mr. Dorando, before the break at one point you testified about sort of a shift where the City went from relying on internal scoresheets to deciding to retain an outside consultant.
Do you recall that general topic?
A Sorry. Can you repeat the question.
Q Sure.
Before the break I asked you some questions

about the shift where the City went from relying on internal scoresheets to deciding to retain an outside consultant.
Do you recall that topic, generally?
A Generally, yes.
Q At about that same time did the City personnel who were involved in the RFQ process change in some way?
A I believe Mr. Vasselli removed himself from the conversation, and Mr. Maillard may have removed himself from the conversation, as well.
Q Did you have an understanding about why they removed themselves from the conversation?
A I don't believe I ever fully understood which Mr. Vasselli removed himself from the conversation. Mr. Maillard noted his connections to video gaming licensing in the state previously.
Q When you say he noted his connection to video gaming licensing, in what context?
A I know that he was an employee of a company. I believe he referenced Tap Room Gaming.
Q Were you a party to a conversation where Mr. Maillard talked about that?
A I don't specifically recall a specific conversation.

Q How did you become aware that that was the reason Mr. Maillard was removing himself from the process?
A I honestly don't recall.
Q Did you personally have a reaction to that revelation at the time?
A I don't recall.
Q Mr. Dorando, I think you said at the outset of the deposition that one of the things you reviewed to prepare yourself for the deposition was the collection of scoresheets that were prepared before the outside consultant was retained to review casino proposals, is that correct?
A No. I said I reviewed my own scoresheets.
MR. SMITH: Okay. So let me ask you to take a look at what's been previously marked as Exhibit 4.
(Exhibit 4 marked and tendered.)
MR. SMITH: Q And I'll just note for you that Exhibit 4 is an e-mail from Mr. Long to Charles Johnson and a number of others I think not including yourself.
But the reason I am showing -- asking you to take a look at what was previously marked Exhibit 4 is that appended to Mr. Long's e-mail are a number of scoresheets.

And I'm just curious where you are able to identify your own scoresheet as you look through the collection. And if you are able to, perhaps you could identify it by Bates number where your scoresheets begin.
A I believe my scoresheets begin at CHJC 1209 through 1214.
Q 1209 to 1214, is that what you said?
A Yes.
Q And are you able to identify who the author is of any of the other scoresheets in a way that won't be speculative?
A In a way that's not speculative, no.
Q And what did you do to -- what process did you personally go through in filling out these scoresheets?
A I read through the proposals.
Q And any other source of information you referred to?
A I do not believe so.
Q To what extent in reviewing these proposals did you take into account any of the particular applicants' ability to actually follow through on their proposal, to actually deliver the project?
A As I noted, I don't have a finance background,

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WAUKEGAN POTAWATOMI CASINO, LLC, an Illinois Limited Liability Company, Plaintiff, | ) | JUDGE JOHN F. KNESS |
| | ) | MAGISTRATE JUDGE M. DAVID WEISMAN |
| -vs- | ) | No. 1:20-cv-750 |
| CITY OF WAUKEGAN, an Illinois Municipal Corporation, Defendant. | ) | |

Zoom videotaped deposition of NOELLE KISCHER-LEPPER, taken before KAREN KOSTAS, CSR, RMR, CRR, RDR and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 311 South Wacker Drive, Suite 3000, in the City of Chicago, Cook County, Illinois, at 12:00 p.m. on the 14th day of April, 2021.

Pl. SJ Ex. 121

APPEARANCES:

VIA ZOOM:
FREEBORN & PETERS LLP by
MR. DYLAN SMITH
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
312-360-6000
dsmith@freeborn.com

on behalf of the Plaintiff;

VIA ZOOM:
HEPLER BROOM LLC by
GLENN E. DAVIS
MS. MEGHAN RIGNEY
211 North Broadway
Suite 2700
St. Louis, Missouri 63102
314-241-6160
glenn.davis@heplerbroom.com
meghan.rigney@heplerbroom.com

on behalf of the Defendant.

ALSO PRESENT:
MR. THOMAS MUNK
Legal Videographer
Veritext Legal Solutions.

\- - - - - - - - - -

INDEX

WITNESS PAGE
NOELLE KISCHER-LEPPER
Examination by Mr. Smith ....................10
Examination by Mr. Davis ...................184
Re-Examination by Mr. Smith ................187
Re-Examination by Mr. Davis ................188

EXHIBITS

NUMBER FIRST REFERENCED MARKED FOR ID
Deposition Exhibit
Exhibit 10A Waukegan Casino RFQ/P - .......124
List of Proposals Received

Exhibit 14 Notes .........................128
Bates CHJC_0000162 - 0000164
Exhibit 147 June 14, 2019 e-mail chain .....31
to Robert Long, etc. from
Noelle Kischer-Lepper
Bates WKGN 29176 - 29177

Exhibit 148 June 21, 2019 e-mail chain .....33
from Noelle Kischer-Lepper
to Douglas Dorando - Request
for Proposals - Casino
Development & Operator
Waukegan, Illinois
Bates WKGN 29109 - 29120

Exhibit 149 June 21, 2019 e-mail chain .....37
from Noelle Kischer-Lepper
to Thomas Maillard
Bates WKGN 29153

Exhibit 150 June 27, 2019 e-mail chain ....39
from Noelle Kischer-Lepper
to Mayor Cunningham
Bates WKGN 24712 - 24714

Exhibit 151 June 28, 2019 e-mail chain .....42
from Noelle Kischer-Lepper
to James Vasselli
Bates WKGN28694
Exhibit 152 June 29, 2019 e-mail chain .....44
from Elder Sylvia Sims-Hanna
to Noelle Kischer-Lepper
Bates WKGN 28670

Exhibit 153 July 1, 2019 e-mail from .......46
Noelle Kischer-Lepper to
Mayor Cunningham, etc.
Bates WKGN 24651
Exhibit 154 July 2, 2019 e-mail chain ......48
from Noelle Kischer-Lepper
to Tina Smigielski
Bates WKGN 28601 - 28604

Exhibit 155 July 2, 2019 e-mail chain ......51
from Thomas Maillard to
Noelle Kischer-Lepper
Bates WKGN 28582 - 28586
Exhibit 156 July 2, 2019 e-mail chain ......54
from Noelle Kischer-Lepper
to Robert Long, etc.
Bates WKGN 24598 - 24602

Exhibit 157 July 2, 2019 e-mail from .......56
Noelle Kischer-Lepper to
Mayor Cunningham, etc.
Bates WKGN 24613
Exhibit 158 July 3, 2019 e-mail chain ......57
from Noelle Kischer-Lepper
to Tina Smigielski
Bates WKGN 28578

Exhibit 159 July 3, 2019 e-mail from .......60
Noelle Kischer-Lepper to
Mayor Cunningham, etc. -
Attachment: Request for
Qualifications and Proposals -
Casino Development & Operator -
Waukegan, Illinois
Bates WKGN 24558 - 24570
Exhibit 160 July 2, 2019 e-mail from .......64
Google Calender on Behalf of
James Vasselli to Isabel Gallegos
Bates WKGN 23902

Exhibit 161 July 18, 2019 e-mail chain .....69
from Robert Long to
Noelle Kischer-Lepper, etc.
Bates WKGN 29218 - 29221
Exhibit 162 July 23, 2019 e-mail chain .....74
from Noelle Kischer-Lepper
to Robert Long, etc.
Bates WKGN 29071 - 29074

Exhibit 163 July 24, 2019 e-mail chain .....81
from Thomas Maillard to Noelle
Kischer-Lepper, etc. - City of
Waukegan Casino Request for
Qualifications and Proposals Q&A
Bates WKGN 25126 - 25130
Exhibit 164 August 6, 2019 e-mail chain ....93
from Noelle Kischer-Lepper to
Douglas Dorando - Document
Produced In Native Format
Bates WKGN 28932 - 28933
Exhibit 164A Excel Spreadsheet .............94
Exhibit 165 August 7, 2019 e-mail from ....96
Noelle Kischer-Lepper to
Douglas Dorando - Document
Produced In Native Format
Bates WKGN 28916 - 28917

Page 22

development, was there any particular past experience in terms of previous requests for proposals that you, in your mind, viewed as a precedent that you could draw on in particular?

A Primarily just the format, the standards, you know. We have to have a scope of work, we have to have deadlines, we have to have parameters, that kind of thing. In terms of content, no.

Q Okay. And I sort of jumped the gun a little bit, so let me ask you.

If we -- If we focus on -- I'm going to ask you to focus on the 2019 period. What was your earliest involvement in anything having to do with a possible casino coming to Waukegan?

A I was asked to participate on the team and help prepare the request for proposals, request for qualifications and proposals.

Q And when you say you were asked to participate on the team, who asked you to do that?

Page 23

A The mayor. My direct supervisor.

Q And I should have asked you that. Thanks for pointing that out.

I assume as the director of planning and zoning you report directly to the mayor?

A I do.

Q And since we're sort of back at the structure of the City government, let me -- let me ask you. How many people are there in your department underneath you?

A At the present time we're a department of four, so I have three people who report to me.

Q And was that true in the 2019 time period?

A At that time, yes.

Q So you were, when I kind of went on that little tangent, you were saying that the mayor had asked you to be part of the team that would be involved in drafting the request for proposals.

Did I get that right?

A Yes.

Q Who else was part of that team?

Page 24

A Initially it included the mayor, our corporation counsel, Bob Long, Robert Long, his assistant counsel, Douglas Dorando.

Excuse me.

Markus Pitchford from the Mayor's Office. Thomas Maillard from the Mayor's Office. It appeared that James Vasselli, another attorney, would probably participate. Tina Smigielski, the finance director. And me.

Q And we'll look at some documents that will kind of flush that out a little bit.

I've also seen reference in some of your e-mails, Miss Kischer-Lepper, to something referred to as the Fountain Square Working Group.

Are you familiar with that phrase?

A It was a phrase that we used very loosely at the beginning of the formation of that team.

Q Ahh. Okay.

A Working group is a phrase that we use when it's a staff committee rather than a formal City Council-related structure.

Page 25

Q So -- So Fountain Square Working Group, to the extent I see reference to that, that's not really something distinct from the effort on the casino request for proposals, that was just a term that was sometimes used to describe the same effort?

A For a very brief amount of time, yes.

Q And you mentioned that the mayor asked you to be part of the team working on the request for proposals. Do you know whether it was the mayor who asked those other people you've mentioned to also be part of that team?

A My recollection is that it was in a staff meeting and it was sort of a listing of names.

Q Okay. And was it the mayor who listed the names?

A Yes.

Q And did -- Let me ask it this way.

When the -- When the mayor provided the names of the people who would be part of the team working on the request for proposals,

Page 38

to see a draft by Monday/Tuesday?
And then he goes on.
Do you recall getting this e-mail from Mr. Maillard?
A I don't specifically recall it, but it looks like an e-mail that we would have exchanged.
Q And I don't think I asked you this, although you mentioned his name.
What was Mr. Maillard's role in City government at this point in time?
A Mr. Maillard works in the Mayor's Office and has followed various projects to which he has been assigned. So it's not uncommon that he reaches out to another department asking, you know, inquiring about the status of a project.
Q And what was his role at this point in time on the RFQ team?
A I don't know that there was a specific role. Mostly just keeping things on task.
Q Okay. At this stage would it be fair to describe him as a point of contact

Page 39

between you and Mr. Dorando, on the one hand, and the Mayor's Office on the other, with regard to the preparation of the RFQ?
A That would be reasonable.
Q All right. And there's obviously an e-mail that Counsel has redacted for reasons that aren't apparent to me, but that's for the lawyers to talk about.
He responds: Makes sense.
It goes on and you say: Douglas and I talked this morning, and we're both working on it as we speak.
So that's -- That response by you to Mr. Maillard is consistent with the e-mail we just looked at a moment ago, Exhibit 148, which reflected the fact that as of June 21st you and Mr. Dorando were developing a draft of the RFQ, correct?
A It appears so.

(Deposition Exhibit 150 marked.)

BY MR. SMITH:
Q Let me ask you, Miss Kischer-Lepper,

Page 40

to take a look at Exhibit 150.
And Exhibit 150 is a --
A It's taking me a minute to load on my end.
Q Oh, okay.
A Okay.
Q While you're doing that I'll just kind of identify the document. And I won't start asking you questions until you've had a chance to look at it.
So what has been marked as Exhibit 150 is an e-mail chain that ends on June 27th, 2019, Bates stamped WKGN 24712 through 24714.
Have you been able to pull that up?
A Yes.
Q Okay. So do you recognize Exhibit 150 as a chain of e-mails relating to the drafting of the RFQ for casino proposals?
A It looks like that's what it is, yes.
Q And there's an e-mail that is the next to last e-mail in this chain where Mayor Cunningham offers some thoughts on the

Page 41

then current draft of the RFQ.
Is that your reading of what the mayor is doing there?
A Let's see. Yes.
Q Okay. And the mayor has addressed his e-mail to you and then cc'd Mr. Dorando, Mr. Long and Mr. Maillard.
And then your response includes the mayor, Mr. Dorando, Mr. Long and Mr. Maillard.
Do the people who are the senders and recipients on these e-mails in Exhibit 150, do those reflect the people at this point in time within the City government who were the core of the team working on the request for qualifications and proposals?
A I wouldn't describe that as the core of the team. I would say that this was the point that Douglas and I were giving an update to our bosses and Thomas then being part of the Mayor's Office was included on that.
Q Okay. And do you have an understanding why at this stage, June 27th, it would be Thomas as opposed to Thomas and Markus Pitchford or Thomas or

Page 42

Markus Pitchford?

A Thomas was following the -- the time line, you know, the schedule to get the RFP put out to the market.

Markus, his role was one of the actual reviewers, but he didn't review the RFP, as I recall, he reviewed the proposals later.

Q Okay. Thank you.

(Deposition Exhibit 151 marked.)

BY MR. SMITH:

Q Miss Kischer-Lepper, let me ask you to take a look at what has been pre-marked as Exhibit 151.

And, again, Exhibit 151 includes certain redacted information, it's a single page Bates stamped WKGN 28694 consisting of an e-mail chain that ends on June 28th, 2019 with an e-mail from you to Mr. Vasselli, James Vasselli. And the Subject line of the e-mail is RFQ - Fountain Square Version 2, 6.24.19-mlt redline.pdf.

Page 43

So, Miss Kischer-Lepper, am I right in understanding that generally speaking your communication here with Mr. Vasselli concerned the drafting of the casino RFQ?

A I was likely asking his feedback with the redline document.

Q Okay. And I -- Since -- Since the City's counsel has redacted the actual substance of the exchange, I don't want to ask you to get into that.

Does looking at the reference to Fountain Square v2 and the date I read off with the mlt redline, does that signify any particular draft to you?

A No. I believe there were several, so I couldn't identify one from the other.

Q Okay. What about the mlt, does that mean anything to you?

A It wouldn't be something that I would have added to it.

Q Okay. And generally speaking, without getting into the substance of any advice Mr. Vasselli may have provided to the City in connection with the RFQ, can you just

Page 44

at a very general level explain to me what you understood to be Mr. Vasselli's role with regard to the drafting of the RFQ?

A Initially I understood him to be part of the review team, that he would likely review the RFP document that we would put out and that he would also probably evaluate the proposals.

Q And was it your observation that it was the mayor who had selected him to be part of the RFQ team?

A I wasn't part of that conversation. I don't know how that happened.

(Deposition Exhibit 152 marked.)

BY MR. SMITH:

Q Okay. So you probably can guess where we're going next. If you could take a look at what has been pre-marked as Exhibit 152.

And while you're pulling that up, Miss Kischer-Lepper, I'll note that Exhibit 152 is again a partially redacted

Page 45

e-mail chain with the most recent e-mail dated June 29th, 2019 -- excuse me -- from Elder Sylvia Sims Hanna to Noelle Kischer-Lepper.

Are you able to see that in front of you, Miss Kischer-Lepper?

A Yes.

Q Okay. And am I right that the -- the unredacted portion of the earlier e-mail from you dated June 28th, 2019 is you transmitting the then current draft of the request for casino proposals to the members of the City Council?

A That's correct.

Q And then the -- the response from the sender identified as Elder Sylvia Sims Hanna, do you understand that to be the First Ward alderman who is also known as Sylvia Sims Bolton?

A Yes.

Q And Alderman Bolton says: Thank you so much for this information. I have had a few private sessions to gain insight about the issue.

Pl. SJ Ex. 121

Page 46

Did you ever learn what she was referring to when she mentioned a private session to gain insight about the issue?
A I did not.
Q I take it that you didn't follow up with her about that?
A I did not.

(Deposition Exhibit 153 marked.)

BY MR. SMITH:
Q Okay. Miss Kischer-Lepper, if you could pull up what has been pre-marked as Exhibit 153.
And while you're getting that up, I'll just note that Exhibit 153 ends in Bates Number 24651 and is an e-mail chain with the most recent e-mail dated July 1st, 2019 from Miss Kischer-Lepper to Mayor Cunningham, Thomas Maillard, Robert Long, Douglas Dorando and James Vasselli.
And, Miss Kischer-Lepper, in the earliest e-mail in this chain, am I correct that you were providing a link to those same

Page 47

recipients to what was at that time the most recent version of the casino request for proposals?
A Yes.
Q And -- Well, so let me -- let me ask you in an -- in an open-ended way.
Why are the recipients of your July 1st e-mail in this exhibit, how did you select those people to send the draft to?
A Those were the people that were participating at that point in the review. Miss Smigielski had dropped off because she had provided input on the financial piece.
Q And when you say participating in the review, just so the record is clear, you're talking about the review of the casino RFP?
A The draft document that we would put out when it was final, yes.
Q And are you certain that Miss Smigielski had dropped out at this point or is it possible that she had not yet been looped in?
A I would say this close to the date

Page 48

that we submitted it, I think we already had had her input. I'm reading that it says Draft Number 3. My recollection is that I had her input at the earliest draft, that financial piece.

(Deposition Exhibit 154 marked.)

BY MR. SMITH:
Q Let me ask you to take a look at what has been pre-marked as Exhibit 154.
And while you're pulling that up, Miss Kischer-Lepper, I'll note that Exhibit 154 is an e-mail chain that ends on July 2nd, 2019 with an e-mail from Miss Kischer-Lepper to Miss Smigielski and its Bates numbering runs from 28601 to 28604.
And just let me know when you've had a chance to look over this exhibit.
A I have looked at it.
Q Okay. Miss Kischer-Lepper, does looking at this exhibit do anything to refresh your memory about when Miss Smigielski was brought in to -- for input on the drafts of

Page 49

the casino requests for proposals?
A I was mistaken on the dates.
Q Okay. Explain why you say that.
A Because I had thought she was brought in at a date earlier than the beginning of July.
Q Am I correct that the e-mail on the first page of Exhibit 154 from July 2nd, 2019 at 4:25 p.m. where you say to Miss Smigielski, Could I request your expertise?, Is this the proper information to ask for and the correct language, that's the point in time in which you solicited input from Miss Smigielski, is that correct?
A It appears.
Q And I know this is probably a point of common knowledge, but I don't think we've covered it yet.
Am I correct that Miss Smigielski was the City's director of finance at this point in time?
A Yes.
Q And then you and Miss Smigielski have a subsequent exchange where

Page 78

chain still on the bottom of Exhibit 162: No, I did not submit yet. Mayor had some resistance to releasing the appraisals for the first time in this as opposed to in a different public rollout.

So, Miss Kischer-Lepper, apart from what Mr. Maillard said here about the mayor's resistance to releasing the appraisals, do you, yourself, have any firsthand knowledge as to the source of the mayor's resistance to that?

A I do. I believe it's -- He had assigned me a larger project to look at all of the City's properties, the property that the City owned within the City of Waukegan, and submit to him something that I'm calling an evaluation. It's not a financial valuation, but just sort of a look at the properties and what the issues are on the sites, what they might be used for, what they might have been used for, that type of thing. And that analysis project was something that he wanted to have as a stand-alone project and the appraisals were supportive material for that

Page 79

effort.

Q Understood. Is the answer you just gave, Miss Kischer-Lepper, is that based on your general understanding and involvement in that project you just described of obtaining appraisals about a number of properties, or did you subsequently have a direct conversation with the mayor at the time that you and Mr. Long and Mr. Maillard were trying to figure out how to deal with responding to the Greenberg Traurig lawyer's questions?

MR. DAVIS: I'll just object to the form of the question, it's not really an either/or.

But subject to that, go ahead, if you can answer.

A I'm not sure that I got the whole question.

BY MR. SMITH:

Q Yeah. Let me -- Let me -- Let me break it down. And I think Counsel had a fair objection there.

You, in your answer a moment ago, described your involvement in a project under

Page 80

the mayor's direction to obtain appraisals for a number of properties that the City had on its rolls, correct?

A I wasn't the person directly obtaining the appraisals, but yes, that supported a project that I worked on.

Q Okay. And I understood the answer you gave about your understanding of the mayor's resistance to releasing the appraisals to be based on your familiarity with that underlying project.

Did I follow you correctly?

A Yes.

Q Okay. So my question is now, in addition to that basis for your belief about what the reasons were for the mayor's resistance, did you also have any type of conversation directly with the mayor at this point in time, on or about July 22nd, 2019, regarding that resistance when you and Mr. Maillard and Mr. Long were working on writing answers to the questions for the Greenberg Traurig lawyer?

A I don't recall ever having a

Page 81

discussion with him about that.

(Deposition Exhibit 163 marked.)

BY MR. SMITH:

Q So, Miss Kischer-Lepper, let me ask you to take a look now at what has been marked as Exhibit 163.

And Exhibit 163 is another chain of e-mails, the most recent in this one dated July 24th, 2019 from Mr. Maillard to you, Miss Kischer-Lepper, Mr. Long, with a cc to Mayor Cunningham.

Is this, in fact, an e-mail chain you were a part of on the dates indicated?

A Yes, it appears to be.

Q Okay. There's an attachment to this e-mail.

And Mr. Maillard states in his July 24th e-mail message: Based on Mayor's initial feedback, here's the most recent version of the document.

Do you take Mr. Maillard's reference to the document to be a reference to the

document that is attached in this e-mail?
A I do.
Q Okay. And am I right, Miss Kischer-Lepper, that this is a draft of what would become or what was an intent, I believe -- I'll start again.
This is a draft of what was intended to be an addendum to the City's request for qualifications and proposals that ultimately could be posted on the City's Web site?
A Yes, it appears to be.
Q Do you see, if you look at the -- at the attachment, the second question states, has -- has the question: We see that the RFP requires the respondents to include an offer for any City-owned land. Nonetheless, the City will announce its -- I'm sorry. Nonetheless, will the City announce its asking price for the City-owned land?
And do you recognize that question as basically being taken from that e-mail from the Greenberg Traurig lawyer that we had looked at in Exhibits 161 and 162?
A Yes, it appears to be.

Q Okay. And then there's an answer there: The City declines to state an asking price at this point, preferring instead to consider offers from interested respondents.
And that's ultimately what the City posted by way of answer on its Web site, is that your recollection?
A It is.
Q There is also, if we take a look on the next page of this attachment which is the page with the Bates stamp 25129, the WKGN Bates series, there is a question: Does the City expect there to be a temporary casino? If so, is there an expectation that the temporary casino would be on the same site as the permanent casino?
Do you see where I am?
A I do.
Q And would you agree with me that question also comes from that e-mail from the Greenberg Traurig lawyer we looked at in Exhibits 161 and 162?
A Yes.
Q And the answer, the first sentence

says: We expect there to be a temporary casino.
Do you see that?
A I do.
Q Okay. And do you recall that that's a slightly different formulation than the proposed answer in Exhibit 161?
A It seems to be slightly different from what I recall.
Q Okay. The earlier answer said we expect there to be interest in a temporary casino.
Do you recall that?
A That sounds familiar, yes.
Q Do you have an understanding of who is responsible to the change to make it we expect there to be a temporary casino?
A I don't know who made that change.
Q Miss Kischer-Lepper, if we take a look at, again, going back to the top of this exhibit, or the first page of this exhibit, once again here Mr. Maillard is providing -- is transmitting what he states is the mayor's feedback.

Is this consistent with your recollection of Mr. Maillard's role at this point in time, in other words, was he acting as a point of contact between the mayor and those of you who are working on responding to questions about the RFQ?
A Yes.
Q So, Miss Kischer-Lepper, at some point proposals were received by the City in response to the RFQ.
Do you recall that?
A Yes.
Q And do you generally recall that that -- that the deadline for the submission of proposals was August 5th, 2019 or thereabouts?
A Yeah.
Q Was there -- Was there a team established within the City in anticipation of the receipt of those proposals of people who were going to be reviewing the proposals that came in?
A At that point I understood it to be basically the same group that had participated

Pl. SJ Ex. 121

in the review of the RFP itself.
Q Okay. So I realize this may be a little tedious, but just since someone could be, you know, reading this transcript some day and not want to go back, let me ask you.
So those -- those same people would be you, correct?
A Yes.
Q Mr. Maillard, correct?
A Yes.
Q Mr. Long?
A Yes.
Q Mr. Dorando?
A Yes.
Q Did I say Miss Smigielski?
A You didn't say it, but yes.
Q Okay. I think I said Mr. Maillard, yes?
A Yes.
Q I should have written this down.
Would you include the mayor in that group?
A Generally speaking, yes.
Q Okay. Mr. Vasselli?

A At that point, yes.
Q Okay. Mr. Pitchford?
A Yes.
Q Okay. Now, at that point in time, in other words, as of the date the proposals came in, was there, to your knowledge, any plan to use an outside consultant to help review casino proposals?
A No. There was not.
Q All right. When did you first become aware of any intent on the City's part to bring in an outside consultant to help with the review process?
A I don't know an exact date. It was after the review had begun.
Q So just putting together a couple things you said here. When I asked about who the people were who were reviewing proposals you identified the list for me and said at that point in time, and then you've also said that, you know, there wasn't initially going to be a consultant but then there was.
Without getting overly hung up on dates, can you describe for me what, if

anything, changed in the review process, as you understood it, to have been contemplated?
A Sure. At one point Mr. Vasselli and Mr. Maillard were no longer reviewers. And at one point it was decided that we would benefit and the process would benefit from the assistance of a consultant with some specific expertise in reviewing casino developments, particularly as it relates to the financial aspects of casinos.
Q So let me -- let me break out those -- those two things.
Who decided that Mr. Maillard and Mr. Vasselli would not be involved in the review?
A I don't know.
Q How did you become aware of it?
A I was told at one point, I'm not sure by whom, that they were no longer reviewing.
Q And do you know, from your involvement in this process, do you know who decided that the process would benefit from an outside consultant?

A Ultimately, the decision was made, you know, by the City Council to hire a consultant. I was one of the people who advised that it would be beneficial. I don't have the qualifications to review the financial proposals of consultants and determine whether they're realistic or not.
Q Yeah. Do you know -- I appreciate the City Council's approval of the contract.
Do you know who initially set in motion the effort to go look for an outside consultant?
A Bob Long. Robert Long, our attorney, was the person who reached out to consultants.
Is that what you're asking?
Q Well, if you know, who -- who first raised the idea of getting an outside consultant, if you know?
A I was -- I was one of the people. I don't know if somebody raised it to somebody else before I raised it. But I certainly raised it to Bob.
Q Okay. And you don't know when

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAUKEGAN POTAWATOMI CASINO, LLC, an Illinois limited liability company, )
)
Plaintiff, ) No. 1:20-cv-750
)
-vs- )
)
CITY OF WAUKEGAN, an Illinois municipal corporation, )
)
Defendant. )

The videotaped videoconference deposition of ROBERT LONG, reported remotely by JUNE M. FUNKHOUSER, CSR, RMR, and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, commencing at 10:03 a.m. on April 27, 2021.

There were present at the taking of this deposition via videoconference the following counsel:

FREEBORN & PETERS, LLP by
MR. DYLAN SMITH
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
312.360.6000 | 312.360-6520 (fax)
dsmith@freeborn.com
on behalf of the Plaintiff;
HEPLERBROOM, LLC by
MR. GLENN E. DAVIS
211 North Broadway, Suite 2700
St. Louis, Missouri 63102
314.480.4154
Glenn.Davis@heplerbroom.com

and

HEPLERBROOM, LLC by
MS. MEGHAN A. RIGNEY
30 North LaSalle Street
Chicago, Illinois 60602
312.205.7741
Meghan.Rigney@heplerbroom.com
on behalf of the Defendant.

ALSO PRESENT:
MR. MICHAEL PRAGER, Videographer.

INDEX

Witness: Page
ROBERT LONG
Direct Examination by Mr. Smith 8

EXHIBITS

Page
EXHIBIT 212 30
E-mails, 6/13/19 to 6/14/19, Subject: Waukegan Gaming Market Assessment
Bates WKGN 29178 - 29179

EXHIBIT 213 39
Article from rrstar.com, 7/19/19

EXHIBIT 214 40
E-mail, 8/7/19, R. Long to T. Maillard, M. Pitchford, Mayor Cunningham, T. Smigielski, Subject: Casino consultant
Bates WKGN 25036

EXHIBIT 215 49
E-mail, 8/8/19, R. Long to J. Banovitz, Cc: Mayor Cunningham, Subject: Waukegan Casino
Bates WKGN 25035

EXHIBIT 216 42
E-mail, 8/6/19, J. Grotto to Mayor Cunningham, Subject: Jason Grotto/ ProPublica story about Waukegan casino
Bates CW00505 - 00506

EXHIBIT 217 51
E-mails, 8/8/19 to 8/14/19, Subject: Waukegan Casino
Bates WKGN 28275 - 28278

EXHIBIT 218 57
Video Clip, City of Waukegan Finance & Purchasing Meeting, 8/19/19

EXHIBITS (Cont'd)

Page
EXHIBIT 219 71
E-mails, 8/30/19, Subject: Casino schedule
Bates WKGN 28373 - 28375

EXHIBIT 220 143
Calendar invite, 10/15/19, R. Long to Mayor Cunningham, Subject: Bond Meeting
Bates WKGN 24491

EXHIBIT 221 145
E-mails, 8/15/19
Bates WKGN 22530 to 22533

EXHIBIT 222 146
Redacted e-mail chain, 9/3/19
Bates WKGN 24905

PREVIOUSLY MARKED EXHIBITS

Page
EXHIBIT 4 60
E-mails, 8/8/19 to 8/20/19 with Score Sheets
Bates CHJC_0001192 - 0001220

EXHIBIT 9 73
E-mails, 9/4/19
Bates WKGN 001857 - 001858

EXHIBIT 10a 75
Spreadsheet, Waukegan Casino RFQ/P List of Proposals Received

EXHIBIT 26 125
E-mail with attachments, 10/4/19, D. Dorando to C. Johnson, S. Emmerton, casino@waukeganIL.gov, and R. Long, Subject: Potawatomi Supplemental Letter to Waukegan Casino Review Team 10-4-19
Bates CHJC_0000992 - 0001079

EXHIBIT 27 129
E-mails, 10/15/19
Bates CHJC_0002433 - 0002434

PREVIOUSLY MARKED EXHIBITS (Cont'd)

Page
EXHIBIT 28 134
E-mails, 10/16/19
Bates CHJC_0002424 - 0002425

EXHIBIT 30 84
E-mail with attachment, 9/16/19, S. Emmerton to R. Long, Cc: C. Johnson, Subject: CONFIDENTIAL CHJC Waukegan Casino_Public Meeting 091819_DRAFT
Bates CHJC_0000929 - 0000942

EXHIBIT 38 115
E-mail with attachment, 10/8/19, S. Emmerton to R. Long, Cc: C. Johnson, Subject: CONFIDENTIAL CHJC Waukegan Report WORKING DRAFT
Bates CHJC_0000943 - 0000958

EXHIBIT 41 117
E-mails, 10/8/19
Bates CHJC_0002251 - 0002252

EXHIBIT 43 120
E-mail, 10/10/19, S. Emmerton to R. Long, Cc: C. Johnson, Subject: CHJC Waukegan Casino Developer_Memo Report 101019
Bates CHJC_0000900 to 0000918

EXHIBIT 170 74
E-mails, 9/6/19 to 9/7/19
Subject: CHJC Waukegan Casino Proposal Summary
Bates WKGN 24105 - 24106

EXHIBIT 206 18
Letter, 10/18/19, S. Cunningham to Illinois Gaming Board, Re: Waukegan Certification of Developers Pursuant to Public Act 101-0031
Bates WKGN 27139

McHenry County Department of Health in a rather interesting lawsuit last year involving the coronavirus, PPE, and the disclosure of HIPAA information that was requested by a sheriff that went to the Illinois Appellate Court.

Q All right. Well, thank you. That was a helpful overview.

Mr. Long, I could make out everything you were saying but you were starting to get a little faint, so if you're able to -- I don't know if there's a way to get a little closer to your microphone it may help.

A Not much. It's sitting at the top of my computer screen. I suppose I can try to pull it a little closer if that will help.

Q It helps a little.

A My voice is also deep and it doesn't pick up well on microphones.

Q Whatever you did it's a little better, I think.

So can you tell me a little bit more, just to focus in on 2017, how you came to be corporation counsel for the City of Waukegan?

A Well, I was -- I've known Sam Cunningham

since I think about 2000, 2001. I met him through a -- an acquaintance named Bobby Evans. Bobby Evans was the former first ward alderman of the City of Waukegan and he was a client of this firm and his sister, Bette Thomas, was elected the mayor of the City of North Chicago and that's where I served, as I mentioned earlier, and in that context I got to know some of the other people around the first ward and in the -- that adjoins North Chicago on 10th Street, so I also got to know a broad range of people in that area.

And the -- I got to know Sam. Sam brought a -- his -- I think his mother in-law at the time, Rayeanne's mother, who had had a horrific accident at one of the local hospitals where she had a knee replacement surgery on an elective basis, they severed the popliteal artery, and she lost her -- lost her leg, and that led to a malpractice case that I worked on quite extensively with a firm of -- Bob Baizer is the attorney that actually try -- got the case ready for trial, and I do a lot of work on that case.

I got to know Sam pretty well during that period of time. I did some other work for

him, I think a couple of real estate deals maybe and he had an insurance claim for a building that had a roof collapse, if I remember correctly, or something went wrong with the roof, I don't remember the details, it was a long time ago, and then he was running for mayor and he did that I think three or four times. I guess four in total. He probably did it -- the third time I think he won the 2017 election, but I had assisted him on -- with some legal issues. I'd looked at his paperwork, the filing petitions, make sure that they looked right before he filed stuff. I knew his mother from -- and I represented her at different points in time and some other family members. I was pretty close to the family. They're really good people.

And I think it was in 2013 when he was running against Terry Link and Wayne Motley that he asked me for the first time if I would consider serving as corporation counsel, and, of course, by then I had a substantial amount of municipal background, I was happy to take him up on the offer, but it didn't lead to anything because he didn't get elected.

So fast-forward to 2017. He wins the primary, and then shortly -- I think it was right about the time of the election there was -- there were two things that went on over at city hall involving Mayor Motley, one of which was a union dispute involving the arbitration of benefits and such under one of the police contracts and the other one was a -- well, to put it bluntly, she was a bit wacky, a real estate broker that claimed -- that came in and claimed to be representing a Chinese company that wanted to invest a billion dollars on the lakefront in Waukegan.

And at that point Motley had lost the primary so he knew he wasn't going to be reelected, Sam was running against Alderman Lisa May and it was a tight race, but immediately after he edged out Lisa by a small margin of votes I was brought into the City Council to try to start a transition period from the then corporation counsel, Steve Martin, and I was working particularly on those two issues, the -- we eventually resolved the police union contract and we eventually found out that the Chinese really weren't hiring the rather wacky real estate broker and nothing ever came of that. She

really wanted the city to just pay her -- buy her -- to go into contract with her and then she was going to try to put a deal together, but that wasn't going to work.

Q So that was basically the sequence that ended up with you as corporation counsel?

A Yes.

(Witness referred to previously marked Exhibit 206.)

BY MR. SMITH:

Q Okay. Mr. Long, let's give -- since we made such an effort to get you linked up to it, let's give Exhibit Share a try.

If I could ask you to pull up what's been premarked as Exhibit 206. It should be available in your folder of marked exhibits.

A Okay. Yeah. It's pretty small, but okay. Oh, here.

Q Hopefully you can enlarge it to full-screen size.

A Yeah, I got it now.

Q Okay. So just to set the stage for my questions about Exhibit 206, would you agree with me that at a special City Council meeting on

October 17th, 2019, the Waukegan City Council voted to approve certain resolutions certifying three casino proposals to send on to the Illinois Gaming Board?

A That is correct.

Q Is Exhibit 206 the letter from the City of Waukegan transmitting those certifying resolutions to the Illinois Gaming Board?

A It looks like it. It looks like the letter I wrote, yes.

Q Obviously without any enclosures, correct?

A Yeah, I didn't -- I didn't assemble the document. I might have had help writing the letter from Douglas, but I think I wrote this one.

Q Okay.

A Not quite sure.

(Witness referred to previously marked Exhibit 207.)

BY MR. SMITH:

Q Okay. Let me -- let me ask you to take a look at what's been premarked as Exhibit 207, and I'll just give you a moment. Let me know when you've had a chance to look that over.

And while you're pulling that up I'll just note that Exhibit 207 is a document that on the first page is entitled City of Waukegan Resolution Number 19-R-96, and it runs from WKGN 10838 through 10853.

A Yeah, okay. Yeah, I know what this is.

Q Mr. Long, do you recognize the documents that are included in Exhibit 207?

A Yep. I do.

Q What are they?

A Those are the resolutions that -- that certified, as required by the stat -- by the public act that we were operating under, the amendments of the video game -- or the riverboat video game -- or Riverboat Gambling Act is the correct name of that, and it -- these certify the Rivers Casino, which is a combination of Rivers and Churchill Downs, Full House, and North Point, which is a combination of some -- it was something put together by Michael Bond, I think, and Warner Gaming. It certified those three casino proposals to the Illinois Gaming Board for further vetting and the bidding process and all the stuff that goes along with it.

Q And North Point, if I'm not mistaken, was

also known as Lakeside Casino, correct?

A Yeah, I think that's what they called it. The names don't mean an awful lot to me. I know which groups they are.

Q Fair enough.

Just to try to nail this down for the record, hopefully it won't be too tedious, in each of these certifying resolutions included as Exhibit 207 there's a reference to an Exhibit A, which is identified as the response the particular applicant submitted to the City's request for proposals. Do you see what I'm referring to throughout that exhibit?

A Yeah. That's exactly what we did. We --

Q Am I correct in --

THE REPORTER: I'm sorry. Would you repeat the end of that answer, please?

MR. SMITH: Sorry.

THE WITNESS: We incorporated the exhibit by reference.

BY MR. SMITH:

Q And in terms of what was actually sent to the Illinois Gaming Board, am I correct in assuming that the proposals that were sent along with each

because our original RFQ date we put -- you know, here's the basic problem. The legislation gave us a very short window of time in which to operate, and we extrapolated backwards from that final date, which we calculated to be I think the 19th or the 21st of October, whatever the date was, and tried to back it up from there to try to create what were reasonable milestones for the submission, a review process, the aldermen to look at it, a meeting with the developers, a public hearing, and finally, finally Council action. These are the principal steps that we had to follow there.

So what we were looking for was, okay, well, when -- how much time do we need to get developers. Now this was hot news. We knew it had been in some of the -- there's some kind of trade journal, Gaming News or something like that, I forget the name of the thing, and it was in the -- in the Milwaukee papers, in the Chicago papers, it was even in some of the national press that this went out, new stuff was coming on the market, new opportunities, so we figured that if we were going to get developers they would be pretty well-heeled, be ready to proceed, and very ready to go in a

pretty quick period of time.

So we looked at that and originally gave I think -- I think 30 days, something like that, I'm not quite sure of the time frame because I haven't reviewed the document, and then after we submitted our original RFP/RFQ we saw that both Danville and Rockford had longer periods of time and we said, wait a minute, if they're going this long, they're our competitors in this for the bidders in this process because we figured we probably would get some overlap or maybe bidders would be more likely to bid for ours versus Rockford's, ours versus Danville's, whereever, you know, it's a competitive thing, but when we saw they were doing a couple extra weeks we figured, well, let's all do it about the same time and we extended our period of time.

So that's really what my take on the Rockford situation was was it was more timing than anything else.

(Document was marked Exhibit 213 for identification.)

BY MR. SMITH:

Q That's helpful. Let me ask you to take a

look at what's been marked as Exhibit 213.

And, again, just while you're pulling that up, Mr. Long, Exhibit 213 is a two-page document. It's a printout of an article from the rrstar.com website dated July 19th, 2019.

A Yeah.

Q All right. Now, Mr. Long, in fairness, this isn't anything you drafted. I just wanted to see if looking at this article from July 19th of 2019 whether you recall being aware around this point in time that Rockford had hired a couple of outside consultants by July 19th, 2019.

A No. I didn't know that. I don't remember ever seeing this article.

(Document was marked Exhibit 214 for identification.)

BY MR. SMITH:

Q Let me ask you, then, to take a look at what's been marked as Exhibit 214, and this is an e-mail dated August 7th, 2019, from Mr. Long to Mr. Maillard, Mr. Pitchford, Mayor Cunningham, and Tina Smigielski Bates stamped WKGN 25036.

A Uh-huh.

Q Mr. Long, am I correct this concerns your

efforts as part of the City's casino review process to think about possible outside consultants who could be contacted?

A Yeah. That's exactly what this was.

Q Okay. Now I will represent to you, it's possible I missed something, but this is the earliest e-mail I've seen from the City's production of any effort to seek out an outside consultant. Do you have a memory seeing this of earlier efforts to identify potential outside consultant candidates?

A There weren't any to the best of my knowledge. I happened to find -- and this -- this came because I was looking at some of the documents that related to the Waukegan Gaming litigation and I saw that there was -- that there was a consultant's report in there.

Q And I just want to make sure, I may not have heard the beginning of your answer, did you say there weren't any earlier efforts or not?

A That is correct, there were not to the best of my knowledge.

Q Okay.

A If anybody thought about it, they didn't

tell me.
(Document was marked Exhibit 216 for identification.)
BY MR. SMITH:
Q Okay. Mr. Long, let me ask you to take a look at what's been marked as Exhibit 216.
And while you're pulling it up, Exhibit 216 is an e-mail dated August 6th, 2019, from Jason Grotto to Mayor Cunningham. It's Bates stamped WKGN 7464 to 7465.
Mr. Long, this e-mail, obviously you're not copied as a recipient, my question for you is apart from having seen this e-mail in any litigation context did you -- did you see this e-mail at or around the time it was sent to Mayor Cunningham?
A Well, yes, in my -- in my capacity as the advisor and counsel for the City, yes, but, then again, now you're into the -- that gets us into the attorney-client privilege issues.
Q All right. And let me just issue a little preface that I think could just as well come from Mr. Davis. Obviously, Mr. Long, I appreciate that given your role as corporation counsel and

your involvement in the underlying activities that are going on here there may be questions or areas of inquiry where you feel we're getting into areas of attorney-client privilege. Obviously I expect you to speak up about that, and if at any point in time you need to have an offline conversation with Mr. Davis to just confirm the parameters of that I have no -- no problem with that at all.
Do I -- am I correct in understanding from your answer that if I were to ask you about any conversation you had with Mayor Cunningham about this e-mail or its content that you would view that as falling within the confines of the attorney-client privilege?
A Yes.
Q And just to make sure the record's clear, I assume on that basis you would decline to answer questions I put to you about this -- your conversations with Mayor Cunningham about this e-mail?
A I don't believe I have any choice but to do so, sir.
Q Understood. Understood. Okay.
Let me ask you this. I don't know

whether you will feel you can answer it. Was there any connection between this e-mail and the decision to retain an outside consultant?
A None.
Q And why do you say that?
A Because we were -- our sources of looking for an outside consultant were -- were just going on. I realize that there's what appears to be a synchronicity at the time. The ProPublica dude, you know, that wasn't the defining question. For us the defining question was how are we going to -- you know, there are political issues and there are practical issues. The political issues involve how is this going to go through City Council when some of the aldermen don't like the idea of a casino very much at this point as well and how is this going to be presented, and that's the mayor's political issue and a number of the Council members.
I'm not -- keep in mind, I'm not an advocate for that. I don't push -- I don't push the agenda. I push the process to try to make sure that whatever the decision is it's up -- it's square and it's up front, okay?

So the question politically is how is this going to be packaged in a way that makes the most sense to people so that they can look at the proposals dispassionately. There's already been some degree of public dis -- public dismay over there's going to be a casino. We've been down this road before. Other people are saying this is the best -- absolutely the best thing since sliced bread and the invention of the light bulb and it's just a matter of trying to figure out how we're going to package it up and what's the most effective way to do it.
That's where I ran into that -- that document from Ludwig's -- the litigation with Ludwig, and I said, you know, that's not a bad idea, that might take -- help package this up in a fashion that made sense to the aldermen and they could more closely focus in on what the real issues are of a casino, which is what real benefits is it going to bring to the City. We're holding onto this piece of property now for, I don't know, 15 years or 20 years at that point almost, I think, and where is this -- where is this proposal going, how are they going to complete a vetting process,

a good time to take a lunch break?
A It would.
Q Why don't we do that. If you're able without impeding on your lunch and other obligations you want to attend to to see whether you can refresh your memory about that issue of the exhibits to the resolutions that would be helpful.
A I'll see. There are some problems I need to deal with over the lunch hour that have come up.
Q Understood.
A I'm getting texts and phone calls which I need to respond to.
Q I understand. The world does not stop. Do you want to -- how long do you want to take --
THE VIDEOGRAPHER: Let's go off the record first.
We are going off the record. The time is 12:22 p.m.
(Whereupon, a lunch recess was taken at 12:22 p.m. and resumed at 1:15 p.m. as follows:)
THE VIDEOGRAPHER: We are back on the record. The time is 1:15 p.m. Please proceed.

BY MR. SMITH:
Q All right, Mr. Long. I hope you were able to attend to some of the outside world over lunch.
Did you have an opportunity to refresh your memory about what the exhibits were to the certifying resolutions we had looked at in Exhibit 207?
A Hello?
THE REPORTER: I didn't hear you. I'm sorry.
THE WITNESS: Yeah, I didn't hear -- Dylan was asking a question. It didn't come through. The speaker shut down.
BY MR. SMITH:
Q Sure. Can you hear me now?
A I can.
Q All right. I think you answered it, but I was just asking whether you'd had an opportunity over lunch to refresh your memory as to what the exhibits were to the resolutions that the City Council voted on on October 17th, 2019.
A Yeah. I looked at that. We included all the things that were submitted to us no matter when

they were submitted.
Q Okay. So let's go back to Exhibit 207, if we could.
A Okay.
Q So I think we've established that the resolutions in Exhibit 207 are the signed copies of the resolutions that passed the City Council on October 17th, 2019, correct?
A Yes. Yes.
Q So, Mr. Long, I take it you'd agree with me that if we looked at the Rivers certification, turning to the second page of that, which is on the page with Bates stamped 10840, there's in Section Two a reference to Exhibit C.
Do you see where I am?
A Yes.
Q And I think you've now confirmed that Exhibit C to this resolution is the supplemental letter that Rivers submitted sometime -- to the City sometime after its original casino proposal, correct?
A That is correct.
Q All right. And that was the letter we had looked at in Exhibit 208 at the time when we

sort of abandoned this effort earlier, correct?
A Yep.
Q All right. So could you explain to me what the resolution means when it says that "the details in the mutual agreements included in the applicant's response to the City's request for proposals, hereto attached as Exhibit A, should be read in conjunction with any additional materials submitted by the applicant, hereto attached as Exhibit C"?
A So the City is -- what we're trying to say is the Gaming Board, along with the fourth resolution that doesn't certify anything but asks the Gaming Board to look at the entire package, says take a look at the entire package. It's up to you. You have the statutory authority from this point forward to decide what to do with all of these. We have certified these candidates, we have given you all of their materials as they've supplemented them and as they originally submitted them, and it's now up to you to decide what you're going to do with it.
Q Right. Although this language that I just referenced refers to mutual agreements between

the City and the -- and the applicant, doesn't it?
A Well, it says mutual agreements. I'm not quite sure I remember at this point in time what I was thinking when I put that language in. I think it may -- it would be better read and it might have been better phrased as mutual representations.
Q Let me direct your attention a little higher up on this same page. It's the whereas clause -- it's the second whereas clause from the top. It says, "Whereas, the City and the applicant have mutually agreed in general terms upon a permanent location for" --
A Oh, I've lost you.
Q You lost my train or you lost the volume? Volume.
MR. SMITH: Can everyone else on the call hear me?
MR. DAVIS: I can hear you.
MR. SMITH: Hmm. Does someone else want to say something to Mr. Long just to see whether it's just an issue with my connection?
MR. DAVIS: Robert, can you hear me?
THE WITNESS: Yeah, now I can hear you.
MR. DAVIS: Okay.

MR. SMITH: And can you --
THE WITNESS: I didn't hear any of that question.
MR. SMITH: Can you hear me, Mr. Long?
THE WITNESS: Yeah, now I can.
MR. SMITH: Okay.
THE WITNESS: I don't know what's going on but...
BY MR. SMITH:
Q Strange.
Okay. So, Mr. Long, it states, if I can refer you to the second whereas clause on this page, second from the top, "the City and the applicant have mutually agreed in general terms upon a permanent location for the riverboat."
Where is that mutual agreement set forth?
A Only because they have -- the only property that they've identified, as all of the -- all five of the proposals did, landed on Fountain Square.
Q Well, going back to Section Two, it states "the details of the mutual agreements included in the applicant's response to the City's

request for proposals, hereto attached as Exhibit A."
Tell me if I'm reading this correctly. I understand this language to be indicating that the mutual agreements referenced above are included in the applicant, in this case Rivers', response to the City's request for proposals. Isn't that what this language states here?
A It's the same language in all of the resolutions.
Q Right.
A It was the same language that I drafted for the Potawatomi, too, I might add.
Q Correct.
A But, yes, I think that's one of the -- one of the things that would be mutually agreed upon.
Q All right. So Exhibit C, the supplemental proposal that Rivers submitted, included an increased offer for the purchase of Fountain Square. Do you recall that?
A Yeah, I think they did try to sweeten their pot, too.
Q Okay. So when it says that the mutual agreements are included in Exhibit A, which should

be read in conjunction with any additional material submitted by the applicant, hereto attached as Exhibit C, what impact does Exhibit C have on the purchase price that is mutually agreed between the City and Rivers?
MR. DAVIS: Object to the form of the question --
THE WITNESS: Nothing.
MR. DAVIS: -- it misstates the evidence. Hold on. It misstates the evidence, and it's taken totally out of context. Misleading in form, vague and ambiguous.
BY MR. SMITH:
Q Okay. You can answer, Mr. Long.
A My answer is nothing.
Q Why is it nothing?
A Well, because you get to the last whereas at the bottom of the preceding page, "the City contemplates final negotiations on all terms with the applicant cannot take place until after the Board completes its process and issues a license." All we can do, Board, is give you the stuff. We say this is an okay applicant, here's the stuff. You decide whether or not you're going to give

them, this particular applicant, the license and then send them back to us and we'll complete our negotiations.

Q Well, the reason these recitals about agreements are in here is because the relevant legislation required a certification that certain agreements had been reached, correct?

A Yes.

Q Okay.

A That the parties negotiated in good faith.

Q Right. And reached agreement on certain points, correct?

A Yeah, they tried to make that, but they also made it fundamentally impossible for us to do exactly that with more than one -- with more than one applicant.

Q Explain what you mean by that.

A How can you have a contract with somebody that doesn't -- that is one of three and we have three different con -- we would have three different contracts. I realize they could be conditional, but it was unworkable in that setting.

Q Okay. And is that the reason for the

mutual agreement on general terms language?

A Yes.

Q Now you're aware, I take it, that Rockford negotiated a host community agreement with the applicant that it certified to the Illinois Gaming Board?

A It got exactly one applicant, which it negotiated a deal with, certified it, sent it to the Gaming Board, and got it sent back to them.

Q And you kind of anticipated my next question there, Mr. Long, but I take it that the distinction you would draw between Waukegan's situation and Rockford's situation is that Rockford ended up certifying only one applicant whereas Waukegan made the decision to certify multiple applicants, correct?

A That is true. But then again, Rockford only had one applicant.

Q What's the basis for your understanding that Rockland [sic] only had one applicant?

A That was what I was told. Were there more than one? I don't know.

Q Okay.

A I'd be surprised to hear that.

Q Why would you be surprised to hear that?

A Because that's not the information I've been operating on for the last, I don't know, year and a half.

Q Where did you get your information?

A I think I got that from probably an online newspaper would be my guess. It was my understanding that Rockford and Danville both got one applicant, which I thought was an inherent -- and we talked about it at the time, it was an inherent weakness in their process because it means that they aren't that valuable a commodity compared to Waukegan that drew as many applicants as we got.

Q Can you explain for me in your view, Mr. Long, about why the City could not have at least commenced negotiations with each of the applicants as a way of gauging the seriousness of their proposals and helping to draw distinctions among the applicants?

A We read that --

Q Prior to certification. I apologize. Yeah.

A I understood that.

So we read that -- that legislation at

least 15 to 20 times and tried to interpret it as best we could. That legislation doesn't seem to be well set for a situation where you have multiple applicants competing in an open environment for a license.

And we also know that the Gaming Board, historically at least, has auctioned off the licenses once they get down to -- down to their office. So as a result, you know, you're sitting there and you're trying to figure out, you know, what if we certified a candidate that wasn't going to pay as much to the gaming -- pay as -- (audio lost).

THE REPORTER: I lost his audio.

MR. SMITH: We lost your connection.

THE VIDEOGRAPHER: Shall we go off the record?

THE WITNESS: Well, there's not much -- I can go back on --

MR. DAVIS: Now we hear you.

THE VIDEOGRAPHER: You're good now.

MR. DAVIS: Can we go back and start your answer over again?

THE WITNESS: Yeah. What was my question

again? Why couldn't we negotiate? Okay.

We were looking at the legislation in multiple ways to try to figure out what it actually required of the City in the setting like this where we had multiple applicants and we determined, and especially since we had the lousy history of having selected a candidate that we -- that the City spent a lot of money and a lot of energy on only to have it fall through, we thought that the safest approach for the City was for us to certify multiple candidates and then complete the negotiations after the fact because that would avoid the problem if the candidate we sent down was unacceptable to the Gaming Board.

The way that legislation is written, if you read it carefully, what it says is if a -- that it carves out a location in -- for Waukegan. However, if they don't certify a candidate for Waukegan then it opens up to all of Lake County. So -- and, you know, Park -- you asked earlier about Park City and North Chicago. Those cities would be more than happy to have a casino in their territory, and we were concerned that if we sent one down that wasn't certified the Gaming Board

would send it back and then we would end up locked -- either having the Gaming Board allow a proposal for Park City or North Chicago or we'd end up in litigation over the siting and whether we had -- or whether the -- an alternative site in Park City or North Chicago would be allowed.

So we were put in a box by the legislation.

BY MR. SMITH:

Q Right. I understand what you're saying.

Should I take from your answer that you viewed negotiating with the applicants as inconsistent with the idea of sending down multiple proposals to the Gaming Board?

A Yeah, to a degree. To a degree. You could only negotiate so far. If you came to a final agreement on it and you picked the wrong one I think you were screwed, to put it bluntly.

Q Am I right, in this case I don't think there's any real dispute about this, I just want to confirm, the City didn't engage in negotiations to any extent with the applicants; is that fair?

A That is correct. We did not negotiate beyond, you know, their original proposal and then,

you know, they added their stuff after the fact, but if you look at Johnson's report he didn't look at the ups and extras, he just looked at the base proposal itself on all instances, and that's what we went on, although we did inform City Council of what everybody's clarifications, supplementations, and so on and so forth were.

Q Yeah. Is there a reason you wanted the Gaming Board to take into account the supplemental information but didn't want Johnson to include it in his analysis?

MR. DAVIS: Object to the form of the question. It presumes facts not in evidence, that they had an intention that Johnson would or would not consider something.

MR. SMITH: Well, I think that's in evidence, but we can get to that.

MR. DAVIS: No, it isn't.

BY MR. SMITH:

Q Okay. Mr. -- Mr. Long, I thought you just said that Johnson did not consider the supplemental information in its -- in his analysis.

A I believe that's true.

Q Okay. And do you recall that you in

particular confirmed with Mr. Johnson that he was not supposed to consider that supplemental information in his analysis?

MR. DAVIS: Same objection.

You can answer if you have an answer.

THE WITNESS: You know, I think Charlie and I did, in fact, talk about it after -- after I got back from Canada.

BY MR. SMITH:

Q Okay. And you --

A Briefly.

Q And didn't you express the view on the part of the City that the City did not want Mr. Johnson to incorporate the supplemental information from applicants in his analysis?

A That's not quite exactly right. You're close but not quite there.

Q All right. Explain to me how you would qualify that.

A Well, Charlie said I don't think I should be looking at this stuff, I think it would impair my ability to be -- because that opens the door for everybody to submit additional stuff and I've got to go back and finish and reconfigure all of these

Page 110

things if we do that and come up with alternative A and B depending on which -- what you believe from each individual applicant, what was their original offer, what's their enhanced offer, and then part of the concern there was, well, what happens if you don't get it done by October 25th.

Q And so you expressed agreement to Mr. Johnson with the idea that he should not incorporate supplemental materials into his analysis, didn't you?

A Yeah.

Q Okay.

A Seemed like it made sense to me.

Q Okay. And nevertheless, I think we've established the City's resolutions asked the Gaming Board to take into account the supplemental information, correct?

A Well, the resolution reads for itself, but, yes, I think the Gaming Board has the inherent ability to read the entire proposal anyway.

Q Was there a concern on your part that there would be a disconnect between what Mr. Johnson was analyzing and what the Illinois Gaming Board was being asked to take into account?

Page 111

A No, I don't think so. I mean, no, I don't -- I don't really think so.

Q Okay.

A I'm not sure that those factors really meant very -- would mean very much to the Gaming Board, and I never have thought that they would add much.

Q Mr. Long, the resolution states, and, as you've indicated, the language of the resolution was the same for each of the applicants so I'll just stay focused on Rivers since we have that in front of us, there's a -- the next whereas clause on the second page here says that "the City and the applicant have mutually agreed in general terms on location for a temporary riverboat."

Did any of the applicants in the course of the RFQ process reach agreement with the City, in general or specific terms, on a location for a temporary casino?

A In the context that the ones that said they would put up a temporary casino said they would site it near where the permanent casino would be, and that's what I mean by "general terms." That's a broad general term.

Page 112

Q So let me -- going back to the Section Two of this certification which states, and I'll -- I know it's cumbersome. I'll read it in its entirety, because I don't want to draw an objection that I've mischaracterized it, just to remind us.

Section Two states, "The applicant, CDI-RSG, is hereby certified to the Illinois Gaming Board, with the details of the mutual agreements included in the applicant's response to the City's request for proposals, hereto attached as Exhibit A, which should be read in conjunction with any additional materials submitted by the applicant, hereto attached as Exhibit C. All exhibits are hereby incorporated in their entirety as if fully set forth here?"

In light of that language, Mr. Long, if CDI-RSG, which I believe is also known as Rivers, is the applicant licensed by the Illinois Gaming Board is the agreement on price for Fountain Square to be taken from the original application from Rivers or would the City take the position that the price is the sweetened offer included in Exhibit C?

A Neither.

Page 113

Q Can you elaborate on that?

A Go back to the whereas I read you earlier. You can't complete the negotiations until there's a license in place. Then we negotiate.

Q All right. Well, what would be the City's opening position on what Rivers had committed to?

MR. DAVIS: Object to the form of the question.

THE WITNESS: It's speculative, but I think if I was negotiating that I would start that that's you've set the floor, here's our asking price.

BY MR. SMITH:

Q Right. Which set the floor, Exhibit C or Exhibit A?

A Probably whatever is higher.

But I'd also look at the other proposals and say these other people were offering X, whatever that is. I'd probably take the highest one of the bunch as setting the floor and then I'd look for more than that. That would be my job, to try to maximize the revenue to the City.

Might even have an appraisal done.

That would be a point at which it would make sense to have an appraisal done.

Q Why do you say that?

A Because now you have an actual use of the land that's available. Otherwise you're speculating, you're speculating that you'll get a license.

Q And I think I understand what you're saying there but just so the record is clear, when you say "now you have a use of the land," how does that relate to getting a new appraisal?

A "Use" is a technical legal term. Now you have a legitimate zoned use, and once you have a use it is an entitlement that you can appraise. Otherwise you're just engaging in this hypothetical thought process that if a casino is licensed and if it can be sited on this property then it might be worth X, and that removes one of the principal hypotheticals from that analysis.

Q Gotcha. Okay.

Mr. Long, in thinking about the way this was set up by the legislation in the form of these certifying resolutions did you have any concern that once a single applicant was licensed

by the IGB that the City's negotiating leverage would be limited by the fact that there was now one license holder?

A Yeah.

I didn't write the law. If I had written the law it would have been a lot better.

(Witness referred to previously marked Exhibit 38.)

BY MR. SMITH:

Q Understood. Understood.

Let me -- let me ask you to take a look at what's been marked as Exhibit 38.

A 32?

Q 38. I'm sorry.

MR. DAVIS: 8.

THE WITNESS: Okay.

BY MR. SMITH:

Q And, Mr. Long, I just want to confirm, is Exhibit 38 an e-mail you received from Ms. Emmerton on October 8th, 2019, attaching the -- a draft of Johnson Consulting's report to the City of Waukegan?

A Well, I think that's when she sent it, but I probably didn't see it for a bit after that

because I was in Canada at the time.

Q Ah. Okay. When did -- if you remember, when did you get back from Canada?

A I believe I was gone from short -- one or two days after the -- I think it was the Friday after the thing at the Genesee, and I got back in town, really had a horrible trip back but it's a long story, I got back to this area the Friday before the 17th, whatever that was, and I didn't look at -- I didn't look at any of this stuff until Monday -- (audio lost).

MR. SMITH: You cut out.

MR. DAVIS: You're dropping off again, your voice is.

THE WITNESS: Well, I'm doing the best I can, Glenn.

MR. DAVIS: Now you're back.

MR. SMITH: Whatever you just did worked.

THE WITNESS: Okay.

MR. SMITH: I don't know.

THE WITNESS: Well, I don't know. The phone doesn't like me. What else is new.

MR. SMITH: I don't know. Maybe Glenn is hitting a mute button over there. That's --

MR. DAVIS: No, I'm not.

If you could put -- maybe put that phone directly in front of you. Is it off to the side?

THE WITNESS: Well, here. I'll try and see if this does anything.

MR. DAVIS: It just seems to be catching some dead space once in a while.

THE WITNESS: All right.

So basically I left town two days -- about two days after the extravaganza at the Genesee. I got back and I was at work the Monday before the special meeting on October 17th or 19th, whatever that was.

BY MR. SMITH:

Q Okay. So you recall at some point reviewing this draft, just perhaps not right when it was sent to you?

A Yeah, I remember looking at it, although it might have been -- it might have been outmoded by the time I saw it.

(Witness referred to previously marked Exhibit 41.)

Page 138

A The expression --
Q Go ahead.
A What people expressed seemed to be, yeah, this is -- we probably shouldn't in large -- well, for the two different reasons that I already mentioned.
Q And you sort of cleaned up my question with your clarification, so thank you. In terms of what was expressed to you, you were not aware of anyone expressing at the senior staff or mayoral level a dissenting view in terms of how to handle supplemental information?
A No.
Q Mr. Long, I want to ask you a little bit about the Waukegan Gaming litigation, and I'm sensitive to the fact that I need to be careful here not to, you know, try to -- try to press on anything that would either get into work product or attorney-client privilege so I'm going to -- I'm going to try to do that and I feel confident that between you and Mr. Davis you'll push back if you think I'm overstepping that boundary.
Can you just describe for me -- I know that the City was represented by outside counsel in

Page 139

that litigation between the City and Waukegan Gaming in 2019. Can you just explain to me how you viewed your role as corporation counsel in a litigation like that where you have outside counsel? Are you, you know, overseeing the litigation in some way or do you just kind of hand that off to outside counsel?
A Same way I view this litigation and Glenn Davis's role here. I am their client. I am the face of the client and to a very large extent. There are other people that are also the face of the client because the client has many faces.
Q That's helpful.
Who do you -- what do you do to keep the City as the client abreast of developments in the litigation?
A Well, you're familiar with the Consolidation Coal case and the concept of a control group, right? Okay. They're the ones I talk to, and I will determine which ones need to hear at what points in time based on my best judgment and my years of experience.
Q And are you comfortable telling me who you considered to be the control group for purposes

Page 140

of the Waukegan Gaming litigation?
A Well, the corporate authority. The aldermen -- the elected officials essentially, and that would include actually the clerk and the treasurer as well as the mayor and the aldermen and then typically senior staff, particularly those -- you know, Noelle and Tina since they were in the review team and have express opinions from time to time on important aspects of the litigation and are affected by it.
Q Is it fair to assume that as a point of contact that the mayor was a more frequent point of contact for you in terms of updates on the litigation than, say, for example, the City Council?
A You have to realize that -- yes, but there's a reason for that.
Q Sure.
A And the reason is that Waukegan is one of the few strong-mayor form of governments in the State of Illinois. There aren't very many of them. But when you have a strong-mayor form of government all of the executive power as well as the chairman of the board sort of aspect of a mayor is vested in

Page 141

him, so as a result he is the primary face of the City for any -- a great multiple of reasons.
Q Mr. Long, my understanding is that the summary judgment briefs that were exchanged in that case were not filed on the public docket but they were exchanged and courtesy copies were provided to the judge. Are you able to explain to me why that process was followed?
A No.
Q And just so the record is clear, I just want to understand, are you not able to tell me because you feel you would be disclosing privileged information or is it because it's information you're not privy to?
A Even the answer to that question will disclose information that you're not entitled to and will violate my privilege -- the privilege.
Q Okay. Okay. That's fair.
Did the -- my understanding is that litigation was resolved through a dismissal without prejudice. Is that your recollection of it as well?
A I believe that's what the order on record is.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAUKEGAN POTAWATOMI CASINO, LLC, )
an Illinois Limited Liability )
Company, )
)
Plaintiff, )
)
vs. ) 1:20 cv 750
)
CITY OF WAUKEGAN, an Illinois )
municipal corporation, )
)
Defendant. )
)
)

The Deposition of ROBERT LONG, called by the Plaintiff for examination, pursuant to Notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts, taken before Victoria D. Rocks, CSR, and Notary Public in and for the County of Cook, State of Illinois, commencing at 2:00 o'clock p.m., on the 11th day of August 2021, A.D.

APPEARANCES:

FREEBORN & PETERS, LLP
MR. DYLAN SMITH
311 S. Wacker Drive
Suite 3000
Chicago, Illinois 60606
dsmith@freeborn.com

appeared on behalf of the Plaintiff;

HEPLER BROOM, LLC
MR. GLENN E. DAVIS
30 N. LaSalle St.
Suite 2900
Chicago, Illinois 60602
glenn.davis@heplerbroom.com

appeared on behalf of the Defendant.

THE VIDEOGRAPHER: TOM PERRY

I-N-D-E-X

WITNESS: ROBERT LONG

Direct Examination by MR. SMITH: 5 - 54
Attorney's Eyes Only 55 - 71

| EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 336 | email chain 10-7-19 | 6 |
| Exhibit 338 | email 10-4-19 | 21 |
| Exhibit 337 | letter 10-30-19 | 27 |
| Exhibit 339 | email with attachments | 54 |

THE VIDEOGRAPHER: Good afternoon. We are going on the record at 1:56 p.m. central time August 11, 2021.

This is media unit one of the video recorded deposition of Robert Long taken by counsel for plaintiff in the matter of Waukegan Potawatomi Casino LLC, versus City of Waukegan filed in the U.S. District Court for the Northern District of Illinois, Eastern Division. Case number 1:20 cv 75O.

My name is Tim Perry, certified legal video specialist. Our court reporter is Victoria Rocks who will now swear in the witness.

MR. SMITH: Mr. Long, thanks for making yourself available again.

MR. DAVIS: Do you want to identify yourself, counsel?

MR. SMITH: That's a good idea. Dylan Smith for plaintiff Waukegan Potawatomi Casino.

MR. DAVIS: Good afternoon. My name is Glenn Davis. I am here on behalf of the defendant, City of Waukegan.

MR. SMITH: So Mr. Long, this will be a shorter session than we had last time. We're grasping for

silver linings.

I'm getting a little lag on your audio too. So I will really make an effort to try to let you complete your answer. So it may seem a little stilted, but that is what I'm doing there.

ROBERT LONG,

called as a witness herein, having been first duly sworn, was examined upon oral interrogatories and testified further as follows:

DIRECT EXAMINATION

BY MR. SMITH:

Q. Mr. Long, just to catch us up from when I took your deposition previously, my understanding is that with the transition to the new mayoral administration, you are no longer a corporation counsel for the City of Waukegan, is that correct?

A. That's correct.

Q. Do you know when you formally stepped down from that position?

A. At the end of June.

Q. And without getting into specifics do you have any work that you continue to do for Waukegan? Are there cases that carry over for example?

Page 6

A. No, I do no work for the City of Waukegan. I try to occasionally send them stuff that lands in my in box. That's about it. And tell them here, you have to deal with it. It's not my problem.

Q. Mr. Long, are you logged into Exhibit Share?

A. Yes, I am in that site or I was. Where did it go.

Q. Let me ask you to pull up what's been already marked as Exhibit 336. Let me know when you have that in front of you.

A. 336. The numbers I've got go from three to 21. Am I in the wrong directory?

Q. Yes. I think you may be in the old folder for your previous deposition. If you close out of that, there should be one with today's date.

A. I found it.

A. Okay.

Q. Have you been able to pull up Exhibit 336?

A. I have.

Q. Mr. Long, just for the record Exhibit 336 is an e-mail chain with the most recent e-mail dated October 7, 2019 from the casino@Waukegan.il.gov e-mail address forwarding an e-mail that originally

Page 7

came in on October 4, 2019 from Michelle Shriver to you, Douglas Dorondo and Noelle Kish Lepert.

Mr. Long, am I correct that you were on vacation on the Friday October 4 when this e-mail originally came into the casino@Waukegan.il.gov e-mail address?

A. The recitation there was incorrect. The e-mail was not sent to me, Noelle and to Douglas. The e-mail from Michelle Shriver was sent to the casino. It was not sent to me.

The e-mail that I got was sent to me by probably Noelle or somebody at the City on October 7.

Q. Yes, I will apologize. I thought I prefaced that by saying it was forwarded to you on the 7th. Either way I take your point.

Just to kind of set up the chronology here, am I right that you were on vacation on that Friday October 4, 2019?

A. I was trying to get home from Montreal and stuck at an airport in Montreal for about 16 hours. So yes, I suppose you call that vacation.

Q. What was an unpleasant end was hopefully a wonderful vacation.

Page 8

A. Yes, it was a wonderful vacation up to that point in time.

Q. Were you back in your office by Monday, October 7th?

A. I think I was. I don't recall for sure. But I am relatively certain I got here sometime that day.

Q. And taking your point that the substantive e-mail here was forwarded to you and the other two people I mentioned on October 7, 2019 from the casino@waukegan.il.gov e-mail address, did you review this e-mail on or about that October 7th date?

A. Probably within a couple of days. When I got back, I had been gone for about two and a half weeks. And I averaged at this point in time somewhere around 150 to 200 e-mails a day that would come in.

So typically I will start at the oldest e-mails and work my way forward to see what in the world it is that the world has for me. So I might not have gotten to this until Tuesday or maybe even Wednesday.

Q. Fair enough. Once you had a chance to

Page 9

read this e-mail what, if anything, did you do about it?

A. Nothing.

Q. Why not?

A. On its face it asks for prejudgment of a decision that was going to be made by the City Council.

And I didn't have the authority to decide what they wanted. I didn't see how the Illinois Municipal Code gives authority to anybody in the City to give them what they wanted based on their description. So I didn't even bother to read the MOU and just ignored it.

Q. I think what I'm about to ask you is probably implicit in the answer you just gave me, but I'll ask it just to make sure it's clear.

Did you yourself forward this e-mail on to anyone else?

A. No.

Q. Do you know whether Mr. Dorondo or Ms. Kisher Lepert did?

A. I saw some e-mails from Douglas from about I think it was around October 24 or 25, something like that. I don't remember him forwarding it per

se, although he might have.

But that's the only other reference I ever saw of this thing.

Q. I think that we'll take a look at the October 24th e-mail chain shortly. Again, probably asking you a question I may know the answer to based on your earlier answer.

But putting aside forwarding of the e-mail did you communicate with anyone else about the contents of this e-mail apart from this litigation but after receiving it?

A. I spent rather a significant amount of time trying to answer that exact question in my own mind. And I can't really tell you for sure. I probably mentioned it in passing with Noelle or Douglas, but nobody else.

The reason I have to qualify it like that is when this e-mail chain was first brought to me, when did you guys get it to me, I don't know, four or five, six weeks ago, whenever that was. I couldn't even remember that there had been this communication, it meant that little to me.

So it didn't imprint very deeply in my skull because I just rejected it right off the start

as an attempt to get an advantage in the casino process that I wasn't about to give somebody.

Q. I take it then you have no recollection of discussing this e-mail with the mayor or anyone else within the administration other than possibly in passing Noelle and Douglas?

A. I am sure I did not talk to the mayor, and I did not talk to the aldermen. That I am sure.

It's one thing to talk to staff about this, did you see this stupid e-mail that these people sent. Can you believe it. And it's another thing entirely to go to the decision makers and say here's an e-mail I received. They're looking for a leg up.

I wouldn't do that because it will prejudice it one way or another, and I wasn't about to put my finger on the scale of this process.

Q. Let me ask you a little bit about the e-mail from Ms. Shriver and given what you said, we probably won't linger long.

But if I could direct your attention to the first page of this Exhibit 336, which is the bates number 32943. In the middle of the page, there's a paragraph that has some underlying text.

And I really want to focus your attention on the couple of sentences that follow that.

And before I do that let me make sure that we're on the same page about one thing. Ms. Shriver, according to her e-mail address and her signature block appears to be the director of project development for Warner Gaming.

Did you understand that was the entity on whose behalf she had sent this e-mail?

A. I saw that it came from Warner Gaming, from somebody at Warner Gaming. I did not pay the slightest bit of attention about what their title may be.

I have no idea what that title might entail. I assumed it was from Warner Gaming, but what I was clear on was that it didn't come from any of the Warner Gaming lawyers.

Q. You generally understood that Warner Gaming was one of the partners in the Lakeside casino that had made the proposal often referred to as North Point, correct?

A. Yes, that I understood.

Q. So focusing on that language I was about to direct attention to after the underlined text on

the first page of this Exhibit 336.

Let me read that. Then I want to ask you a question or two about it. Ms. Shriver says here "the rationale is if the IGB receives multiple proposals, the IGB is required to run a competitive process that will end in selecting the project team with the highest direct financial offer to the State.

This is likely to be the project team that offered the least to Waukegan and thereby has more still to offer the state while maintaining a financially viable project. For example, if a bidder offering the City randomly is selected and another bidder offering 50 million is selected, the lower bidder has 39-million more available to offer the State."

Mr. Long, putting aside the appropriateness of what Ms. Shriver was asking for here, I just want to know did you agree with her basic premise about how things worked at the State level following certification by the City?

A. In what context? I don't understand your question. I do understand that the State will run a competitive bid. That I understood.

Q. And did you agree with the premise that in running this competitive bid that the State is going to be primarily focused on what the various bidders certified by Waukegan are offering to pay the State?
Do you have an understanding of what criteria the State uses in awarding the license?
A. I have a lay understanding of it. I don't have any particular expertise in that field. I don't represent gaming interests generally speaking.
Q. What was your general lay understanding as of this period in time?
A. That they put it up for a bid the same way they did back in 2003. And sit back and see what happens. How they run their bid, who they select to run it, I don't know.
Q. Now, Ms. Shriver in this e-mail and then in the documents that are attached appears to be stating that Lakeside proposes to enter into one agreement with the City if it is the sole applicant certified and another alternative agreement if there are multiple applicants certified.
Did you have that general understanding from reading her e-mail?
A. Well, I do now, but I didn't necessarily

pay much attention to the details that she was offering. As soon as I started reading this thing in October of 2O19, I realized quickly what it was she was trying to do.
And as soon as I saw she was trying to get us to agree to something that would provide them with an advantage of one kind or another, I stopped reading and didn't forward it on to anybody.
Q. And what did you understand she was trying to do beyond just having an advantage? Did you understand the basic framework of what she was proposing?
A. No, not really. No. At that point you know I'm looking at this from a very ethical point of view, and I am going this person wants something from us, from the City. I don't want to give her and her company anything.
For me to continue reading this and trying to understand her position runs the risk that I will somehow come to a position where I give an advantage or disadvantage somewhere else. So I'm not going to touch it. Throw it away, push it to the side and go on to my next e-mail.
Q. So given that limited read, let me just to

make sure I understand. Did you understand that North Point Lakeside, I'll use those interchangeably, appeared to be trying to at least trying to condition its original proposal that was included in response to the RFP to the circumstances where it was the loan applicant certified by the City?
Did you understand that basic point?
A. No, I really didn't. What I'm trying to tell you very simply is the same thing I did with Potawatomi, frankly.
This came in. I wasn't going to give an advantage to anybody. The bidding had already ended. The public presentations had already happened. All that's left is for the City Council to review and decide for themselves. I am not going to let anybody change what they have done after that time. So I pushed it to the side, and I went on to the next e-mail.
Q. Well, is there anything -- let me ask you this: At this point in time in your view could North Point have withdrawn its proposal?
A. Yes, sure they could withdraw the proposal.

Q. Is there a legal principal that prevented them from saying look, our proposal only stands if we're the lone bidder certified?
MR. DAVIS: Let me object to the form of the question at this point because I think it seems to imply a premise in this communication that doesn't exist.
North Point was proposing two forms of an MOU, one being as a sole bidder and the other being as one of multiple bidders submitted to the State. So I don't understand why the questions are implicitly now based around some North Point's understanding that they were conditioning their proposal to be the sole bidder because they offered two different alternatives here.
BY MR. SMITH:
Q. So Mr. Long, you could go ahead and answer if you can.
A. I have lost track of your question. So it doesn't make sense to me. It seems to be asking for my legal opinion about what they can do in a hypothetical bidding process. I am not offering expert testimony here, counsel.
Q. Let me take up counsel's objection. There

A. I don't remember when those packages were put together. And honestly I don't think I was the one that assembled packages. So I'm not sure exactly about that.
Q. Do you recall that the -- and we could take a look at this. I want to see what you have a memory of.
Do you recall that the certifying resolutions for Rivers as well as for Potawatomi, referenced supplemental information that had been provided?
A. No. It's almost two years ago at this point in time. I don't remember the exact language used. I think Douglas wrote those anyway.
Q. We will come back to that.
A. I could be wrong. I don't remember.
Q. We'll come back. I take it it's your understanding, your memory, that if we go back to Ms. Shriver's letter 336 that we were looking at a moment ago, that was not included in materials for the aldermen to review in advance of their certification vote?
Would you agree with that?
A. Right. Yes. There would have been no way

for it to get there.
Q. Given that you have now had an opportunity to see what the Shriver e-mail included substantively as attachments of what Ms. Shriver was proposing on behalf of Lakeside, do you think it was in hindsight a mistake not to have reviewed that e-mail more thoroughly?
A. No.
Q. Help me understand this. Is there any principal you're aware of that prevents -- that in advance of this certification by the City, the certification vote, prevented Lakeside from conditioning its original proposal on being the sole selection by the City?
Do you believe they had the ability to do that?
MR. DAVIS: Let me again object to the form of the question. I think that this goes beyond the purpose of why we're having this deposition today.
The deposition is limited not to go over ground we've been over before and not to go over new topics that might come to your mind. I don't know what this has to do with -- we've gone over in some detail the Lakeside North Point email issue with the

attachments. He's offered two alternatives.
MR. SMITH: Again, I'm entitled a little latitude about this e-mail.
MR. DAVIS: I am making a record because the direction we're going is a little far afield.
BY MR. SMITH:
Q. Mr. Long, let me restate the question, and I will stipulate that counsel has objected so that you could follow the frame.
When Ms. Shriver sent her e-mail you would agree with me that the City had not yet voted on whether to certify the Lakeside proposal or any of the other casino proposals. Would you agree with me on that?
A. The report on October 7, that is correct.
Q. As we see, Lakeside was proposing one MOU if it was the only applicant certified and a different MOU if there were multiple applicants certified. Agreed?
A. That's what it looks like when I read it last week.
Q. And is there any reason you're aware of why North Point was precluded from putting that, attaching that condition to its proposal?

A. That is not the way I read this. She wasn't saying we're going to withdraw this if we don't get A or B or A and B.
Her e-mail says we want an unfair advantage. The difference between that and what Rivers is doing, Rivers is doing nothing but puffing. That letter is a sales pitch.
If you look at what she's doing she wants to change the playing field itself. She want to alter the relationship of the party and set up a situation where she is gaining an advantage that nobody else has.
Q. What is to prevent Lakeside if it gets the license from coming back to Waukegan now and saying hey we told you our proposal was only operative if we were the sole applicant. So we're going to negotiate with you from the standpoint of the other proposal?
MR. DAVIS: Object to the form of the question. It calls for speculation. It assumes facts not in evidence and, in fact, contradicts evidence. But go ahead.
THE WITNESS: I don't know what position they'll take now, do I? I'm not there. And I won't

be there.
BY MR. SMITH:
Q. And you don't know what position Lakeside may give, correct?
A. You know, I don't, but they're in the Gaming Board. They got to figure out what it is they're doing, and the world has changed quite a bit in the last 18 months, hasn't it? And the gaming market has exploded recently when it was dead for almost a year.
Q. So Mr. Long, I apologize if I asked this, but just to make sure that I touch this point.
Ms. Shriver's e-mail Exhibit 336, to your knowledge did you or anyone else forward that onto Johnson Consulting?
A. No, I did not. I don't know of anybody that did.
Q. And why did you not forward it to Johnson Consulting?
A. The same reason, I wouldn't bother or I didn't think it was appropriate to send it to the mayor and the aldermen.
Q. Mr. Long, is it your understanding as you sit here today that Ms. Shriver's e-mail was not

included on the report, that the monthly report that Waukegan provided to the Illinois Gaming Board about contacts with casino developers?
A. You know, I saw the e-mail from Douglas from October 24 or 25th, whenever it was, and I've been trying to remember what happened at that point in time, and I cannot recall.
I will tell you I went back and looked at my file to see because I kept copies of the reports, and it looks like it wasn't included. That's true.
Q. Let me ask you just so we're looking at the report, let me ask you to take a look at what has been marked as Exhibit 337, which is a letter dated October 30, 2O19 from you to the Gaming Board with attachment.
And Mr. Long, I will ask you to confirm that this appears to be the letter transmitting to the Gaming Board the City's log of monthly contacts with potential gaming operators minus the Kessler log that is referenced in your letter.
Is that what it appears to be to you?
A. That is what it looks like.
Q. One of the things you say in your

transmittal letter is that the spreadsheet disclosing contacts with gaming operators includes contacts made from a city website casino@waukeganil.gov, which is the e-mail address involved in the Exhibit 336, the email from Ms. Shriver.
Just as a matter of process, do you have an understanding of --
A. I lost track of your question.
Q. As a matter of process, how did the City over the course of a month, knowing it was going to have to be reporting to the Gaming Board about contacts with gaming operators, what did it do as a matter of process just to keep track of the communications that came in over the Waukeganil.gov email address?
A. I realize this is going to sound pretty provincial. Douglas maintained a spreadsheet on his computer in an Excel format. I use a yellow pad, and I write stuff down with a pen.
The things from the casino I relied on Noelle to give me a list or maybe Thomas it might have been for a while. But anyway it was somebody over there gives me a list of this stuff. And I

assemble it -- I actually give it to my secretary at that time, and she assembles it. And I write up a letter and sign it.
Q. And Noelle Kisher Lepert is the primary person who had access to or received the e-mails that came over the Waukegan casino website?
A. Certainly, by October that is true. Originally I think it was Thomas, it was the first month or so.
And then he dropped off, and we used Noelle. For what it's worth I also asked all of the aldermen and the mayor to give me a list of any contacts I had. And I assume they did, much like I did. If you happen to be near a piece of paper you write it down.
That may actually play a part in this whole thing. Like I said, I can't remember for sure that I read this e-mail from Ms. Shriver at the office. And typically I keep my yellow pad at the office and jot down my notes at that point. If I read this on my laptop at home I know this sounds provincial, but I keep the piece of paper at the office. I may have forgotten to write it down by the time I got to the office. I don't know.

Page 30

Q. So you don't know exactly why the e-mail didn't end up on the log that went to the Illinois Gaming Board, is that fair?

A. I really don't, and I could tell that's what you were trying to find out. If I had an answer I would give it to you, but I don't remember.

Q. There is one entry in here. I want to see if it jogs your memory at all about any discussion that may have occurred related to that Shriver e-mail, Exhibit 336.

So there is an entry, and it's sometimes a little hard to make out because of the way this spreadsheet printed out. I am talking about the second page of this Exhibit 337. It's the first page of the Excel spreadsheet, so the bates number is 1006.

There is an October 10, 2019 communication with someone identified as Lakeside Casino, LLC doing business as North Point Casino agent, Todd Abbott. Do you see where I am?

A. On line 6?

Q. Correct.

A. Yes.

Q. And do you have an understanding of who

Page 31

Todd Abbott is or was as of this point in time at least?

A. You know, I don't remember who he was. It was somebody affiliated with -- was he an attorney? I don't recall. He could have been anybody.

Q. I have seen some other e-mails produced by the City that identify Mr. Abbott as the chief compliance officer for Warner Gaming.

Does that jog your memory at all?

A. It could be, yes.

Q. And this entry, the description appears to say that you had a phone call with Mr. Abbott where a clarification of voting and certification procedures planned by the City. Do you see what I'm referring to?

A. Yes. Now, that's an interesting question. Honestly, this document stinks. It's hard to read.

Q. Let me walk you through. I agree with you, and I made some efforts to I think try to determine which description corresponded to which date and participants.

So just to walk you through it, it appears that line two, there is an October 4th entry attributed to contact between you and Mr. Winter

Page 32

acting on behalf of Potawatome, and it's an e-mail and hand delivery of a supplement to a Casino proposal.

Do you see that?

A. Yes.

Q. Line three, it appears that the description for the communication on October 7, between you and Mr. Bruce is phone call regarding timing of final vote.

And then the next one is October 7 as well, Ray Vukavich, addressed City Council, the Mayor, Potawatome Casino generally during audience time, which I will represent to you seems to be consistent with the October 7th- meeting.

Then there is another October 7 entry, again, Mr. Winter in contact with you regarding supplementation, amendment of proposal which I think given all of the discovery in this case seems to match.

So that left me with the next description phone call Re: clarification of voting and certification procedures planned by the City seems to correspond with your conversation with Todd Abbott.

Page 33

Does that seem correct to you?

A. When I looked at it, I thought that statement also carried on into the second part or the next line. But I think that next line goes to all bidders.

Q. So sitting here today, Mr. Long, do you have a recollection of your conversation with Mr. Abbott?

A. The only thing I can remember is to the extent I remember any conversation with Todd Abbott, which is next to nothing, I seem to remember having had a conversation about this time about when we were going to bid, how long it would take to get the packages together and get them sent down to the Gaming Board. And that was about it. That was the mechanics of it.

Q. I will throw this out here to you, and you could tell me whether there is anything to it or not.

We looked at in Exhibit 336, there is an e-mail from Ms. Shriver, who is with Warner Gaming making proposals that seem to relate to the City Council's casino certification votes, which is upcoming at this point.

Pl. SJ Ex. 123

I think that a special meeting was held October 17, 2019. That e-mail was dated October 7. You said it may have taken you one or two or three days to get to it coming back from vacation.

There is another phone call with a Warner Gaming representative that appears to relate to voting and certification procedures planned by the City.

Seeing those things together, does it refresh your memory in any way that your conversation with Mr. Abbott may have touched on the proposals that Ms. Shriver had made in her e-mail?

A. Whatever it is. Whatever you're getting at, I had no further conversations with Ms. Shriver, Mr. Abbott or anybody from Warner Gaming about that letter. None.

Q. You mention the resolutions that the City Council actually voted on at the special meeting on October 17th.

I think you said that Mr. Dorondo was the primary draftsperson of those. Am I correct on that, you had some input into those resolutions?

A. Yes. The way the work flow worked around here is Douglas would usually be charged with

putting together an initial draft with whatever document key documents were involved, and this is certainly a key document.

It would come to me, and I would do editing and polish the text and sort of make it, improve the language, if you will, to make it easier to understand. And the thing what senior lawyers do is they package it.

So I would package it and make it look nice and give it back to him and then he would do some edit. Sometimes I would do it with red pen and sometimes do it in an e-mail. Whatever.

Q. So typical interaction between a more junior and a more experienced attorney?

A. Yes. Well, after 40 years you get pretty good at writing.

Q. So I want to ask you about -- I won't stay here long, but I do want to ask about one aspect of the certifying resolution in light of the e-mail from Ms. Shriver.

So you may need to refresh again, but you should have in your folder, Mr. Long, what was marked at an earlier deposition as Exhibit 207.

A. The certifying resolutions?

Q. Yes. Take a moment to look through these. Do you recognize these as the certifying resolutions that the City Council passed relating to those or adopted relating to the casino proposals that it did certify?

A. The correct phrase is passed.

Q. Okay.

A. Yes, this is pretty much it.

Q. So let me ask you to scroll down to the certifying resolution for Lakeside Casino, which is if you want to go by the bates numbers it is WKGN 10846 is where it starts. I think it's the ninth page of this exhibit.

A. Yes, I see it.

Q. So if you then scroll down to past the cover page to 10848, which is once you get passed the whereas clauses it includes the mayor's signature and the attestation.

It includes in the whereas paragraphs the statement that the City and the applicant had mutually agreed in general terms on certain aspects of the casino proposal for Lakeside. Do you see that?

A. You're talking about the location and the

temporary riverboat?

Q. And it also says --

A. The percentage of revenues for the last one on zoning and public health because they're different things.

Q. I take it you're aware now having reviewed Ms. Shriver's e-mail at more length that the two alternative MOUs that she attached to her e-mail, one of the differences between them concern the revenue share that Lakeside was proposing for the City. Do you recall that?

A. No, I really don't recall it. Again, when I read them last week all I was looking for was what was it she was really after roughly, the big picture. I wasn't interested in the details.

Q. Well, it goes on to say in the certifying resolution in section two that the details of the mutual agreements included in the applicant's response to the City's request for proposals hereto attached as Exhibit A, which should be read in conjunction with any additional materials submitted by the applicant hereto attached as Exhibit C.

And my understanding, Mr. Long, and I will represent to you based on looking at the Board

docs website for the City Council is that the supplemental material referred to with reference to Exhibit C does not include the Shriver e-mail and attachments, which I think is consistent with your earlier testimony.

I take it that is your understanding as well that Exhibit C does not include the Shriver materials?

A. That is accurate.

Q. Given the Shriver e-mail, can you explain what the basis is for the statement that the mutual agreements between the City and Lakeside concerning the items that you read off that are referenced in the whereas clause, what is the basis for the statement that the mutual agreements are embodied in the Lakeside original casino proposal and the supplemental material that was included as Exhibit C?

A. Well, to begin with, let's go down them one at a time probably. We felt that there was good faith, that when they submitted their proposal they had identified the Fountain Square property. It was one of them that we had identified ourselves. So it seemed like a agreement.

In general terms, they identified a location for a temporary riverboat or a temporary casino and explained kind of its parameters in broad terms. And that was something we had asked for. So that seemed to be an agreement. And percentage of revenues, that is fixed by statute.

You could agree or disagree, but it's fixed by statute. So we agreed that the statute applies, and you have an agreement on the zoning, licensing, public health under the jurisdiction, we agreed on all that.

We showed them the zoning maps and explained where the sewer lines and water lines were. What kind of improvements might be needed for the site. Not much impact on public health other than, you know, some issues I suppose that might arise about problem gambling, things of that nature. But that is actually covered in some of the regulations of the IGB anyway. So I think there was agreement in broad general terms across all those.

Q. Mr. Long, just so I understand, are you suggesting that the proposals that the various applicants made or did not make about revenue sharing in their proposals were irrelevant because

the revenue share was going to be fixed by statute no matter what an applicant had proposed?

A. They were going to -- depending on the form of the proposal as I remember them, and again, we're going back almost two years at this point. A lot of stuff has happened between then.

But as I recall, the percentage that the house takes is fixed to a large extent by statute. There is a gaming tax and that has to be paid to the host community.

And then there is an amusement fee, an amusement tax for entering the premises that was going to be collected. And you know, I may have spoken a little quickly on that. I don't honestly remember at this point, Mr. Smith, what the proposal said about splitting the payments across the Board because they were mixed in together.

And I haven't read any of these materials in a long time, but as I recall, the differentials came in more in the purchase price of the property, how they were to be paid over time, and they mixed -- and if I recall correctly, they mixed in a bunch of pieces on each of the proposals about how they were going pay the City for whatever

it was going to get from their proposal.

Now, there were also hotel taxes on some of them. There were sales tax, alcohol and food sales. There was a mix of all sort of information that was put together for each one of the proposals. And I have to look at the proposals right now to try to remember what the differentials were on splitting gaming revenues. But I may be mixing that up with in my mind with video gaming because I have been dealing more with video gaming over a longer period of time. And that split is strictly defined by statute.

Q. Let's look back at Ms. Shriver's e-mail because it at least references the North Point contribution.

So if you pull Exhibit 336 back up and scroll down to, I'll go by bates numbers. I think it's 32945, which is the third page of the exhibit. There is the MOU that is labeled option one, and you can feel free to review it.

I will represent to you that based on Ms. Shriver's e-mail it appears that option one is the MOU Lakeside was proposing in the event that their proposal was the sole selection.

broke up.
Q. We have just looked at the differences between what Ms. Shriver called MOU one and MOU two which as proposed by Lakeside, which one applies depends on whether Lakeside's proposal is the sole applicant certified or not the sole applicant certified.
So given that, my question is when the resolution that the City Council actually adopted certifying Lakeside refers to mutual agreement concerning revenue share what is that resolution referring to?
A. It refers to the proposal as it existed at that time, including whatever supplemental materials were given prior to the public hearing, but not including Ms. Shriver's letter.
Q. But how is their mutual agreement of North Point before the certification vote has proposed two alternatives, that depends on whether there are multiple applicants?
MR. DAVIS: Objection to the form of the question. It calls for a legal conclusion. But go ahead. You could give your personal perspective if you have one.

THE WITNESS: I do, and I will draw your attention to any ordinary bid. If you want to issue a bid for a sewer project, so you put up plans. You put together the request for bid, and you get the bid back.
The guy's bid says he's going to do your sewer project for $3 million, and it's got a due date. And he's given an opportunity after the due date to ask any questions and make adjustments to the bid for ten days. On the 11th day he comes in and says wait a minute, I'm changing my bid. It's meaningless.
BY MR. SMITH:
Q. That is what you just described as a sealed bid process, isn't it?
A. That would be a form of sealed bid. It's not a typical closed sealed bid.
Q. And often there is a bid bond in connection with that?
A. You know, I have always wondered what a bid bond is. I have never seen a case actually drawn on a bid bond all these years.
Q. You're not suggesting that the certification process that was run with the casino

proposals was the equivalent to a sealed bid situation, are you?
A. No. It was a hybrid form.
Q. And as we have seen, at least one applicant had completely withdrew its proposal after it had been submitted, correct?
A. Yes, that's true. But at the same time there was nothing that said they couldn't.
Q. So is it your testimony, Mr. Long, that when the resolution refers to a mutual agreement between the City and North Point, that is based on some sense that North Point is bound to its original proposal notwithstanding Ms. Shriver's e-mail?
A. No, it's not my position at all.
Q. Can you explain?
A. That statute stinks. You have to get back to the fact that the statute itself was poorly drafted and didn't contemplate the problems you would have when you had multiple bidders for a license.
And what in God's green earth was the City supposed to do in that setting. If you only had one bidder like Rockford, it would have been a whole heck of a lot easier.

Q. We've been through this. My understanding is that Rockford had more than one bidder, but we could move on from that. So let me ask you just factually --
A. No, they didn't.
Q. I know they sent one to the IGB, but I think they had more than one applicant.
A. They had one qualified applicant.
Q. So it's your view that the applicants other than ultimately the one that Rockford certified were not qualified?
A. That is what I was told.
Q. Who told you that?
A. That came from trade journals.
Q. I didn't hear.
A. That came from trade journals. Nobody told me.
Q. I still didn't hear that word.
MR. DAVIS: Trade journals.
THE WITNESS: Trade journals. Written documents I came across.
BY MR. SMITH:
Q. Do you remember which trade journals?
A. It might have come from the Illinois Local

Pl. SJ Ex. 123

Government Lawyers Association would be once source that is possible.

And they might have been in the form of RRS feeds. I don't know.

Q. You were starting to explain to me, I had posed a question to you is it your position that where the certifying resolution references a mutal agreement, is that based on the notion that Lakeside is essentially locked into its original proposal notwithstanding Ms. Shriver's e-mail?

And I think you started to say no, that is not my position. And you mentioned the fact that the statute stinks and then also that it would have been easier if Waukegan had been in a position of Rockford, but I don't think you finished the thought in terms of correcting me on my premise. So I want to give you an opportunity to do that.

A. Right. What I was getting at was that the way we looked at the statute, the only interpretation we could use in a setting where we had multiple bidders for this -- and keep in mind fundamental at the bottom of everything else was Waukegan's history where the City had put all of its eggs into one basket with Waukegan gaming and

Ludwig's proposal back in 2003 and went all the way through everything that was involved with that and got blown out of the water. And the casino ends up in Des Plaines.

Starting from that premise, that fear that if you only put your eggs into that one basket and something comes along which in that particular instance was outside the bidding process, we didn't know by any means that Ludwig's partner was going to be indicted.

Who in the hell could have figured that one out in advance? So from that kind of a perspective you don't want to take that chance. We're not going to take that risk. We're going to have more than one bidder.

Under that circumstance, how do we enter into contracts with each one of these people which are conditional in some respects on their getting the gaming license. How do we do that and still follow all of these rules that they are giving us which limit the contact.

I don't even see how you can possibly do it to this point in time. Nobody has showed me a way in which that will work. So we followed the

process as best we could. We considered that the negotiations had reached a maximum point as far as they could go when we certified. And with the assumption and the belief and good faith is involved in all of this, which is they can go all the way to get their license and come back, but they still have to buy the property.

They have identified the property, they have a license that is attributable to that piece of property. They have to negotiate with the City further at that point in time and that is when the final deal is going to be done.

Q. I don't want to take away too much from your answer. So let me ask if this is a correct implication of what you were saying.

Are you saying -- are you saying that when this statute talks about reaching mutual agreement on say revenue sharing that in that situation Waukegan faced with multiple qualified applicants and the desire to send more than one applicant to the IGB, that it just wasn't practically feasible to reach a mutual agreement with each of those applicants on those points?

A. I think it would have been highly

impracticable to try to find a way to do that.

Q. You referenced negotiations. It's correct to say that the City did not engage with Lakeside around the alternative proposals attached to Ms. Shriver's e-mail, correct?

A. Of course we did not.

Q. When you say, of course, what you do mean?

A. Because I didn't give them to anybody. I didn't talk to her about it. I didn't talk to anybody about it. So you can't engage in the discussions if you haven't had them.

Q. We don't have too much left since I am limited to two hours. I don't feel from my perspective we need to take a break, but if either you or our court reporter wants to.

THE WITNESS: If I could have a minute to get a glass of water.

MR. SMITH: Why don't we go off the record three minutes or so.

THE VIDEOGRAPHER: Off the record at 3:17.

(Recess)

THE VIDEOGRAPHER: Back on the record. This is media unit number two. The time is 3:22.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAUKEGAN POTAWATOMI CASINO, LLC, )
an Illinois limited liability )
company, )
)
Plaintiff, )
)
-vs- ) Case No. 1:20-cv-750
)
CITY OF WAUKEGAN, an Illinois )
municipal corporation, )
)
Defendant. )

Videotaped deposition via videoconference of THOMAS MAILLARD taken before TRACY L. BLASZAK, CSR, CRR, and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 1272 South Candlestick Way, in the City of Waukegan, Lake County, Illinois at 9:28 a.m. Central Daylight Time on the 23rd day of April, A.D., 2021.

There were present at the taking of this deposition via videoconference the following counsel:

FREEBORN & PETERS LLP by
MR. DYLAN SMITH
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 360-6394
dsmith@freeborn.com

on behalf of the Plaintiff;

HELPER BROOM LLC by
MR. GLENN E. DAVIS
MS. MEGHAN RIGNEY
30 North LaSalle Street
Suite 2900
Chicago, Illinois 60602
(312) 230-9100
gdavis@heplerbroom.com
mrigney@heplerbroom.com
on behalf of the Defendant;

ALSO PRESENT: Ms. Lynne Craven
Legal Videographer.

- - - - -

VIDEOTAPED DEPOSITION OF
THOMAS MAILLARD

April 23, 2021

| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Dylan Smith | 7 |
| | 163 |
| Mr. Glenn Davis | 158 |
| | 167 |

* * * * * *

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 4 | E-mail from Long to Johnson 8/20/19 | 135 |
| Exhibit 57 | Article, From truck stops to elections, a river of gambling money is flooding Waukegan, by Grotto 8/8/19 | 137 |
| Exhibit 90 | Defendant's supplemented answers to plaintiff's second set of interrogatories | 58 |
| Exhibit 123 | Text message 8/21/18 2:10 p.m. | 89 |
| Exhibit 145 | Text message conversation with Kozlowski, Bond, Maillard | 69 |
| Exhibit 146 | Text message 3/24/19 9:32 p.m. | 83 |
| Exhibit 162 | E-mail from Kischer-Lepper to Long 7/23/19 | 131 |
| Exhibit 163 | E-mail from Maillard to Kischer-Lepper 7/24/19 | 129 |

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 167 | E-mail from Kischer-Lepper to Smigielski 8/7/19 | 133 |
| Exhibit 167A | Scoresheet WKGN 28886 | 134 |
| Exhibit 187 | LinkedIn profile of Thomas Maillard | 11 |
| Exhibit 188 | Text message conversation with Bond and Maillard | 45 |
| Exhibit 189 | E-mail from Kozlowski to Koss 2/2/19 | 52 |
| Exhibit 190 | E-mail from Koss to Maillard 2/22/19 | 54 |
| Exhibit 191 | News-Sun article, Upcoming elections for Waukegan City Council include 16 candidates so far 11/27/18 | 71 |
| Exhibit 192 | News-Sun article, Gambling money again plays significant role in Waukegan election 3/17/19 | 73 |
| Exhibit 193 | Meeting invite from Outlook to Kischer-Lepper 6/4/19 | 114 |
| Exhibit 194 | E-mail from Maillard to Kischer-Lepper 6/21/19 | 116 |
| Exhibit 195 | Calendar invite for 6/10/19 subject: Casino discussion | 118 |
| Exhibit 196 | E-mail from IThelpdesk to Maillard 7/1/19 | 119 |
| Exhibit 197 | Calendar invite for 7/1/19 subject: Casino process discussion | 122 |
| Exhibit 198 | E-mail from Maillard to Dorando 7/12/19 | 124 |

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 199 | E-mail from Maillard to HWV PC 8/12/19 | 143 |
| Exhibit 200 | E-mail from Long to Maillard 8/14/19 | 145 |
| Exhibit 201 | Calendar invite for 8/28/19 subject: Casino update discussion | 148 |
| Exhibit 202 | E-mail from Vasselli to Maillard 8/28/19 | 149 |
| Exhibit 203 | E-mail from Maillard to Dorando 8/30/19 | 150 |
| Exhibit 204 | E-mail from Dorando to Maillard 10/18/19 | 154 |

* * * * * *

Q Mr. Maillard, I apologize.
So let me ask you, and I'm sort of asking this to get the sequencing right for some of your employment activities.
Is this Marquette University in Milwaukee or is it a different Marquette University or a branch of that university?
A That is Marquette University in Milwaukee, Wisconsin.
Q Okay. And did you go through, straight through four years for your college degree? I ask that only because it looks like you also managed to work during the same years you were in college.
A No, I did not. I started and stopped.
Q Got you. Okay. So how many -- over how many years, you know, total -- Let me ask it this way, I guess. When did you start your time in college and kind of can you just describe for me the time on and off sequence there?
A I started in 2007. I finished in 2015 and intermittently would leave college, leave Marquette, went to a few others, other universities or community colleges and worked in between.
Q Got you. Okay. And then you the ultimately got

your degree in 2015?
A Correct.
Q Okay. And, Mr. Maillard, where did you go to high school?
A Mundelein High School.
Q So you're from the Lake County area?
A Correct.
Q And how did you -- the first sort of employment you have listed in your LinkedIn profile is data analyst/intern coordinator for Michael Bond.
Can you just describe what that entailed?
A That entailed setting up computers in the office, knocking doors, onboarding volunteers and staff.
In terms of the data analyst, I would look at past election trends, the lowest Democratic performer, the highest Democratic and then the typical Democratic performer and based on that would identify what would be presumed a Democratic friendly, a swing precinct or neighborhood, and a nonfriendly or Republican neighborhood and district.
Q And how did you -- was that sort of your -- that job your introduction to sort of the work of politics, if you will?
A No.

Q Can you explain?
A My parents have been active in politics for many years. And as a young child I have been going -- walking in parades with elected officials, have been attending Democratic Party meetings, et cetera.
Q So it's in the DNA, so to speak?
A Yes.
Q Okay. And, in fact, if I'm not mistaken, your mother Mary Maillard was a Lake County Democratic committee member for some period of time, is that right?
A She still is.
Q She still is. Okay.
And -- Okay. And you are -- are you still now yourself the 10th District Democratic State central committeeman?
A Yes, I am.
Q And you've been that since March of 2020?
A Yes.
Q Approximately?
A Yes.
Q And can you explain what that is, a 10th District Democratic State central committeeman?
A Sure. Each Congressional district in the State of Illinois, there are 18, has a committeeman, a

committee woman who are party leaders, as much figureheads, occasionally vote on actions of the State party from time to time, yes.
Q And so you're that person for the 10th District?
A I am the committeeman, yes.
Q Okay. And one of the -- there was, as you might expect, sort of a press release issued by the 10th District Democrats when you became committeeman.
Do you recall reading that press release?
A Yes.
Q All right. And one of the -- the press release quoted Terry Link who was then still a State senator saying, I've worked with Thomas for many years now, and I know how hard he will work to keep and build on our gains.
So do you recall generally the substance of those remarks from Senator Link in that press release?
A Yes, I do.
Q Can you just describe for me what your background is with Mr. Link?
A Senator Link, as the Democratic Party leader for Lake County and as the senate majority leader, is someone that anyone working in Democratic Party politics in Lake County would have interacted with, would have

had -- you know, run into him on campaigns.

I worked out of office in 2014 for Governor Quinn. Yes.

Q Okay. Was he, you know, given what you said about sort of the politics being a family, you know, vocation or hobby, was Senator Link someone you knew since childhood?

A Yes.

Q Do you consider him to be a family friend?

A Yes.

Q So this was all a little bit of a tangent from talking about your time with Mr. Bond when he was a State senator. Let me go back to that.

When you worked for Mr. Bond doing the things you described, then Senator Bond, were you working out of his district office or out of Springfield?

A Out of his campaign office.

Q His campaign office, okay. It makes sense. Because you were essentially doing political work for him?

A Correct.

Q And how did you get linked up with Senator Bond in the first place?

A My mother, as a party leader, mentioned to me

one day I think when I was about 17 that there was a younger State senator who was looking for an intern, looking for someone to help with his campaign or his work, and I reached out and connected with his campaign.

Q Got you. Okay. And let me -- this doesn't matter so much, but I'm just trying to place things, Mr. Maillard. What year were you born?

A 1989.

Q Okay. A momentous year.

So I take it you basically stayed on with Mr. Bond until his unsuccessful -- the end of his unsuccessful campaign in 2010 or just after that, is that right?

A No, I left in 2008, although, I helped him. I left for college and then rejoined in 2010 when I was back here.

Q I see. Okay. So, you know, and some of this may just be the function of the way LinkedIn kind of mushes things together.

Am I right in understanding, then, you helped -- you worked with Mr. Bond during the -- essentially, the 2018 election campaign cycle and then came back for the 2010 campaign cycle?

A I wouldn't say came back. I was back and then

rejoined, yes, but effectively, yes.

Q Okay. And was your role pretty similar during both campaign cycles?

A No.

Q Can you explain the difference?

A In 2008 he was not running, he was assisting other campaigns. In 2010 he was running and it was his campaign.

Q Right. Okay. Got you. And as I recall, 2010 was a tough year for Democrats across the board. So we'll chalk that one up to that.

And, Mr. Maillard, after that 2010 campaign, did you stay in touch with Mr. Bond?

A Infrequently, yes.

Q Just sort of from time to time would check in with him?

A From time to time I would still assist other campaigns.

Q And when you were assisting other campaigns, was Mr. Bond at times involved in those efforts, as well?

A Yes.

Q All right. So am I correct based on sort of your perceptions that even after Mr. Bond left the senate, he continued to stay active in Lake County

Democratic politics to some degree?

A Correct, Lake County and other Democratic politics.

Q Sure. Okay. Fair enough. So can you walk me through, the next item on your LinkedIn profile in terms of employment is the -- working for the campaign of Carol Sente in 2012. And I realize this is a period where you're, you know, sort of still pursuing your college degree.

Is that LinkedIn profile complete for that period or was there other employment between the 2010 and 2012 period?

A I also have caddied for over, shoot, 12, 15, a bunch of years.

Q Okay. But apart from that type of -- that job that you had for a long time, probably going back to at least high school, right, but nothing else politics or business related?

A No, I worked at a sports memorabilia shop, you know, in the mall. And I also -- gosh, I'm sure I've done odds and ends retailer. I worked in a cafeteria in college, those sorts of things -- those sorts of limited employment opportunities.

Q By the way, which one country club did you caddy

at?
A Ivanhoe.
Q So from 2013 to 2015, at least according to the LinkedIn profile, you -- Well, let me ask you, how did you get hooked up with -- and I may be -- I apologize if I'm mispronouncing her name. How did you get hooked up with the Sente campaign?
A Ms. Sente I meant when she was first appointed to the Democratic Party. I don't recall how I became aware of the opening for her campaign. That was a very important campaign, so there were a bunch of people that were hired. I just don't recall how exactly that working on her campaign came about.
Q Okay. And why do you say it was an important campaign?
A It was the only incumbent versus incumbent race in the State post redistricting.
Q And was Mr. Bond involved in that campaign, to your knowledge?
A Yes, he, I believe, sent a staff or a volunteer to help.
Q Do you remember who the volunteer was?
A Travis Haley.
Q And did you know Travis Haley to also be a

Tap Room Gaming employee at some point?
A Yes.
Q So according to your LinkedIn profile from December, 2013, through December, 2015, you were in partnership development at Tap Room Gaming, is that accurate?
A No.
Q Okay. Explain?
A Partnership development was a catchall title that was given to all employees. I did a number of other roles and certainly less exciting or professionally sounding roles, namely, collecting money from machines and running pool and dart leagues.
Q And I understand, and correct me if I'm wrong, but in the -- particularly in the earlier days of Tap Room, folks did a lot of everything in kind of the spirit of a start-up company.
Was that your experience?
A Yes.
Q Apart from describing what you did in terms of the title, are those years or, you know, those dates accurate in terms of the time you spent at Tap Room?
A No.
Q Okay. Tell me what the right answer is.

A I took a leave of absence in order to run Governor Quinn's campaign in Lake and McHenry County from July of 2014 through, essentially, November and then proceeded to work on the ballot counting initiative or volunteered for the ballot counting initiative for now State treasurer Mike Frerichs.
Q So when did that, so help me out, what was the gap in your time at Tap Room Gaming datewise?
A Maybe July of 2014 through probably either the end of December, 2014, or January of 2015.
Q Okay. And while you were -- and I take it that was something you did with Mr. Bond's blessing?
A Yes.
Q While you were at Tap Room, who did you report to?
A Certainly, Michael Bond is the CEO who was always the boss. I reported to for some of the work in municipalities with -- to Kevin McGourty, to Cary Mayman (phonetic) prior to Kevin McGourty.
I'm trying to think who was the overseen the morning daily collection routes, maybe Wayne because -- I forget Wayne's last name.
Q Okay. That's okay.
I take it, then, that ultimately you reported

to Michael Bond, but depending on what task you were assigned to do at a particular point in time, there might be a particular supervisor that you would be interacting with, is that a fair summary?
A Yes.
Q So let me try to do this -- see if this is a little more efficient in terms of asking you. In between your last -- Let me ask you, why did you leave Tap Room?
A Gambling was not my passion, public service is, working in government is. And, certainly, as I had completed my college degree while working and commuting to Milwaukee, I was ready to move on from gambling.
Q Was that construction going on I-94 while you were commuting to Marquette?
A Yes.
Q Okay. Let me ask it this way. In between the end of your time at Tap Room and your start at the City of Waukegan, the only thing listed is your time with DeVry.
I assume within that period there was other -- there were other political activities you pursued, campaigns you assisted with, maybe I'm wrong about that.
But could you describe for me, if you could,

Page 26

kind of apart from school what you were involved in either by way of, you know, volunteer work or paid work for campaigns between December, 2015, and August, 2017?

A I had always remained, you know, a member of the Democratic Party of Lake County.

I don't recall if during this period I was an appointed precinct committeeman, but over the years I have been a -- like a neighborhood precinct committeeman.

After DeVry let go of all of the government relations staff, I helped State representative Carol Sente's campaign for the last month, you know, a little over a month.

And then what was the -- I'm sorry, what was the end timeframe that you were asking?

Q Just up until your start working for the City of Waukegan.

A Okay. And then I joined Mayor Sam Cunningham's election after the primary in 2017.

Q Okay. So sometime, if I'm not mistaken, the primary was February of 2017, so somewhere in the late February, March timeframe you joined the Cunningham campaign?

A Yes.

Page 27

Q And I'll come back to the Cunningham campaign just to make sure we're covering all the bases here.

Between your December, '15, departure date from Tap Room and your start at DeVry, which is listed as February, 2016, I guess that's only -- it seems like a large amount of time to me. So was there anything during that month or two gap that you did politics-wise?

A Not that I -- I don't recall.

Q Okay. Okay. Fair enough.

And just to round it out, what did you do while you were at DeVry?

A I was a State and -- I don't know if it's truly fair to say I was a Federal lobbyist; but, certainly, we tracked -- I tracked legislation in 16 states from Illinois down to Florida, Georgia and everything in between interacting with both Capitol lobbyists or in-dome lobbyists in Illinois, Georgia, Florida, tracked legislation for possible legislation that impacted DeVry or the five other associating universities, nursing schools, medical schools.

And what else? And, you know, would coordinate campus tours and other information sharing with legislatures related to for-profit education.

Q And then I think you said that around the time

Page 28

you left, DeVry had made a decision to disband its government affairs department, essentially, is that right?

A They let go of most of their public relation department at that time, yes. Or I was the second person to be -- or third person to be let go within a short period of time.

Q Got you. Okay. So tell me what you did -- Well, let me ask you this: How did you come to be assisting with the Cunningham campaign in 2017?

A I have met Sam Cunningham through the Democratic Party in Lake County and his mother over many years. They've certainly seen me grow up in some essence.

After his primary victory, Michael Bond had reached out indicating that, you know, Sam was the successful primary candidate and that they needed some help running their campaign and believed I was available or on the job market and if I was interested in helping his election.

Q So I take it you've known the mayor's mother from a relatively young age?

A Known of or been in rooms with through the Democratic Party.

Q Yes. Okay. And when you -- when Mr. Bond kind

Page 29

of reached out in the way you just described about the Cunningham campaign, were you aware that -- or were you made aware that Mr. Bond was supporting Mr. Cunningham's campaign?

A Supporting, I'm sorry, what do you mean?

Q Well, let me ask you: Were you aware Mr. Bond was supporting Mr. Cunningham's campaign financially?

A Yes.

Q All right. And how did you come to be aware of that?

A I believe he was providing in-kind services or donations of technology, computers, I don't want to call them burner phones, but prepaid cellphones. You know, that was my knowledge. I had no knowledge or interaction with the campaign financing.

Q Understood. How were you aware of those -- the fact that those in-kind contributions were coming from Mr. Bond to the Cunningham campaign?

A Mr. Bond had asked me to assist with setting up some of these that he had -- in the process of purchasing prepaid cellphones, you cannot just go and purchase a bunch without raising red flags. So we had to go to the store and activate them in person.

So -- I need to take a step back. Presumed

that he was the one purchasing the cellphones based on him going to the store.

Q Understood. Okay. And was there a particular campaign office that Mayor Cunningham's campaign was being run out of?

A Yes.

Q Okay. And where was that?

A There were two locations, one on Genesee Street and one on North Avenue. Those are the two I was aware of.

Q And based on your involvement in the campaign and some of the things you've just described, was it your perception that some of Mr. Bond's in-kind contributions to the Cunningham campaign went toward helping those campaign offices function?

A In terms of technology, yes.

Q Putting aside financial support, based on your involvement in the Cunningham campaign, did Mr. Bond support Mr. Cunningham's candidacy in other ways, either with logistical support, campaign advice? I'm really not trying to limit that in any way.

A Campaign advice, certainly.

Q Okay. Can you tell me about that, what you observed in that regard?

A Certainly messaging in terms of how to speak about -- there is a common political exercise, it's -- I forget the term, but it's essentially -- it's a box, me on me, me on you, what do you say about me, what do you say about you. And through that you can develop a pretty standard understanding of how to speak on topics. And so I think that was an exercise we performed.

Q Okay. Taking what you just said, is it fair to say that to some extent Mr. Bond was a coach for Mayor Cunningham in terms of his being a mayoral candidate?

A I wouldn't be able to say that.

Mr. Davis, are you trying to be unmuted?

MR. SMITH: You're muted, Glenn.

MR. DAVIS: Excuse me, Tom. I just want to object to the form of the question. It's vague and ambiguous as to what coaching means in this context, but subject to that -- you can answer subject to that.

THE WITNESS: You cut out again, Mr. Davis.

MR. SMITH: I think he's done.

MR. DAVIS: I'm done.

MR. SMITH: Q That's fine, Mr. Maillard, I think you gave me an answer. It wasn't a great question, anyway.

I apologize if I asked you this. Can you just

describe taking the period of Mayor Cunningham's campaign that you were involved in, which, if I'm understanding you correctly, is probably, you know, a period of four to eight weeks given that you got involved after the primary, can you just describe what you did for Mayor Cunningham's campaign, in addition to what you described already.

A Certainly. I would oversee the staff, the phone anchors and the door knockers, help them with how to use the vote builder -- the voter contact database, how to make phone calls, how to improve their -- the way they would speak to people on the door or on the phone.

Q And were you working out of either or both of those two campaign offices you described on Genesee or North Street?

A Primarily on Genesee.

Q And was that office on Genesee, was that in a building or a storefront not too far from Soto's Furniture?

A Correct. It's not that long of a street, so, yes.

Q Okay. So who else based on your involvement in the Cunningham campaign was involved in providing either campaign advice or logistical support to the mayor that

you were able to observe?

A Matt Sanchez, Victor Reyes, Mike Noonan, Pete Couvall, his mother, Commissioner -- Commissioner Cunningham, yeah.

Q Okay. So Reyes and Newman, that's The Roosevelt Group, right, their firm is The Roosevelt Group?

A That's one of their -- I think they have a couple.

Q They have Reyes Kurson, as well, right?

A Yes.

Q But Victor Reyes and Mike Noonan are long time -- and I'm not using this in a pejorative sense, but long-time political operatives, correct?

That's a fair characterization, right?

A Yes.

Q And what about Matt Sanchez, who is he?

A Matt Sanchez worked for Roosevelt Group.

Q Okay. So what did, based on your observations, what support did Sanchez, Reyes, and Noonan provide to the Cunningham campaign?

A They assisted with mailers and messaging mailers.

Q Were they focused on messaging or mailers with regard to any particular constituency?

A The Waukegan voting constituency.
Q Okay. Not sliced any more finely than that?
A There was different outreach for Hispanics, for strong Democrats, you know, certain municipal voters.
Beyond that, I do not know.
Q Okay. So what did you do in the period between when the campaign ended and you started at the City of Waukegan as a special projects analyst?
A I worked on the transition documents, and I assisted with the 1st ward aldermanic replacement search.
Q So let me just break that down just to make sure the record is clear.
When you say you assisted with the transition documents, I take it these are documents relating to the mayoral transition in Waukegan?
A Yes.
Q And I'm not interested in delving into that many detail, but can you maybe just explain generally what you mean by that?
A Yes. We did a comprehensive review of operations, the City of Waukegan, and met with community liaisons and published a community transition and the broader transition documents.

Q Okay. And then you were involved in the selection of the replacement for Mayor Cunningham as 1st ward alderman, correct?
A Yes.
Q And how did that process lead to the selection to Alderman Bolton?
A Mayor Cunningham has been involved in the -- obviously, in the 1st ward for many years and knew a number of the highly qualified individuals in the 1st ward.
We pared down a list or developed a list of, I think, five individuals that seemed very capable, organized some interviews with individuals, and then ultimately chose Dr. Bolton.
Q And you said we. Who else was involved in that selection process?
A Certainly, Mayor Cunningham, Pete Couvall and Markus Pitchford and myself.
Q You've mentioned Pete Couvall a few times. And my understanding is he was a long-time Lake County Democratic Party official.
Is that a fair description?
A Yes.
Q Did you know him either from just your

experience in Lake County Democratic circles or your time at Tap Room, did you know him to have been a contract employee at Tap Room for some period of time?
A I did not know that or I did not know he was a contract employee.
Q Let me ask you this --
A I knew him from the political circles. It seemed like there was multiple questions there.
Q Yes. Fair enough. Okay.
Did you know Mr. Couvall to have any connection to Tap Room?
A I did not know.
Q Okay. During your time at Tap Room, did you deal with Andrew Hochberg at all?
A We worked out of his office in Northbrook in the early days, so I know who he is. Certainly, he is a very wealthy man, so you tend to remember him. There is no personal or sustained interaction with myself and Mr. Hochberg.
Q Thank you. So, Mr. Maillard, we've now gotten to your time at the City of Waukegan. I take it you began formally as a special projects analyst in August of 2017, does that seem accurate to you?
A Yes.

Q Okay. Can you kind of -- And am I correct that you're still employed at the City of Waukegan?
A Yes.
Q All right. And I understand your title has changed perhaps?
A On my business card, yes. In the, what is it called, the -- in the, essentially the budget, I am still a special project analyst or manager.
Q Have your responsibilities changed over the time you've been employed by the City of Waukegan?
A Yes.
Q Could you kind of summarize for me from the time you started there what your responsibilities were initially and how those have changed over time?
A Initially I was one of three special project analysts or managers. Each of us were brought in as a reflection of the diversity of the City for lack of a simplistic, better simplest term, an African-American, Hispanic, and a white individual.
I would work on various prescribed projects as the mayor saw fit.
Over time for clarity of not only internal but external standards my focus has become more internal operational management, and then others have taken on

other roles, the external and constituent.

Q And I think you said when you started there were three special projects analysts?

A Correct.

Q I am aware that the other -- one other was Mr. Pitchford, correct?

A Correct.

Q Who was the third special projects analyst?

A Susana Figueroa.

Q Is she still employed by the City?

A Yes.

Q And to your knowledge, is she still a special projects analyst?

A In the budget, yes.

Q Does she have a new title on her business card?

A Yes.

Q Do you happen to know what that is?

A Director of constituent affairs or community affairs, I believe.

Q So that's a more outward reaching role?

A More resident role, yes.

Q Am I right in understanding from your description that as a special projects analyst you reported directly to the mayor?

A Correct.

Q Does that remain true throughout your time with the City government?

A Yes.

Q Doing okay, Mr. Maillard?

A Yes, I'm doing okay.

Q Let me ask you -- I just want to ask you about some other people you may be acquainted with through Lake County Democratic politics or political circles.

I know you're familiar with Janet Kilkelly, the clerk of the City of Waukegan, correct?

A Yes.

Q Do you also know her as someone who has been involved in Lake County Democratic politics?

A Yes.

Q And can you describe what your understanding of her involvement in Lake County Democratic politics has been over the years?

A Only to -- my only interaction is the knowledge of her running for I believe county clerk.

Q What about Michael Del Galdo, is he someone you know from Democratic circles?

A Not until after the -- after joining the City of Waukegan.

Q Okay. How did you become acquainted with Mr. Del Galdo after joining the City of Waukegan?

A His firm is the economic development law firm for the City.

Q Based on -- Let me ask you this. Is it fair to say that after becoming an employee of the City of Waukegan you continued to stay involved in Democratic politics in Lake County and beyond?

A Before and after 8 -- before 8:00 p.m. -- or 8:00 a.m. and after 5:00 p.m., yes.

Q Fair enough. On your own time whatever you do.

Okay. So have you, again, not on City time, but have you continued to play any kind of political role for Mayor Cunningham?

A Yes.

Q Okay. Can you describe what that role has been?

A I provide advice and consent for the -- I provide advice and consent -- or advice, I'm sorry, advice for the -- for Mayor Cunningham related to his election or reelection attempt, failed reelection attempt.

Q And in the course of fulfilling that role, have you come to know Mr. Del Galdo as a political advisor to the mayor?

A Not really.

Q Have you ever sat in on any strategy session for the mayor's campaign where Mr. Del Galdo participated?

A Yes.

Q Can you describe that? Was that one occasion or more than one occasion?

A One occasion.

Q Can you describe that?

A You know what, and let me amend that previous one because Del Galdo law firm did hold a fund-raiser for Mayor Cunningham, so I want to be fully honest or truthful in this.

Q Yes. Fair enough. And I'm not -- can you describe the strategy session with the mayor? Just to be clear, I'm not asking you to get into the nuts and bolts of, you know, what was discussed in terms of strategy but sort of where it was, who was there, kind of how long it lasted?

A I don't recall in terms of that specifics. I do recall having some sort of conversation that described polling for the mayor. You know, there was presumed issues related to crime that Mayor Cunningham is considered a trusted, loyal -- or trusted individual by residents. I really don't recall a lot of the specifics

of that.
Q Let me see if this refreshes your memory. Do you remember attending a strategy session for the mayor's campaign at Michael Bond's lake house?
A Okay. Yes, that would make sense, yes.
Q All right. And is that the meeting you were recollecting where Mr. Del Galdo was in attendance?
A Yes.
Q And was Will Cousineau also in attendance at that meeting?
A Yes.
Q And who do you understand Mr. Cousineau to be?
A Mr. Cousineau is, during City hours, he is a lobbyist for Mayor Cunningham on noncasino-related issues.
Q And the casino-related issues were subcontracted to a lobbyist known as Heather Wier Vaught, correct?
A Correct.
Q And that's because it was understood that Mr. Cousineau -- it was understood within the City by you and others that Mr. Cousineau was also a lobbyist for Mr. Bond, correct?
A Correct.
Q And so it was perceived as a conflict of

interest if Mr. Cousineau were to lobby on gaming issues for the City, correct?
A Correct.
Q At this strategy session at Mr. Bond's lake house, in addition to Mr. Cousineau and Mr. Del Galdo, was Jon Kozlowski in attendance?
A I don't recall. Actually, that's a good question. I don't recall if Jon was there.
Q Okay. All right. Fair enough. By the way, I don't recall is always a perfectly fine answer if you don't recall something, to state the obvious, I hope.
All right. I take it Jon Kozlowski is someone you know?
A I know who Mr. Kozlowski is, yes.
Q How did you come to be acquainted with Mr. -- how did you first come to be acquainted with Mr. Kozlowski?
A Through the aldermanic campaigns.
Q Okay. These are the 2019 aldermanic campaigns?
A Correct.
Q All right. We'll come to that.
Are you also familiar with someone named Dave Koss, K-O-S-S?
A Yes.

Q And how do you know Mr. Koss?
A Mr. Koss has been an active member of the Democratic Party in Lake County or was.
Q To your knowledge is he no longer?
A I haven't seen Mr. Koss or talked to him in, gosh, it's got to be a couple years now.
Q Okay. So you just didn't want to presume what he may be up to at the moment?
A I wouldn't be able to guess.
MR. DAVIS: I'm all ears. Fill us in, Dylan. What's he doing?
MR. SMITH: I don't know. I'm not an omniscient, Glenn.
MR. DAVIS: FTI is.
MR. SMITH: Hey, come on, give me some credit.
Q So let me ask you to -- Mr. Maillard, can you describe -- you said you continued in your non-City time to play as a campaign advisor to Mayor Cunningham after he became mayor.
Can you just describe that role a little more substantively?
A As someone that understands or who has worked on campaigns, I would attend his campaign team meetings over the last number of months, would try to assist the

campaign manager with editing campaign language -- or mailer language, though he would develop and I would develop the actual direct.
I have knocked on doors for Mayor Cunningham or on behalf of Mayor Cunningham.
I've helped organize a fund-raiser, two fund-raisers. Let's see. I've helped draft responses to, surveys, you know, written answers to questions, you know, things like that.
Q That's helpful.
MR. SMITH: Let me ask you if you could pull up what's been marked already as Exhibit 188.
(Exhibit 188 marked and tendered.)
MR. SMITH: Q Are you able to pull that up, Mr. Maillard?
A Give me a second.
Q While you're pulling up it, I'll just note that Exhibit 188 is a one-page document Bates stamped WKGN 8534.
A So I see -- is this conversation with Michael Bond, Thomas Maillard?
Q Yes. All right. So, Mr. Maillard, I'll represent to you it's my understanding just from the City's production that these are some text messages that

Page 106

first and second vote you came and discussed that ordinance with her.

Do you recall having a discussion with Alderman Bolton about the ordinance concerning an entertainment district?

A I don't recall particularly. It might have occurred.

Q Is that something you would do without running it by the mayor first?

A Aldermen may request to meet with me to go over what is on the agenda, so that could happen without the mayor being explicitly asked.

Q Would you affirmatively reach out to an alderman to discuss an upcoming vote without running it by the mayor first?

A No. If I was requested and that would have -- if I was requested, certainly, that would be done at a department head meeting with about 30 other department heads that would be present. So, no.

Q Let me try to ask the next question in kind of an incremental way given the sensitivities.

Do you have any information about any effort to influence Alderman Rivera's vote on any gaming issue through reference to legal difficulties that his son may

Page 107

have been going through? Does that --

A No.

MR. SMITH: All right. So this is -- I'm actually going to really shift topics, so this actually would be a good time to take a quick lunch break.

I'm happy to, you know, make it as short as 20 minutes or as long as 45 minutes, depending on kind of what works for the group, including our trusted court reporter and videographer, Glenn, Meghan, Mr. Maillard.

Want to say half an hour?

MR. DAVIS: We could shoot for that.

MR. SMITH: All right.

THE VIDEOGRAPHER: Okay. Going off the record. The time is 12:06 p.m.

(a brief recess was taken)

THE VIDEOGRAPHER: We are back on the record. The time is 12:36 p.m.

MR. SMITH: Q Mr. Maillard, good afternoon. I understand that during the period around when the gaming expansion bill had passed the General Assembly but before it was actually signed into law Mayor Cunningham tasked certain members of the City government with providing input into a request for proposals that the City could issue for casino proposals.

Page 108

Are you generally familiar with that?

A Yes.

Q And were you one of the people that the mayor asked to provide input into a request for proposals?

A It may not have been -- I don't recall an explicit directive, but I offer -- for City communications, I assist with editing for brevity, language, and such and have provided some, yes.

Q All right. So thanks for that clarification. Let me just make sure I've understood it correctly. You were one of the people who provided input into the requests for qualifications and proposals?

A Yes, initially.

Q Okay. And I also understand that you were one of the people who provided input in response to questions that came up about the request for the proposal, you're one of the City employees who provided input about the appropriate response to those questions to be posted on the City's website via addenda to the request for proposals, is that correct?

A No.

Q Okay.

A Initially, yes, but at some point in that period I recused myself from involvement.

Page 109

Q Okay. And we'll take a look at the evolution of the process. Without getting overly hung up right now about exactly where in the process you recused yourself, explain why you recused yourself from the casino proposal process?

A I chose to recuse myself due to having previously worked for Michael Bond and feeling that someone might misconstrue my providing scoring or other, you know, specific advancing of one or multiple projects or proposals.

Q My understanding is at about the same time you took a step back from the casino-related activities with the City that James Vasselli of the Del Galdo law firm also stepped back from any involvement in that process.

Were you familiar with that?

A No.

Q And we can look at some documents if it will refresh your memory, Mr. Maillard.

My understanding is that before Johnson Consulting was engaged by the City, there was a window where certain City personnel filled out scoresheets, I think you alluded to scoresheets providing scores on the various casino proposals that had come in.

Did you at some point before you recused

yourself fill out a scoresheet for casino proposals?
A Not that I recall.
Q Okay. My understanding is you were involved in discussions about the form that scoresheet should take, is that correct?
A Yes, I believe I had some relevance to the form of that scoresheet.
Q Let me ask you, given that, you know, at least for some time you were involved in the City's RFP process related to casinos and then at some point later in the process decided to recuse yourself, was there something in particular that prompted you to make the decision that you should recuse?
A No.
Q Your recusal had nothing to do with press inquiries, for example?
A No.
Q And you said this was a decision you made on your own initiative.
Did you not first discuss it with anyone before you recused yourself?
A I had considered -- I had thought about it and decided to share with the group that I thought it was going to be in the best interests that I should recuse.

And I said that to the City staff, and there was no objection to my recusing.
Q Let me ask you this, when you say you shared it with the group, who did you share that decision with, what were you referring to there?
A I shared that with Noelle, with Mayor Cunningham, and I'm not sure how much I'm supposed to -- because, certainly, I shared that with legal counsel.
Q Okay. And I, obviously, don't want to get into the substance of any discussions you had with legal counsel.
You anticipated, I'm assuming before the City received responses to its requests for proposals, you anticipated that Mr. Bond would be part of a group submitting a casino proposal, correct?
A I anticipated a number of the submissions.
Q Yes, including Mr. Bond's group, correct?
A Yes, including Rivers, Potawatomi, and Mr. Bond's group amongst others that were received.
Q And I don't want to -- I don't want to kind of perseverate by asking you the same question. I just want to make sure I just rounded this out.
Was there something about -- I just want to give you an opportunity to fully explain this.

Was there something that triggered your decision to recuse at the point in time when you did?
A No.
Q Okay. In hindsight do you believe you should have recused earlier?
A No.
Q And why was the point where you decided to recuse the appropriate point to recuse in the process?
A I believe I didn't need to recuse whatsoever. I believe that I was doing -- I believe that I was giving the City additional professional, you know, professional standards by recusing.
I think I could have recused at any point in time or not recused and absolutely been consistently appropriate. But I chose at that point in time that I believed it was in my best interests to recuse.
Q And you say in your best interests. What do you mean by that?
A In everyone's best -- in the interests for the same reasons I have stated before, for misinterpretation and misconstruction -- misconstruing of my intentions.
Q And granting your answer that it's your view that you didn't need to recuse, so I'm not trying to, you know, fight you on that, taking that as a given as

your viewpoint, was there something about the particular point in the process that the casino review process had reached that you said to yourself now is -- now is an appropriate time for me to recuse based on whatever consideration process you were going through?
MR. DAVIS: Asked and answered.
MR. SMITH: Q You can answer, Mr. Maillard.
A I've provided this answer.
Q Huh?
A I would refer to my previous answer.
Q Okay. Let me -- so without getting into your reasoning, as you sit here today, what's your memory of what point the casino review process had reached when you decided to recuse? I'm not asking date but just functionally.
A Functionally this was prior to, as far as I recall, any scoring of individual proposals or that no decisions had been made on advancing or evaluating of one or more or comparisons of the proposals.
I generally recall it being prior to the evaluations of proposals.
Q And let me ask you, you used the word recuse. And, you know, I think in some contexts that has a particular meaning. I want to give you an opportunity

to explain what you mean by recuse?
A I was not involved in the scoring of the specific proposals. I was not present for interviews by the working group that I think met with each of the proposers. So in that sense recuse.
I am still a member of the administration or still a member of the mayor's office.
MR. SMITH: Let me ask you to take a look at what's been marked as Exhibit 193. And I think, if it's any comfort, we will start going through these exhibits a little more quickly, Mr. Maillard.
(Exhibit 193 marked and tendered.)
MR. SMITH: Q Exhibit 193 is what appears to be a Microsoft Outlook calendar invite sent June 4th, 2019, setting up a meeting for June 5th, 2019.
And it's -- it seems to be sent by you to -- well, it's maybe a response to an invite Ms. Kischer-Lepper sent. Is that your understanding looking at this meant?
A No, this does not appear to be from Ms. Kischer-Lepper, it appears to be to.
Q Right.
A I serve as a backup to the secretary, so I may have been asked to schedule on a calendar a meeting and

forward that to the appropriate parties.
Q Well, I'll tell you -- Anyway, it goes on. There is information in here saying Thomas Maillard has forwarded your meeting request to additional recipients, which made me think that perhaps what we're looking at was your response to an invite from Ms. Kischer-Lepper, but I'm not sure it matters.
A Literally, that notification, if I understand correctly, may be sent even if I send -- if I forward off of the mayor's calendar to another individual even if I am not a participate. I don't recall if I am a participant or know if I am a participant in this matter, but.
Q All right. That's fair.
So let me ask you, does the term Fountain Square working group mean something to you?
A No.
Q Okay. And I take it if I were to ask you -- Well, let me ask you, do you have an understanding sitting here today of why you forwarded this meeting invite to Mr. Vasselli?
A I don't recall.
Q I apologize if I asked you this. I don't think I did.

From the period where you were involved in the casino RFP process, did you have an understanding of the role Mr. Vasselli played in that process?
A I know that Mr. Vasselli generally has been an economic development counsel for the City. What specific role I don't recall.
Q Okay. Fair enough.
A Even, too, whether it had to do with the casino itself or a TIF in general or land only I don't recall. I don't know to what specificity his involvement was.
Q And I think I probably know the answer to this, but I can't help but ask. Sitting here today, do you have any memory of a meeting that took place on June 5th, 2019?
A I don't recall just based on a date.
MR. SMITH: Okay. Let me ask you to pull up what's already been marked as Exhibit 194.
(Exhibit 194 marked and tendered.)
MR. SMITH: Q Let me know when you've got that up.
While you're pulling it up, I'll just note that Exhibit 194 is a one-page document. It is an e-mail dated June 21st, 2019, from Mr. Maillard to Noelle Kischer-Lepper, WKGN 29156.
A I see it.

Q Dated June 25th, 2019.
A I see the exhibit, yes, sir.
Q And, Mr. Maillard, do you recognize this as an e-mail that you sent to Ms. Kischer-Lepper on the date indicated?
A I see that it's an e-mail from me. I don't recall the specifics of the conversation.
Q Sure. Okay. You have no reason to question that you sent this e-mail, correct?
A No, no.
Q Here you seem to be asking Ms. Kischer-Lepper about seeing a draft of the casino RFQ.
Do you generally recall a period where you were a part of some group within the City government that was awaiting to review a draft RFQ that Ms. Kischer-Lepper was involved in preparing?
A Yes, vaguely, yes.
Q Okay. As you can recall it -- Well, let me ask you, who do you recall being involved in the review of the RFQ besides yourself?
A I would -- I could speculate. I don't recall the specific members. I would speculate the finance department, the planning department, someone from corporation counsel, but the specific members I don't --

MR. SMITH: And Exhibit 167 was marked at an earlier deposition. It's an e-mail chain that occurred on August 7th, 2019. I'll let you know kind of by way of a preview that what I understand to be the attachment to this e-mail is marked as 167A, and you should have access to that.

(Exhibit 167A marked and tendered.)

MR. SMITH: Q And I'm going to sort of be assuming in my questions you've kind of looked at both. So if you want to take a moment to just eyeball 167 and then 167A.

A So I'm seeing 167. And then you said 167A. All right. One second.

Okay. I've had a chance to review 167 and 167A.

Q So would you agree with me that the e-mails in this chain seem to relate to various drafts of a casino scoring sheet that Ms. Kischer-Lepper is circulating?

A Yes.

Q And am I correct that at this point in time you hadn't yet recused yourself from the casino RFP process?

A Correct.

MR. SMITH: At some point -- Let me ask you, just take a look, if you would, Mr. Maillard, at Exhibit 4.

(Exhibit 4 marked and tendered.)

MR. SMITH: Q And as you're pulling that up, let me just explain. Exhibit 4 is an e-mail from August 20th, 2019, in which Mr. Long is e-mailing Charles Johnson of Johnson Consulting and cc'ing a number of other people, including yourself.

But the real reason I'm asking you to take a look at this is that Mr. Long attaches to the e-mail to Mr. Johnson various casino scoresheets that, as I understand it, various City personnel completed.

And so I'll tell you my question for you in advance while you're looking this through.

I think your recollection was that you had not completed a scoresheet. I just wanted to ask you to look through the scoresheets that are appended to Mr. Long's e-mail and see whether that either confirms your recollection that you didn't prepare a scoresheet or whether you see any scoresheet that you believe you had, in fact, filled out?

A I think this seems to be consistent with my recollection that I don't recognize any of the scoresheets as being from me, and I don't recall having completed one, which would be consistent with my not having been involved in scoring.

Q Okay. Thanks. That was all I wanted to ask you about that.

Let me ask you whether you recall a particular press article.

There was a story that came out on around August 8th that I think was published in collaboration, it was a ProPublica story but I think also published in the Sun-Times and WBEZ that talked about the impact of money from Tap Room Gaming on Waukegan City politics and policies with regard to gaming.

Do you generally recall that article?

A Not off the top of my -- there have been a number of articles, in general, about gaming, so I don't recall that specific just upon reference. I don't differentiate what would have been specifically incorporated in that article.

But I generally do track -- try to keep an eye out for any articles that have the City of Waukegan in them.

Q Just bear with me. I'm just loading.

MR. DAVIS: Doing okay, Tom?

THE WITNESS: Yes, I'm all right. I got my vaccine, gone a year and a half without a cold or a flu or a sinus, and getting my ass kicked before the weekend.

MR. SMITH: Just let us know if you want to take even a short break.

THE WITNESS: I'm good.

MR. SMITH: Okay. You may need to refresh your browser, but you should be able to see in the marked exhibits what was marked at an earlier deposition as Exhibit 57.

(Exhibit 57 marked and tendered.)

MR. SMITH: Q And I'll note, Exhibit 57 is an article with a byline of August 8th, 2019, with a title, From truck stops to elections, a river of gambling money is flooding Waukegan.

And you're welcome to, I don't think you will need to read the entire article for purposes of the questions I'm going to ask you, Mr. Maillard, because I don't propose to go into detail on this.

My question really is going to be, once you've had a chance to kind of look this over, do you remember reviewing this, reading this article at about the time it was published?

A Yes, I recall seeing this.

Q Okay. Did you get any kind of advanced notice that this article was coming out as best you can recall?

A Not in terms of the timing, not in terms of the

A Give me a second.
Q Yes.
A Okay. What was your question?
Q Did you end up talking to Mr. Long about Johnson Consulting?
A I don't recall the conversation, but, obviously, I see the e-mail requesting.
Q All right. Sitting here today you have no recollection of any -- of a conversation if it did occur?
A No.
Q And I think I saw you shaking your head. I just want to make sure you verbalized your answer, Mr. --
A I'm sorry. No, I don't recall a conversation. I don't recall specifics of a conversation with Mr. Long related to Johnson Consulting.
Q Okay. Let me ask you, you kind of -- you gave a helpful clarification about what you meant by recusal.
If I understand correctly, you removed yourself from the scoring process or any substantive consideration of the casino proposals.
I take it you viewed your involvement in any efforts to retain an outside consultant as something that you were not needing to recuse yourself from, is

that fair?
A I won't say that -- I believe that I -- I believe that the vocation of outside counsel removed my -- or eliminate my partiality or any semblances of my partiality or misconstruction -- misconstruals of my former relationship with Michael as impartial.
So, no, I do not look at that as -- I mean, however, I was not involved in the determinations related to -- or I don't recall still being very involved in the decision-making or final determinations following that quote, unquote, and it's a loose -- I loosely use the term recusal.
Q Okay. Fair enough.
And we went around the bend about the timing and reasons for your recusal.
You I think stated it was based on a concern about perceptions about your past relationship with Michael Bond.
Did I get that right?
A Correct.
Q All right. When you talk about your past relationship with Michael Bond, are you focusing on your status as a former Tap Room employee, your former employment for his political campaign, all of the above?

What did you have in mind that was going to perhaps prompt perception issues?
A That seems to be an awkwardly phrased question.
Certainly, his -- having worked for Tap Room Gaming, I did not want to, even though it's video gaming versus casino, being that I had knowledge that he had pursued a casino in Gurnee or had desired a casino in Gurnee, that would certainly be something of relevance. Or I think that would be -- I'm sorry, not something of relevance.
That would be something I could envision, hypothesize that someone could misconstrue as a perception of partiality.
Q Do you happen to know, Mr. Maillard, when Mr. Bond pursued the casino in Gurnee, do you know whether he had any partners lined up at that point in time to work with him on the casino?
A No, I don't. I don't know.
MR. SMITH: Let me ask you to take a look at what's been marked as Exhibit 201.
(Exhibit 201 marked and tendered.)
MR. SMITH: Q And Exhibit 201 is a one-page document. It's another one of these calendar invitations. The organizer is identified as you,

Mr. Maillard, for a casino update discussion in the mayor's conference room on August 28th, 2019.
Do you have any recollection of whether this meeting occurred and what was discussed?
A No, I don't recall. I don't recall if I was the secretary just setting up a meeting. I don't recall. Obviously, it does not indicate who were participants in this meeting. I do not recall.
MR. SMITH: Let me ask you to take a look at what has been marked as Exhibit 202.
(Exhibit 202 marked and tendered.)
MR. SMITH: Q And I'm not sure this is going to add much, but Exhibit 202 seems to relate to the calendar invite we just saw in Exhibit 201.
Mr. Vasselli is e-mailing for you, is this for today at ten which was scheduled at 11:00 p.m. last night?
Does that, seeing that e-mail, does that do anything to refresh your memory about whether the meeting occurred and who attended or what was discussed?
A No, it doesn't help. It doesn't add anything.
Q Okay. That's fair.
MR. SMITH: Let me ask you to take a look at what's been marked as Exhibit 203.

IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAUKEGAN POTAWATOMI CASINO, )
LLC., an Illinois Limited )
Liability Company )
)
Plaintiffs, ) No. 1:20-CV-750
)
vs. )
)
CITY OF WAUKEGAN, an Illinois )
municipal corporation, )
)
Defendants. )

The remote videotaped deposition via ZOOM of
SYLVIA SIMS BOLTON
March 8, 2021
9:47 a.m. CST

PRESENT:

FREEBORN & PETERS LLP
MR. DYLAN SMITH
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
dsmith@freeborn.com
Appeared on behalf of Plaintiffs.

HEPLERBROOM, LLC
MR. CHARLES INSLER
MS. MEGHAN RIGNEY
211 North Broadway
Suite 2700
St. Louis, Missouri 63102
cinsler@heplerbroom.com
Appeared on behalf of Defendants.

VIDEOGRAPHER: JUSTIN BOND

STENOGRAPHICALLY REPORTED BY:
JO ANN LOSOYA, CSR, RPR, CRR
LICENSE #: 084-002437

EXAMINATION

| Witness | Page | Line |
|---|---|---|
| SYLVIA SIMS BOLTON | | |
| By Mr. Smith | 4 | 21 |

***************

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 7 | Johnson Consulting report | 135 |
| Exhibit 107 | State Board of Elections form | 68 |
| Exhibit 108 | Form D2 for Citizens for Sylvia | 78 |
| Exhibit 109 | Form D2 4/1/2019 thru 6/30/2019 | 87 |
| Exhibit 110 | Form D2, October 1st, 2019, thru December 31, 2019. | 92 |
| Exhibit 111 | ISBE Letters | 131 |
| Exhibit 112 | Campaign literature | 144 |

THE VIDEOGRAPHER: Good morning. Today is March 8, 2021. We are on the record at 9:47 a.m. today we'll take a videotape deposition in case No. 1:20-CV-750. This deposition is being held remotely.

Counsel please state your appearances and affiliations for the record.

MR. SMITH: Good morning. Dylan Smith of Freeborn and Peters for the plaintiff, Waukegan Potawatomi Casino LLC.

MR. INSLER: Charles Insler and Meghan Rigney are here on behalf of the City of Waukegan.

THE VIDEOGRAPHER: Would you please swear the witness.

(Witness sworn at 9:48 a.m.)

WHEREUPON:

SYLVIA SIMS BOLTON,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

E X A M I N A T I O N

BY MR. SMITH:

Q. Alderman Bolton, how are you today?
A. Good morning.
Q. Thanks for working through all the

technological issues.

Alderman Bolton, do you prefer to be addressed as Alderman Sims Bolton, Alderman Bolton? I want to make sure whatever your preference is.
A. Alderman Bolton is fine.
Q. Alderman Bolton, have you ever had your deposition taken before?
A. No.
Q. Okay. So this is a first time experience for you. I can tell you that you're getting -- it used to be we would do these things in person. So you're really getting introduced to a whole new world here.

Let me -- since you haven't done this before and you've probably -- probably heard some of this from your counsel in prep, but let me just go over a few ground rules that I'll try to follow as well.

One is that because everything is being written down, it's really important that we try to verbalize our answers. So, you know, a lot of the nonverbal things we do to communicate, shrugs, shaking the head, they don't translate to the page. So if you could try to answer me in

Page 18

A. I do not recall.
Q. I'm just going to throw some other names out to you, Alderman Bolton, just to see if they're people who are familiar to you. We may be talking about some of them over the course of the deposition.
Do you know someone named Fay Ladon Luna?
A. No, I do not. No.
Q. What about Annette Darden who was a candidate in the 9th Ward during the 2018-2019 aldermanic election cycle?
A. I'm sorry. What is your question?
Q. Do you know someone -- did you know Annette Darden before she -- let me ask you: Do you know Annette Darden personally?
A. The issue is more visual than I am with names. The name sounds familiar. Allow me to backtrack, the name Fay Luna also sounds familiar as well.
Q. Okay. And we may talk about something that may refresh your memory on that.
What about Michael Bond, is that someone you have ever met?

Page 19

A. I have met, yes.
Q. Can you tell me how many times you have met Mr. Bond in person?
A. Maybe once or twice.
Q. Okay. As best you can recall, can you describe what those occasions were?
A. At his office.
Q. Both meetings were at his office?
A. One I can recall.
Q. And when you say his office, is that his office at Tap Room Gaming?
A. Correct.
Q. When did that meeting occur?
A. Oh, maybe 2018.
Q. I realize sometimes precise dates can be difficult. Can you give the context of sort of what was going on as best you can recall that helps you place it in 2018?
A. What events occurred around it, is that what you are asking?
Q. Yes.
A. Being introduced to the organization and their interest in supporting the community.
Q. Who initiated that meeting, you or

Page 20

Mr. Bond or someone who acted as a go between?
A. Someone else.
Q. Do you remember the name of the person who initiated the meeting?
A. John was the first name.
Q. Does the name John Kozlowski ring any bells?
A. Yes, that sounds like the name, yes.
Q. And I know you said 2018. Can you narrow that down as best you're able for me?
A. Time frame? No, I cannot.
Q. What if we said first half versus second half of 2018, are you able to place it within that?
A. I'm sorry. No, I can't.
Q. Fair enough. And Alderman Bolton, you're doing a great job at this, and I'm sure your lawyers have communicated to you. I can only ask for your best memory of things. So I never want you to guess or speculate. So I appreciate you giving me your best answers based on the limits of your memory.
I take it, Mr. Kozlowski reached out to you to set up that meeting?
A. Yes.
Q. And was this by telephone?

Page 21

A. Initially.
Q. Do you know how Mr. Kozlowski got your telephone number?
A. Probably the name way that you have gotten it.
Q. Well, I go through your lawyers, so...
Do you remember that coming up, how he had gotten your contact info?
A. As my position as an alderman.
Q. He called your regular alderman -- you have a phone number as alderman I take it?
A. Yes.
Q. And how did Mr. Kozlowski introduce himself? Did he say he was affiliated with any particular organization?
A. He did announce that he was affiliated with Tap Room, but the initial nature of the call was about assisting businesses in the community.
Q. And can you describe that a little more fully? What did he say in terms of either what types of businesses he was talking about or what type of assistance?
A. Any type of assistance that I think could benefit from charitable contributions.

Page 22

Q. I see. And was -- did you understand Mr. Kozlowski to be asking that question on behalf of Tap Room?
A. Yes.
Q. About how long did your phone call with Mr. Kozlowski last, as best you can remember?
A. Oh, maybe 15 minutes.
Q. What did you say to Mr. Kozlowski when he raised the question of possibly supporting organizations in the community?
A. What did I say in my response to him?
Q. Yes.
A. I would think about it and get back with him.
Q. And how did things transition from that phone call to you having a meeting with Mr. Bond?
A. I submitted a few names that I thought that could benefit, someone that they could connect with, and they collaborated with, and there was a -- later on, I believe, there was calls in reference I wanted to more about what they did.
Q. I'm going to because for a moment here, I don't know if you can hear, there are sirens going outside of my office, it is making it a little tough

Page 23

but it is moving past.
Okay. So, I apologize, Dr. Bolton. It made it a little tough for me to hear, but I think, if I understood correctly, you said you provided him a name of some organizations and then there was a further call, did I get that right?
A. Yes, hm-hmm.
Q. What were the organizations that you mentioned during the call?
A. I cannot recall at this time.
Q. Okay. Could you help me understand just sort by too category what the types of organizations you mentioned to Mr. Kozlowski were?
A. Organizations that they could collaborate with. As a matter of fact, they were local businesses within the 1st Ward.
Q. But I take it from your testimony that the specific names of those businesses don't come to mind at the moment?
A. Not at the moment.
Q. Is there anything -- I realize you may not have it with you, but is there anything that would refresh your memory about what organizations you mentioned at the time?

Page 24

A. Well, I was looking I thought at that time any existing business that could use some support, and I can't think of the name of it, but it was a business and the nature of their business was about giving back to the community, helping those that needed employment or needed additional training, and I can't recall the name of the business, but, yeah, that was the nature of, was one of them.
Q. Okay. And then, what, if anything, did Mr. Kozlowski say on this first call about meeting with Mr. Bond?
A. He never did say anything initially about Mr. Bond.
Q. Okay. So I take it that that -- how did you leave things with Mr. Kozlowski on the first call?
A. How did I leave on the first call?
Q. Yeah.
A. The topic basically was about ways we could assist community businesses.
Q. Okay. And then I take it there was a follow-up call?
A. Correct.

Page 25

Q. Right. And I'm just trying to get a sense here about how long after that first call did the second call occur?
A. I really can't recall.
Q. Okay. I take it, was it sometime within weeks of that first call, months, how would you characterize it?
A. I would say weeks.
Q. Okay. And tell me what transpired on the second call, what did Mr. Kozlowski say to you and what did you say to him?
A. Like I had mentioned, I indicated I would get back with him after thinking about a few names, and so I initiated the call and submitted the names.
Q. Was it on this second call that the idea of meeting with Mr. Bond came up?
A. Correct. I wanted to know a little bit more about the operation, how it was ran.
Q. Did you actually request a meeting with Mr. Bond?
A. I think it was a collaboration.
Q. So that idea of merged through your conversation with Mr. Kozlowski?
A. Yes.

Q. And then anything else about that second call you remember, Alderman Bolton?
A. Not at this time.
Q. Okay. And, again, just to give me a sense, about how long would you say that second call lasted?
A. Oh, maybe another 15, 20 minutes.
Q. Yeah, I won't -- you know, I'm just trying to get a sense, was it a two-hour call or like a 15-minute call?
A. Oh, no. Yes.
Q. Did you agree during that second call to meet with Mr. Bond?
A. I did.
Q. And, again, just to give me a sense, about how long after that second call did the meeting with Mr. Bond occur?
A. We scheduled in maybe a week or two.
Q. And I take it you went out to the Tap Room Gaming headquarters?
A. That is correct.
Q. And I think you mentioned you meet with Mr. Bond there. Did anyone else participate in that meeting?

A. Yes. It was quite a few people.
Q. As best as you can remember, either by name or by job function, tell me who else was there.
A. Some of the employees that worked for the organization. How many, maybe five or six people. I cannot recall names.
Q. Okay. Anyone you remember by just what their role was?
A. Director, security.
Q. Was there a gentleman there --
A. And other employees that worked there.
Q. Was there a gentleman there you understood to be a former law enforcement officer of some type?
A. I do not recall.
Q. All right. Was Mr. Kozlowski there?
A. Yes, he was.
Q. Was that your first time meeting Mr. Kozlowski in person?
A. That is correct.
Q. I take it this was also your first time meeting Mr. Bond?
A. Correct.
Q. Can you just sort of visually describe for me what happened when you got to Tap Room, what you observed, where you went, and obviously I'm going to ask you about the meeting but first I would like to get you to set the stage, if you would.

A. You walk in to the facility, you're checked with security, and basically it consists of giving me a tour and how the business is operated.
Q. Okay.
A. That, in general.
Q. Who actually guided you on the tour?
A. Oh, my goodness. I do not recall.
Q. I was just wondering whether it was Mr. Bond himself.
A. No.
Q. And at some point did you actually sit down and meet with Mr. Bond and these other folks you mentioned?
A. Correct.
Q. And tell me what was discussed during that meeting?
A. Basically, a PowerPoint was given of how the businesses operated. I asked questions in reference to how gaming is ran, talked about ways that they can contribute in the community and possibly bring change.

Q. And so, let me focus on that with you when you spoke about how they could contribute to the community and possibly bring change. Can you, as best as you're able to reconstruct it today, tell me what you said to them about that?
A. Sharing them my perspective of ways to bring economic stability more to the city and what their possible contribution could be.
Q. And I'm actually interested in that. So specifically what did you say to them?
A. We talked about economic development, after they presented a PowerPoint, in reference to what their goals could possibly be in years to come.
Q. Were there any businesses or community organizations that you mentioned in particular at that point?
A. Did I mention any businesses? No.
Q. Any community organizations in particular that you mentioned?
A. No.
Q. And the PowerPoint that they showed you at the meeting was there someone in the meeting who sort of did the talking while the PowerPoint was

being presented?
A. Yes.
Q. Who was that?
A. I do not recall.
Q. Okay. I take it it wasn't Mr. Bond or Mr. Kozlowski?
A. That is correct.
Q. And what was presented in the PowerPoint?
A. Possible future for building a casino and things that it could offer.
Q. I take it Mr. Bond and Mr. Kozlowski were present throughout this PowerPoint, they just weren't the ones kind of doing the talking while the PowerPoint was presented?
A. That is correct.
Q. And did someone explain during this meeting why they were talking to you about a casino -- a possible casino at this point?
A. I believe I had the understanding that the city wanted to bring jobs into the community as well as, as I mentioned before, economic development.
Q. Here's what I'm asking: If I understand the chronology correctly, the gaming expansion bill

that authorized a casino in Waukegan became law toward the middle part of 2019. I guess what I'm trying to understand is what did the folks you were meeting with tell you about why they thought now was an appropriate time to be talking about a potential casino in Waukegan?
A. So I'm understanding you're asking why -- clarify.
Q. Sure. So, if I understood correctly -- and maybe I should -- I may be assuming something and I shouldn't.
This meeting with -- at Tap Room Gaming, did this occur also in 2018 as best you can recall?
A. Yes. If I recall, yeah.
Q. And would you agree with me that back in 2018, there wasn't yet legislation passed that authorized a casino in Waukegan?
A. I am not sure.
Q. So let me just ask you: Did anyone at the meeting say anything about why they expected that a casino could be built in Waukegan?
A. No. I don't recall, no.
Q. Can you describe -- well, I take it the

PowerPoint included images of the proposed casino?
A. Yes, it did.
Q. Did the images place the casino at a particular location in Waukegan?
A. I do not recall.
Q. Let me ask you this. Of course, later on, as part of the casino review process that occurred in 2019, you saw renderings of various proposed casinos envisioned for the Fountain Square site. Do you recall that?
A. I do.
Q. Did any of the images you saw at this Tap Room Gaming meeting you have been describing include images of the casino that appeared to be at Fountain Square?
A. No.
Q. Do you remember -- let me ask just a more open-ended question. Describe for me, as best you can, I know you don't remember precisely which person was talking during the PowerPoint, but describe to me as best you can what was said in this meeting about the proposed casino.
A. Nothing was said about a proposed casino other than just future opportunity.

Q. Okay. Did you have an understanding of who would be developing this proposed casino?
A. It possibly was discussed, yes.
Q. Okay. What was your understanding from what was discussed at the meeting?
A. It would be that particular organization.
Q. So, in other words, Tap Room in some way would be developing this casino?
A. Correct.
Q. Let me ask you this: Did Mr. Bond talk at some point during this meeting?
A. Yes.
Q. What did he say?
A. Other than introducing himself and sharing his history, who he is, and I'm sure he explained his role with the company.
Q. What did he say about his role at the company?
A. Oh, my goodness. I do not -- he explained basically his job task. Of what exactly that was, I'm not sure. I can't recall.
Q. Did you understand him to be basically in charge of Tap Room?
A. Not at that time.

Q. What was -- in general terms, what understanding did you have of what Mr. Bond's role in Tap Room was?
A. General understanding, part as building the casino.
Q. I'm going to throw out another name just to see if it sparks any recollection. Does the name Andrew Hochberg mean anything to you?
A. No.
Q. Alderman Bolton, what did you say during this meeting?
A. After the PowerPoint, I was interested in not only what they could contribute to the community but also what else that in addition to the casino that they could possibly bring. I was basically interested in not only jobs, but also what other entertainment options, how they would be as far as restaurants and theaters and things like that other than just casino.
Q. Gotcha. And what did the -- did anyone at the meeting respond to those questions you raised?
A. They did.
Q. And what did they say?

A. In the conversation, they did indicate, possibly, yes, they could bring theater, restaurants, some other form of entertainment other than just casino.
Q. Alderman Bolton, going back to that point in time, so sometime in the 2018 period when you're attending this meeting, in your role as alderman, had you publicly taken a position one way or the other about whether you were in favor of a casino for Waukegan, against a casino for Waukegan?
A. So am I hearing you ask -- clarify.
Q. Yeah. So pulling away from the meeting for a moment, going back to 2018, at that point, you were still in your first term as alderman, correct?
A. Correct.
Q. At the time when you went to this meeting with Mr. Bond and the other people at Tap Room, had you publicly, in your role as an alderman, taken a position either for or against the idea of a casino coming to Waukegan?
A. I had not.
Q. Did you personally -- had you personally formed a view at that point in time about whether a casino coming to Waukegan was a good idea or a bad

idea?
A. I had not formed a position at that time.
Q. About how long did the meeting at Tap Room Gaming?
A. Maybe an hour.
Q. Would that hour include the tour or is that just the sit down part of it?
A. That would include the tour.
Q. Is there anything else anything else you recall about the meeting in terms of what you said or what anyone at the meeting said to you?
A. Not at this time.
Q. Were there any -- did you leave the meeting with any understanding about that there were would be further communications around the issues you had discussed with the Tap Room personnel at the meeting?
A. I did not.
Q. How did the meeting end?
A. I thanked them for the presentation and introduction and allowing me to come and take the tour, and then I left through security and that was it.
Q. At any point during this meeting, did the

issue of support for your campaign come up at all?
A. No.
Q. Okay. Alderman Bolton, after that meeting, did you have any other in-person meetings with Michael Bond? And I'm excluding here -- I know there were, you know, public City Council meetings that Mr. Bond may have attended, but apart from City Council meetings, did you have any other -- any other meetings with Mr. Bond yourself?
A. I did not.
Q. What about Mr. Kozlowski, did you see him again after this Tap Room Gaming meeting?
A. I did not.
Excuse me. Can I get a drink of water? Thank you.
Q. Yeah. Sure.
If I expanded the question to include any form of communications, so emails or phone calls or text messages, after the Tap Room Gaming meeting, did you have any additional contact with either Mr. Bond or Mr. Kozlowski?
A. No.
Q. Alderman Bolton, I think we got on that discussion of the Tap Room Gaming meeting because I

Pl. SJ Ex. 125

THE VIDEOGRAPHER: Let's go off the record at 12:04.

(Whereupon, a break in the proceedings was taken.)

THE VIDEOGRAPHER: We're back on the record at 12:12 p.m.

BY MR. SMITH:

Q. Alderman Bolton, I asked you I think way back toward the beginning of the deposition whether you knew Mayor Cunningham and we talked about that.

Did you know any of your fellow -- now fellow aldermen before you became an alderman?

A. Yes.

Q. Who did you -- who of the members of the City Council did you know personally before you became an alderman?

A. Alderman Newsome.

Q. Anyone else?

A. Not that I recall, no.

Q. How was it that you were acquainted with Alderman Newsome?

A. In the community.

Q. I know he was not on the City Council when you joined. He was elected in -- actually both

Alderman Kirkwood and Alderman Turner were elected in 2019.

Did you know either of them personally before they joined the City Council?

A. No, I did not.

Q. Alderman Bolton, during the summer of 2009 -- actually in the middle of June, which is technically the summer, there was a -- there came before the City Council a proposed ordinance to amend the city's liquor and video gaming code by establishing a downtown entertainment district.

Do you remember that issue coming before the City Council?

A. I do recall.

Q. You said you do recall?

A. Yes.

Q. Your video seems to have frozen there.

A. How about now?

MR. INSLER: I can see her fine.

MR. SMITH: I can hear.

(ZOOM technical difficulties.)

BY MR. SMITH:

Q. So you said you did remember -- you do remember that issue coming before the City Council.

A. Yes.

Q. My understanding is that when that issue first came up before the City Council in mid June, you voted against proposed ordinance but then at the next City Council meeting, you voted in favor of reconsidering and then you voted in favor of the ordinance; am I right about that?

A. I believe so.

Q. One thing you said at the City Council meeting where you voted in favor of the ordinance was, in substance, you said you had originally voted against the ordinance, but now that you understood the issue better, you were going to vote in favor.

Do you recall making that general statement?

A. I do recall.

Q. So can you explain why you initially voted against the creation of the entertainment district and then what you learned in the meantime that led you to change your position on that proposed ordinance?

A. I think there was concern with the constituents throughout the city wanting to gaming throughout the city but more or less in our

entertainment district. So there became a clarification about that once I understood that.

Q. Between your initial vote opposing the creation of the entertainment district and your vote in favor, did you discuss that that proposed ordinance with anyone in the city government?

A. Yes, I do recall.

Q. Okay. Who did you discuss the ordinance with?

A. His first name is Thomas.

Q. Okay. Would that be Thomas Mallard?

A. Yes.

Q. Tell me what -- did you seek out Mr. Mallard or did he seek out you to discuss the ordinance?

A. I do not recall.

Q. Tell me what you remember about your conversation with Mr. Mallard?

A. Well, indicating that what I just stated, how this particular area of the city will be allocated for entertainment.

Q. Is that in substance all that you remember Mr. Mallard saying to you about it?

A. In summary.

Page 102

Q. Anything else you remember Mr. Mallard telling you about the ordinance?
A. I do not recall.
Q. What is your understanding of Mr. Mallard's position in city government?
A. He's a director of governmental operations.
Q. Did Mr. Mallard convey to you what the mayor's view were about the ordinance?
A. I do not recall.
Q. When you say you don't recall that, do you mean you don't recall one way or the other?
A. Correct.
Q. Were you aware when you were speaking to Mr. Mallard about the ordinance that he had some past connection to Tap Room Gaming?
A. No. No, I don't recall that.
Q. Did you -- do you recall speaking to anyone else about that proposed ordinance?
A. No, I do not.
Q. Did you understand that the ordinance was something that was desired by the video gaming industry?
A. No, I do not.

Page 103

Q. Did you have an understanding one way or the other about whether the video gaming industry was in favor of the ordinance?
A. No, I don't recall. No.
MR. SMITH: I apologize, Alderman Bolton. At least for me your image is freezing up. I assume no one else since saying anything, that may be a problem on my end.
MR. INSLER: Correct.
MR. SMITH: As long as the videographer is getting you, then we're fine.
BY MR. SMITH:
Q. Alderman Bolton, I take it you recall that during the summer of 2019, the city of Waukegan issued a request for proposals seeking the submission of proposals for a casino in Waukegan. Do you recall that generally?
A. I'm not sure.
Q. Do you remember generally the city proposed a building a casino in Waukegan?
A. Yes.
Q. This may be obvious from your previous answer but did you have any role in the city's efforts to prepare the request for proposals to be

Page 104

submitted?
A. No, I did not.
Q. When did you first become aware that there was legislation likely to pass that would authorize a casino to come to Waukegan as best you can recall?
A. Restate the question.
Q. At some point you became aware that there was legislation passed by the Illinois General Assembly that authorized the expansion of gaming in Illinois including a potential casino in Waukegan, correct?
A. Yes.
Q. That legislation was signed into the law -- into law by Governor Pritzker towards the end of June 2019. Is that consistent with your memory about when that law came to --
A. I would say so, yes.
Q. Do you remember was there a point before that legislation came into law when you became aware that Waukegan was likely to be a potential casino site under the legislation making its way through the General Assembly?
A. I would say yes.

Page 105

Q. Do you remember when you became aware of that?
A. No, I do not.
Q. Let me ask it this was: Was it something you were aware of already when you were campaigning for alderman?
A. No, not during my campaign, no.
Q. Do you remember how it was brought to your attention that the General Assembly was likely to pass gaming expansion legislation that included Waukegan as the potential casino site?
A. I do not recall.
Q. Was that an issue you ever discussed with Mr. Kozlowski?
A. No, not that I recall.
Q. At some point in the summer of 2019 the City Council voted to authorize the city to retain the services of an outside consultant to assist in the review of casino proposals. Do you remember that?
A. I do not recall.
Q. Do you remember at some point that the city retained a consultant called Johnson Consulting to assist with its review of the casino proposals?

and I know there are some other mailers you did with some different photographs. Who was it who told you, you know, Alderman Bolton, we're going to do a particular -- we're going to do a photo scoot on this day for your campaign literature so we need you to, you know, show up at such and such a place at such and such a time, who conveyed that information to you?
A. I would say Jon.
Q. Who is the tall gentleman pictured in the photo with you there?
A. I'm not sure if you have gotten a release -- well, we got a release. His last name is Jones, Jonathan Jones.
Q. Is he just someone you know from the 1st Ward?
A. That is correct.
MR. SMITH: Alderman Bolton, I think we're about done. If you don't mind indulging me, I'm going to through my notes for a minute. Rather than going off the record, it may be just faster if we all hang on while I do that if you don't mind.
THE WITNESS: Sure.

BY MR. SMITH:
Q. Alderman Bolton, you mentioned that Mr. Mallard had come and spoken to you about the entertainment district ordinance. Did Mr. Mallard ever speak to you about any other gaming related issues coming before the City Council that you can recall?
A. No.
Q. And if we focus on the period from your votes on the casino proposals and earlier, can you recall any other instance where Mr. Mallard came and talked to you about a particular matter coming before the City Council?
A. No.
Q. Are there any conversations you had with anyone about a possible casino in Waukegan that I just haven't asked you about over the course of the deposition today that you can recall?
A. Have anyone come to me and talked to me about --
Q. Let me ask a more precise question. In the period up until the votes on the casino proposals, so the period up until October 21, 2019, other than, you know, discussions within the City

Council and hearing from constituents about, you know, their views on casino proposals, are there any other discussions, whether face-to-face or by phone or by email that you had about casino proposals in Waukegan that you can recall that just hasn't come up in the course of your deposition today?
A. Yes. I believe his name is Tim, but I don't remember Tim's last name, who worked for Potawatomi.
Q. Tim Mahone, thank you. Was that a phone call after the initial vote on the casino proposals at the special City Council meeting?
A. I'm sorry. Your question?
Q. I was asking about when that call from Tim came, was that after the initial vote on the casino proposal's certification?
A. I recall, I think so.
Q. And did you actually speak to Tim or did he leave you a message?
A. I do recall speaking with him.
Q. And was he calling to see whether you would support a motion to reconsider the Potawatomi proposal, was that the subject of the call?
A. I do remember them asking why did I vote

the way that I did, and the previous information I shared with you, I shared with them in regards to their proposal.
Q. I'm sorry. I cut you off. I missed the end of your answer. Go ahead.
A. It was in reference to the proposal.
Q. You said them, was there someone besides Tim on the call?
A. Yes, I'm not sure if he was on the call but he made reference to someone I think on the board of Potawatomi.
Q. I think I lost you there. Who made reference to someone on the board?
A. Tim had made reference about someone that's on the board. They were not actually on the call, but he had made reference in the conversation.
Q. So tell me, as best you can recall, what do you remember Tim saying?
A. Them asking me why did I vote the way I did and would I -- I think it may have included would I -- basically it was about why did I vote the way I did, and I shared with them, looking at their proposal, I was looking for their certain things like theater, restaurants, and additional things

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAUKEGAN POTAWATOMI CASINO, LLC, an Illinois Limited Liability Company,

Plaintiff,

-vs-

CITY OF WAUKEGAN, an Illinois Municipal Corporation,

Defendant.

JUDGE JOHN F. KNESS

MAGISTRATE JUDGE M. DAVID WEISMAN

No. 1:20-cv-750

Zoom videotaped deposition of LYNN M. FLORIAN, D.C., taken before KAREN KOSTAS, CSR, RMR, CRR, RDR and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 311 South Wacker Drive, Suite 3000, in the City of Chicago, Cook County, Illinois, at 9:30 a.m. on the 4th day of February, 2021.

APPEARANCES:

VIA ZOOM:
FREEBORN & PETERS LLP by
MR. DYLAN SMITH
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
312-360-6000
dsmith@freeborn.com

on behalf of the Plaintiff;

VIA ZOOM:
HEPLER BROOM LLC by
MR. GLENN DAVIS
MS. MEGHAN RIGNEY
30 North LaSalle Street
Suite 2900
Chicago, Illinois 60606
312-230-9100
glenn.davis@heplerbroom.com
meghan.rigney@heplerbroom.com

on behalf of the Defendant.

ALSO PRESENT:
MR. CHRISTIAN SALMON
Legal Videographer
Veritext Legal Solutions.

- - - - - - - - - -

INDEX

| WITNESS | PAGE |
|---|---|
| LYNN M. FLORIAN, D.C. | |
| Examination by Mr. Smith | 6 |
| Examination by Mr. Davis | 185 |
| Re-Examination by Mr. Smith | 191 |

EXHIBITS

| NUMBER | MARKED FOR ID |
|---|---|
| Deposition Exhibit | |
| Exhibit 33 Audio and Video Clip City Council Meeting | 128 |
| Exhibit 54 City of Waukegan's First Amended Answer To Waukegan Gaming, LLC's Interrogatories Certificate of Service Bates WKGN 006213 - 6220 | 46 |
| Exhibit 55 Text messages Bates CW01175 - 01176 | 73 |
| Exhibit 56 Text Messages Bates WKGN 008509 - 008514 | 79 |
| Exhibit 57 ProPublica - From Truck Stops to Elections, a River of Gambling Money Is Flooding Waukegan | 83 |

| NUMBER | MARKED FOR ID |
|---|---|
| Exhibit 58 Casino Developmer and Operator Solicitation Waukegan, IL Advisory Services Report Bates WKGN 010914, 011076, 010915, 011075, 010916, 011074, 010917, 011073, 010918, 011072, 010919, 011071, 010920, 011070, 010921, 011069, 010922, 011068 | 106 |
| Exhibit 59 City of Waukegan Resolution No. 19-R-99 Bates WKGN 010850 - 010853 | 121 |
| Exhibit 60 Collection of Documents 214 Pages Bates WKGN 010854 - 11067 | 133 |

EXHIBITS ATTACHED

- - - - - - - - - - -

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:42 a.m. on February 4th, 2021.

This is Media Number 1 of the video-recorded deposition of Dr. Lynn M. Florian taken by counsel in the matter of Waukegan Potawatomi Casino, LLC, plaintiff, versus City of Waukegan, defendant, filed in the United States District Court for the Northern District of Illinois, Eastern Division. Case Number 1:20-cv-750.

This deposition is being held via Zoom video conference.

My name is Christian Salmon, I'm the videographer, and the court reporter is Karen Kostas, both in association with Veritext Legal Solutions.

Would counsel and all present please introduce yourself after which the court reporter will swear in the witness.

MR. SMITH: Yes. Good morning. Dylan Smith of Freeborn & Peters for Waukegan Potawatomi Casino, the plaintiff.

MS. RIGNEY: Meghan Rigney from

Pl. SJ Ex. 126

Mr. Long.
When did you reach out to Mr. Long about issues you were having with Mayor Cunningham?
A I think we sat down the same day. I met Terry in the morning and I think I saw Mr. Long in the afternoon.
Q Let's -- Let's stick with your meeting with Terry Link for a moment.
I take it the meeting did take place at the Starbucks in Libertyville on August 8th, 2019?
A I don't remember the exact date, but that seems plausible. It was summer, for sure.
Q And about how long did you meet with Senator Link?
A This is probably accurate. It was probably about an hour.
Q And I take it one of the topics you discussed with Senator Link was this issue about your relationship with Mayor Cunningham?
A Yes.
Q Just going by topics, so I have some

roadmap in asking you about this meeting, what other topics came up during the meeting you had with Senator Link?
A Well, he talked about the downtown entertainment district. We had -- We had -- I voted no, but the Council had just passed a downtown entertainment district ordinance. And he -- he told me that that was something Michael Bond had -- had wanted done. And initially it had failed and an alderman changed their vote and then it passed the second time. And so he talked about that a little bit.
And then he talked about the casino bill and tried to convince me what a great thing a casino is going to be for Waukegan and how nicely dressed the people are that go there and blah, blah, blah.
And he did tell me that, as it says here, that he felt the Rivers proposal was the best one and that we'd be, I don't remember what word he used, but something along the line of we'd be fools if we didn't approve Ludwig's proposal.

Q All right. So let me break those down a little bit and let me focus on the second one you mentioned which is this question of the entertainment district.
And just to make sure we're talking about the same thing, my understanding is that initially at its June 17th, 2019 meeting the City Council voted down a proposal to create an entertainment district in the downtown section of Waukegan.
Am I generally right about that?
A Yes.
Q All right. And without getting too detailed about it, my understanding is that this proposal would have within this entertainment district eliminated distance requirements that otherwise apply to video gaming establishments and places that serve alcohol?
A Yes.
Q And then at the subsequent City Council meeting at the very beginning of July, 2019, you mentioned a member of the City Council changed her vote and that was

enough to allow the proposal to carry.
Have I got that right?
A It wasn't a her, it was a him.
Q Okay. Thank you for that clarification.
Am I correct that both Alderman Rivera and Alderman Bolton changed their votes?
A Oh. Oh, oh, oh. I forgot about that. I thought only one changed their vote, but you're right, I think it was two.
Q And the reason two were needed to make the difference was that in between the first and second vote, Alderman Kirkwood, after initially supporting the proposal, then abstained during the second vote, am I right about that?
A Yes.
Q Do you have an understanding --
THE REPORTER: Excuse me one second. What was the alderman's name?
MR. SMITH: Kirkwood. K-i-r-k-w-o-o-d.
THE REPORTER: Okay. Thanks.

Development Committee comes second at 11062, I take it based on the times that are listed on the top of each document that first you meet in committee and then there's the City Council meeting after that.

Have I got that sequence right?

A Yes.

Q All right. And then the following page are handwritten notes.

Are these your handwritten notes?

A Yes.

Q Okay. And on the original, are these notes on the back page of either the City Council agenda or the Community Development Committee agenda?

A It's on the back of the Community Development Agenda.

Q And is this a note you wrote to yourself or to someone else?

A Just to myself.

Q Okay. And it says Michael Bond must have paid a visit to Dr. Bolton since last meeting.

What did you mean by that?

A Well, I don't know that I can say for sure since it was a year and a half ago. But I'm assuming it has to do with the fact that she changed her vote.

Q And what was it in your mind that connected Mr. Bond to Dr. Bolton?

A Just the fact that his PAC supported her campaign. And that this -- I knew this item on the agenda was going to be helpful for Mr. Bond.

Q Did you ever talk to Dr. Bolton about why she had --

A No.

Q -- switched her vote?

A No, I did not.

Q And so to be fair, Dr. Florian, this is an inference you were drawing to yourself rather than something that was based on direct information you had from either Dr. Bolton or Mr. Bond?

A Yes.

Q Then, Dr. Florian, if you -- if you look at the next page --

MR. SMITH: Meghan, I just noticed

Glenn seems to have stepped away. Should we pause for a moment?

MR. DAVIS: I'm here.

MR. SMITH: Okay. Okay.

BY MR. SMITH:

Q Dr. Florian, starting on -- And I will say in the exhibit -- And I apologize to everyone, I had to make a choice between keeping the numbering legible or getting things so they were right side up.

But what is Page 210 of the exhibit which is Bates stamped 11064, I will state for the record to everyone that I actually went in and manipulated the image so it was right side up before marking this as an exhibit.

Do you recognize these notes?

A That's not my notes. I don't know. That's not my handwriting.

Q Okay. Okay. Okay. So I will not ask you about -- about those notes.

And Dr. Florian, I think we're -- we're done with exhibits, at least for a while, and maybe for the afternoon. So if -- if you want to go back to just getting to see

all of us, you're -- you're welcome to do that.

Dr. Florian, after the City Council voted on October 17th, 2019 on the casino proposals, am I right in understanding that you were contacted at some point after that meeting by a representative or representatives of Potawatomi about a possible motion to reconsider the vote as to their proposal?

A Yes.

Q Okay. Can you describe for me what you recall about that contact?

A We voted on a Thursday night. On Friday, a friend of mine called me and said that an attorney wanted to speak to me about the Potawatomi proposal. I told her to have him call me at one o'clock because I was working.

And at one o'clock he walked into my office. It was Mr. Winter, I believe, Bryan Winter. And he had the document, the request for agenda item motion to reconsider, which I'm sure is in your exhibits somewhere.

Mr. Moisio had signed the document

already. It needed three signatures. And we had a conversation, I don't remember exactly what we said, but we had a short conversation. I decided to sign it thinking they'd never get a third person to sign it, but they did. And then that was the only contact I had with him that day.

Q That's helpful.

You said Mr. Winter, at least as you understood it, had reached out to a friend of yours first. Who was the friend?

A Charlotte Callahan Wozniak.

Q Okay. And was that someone that just happened to be a mutual acquaintance?

A Yes.

Q And I appreciate you don't remember the, you know, actual, you know, words of your meeting with Mr. Winter, but can you describe for me as best you can recall the substance of the conversation or the gist of it.

A Well, he was asserting that they felt because there was no audience time they needed a chance to re-present their proposal and they wanted to get on the agenda for the

next meeting. This was the first time I had ever seen a document like this. And he explained to me that if three aldermen signed it, it would go on the agenda, so...

Q And why did you think that they wouldn't be successful in getting three signatures?

A Well, it was 1:00 o'clock, they needed to get it done by 4:00. And I don't know, I just didn't think anyone else would sign it.

Q And why did you sign it?

A Well, I do -- I did feel at the time when we held this meeting, I specifically asked Mr. Long if we needed audience time and he said no. And we always have audience time. And my training I took to become an aldermen said any time you have a council meeting, you have audience time. So I was concerned about the fact that we did not have audience time.

And at this point I realized there was a possibility we could be sued over this, and I thought, well, if we put him on the agenda, we already -- we voted to send three

proposals, why not send all four and avoid a lawsuit. And here I am deposing for a lawsuit.

Q Right.

Dr. Florian, did there come a time after you signed that request for agenda item seeking to put a motion to reconsider on the agenda for the Potawatomi proposal, did there come a time where Mayor Cunningham talked to you about the fact that you had signed that?

A Yes.

Q And was that in person or a phone call?

A It was a phone call.

Q Can you describe the phone call to me.

A He was on speakerphone with Clerk Kilkelly. And it was about 4:15 maybe, 4:20. They were both very upset about the fact that I had signed this document. I was told they couldn't change the agenda. They weren't changing the agenda. And that's all I remember specifically, but...

Q You mentioned they were upset. What

was it about either their words or their demeanor that suggested to you they were upset?

A Well, there was a bit of yelling and -- and it was -- Neither one of them were happy. And I said Alderman Moisio signed it first, I hope you're going to call and have the same conversation with him.

Q Who was yelling?

A Both Janet and the mayor. The clerk and the mayor.

Q Anything else you recall about that conversation?

A No.

Q What did they say when you said I hope you're going to call Alderman Moisio?

A I don't think I got an answer.

Q Okay.

A It was more a rhetorical question, I guess.

Q Were there any other contacts that you recall around this issue of signing the -- the request to reconsider?

A With Potawatomi, or?

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAUKEGAN POTAWATOMI CASINO, LLC, )
an Illinois limited liability )
company, )
)
Plaintiff, )
)
-vs- ) Case No. 1:20-cv-750
)
CITY OF WAUKEGAN, an Illinois )
municipal corporation, )
)
Defendant. )

Videotaped deposition via videoconference of ROUDELL KIRKWOOD, Ph.D., taken before TRACY L. BLASZAK, CSR, CRR, and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 100 Martin Luther King Jr. Avenue, in the City of Waukegan, Lake County, Illinois at 9:31 a.m. Central Standard Time on the 5th day of March, A.D., 2021.

There were present at the taking of this deposition via videoconference the following counsel:

FREEBORN & PETERS LLP by
MR. DYLAN SMITH
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 360-6394
dsmith@freeborn.com

on behalf of the Plaintiff;

HELPER BROOM LLC by
MR. GLENN E. DAVIS
MS. MEGHAN A. RIGNEY
30 North LaSalle Street
Suite 2900
Chicago, Illinois 60602
(312) 230-9100
gdavis@heplerbroom.com
mrigney@heplerbroom.com
on behalf of the Defendant;

ALSO PRESENT: Mr. Mark Lyle
Legal Videographer.

- - - - -

VIDEOTAPED DEPOSITION OF
ROUDEL KIRKWOOD, Ph.D.

March 5, 2021

| EXAMINATION BY: | PAGE |
| --- | --- |
| Mr. Dylan Smith | 6 |

* * * * * *

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 93 | Form D-1 statement or organization Friends of Roudell Kirkwood | 75 |
| Exhibit 94 | Form D-2 report of campaign contributions and expenditures quarterly report Friends of Roudell Kirkwood filed 5/16/19 | 78 |
| Exhibit 95 | Form D-2 report of campaign contributions and expenditures quarterly report Friends of Roudell Kirkwood filed 7/10/19 | 96 |
| Exhibit 97 | Form D-2 report of campaign contributions and expenditures quarterly report Friends of Roudell Kirkwood filed 1/14/20 | 116 |
| Exhibit 98 | Video clip | 152 |
| Exhibit 99 | Campaign mailer for Roudell Kirkwood | 157 |
| Exhibit 101 | Illinois Gaming Board video gaming location disclosure of records Mac Dynasty Inc. 12/21/18 | 20 |

| EXHIBIT | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 102 | Google Maps picture | 29 |
| Exhibit 103 | Google Maps picture | 32 |
| Exhibit 104 | Illinois application to adopt an assumed corporate name 6/27/19 | 35 |
| Exhibit 105 | C.Y.O.C. Facebook page | 38 |
| Exhibit 106 | Illinois Gaming Board video gaming report for Mac Dynastic Inc. Jan 2019 to Oct 2019 | 43 |

* * * * * *

INDEX OF EXHIBITS PREVIOUSLY MARKED

| EXHIBIT | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 90 | Defendant's supplemented answers to plaintiff's second set of interrogatories | 52 |

* * * * * *

THE VIDEOGRAPHER: Good morning. We're going on the record at 9:31 a.m. The date is Friday, March 5th, 2021.

Please note the microphones are sensitive and can pick up whispering or private conversations or cellular interference. Please turn off cellphones or place them away from microphones as they can interfere with deposition audio. Audio and video will continue until parties agree to go off the record.

This is media unit No. 1 of the virtually recorded deposition of Alderman Dr. Roudell Kirkwood taken by counsel for plaintiffs in the matter of the Waukegan Potawatomi Casino vs. the City of Waukegan. This case is filed in the U.S. District Court for the Northern District of Illinois, Eastern Division.

This deposition is being held remotely and our witness is located in Waukegan, Illinois.

My is Mark Lyle. I am today's video technician. Our court reporter is Tracy Blaszak. We're here on behalf of Veritext Legal Solutions.

I'm not authorized to administer an oath. I'm not related to any party in this action, nor am I financially interested in the outcome.

First we will have counsel introduce themselves

educational administration. I have a doctorate from Northern Illinois University.
Q And is the doctorate in education?
A It's in adult education and psychology.
Q Okay. And I know you have been a professional educator for many years over the course of your career, and I don't necessarily want to spend too much time sort of going through that, but if you could maybe -- if there is a way to summarize for me kind of your professional experience after you got your doctorate, at least focusing for now on your experience as an educator?
A Since my doctorate?
Q Please, yes.
A I was principal at North Chicago Community High School, principal at Rich South High School, and principal at Proviso West High School.
Q And I should have asked you this, what year did you get your doctorate?
A 2001.
Q I see.
So I take it you got that after you had been in the workplace for a number of years?
A Yes, I started in 1974, '75.

Q Okay. And what year did you get the double masters?
A 1978, '79.
Q Okay. And I take it you're -- did you retire at some point from the education field?
A Yes.
Q All right. What year did you stop working in education?
A I think it was -- I think it was 2016. I'm not totally sure.
Q And I'm just trying to get a general sense of your -- it doesn't have to be the exact year.
Can you, then, if we take it from 2016 or thereabouts, walk me through kind of what your professional life has been like since -- what was the last job in education you held?
A I was principal at Proviso West High School in Hillside.
Q And how long had you been at Proviso West?
A I believe it was two years.
Q So could you just walk me through what your professional life has been since you left Proviso West?
A I've done some educational consulting in the Wisconsin, Illinois, and Missouri area.

Q Any other employment? And for now I'm not talking about sort of entrepreneurial stuff, but just regular wage employment.
A I worked at Walgreens for a little bit.
Q Okay. And, again, I'm not looking for precise dates but just give me a sense how long did you work there?
A Probably two years.
Q And what was your role at Walgreens?
A I was the shift lead.
Q Was that in -- at a branch in Waukegan?
A Yes.
Q And then I also understand, Dr. Kirkwood, that at some point you became president of a corporation called Mac Dynasty, Inc., is that correct?
A Yes.
Q And is that a business you have any other business partners in or are you the owner of it?
A Yes, I'm the president of the corporation.
Q Okay. And do you also own the company?
A Yes.
Q Okay. And do you have any business partners or is that basically your business?
A Well, my son assists me.

Q And I should have asked you this. My understanding is Mac Dynasty operates a bar and lounge at what was the location of the Long Sing Restaurant on North Green Bay Road, is that correct?
A Yes.
Q And is it just that one location that Mac Dynasty owns or do you have more than one location?
A That's the only one that I'm involved in.
Q Got you. Okay.
And you said you're involved -- your son -- you're the president, your son assists you. I guess first to start with you, just to give me a sense, are you involved in the day-to-day operations of the bar and lounge or --
A No.
Q -- do you have someone else -- Okay.
So who sort of manages the operations for you?
A My son.
Q Okay. And, Dr. Kirkwood, I want to ask you a little bit about that business, but I'm going to focus on the period -- I'm not so interested in sort of what's going on currently but my focus is going to be on the period up through late October, 2019, so just to kind of direct your attention there.

Page 18

raised this.
Is this the person you're talking about or was it someone else from the community who brought it to your attention?
A It was someone else.
Q And who was that person?
A I don't know her name. Like I said, it was a community member from one of the local churches wanted to meet with me. I don't know her name. Would recognize her if she walked past me.
Q Got you. Okay. And I take it that once that issue was brought to your attention, you've also as an alderman recused yourself from votes relating to video gaming, am I right about that?
A No, alcohol.
Q Okay. So I'll take up alcohol separately. So let me just make sure.
I was under the impression, and correct me if I'm wrong, that you had made a decision not to vote on matters that related to video gaming just given your interest in Mac Dynasty.
Am I wrong on that?
A I have voted in the past. Not lately.
Q Okay. Do you have a kind of set guideline in

Page 19

your mind that you follow on when you will refrain from voting on a gaming issue versus when you feel it's appropriate to do so?
A Yes, based on the law as far as elected officials.
Q And I'm not asking, I don't want to get into legal advice you've received, but when you say based on the law, what are you referring to there?
A What an elected official can do in terms of whether it's alcohol or gaming issues.
Q Okay. And I didn't ask a very good question. I guess I mean, is that source of law State law, Waukegan municipal law, as you understand it, some combination of both?
A Combination of both.
Q Okay. And you mentioned that you refrain from voting on I think matters before the City Council relating to the distribution of alcohol.
Did I get that right?
A That is correct.
Q And is that because of the fact that the bar and lounge has a liquor license?
A That is correct.
Q And you understand that to be a legal

Page 20

requirement that as an alderman with an interest in an establishment that serves alcohol that it's -- you're supposed to refrain from voting on those matters and that's why you do that, is that correct?
A Yes.
Q So let me ask you to take a look at a document, Alderman Kirkwood, that may just help us pin down a little bit of the timing on the Mac Dynasty question.
If you've hopefully been set up with this program Exhibit Share that was causing us fits this morning, you should be able to access what has already been marked as Exhibit 101. So we're going a little bit out of order here.
(Exhibit 101 marked and tendered to the witness.)
MR. SMITH: Q Let me know when you've been able to pull that up and take a moment to scroll through it. And just kind of look up and let me know when you're ready.
A So we're looking at the Illinois Gaming Board.
Q Yes. Just to make sure we're all looking at the same thing and also for the record, Exhibit 101 is a document with the Illinois Gaming Board heading, and it is entitled, video gaming location disclosure of

Page 21

records. And the applicant identified there is Mac Dynasty, Inc., with a disclosure date of December 21st, 2018.
Dr. Kirkwood, my first question for you is have you seen this document before?
A Yes. It's been a while.
Q Okay. Do you recognize this as the video gaming disclosure that Mac Dynasty filed with the Illinois Gaming Board back in December of 2018?
A I don't recall.
Q Okay. Fair enough. And when you say you don't recall, I just want to make sure, that can mean a couple of different things.
So when you say you don't recall, is it that you don't recall whether or not you've seen this document before?
A No, I don't recall the exact dates and everything.
Q Sure.
A But I do know that I remember this particular, you know, document, but not all of the detail as I see it right now.
Q Sure. Fair enough. Okay. I take it it's been some time since you've looked at this document?

A Absolutely.
Q Yes. Okay. Well, that's fair.
And without getting into specifics, I take it you generally recognize it as a disclosure that Mac Dynasty filed with the Illinois Gaming Board?
A Yes.
Q Okay. So if I could ask you to look at the -- scroll down to the second page of Exhibit 101.
A The second page?
Q Yes. So it will be items -- it's the page where there are sort of numbered items starting. So I'm actually going to be directing your attention to item 2 there. It's where there is information about Mac Dynasty dba Long Sing restaurant.
Do you see where I am?
A Yes.
Q So at this point, and just to remind us, the disclosure that we're looking at here in Exhibit 101 is dated December, 2018. At this point in time at least according to the disclosure it says that Mr. Le Mac is the president and 100 percent owner and that you, Mr. Kirkwood, are video gaming manager.
Was there some transition period where you were the video gaming manager before you became the owner of

Mac Dynasty, Inc.?
A That is correct.
Q Okay. Can you just explain to me how that evolution took place?
A Well, I believe that the deal had not been consummated, and so I was the video gaming manager for a while before we consummated the deal.
Q Okay. So at this point in time your purchase of Mac Dynasty was contemplated, but it just -- the deal hadn't been completed yet, is that right?
A Yes.
Q Got you. Okay.
And what did being video gaming manager involve from your perspective?
A Making sure that, you know, the rules were being followed and making sure that individuals came in were of age.
And, like I said before, there were other individuals that when I was not there, they would make sure that people were at the right age and, you know, there was no alcohol being in that particular area that would spill on the games and things of that nature.
Q Got you.
And just to make sure I'm clear on this, when

you acquired Mac Dynasty, were there already video gaming terminals installed in the restaurant, in other words, had Mr. Le Mac operated the restaurant with video gaming terminals before you acquired it?
A Yes, as I stated before.
Q Okay. And I thought you had. I just want to make sure.
Okay. If you scroll down to the page 11, I'm sorry, item 11 on page 3, Alderman Kirkwood.
A Item 11 on page 3?
Q Yes. 11 asks for a description of any proposed or approved video gaming operation, including the type of location anticipated or actual number of employees. And I'll just read this for the sake of the record, Dr. Kirkwood.
A Okay.
Q It says, Mac Dynasty, Inc., dba Long Sing Restaurant proposes to have up to five gaming terminals located on its business premises. Applicant has entered into a use agreement with Tap Room Gaming to serve as its video gaming manager. Applicant currently employs two individuals. Applicant is a restaurant with a liquor pouring license.
Does that refresh your memory that around the

time you acquired Mac Dynasty, the Long Sing Restaurant's video gaming terminals were supplied by Tap Room Gaming?
A Well, I see what it says there, but I didn't know who tap room was.
Q Okay. Did you in the course of acting as video gaming manager, did you come to be familiar with tap room gaming?
A No, because there -- I think many of the times that they came to either pick up funds or whatever they did I was not there.
Q I see. Okay. Did there come a point at some point just given your ownership of Mac Dynasty and the restaurant it operated first as Long Sing and then as the Choose Your Own Cheesecake Bar & Lounge, did there come a time where you became familiar with Tap Room Gaming in that capacity?
A I met with one of the gentlemen that would come and service the machines and have new promotions. I don't recall his name. But he would come in periodically where I would meet with him to go over new ideas.
Q Okay. Understood.
And at that point in dealing with that

gentleman, you became aware, I assume, that he was a Tap Room Gaming employee?

A Yes.

Q And I think you did state this earlier, in fairness, Dr. Kirkwood, if I understand the logistics of this, in that same -- and I've got a picture, actually, we can look at in a moment which will make this easier, but if I understand it correctly, your son's restaurant, the Choose Your Own Cheesecake and Cheesesteak was in that same strip mall where the Long Sing Restaurant was and later the Choose Your Own Cheesecake Bar & Lounge, and your son was more involved, if I understood your testimony correctly, more involved in the day-to-day operation of the bar and lounge.

Did I gather that correctly, than you were?

A Yes. And there was a couple other people that actually do the day to day. He more or less does the C.Y.O.C., but there is another individual that is there at the lounge side.

Q I see. And who is that on the lounge side?

A Her name is Veronica. I don't know her last name.

Q Okay. And what I was trying to, I guess, get at through that question is, would you say that it would be

your son who would be more familiar with or interact more often with whatever gaming company was servicing the bar and lounge as opposed to you?

A No, because I would get a call from this gentleman to could I meet regarding promotions, and usually my son would ask could I be there and I would show up for short meetings. Usually the meetings were no longer than a half hour at the most.

Q Got you. Okay. So that would be you and your son together, I take it?

A Yes.

Q Okay. So, Dr. Kirkwood, having seen this disclosure, which is in December, 2018, you're at the stage where you're the video gaming manager but the purchase of Mac Dynasty hasn't been consummated yet, does that help you at all in kind of placing the approximate date when you actually acquired Mac Dynasty?

A I don't remember the exact date of when it was purchased.

Q Is sometime in early 2019 sound about right?

A Yes, I would say so.

Q Okay. Okay. And, Dr. Kirkwood, looking -- if you know the answer, if you don't, that's fine, having had the opportunity to look at Exhibit 101, this

Illinois Gaming Board disclosure, does that trigger any recollection on your part on who actually completed and submitted this disclosure form?

A No.

Q And you think it was someone other than yourself, though?

A I'm sure I was involved or they wouldn't have my name and some of the other information there.

Q Okay.

A I'm sure I gave it. I don't recall who -- because there was a lot going on at that time in terms of -- This was in December you say?

Q Yes.

A Okay. And I'm sure that at that time I had decided to run for alderman, so there was a lot of things going on.

Q Right. Understood.

A So I don't really recall, you know, because this was December. I filed in November. And, certainly, I was out campaigning in December.

Q And that is my understanding, as well.

MR. SMITH: Let me ask you to take a look at, just to get some visuals here, which are always helpful, let me ask you to take a look at what has been marked as

Exhibit 102.

(Exhibit 102 marked and tendered to the witness.)

MR. SMITH: Q And while you're pulling that up, I'm just going to identify it for the record, Dr. Kirkwood.

Exhibit 102 is a Google street view capture. In terms of identifiers, it says 2140 IL-131, I'm not sure what that denotes, but the image capture date is September, 2018, and the image appears to show the restaurant with the Long Sing awning sign on it.

So, Dr. Kirkwood, let me ask you, do you recognize what's depicted in Exhibit 102?

A I'm pulling it up now.

Q Oh, I'm sorry. Go ahead.

A It's not coming up.

Q Sometimes the pictures just take a little longer.

A Okay. Now it's up. Okay.

Q So do you recognize what's depicted in that photo?

A Well, I see an awning but I can't -- it's just not real clear, but I see something there.

Q Okay. Well, let me ask you and let me -- and I

Q Okay.
A So I could not, you know, tell you. But certainly I could, you know, if I inquired, I could find out. But I don't go on Facebook in terms of the business, someone else handles that unless somebody brings it to my attention that there is a problem.
Q Okay. No, I appreciate that. And I won't spend too much time on this. One question I have for you is this makes reference to our fourth location.
What's your understanding of what that post is talking about with regard to a fourth location because I understood you to say there is only one bar and lounge that Mac Dynasty owns?
A Oh, there is only one for the Mac Dynasty, but there is other C.Y.O.C.s.
Q I see. Okay. And if you could scroll down to -- it will be the third page of the exhibit, Dr. Kirkwood, which is maybe a little easier to see, the print quality is a little better.
A Okay.
Q Do you see that there is a July 25th posting that says, coming soon C.Y.O.C. Create Your Own Cheesecake and Cheesesteak Bar & Lounge? Do you see what I'm referring to?

A Yes.
Q Okay. And then below that do you recognize those images as being promotional material relating to Tap Room Gaming?
A Well, I know they're promotional materials by looking at them, but whether they're Tap Room or not, I couldn't tell you.
Q Okay. Just reading it, do you see there it says Tap Room Gaming double points?
A Yes, vaguely above, you know, it looks like two characters or something in red, but I can't really read. It says double points. I see that real clearly.
Q Okay. Even with it blown up, you can't make out the Tap Room?
A No, and I have it to the maximum.
Q Okay.
A But I see something there that appears to be what you just said.
MR. SMITH: Okay. Dr. Kirkwood, since you didn't post this, let me move on from Exhibit 105, ask you to pull out Exhibit 106.
(Exhibit 106 marked and tendered to the witness.)
THE WITNESS: Okay.

MR. SMITH: Q And I think the challenge with Exhibit 106 is it's a horizontal document, so you may have to kind of move back and forth to make out the whole document.
But while you're taking that in, I'll note that Exhibit 106 is an Illinois Gaming Board video gaming report for Mac Dynasty, Inc., for the period January, 2019, through October, 2019.
And I'll just represent to you, Dr. Kirkwood, that my understanding is that this is just a report that anyone can pull off the Internet from the Illinois Gaming Board.
Are you involved -- do you -- are you involved in the reports that Mac Dynasty files with the Illinois Gaming Board relating to its revenues from video gaming terminals?
A I look at them occasionally, not on any regular basis.
Q Who does the actual filing of those reports for Mac Dynasty?
A I believe my son does or one of the other managers. I'm not absolutely sure.
Q Okay. And so how many managers are there that Mac Dynasty employs?

A There is at least two.
Q Okay. Your son and this one other person you've mentioned named Veronica?
A Yes. And if they're not around, someone from the other establishment will come and cover.
Q Got you. The other establishment being the Choose Your Own Cheesecake restaurant?
A Right. If someone is absent, someone else will cover.
Q Understood. Okay. So, Dr. Kirkwood, this report, Exhibit 106, if you look at the right-hand columns, there is some information relating to VGT, which I take to mean video gaming terminal.
Is that your understanding of VGT?
A Yes.
Q Okay. So it's got VGT income and then VGT tax distribution.
So it has a net terminal income figure of $216,000 for this period from January, 2019, to October, 2019.
And I'm not asking for unrealistic precision here, Dr. Kirkwood, but as the president and owner of Mac Dynasty, does that net income number appear generally consistent with your understanding of what

those terminals brought in during that period in 2019?
A Well, this is probably the first time I've seen this particular documentation, so I couldn't answer that with total knowledge.
Q That's fair. Let me ask it this way: So according to this report filed with the Illinois Gaming Board, the net income before, as I understand it, before paying taxes, in fairness, the net income funds in and funds out at the video gaming terminals operated by Mac Dynasty for the first ten months in 2019 was about $216,000.
Without holding you to that number, based on your experience owning Mac Dynasty, is that generally consistent with what you would expect to see for that ten-month period?
A No.
Q Explain why you say that?
A Well, because I know that -- I think that this is probably the opening of it at that time.
Q Okay.
A And people came because it was something new. I think there are other facilities right across the street. And I believe it was up and down. I think being the new individual on the block, people came to

see what it was all about.
Q Understood. So if I understand you correctly, the level of video gaming activity at the now Choose your Own Cheesecake Bar & Lounge has gone down somewhat since the 2019 period?
A Very significantly.
Q Okay. So just with that clarification, which I appreciate, focusing on this period, the first ten months of 2019, you know, you're the president of Mac Dynasty, all I'm really asking for is do these numbers seem consistent with your recollection of what the level of gaming activity was at the bar and lounge at that point in time?
A Based on these figures I see.
Q Another way to ask this, is I take it you don't have any reason to question these numbers?
A No.
Q Okay. And then am I correct in assuming, Dr. Kirkwood, that in terms of what the -- what Mac Dynasty nets, you have to deduct from that net terminal income the tax distribution that Mac Dynasty is required to pay as reflected in the right-hand side of Exhibit 106?
A That is correct.

Q Okay. So granting all of that, and I'm really not trying to probe into exact numbers here, I'm just trying to get a sense, based on your ownership of Mac Dynasty and the arrangements you have in place, what -- can you give me a sense of what portion of the video gaming terminal income that the bar and lounge brings in after paying required taxes, what portion of that flows to your personal income? Just give me a ballpark sense.
A I couldn't really tell you that because, once again, there is other factors involved as far as, you know, the remodeling of the facility, paying employees and everything else, so putting up cameras throughout the facility.
So I really couldn't tell you that without looking at, you know, the details of what it cost to do that.
Q Okay.
A And that was during that period of time.
Q Okay. And if you were going to try to figure that out, what would you look at document-wise?
A Well, I would have to go back and see what the actual construction for that whole facility was reconstructed.

Q Uh-huh.
A You know, security cameras were put inside and out of the facility. New signage was put in the facility, furniture. A lot of money went into that facility to get it to where it is right now during this particular --
Q And I take it from your testimony that those were expenses that Mac Dynasty was still paying off in 2019?
A That is correct.
Q Let me ask it this way, if you can answer it, in that January to October, 2019, period, did Mac Dynasty -- Let me ask this. I should have asked earlier. And if I did, I apologize.
Did Mac Dynasty have any other business operations other than operating what was first the Long Sing Restaurant and then became the Choose Your Own Cheesecake Bar & Lounge?
A Could you repeat the question, please.
Q Yes. I'm just trying to make sure I'm not overlooking something.
Did Mac Dynasty, the corporate entity, Mac Dynasty, Inc., did it operate any other businesses other than the establishment that was the Long Sing Restaurant

Page 134

proposals at the public hearing, was there any other source of information that in your view impacted your ultimate decision on which proposals to certify?
A Well, I think that, certainly, the Genesee display, you know, had some impact on my decision. And, certainly, following the -- I guess that weekend, I don't know the dates, but somehow some of my colleagues, you know, decided to not go along with corporation counsel where we weren't supposed to discuss with one another or anything else, but apparently that didn't continue.
Q And what are you referring to there?
A Well, we were told that we were not to discuss with each other anything regarding the casino, that you make your decision based on what you believe and information that you gather from reading the materials so it wasn't any alderman talking to another alderman or discussing with any casino operators or anything.
We were told by corporation counsel not to do that so it would not cloud any issues, but apparently three of my colleagues decided that they weren't going to follow that edict.
Q And that's what I was asking about. What is the discussion among three of your colleagues that you're

Page 135

aware of?
A Well, I don't know the actual discussion, but it's apparent that they talked to someone because it came back to the council and they decided that they warranted to do a revote.
Q Okay. So you're referring to the document that was signed by three of the City Council members asking that a reconsideration of the Potawatomi proposal be put on the agenda?
A I don't know what document. All I know is that, you know, over the weekend something occurred, and, you know, I don't know any details about signed documents, but I know that they spoke because we came back to council and we were asking to do a revote.
So I knew someone had spoken to somebody in order to be influenced.
Q Understood. Just sticking with the Genesee Theatre for a minute, was there anything from the presentations that you listened to that you remember being something that you viewed as being particularly positive or particularly negative?
A Well, I don't think any of the presentations were negative. I think that some of the showmanship of bringing busloads of people in was kind of out of order

Page 136

for me.
Q Okay.
A You know. But as far as the presentation, I thought each of the presentations were good. I think that some had more in it than others.
But other than that, I think that that whole display, and I think there was two groups that came through, but I didn't quite understand that because I didn't think that's what we were there for.
Q So let me ask about your vote at the special City Council meeting on the certification of the proposals.
My understanding is there were four proposals up at that point because one developer or dropped out and that you voted in favor of three of the proposals but not in favor of certifying the Potawatomi proposal.
Is that consistent with your memory?
A Yes.
Q Let me ask you to explain, as best you can remember, why you voted the way you did on each of the proposals. And feel free to answer that in any way that makes sense to you. In other words, if it makes more sense to discuss it proposal by proposal, feel free to do that. If there is a more global explanation, feel

Page 137

free to do that.
I'm trying to understand how you thought about the issue when it came before you.
A Well, I looked at, you know, detail, how detailed they were. Also, I thought that -- I can't even think of the name of it, but I thought that that particular one, I don't know if it was out of Las Vegas or somewhere, but one of them I thought was very nicely done, but could they pull it off?
You know, I thought -- and then there was two others that I thought that were good. I was concerned about the lack of details on one of them that made me not approve that one.
But other than that, I thought they were more or less, because we didn't rank them, I think they just -- you know, we didn't rank any of them. But I saw one that was kind of new to the pool that was more appealing to me.
Q And which one was that?
A I don't know the name of it.
Q Okay. Can you describe any feature of it that you --
A Well, it had like suites and different things that went along with it. It was something different.

Page 138

And, plus, what they were going to do with the community, with the educational because where the casino is seated, the Waukegan School District would not generate any funds from it, but they were willing to do some things with that because that's in the -- in a couple other school districts.

Q So, you know, given what you've described which is maybe one proposal that had some things that stood out to you that you liked and kind of -- this is my characterization, so feel free to reject it, but maybe a more mixed reaction to some of the things in the other proposals, what made you decide to certify three, you know, three of those proposals? Why did you decide, yes, I'm going to go ahead and certify multiple proposals?

A Well, I think that because they had some of the ingredients as far as what they're going to do for the school district, you know, the phasing in of different -- of the building, you know, yes, we will look at building a hotel, amphitheater, all those kind of things in different phases, you know, help with a community center.

I think one of them had something in there about for the young people, which goes back to the

Page 139

school district. So there was various points for each one. I can't tell you in detail which one said what.

Q How important to you was it as you went through the various casino proposals what they projected in terms of economic impact for the community, jobs and the like?

A Well, that was important, but I think more important was sustainability in the community.

Q What do you mean by that?

A Well, were we going to be, you know, morphed off, whether it was -- I think there was two of the proposals that were more established than the others, to my remembrance. One was new -- two of them, I think, were new. I'm not totally remembering that.

But, you know, my concern was, you know, there was one outside Chicago and one was in Wisconsin, and were they going to just morph off the one in Waukegan. That was a concern.

Q So you voted in favor of Rivers which operate -- their proposal, they also operate the Des Plaines casino, as you've alluded to, and you voted against Potawatomi.

What was your reasoning for voting against the Potawatomi proposal?

Page 140

A I think that with the establishment of Potawatomi being, you know, long term they weren't as detailed as the others. And I think that you mentioned Rivers, my concern is that it would be north of the one they have now and how serious were they, so, I mean.

Q That's what I'm trying to understand. You did get over that concern for Rivers, I take it?

A Well, I don't know if I got over it, but I think that they were not in my, you know, top of the list.

Q Okay. But high enough up to certify them?

A More detailed enough to send them.

Q Okay. And so was the issue for you with Potawatomi, just focusing on that, what was the concern there? Was it that to your mind they fell below the bar to get certified?

A Well, as I said before, I think it was, you know, a company that's been in business that long, the detail of it, I didn't see that.

Also, you know, to my remembrance, they came back and added something after the fact. And that concerned me that the others were not all able to do that, you know. And then -- that was a concern. You know, what was it that they didn't put in before that I did not get to really review? I heard about it, you

Page 141

know.

And then there was something about the cost of the land and somehow that was not accurate in terms of their initial proposal.

So I didn't think that was a transparent way of -- you know, if one does it, everyone should be able to do it. And to my knowledge, that wasn't the case.

Q Okay. So let me ask you, in light of that, was, in your mind, the fact that Potawatomi, and I realize this isn't the only thing you mentioned, but was the fact that in your view Potawatomi had attempted to provide some additional information after the original response to the request for proposals, was that something in your mind that was a strike against them?

A I wouldn't say that it was a strike against them. I think that, as I said earlier, I think that a company that's been in business that long, you know, you're detail-oriented and you're coming against what I thought was a couple -- I think two out of the five or three out of the five were newcomers, you know, that you would have the people that could put a proposal together and lay it out.

And even if you came in a little higher, then you could negotiate whatever had to be done. But,

certainly, there was opportunities and time, you know, to do that.

Q And one of the things -- one of the things you said at the City Council meeting, I believe, and you used similar language just now, is if we do something for one, we must do it for everyone.

Do you recall saying words to that effect at the City Council meeting?

A Absolutely.

Q Oh, I'm sorry, go ahead.

A I believe that if we're going to be transparent and we're going to be, you know, equal opportunity, if we do something for one, we should do something for the other. And that goes for our society as a whole, which we don't do, okay? And I'm a witness to that.

Q So in your view, I take it, then, it's your, you know, based on that view that from your perspective it would not be fair to allow some casino applicants to submit additional information after the deadline for the response to a request for a proposal and not allow others to do so, is that basically the point?

A Yes. But, you know, the question always comes back, you know, what is fair? Fair is those who are in control of the situation, you know.

So whoever made the decision to allow additional information we should have made that -- if the other individuals had something else they wanted to add, they should have been given the same opportunity so it's as transparent because fair is a nebulous word but transparent to the point that they were able to put in additional information to support their case.

Q And I take it it's your perspective that -- I'll take your word transparent, that the City should in its evaluation of casino proposals try to be equally transparent as to each of the applicants?

A Absolutely because I don't know how that all came about.

Q So I'm going to ask you a couple more specific questions about Potawatomi, and it's for purposes of trying to explore how you put that principle into action in your own evaluation proposals.

So, for example, my understanding is that the Potawatomi's original proposal that it submitted in response to a request for qualifications at the deadline didn't include a rendering but that subsequently Potawatomi made that rendering available in an interview with the City, and I think it was included in the presentation at the Genesee Theatre.

So in your personal evaluation of the proposals, did you sort of decide you were going to just sort of not consider the Potawatomi rendering because it came after the submission of casino proposals?

MR. DAVIS: Object to form of the question -- Hold on. Object to the form of the question and length and vagueness and duplicity.

You can answer that if you understand what the question was.

MR. SMITH: Q Your counsel doesn't like my question, but you can answer it.

MR. DAVIS: It's a long question.

MR. SMITH: No, I'm not -- yeah, I'm not quibbling.

MR. DAVIS: There was a lot of information in there.

MR. SMITH: Q Did you understand the question?

A Can you repeat the question, please.

Q Yes, and I'll try to be a little more concise.

What I want to know is you've articulated a general principle that you thought -- Well, let me not even do the preamble.

Is it your understanding that Potawatomi, the rendering of its proposed casino was submitted to the City at some point after the original deadline for responding to the request for casino proposals?

A Yes.

Q Okay. And given that and given the principle you've articulated, did you in your own mind, your own evaluation of the casino proposals make a decision that you were going to not -- not consider Potawatomi's rendering because it came after its original proposal?

A No.

Q Okay. And so, I take it, just so we don't have a double negative there, I take it you did take into account Potawatomi's rendering of it's proposed casino?

A Yes, I did.

Q And if you remember sitting here today, did that have any impact on your view of Potawatomi good, negative, neither?

A I was neutral.

Q Okay. And what about the -- I think you alluded to this, there was a discussion at the City, the special City Council meeting about a supplemental letter that Potawatomi submitted that included an offer for Fountain Square for $12 million.

Was that something that you decided should not be considered from your perspective?

A Well, I didn't decide that it should not be considered. But my concern was, once again, if one can

do it, why others couldn't do it. If one made the timeline, why, you know, others can't make the timeline.

So I took all those things, you know, in consideration not negative or positive but let's make sure that each person gets an equal opportunity to do the same thing. It's like bidding on a house. If, you know, the deadline is that day and somebody else comes in to sweeten the pie, do we still consider that after the deadline?

Q And so how did that impact -- that view impact your vote on Potawatomi?

A Well, once again, I had to look at everything, you know, in general, the rendering because there was no rendering before, you know, look at that and compare it to the others and all the other things, the dollar amounts that -- for the Fountain Square area, you know, what it was proposed to be worth and so forth and so on.

Q Okay. And so to put all of that in kind of one package, if you were going to summarize for someone why you voted against Potawatomi but for the other three, how would you explain that?

A It's not a matter of explanation. I think that you follow timelines, you get things in on time, and you go from there.

You know, I think that their proposal was okay, but I think, as I said earlier, that a company that's well-established should be on top of their game.

Q So it was the timeline of their submissions relative to what you would expect from an established company, is that fair?

A No, that's not fair.

Q Okay.

A I think that it's detail-oriented, I think that you need to be detail-oriented. It's just like my years of experience in my field, I shouldn't come in like I'm a rookie.

Q And did you feel the Potawatomi proposal was a, to use your term, a rookie proposal?

A I don't think it was up to par as I would expect, you know. I wouldn't say it's a rookie because it was laid out, but, certainly, a rookie is no experience whatsoever.

Q Okay. And just before I leave this, any -- I just want to give you an opportunity to make sure, any specific aspects of the proposal that, you know, sitting here today stand out to you as not having been, you know, up to the level that you would expect given your, you know, detail-oriented standard?

A Well, I think after the opportunity was given to submit whatever the additional, you know, was submitted, I mean, it was -- it was at that level that, you know, some of the others was.

But like I said, you know, my concern was the school district because the school district is not going to generate any money from the casino.

And the other proposals had something in there where they would set aside a fund and some other things that I had talked about at the Genesee in regards to be able to help the school district. The money from the casino will go to other school districts that butt up against the property there.

Q Thank you for that explanation.

So, Alderman Kirkwood, I think I know the answer to this, I think it's implicit in what you've said, but did you ever discuss the casino proposals, and I'm talking outside of City Council meetings, did you ever discuss the proposals with anyone from the City administration?

A Absolutely not.

Q And I take it from your earlier answer you did not discuss the casino proposals with any of your fellow aldermen outside of a City Council meeting?

A No.

Q Did any of your fellow aldermen ever confide in you about why they voted the way they did?

A No.

Q And I think I know the answer to this, but just for the sake of completeness, in the period before the gaming expansion legislation was passed, did any other -- did any casino developers or people associated with casino developers other than Mr. Bond, did you have any meetings or communications with them?

A I didn't have any communication with anyone. As I have stated previously, no one -- I talked with no one. Someone tried to contact me, but I never returned the call.

Q Who was it who tried to contact you?

A It was -- I can't think of the gentleman's name, but it was from Potawatomi that tried to contact me probably around the same time that those other aldermen were contacted, but I did not return the call.

Q Okay. So this was after the initial vote at the special City Council meeting your best recollection is someone connected to Potawatomi tried to reach out to you before the subsequent meeting where there was the question of whether the vote would be reconsidered for

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WAUKEGAN POTAWATOMI CASINO, LLC, | ) | |
| Plaintiff; | ) | |
| -vs- | ) | Case No. 1:20-cv-750 |
| CITY OF WAUKEGAN, an Illinois, Municipal Corporation, | ) | |
| Defendant. | ) | |

REPORT OF PROCEEDINGS from the deposition of PATRICK SEGER taken via videoconference by Paul W. O'Connor, a CSR within and for the State of Illinois, pursuant to the provisions of the Federal Code of Civil Procedure and Rules of the Supreme Court thereof pertaining to the taking of depositions, at Waukegan, Illinois, 60085, commencing at 1:14 p.m. on February 17, 2021.

APPEARANCES:

FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois, 60606
By: MR. DYLAN SMITH
Dsmith@freeborn.com
Appearing on behalf of the Plaintiff;

HEPLER BROOM LLC
30 North LaSalle Street, Suite 2900
Chicago, Illinois, 60602
By: MS. MEGHAN RIGNEY and
MR. CHARLES INSLER
Meghan.Rigney@heplerbroom.com
CharlesN.Insler@heplerbroom.com
Appeared on behalf of the Defendant.

ALSO PRESENT:

MR. MARCO SOZIO,
Videographer

INDEX

| WITNESS | PAGE |
|---|---|
| PATRICK SEGER | |
| Exam by Mr. Smith | 7 |
| Exam by Mr. Insler | 93 |

EXHIBITS:

| | |
|---|---|
| Exhibit No. 76 | 20 |
| Exhibit No. 77 | 28 |
| Exhibit No. 78 | 43 |
| Exhibit No. 80 | 52 |
| Exhibit No. 81 | 61 |
| Exhibit No. 82 | 64 |
| Exhibit No. 87 | 65 |
| Exhibit No. 83 | 71 |
| Exhibit No. 89 | 73 |
| Exhibit No. 84 | 75 |
| Exhibit No. 85 | 77 |
| Exhibit No. 86 | 84 |
| Exhibit No. 88 | 86 |

THE VIDEOGRAPHER: Good afternoon. We are going on the record at 1:14 p.m. Central Time on February 17, 2021. Please note that the microphones are sensitive and may pick up whispering, private conversations, cellular interference. Please turn off all cell. phones or place them away from the microphones as they can interfere with the deposition audio. The recording will take place unless all parties agree to go off the record.

This is media unit one of the video recorded deposition of Patrick Seger, taken by counsel for the plaintiff in the matter of Waukegan Potawatomi Casino, LLC, an Illinois limited liability company, versus City of Waukegan, an Illinois municipal corporation, filed in the United States District Court for the Northern District of Illinois, Eastern Division, case number 1:20-cv-750.

The deposition is being held remote by virtual Zoom located at Waukegan, Illinois, 60085. My name is Marco Sozio with the firm Veritext Midwest. I'm the videographer. The court reporter is Paul O'Connor from the firm Veritext Midwest. I'm not authorized to administer an oath nor am I related to any party in this action, nor am I financially interested in the outcome. If counsel all present in the room and everyone attending

remotely will now state their appearances and affiliations for the record. If there are any objections to the proceeding, please state them at the time of your appearance, beginning with the noticing attorney.

MR. SMITH: Good afternoon. Dylan Smith of Freeborn & Peters for the plaintiff Waukegan Potawatomi Casino, LLC.

MR. INSLER: Charles Insler on behalf of City of Waukegan.

MS. RIGNEY: Meghan Rigney from Hepler Broom on behalf of City of Waukegan.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

(Witness sworn).

MR. SMITH: Alderman Seger, good afternoon. Again thank you for bearing with us as we sorted out the technology.

THE WITNESS: That's fine.

MR. SMITH: Let me just to begin, Alderman Seger, go through just a few ground rules. But before I do that, let me ask you, have you had the pleasure of having your deposition taken before?

THE WITNESS: No, I have not.

MR. SMITH: Okay. So this will all be a little bit

cameras and locked doors. I had gone, I had called out there and told them I was on my way out there. And I did. I went out, went up to the door, parked in the parking lot, went up to the door, Michael Bond was waiting by the door and let me in.

Q. Okay. Had you met Michael Bond before that?

A. No, sir.

Q. So how is it you guys were able to recognize each other, how did it play out?

A. How did it play out?

Q. Yeah. I mean how did you know that was Michael Bond?

A. I didn't. He introduced himself and I took his word for it. I introduced myself.

Q. Did Mr. Bond give you the tour himself?

A. He escorted me in the building and then showed me different areas, you know, throughout the building. And that was it.

Q. Then --

A. Went fast.

Q. -- was anyone else from Tap Room with you when you went on the tour?

A. No.

Q. The city said following the tour, you spoke to

Mr. Bond for approximately two minutes.

Can you describe --

A. I thanked him, I enjoyed myself. What short of time it was and that was it, I was up and gone.

Q. Did he say anything to you?

A. No. He said thanks for coming out and taking the time out to see how it's all run and put together. It is very neat, you know, clean building. I was, you know, happy with it.

Q. Did the issue of a casino come up at all?

A. Not at all.

Q. Not at all. Okay. And have you -- I mean apart from, you know, public presentations at the Genesee for example, have you met or, you know, communicated with Mr. Bond since then?

A. No, I have not.

Q. Do you know someone named John Kozlowski, Mr. Seger -- Alderman Seger?

A. I do know him. But I haven't seen him in a long time.

Q. How do you know Mr. Kozlowski?

A. He did some campaign work for me.

Q. How did it come about that he got involved in doing campaign work for you?

A. I'm not sure. I went down to the democratic headquarters and that's where I met up with John.

Q. Describe that meeting for me?

A. Describe it? I told him who I was. I was alderman of the second ward running for re-election. And that was it.

Q. Had you arranged to meet Mr. Kozlowski there?

A. I had several times, yes. But he was more, he was into other business, too. You know. He had a back room off to the southwest side. But I would go in there.

Q. I'm not sure what you're referring to there when you say the other business. What is that?

A. I don't know what he was working on at the time.

Q. But I mean was it some type of company or what?

A. No. Not that I know of.

Q. How did you get in touch, how did you get hooked up with Mr. Kozlowski?

A. I went down to the democratic headquarters. At that time that's where he was.

Q. But I mean did you just meet him there by chance or had you spoken to him before?

A. I guess, yes, I did. I hadn't made any previous earlier arrangements with him if that's what you

mean.

Q. Well were you going there specifically to meet him?

A. No.

Q. The democratic headquarters you're talking about what are these, what democratic headquarters?

A. Let me see if I recall. 118 is it? Genesee? I think it's 118, 117.

Q. But apart from the address what is it; is it the Lake County Democratic Headquarters, the Waukegan Democratic Headquarters? How would you describe what this is where you were meeting?

A. I guess it would be the Democratic Lake County Headquarters.

Q. Did you, were you aware of any connection between Mr. Kozlowski and Mr. Bond?

A. No I was not.

Q. Have you since become aware of the connection between the two?

A. No, no, sir.

Q. So I just want to make sure I am clear.

Sitting here today, your testimony is that you're unaware of there being any relationship between Mr. Kozlowski and Mr. Bond?

A. Not that I know of.
Q. Okay. Do you know someone named Dave Koss, K-O-S-S?
A. Say that again.
Q. The name David Koss, K-O-S-S, does that mean anything?
A. No, I don't. No. No, sir.
Q. Okay.
A. David Koss.
Q. All right. We are going to try a little -- let me ask you this. How many times have you and I am really just asking for your best estimate.
How many times have you met Mr. Kozlowski in your life?
A. Maybe --
MR. INSLER: I will object. It calls for speculation.
MR. SMITH: Go ahead, you can answer.
THE WITNESS: I can answer this?
MR. INSLER: Yeah.
THE WITNESS: A I don't. I don't know how many times I have seen him. I don't even know if I'd recognize him today.
MR. SMITH: Q I'm trying to get a sense of, again

I'm not asking for an exact number, but what's your best estimate of how many times you have met him?
A. Maybe three times.
Q. Were they all at the Lake County Democratic Headquarters?
A. Yes.
Q. Was it the meetings that you can remember, were they with Mr. Kozlowski alone or was anyone else there?
A. There were other people in the building.
Q. But not -- was there anyone else participating in your meeting with Mr. Kozlowski?
A. No.
MR. SMITH: All right. We are going to try a little experiment here, Alderman Seger, I am. I'm going to actually, yeah, I'm going to try to show you an exhibit by sharing my screen with you. Because we have got a few exhibits that we weren't able to get you in paper copy. So this may or may not work but just bear with me a minute here. And I'm going to try to show you what's been marked as Exhibit 78. And let's see how this works. It will just take an moment. Hopefully when I push this button. Working? All right.
Alderman Seger, I put in front of you what's been marked as Exhibit 78.

THE WITNESS: That's my sign.
MR. SMITH: You see the exhibit sticker because something about the formatting made it itty-bitty.
Q. Do you recognize what's come up on the screen as Exhibit 78?
THE WITNESS: A What, the re-elect Patrick Seger second ward Alderman?
Q. Yes.
A. Yes.
MR. SMITH: Let me just state for the record Exhibit 78 is what appears to be a sign that as you just said Alderman Seger, says re-elect Patrick Seger, second ward alderman. It also has the legend paid for by Patrick Seger on the lower left-hand corner.
THE WITNESS: And that same sign is in my garage today. Along with 149 others.
MR. SMITH: Q Do you recognize this sign as an example of a sign that you used in your election campaign?
THE WITNESS: A Yes, I do.
Q. Let me ask you, I have made a little inference about the sign. I notice that the re-elect part appears to be stickered onto the sign.
Am I correct in assuming that this is a

sign or an example of a sign that you used in your -- just let me get the question out.
A. All right.
Q. My assumption is that this sign is one you used in your 2015 campaign and then when you were running again for re-election you essentially recycled it by putting the re-elect sticker on it.
Am I right about that?
A. Yes.
Q. I think from what you said a moment ago, you probably had about 49 or so of these signs that you used?
A. To be exact, 150.
Q. 150. Alderman Seger, I should have asked you this earlier but your 2015 campaign, the one where you first won, do you recall about how much money you spent on that campaign?
A. Way over $2,000. Just on signs.
Q. What about total in that campaign?
A. You know, I couldn't give you an exact number. Three, $4,000.
Q. That's fair. Did you finance that campaign yourself or did you have contributors, how did you fund your campaign?
A. In 2015?

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAUKEGAN POTAWATOMI )
CASINO, LLC, an Illinois )
limited liability )
company, )
Plaintiff, )
vs. )No. 1:20-cv-750
CITY OF WAUKEGAN, an )
Illinois municipal )
corporation, )
Defendant. )

The remote Zoom deposition of ANN B. TAYLOR, called as a witness for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before ANDREA L. KIM, a Certified Shorthand Reporter of said state, CSR No. 84-3722, on the 4th day of March, A.D. 2021, at 10:03 a.m.

PRESENT:

FREEBORN & PETERS LLP,
(311 South Wacker Drive, Suite 3000,
Chicago, Illinois 60606-6677,
312-360-6000), by:
MR. DYLAN SMITH,
dsmith@freeborn.com,
appeared remotely on behalf of the Plaintiff;

HEPLERBROOM, LLC,
(30 North LaSalle Street, Suite 2900,
Chicago, Illinois, 60602,
312-230-9100), by:
MS. MEGHAN RIGNEY,
meghan.rigney@heplerbroom.com
MR. CHARLES N. INSLER,
charles.insler@heplerbroom.com,
appeared remotely on behalf of the Defendant.

PRESENT: (Continued)

S.T. LEGAL GROUP,
(1020 North Milwaukee Ave, Suite 335,
Deerfield, Illinois 60015
847-654-9200), by:
MS. DIANA TAYLOR,
dt@stlegalgroup.com,
appeared remotely on behalf of the Deponent.

VIDEOTAPED BY:
MR. MARK LYLE.

REPORTED BY: ANDREA L. KIM,
Illinois CSR No. 84-3722.

I N D E X

| WITNESS: | PAGE: |
|---|---|
| ANN B. TAYLOR | |
| EXAM by MR. SMITH................. | 7 |
| EXAM by MS. RIGNEY................ | 128 |

*****

I N D E X

| EXHIBIT NUMBER | MARKED |
|---|---|
| Exhibit No. 90.............................. | 19 |
| Exhibit No. 91.............................. | 80 |
| Exhibit No. 92.............................. | 141 |

THE VIDEOGRAPHER: Good afternoon. We are going on the record -- I am sorry. Good morning, we are going on the record at 10:03 a.m. The date is Thursday, March, 4, 2021.

Please note that microphones are sensitive and can pick up whispering or private conversations. Please turn off cell phones or place them away from microphones as they can interfere with deposition audio. Audio and video recording will continue until parties agree to go off the record.

This is media unit number one of the virtually recorded deposition of Ann Taylor being taken by counsel for plaintiff in the matter of Waukegan Potawatomi Casino versus the City of Waukegan. This case is filed in the U.S. District Court for the Northern District of Illinois, Eastern Division.

Again, this deposition is being held remotely, and our witness is located in Deerfield, Illinois. My name is Mark Lyle. I am today's video technician and our court reporter is Andrea Kim. We are here on behalf of Veritext Legal Solutions.

think that the opponent would you have had to have declared probably by November. So I don't really remember making the connection but, you know, it doesn't ring a bell with me. Do you know what I mean.

Q. So when the person called you to set up the meeting, was this a man or a woman?

A. A man.

Q. What did he say to you about the purpose of the meeting, you know, why Mr. Bond wanted to meet with you, et cetera?

A. He was vague. He just said that Mr. Bond wanted to meet with me and show me some plans for some development that he had. I don't specifically remember him telling me it was a casino, but that he had a development project.

Q. And was the discussion on that call that the meeting would take place at Tap Room Gaming?

A. Yes.

Q. And then between that call where I take it you agreed to --

A. Correct.

Q. Any other communications with Mr. Bond

or someone you understood who was, you know, working on his behalf between that call and when you actually went and met with him?

A. No.

Q. So you've kind of set the table for me in terms of who was there. I think you said Mr. Bond, someone name Lanie Kozol.

Did you get that name --

A. Correct.

Q. Did you understand what her connection to Mr. Bond or Tap Room Gaming was, if any?

A. Not at the time but later I did.

Q. Okay. And when you say later, when did you learn that?

A. Probably more during the campaign process.

Q. And what did you come to understand about the connection between Ms. Kozol, whose name I may be somewhat mispronouncing, and Mr. Bond?

A. I understand it to be his girlfriend.

Q. So -- and do you remember how you learned that?

A. I believe and for some reason, I saw

pictures of them together. I think somebody had told me, and then I had seen pictures of them together.

Q. So, Alderman Taylor, I think probably the easiest way to do this is if I could ask you to describe as best you can, you know, what happened at the meeting, you know, who said what to whom, where you were sitting, what you were shown, if anything, and then once you have had a chance to summarize that, you know, maybe I will jump in and ask questions about it.

A. Sure. The meeting was basically in a conference room and, you know, they -- it started off with, you know, like a lot of development meetings where we are going to try and impress you with, you know, who we know, what we know, you know, that kind of thing, and that was done more by Mr. Hochberg.

And then they showed me the plans. They showed me two different types of plans. One included a casino and one did not. One was more of an entertainment district. The casino plan included an entertainment district, and the questions that I had were like, you know, the

pictures that they showed me. Okay. It was a Blue Chip Casino.

So my questions were do you have a contract with Blue Chip Casino. Do you have a contract with the Alexis Steakhouse or whatever that you are showing me. Like how involved are you with this? Where are you at in the process? And basically, you know, they didn't have contracts with anybody. These were just their plans.

Well, as an alderman, I see a lot of plans in the course of a day. That doesn't mean they are going to pan out. You know, they talked about, you know, all the -- you know, the mayor was gung-ho for the -- you know, we are going to have a casino and, you know, that this was their plan. And my thing is, well, you know, nothing has been talked about this to the community. I haven't seen any community forums. Not everybody in the community is going to be gung-ho with this. If this is really what you want, you need to discuss with community leaders like the Ministers Alliance which was Pastor Gass.

So they did follow up with him and

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WAUKEGAN POTAWATOMI CASINO, LLC, an Illinois Limited Liability Company, | ) | JUDGE JOHN F. KNESS |
| Plaintiff, | ) | MAGISTRATE JUDGE M. DAVID WEISMAN |
| -vs- | ) | No. 1:20-cv-750 |
| CITY OF WAUKEGAN, an Illinois Municipal Corporation, | ) | |
| Defendant. | ) | |

Zoom videotaped deposition of KEITH TURNER, taken before KAREN KOSTAS, CSR, RMR, CRR, RDR and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 311 South Wacker Drive, Suite 3000, in the City of Chicago, Cook County, Illinois, at 12:30 p.m. on the 19th day of March, 2021.

APPEARANCES:

VIA ZOOM:
FREEBORN & PETERS LLP by
MR. DYLAN SMITH
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
312-360-6000
dsmith@freeborn.com

on behalf of the Plaintiff;

VIA ZOOM:
HEPLER BROOM LLC by
MS. MEGHAN RIGNEY
MR. CHARLES INSLER
211 North Broadway
Suite 2700
St. Louis, Missouri 63102
314-241-6160
meghan.rigney@heplerbroom.com
charlesn.insler@heplerbroom.com

on behalf of the Defendant.

ALSO PRESENT:
MR. CODY HENDERSON
Legal Videographer
Veritext Legal Solutions.

- - - - - - - - - -

INDEX

| WITNESS | PAGE |
|---|---|
| KEITH TURNER | |
| Examination by Mr. Smith | 6 |
| Examination by Ms. Rigney | 138 |
| Re-Examination by Mr. Smith | 140 |

EXHIBITS

| NUMBER | MARKED FOR ID |
|---|---|
| Deposition Exhibit | |
| Exhibit 90 Defendant's Supplemented Answers To Plaintiff's Second Set of Interrogatories Verification Certificate of Service | 54 |
| Exhibit 113 Form D-1 - State Board of Elections - December 12, 2018 | 91 |
| Exhibit 114 Form D-2 - Report of Campaign Contributions and Expenditures Quarterly Report - 1/7/2019 | 93 |
| Exhibit 115 Schedule A-1 - Report of Campaign Contributions of $1000 Or More - Filed 1/9/2019 | 95 |
| Exhibit 116 Form D-2 - Report of Campaign Contributions and Expenditures Quarterly Report - 4/5/2019 | 97 |

| | |
|---|---|
| Exhibit 117 Form D-2 - Report of Campaign Contributions and Expenditures Quarterly Report - 7/11/2019 | 100 |
| Exhibit 118 Form D-2 - Report of Campaign contributions and Expenditures Quarterly Report - Filed 7/11/2019 | 106 |
| Exhibit 119 Form D-2 - Report of Campaign Contributions and Expenditures Quarterly Report - Filed 7/23/2019 | 107 |
| Exhibit 120 Form D-2 - Report of Campaign Contributions and Expenditures Quarterly Report - Filed 4/3/2020 | 119 |
| Exhibit 121 Invoices - Breaker Press Company, Incorporated The Dover Group Jeff Waggoner Graphic Design | 121 |
| Exhibit 122 In-Kind Contribution Notification Bates DK_0000304, 318, 321, 324, 341, 386, 387, 397, 405, 410, 414, 419, 442, 443 | 123 |

EXHIBITS ATTACHED

- - - - - - - - - -

THE VIDEOGRAPHER: Good afternoon. The time is 12:39 Central Time on Friday, March 19th, 2021.

This begins Media Unit Number 1 of the video-recorded Zoom deposition of Keith Turner taken in the matter of Waukegan Potawatomi Casino, LLC --

Is that pretty close?

MR. SMITH: Close enough.

THE VIDEOGRAPHER: -- versus the City of Waukegan and to be heard in the United States District Court for the Northern District of Illinois, Eastern Division, Case Number 1:20-cv-750.

My name is Cody Henderson, I'm the videographer. Karen Kostas is the court reporter.

Will counsel please state their appearance for the record.

MR. SMITH: Sure. Dylan Smith of Freeborn & Peters for plaintiff, Waukegan Potawatomi Casino, LLC.

MS. RIGNEY: Meghan Rigney from Hepler Broom here on behalf of the City of

Q Got you. So taking your -- taking your explanation that the focus for you really was the price for the land, how did that -- how did that play out in terms of your voting on the proposals?
A So, as I recall, and I don't remember all these specifics, but there was one -- there were four -- four proposals.
One I think was for 33 million.
One was like 17 million or something like that. I forgot. 20 maybe. And then -- Maybe it was 22. I don't know. Something less.
There was one for like 5 million.
And there was one there that wanted to lease it, lease the land for 99 years with an option to buy anywhere in there and I think they were going to pay something over market price or something. I forget the details.
Q Okay.
A Yeah.
Q And am I right that the one proposal you voted against was the one that you recall being somewhere in the $5 million neighborhood?

A Yes. But that's not why I voted against it.
Q Ahh. Okay. Tell me why you voted. And just to make sure we're talking about the same thing, is that what you understood to be the Potawatomi proposal?
A Yes.
Q Tell me why you voted against the Potawatomi proposal.
A Well, when the gentleman who represented Potawatomi came before the council and made his presentation or his pitch, he stated words, more or less he said, this is an Indian tribe and we should get it because we're an Indian tribe, we're entitled. He was saying he was entitled to -- or they were entitled to be awarded that bid because they were Indians.
I do not believe in that in any shape, form or fashion. I think everyone should be treated equally. There should not be given any considerations for color, creed, ethnicity, none of that. We're all Americans.

And they should have came to the table with a straight proposal for consideration. But they asked me and they asked us to consider -- not to consider, but to give it to them because you're an Indian tribe.
It didn't fit with my makeup. And I didn't like it. And so as soon as he said that, I was like, I don't want to hear anymore. It just so happened that they had the $5 million bid.
And even if -- So that being said, right, that was my driving decision, that the decision point for me was that statement he made along those lines.
Taking that aside, had I only considered monetary offers for that land, they still would have made my cut because they were so low.
Q Okay. So let me -- let me just unpack that a little bit.
The statement that you're talking about that was a turnoff to you, was that something that was said at the -- at the public meeting at the Genesee Theatre?

A No. That was said in the -- in the council chambers, as I recall.
Q Okay. My understanding is no one -- none of the applicants addressed the City Council at the -- at the initial vote on the proposal, so I'm just trying to identify what you're referring to.
A I don't know when -- when he was there. I think it was an attorney. But he was -- He did come into the council chambers. And I -- I don't think that was -- I think that statement was made in the council chambers. I don't think it was made at the Genesee Theatre. It may have been. Maybe I'm wrong. It was a long time ago. But I do recall him making that statement. And I think it was in the council chambers.
Q And was it -- was it -- So just to kind of put a time frame on this, putting aside the exact date, you remember there was a special City Council meeting where the City Council voted on the various casino proposals in October of 2019?

A Yes. Yes.
Q Okay. Was this statement that you recall being made in council chambers at that meeting or at some earlier City Council meeting?
A I think that was at an earlier council meeting. Yeah. I don't think it was at that special meeting. Because that special meeting was a continuation of an earlier meeting. Yeah. The one at the Genesee was a continuation, I think, because they had so many people that wanted to speak.
Q But your best memory, as you sit here today, is that that statement, that sort of turned you off because it seemed like, and this is my effort to catch what you said, but sort of special pleading for an Indian tribe, that was something you remember being stated in council chambers sometime before the special City Council meeting?
A Yeah. That's -- That's my remembrance.
Q Okay.
A Excuse me. I'm just going to turn

the heater on.
Q Sure. Sure.
A All right. Go ahead.
Q So let me ask you this, and I appreciate you just laying out your thinking for me, just to explore that for a moment.
Excepting that you found that -- that statement that you recall to be a turnoff, why, in your mind, was the appropriate response to vote against Potawatomi as opposed to saying, okay, I'm not going to give you special treatment, I'm going to certify you with the other casino proposals?
MS. RIGNEY: Objection, form, foundation.
Go ahead.
A Can I answer?
BY MR. SMITH:
Q Yeah.
A Rephrase.
Q Yeah. And just to be clear, I'm really trying to explore the way you thought about this. So this may sound argumentative,

but I don't mean it that way.
A I understand.
Q I think you've been very clear that you found the statement, hey, you should -- you should choose us because we're an Indian tribe, that was a turnoff to you, correct?
A Yes.
Q Okay. And what I'm wondering is in your mind, why was the appropriate response to that, hey, I'm going to vote against Potawatomi as opposed to I'm not going to give you special consideration because you're an Indian tribe, but I'm going to certify you along with the others, why did you go to a no vote?
MS. RIGNEY: Objection, form, foundation.
Go ahead.
A That was my reason. That was it. Because they're asking for special consideration.
I go through my life, I never ask for special consideration for any reasons. And I don't -- I don't -- I deeply believe,

it's at the core of my belief system, that we are all equal and we all deserve to be treated equally under the law. And as a member of a legislative body, I -- I think it is my responsibility to do that.
And so when they said treat me differently, I want to be treated equal, but treat me more equal because, then I reject that and that's why I rejected them.
BY MR. SMITH:
Q Thank you for explaining that.
If you were to try to refresh your memory about where this statement was made, what do you think would be the best way to do that? Would it be watching videos of the --
A I have to -- I have to go back and -- and watch the videos.
Q Yeah. Okay. Okay. Let me -- Let me ask you, on the -- on the other three, your yes votes on the other three proposals, can you explain to me your reasoning behind those. And, you know, feel free to make it as short or as elaborate as you think you need to to kind of explain how you thought about those

proposals.
A Yeah. So my thought was to only send one. Somebody offered 33 million. And I don't recall, I think, I think that was North Point, but I'm not certain. But one of them offered like 33 million, right. And that was my choice. Only.
And shortly before we took the vote -- Again, I'm a new guy and, you know, I'm not a go-along get-along guy, by any means, but not to rock the boat. As we were prepping for the meeting, I was seated on the dais. As others came in, the mayor came in to me and he said, we want to send these three down to Springfield for them to decide, these are the choices.
Q Sure. And I'm going to ask you -- I apologize, Alderman Turner. It was getting a little faint there, so I'm going to ask if you could repeat that part of your answer again.
A So as I sat on the dais waiting for the meeting to start, preparing, as the mayor entered, he came by, he had to pass by my chair, and he said to me, these are the three

that we want to send to Springfield. Right. And that was what the vote was going to be. Right. Put those three down there.
Q Got you. And how did he identify the three that they wanted to send down, did he name them or did he point to something?
A No. He named them.
Q And Alderman Turner, let me kind of bring your attention to something else I think you said at the City Council meeting. And I'm talking about the special City Council meeting in October, 2019 before you voted.
I think as to Rivers you made a statement bringing up the fact that it had partnered in some way with another entity that had had some difficulty getting licensed in the past with regard to what is known as the tenth casino license.
Do you remember making that statement?
A Yeah. Vaguely. I do.
Q And it sounded like you were expressing some concern about that but saying, nevertheless, I'm going to go ahead and vote

for them.
Was part of the reason you sort of went ahead and voted for them despite those misgivings based on kind of what -- what Mayor Cunningham had -- had told you beforehand a little bit?
MS. RIGNEY: Objection, form, foundation, speculation.
Go ahead.
A Yeah. Not really. I mean I figured that whatever vetting had been done back then and was going to be done, or had been done -- The vetting that had been done during that 2005 bidding process that canceled out the casino for Waukegan and whatever vetting had been done to the point where we were taking this vote and whatever was to come later under the Illinois Gaming Board, they would flush all that out. So it wasn't a super consideration on my end. It just -- It was -- It was a point that I had to make note of.
BY MR. SMITH:
Q Okay. So if I'm following you, from what I understand, although you brought up

that issue, it wasn't in your mind a tremendously important consideration at that stage of the process?
A It was not.
Q Okay. How did you, if you recall, how did you become aware about that particular issue, do you remember?
A I do not.
Now, you know, you're talking about a long period of time. And that initial -- I was around when that came up back in 2005. Right. And so I had awareness of it back then. But then I totally forgot about that.
And when we were going through this process, someone raised the issue again. I don't recall where and how that came, you know, was put back into my mind. Oh, yeah, remember that happened. I don't know. I don't know why -- why it came back to me.
Q Okay.
A But I did have an awareness of it when it occurred back in 2005, because there were newspaper articles about it and so forth and so on. And, again, I was a political

Page 58

I'm sorry.
THE REPORTER: Let's start with Mr. Bond called me and invited me to come out.
A To see or hear his presentation or -- or, you know, his vision, what he wanted to do in terms of bringing a casino, developing a casino in Waukegan.
BY MR. SMITH:
Q And do you know, had -- had you -- Do you know how Bond had your phone number?
A I do not. He could have had it since 2003 when I worked on his campaign. I mean I've got literally thousands, tens of thousands of phone numbers in my phone.
Q Yeah. Okay. And I take it you agreed to go out to Tap Room and hear him out?
A Yes.
Q And I'm not sure it matters, but just to give me a sense. About how much time passed between the phone call and when you went out to Tap Room Gaming?
A A couple, three days maybe. Yeah.
Q And describe for me, I'm going to ask you about what was said at the meeting,

Page 59

but before we get to that, just set the table for me, describe what happened when you got to Tap Room Gaming.
A I got a tour of the facility and Tap Room Gaming. I mean you remember, Mr. Bond and I go back to 2003. So he's kind of proud of his business and showing me what he has done, right. So he gave me a tour of the building.
And we went into a conference room. It was very nice and a high tech kind of thing. Big screens up on the wall. And he showed me basically a PowerPoint presentation about what -- what his project might look like.
Q So who else was at this meeting where he showed you the PowerPoint?
A Yeah. So I'm not -- I'm not certain. Jon Kozlowski might have been there, but I don't -- I can't say for certain if that's -- if that's when I met Jon.
And Michael's -- I think Michael's business partner was there, but I don't remember him being in the -- in the room when

Page 60

the presentation was made. Maybe he was. I don't remember the specifics there. I don't.
Q Sure. When you say his business partner may have been there for part of it, is that Mr. Hochberg?
A Yeah, I don't know. I don't remember his name. What's the first name?
Q Andrew. Andy.
A Maybe.
Q Okay. Let me see if this refreshes your memory at all.
Do you recall that one of the casino applicants that ended up dropping out was something called Waukegan Development Association or WDA?
A No. No.
Q All right. How many -- How many people do you remember meeting when you went to Tap Room about?
A I don't know. There were some people there, you know, some -- some employees there. And he's like this is the guy that does that or something. I don't know. It wasn't -- I don't know. I don't remember.

Page 61

Q All right. About how long did the meeting last, Alderman Turner?
A I'd say about an hour all total. You know, come in, hey, how are you doing, you want something to drink. He showed me around the building and described the operation for Tap Room. And then we went into the conference room. I'd say roughly an hour. I was there roughly an hour.
Q Okay. And you mentioned there was a PowerPoint presentation. Can you describe to me what that consisted of.
A Several slides that showed a building on the -- the building, the entry to and the parking lots for the building. And I think there was some interiors where he described like the layout of the gaming facility and like a restaurant. There was going to be a couple -- There was going to be a couple, three restaurants or something there. And then I think there was going to be room for some kind entertainment with concerts or some such. I don't recall.
Q So these were renderings of a -- of

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAUKEGAN POTAWATOMI CASINO, LLC, an Illinois limited liability company,

Plaintiff,

vs.

CITY OF WAUKEGAN, an Illinois municipal corporation,

Defendant.

Case No. 1:20-cv-750

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF
MICHAEL BOND

April 7, 2021
8:07 a.m. CDT

Stenographically Reported By:
Deanna Amore - CRR, RPR, CSR - 084-003999
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

APPEARANCES OF COUNSEL
(All Participants Appeared Remotely.)

On Behalf of the Plaintiff, WAUKEGAN POTAWATOMI CASINO, LLC, an Illinois limited liability company:

FREEBORN & PETERS
DYLAN SMITH
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 360-6000
dsmith@freeborn.com

On Behalf of the Defendant, CITY OF WAUKEGAN, an Illinois municipal corporation:

HEPLER BROOM
GLENN DAVIS
MEGHAN RIGNEY
150 North Wacker Drive
Suite 3100
Chicago, Illinois 60606
glenn.davis@heplerbroom.com
meghan.rigney@heplerbroom.com

On behalf of the Deponent, MICHAEL BOND:

TABET, DIVITO, ROTHSTEIN
MR. MICHAEL J. GRANT
209 South LaSalle Street
7th Floor
Chicago, Illinois 60604
(312) 762-9465
mgrant@tdrlawfirm.com

ALSO PRESENT:
Michael Prager, Videographer

* * * * *

INDEX

| WITNESS | EXAMINATION |
|---|---|
| MICHAEL BOND | |
| EXAMINATION BY MR. SMITH | 6 |

EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 143 | Waukegan Democratic Organization Form D-2 | 34 |
| Exhibit 144 | iMessage Printout; WKGN 008516-533 | 40 |
| Exhibit 145 | Text Message Printout; WKGN 009911-912 | 87 |
| Exhibit 146 | Photo of Text Message; WKGN 011077-081 | 89 |

THE VIDEOGRAPHER: Good morning. We are going on the record at 8:07 a.m. on April 7, 2021.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Michael Bond, taken by counsel for plaintiff, in the matter of Waukegan Potawatomi Casino, LLC, versus City of Waukegan, filed in the United States District Court for the Northern District of Illinois, Eastern Division, Case Number 120-cv-750.

This deposition is being held remotely.

My name is Michael Prager from the firm Veritext, and I am the videographer. The court reporter is Deanna Amore from the firm Veritext.

I'm not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome.

Counsel and all present in the room and everyone attending remotely will now state their appearances and affiliations for the record.

If there are any objections to proceeding, please state them at the time of your appearance beginning with the noticing attorney.

MR. SMITH: Dylan Smith, of Freeborn & Peters, for plaintiffs, Waukegan Potawatomi Casino, LLC.

MR. DAVIS: Good morning. My name is Glenn Davis. I'm counsel of record for the defendant, City of Waukegan.

MS. RIGNEY: Meghan Rigney, from Hepler Broom, here on behalf of the City of Waukegan.

MR. GRANT: Michael Grant, here on behalf of the witness, Michael Bond.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness?

THE WITNESS: I missed the name of the person before Michael.

THE VIDEOGRAPHER: Meghan, will you reintroduce yourself?

MS. RIGNEY: Yes.

Meghan Rigney, from Hepler Broom.

THE WITNESS: Thank you.

(Whereupon, the witness was duly sworn.)

THE WITNESS: Yes.

THE VIDEOGRAPHER: Thank you. We may proceed.

Page 10

A. Sounds right.
Q. Okay. And then within about eight years, you had risen to director of corporate finance?
A. It sounds -- sounds right.
Q. Okay. And I realize -- I won't hold you to, you know, exact years, but I'm just trying to get a sense. So a pretty rapid rise up the chain at Allstate; fair to say?
A. I don't know how to answer that.
Q. All right. Isn't it the case that you had something like eight promotions within eight years at Allstate?
A. It's possible.
Q. Okay. You don't remember that sitting here today?
A. I haven't counted them up or thought about it in a long time.
Q. All right. And my understanding is your first involvement in elected politics was getting elected to the Board of Ed of the Woodland School District?
A. As an elected official; that's correct.
Q. Have you had any -- and that was in 2005, thereabouts?
A. Yes.

Page 11

Q. Had you had any involvement in politics before running for the school board?
A. No.
Q. And then you were first elected to the state senate in 2006?
A. Yes.
Q. And if I understand correctly, you were, in fact, endorsed by the incumbent Republican Senator Geo-Karis; is that right?
A. Yes.
Q. And you served as the state senator for the 31st district from 2007 to 2011?
A. Yes.
Q. And I understand you lost in 2010, and that was a pretty tough year for Democrats?
A. Yeah. I was not re-elected in 2010.
Q. Right. Okay.
Have you considered any other runs for office since leaving the state senate?
A. Nope.
Q. I thought at one point you had considered running for Congress. Is that not true?
A. Not since leaving the state senate.
Q. Okay. Understood.
So at some point while you were a senator,

Page 12

you contemplated a run for Congress?
A. Yes.
Q. Can you describe for me what you did work-wise once you left the Senate?
A. Some consulting, public affairs work, became a registered lobbyist, and then started the gaming company.
Q. When you say you "started the gaming company," is that Tap Room Gaming?
A. Yes.
Q. And can you just, at a very general level, describe for me the origins of Tap Room Gaming? How it came to be that you started a gaming company?
A. Regulated gaming was taking effect. It was an emerging growth industry and decided to give it a shot.
Q. And did you have any partners in getting that started?
A. Yeah.
Q. Who were your partners?
A. Initially, it was my aunt.
Q. What's your aunt's name?
A. Elizabeth Rinner.
Q. And did -- at some point did you take on

Page 13

other partners in Tap Room Gaming?
A. Yes.
Q. Okay. Who came to be your other partners?
A. Andy Hochberg and John Lowenstein.
Q. I'm sorry, Mr. Bond. I missed the second name?
A. John Lowenstein.
Q. Any other part owners of Tap Room Gaming while you owned it?
A. Nope. That's it.
Q. Okay. And my understanding is you sold Tap Room Gaming to J&J Ventures in about January 2020; is that right?
A. No. December 2019.
Q. December 2019. Okay.
So let me focus on the period while -- you know, before you sold Tap Room Gaming. What was your role within Tap Room Gaming on a day-to-day basis?
A. The chief executive manager of the LLC.
Q. Have you retained any stake in Tap Room Gaming after selling it to J&J?
A. No.
Q. I understand that there were actually two entities that you were a part owner of,

Tap Room Gaming, LLC, and then Tap Room Amusement, LLC; is that right?
A. Yes.
Q. Can you explain, again, at a pretty general level what the differences were between Tap Room Gaming and Tap Room Amusement?
A. Initially, the amusement company was set up to handle amusement equipment and amusement services, pool tables, jukeboxes, dart machines, stuff like that. And then Tap Room Gaming was, like I said, initially set up to handle the regulated part of the gaming business, so the slot machines.
Q. You said "initially." Did that arrangement change at some point?
A. It did.
After the industry had launched, the gaming board determined that it was not an issue to have nonregulated equipment in a regulated entity. So the Tap Room Gaming company began to own and operate pool tables, jukeboxes, and dart machines.
Q. Okay. Thanks. I understand.
And then at some point, did you also start a company called State Street Public Affairs?
A. Yes.

Q. And do you still have an ownership interest in State Street Public Affairs?
A. Yes.
Q. And what is State Street Public Affairs?
A. That was my -- it's a single-member LLC. That's my lobbying and public affairs entity.
Q. Okay. And I take it you're the sole member?
A. Yes.
Q. Any other businesses since leaving the Senate that you've had, apart from public companies, that you've had an ownership interest in?
A. Yes.
Q. And what would that be?
A. I've had just a business entity called Fisher -- Fisher Trust Capital, just an investment company.
Q. Okay. That's just a vehicle to make investments?
A. Yep.
I have another company that holds my interest in our -- the North Point Casino bid, which is Lakeside, LLC.
Q. Sure. Okay.

A. And I have an entity that holds an interest in an aircraft, but off the top of my head, I think that's pretty much it.
Q. Okay. Let me ask you about a couple of names. You mentioned Mr. Hochberg. Are you just -- how did you come to know Mr. Hochberg?
A. I think we originally met when I explored a run for Congress in -- I don't know -- '09, maybe.
Q. And was he someone you talked to about being a political supporter? What was the connection between your running -- thinking about a run for Congress and meeting Mr. Hochberg?
A. I met him through APAC.
Q. Okay. And when did he become an investor in Tap Room roughly?
A. Sometime between 2013, 2014, something like that.
Q. And through your business dealings and acquaintance with Mr. Hochberg, did you become aware of other businesses he was involved in?
A. That Andy was involved in?
Q. Yes.
A. Generally, he was involved in real estate, which -- was involved in a lot of things.

Q. Okay. Were you familiar with the names of any of his real estate companies?
A. Possibly.
Q. Any names come to mind?
A. Not really.
Q. Let me bounce a couple names off of you.
A. Next Realty, I guess.
Q. Next Realty.
Does the name -- North Riverside Corporation, is that familiar to you?
A. No.
Q. Have you ever been to the headquarters of Next Realty?
A. Yes.
Q. Okay. Where are they?
A. He had an office in Northbrook, and then I believe they moved. I'm not sure where the current office is.
Q. So it was the Northbrook office that you visited?
A. Yes.
Q. Is the name Brian Barrett familiar to you?
A. Yes. He was my CFO for a time at Tap Room Gaming.
Q. And during approximately what years was he

Page 30

A. Yes.
Q. Okay. That's helpful. Thank you.
Mr. Bond, let me ask you a little bit about Mayor Cunningham. I take it you're personally acquainted with Mayor Cunningham.
A. Yes.
Q. How long have you known Mayor Cunningham?
A. I don't know.
Q. Give me a sense. I'm just trying to get your best --
A. Either after my Allstate days or for sure when I was involved in politics.
Q. Okay. And you don't remember which it was, Allstate or your involvement in politics?
A. No, not really. He worked at Allstate around the same time I did. You know, we didn't work closely. I think it was maybe a political event, and it was, like, "Oh, you worked there, too?"
Q. Gotcha. Okay.
I take it you consider yourself a political supporter of the mayor?
A. Yes.
Q. How long would you say you've been a supporter of his political career?

Page 31

A. I don't know.
Q. Well, does it date before the time he became mayor?
A. I don't know.
Q. Let me -- let me, again, go with a frame of reference here. My understanding is Mayor Cunningham was elected mayor in 2017. Is that your recollection as well?
A. Yes.
Q. And isn't it the case that you were a supporter of his before he was elected mayor?
A. What do you mean by "supporter"? Did I vote for him? No, I wasn't eligible.
Q. Fair enough.
Let me ask you this: Were you a -- directly or indirectly a contributor to Mayor Cunningham's campaign for mayor?
A. In 2017?
Q. Yes.
A. Yes.
Q. Okay. And before that, were you aware he had been an alderman for a number of years?
A. Yes.
Q. Okay. And had you ever hosted campaign events for mayor -- well, then Alderman's

Page 32

Cunningham's election to City Council?
A. Did I ever host what?
Q. Campaign events.
A. I don't believe so.
Q. Okay. Did you ever contribute directly or indirectly to Mr. Cunningham's campaigns for alderman?
A. I don't recall.
Q. Let me focus on Mr. Cunningham's campaign for mayor in 2017. Apart from any financial support you may have lent to Mr. Cunningham's campaign efforts, did you play any role as a political adviser?
A. To who?
Q. To Mayor Cunningham in his run for election in 2017.
A. What do you mean by political adviser?
Q. Give him advice about his campaign strategy, for example.
A. Yes.
Q. Okay. Can you -- I don't want to get into a particular campaign strategy from four years ago, but can you describe what your role was in that regard?
A. General strategies on how to win

Page 33

elections.
Q. And was that something you -- can you give me a sense of how frequently you talked to Mr. Cunningham about that in the course of his campaign for mayor in 2017?
A. I don't recall.
Q. Mr. Bond, my understanding is that Tap Room Gaming contributed to Mayor Cunningham's campaign by making certain contributions to something known as the Video Gaming United PAC, which, in turn, transferred money to the Waukegan Democratic Organization, which, in turn, contributed money to Mr. Cunningham's campaign in 2017.
Are you familiar with that sequence of events?
A. It sounds about right.
Q. At some point -- and I'm just throwing this out there to see if you recall this -- there was an issue where an excess payment from the Video Gaming United PAC to the Waukegan Democratic Organization needed to be returned. Do you recall that?
A. Not specifically.
Q. Since you said "specifically," let me ask

you do you generally recall something along those lines?
A. Not today.
Q. Okay. Let's take a look at some documents to see if they refresh your memory, and we are going to -- bear with me. I'm going to try to use the screen share program since we are having trouble getting you on Exhibit Share. So it will just take a moment to make this -- for me to make this document available to all the other lawyers on the call, and we'll try to get it to you.
MR. SMITH: It's loading up now. But, Glenn, and, Michael Grant, you should have the ability to -- if you refresh your Exhibit Share, you should be able to see what's been marked as Exhibit 143 hopefully.
(Whereupon, Exhibit 143 was marked for identification.)
MR. SMITH: All right. Glenn and Michael G., are you able to see Exhibit 143 before I show it to Mr. Bond? I just want to make sure.
MR. GRANT: I'm getting a refresh on the Egnyte site. Why don't you go ahead and show it, and we can just look at it together?
Okay. I think I'm in there now. I can

get that. Sorry about that.
BY MR. SMITH:
Q. So, Mr. Bond, hopefully on your screen you're able to see what's been marked as Exhibit 143. I'm going to just try to manipulate this.
This is a Form D-2 for the Waukegan Democratic Organization for the -- what's the second quarter of 2017 signed by David Koss. Is the name David Koss familiar to you, Mr. Bond?
A. Yes.
Q. Who do you know Mr. Koss to be?
A. He's the head of the Waukegan Democrats.
Q. And that's something you were familiar with -- you know David Koss through your time in politics; is that true?
A. Yes.
Q. You're familiar, I take it, with what a Form D-2 is?
A. Yes.
Q. So I'm going to go through a couple items in this form, Mr. Bond, and I'm going to try to go slowly, enlarge things so that they're visible, and you can let me know if I'm either making you nauseous or you're having trouble seeing things.

Directing your attention now to page -- it's indicating a transfer in from Video Gaming United PAC for $10,000 on April 5, 2017. Are you able to see that?
A. Yes.
Q. If we look at transfers out, do you see, on Schedule B, which is page 5 of this exhibit, the very next day, April 6, 2017, there is a $10,000 reimbursement to Video Gaming United PAC. Do you see that?
A. Yes.
Q. Okay. And I should have asked you this, but you were, back at this time, chair of the Video Gaming United PAC; is that right?
A. That sounds accurate.
Q. And Mr. Barrett was the treasurer?
A. I assume. I can't confirm that.
Q. I guess the public filings will be what they are, but I take it you recall that, at least for some period of time, Mr. Barrett was the treasurer of Video Gaming United PAC?
A. Yes.
Q. And, Mr. Bond, does seeing this reimbursement of the $10,000 contribution from Waukegan Democratic Organization to the Video

Gaming United PAC refresh your memory in any way about that sequence of events?
A. It says it's a reimbursement.
Q. Okay. And in a moment we'll take a look at the D-2 for the Video Gaming PAC which, I think, will have more information about that reimbursement but sitting here today, does this trigger any recollections on your part?
A. Other than it was a reimbursement, no.
Q. Mr. Bond, if we look at Schedule A on page 2 of Exhibit 143 -- apologies for all the scrolling -- there are donations of $5,000 each, one from Continuum Financial, LLC, on April 11, 2017; and one from North Riverside Corporation on May 7, 2017.
I think you testified earlier you were familiar that Continuum was a company associated with Mr. Barrett, correct?
A. Yes.
Q. Did you play any role in soliciting this contribution from Continuum Financial to the Waukegan Democratic Organization?
A. I don't recall.
Q. And when you say you "don't recall," I take it you don't recall one way or the other?

A. Right.
Q. Okay. And there's another corporation here, North Riverside Corporation. I'll represent to you that that's a company that, according to public filings, is associated with Andrew Hochberg and Larry Hochberg. Did you play any role in soliciting this contribution to the Waukegan Democratic Organization from North Riverside Corporation?
A. I don't recall.
Q. And, again, I take it that's you don't recall one way or the other?
A. What other interpretation of that --
Q. I'll tell you. I'll tell you since you asked. I'll make an exception to the way this works. Sometimes when people say they don't recall, they are saying I don't recall that happening. I don't think it happened. It sounds like what you're saying is you just don't recall one way or the other.
A. Yes.
Q. Okay. Thank you for asking for that clarification.
I'm going to stop the Exhibit Share now.
Mr. Bond, if we were to focus on the

period from Mr. Cunningham's election as mayor in 2017 through fall of 2019, how would you characterize your relationship with Mr. Cunningham?
A. Give me just a second.
Q. Okay.
A. Can you hear me okay?
Q. Yes.
A. Can you give me the question one more time?
Q. Focusing on the time period from April 2017, when Mr. Cunningham was elected mayor, through the fall of 2019, how would you characterize your relationship with the mayor?
A. Friendly.
Q. Did you consider him a friend?
A. Sure.
Q. Was he someone you socialized with on occasion?
A. Not often, no. Usually through political things. You see each other at events.
Q. Okay. So we are going get into some more exhibits now. Things may get a little more exhibit heavy. Did that seem to work okay with the Exhibit Share?
A. Yes.

THE VIDEOGRAPHER: The exhibit is not being displayed on the screen. Is that okay?
MR. SMITH: That's okay. It will be.
THE VIDEOGRAPHER: No, I mean for the recording, it's not being displayed.
MR. SMITH: I think that's okay. It will be part of the record.
THE VIDEOGRAPHER: Gotcha. Sorry for the interruption.
MR. SMITH: Thanks for alerting.
BY MR. SMITH:
Q. Mr. Bond, I'm going to show you now what's been marked as Exhibit 144.
(Whereupon, Exhibit 144 was marked for identification.)
BY MR. SMITH:
Q. Let me know if you're able to see that document up on your screen.
A. Yep, I see it.
Q. Okay. And I'll represent to you, Mr. Bond, that my understanding is Exhibit 144 are text messages that were retrieved from Mayor Cunningham's phone and produced by the City.
Take -- let me -- this is the part that's hard. I want to give you ample opportunity. I'm

going to be asking about individual text exchanges, but take a moment to look through this as much as you need to. My first question to you is going to be do you recognize the exchanges here as text messages that you exchanged with Mayor Cunningham on the dates indicated?
And I'm happy to scroll down, at your direction, once you let me know you've had a chance to view as much as you want to of a particular page.
A. I'm just reading them. It appears to be text exchanges.
Q. Okay. And you recognize them as text exchanges you had with Mayor Cunningham?
A. Yeah, it's possible.
Q. And based on the context and the content of the messages, I take it you have no reason to doubt that; right?
A. Right. Right.
Q. Okay.
A. From what I see on the screen, that's -- I mean it's possible.
Q. There's a reference to Pete's wife's services tomorrow. I take it that's a reference to Pete Couvall's wife who had passed away around this

Q. Mr. Bond, I'm now turning to the next page, which is the 13th page of Exhibit 144.
On April 4, 2019, you wrote to the mayor "Can you keep Tuesday, April 16, open from 8-noon. Delgado and Cousineau are both available to do a planning session for your re-election. I'd like to include Jon and Tom. We can meet at my lake house in Antioch. Let me know."
Did the meeting that you were proposing in this text message actually take place?
A. I believe so.
Q. And what's written here, is Delgado a reference to Mike Delgado, the attorney?
A. Yes.
Q. Why did you think it was appropriate to include him on a planning session for Mayor Cunningham's re-election?
A. He's a good political strategist.
Q. Okay. Had he, to your knowledge, served as an adviser to the mayor previously?
A. It's possible.
Q. Okay. Well, when you say "it's possible," do you have a memory that he did?
A. I don't know what their professional relationship is.

Q. But, for whatever reason, you thought it made sense to invite Mr. Delgado; right?
A. Yes.
Q. And why Mr. Cousineau?
A. Talented political strategist.
Q. Did -- to your knowledge, did he have any kind of prior relationship with the mayor?
A. I don't know.
Q. And then you say "I'd like to include Jon and Tom."
Is that a reference to Mr. Kozlowski and Mr. Mallard?
A. Probably.
Q. And of the people you mentioned here in this text message, do you remember who actually attended the meeting that took place at your lake house?
A. I don't remember exactly who was there, no.
Q. You were proposing this as a planning session for the mayor's re-election. Was -- did there end up being more than one such meeting?
A. I don't recall.
Q. Then staying on the same page, Mr. Bond, you texted the mayor, "Let's think through your

committee assignments when we get together Tuesday. Hold off on commitments, if you can."
What -- help me understand the conduct here. What was it about your relationship with the mayor that led you to believe he would want your input on committee assignments?
A. I don't recall.
Q. Did you end up giving him input on committee assignments?
A. I don't recall.
Q. You then went on to say "You need to make sure you have the right people in the right spots. You should not empower your enemies with powerful committee chairmanships or assignments."
Who did you regard as "the right people"?
A. I don't recall.
Q. Okay. And what about the mayor's enemies? Was there anyone at that point you would identify as an enemy of the mayor?
A. Probably the opponent. And if you go back to 2017, from a strategic point of view, he appointed his opponent, Lisa May, who he had just gone through a very hot -- hotly contested election to like a really important committee position, and I think he viewed it as an olive branch sort of

thing. And she used it to just harm him politically and do things to the City that were harmful. So I think it was kind of a recommendation or a "Remember, don't do that again" sort of thing.
Q. And so are there particular people who fell into this category?
A. Specifically, no, I don't recall.
Q. On April 29, the mayor texted you, "I'm speaking in front of the subcommittee. Your thoughts?"
Do you recall what subcommittee he was speaking in front of at that point in time?
A. No.
Q. All right. Mr. Bond, I am turning to the 14th page of Exhibit 144, Bates-stamped 8529. On May 15, 2019, you texted the mayor "I'm in Las Vegas traveling to Hard Rock Casino in Tulsa, later today. I'm not sure we need the Hard Rock brand, but I want to make sure we have the option. They basically take a licensing fee, and this makes the economics more challenging. I'll let you know."
Do you see where I am?
A. Yes.

Q. These were -- this travel that you're describing related to your efforts to develop a potential casino in Waukegan; true?
A. The travel was to attend a gaming conference in Las Vegas, and I stopped in Tulsa and picked up a fishing boat in the area that I purchased and then rented a car and drove home. So that's the purpose of the travel.
Q. Okay. Did you meet with Hard Rock Casino personnel during that trip?
A. I went to the Hard Rock in Tulsa, yes.
Q. Did you meet with people there, or did you just attend as a patron?
A. Both.
Q. And when you said, "I'm not sure we need the Hard Rock brand, but I want to make sure we have the option," who is the "we"?
A. Me, my group.
Q. Who was your group at that point?
A. Whoever I assembled to be my partners.
Q. To be your partners in the casino development? Yes?
A. Yes. Correct.
Q. And then you said, "I'll let you know how it goes." Did you have some kind of follow-up

conversation with the mayor to let him know how it went?
A. I don't believe so.
Q. All right. Mr. Bond, let's turn to -- I'm going to skip a page. I'm sure everyone will be happy about that. Let's take a look at page 16 of Exhibit 144. And I apologize. I'm going to just scroll back up so you can see that the text message at the top of that page is from you.
Do you see you texted to the mayor, "Felix said he is a no"?
A. I see that, yes.
Q. That was a reference to Alderman Felix Rivera?
A. I assume so, yes.
Q. And when you said he was "a no," you were letting the mayor know what you understood to be Mr. Rivera's position with regard to a Waukegan casino?
A. Probably, yeah. I don't specifically recall what that was about, but that could be what it's about.
Q. And, similarly, when you wrote that "Technically Lynn didn't say no. She just said she's not convinced," that was a reference to

Alderman Lynn Florian's position on a casino for Waukegan; correct?
A. I believe so. It was Facebook chatter.
Q. Okay. Were you making some effort to monitor the Facebook chatter of the various City Council members?
A. I wouldn't say it was an effort to monitor, no.
Q. How did you learn about the Facebook chatter then?
A. The candidates were posting things on Facebook.
Q. Are you a Facebook user?
A. I have an account. I probably haven't posted anything in a year or so. I don't know. I'm not an avid Facebooker, if that's your question.
Q. And, Mr. Bond, toward the bottom of this same page, you wrote to Mayor Cunningham, "Are you aware the IGB license fee for Waukegan is estimated to be 90 million to 100 million? It's 75 percent of highest 12 months over the first three years."
And then you go on and you say, "Host communities will need to take this into consideration when working with developers."

What were you attempting to communicate to Mayor Cunningham?
A. Just what it says. The City stands to benefit from the licensing fees. Just passing on information.
Q. Why were you passing on this information to the mayor?
A. It's important information.
Q. And when you said, "Host communities will need to take this into consideration when working with developers," help me understand what that meant.
A. It's a -- it's a component of development, and you have to consider it.
Q. And consider it because it would be a cost to developers? Was that the idea?
A. Yeah. This is the licensing fee mechanism of how a state would extract their licensing fee.
Q. Were you concerned in some way that the mayor didn't have access to good information about the way that the casino process was going to work?
A. I don't know.
Q. And then the mayor wrote you back the same day, if we turn to the next page, which is page 17 of 18, and I think there may just be a word missing

here as a typo. "Okay. And for the heads up the rules." He then goes on to say, "We are getting our RFQ info together as we speak."
Do you see where I am?
A. I see that.
Q. Okay. Did you understand the mayor's reference to RFQ to be a reference to a request for qualifications and proposal for casino developers?
A. That makes sense.
Q. Mr. Bond, did you ever have any conversations with either the mayor or anyone else in the city government about the content of the RFQ before it issued on July 3 of 2019?
A. No.
Q. And then on June 28, 2019, you texted "Today is the big day. Call me this morning before 10:00 a.m."
You recall that June 28, 2019, was the day that Governor Pritzker signed the gaming expansion bill into law?
Do you recall that, Mr. Bond?
A. The date sounds about right.
Q. Why did you want the mayor to call specifically before 10:00 a.m.?
A. Probably based on the next text, just to

make sure we both understood the rules that were taking effect from at least the state's perspective.
Q. And did you actually have a conversation with the mayor before 10:00 a.m.?
A. I don't recall.
Q. Okay. And I should have asked you this. You said "probably" in the previous answer. Am I correct in understanding you don't have a recollection one way or the other about whether you had this conversation or what the content of it was?
A. I don't, no.
Q. And then your next text says, "Hey, just to make sure you remember that after the gaming bill takes effect, any communication relating to gaming between you and us needs to be disclosed to the gaming board."
Then you say, "We can still speak about other things that are not related to gaming."
And then you go on to quote the relative statutory language. Do you see that?
A. Yes.
Q. Were you suggesting to the mayor here that once the gaming bill takes effect, that you and he

should no longer talk about issues related to gaming?
A. This was a reference to the state statute that was taking effect. My belief is that under state statute, there is no prohibition to communication, but the elected or city official has a duty to report to the gaming board information about the communication.
Q. Why did you suggest to the mayor that you should limit your conversations to items that were not related to gaming?
A. I don't understand.
Q. Sure.
I think you just testified that your understanding of the legislation was you were free to talk to elected officials about gaming. It's just that they had to disclose those conversations; right?
A. Yes.
Q. And correct me if I am wrong, but I take it the import of your text to Mayor Cunningham here that you and he should limit your conversations to items that are not related to gaming. Am I understanding it correctly?
A. I'm not sure.

Q. You're not sure what you meant by your text, as you sit here today?
A. Well, the purpose of it was to make sure what the rules were.
Q. Did you feel you and the mayor had been having gaming-related conversations that you wouldn't want disclosed publicly?
A. Repeat that again.
Q. Yeah.
Did you feel that there was something that you and the mayor had previously had gaming-related conversations of the nature that you wouldn't want disclosed publicly?
A. No.
Q. Did you continue to discuss gaming after -- with the mayor after June 28, 2019?
A. I don't believe so.
Q. Why not?
A. What's that?
Q. Why not?
A. Why didn't I have gaming conversations with him?
Q. Yeah.
A. We wanted to follow the rules.
Q. What rules are you talking about?

packed with meetings. That's basically all I did.
Q. Okay. Do you have any kind of calendar in existence still that would kind of show your lineup of meetings from that time?
A. No.
Q. How did you keep your calendar at that point in time?
A. Sometimes just written. Sometimes electronic. Just depended.
Q. All right. So you didn't have a set practice of I keep it on Outlook? Or I have a paper calendar? Something like that?
A. It's kind of a combo of both.
Q. And where did the electronic portion of your calendar reside?
A. Probably on a server somewhere at the company.
Q. So that was a Tap Room item?
A. I'd assume so, yes.
Q. And I take it you no longer have your paper calendar from that period of time?
A. Correct.
Q. But I take it that's something you've looked for in response to the subpoena in this case?

A. Yes.
Q. Do you recall at some point a meeting you had with Gina Roberts not at Tap Room where you discussed the desire to support Alderman Florian's campaign financially in some way?
A. I don't recall.
Q. And, Mr. Bond, so I don't go through kind of the list of everyone I think you might have met with in a Waukegan-specific meeting, let me ask it this way, and then I think we can sort of move on. Granted that you were having all these meetings, you don't have a lot of specific recall. Are there any what I'll call Waukegan-specific meetings, following your term, that you do just happen to remember that stand out in your mind for some reason or another?
A. No.
Q. Mr. Bond, we talked a little bit earlier about the Waukegan Voter Alliance, and we can look at another one of those D-2 forms, if it would be helpful, but I just want to see if you have any memory of this. In March of 2019, J&J donated $10,000 to the Waukegan Voter Alliance. Did you have any role in soliciting that contribution from J&J?

A. I assume yes.
Q. And why do you assume yes?
A. I had a longstanding relationship with them, and we were collaborating on the -- what we call the Bet on Main Street project.
Q. And can you give me a sense, just describe what were the components of the Bet on Main Street project?
A. Just an advocacy campaign to bring awareness to the benefits of regulated video gaming.
Q. And who besides Tap Room and J&J were behind that campaign?
A. Excel is the other big operator and then a couple other medium-side terminal operators.
Q. And was there, for lack of a better word, some organization that was the focal point for that campaign?
A. It was kind of created as its own entity that was kind of operator neutral. You know, it wasn't -- the two big companies, J&J and Excel, typically don't get along. So I helped bring them together in the spirit of making sure our industry continued to be regulated in an appropriate way and not overtaxed and primarily due to policymakers'

gross misunderstanding of how the industry works.
Q. And just so I'm clear, because you used the word "entity," was there some sort of -- some sort of entity formally set up? An organization? A PAC? Something like that?
A. I don't believe so. I think it was more of a web domain was purchased and...
Q. And this -- the group behind this campaign, why was that not an effort that could be made through the Illinois Gaming Operators Association?
A. The greatest or most powerful argument to not -- I mean, the tax -- the proposed tax increase would have basically bankrupted the industry. As it turns out, we learned it was really just an analyst's error late at night that they needed x million to balance the budget, the speech needed to be finalized. So as draconian as sounds, it was an error, believe it or not. It made national headlines.
But the most powerful argument that we had to go against the very popular newly elected governor was not what it did to terminal operators -- I mean, I had 95 full-time employees whose paychecks depended on it and families

Pl. SJ Ex. 131

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAUKEGAN POTAWATOMI CASINO, )
LLC, an Illinois limited )
liability company, )
Plaintiff, )
vs. ) No. 1:20-cv-750
CITY OF WAUKEGAN, an )
Illinois municipal )
corporation, )
Defendant. )

The videotaped deposition of JON KOZLOWSKI called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before DENISE A. JOHNSON, a certified shorthand reporter within and for the State of Illinois, via video conference per Executive Order 2020-14 on the 6th day of April, 2021, at the hour of 9:28 a.m.

Reported By: DENISE A. JOHNSON, C.S.R.
License No.: 084-004004

APPEARANCES:

FREEBORN & PETERS, LLP, by
MR. DYLAN SMITH,
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 360-6000
dsmith@freeborn.com
Representing the Plaintiff;

HEPLER BROOM, LLC, by
MR. GLENN DAVIS,
MS. MEGHAN RIGNEY
30 North LaSalle Street, Suite 2900
Chicago, Illinois 60602
(312) 230-9100
glenn.davis@heplerbroom.com
meghan.rigney@heplerbroom.com
Representing the Defendant;

TABET DiVITO & ROTHSTEIN, LLC, by
MR. MICHAEL GRANT,
209 South LaSalle Street, Suite 700
Chicago, Illinois 60604
(312) 762-9450
mgrant@tdrlawfirm.com
Representing the Deponent.

Also Present: Mr. Michael Prager
the videographer

INDEX

| WITNESS | EXAMINATION |
|---|---|
| JON KOZLOWSKI | |
| By Mr. Smith | 6 |
| By Mr. Davis | 198 |
| By Mr. Smith (further) | 203 |

EXHIBITS

| NUMBER | MARKED FOR ID |
|---|---|

(ALL EXHIBITS PREVIOUSLY MARKED AND SHARED THROUGH EXHIBIT SHARE.)

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:28 a.m. on April 6, 2021. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video recorded deposition of Jon Kozlowski taken by counsel for Plaintiff in the matter of the Waukegan Potawatomi Casino, LLC, versus City of Waukegan filed in the United States District Court for the Northern District of Illinois Eastern Division, Case Number 1:20-cv-750. This deposition is being held remotely.

My name is Michael Prager from the firm Veritext, and I am the videographer. The court reporter is Denise Johnson from the firm Veritext. I am not authorized to administer an oath, I am not related to any party in this action, nor am I financially interested in the outcome.

Counsel and all present in the room and everyone attending remotely will now state their appearances and affiliations for the record. If there are any objections to proceeding, please

state them at the time of your appearance beginning with the noticing attorney.

MR. SMITH: Good morning. Dylan Smith of Freeborn & Peters for the Plaintiff, Waukegan Potawatomi Casino, LLC.

MR. DAVIS: Good morning. Glenn Davis from HeplerBroom. I'm here on behalf of the City of Waukegan, the Defendant.

MR. GRANT: Good morning. Michael Grant from Tabet DiVito & Rothstein. I'm here on behalf of the witness, Jon Kozlowski.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness?

THE COURT REPORTER: Will you raise your right hand, please?

(Witness sworn.)

JON KOZLOWSKI,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SMITH:

Q. Thank you again, Mr. Kozlowski. Good morning.

A. Good morning.

background, okay?
A. Okay.
Q. Where do you currently live?
A. In Chicago on the Northwest Side.
Q. Okay. Can you give me your street address?
A. 4203 North Keystone Avenue, Number 1-W, Chicago, Illinois, 60641.
Q. Thanks. Which ward is that?
A. Right on the edge -- this is 39.
Q. And -- okay. And where did you grow up?
A. Lake Zurich, Illinois.
Q. So how long have you lived at that spot in Chicago?
A. Two years.
Q. Where did you live before that?
A. Man, I can't remember my address, but it was not too far from here. I believe it was also in the 39th ward. It was on Keeler Avenue only a few blocks away from where I'm at right now, so just around the corner.
Q. Okay. That's fine. And how long have you been at that address about?

A. That was one year.
Q. How old are you, Mr. Kozlowski?
A. I'm 30 years old.
Q. And you said you grew up in Lake Zurich. Did you go all the way through high school in Lake Zurich?
A. Yes.
Q. And how far did you get in school?
A. I got a bachelor's degree. And then after that, I got a certificate in non-profit and mission driven management. So that's about as far.
Q. Where did you get your bachelor's degree?
A. Illinois State University.
Q. And the certificate, was that something you did through a school? How did you get that?
A. I got that through the Stuart School of Business at Illinois Tech. I did that on my own.
Q. Did you actually attend classes for that, or is that more an on-line course? How does that work?
A. That was in classes. That was in

class.
Q. So when did you graduate from Illinois State?
A. 2012 if I recall correct, yes, that's right.
Q. Makes sense. And when did you get the certificate from the Stuart School?
A. That would have been a handful of years ago. I think I was 26 or 27, so 2016 or 2017.
Q. Thereabouts?
A. Abouts.
Q. So it sounds like that certificate is something you went back and got after you already started working?
A. Yes.
Q. Any other education beyond high school?
A. No.
Q. Other than what you've mentioned obviously?
A. No.
Q. And, Mr. Kozlowski, can you walk me through the jobs you've held since graduating college?
A. Okay. After college I worked at a bar

and music venue, I think, a year, maybe a little longer. I worked at a hotel, I think, a year, maybe longer.
I worked on a political campaign and -- or volunteered at the political campaign and then I -- oh, then I worked -- or I also worked for a social service non-profit agency for about three years.
And then I worked -- yes. And then I did, let's see, another campaign. And I worked with Michael at Video Gaming United.
Q. I'm sorry. You said you worked with Michael where?
A. Video Gaming United.
Q. When you say at Video Gaming United, is that Video Gaming United Association or Video Gamed United --
A. Association.
Q. When you say you worked at Video Gaming United Association, does it actually have a physical headquarters of some sort?
A. Not exactly.
Q. Explain what you mean by that.
A. I -- it didn't have its own office

Page 18

A. Let's see. I -- Michael -- through Michael is how I got linked up there. Michael knew Angelo, and that's how I got there.
Q. So maybe now is a good time. Could you explain to me how it was you knew -- when you say Michael, you mean Mr. Bond?
A. Oh, sure, yes.
Q. And it's okay to refer to him as Michael. I just want to make sure we know who we're talking about.
Maybe you could explain to me how it was you knew Michael Bond.
A. Let me see. So after my campaign working with Merry Marwig, you know, I had submitted my resume. And I believe it must have circled around the political world. And I think Michael was looking -- you know, needing advocacy help. So that's how it kind of made its way to him.
Q. And did you understand Mr. Bond to have some sort of role in the Angelo Kyle campaign?
A. I didn't think -- I don't -- I don't think he had a role in the campaign, not that I'm recalling.

Page 19

Q. So at some point, he reached out to you about working on the Kyle campaign?
A. Yes, and -- yes, that's how it happened. He reached out to me or -- and I interviewed with Michael. And then -- and then after that I -- you know, I worked on the Angelo Kyle campaign.
Q. And when Michael reached out to you, that was somewhere in the 2017 period would you say?
A. No. I think 2018.
Q. 2018, okay. And then I think when -- I was asking about other campaigns, and you mentioned the Angelo Kyle campaign. It could have been a misimpression. I thought you were perhaps going to mention another campaign as well.
A. I'm not -- I'm not -- yes, yes, correct.
Q. Okay.
A. Let's see. I've since -- you know, I've volunteered on the Sam Yingling for state representative campaign and the Diane Pappas for state representative campaign and -- yes, at

Page 20

that time -- or after that Kyle campaign, I did those things.
Q. Got you. Okay. And then you said you began working for Michael Bond at Video Gaming United Association. Did I get that right?
A. Correct, yes.
Q. And can you explain how that came about?
A. Let's see. Well, so I -- so I interviewed with Michael. And I knew -- and so Michael hired me for -- to be the executive director of the trade association that he had started. It was called Video Gaming United.
Q. And you're today still the executive director of Video Gaming United Association, correct?
A. No.
Q. When did you stop being the executive director?
A. I believe at the very end of 2019, yes.
Q. So that was shortly -- I'm sorry, Mr. Kozlowski. Go ahead.
A. If I recall correctly, right at the end of 2019.

Page 21

Q. So that was shortly before Mr. Bond sold Tap Room Gaming to J&J Ventures?
A. It was shortly after.
Q. Okay. And why did you -- why did you cease to be the executive director of Video Gaming United Association?
A. Let's -- at that time there was no -- there was no funding source for the association. And there was no -- going to be no advocacy effort -- a local advocacy effort needed.
I know Michael sold his company and -- and so there -- I believe the new owners of that company -- I don't think they had an advocacy effort. And so there was no point anymore to have the association, you know, existing, and so I just went on my way.
Q. Got you. Let me try to unpack that answer a little bit. You said there was no longer going to be any funding source for Video Gaming United Association. I took you to mean that Tap Room Gaming had been the funding source for the Video Gaming United; is that correct?
A. The dues payer, yes.
Q. So they actually paid some -- they paid

dues to the association?
A. Yes.
Q. Were there any other dues payers?
A. They were the -- they were the only one.
Q. Okay. And what were their dues?
A. I can't recall.
Q. Okay. Can you give me an approximate sense of how that worked?
A. I can't -- I can't recall at the moment how much -- I can't recall how much they were paying in dues.
Q. Did they pay the dues on a periodic basis or on a yearly basis? How did that work?
A. I recall periodic basis. What the period was I can't recall.
Q. And did you as the executive director of the association set the dues amount, or did Mr. Bond decide what the dues were going to be?
A. I believe -- I'm not quite sure. I believe Mr. Bond set the dues.
Q. I take it you did not set the dues?
A. I did not.
Q. While you were executive director of

the Video Gaming United Association, who was your primary point of contact at Tap Room Gaming?
A. My primary contact was Michael, Mr. Bond.
Q. Was there anyone else from Tap Room Gaming you dealt with in your capacity as executive director of the Video Gaming United Association?
A. Not in my capacity that I can recall.
Q. So just going back to the narrative that got us talking about this a little bit, Mr. Kozlowski, I think you said that when Mr. Bond reached out to you you got offered the job to be executive director of the Video Gaming United Association.
Just to make sure I'm not sort of combining two separate things in my head, was the outreach about working on the Kyle campaign also the outreach that led to you becoming executive director of the Video Gaming United Association?
A. I don't recall, but I -- I recall it -- you know, reaching out for the -- for the Kyle

campaign. And after the Kyle campaign is when Michael spoke to me about becoming -- working for Video Gaming United.
Q. And I think you just said once Mr. Bond sold Tap Room there wasn't going to -- there wasn't a need for an advocacy organization anymore. Did I hear that correctly?
A. Well, I mean, I believe there's always a need for advocacy and there should have been, however I don't believe -- I'm not -- you know, I'm not sure what the new owners of the company wanted to do, but I don't believe they had any local advocacy or outreach ideas or plans or just, you know, desires.
Q. So, Mr. Kozlowski, have we covered your -- what do you do for employment right now?
A. Unfortunately, I am currently unemployed.
Q. Okay. And how long have you been unemployed?
A. A few months.
Q. What was your last job?
A. I worked on a campaign in -- I worked on a state representative campaign.

Q. Whose campaign was that?
A. That would be Ken Mejia-Beal for state representative.
Q. So did you regard your position as executive director of Video Gaming United association as a full-time job?
A. Yes.
Q. And I take it you received a salary for that position?
A. Correct.
Q. What was your salary?
A. I believe I -- if I recall correctly, I believe I started maybe $45,000 per year.
Q. So -- and help me out. How long were you executive director of Video Gaming United Association? You've testified you left at the end of '99 (sic). So how long before that have you been the executive director?
A. Less than two years if I'm recalling correctly, if my math is correct.
Q. And I take it your salary was paid out of the dues that Video Gaming United collected from Tap Room Gaming?
A. Correct.

Mary Kozlowski?
A. No.
Q. I will give one more Kozlowski a try. You know, being a Smith myself, this is -- Ed Kozlowski?
A. No.
Q. Okay. We are in Chicago. Michael Delgado?
A. I don't have a personal -- I'm familiar.
Q. Have you met Mr. Delgado?
A. I believe I have. I can't recall when.
Q. We will come back to that.
A. Okay.
Q. Pete Couvall?
A. I am familiar, yes.
Q. And how is it that you're familiar with Mr. Couvall?
A. Pete Couvall was the chairman of the Waukegan Democratic Organization, and so I'm familiar with him through that.
Q. And is that from your working on campaigns that you came to know him?
A. Yes, and other volunteer stuff.

Q. When you say other volunteer stuff, what are you referring to?
A. Well, campaigns essentially, yes, whether I -- yes. I know that -- I don't recall specific -- you know, like when I first met him, but I know that the Waukegan Democratic Organization is active. And I've probably run into him, but yes. But campaigns is how I know him.
Q. Dave Koss?
A. Yes. I'm familiar with Dave Koss.
Q. How is it you know Mr. Koss?
A. Dave Koss was the -- he was the -- I'm not sure of his role with the Waukegan Democratic Organization, but he was there. He ran the Waukegan Voter Alliance Action Committee as well.
Q. And we will get into this. You had some occasion to collaborate with Mr. Koss in the Waukegan Voter Alliance in connection with certain aldermanic elections in Waukegan; is that right?
A. Correct.
Q. Do you consider Mr. Koss a personal

friend?
A. I don't recall ever hanging out with him. He is a very nice guy.
Q. So more a professional acquaintance than a personal acquaintance?
A. Yes.
Q. Former Senator Terry Link?
A. Yes, I'm familiar.
Q. Are you personally acquainted with Mr. Link?
A. I am not personally acquainted with Terry.
Q. Brian Barrett?
A. I am not acquainted with Brian Barrett.
Q. Wendy Richardson?
A. I don't believe -- I don't recall Wendy Richardson.
Q. Travis Haley?
A. I know Travis.
Q. How do you know Travis?
A. Travis I would say is a friend of mine, and he has volunteered on a number of campaigns that I have also been involved with.
Q. And which campaigns are those?

A. My most recent one. I think he is -- I believe Sam Yingling campaign. He was involved with that, the Angelo Kyle, and some aldermanic campaigns.
Q. Aldermanic campaigns in Waukegan?
A. Yes.
Q. Did you know him to be a Tap Room Gaming employee or a former Tap Room Gaming employee?
A. Correct. That's what I know -- I know him to be that.
Q. And what's your understanding of what his job was at Tap Room Gaming?
A. If I recall correctly, he -- he fixed broken machines.
Q. And you said he's a friend of yours. How did you guys come to be friends?
A. Through, you know, campaign -- working on campaigns together.
Q. So not a friend from growing up, in other words?
A. No.
Q. Tom Maillard?
A. I'm familiar.

Q. Do you consider Mr. Maillard a friend?
A. No, not really.
Q. How is it that you're familiar with Mr. Maillard?
A. He is very active in democratic politics.
Q. When you were involved in aldermanic campaigns in Waukegan, did you also collaborate to some extent with Mr. Maillard on those campaigns?
A. I recall collaboration, sure, yes. Specifically I'm trying -- I recall collaboration.
Q. We'll get more into the nature of that. I just want to cover the bases right now.
Did you know Mr. Maillard to be a former Tap Room Gaming employee?
A. I never knew of him as a Tap Room Gaming employee. I believe he worked there in the past.
Q. What understanding did you have, if any, about any connection between Mr. Maillard and Mr. Bond?
A. I don't recall much -- I don't -- I

don't recall much information about their relationship.
Q. Is the name Elaine Gates familiar to you?
A. Yes.
Q. Who is Elaine Gates?
A. If I recall correctly, she -- I don't recall her title. I know she -- I don't recall the title. I know she worked at Tap Room Gaming for a period of time. I don't recall her title.
Q. Putting aside title, what was her function at Tap Room Gaming to your knowledge?
A. Financial, financial if I recall.
Q. James or Jim Parks?
A. I don't know -- I don't know of James Parks personally, no.
Q. Is he someone who -- is that a name that's familiar to you when you say you don't know him personally?
A. Yes. I've read things.
Q. What are you referring to?
A. I think newspapers and stuff. I do not know him personally.
Q. And what have you read about him in the

newspapers?
A. I can't recall. The name -- the name sounds familiar.
Q. Okay. Chuck McKenzie?
A. I know Chuck.
Q. Who is Chuck at least to you?
A. I don't know his title. I don't know his role. I know he was a -- to me he's a -- I know he's a state police officer -- former state police officer, yes. That's how I know about Chuck.
Q. Did you understand him to be a Tap Room Gaming employee while you were at the Video Gaming United Association?
A. I don't recall if he was an employee, but I recall that -- I think he worked with Tap Room Gaming.
Q. Did he work in some sort of security capacity?
A. No, I don't recall it being security.
Q. Okay. What was your understanding of his function for Tap Room Gaming?
A. If I'm -- I can't -- I don't recall specifically, but the best -- I think it had

something to do with making sure like compliance rules are being followed if I'm on the right direction.
Q. Do you know the name Tina Sellers?
A. No, or I don't recall any Tina Sellers.
Q. Okay. Do you recall -- well, let me ask you this. Did you -- in the course of your work either in politics in Lake County or with the Video Gaming United Association, did you come to know Mayor Sam Cunningham of Waukegan?
A. Yes.
Q. And how was it that you came to be acquainted with Mayor Cunningham?
A. I don't -- I don't recall how I became acquainted with him, but I know that he is the mayor of Waukegan and, you know, leader in the Democratic party.
Q. Did you ever meet any campaign advisor to -- or work with Mayor Cunningham named Tina?
A. I don't recall ever meeting a Tina.
Q. What about Mayor Cunningham's mother, Mary Ross Cunningham, have you ever met her?
A. Yes, I recall -- I believe I -- I recall meeting her.

Q. Do you remember the circumstances?
A. No, not -- I don't remember the circumstances.
Q. What about the mayor's sister, Jackie Cunningham?
A. I recall meeting her.
Q. Okay. And how did you meet her?
A. If I remember correctly, around the time I -- you pulled up one of the exhibits. I think it was about a -- well, maybe -- I don't recall if it's one of these exhibits. But Tap Room donated a refrigerator -- a high-efficiency refrigerator to a food pantry, and that was over in the Avon Township.
And I know she worked -- she worked there -- or worked or works. I'm not sure. And that is how I became acquainted with her through that.
Q. Did she also work on aldermanic campaigns in Waukegan in the 2019 election cycle to your knowledge?
A. I don't recall her working on them.
Q. Do you know the name Lainie Krozel?
A. I do know Lainie.

Q. And who is Lainie?
A. Lainie is -- she worked at Tap Room Gaming and -- yes, she worked at Tap Room Gaming.
Q. And what did she do at Tap Room Gaming?
A. I'm not sure. I don't know.
Q. Fair enough. Andrew Hochberg?
A. I'm familiar with Andrew Hochberg.
Q. How is it you're familiar with Andrew?
A. If I recall correctly, I know he worked with Michael.
Q. And this was during your time as executive director at Video Gaming United Association?
A. That I would have been familiar with him?
Q. Yes.
A. Correct.
Q. And when you say he worked with Michael, what was your understanding of what he did with Michael?
A. If I understand correctly, they owned -- they owned Tap Room. He did, and so did Michael.

Q. And if I understood your earlier testimony, you have space you've used at Tap Room for your role as executive director of Video Gaming United Association; is that right?
A. Yes, sometimes.
Q. Okay. Can you explain why you say sometimes?
A. Well, if I -- you know, as I remember, sometimes I was, you know -- you know, I was always moving around. Sometimes I was in a conference room. Sometimes I was in just a desk that was unused or another office that was shut away and unused. Sometimes I was in my car. So I -- you know, sometimes, yes. But there was often space available.
Q. Got you. So if I'm understanding correctly, Tap Room would make space available for you as the need arose, but it wasn't always in a set location within the headquarters?
A. Correct, that would be correct.
Q. So, Mr. Kozlowski, we've been going not quite an hour. I'm about to kind of shift topics. We can keep on going. That's fine with me, but I just wanted to raise it in case you or

anyone on the Zoom felt like he or she needed a break. You doing okay?
A. I'm okay if everybody else is okay, if you're okay.
Q. Okay. We'll keep going then.
So, Mr. Kozlowski, I think I know the answer to this based on the -- kind of personal history you've given me, but let me just ask to make sure.
Did you work at all either in a volunteer capacity or in some paid capacity for Mayor Cunningham's election in the 2017 cycle?
A. No.
Q. Have you worked at all on -- again, when I say worked, I'm not trying to exclude volunteer efforts. Have you been involved at all in Mayor Cunningham's campaign for re-election which, I guess, is --
A. Today.
Q. -- today? Have you worked on his campaign at all?
A. No.
Q. Let me ask you to focus on -- I want to focus your attention on a particular point in

time, so April of 2019. Did you attend a meeting at Michael Bond's lake house in Antioch that was for the purpose of strategizing about Mayor Cunningham's campaign?
A. I don't recall if -- I'm not sure when -- I'm not sure -- I don't recall any -- a meeting of that time, but I would say that -- I can remember a strategy meeting if I'm not mistaken.
Q. And when you say you remember a strategy meeting, was that at Mr. Bond's lake house in Antioch?
A. If I recall correctly, yes.
Q. And I just want to see if this refreshes your memory. Do you recall not only Mr. Cunningham and Mr. Bond being there but also Michael Delgado, Will Cousino, and Tom Maillard?
A. I don't recall if all those people. I think I remember -- I'm trying to get a picture. I think I remember Will there.
Q. And who else do you remember being at this meeting?
A. I believe -- I think the mayor was there, I believe, and Tom Maillard. I don't

recall any Delgado there.
Q. Have I been mispronouncing -- is it Mr. Maillard? Is that how he pronounces his name?
A. I'm actually not sure.
Q. Okay. He is Tom to you I take it?
A. Yes, yes.
Q. All right. And so I realize you were not entirely certain about the exact month and year when this meeting took place where you recall Mr. Bond, Mayor Cunningham, Tom Maillard, and Will Cousino being there.
What's your best recollection of approximately when this meeting took place?
A. I can't recall actually. I'm not sure.
Q. Okay. Let me -- sometimes it's easier to relate an event to other events rather than to come up with a time. Let me give you a marker, and you can let me know if you're able to say whether it occurred before or after that.
So the last aldermanic election in Waukegan, the general election, was April 2nd of 2019. Would you agree with me on that?

A. I don't remember actually.
Q. Okay.
A. But I can suppose if that's -- if it is, then, you know, it is but --
Q. All right. Does April 2019 sound about right?
A. Yes. Those elections are usually at the beginning of April on Tuesdays, whatever day that --
Q. Okay. And did the meeting with Mr. Bond, Mayor Cunningham, Mr. Maillard, and Mr. Cousino and you occur before or after that aldermanic election?
A. I'm not sure. It was likely after.
Q. Why do you say it was likely after?
A. I just -- I recall it being warm. That's about all I've got. I think that -- yes, I just recall it being warm. I don't know. Earlier than that would be cold. That could be warmer.
Q. And I don't really want to get into the substance of the mayor's campaign strategies, but how long did that meeting last?
A. I don't know. I'm not sure.

Q. And having refreshed your memory about that meeting, are there any other -- was there any other involvement you had in Mayor Cunningham's re-election efforts?
A. No.
Q. Based on your attendance at that meeting, how would you describe Mr. Bond's role relative to the discussion of the mayor's campaign strategy?
A. I can't remember. I can't remember what he -- I'm not -- I mean, other than it being at his house, I don't remember what he said or anything.
Q. Okay. Was there someone who seemed to be in charge of that meeting?
A. Not that I'm recalling, not that I'm picturing.
Q. So, Mr. Kozlowski, let me turn you back to Mr. Maillard. I apologize if you answered this already, but when did you first meet Mr. Maillard?
A. I'm not sure. I don't recall when I met him.
Q. Okay. Putting aside the exact date,

person and has a lot of anti-gaming and really is a strong anti-gaming advocate, I guess, is the word.

And then she often, you know, has a lot -- you know, whips up lots of -- whips people up on Facebook posts. And so that's probably the echo chamber I was referring to if I'm not mistaken.

Q. What do you mean by whips people up?

A. Oh, just as in -- I'm not sure, advocates, you know, very much against regulated gaming and the local gaming industry and is very -- and is on the social media about that. And that's what the echo chamber references and refers to is people who -- you know, echo chamber is people typically who agree with you, I think.

MR. SMITH: So, Mr. Kozlowski, we've been going not quite two hours. I think maybe this would be a good time to just take a five-minute break if everyone is okay with that.

MR. GRANT: Okay by me.

THE WITNESS: Okay.

THE VIDEOGRAPHER: We are going off the

record. The time is 11:09 a.m.

(A short break was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:15. Please proceed.

BY MR. SMITH:

Q. Mr. Kozlowski, I want to turn to the topic of meetings that I understand you helped arrange at Tap Room with various elected officials and politicians. You recall testifying about that briefly?

A. Yes.

Q. Am I right that in the fall of 2019 you assisted Mr. Bond in arranging meetings with various city council members and candidates for city council at Tap Room Gaming?

MR. DAVIS: I just object to the form of the question and the foundation and as to the lack of clarity as to time.

MR. SMITH: Sure.

BY MR. SMITH:

Q. Let me -- let me try to rephrase it because I'm honestly not sure what I asked.

Mr. Kozlowski, focusing on the fall of 2018, am I right that starting in

approximately that period you played a role in assisting Mr. Bond in scheduling meetings that took place at Tap Room Gaming with various city council members and candidates for city council?

A. Yes, I recall meetings. I recall meetings, yes.

Q. And am I right that one of the things you did for Mr. Bond was to help set up those meetings?

A. Right.

Q. Okay. And did you also attend some of those meetings?

A. Some of them.

Q. Okay. Did you understand, based on your attendance at some of the meetings, that at least some of these meetings involved discussion of Mr. Bond's vision for a proposed casino in Waukegan?

A. I remember a casino being a topic. I know the -- I recall that the meetings were a lot about -- if I'm remembering correctly, about video gaming advocacy, his specific company, his employees, the touring of the facility and, you know, how it works and all that. And there was

casino discussions. That's a hot topic of Waukegan, so it comes up.

Q. How -- when you set up in a meeting -- when you set up a meeting with an elected official for Mr. Bond or a candidate for office, how was it decided whether or not you were going to sit in on the meeting?

A. I'm not sure. I'm not sure.

Q. Okay. Was it Mr. Bond who would ask you to set up a meeting with a particular politician, or were you suggesting names to Mr. Bond?

A. I don't recall. I'm not sure.

Q. To the extent the meetings, at least the ones that you attended, touched on casino -- the casino issue, do you recall there being a visual presentation of some sort, a Power Point slide, that depicted a possible casino in Waukegan?

A. I recall visual aids.

Q. Did you have any role in preparing those visual aids?

A. Let's see. I don't recall preparing casino visual aids. I don't recall -- correct,

yes. I don't recall preparing casino visual aids.
Q. Did you prepare some other types of visual aids for meetings at Tap Room Gaming between Mr. Bond and elected officials or candidates for office?
A. I recall being involved in preparing like, you know, video gaming advocacy things if I remember correctly.
Q. So let me try to get a little less abstract with you, Mr. Kozlowski, and try to talk about particular meetings.
A. Okay.
Q. So let's start with meetings you attended as best you can recall at Tap Room Gaming --
A. Okay.
Q. -- in either sort of the latter half of 2018 or early 2019 with anyone who you understood to be either an elected official or a candidate for office.
A. Okay.
Q. What meetings in that category do you recall attending?

A. Well, from earlier I recall meeting with Gina and -- I can't remember -- Florian, Lynn. I recall meeting with Alderman Seger. And I believe I recall meeting with Alderman Moisio and Alderman Valko if I'm not mistaken.
Q. Did you also participate in a meeting at city hall with Alderman Newsome and Mr. Bond?
A. I did. I do recall that. I forgot.
Q. Do you recall approximately when that meeting with Alderman Newsome took place?
A. I don't.
Q. If we kind of put a big range around it, would you say it was the second half of 2018? Does that sound about right to you or --
A. I don't know.
Q. Okay.
A. I'm not sure.
Q. Let me just go through some other names to just see if it spurs your memory on whether or not you attended meetings with these folks. Alderman Sylvia Sims Bolton?
A. I'm not recalling that. I don't think it's unlikely, but I'm not recalling that.

Q. Do you have any recollection of helping to set up a meeting with Alderman Bolton?
A. I don't. I don't have a -- it's hard to remember sometimes. I don't recall that, but I would say it's not unlikely.
Q. And I think you testified that you don't recall attending a meeting at Tap Room with Alderman Villalobos, but you do recall meeting him with Mr. Bond at Big Ed's Barbecue?
A. I recall that.
Q. What about Alderman Ann Taylor?
A. I don't recall -- I don't recall -- I don't recall meeting with her.
Q. Do you recall setting up a meeting between her and Mr. Bond at Tap Room Gaming?
A. I believe I recall setting up a meeting for her if I'm not mistaken.
Q. Alderman May?
A. I don't recall -- I don't recall that.
Q. What about Keith Turner?
A. I don't recall that.
Q. Roudell Kirkwood?
A. I don't recall that.
Q. By the way, don't take me to be trying

to suggest one way or the other that you were. I'm really genuinely just going to test your -- you know, get your best recollection.
A. Okay.
Q. Annette Darden?
A. I don't recall -- I recall -- I recall meeting with Annette.
Q. Where was that?
A. A barbecue restaurant.
Q. Ed's?
A. I don't think so.
Q. And was that a meeting with Mr. Bond or a separate meeting?
A. I believe Michael was there.
Q. And what was the -- what was discussed at that meeting?
A. Oh, I can't recall specifically. I believe -- if I'm not mistaken, I believe Annette Darden was planning to run for alderman if I'm not mistaken and I -- I'm not sure. I believe she was planning to run for office and -- yes.
Q. So one topic was her future campaign for alderman?

Pl. SJ Ex. 132

A. I think that might have been the only topic.
Q. So you don't remember the topic of a casino coming up at that meeting?
A. I don't recall that. I don't believe it did, but I don't recall that.
Q. John Patterson?
A. I don't recall meeting with him.
Q. And I know you said you don't recall meeting with Turner or Kirkwood. Did you have any role in setting up meetings between Mr. Bond and either Mr. Turner or Mr. Kirkwood?
A. I don't recall that I did. I don't believe -- I don't believe so.
Q. What about Mayor Cunningham?
A. I don't recall doing that either.
Q. Do you recall attending a meeting at Tap Room with Mayor Cunningham?
A. I believe I recall meeting -- I believe I recall meeting.
Q. And what was the -- what were the topics covered in that meeting?
A. I don't recall those topics actually.
Q. Do you recall about -- I'm sorry.

A. I'm sorry. I don't recall what the topics were.
Q. Do you remember approximately when the meeting at Tap Room that Mayor Cunningham attended occurred?
A. I don't recall. I don't recall that.
Q. Do you remember who else was there besides you and Mr. Cunningham -- and Mayor Cunningham?
A. No. I don't -- I believe Tom may have been there, but I don't -- yes, I believe so.
Q. I take it Mr. Bond was there?
A. Yes, I recall.
Q. Did that meeting include the visual depiction of a potential casino in Waukegan?
A. I don't believe so. I don't think so. I don't recall, though.
Q. All right. Fair enough. The meetings that you did attend which I think you've testified were -- and I'm talking about meetings between Mr. Bond and these various officials at Tap Room Gaming.
I think you testified that included Alderman Moisio, Florian, Seger, and Cunningham

and then Alderman Newsome at city hall. Have I got that right?
A. Yes. That sounds -- that sounds accurate.
Q. Okay. And then Mr. -- Alderman Villalobos at Big Ed's?
A. Yes, correct, I think so.
Q. Were you attending those meetings in your capacity as executive director of Video Gaming United Association?
A. Yes, that's -- yes.
Q. And what was your role at these meetings?
A. I don't recall saying a single word.
Q. Okay.
A. I believe, if I remember correctly, you know, I sat there. I sat down.
Q. Did you have business cards that you handed out at those meetings?
A. I don't recall, but I had -- you know, I had business cards. I don't recall if I handed them out or -- I may have.
Q. All right. Let me ask you to take a look at what's been marked -- pre-marked as

Exhibit 124. I will represent to you, Mr. Kozlowski, that this is a photograph of three business cards that Mr. Villalobos provided.
A. Um-hum.
Q. Do you recognize the business card with your name on it as a business card you were using in the late 2018, early 2019 period?
A. Yes, I recognize that.
Q. Do you have any reason to question the notion that you gave Mr. Kozlowski a copy of your business card that's shown here in Exhibit 124?
A. I gave -- can you repeat that, please?
Q. Yes. Is this -- do you have any reason to believe that this -- that you did not give this business card with your name on it to Mr. Villalobos?
A. I do not have any reason to believe that I did not.
Q. Does seeing your business card together with Mr. Bond's and Mr. McKenzie's business cards do anything to remind you about your meeting or meetings with Mr. Villalobos?

Page 94

pamphlets and going to community events with booths and stuff.
Q. So sort of advocacy stuff?
A. Right.
Q. Were you at all involved in any efforts to monitor gaming expansion legislation or lobbying with regard to that legislation?
A. I was not involved with, you know, lobbying for legislation, no.
Q. So, Mr. Kozlowski, we touched on this before. I want to kind of explore it a little more with you.
I understand that for the 2019 aldermanic campaigns you provided support for a number of candidates for city council; is that right?
A. That's correct.
Q. Okay. And part of what you did was to set up a joint campaign headquarters at 116 North Genesee Street, correct?
A. I don't recall the address, but I helped set up with the campaign headquarters.
Q. Okay. That was -- just to kind of place it, that was a campaign headquarters a

Page 95

few doors down from Soto Furniture, correct?
A. Correct, correct, south of it.
Q. On Genesee Street?
A. On Genesee Street.
Q. Did you ever like on your phone take any pictures inside that campaign headquarters?
A. I don't recall doing so.
Q. Okay. To your knowledge you don't have any such pictures as you sit here today?
A. No.
Q. You talked about Alderman Valko. Am I correct that the other campaigns you worked to support were Alderman Bolton's, Alderman Seger's, now Alderman Kirkwood's, now Alderman Turner's, John Patterson's, and Annette Darden's?
A. That's correct.
Q. Is there anyone I left out from that election cycle?
A. No, no, not that I --
Q. By the way, when we were talking about meetings of elected officials and politicians at Tap Room Gaming that you helped set up, I think I limited it to Waukegan officials.
Were there any other officials or

Page 96

politicians from outside Waukegan you were involved in setting up meetings for at Tap Room Gaming?
A. I remember -- I mean, I believe there was. I can't remember -- I can't recall right now. I don't recall specifically.
Q. Do you remember generally by type of office the person held?
A. Yes. I remember attempting to set up meetings with county board people, state reps, other, you know, community organizations. I don't recall which ones I was ever even successful with.
Q. Okay. That's fair. So going back to the campaign for alderman and city council in 2019, was that -- did that become a full-time effort for you in the spring of 2019?
A. Not -- I would say not -- not totally full-time.
Q. Give me a sense of -- if we look at February, March of 2019, how much of your time was that effort concerning?
A. Oh, I can't recall but I still -- I mean, I -- I don't recall exactly how much of my

Page 97

time. But, you know, I was definitely -- you know, I was involved staff over there. So it was -- it was -- it wasn't a little bit of time. It was not a little bit.
Q. And were you -- when you say not a little bit, I mean, it was more than half of your working time, wasn't it?
A. Yes.
Q. And, Mr. Kozlowski, were you compensated in some way for doing that, or did you view that as part of your responsibilities as executive director of Video Gaming United Association?
A. I mean, that was -- you know, my responsibility through the association. I was -- that's where I was compensated from.
Q. And among things you did was to solicit Strategic Advocacy Group to help out candidates with campaign filings, right?
A. Correct.
Q. And that was someone named -- and I'm going to mispronounce this -- Grainne Mahoney. Is that someone you dealt with?
A. Yes, pronounced Grainne.

Page 98

Q. Grainne, thank you. How did you -- how did you find Grainne?
A. I can't recall how I found her, but she does -- yes, I can't recall how I found her.
Q. Was that someone Mr. Bond suggested or --
A. No. I don't recall Michael suggesting her.
Q. You also coordinated mail programs for the candidates and phone banks, oversaw campaign staff, correct?
A. Yes.
Q. You also oversaw field work and video and TV advertising for the candidates we've mentioned, fair?
A. Not much video or TV. But, you know, I believe, if I recall the question correctly, I think the rest is fair.
Q. You had some involvement with video shoots at least for Ms. Darden and Mr. Seger and Mr. Kirkwood, correct?
A. Yes. I know -- I don't recall -- I don't recall being, you know, very intimately involved with those. I'm aware of those --

Page 99

those photo -- or photo shoots, yes.
Video shoots, I don't recall being intimately involved with the video shoots. I'm aware of video shoots.
Q. And am I right, Mr. Kozlowski, that at least a substantial portion of the funding for these campaign efforts you understand to be coming from Tap Room Gaming. Is that fair?
A. I don't recall specifically Tap Room Gaming but I -- that could be fair, but I don't --
Q. Yes. Let me ask it -- where did you understand the bulk of the money to be coming from to fund these campaigns?
A. I understand the bulk to be coming from Michael or one of -- you know, a company that he might be affiliated with -- he is affiliated with.
Q. And was that something you discussed with Michael, his funding of these campaigns?
A. Yes. I don't recall specifically, but that's something that's -- that was likely something we would have talked about.
Q. And can you explain to me just how it

Page 100

came about that you found yourself coordinating the campaigns of six or seven candidates for aldermen in Waukegan?
A. Well, I have a background in politics and organizing. And I'm the gaming -- I'm an advocate, right? And I -- I know in Waukegan there was a very strong movement of anti -- candidates who were very opposed to gaming and -- regulated game, very opposed.
And so as a gaming advocate, part of that -- a big part of that is elections. And this was, you know, that opportunity to help push back against that -- the growing anti-gaming group. And so that's how -- that would be the nature of my involvement.
Q. So was there someone who asked you who said, hey, Jon, can you kind of coordinate this effort on behalf of these candidates; or did you just of your own initiative wake up one morning and decide, you know, this is what you were going to do?
A. I don't recall. I don't recall being asked. I know -- I mean, it's -- yes, I don't recall. I don't recall being asked. I don't --

Page 101

I know -- I know that I do have, you know, an expertise and background in campaigns.
And that is -- you know, whenever I would work -- you know, work and put my time in towards a campaign that becomes a contribution. My time is a contribution. And so that -- that's kind of how I, you know, got involved.
Q. And I understand you've testified about the fact you have obviously strong organizational skills and some background in political work, right?
A. Yes.
Q. You have to answer with words.
A. I'm sorry. Yes, I testified to that.
Q. And, look, you've testified that you understood Mr. Bond was financing these campaigns efforts.
In sum or substance, at some point wasn't there a communication between you and Michael Bond that, hey, I'm going to -- I'm going to support these candidates financially, Mr. Bond says and, Jon, I want you to help run their campaigns? I mean, didn't that discussion occur?

MR. GRANT: I'm going to object to the form. You can answer if you understand the question.

THE WITNESS: Can you repeat the question?

BY MR. SMITH:

Q. Yes. My question is in sum and substance at some point was it communicated from Mr. Bond to you that he had a desire for you to step in and support these candidates we've discussed?

A. Well, I can't -- I can't recall a specific conversation, but it's not -- I mean, I would imagine it's not unlikely. That's a -- I mean, I wouldn't doubt it essentially is what I'm saying.

Q. And what did you do, Mr. Kozlowski, to reach out to these individual candidates? We can take them one by one if it doesn't lend itself to a general answer.

But what did you do to reach out to these candidates to say, hey, you know, I'm going to be providing campaign support to you and we've got this campaign office that's going to help your candidacy? How did you convey that to the individual candidates?

A. I believe through conversation.

Q. Well, I mean, let's take it -- take it one by one and realize you can only give me your best conversation, but what conversations did you have with Alderman Bolton about that?

A. I can't recall specifically, but I believe generally it would be about, hey, my association would like to be a part of supporting you. And through that support, this is -- this would be the nature of the support. This is -- you know, I would -- you know, I have background and I would like to help you out.

And you are -- you know, you have -- you are a pro -- you are a pro regulated gaming candidate and within my, you know, desire. And so I would like to help you out. That would be the nature of the conversation.

Q. And how would you identify yourself?

A. I'm Jon from Video Gaming United, I believe, is how -- this is Jon from Video Gaming United.

Q. Okay. Taking Alderman Bolton did she say, well, who is Video Gaming United?

A. I would -- I mean, I would typically

explain what it is. It is a local trade association, you know, that focuses on the local gaming industry, advocacy, and organization organizing, you know, stakeholders in the industry and venting the story, maybe challenging certain narratives that are out there by -- and so I -- I don't recall specifically, but that would be a -- it would be probably a typical thing to respond or to say.

Q. Let me ask you a question so I don't torture you going through each individual candidate.

Am I right in understanding from your testimony that you don't have a specific recollection of the conversation you had with each candidate, but you do have a general recollection of the explanation you offered to them about your role that you proposed to plan their campaign?

A. I would say that's -- that is -- could you repeat the question? I'm sorry.

Q. Yes.

A. I didn't hear the end.

Q. So I was asking you initially about

Alderman Bolton. You answered by saying, you know, typically or generally I would say this. I am -- we can go through this alderman by alderman. But I'm taking from your answer that perhaps you don't have a specific recollection of saying your conversation with Alderman Bolton, but you do have a general recollection of the way you explained your role in their campaigns to the various candidates for city council?

A. Yes. In general I would say that's -- I would say so, yes.

Q. So let me ask it this way. Do you remember any -- well, let me ask you this. Would you explain -- did you explain to any of the candidates where your funding came from?

A. I mean, that is a conversation that definitely -- or that would have been had, yes. I recall.

Q. And what did you explain to the candidates in that regard?

A. Well, let's see. I can't remember specifically but, you know, to describe the structure of my organization. That's part of

Page 106

the conversation I would imagine.
Q. And what did you say about the structure of Video Gaming United in substance?
A. Well, I would say the -- again, I can't recall specifically, but it would be something to the effect of -- you're asking about the funding or how --
Q. What you told the candidates about the sources of your funding?
A. Yes. I would -- like I said, I can't recall specifically, but it would be, you know, part of my discussion about the structure of the organization. I would have said that, you know, Michael Bond's organization, Tap Room Gaming, is the primary funder of my -- of my association and a political action committee. And that would be -- you know, that would be part of the discussion.
Q. And why did you make that part of the discussion?
A. Well, because I know in campaign finance it is important to people -- you know, it's important to be transparent and to -- because money is -- money is something that is

Page 107

important to be transparent about.
And I believe, you know, somebody has -- if somebody asks a question, you know, you just -- there's no -- no -- you just answer the question I would imagine, no reason to hide or -- you know, everything is -- no reason to be, you know, shamed or anything. So I just -- that's why I would answer it that way. If there is a question, you answer it.
Q. Sure. And so I take it from your answer you were upfront with the various candidates for city council that Video Gaming United Association supported that -- the source of the funding for your campaign efforts on their behalf came from Mr. Bond or his companies?
A. Well, I would -- I would be -- you know, would be upfront about, you know, we -- well, since Michael, a gaming professional, wanted to advance gaming advocacy. And that was the purpose. Michael is interested in gaming advocacy. And the association is designed for gaming advocacy.
And that is -- and Michael as a

Page 108

supporter of gaming advocacy would support my association. And I would like to -- and through my advocacy, I would like to support those candidates. That is kind of how that would work out.
Q. And you were aware that these candidates had recently met with Mr. Bond at Tap Room Gaming, weren't you?
MR. GRANT: Object to the foundation as to time.
BY MR. SMITH:
Q. Let me ask it this way. Mr. Kozlowski, at the time you were reaching out to the candidates, given your role in scheduling meetings at Tap Room Gaming between Mr. Bond and various elected officials and candidates and your attendance at some of those meetings, you were aware, weren't you, that the candidates you were supporting had previously met with Mr. Bond at Tap Room Gaming?
A. At that time I would have been aware of, you know, who had met with Michael I would imagine, yes.
Q. Now, Mr. Kozlowski, as you kind of

Page 109

embarked on your campaign efforts on behalf of -- I will just call them the six candidates for short. So -- is that okay to you?
A. That will be okay.
Q. Okay. Can you explain what involvement Mr. Maillard had, if any, in those efforts?
A. Mr. Maillard, he was -- he had -- I don't recall him having any -- or I don't recall him being very much involved whatsoever. He -- I know that he is -- you know, he is -- he is a professional in Democratic politics. He has very general interest, but I don't recall him being involved significantly.
Q. When you say significantly, you recall him providing input to you and Mr. Koss on certain campaign literature, don't you?
A. I don't recall, but that might be some of the limits of what he was -- I would -- I mean, I wouldn't doubt it, but I would imagine he -- I don't doubt that. I don't recall him providing very much input, but he -- but I don't doubt it.
Q. And tell me about Mr. Koss' role in supporting the six candidates.

Pl. SJ Ex. 132

A. Mr. Koss, he was the chairman and treasurer of the Waukegan Voter Alliance.
Q. What was your understanding of what Waukegan Voter Alliance was?
A. I understood Waukegan Voter -- he started the organization. I don't know when, but I know he was -- he works with the Democratic -- Waukegan Democratic Organization, and he may have been part of that.
I don't know what his role was there, but that significant role he was -- but the -- I believe at that time the Waukegan Democratic Organization was -- it was struggling to function. I think the chairman if I'm -- Pete Couvall, he died. And, you know, I think that that whole organization -- I don't think that -- I don't think, you know -- to want to be involved in local elections, it was not operational as far as I can remember.
And Dave Koss, I believe he started the Voter Alliance to participate in the elections in a way that the Democratic Organization was not able to because it was unfunctional if I have the right words.

Q. And you understood that some of the funds that you were using to support the campaigns of the six city council candidates that we've talked about was coming through the Waukegan Voter Alliance, right?
A. I'm sorry. What was the question? Did I understand --
Q. Sure. You understood that the Waukegan Voter Alliance supplied funding to support the campaigns that you were coordinating on behalf of the six candidates we've been talking about, right?
A. Yes, yes, I understand that, yes.
Q. Because you provided Mr. Koss with campaign disclosures for him to sign, correct?
A. Correct, correct, I remember that.
Q. Yes. And you also would advise him on occasion when money would be coming in from Tap Room to the Waukegan Voter Alliance, correct?
A. I don't recall specifically, but I -- that's something that -- that sounds like something that I would -- I would do.
Q. And the reason that was something that

you would do is that you were in communication with Mr. Bond about his funding of the six campaigns you were supporting, right?
A. That's -- yes, that's -- that's accurate.
Q. Because for you to fulfill the role of coordinating campaign activities, you needed to know what money was coming in when, fair?
A. Yes. As my experience with campaigns, that's very important to do.
Q. Let me ask you about one aspect of the primary campaigns in the city council election in the 2018-2019 cycle. One of the candidates you helped support was Alderman Seger in his re-election effort, correct?
A. Okay. Yes, yes.
Q. Okay. Were you aware that there was an objection to the candidacy of Mr. Seger's Democratic primary challenger?
A. I was aware.
Q. And that objector was represented by a lawyer from a Springfield firm called Sorling Northrup. Are you familiar with the Sorling Northrup firm?

A. Yes, I am.
Q. How is it you are familiar with the Sorling Northrup firm?
A. I -- well, I have worked with that firm.
Q. Explain.
A. I -- as -- I worked -- you know, I commissioned the looking into and challenge of petitions through -- as an industry initiative through Video Gaming United Association. And that was a project I worked on with them, yes.
Q. Okay. So you -- you worked with the Sorling Northrup firm on the challenge to Mr. Seger's primary opponent, right?
A. Correct, yes.
Q. And I take it you are the one who secured the attorney for that -- I call them a challenger, but the objector to Mr. Seger's primary challenger, right?
A. Right.
Q. That was Kevin Morphew?
A. Yes, yes, correct.
Q. Who put you in touch with Kevin Morphew?

A. I can't remember, maybe Will Cousino.
Q. Who is Will Cousino to your knowledge?
A. I believe -- he is a lobbyist that Michael works with in Springfield and I sometimes -- you know, I had asked him. I was like, hey, do you know anybody?
Q. And did you also coordinate with Mr. Morphew on the legal challenge to Alderman Bolton's primary opponent?
A. Correct.
Q. And who paid the Sorling Northrup firm for those efforts?
A. That was a Video Gaming -- an industry initiative through Video Gaming United Association, and it was Video Gaming United Association who paid the bill to challenge the petitions of not pro gaming candidates.
Q. I understand. And Video Gaming United Association's funding came from dues provided by Tap Room Gaming, correct?
A. Correct.
Q. And did you to your -- well, let me ask you this.
Did you, Mr. Kozlowski, communicate

with Alderman Seger about the fact that you would be assisting with regard to a challenge -- an objection to his primary challenger?
A. Yes. I believe I recall -- I believe I recall saying this is what I'm going to do.
Q. That's not something you would do without talking to Alderman Seger, right?
A. It would -- it actually -- it would have been.
Q. Okay. But in this case, you recall talking to Dr. Alderman Seger about it?
A. I recall mentioning this is what I'm doing.
Q. Okay. And did he say to you, well, who is paying for the lawyer? Where is that coming from?
A. I don't recall that. I don't recall that.
Q. And what about Alderman Bolton, did you discuss with her the fact that you would be coordinating on an objection to her primary challenger?
A. I don't recall specifically. But it is something similar to the other, you know, this

is what I'm doing.
Q. What about did you ever -- did that topic -- the fact that you were involved in coordinating the objection to these primary challengers, do you recall that ever coming up in any discussion with Mayor Cunningham that you were a part of?
A. Not that I recall.
Q. What about Mr. Bond, is that something you ever talked to Mr. Bond about?
A. I don't recall specifically, but I'm sure it's something I mentioned. I said -- you know, I told -- you know -- yes. I'm not -- I don't recall specifically, but it's not unlikely.
Q. Mr. Kozlowski, do you think it's -- would you agree with the notion that within Waukegan the people who came to know you through your activities at Video Gaming United Association viewed you as someone who worked for Mr. Bond?
MR. GRANT: Objection, calls for speculation.
MR. DAVIS: And foundation. I join in the speculation objection.

BY MR. SMITH:
Q. Just based on your interactions.
MR. DAVIS: Same objections.
THE WITNESS: Repeat the question.
BY MR. SMITH:
Q. Yes. Was it your impression that the politicians you interacted with in Waukegan viewed you as someone who worked for Mr. Bond in essence?
MR. DAVIS: Same objections.
THE WITNESS: I'm not sure.
BY MR. SMITH:
Q. You're really not sure?
A. I guess I can't -- I don't know what they were thinking I suppose. I don't know.
Q. Okay. All right. You doing okay, Mr. Kozlowski? We could maybe go another 25 minutes and then take a lunch break. Does that sound okay?
A. I'm okay, yes.
Q. Okay. You're younger than most of us and have more stamina.
MR. DAVIS: Objection, speculation.
MR. SMITH: I think I have a solid foundation

for it.
BY MR. SMITH:
Q. All right. Mr. Kozlowski, I apologize. Mr. Davis and I have been doing this too many times already.
So could you, if you would, pull up what's already been marked as Exhibit 125?
A. Okay.
Q. All right. And take a moment to look at Exhibit 125, and then I may have a question or two for you about it. And in fairness, this is not a letter to or from you so --
A. Okay. I've reviewed.
Q. So, Mr. Kozlowski, Exhibit 125 is a letter from Grainne Mahoney to David Koss. Does this appear to be the Grainne Mahoney at Strategic Advocacy that you testified about a few moments ago as someone who helped prepare campaign filings for the candidates you were supporting?
A. I'm not seeing the name Grainne. There it is. It does.
Q. And Mahoney -- is it Ms. Mahoney?
A. I'm not sure.

Q. Anyway, Grainne says, "Pursuant to my recent discussion with Jon Kozlowski, I have prepared this document to begin a six-month contract to provide campaign financial reporting on behalf of aldermanic candidates in Waukegan, Illinois."
What were your -- to your recollection what were your discussions with Grainne Mahoney on this topic?
A. I don't recall specifically. I know that I reached out to Grainne to help with filing for -- you know, with the State Board of Elections because it's important to be -- to report all contributions, you know, accurately and with some -- you know, with expertise. And she was -- you know, that's a service she provides. And so that's something I reached out to would she be willing to.
Q. And I take it she was willing and we see that result in this letter, correct?
A. Yes, I believe so.
Q. Okay. Now, I've been referring to the -- to the six candidates you worked to support. Let me just identify those six

to make sure we're on the same page. It's Alderman Bolton, Alderman Seger, Keith Turner who became an alderman, Roudell Kirkwood who became an alderman, John Patterson who was not successful in his campaign, and Annette Darden. Am I right about those six candidates?
A. Yes.
Q. Okay. And I think you also mentioned that before the primary in February 2019 you provided some assistance to Bill Valko, but he wanted to be responsible for funding his own campaign. Is that fair?
A. That's -- that's fair.
Q. Okay. So let me now -- what I want to understand is with these six candidates that you supported how the -- what's your understanding of how the interaction between them and Grainne Mahoney, if any, worked.
In other words, did you actually yourself provide the information Grainne Mahoney needed to make the appropriate campaign filings, or did you put Grainne Mahoney in touch with the individual candidates or some combination of those?

A. I put her in touch with the candidates. I recall her having phone conversations with each one of them. I know she worked with them to set up the -- I put them in touch and -- but, you know, also a lot of times I worked with Grainne if -- you know, if Dave Koss paid an invoice or something and needed to know -- you know, he has an in-kind contribution. And that came through the campaign.
And then as the -- you know, with the campaign they would just move it onto -- the campaign would move it onto Grainne. And sometimes that was me. It was oftentimes me moving that onto Grainne.
Q. Okay. So you would let Grainne know, for example -- if an in-kind contribution had been for the benefit of all six candidates, you would help Grainne figure out how to rack that up. Is that --
A. Or I believe, I would -- you know, I would -- if I'm not mistaken, I would work with Dave Koss to figure out how to, you know, separate it so it's accurate and transparent and all that.

Q. Okay. You can close out of this exhibit, Mr. Kozlowski. Let's take a look at what's been pre-marked as Exhibit 126. And I will represent to you that Exhibit 126 is what's going to be one of the series of E-mails that were produced to us by Mr. Koss in response to a subpoena.
A. Okay.
Q. So my first question for you is do you recognize Exhibit 126 as an E-mail that you sent to Mr. Koss on or about January 10, 2019?
A. It appears to be, yes.
Q. That's your E-mail address, at least the E-mail address you were using at this point in time, jmkozlowski97@gmail.com?
A. Correct.
Q. And what were you communicating to Mr. Koss with this E-mail?
A. If I'm not mistaken, all the information that is needed for filings with the State Board of Elections, you know, because it's important to stay on top of that and make sure that all filings are done correctly and on time and accurate. And so I -- all that information

seems to be stuff that is associated with what is necessary you need in order to make -- to file, to file.
Q. And let me make sure I understand. This is information Mr. Koss would need to make an accurate campaign filing as to contribution coming into Waukegan Voter Alliance; is that right?
A. That's -- I believe so. I believe that's where -- yes. I mean, I think so.
Q. And how did you know that he should be reporting a particular check from Tap Room Amusement in the amount of $22,200 as of January 10, 2019?
A. I'm not sure but -- I can't recall specifically, but I probably saw the check, you know, and maybe delivered it. I'm not sure, but I likely saw it. That's probably how -- that's where I have that information from.
Q. Well, let's take a step back. Can you explain to me generally what role you had in the transmission of funds from Mr. Bond's companies to Waukegan Voter Alliance, if any?
A. Some -- I mean, I recall sometimes

picking up and hand delivering it kind of a similar way to -- you know, hand delivering it. That's a lot of times how I would do that, I guess. That's what I recall doing a lot. This one specifically I don't know, but I recall doing that.
Q. Okay. You recall doing that a lot. How would you -- and you would deliver it to Mr. Koss?
A. Yes, sometimes if I recall right.
Q. Did you have the ability to deposit money into Waukegan Voter Alliance's bank account?
A. I did have that ability for streamlining purposes.
Q. So were there times, for example, where you deposited a contribution directly into Waukegan Voter Alliance's bank account and needed to let Mr. Koss know so that he would report it on time and accurately?
A. Correct, with the permission and direction of Mr. Koss.
Q. Sure. No one is suggesting you had unauthorized access to a bank account, no

worries there.
How would you know that there was a check available for you to pick up?
A. I'm not sure. I think the person who cuts the check would probably notify me.
Q. Who is that person?
A. I can't recall, sometimes Elaine if -- yes.
Q. Elaine Gates gates at Tap Room Gaming?
A. Yes, sometimes, yes.
Q. And I think you said Elaine worked in some kind of financial office at Tap Room?
A. Right, right. I can't remember the title.
Q. Sure. Did you understand her to report to Mr. Bond?
A. Yes, I think, yes. I would say so. I think so.
Q. Did Mr. Bond ever tell you, hey, there's going to be a check for you to pick up from Tap Room?
A. Yes. I don't recall specifically. But, I mean, it's not unlikely, yes.
Q. This particular -- focusing on

Q. Let me ask you something. Mr. Kozlowski, do you have any understanding about how it came to be that Mr. Koss was put in charge of the Waukegan Voter Alliance?
A. I don't recall how he got in charge of it but -- I'm not sure. I don't recall.
Q. Did you have any discussions with Mr. Bond about that that you can recall?
A. About -- I know I must have -- I don't recall. I could have spoken with Mike Dave -- I don't recall, maybe Dave is going to be the -- run this organization. I don't recall -- no, I don't recall that.
Q. And I obviously don't want you to guess about that, so let me --
A. Okay.
Q. So let me -- let me ask you this. At some point you became aware that to do what you were doing for the six campaigns we've talked about you needed to coordinate with Mr. Koss and the Waukegan Voter Alliance, right?
A. Correct.
Q. How did you become aware of that?
A. Could you say that again, become aware

of what?
Q. Yes. I mean, you didn't pick Dave Koss out of a phone book one day. How did you learn that you should be talking to Dave Koss about, you know, money coming into the Waukegan Voter Alliance, campaign disclosures, et cetera, et cetera?
MR. DAVIS: Object to the form of the question. Go ahead.
THE WITNESS: Would you be able to repeat the question then, I guess?
BY MR. SMITH:
Q. Yes. It might not come out exactly the same, but I will repeat it. Let me focus you on something a little more specific.
A. Okay.
Q. You saw that when you reached out to Grainne Mahoney you advised her to get in touch with Mr. Koss, correct?
A. Yes, correct, correct.
Q. Okay.
A. That sounds correct.
Q. And you had -- I think you've testified already about the fact that there are various

communications back and forth between you and Mr. Koss about money going into Waukegan Voter Alliance, information necessary to -- for Waukegan Voter Alliance to prepare campaign filings and that sort of thing, right?
A. Correct.
Q. Okay. How did you first become aware, as best you can recall, that Mr. Koss was there in charge of Waukegan Voter Alliance and he was going to be playing some role in these campaigns you were supporting in Waukegan?
A. Well, my -- I mean, I -- I believe I first became aware of Dave Koss, I think, through -- I think introduction through Michael. I know that Dave Koss was the big democrat in the Democratic organization. And so that's the introduction there, yes.
Q. And I understand, you know, that's how you became aware of Mr. Koss. My question is a little more specific.
I mean, obviously Dave Koss is known in Democratic circles in Lake County. That's not a mystery, right?
A. Um-hum.

Q. You've got to say yes or no.
A. Yes, yes. I'm sorry.
Q. But at some point, you learned, hey, I'm going to be working with Dave on these city council elections. He is running Waukegan Voter Alliance. There is going to be money flowing through there. I have to coordinate with him. How did you become aware of that?
A. I mean, I had -- I believe I had spoken with Dave about it. And I -- you know, I think I had let Dave know that I was going to be involved in the elections. And I know Dave wants to be involved -- likes to be involved. And so that's how I know he was going to be involved. He wanted to be involved in the local elections, yes.
Q. But at some point in your discussion with Dave, I mean, does Michael Bond tell you reach out to Dave?
A. I mean, I think that's how I got the introduction was through Michael.
Q. Let's take a look -- let's do maybe one more and then we'll take a lunch break, Mr. Kozlowski.

first. We are going off the record. The time is 12:35 p.m.

(A short break was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:17 p.m. Please proceed.

BY MR. SMITH:

Q. Mr. Kozlowski, good afternoon. How was lunch?

A. It was okay. How was yours?

Q. It was fine. Thanks.

Could I ask you to take a look at what's been marked as Exhibit 129, please? Take a moment to look at that, and then let me know once you have had a chance to do so?

While you're doing that, I will just note that Exhibit 129 is an E-mail dated March 10, 2019, from Mr. Kozlowski to Dave Koss Bates Number DK_161 and an attached document with the Bates Number DK_299.

So, Mr. Kozlowski, have you had a chance to take a look at Exhibit 129?

A. Um-hum.

Q. And is Exhibit 129 an E-mail that you sent to Mr. Kozlowski on March 10, 2019?

A. Can you repeat that?

Q. I'm sorry. Is this an E-mail you sent to Mr. Koss on March 10, 2019?

A. Yes, it appears to be.

Q. You don't have any reason to doubt that this is an E-mail sent to Mr. Koss, do you?

A. I do not.

Q. And, Mr. Kozlowski, the E-mail -- your E-mail with Mr. Koss refers to a quick write-up of some plans and the subject matter of the E-mail is video shoot.

Is the document that's the second page of Exhibit 129 the write-up that you had prepared that you refer to in that E-mail?

A. Yes, I believe it to be.

Q. Okay. Does looking at this E-mail and the attached document, Exhibit 129, do anything to refresh your memory about your role in preparing video shoots for certain candidates for city council in 2019?

A. Yes. It looks like I -- I helped with the -- you know, like the setup of it -- of some -- of these video shoots here.

Q. Did you have any role in drafting the

scripts, for lack of a better term, for the video ads that the candidates created?

A. I don't recall. I don't recall drafting scripts. I don't recall being on site for these video shoots either but -- yes. I'm not -- I'm not -- yes. I don't recall specifically drafting any.

Q. Okay. Let me ask you about something specific and see if it sparks a memory. Promotional videos that both Annette Darden and Roudell Kirkwood appeared in have the candidates pledging to give one-half of their salaries as alderman to charity. Do you generally recall that?

A. Yes, I recall that.

Q. Do you have an understanding of where that idea came from, the pledge to donate half of the aldermanic salary to charity?

A. I believe that could have been an idea I proposed. Some liked it. Some didn't. And I think Annette liked it, and Roudell liked it and -- yes.

Q. And you said it could have been an idea you proposed. I take it you remember that that

was an idea that was -- that came from you, right?

A. Yes. I recall -- I recall that being something I -- I was, you know, a fan of. I liked that.

Q. How did you come up with the locations in the write-up attached to Exhibit 129?

A. I'm not sure specifically. I'm familiar with Waukegan. I'm familiar with good -- you know, about nice, beautiful locations and so --

Q. Yes. Let me ask a question that's maybe a little more germane to the case.

Did you -- did you coordinate those locations with the individual candidates? Is that something you discussed with them?

A. I can't recall.

Q. All right. We can leave that one behind. Let me ask you to take a look at what's been pre-marked as Exhibit 130. Exhibit 130 has the subject line stress reliever and final meeting. It's dated March 19, 2019. It appears to be an E-mail from Mr. Koss to Mr. Kozlowski Bates Number DK_152.

Page 154

had started around this time. It was called the Small Business Coalition. And through that I donated -- I'm sorry. Through that I made a contribution to Annette to fund-raise. And so that -- and then Annette repaid her overdue -- or her -- she repaid back the excess she received in contributions, which was a mistake.

Q. And you know that Annette repaid that excess contribution because you coordinated making sure that happened, right?

A. Yes. I -- yes. I gave my advice and stuff and helped make sure that that happened, correct.

Q. And the Small Business Coalition, you were chair and treasurer of that organization, correct?

A. That's correct.

Q. And it was created in April of 2019, correct?

A. I'm not sure when it was created. It's probably in one of those documents I gave you, but I'm not sure.

Q. And, Mr. Kozlowski, where did the money come from -- do you recall that the amount that

Page 155

the Small Business Coalition contributed to Annette Darden to repay the excess contributions in the Waukegan Voter Alliance was $56,300?

A. I don't recall specifically, but that does not sound inaccurate.

Q. Okay. And where did the money come from that funded the Small Business Coalition's contribution to Annette Darden so she could repay the excess contribution from Waukegan Voter Alliance?

A. If I remember correctly, that was -- I asked Michael to -- if he could contribute. And that was -- I think he did so through Tap Room Amusements and Tap Room Gaming if I remember correctly.

Q. Does it refresh your memory that perhaps he did so through State Street?

A. That sounds accurate as well, yes.

Q. Okay. So, in other words -- tell me if I've got this right. Ms. Darden got money from Michael Bond's organizations through Waukegan Voter Alliance and was in excess of contribution limits. You then asked Michael Bond to contribute to the Small Business Coalition so

Page 156

she could refund those excess contributions to the Waukegan Voter Alliance. Is that basically what happened?

A. Yes, yes.

Q. Mr. Kozlowski, one -- tell me if your recollection is different. But in looking at the public campaign filings, it appeared that of the six candidates you were working to support that Ms. Darden really got the largest amount of in-kind contributions. Is that consistent with your memory?

A. That is consistent. She -- yes. She had a well-funded opponent as well if I'm not mistaken.

Q. Do you have an understanding of why Ms. Darden had contributions -- in-kind contributions to the point where it exceeded campaign limits? Why was she so much higher?

A. Why? I'm not sure, probably oversight. It's just oversight. It's a mistake. And the board allows you to take remedy for that, so yes.

Q. No. I understand. I'm not really -- I guess my question wasn't precise enough. What

Page 157

was -- what was necessitating that level of contributions, what about Ms. Darden's campaign?

A. Ms. Darden's campaign, if I recall correctly, was quite -- quite competitive and so -- and her opponent was well-funded or -- I can't recall. And it was quite a competitive campaign and -- yes. And, you know, through that process, an oversight happened where it went over the limits.

Q. Sure. Mr. Kozlowski, were any expenses -- in-kind contributions attributed to the Darden campaign that in hindsight perhaps benefited other campaigns as well?

A. No, I would not think so.

Q. Okay. So just to round things out with Exhibit 134, was it Ms. Darden who provided this letter to you?

A. I believe so. I think so. I don't recall correctly. I mean, it was awhile ago, but I believe so.

Q. Let me ask you, Mr. Kozlowski, to take a look at Exhibit 135.

And while you're pulling that up, Exhibit 135 is an E-mail chain with the subject

line complaints Bolton and Kirkwood from May 2019. It appears to be an E-mail going back and forth between Mr. Koss and Mr. Kozlowski.

The Bates stamp for the E-mail itself is DK_53, and then appended to this E-mail in this exhibit are the set of documents Bates stamped DK_21 through DK_24 and then DK_17 through DK_20.

So, Mr. Kozlowski, let me represent to you again that this is a situation where it appeared to me from Mr. Koss' production that these sets of documents that follow this E-mail that is the first page of Exhibit 135 based on the way they were named were the attachments to the E-mail that's reflected on the first page of 135.

Having had an opportunity to review that, do you believe that to be the case?

A. Yes. I don't have any reason to not believe it to be.

Q. In this E-mail chain, you asked Mr. Koss to send me the scanned version of these.

Why did you want Mr. Koss to provide

you with documents related to the Bolton and Kirkwood campaign in a matter before the Illinois State Board of Elections?

A. I'm not sure. I'm not sure why I wanted him. I can't recall.

Q. All right. Is part of the support you provided for the Bolton and Kirkwood campaigns -- was it helping them deal with the complaints that were filed against their campaigns with the Illinois State Board of Elections in the course of that 2019 cycle?

A. Yes.

Q. And was one way you did that by retaining Mr. Morphew from the Sorling Northrup firm to represent the Bolton campaign and the Kirkwood campaign before the Illinois State Board of Elections?

A. That's correct.

Q. And, in fact, you were careful to make sure that the campaigns' D-2s and the Waukegan Voter Alliance's campaign disclosures reflected the in-kind contributions of the time from the Sorling Northrup firm, correct?

A. Yes, yes. If I recall correctly, I

was -- that was -- it's important to make sure -- you know, that Sorling Northrup represented their campaign. And I believe that was paid for. That becomes an in-kind contribution. Yes, that is an important part of -- you know, it's important to do.

Q. So you talked earlier about Mr. Morphew representing the objectors who objected to the challenger to Mr. Seger's primary opponent and the challenger to Alderman Bolton's primary opponent.

Do you know whether the Sorling Northrup fees in connection with that effort were reported as in-kind contributions by the campaigns of either Alderman Bolton or Alderman Seger?

A. I don't believe they would be. They were not contributions. That was -- that was an industry, you know, project, with Video Gaming Association as a -- so that was -- those were -- those were not contributions. And those were advice of -- legal advice do not qualify as -- and are not -- are not to be contributions that are disclosed. They're not -- sorry.

Q. So just so I'm clear, you didn't think knocking out Alderman Bolton's primary opponent was a contribution to the campaign?

A. I'm -- you know, I don't believe -- no. I don't think -- that is not a contribution.

MR. DAVIS: I wasn't able to get -- my microphone unmuted on a timely basis. I just object to the last two questions as calling for a legal conclusion.

MR. SMITH: Fair enough.

MR. DAVIS: I would also -- if you're sharing legal advice that's being provided to you by an attorney, you're not obligated to disclose that information.

THE WITNESS: Okay.

MR. DAVIS: Mr. Kozlowski, that would be a privileged communication. I'm not your counsel but --

MR. SMITH: I don't take issue with any of that.

BY MR. SMITH:

Q. So, Mr. Kozlowski, if I asked you what was the basis of your understanding about the answers you just gave, could you answer that

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAUKEGAN POTAWATOMI CASINO, LLC, an Illinois limited liability company, )
)
Plaintiff, )
)
vs. ) No. 1:20-cv-750
)
CITY OF WAUKEGAN, an Illinois municipal corporation, )
)
Defendant. )

THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

The discovery videotaped videoconference deposition of SARAH EMMERTON, taken in the above-entitled cause, before SUSAN HASELKAMP, Certified Shorthand Reporter for the State of Illinois, on December 9, 2020, beginning at the hour of 9:30 a.m. and ending at the hour of 3:50 p.m., at 360 West Illinois, Chicago, Illinois, pursuant to notice.

Reported by: Susan Haselkamp, CSR
License No. 084-004022
APPEARING REMOTELY FROM COOK COUNTY, ILLINOIS

REMOTE APPEARANCES:

FREEBORN & PETERS LLP, by
MR. DYLAN SMITH,
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 360-6000
dsmith@freeborn.com
Representing the Plaintiff;

HEPLER BROOM, LLC, by
MR. GLENN DAVIS,
MS. MEGHAN RIGNEY,
150 North Wacker Drive
Suite 3100
Chicago, Illinois 60606
(312) 205-7743
glenn.davis@heplerbroom.com
meghan.rigney@heplerbroom.com
Representing the Defendant.

ALSO PRESENT:
MICHAEL ABARCA, videographer
VERITEXT LEGAL SOLUTIONS

INDEX

| WITNESS | EXAMINATION |
| --- | --- |
| SARAH EMMERTON, | |
| By Mr. Smith | 6 |
| By Mr. Davis | 186 |
| By Mr. Smith | 198 |
| By Mr. Davis | 207 |
| By Mr. Smith | 209 |

EXHIBITS

| NUMBER | MARKED FOR ID |
| --- | --- |
| Deposition Exhibit | |
| No. 1 | 96 |
| No. 2 | 117 |
| No. 3 | 118 |
| No. 4 | 122 |
| No. 5 | 123 |
| No. 6 | 126 |
| No. 7 | 127 |
| No. 8 | 128 |
| No. 9 | 130 |
| No. 10 | 133 |
| No. 11 | 137 |
| No. 12 | 138 |
| No. 13 | 139 |
| No. 14 | 145 |
| No. 15 | 145 |
| No. 16 | 146 |
| No. 17 | 146 |
| No. 18 | 147 |
| No. 19 | 148 |
| No. 20 | 149 |

CONFIDENTIAL PAGES

Pages 45 to 58

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare her testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting. Please indicate your agreement by stating your name and your agreement on the record.

MR. SMITH: Dylan Smith of Freeborn & Peters for the Plaintiff, and I do agree.

MR. DAVIS: Glenn Davis and Meghan Rigney of HeplerBroom for the Defendant, City of Waukegan, and we agree as well.

THE COURT REPORTER: Okay. Will the witness kindly present her government-issued identification by holding it up to the camera for verification?

THE WITNESS: (Indicating). This might be the point where I clarify that my married

name is actually Arkey.

THE COURT REPORTER: Thank you. Would you raise your right hand, please?

(Whereupon, the witness was duly sworn.)

THE COURT REPORTER: Thank you.

SARAH EMMERTON,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SMITH:

Q. Good morning. I know you as Sarah Emmerton, but I understand we just clarified that your married name is -- is it Sarah Arkey?
A. Arkey.
Q. And I'm sorry, Sarah, your voice is a little bit faint. It's probably the connection. If you don't mind --
A. Yeah. It's Sarah Arkey.
Q. Arkey.
A. Yeah.
Q. Do you have a preference as between Emmerton or Arkey, if --

Page 18

analyzing demographic data, performance data for various real estate assets, real estate markets and so on.

Q. In the course of that job, did you have occasion to yourself review appraisals that had been conducted on various pieces of real estate?

A. I reviewed them in the context to be educated about them but not reviewed them in any capacity to opine on whether or not they were accurate.

Q. And I guess my follow-up question would be did you become in the course of that job familiar with the general format of appraisals and some of the standard components that one finds in real estate appraisals?

A. Yes, I did.

Q. In that position with the real estate consulting company, did you have any involvement with real estate finance?

A. Not specifically. I think, again, sort of in an educational capacity. We were not -- our specific department was not responsible for producing anything in relation to project finance.

Page 19

Q. In the -- in the course of your job as an analyst at the real estate company, did you become generally familiar with the concept of having appraisals done in connection with financing for real estate acquisitions?

A. Yes, generally.

Q. And did you become aware that that was something that was relatively common?

A. Yes.

Q. Ms. Emmerton, let me turn to the project that Johnson Consulting did for the City of Waukegan in the late summer/fall of 2019. Actually, before I do that just to round out your background, do you hold any professional licenses?

A. I do not.

Q. So turning to the project that Johnson Consulting did for the City of Waukegan starting in August 2019. Am I correct in understanding that you were involved in that casino review and analysis project?

A. Correct.

Q. Could I ask you please to describe in kind of overview fashion what Johnson Consulting

Page 20

did for the City of Waukegan, starting from when it was retained in August 2019 through October of 2019 and -- and just to clarify, at this point I'm not asking about the substantive analysis Johnson Consulting did, I'm just trying to get an overview of the work process.

A. Sure. Sorry, I might get it a little out of order. But we received the proposals from the City that had been submitted to the City, we reviewed those, we worked with the City to schedule interviews for all five of the bidders at that stage, participated -- or actually, Johnson Consulting led those developer interviews.

We -- there was I think two public meetings that we prepared for. And throughout that period, we were reviewing the proposals and starting our analysis to rank the bidders accordingly. And then at the conclusion, there was Charlie's presentation to the City Council.

Q. And am I correct that -- when you said Charlie, you're talking about Mr. Johnson?

A. Sorry. Mr. Johnson.

Q. Am I right that Charlie's presentation

Page 21

to the City Council in October was essentially the conclusion of Johnson Consulting's project for the City of Waukegan regarding casino proposals?

A. Yes.

Q. Ms. Emmerton, who from Johnson Consulting was involved in that work for the City of Waukegan?

A. Myself and Charlie Johnson.

Q. I've also learned a name from Mr. Johnson, which I may mispronounce. Iawistiwadi, are you familiar with that individual?

A. Oh, yes. Yes.

Q. Is it -- is it a Ms. Iawistiwadi?

A. Yes, Iawistiwadi.

Q. Did Iawistiwadi have some involvement in the -- in the Waukegan project?

A. Yes. Yes, she did. She did provide some support in terms of the analysis of the proposals.

Q. Okay. And am I correct in gathering from your series of answers that the two principal people from Johnson Consulting who

worked on the Waukegan project were you and Mr. Johnson?
A. Correct.
Q. Okay.
A. Yes. Iaw works from Chicada (phonetic), so her -- she did not have any client interface.
Q. Could you describe for me the roles that you and Mr. Johnson played during the project with an eye toward helping me understand what his role was versus your role?
A. So Charlie served as what we would refer to as project executive. He really oversaw the whole process. My role was the authoring of the report from the various pieces of analysis that went into that.
And really Charlie was responsible for leading the developer presentations on our end. I did a lot of the administrative interface with the City for scheduling those things and understanding our role for the public meetings and that kind of thing. Yeah.
Q. Is it accurate to say that you had more day-to-day interaction with the City during the

project than Mr. Johnson did?
A. Day to day from an administrative perspective, I would say yes. I had a lot of communication with them in terms of gathering data. And as I mentioned, the scheduling of various presentations and so on.
Q. From your involvement in the work with the City of Waukegan, was there a particular person from the City who seemed to be the principal point of contact with Johnson Consulting?
A. I think the points of contact varied based on what we were doing, like what the specific objective of the communication was.
Robert Long was our main point of contact. However, when we needed information regarding financial data, that was Tina. And then Noelle, most of our communication through her was for more general information. And then I also communicated I think with Marcus and -- I'm forgetting the other gentleman's name. But yeah, I would say it varied.
Q. And, Ms. Emmerton, your voice may be fading a little bit, but I'll probably just keep

reminding you of that during the --
A. Yeah, no problem.
Q. Focusing on Mr. Long. Could you explain what your understanding of his role was in the casino project based on your involvement with it?
A. My understanding, which I believe is accurate, was that he was legal counsel for the City and I guess a conduit between us and the rest of the City team.
Q. Did you have occasion during your work for the City of Waukegan to meet the mayor, Mayor Cunningham?
A. Yes. I met Mayor Cunningham at the interview and I believe I met with him at one other point. It may have been around the final presentation to City Council.
Q. Describe for me who attended that initial interview.
A. Yeah. From Johnson Consulting, it was Charlie Johnson and myself. Robert Long was there, Mayor Cunningham, Noelle. I don't recall if Tina was there. But there was one or two other City staff.

Q. And where did that meeting take place?
A. At the City Council offices. I don't know if that's City Hall or -- yeah, in Waukegan.
Q. And I realize it's been some time and you aren't probably able to give me a verbatim recap of what all was said there. But in substance, could you please describe what was said at that meeting and by whom?
A. So we -- from recollection, you know, we did a presentation, you know, without any slides. But, you know, basically talked about our experience in relation to the proposal that we submitted, we discussed the fact that the City had prepared an RFP, received responses and that they were now seeking support in analyzing -- or evaluating those responses.
Q. Have you finished your answer?
A. I think so, yeah.
Q. Did anyone from the City explain why at that point when you were meeting with them the City had decided it needed to retain an outside consultant?
A. I don't believe that it was

tying it to a particular call or meeting, were there any discussions ongoing with the City at that point that come to mind regarding the progress of your work or any preliminary analysis you were doing?

A. Regarding progress and preliminary analysis, I don't believe so. There was communication with the City from an administrative perspective for scheduling the meetings, scheduling the presentations.

(Whereupon, Emmerton Deposition Exhibit No. 10 was marked for identification.)

BY MR. SMITH:

Q. Ms. Emmerton, let me ask you to take a look at Exhibit -- what was marked previously as Exhibit 10 in Mr. Johnson's deposition.

A. Yes.

Q. This is an e-mail from you to Bob Long saying, attached is our summary of the various proposals. Executive summary and initial developer questions will follow early next week. And this was sent Friday, September 6th.

Ms. Emmerton, do you recall sending

this e-mail to Mr. Long with the summary of proposals?

A. This is an e-mail that came from me. I don't recall sending it, but yes.

Q. Okay. Let me ask you do you recall generally preparing a summary of proposals that you provided to Mr. Long?

A. I don't recall what specific format that was in.

(Whereupon, Deposition Exhibit No. 10A was marked for identification.)

BY MR. SMITH:

Q. All right. Let me ask you to take a look at what's again was marked at Mr. Johnson's deposition as Exhibit 10A and take -- take a minute to look through that. And let me know if -- once you've looked through that, you recognize what that is.

And pardon me for a second, I'm just going to shut some blinds in my office that are letting a lot of light in.

Ms. Emmerton, do you recognize what's previously been marked as Exhibit 10A?

A. Yes.

Q. All right. What do you recognize it to be?

A. A summary of the proposals.

Q. All right. Is that a summary that you had principal responsibility for preparing?

A. Yes.

Q. Let me just say, by the way, I should have said this at the outset. You are free to ask to take a break at any point in time. It's not an endurance contest.

I think we're eager to get going because we had a little bit of a late start with the technical issues. But, you know, I know we've been going for a little while now. If you wanted a five-minute break or anyone else does, I'm going to ask you a few questions about this document, so I just wanted to give you the opportunity.

A. I'm okay for now.

Q. Okay.

A. But if I could take a break maybe after we get through this document --

Q. Sure.

A. -- that will be good.

Q. Ms. Emmerton, there are various tabs in this spreadsheet that makes up Exhibit 10A. Do you see that?

A. Yes.

Q. Do you have any understanding of what these tabs correspond to?

A. Yes.

Q. 1, 2A, 2B, et cetera?

A. Yes. They correspond to the RFQ list of criteria or requirements for submittals that we were looking at previously.

Q. And when you say the RFQ, you're talking about the City of Waukegan's RFQ?

A. Correct.

Q. And, Ms. Emmerton, can you explain what you did to put this document together?

A. Basically reviewed each of the proposals and summarized them against the various requirements from the City's RFQ.

Q. And so am I right in understanding that the source of the information in this spreadsheet, Exhibit 10A, comes out of the various proposals you were reviewing?

A. Correct.
Q. And, Ms. Emmerton, my understanding is that the third category in the submittal requirements in the City's RFQ was for the project team and experience of a casino applicants. Is that your recollection, as well?
A. Yes.
Q. And I noted -- I mention that because I noted that Exhibit 10A doesn't have a tab for Category 3. Is there a reason you decided not to try to summarize the responses for -- for requirement 3 in this spreadsheet?
A. Yeah. For the purposes of this spreadsheet, it was -- it's a lot of information that's complicated and not necessarily as easily put side by side as the other criteria, so we just left it out.
Q. What was your purpose in preparing this document?
A. To be able to more easily see the content of each of the proposals side by side rather than having to read each of them in their entirety for a client.
Q. And, Ms. Emmerton, I note that the

spreadsheet Exhibit 10A includes a row for scoring, for a score of 0 to 100 at each of the tabs and then a score matrix to tabulate those. Do you see what I'm referring to?
A. Yes.
Q. What was the purpose of having that -- those boxes for -- for scoring?
A. I do not know. It may have been from the template that I used to create this.
Q. Was there any discussion with the City about using the information in this document, Exhibit 10A, or something like it to score the various proposals?
A. Not that I recall.
Q. And why did you forward this summary of proposals onto Mr. Long?
A. I don't recall if it was requested by them or if we provided it.
Q. And I apologize, Ms. Emmerton. I had trouble hearing your answer there.
A. Sorry. I don't recall whether they requested it or whether we just provided it.
Q. Let me ask it a different way. What was your understanding of what -- what use

Mr. Long was going to make of this document?
MR. DAVIS: Objection, it calls for speculation.
BY MR. SMITH:
Q. Ms. Emmerton, did -- did you want me to repeat the question?
A. Sure.
Q. I'm just asking about your own understanding based on your interactions with the City and with Mr. Long of what -- what use he or the City was going to make of this document.
MR. DAVIS: Objection. I think you have to first ask her whether she had any such information. I don't think -- I don't think it's proper to assume that she did.
BY MR. SMITH:
Q. Ms. Emmerton --
MR. DAVIS: You assume that she knew the purpose of what they would do with this information or how they would use it.
BY MR. SMITH:
Q. What is your understanding, if any, of what use Mr. Long or the City was going to make

of this information?
A. I don't know what they were going to use it for.
Q. Okay. And I just want to make sure. Sitting here today, you yourself don't have a recollection of what prompted you to send this to Mr. Long?
A. No.
Q. Ms. Emmerton, let me ask you to take a look at Tab 2G. And, Ms. Emmerton, 2G is entitled comparison of benefits to the City of Waukegan and its residents. And am I correct in understanding based on your earlier answer, that the information that this Tab 2G would correspond to the responses received in response to what was the submittal requirement 2G in the City's RFQ?
A. Yes.
Q. And, Ms. Emmerton, on -- in -- am I also right in understanding based on the RFQ we looked at and your previous answers that benefits to the City of Waukegan, at least as you understood it, included job creation?
A. Yes.

Q. Ms. Emmerton, looking at the one-time construction impact and then annual operations impact, in the column for Full House Resorts, there are no numbers entered there. Do you see where I'm referring to?
A. I do.
Q. Do you have an understanding of why that portion is blank as to Full House?
A. It's my understanding that that information was not provided in their proposal.
Q. And then for additional annual benefits, there are a number of categories of tax revenue listed. Do you see where I'm referring to?
A. Yes.
Q. For the Lakeside Casino proposal, there are a series of NAs corresponding to those tax revenue categories. Do you see that?
A. Yes.
Q. What did NA stand for?
A. Not available or not -- not -- that might -- there might not be a distinction, I don't know. For example, if -- you know, if the hotel tax wasn't applicable, then it might mean

not applicable. But I think it -- for the most part, a blank or an NA meant that the information was not provided in the relevant proposal.
Q. And is that because that information wasn't provided in the Lakeside Casino's original response to the RFQ?
A. I believe that is correct.
Q. Ms. Emmerton, let me ask you to turn to Tab 4A(a) if you would.
A. Yes.
Q. The top portion of Exhibit 4A(a) is entitled comparison of financial positions, balance sheet and summaries of activities. Do you see what I'm referring to?
A. Yes.
Q. Okay. And am I correct in understanding again that this tab is labeled 4A(a) because it includes a portion of the information that was responsive to the submittal requirement Category 4A in the City's RFQ?
A. Correct.
Q. And, Ms. Emmerton, am I right in understanding that the top portion of the

spreadsheet making up 4A(a), in other words, the rows going from -- well, it's actually enabled, but -- but the assets through net assets, that's essentially the balance sheet that was provided by the various casino applicants? Am I following that correctly?
A. Correct.
Q. All right. And under assets, there's the subcategory of current assets, -- current and other assets versus capital assets. Without getting too technical on us, can you explain what the difference is at least in your mind as you prepared this table between current and other assets versus capital assets?
A. I don't recall the specifics.
Q. Okay. I guess more generally as a -- as a functional matter, why is it -- why is it relevant to distinguish between current or capital assets, if that something you're comfortable talking about?
A. I believe just from a standard reporting perspective.
Q. Ms. Emmerton, you see at the bottom there's -- there's net assets, which I generally

understand to be the assets net of liabilities. Is that your understanding?
A. Yes.
Q. Okay.
MR. DAVIS: You're talking about Line 13?
MR. SMITH: Yeah, I'm sorry. On my -- I'm looking at it on paper, Glenn, so.
MR. DAVIS: Okay.
MR. SMITH: Yes, Line 13. Thank you. It will make a better record.
BY MR. SMITH:
Q. Ms. Emmerton, am I correct that Full House was the only one of the casino applicants listed on this spreadsheet in Tab 4A(a) that had negative net assets?
A. Yes, it would appear that way.
Q. Ms. Emmerton, let me ask you to take a look at Tab 4C, if you would. And, again, we're still on Exhibit 10A.
A. Yes.
Q. What's your understanding of what's summarized in Tab 4C of Exhibit 10A?
A. The references provided by the bidders.

Q. When you say the references, could you be a little more specific?
A. The financial references.
Q. And am I following from your answer that the -- the information in Tab 4A is what comes from risk taken from the financial references that the various casino applicants who responded to the RFQ provided themselves?
A. Correct.
Q. And would you agree with me looking at all of these that Full House's financial reference provides less assurance than the other applicants, relatively speaking?
MR. DAVIS: Objection, foundation.
THE WITNESS: I don't know.
BY MR. SMITH:
Q. Okay. Fair.
Ms. Emmerton, let me just ask you about one other tab in this spreadsheet, which was Tab 4D. And it's 4D(b), I'm sorry, that I want to ask you about. 4D, little b.
A. Yes.
Q. 4D(b) is a catch and comparison of pro forma. And am I right in understanding that for

Full House the only numbers that are provided for the years listed there are the net revenue number?
A. Correct.
Q. And is it your understanding that that's consistent with what we saw from the Full House proposal, that Full House's pro forma included only net revenue but didn't include, for example, a gross revenue number?
A. Yes.
Q. Now, Ms. Emmerton, after you provided this summary to Mr. Long on September 6th, did Mr. Long or anyone else from the City provide feedback to you or commentary on it?
A. I do not recall.
Q. And just to make sure I understand your answer. When you say you don't -- do not recall, do you mean you don't recall that happening or -- in other words, you don't believe it happened or you just don't recall one way or the other?
A. I don't recall whether they've provided any specific feedback regarding that document.
Q. And putting aside feedback specifically

on this document, I just want to probe your memory on whether there were any discussions with the City about some of the -- that you were involved in involving some of the substantive information in this document.
So, for example, if we looked at the fact that Full House, at least as described in your summary of proposals, Exhibit 10A, had negative net assets, do you recall that coming up, that topic coming up in any of the discussions you were involved with with the City?
A. I do not.
Q. Ms. Emmerton, do you have an understanding one way or the other of whether Mr. Long shared your summary of proposals, Exhibit 10A, with anyone else from the City?
A. I do not.
Q. So, Ms. Emmerton, I had promised you we could take a break if you want when we finished this document. I think I'm ready to move on. Would now be a good time to take a -- take a short break?
A. Yeah. Am I able to have 20 minutes?

MR. SMITH: Sure. Well, let me -- let me ask. Let's maybe go off the record and then I'll ask some scheduling questions later.
THE VIDEOGRAPHER: Okay. Going off the record. The time is 11:38 a.m.
(Whereupon, a short break was taken.)
THE VIDEOGRAPHER: Okay. We're back on the record. The time is 10:26 p.m.
BY MR. SMITH:
Q. Ms. Emmerton, good afternoon. How was lunch?
A. Fast and delicious. Thank you.
Q. How's the baby?
A. She's gone out for a walk with the nanny. Not on her own.
Q. Ms. Emmerton, I know I said I was done with Exhibit 10A, but I unfortunately do want to go back briefly to that.
So if you can get that pulled up, I wanted to ask you about Tab 1 in the spreadsheet.
A. Yes.
Q. So for PHC in Tab 1, did you understand

Yes, okay. Yeah.
Q. Okay. What do you recognize Exhibit 11b to be?
A. This was the additional data. So we had added some notes and there was -- I do recall a discussion about the distribution of the various taxes.
Q. Tell me what you recall about that.
A. Some direction from the City regarding, you know, the various jurisdictions that collect certain portions of the taxes that we were looking at.
Q. And was that a direction from Tina?
A. I don't recall.
Q. Okay. Was that direction that you're describing the impetus behind your preparation of Exhibit 11b?
A. From recollection, yes.
Q. And, Ms. Emmerton, am I correct that at this point in time, September 11, 2019, you still did not have numbers related to jobs that the Full House Resorts estimated its proposal would create; is that correct?
A. Did you say September 19th?

Q. September 11 --
A. 11th.
Q. -- 2019.
A. Yes. We requested that information along with interviews, so we still do not have that information at this point.
Q. So, Ms. Emmerton, I asked you a few questions about this just to kind of direct your attention to a new topic that I want to ask you a little bit about, the interviews of the casino applicants that occurred on November 11 and 12, 2019. I take it you participated in those interview sessions?
A. Yes.
Q. And am I right based on your testimony and the documents we have reviewed, that you have -- you personally and Johnson Consulting had already had an opportunity by that time to review and summarize the various proposals that had come from the different applicants you were interviewing?
A. Correct.
Q. And, Ms. Emmerton, what was your understanding of the purpose of conducting those

interviews with the casino applicants?
A. My understanding -- I mean, it's a fairly normal part of the procurement process.
Q. You had participated in similar types of interviews in connection with engagements that Johnson Consulting had done in the past?
A. Yes.
Q. Did anything stand out for you in these interviews that was different from what you had come to be familiar with for those types of interviews?
A. No.
Q. And, Ms. Emmerton, just to set the scene a little bit, where did these interviews take place?
A. Next to the police station or in the police station in Waukegan.
Q. And who from the City attended the interviews?
A. Tina, Noelle, Doug, Marcus.
Q. Apologies.
A. And then Bob Long, as well.
Q. You said Bob Long?
A. Yeah. Tina, Noelle, Marcus and Doug.

Q. I realize each of the interviews was different, but can you just describe generally the format of the interviews, how they were conducted just -- just to give us a sense of how they went?
A. They all started with introductions from the bidder, Johnson Consulting, I believe the City introduced themselves. All the bidders had 20 or so minutes, some had PowerPoint presentations, I think most had PowerPoint presentations and then we had Q&A at the end.
Q. And am I right in picturing, Ms. Emmerton, that after the particular presenters had filed out from their interviews, the -- the folks from the City and Johnson Consulting would remain behind in the room, am I picturing that correctly?
A. Generally, yes, I would say so.
Q. And was there conversation among the City and Johnson Consulting after each of the interviews to get everyone's initial reactions or was there just not an opportunity for that?
A. No. Well, there was general conversation but it wasn't necessarily

Pl. SJ Ex. 133

case the WDA project team, there during the interview while everyone was present?

A. Correct.

Q. Okay. And then you tried to note in summary form the responses to Mr. Johnson's questions; is that correct?

A. Correct.

Q. There's then a section called action items. Do you see what I'm talking about on the second page of Exhibit 12 just after the questions?

A. Yes.

Q. Are these -- you know, again, a similar question. Are these action items that were discussed during the interview itself while the bidder was there and Johnson Consulting and the City representatives?

A. Yes, with the exception of this one, for example, where it says sent 9/11/19, that was my note that I added afterwards to record that I had --

Q. I got you.

Okay. And so if I'm following this correctly, the action items are essentially

follow-up -- well, let me -- let me -- let me -- and let me ask you. I see that there's this -- the action item, which was a request made during the interview and then you sent the request. Was that -- had the request been made to the bidder in the interview and you were just following-up when you note that you sent the request?

A. Yes. The request was made to the bidder during the interview and then we -- I believe from memory following the interview, I sent an e-mail to just formalize the request.

Q. And, Ms. Emmerton, if we -- for each of the casino applicants, there's a questions section. We can go through them one by one if you're not able to answer globally. But I'm -- my question to you is whether in each case the questions came from Mr. Johnson.

A. Yes.

Q. And if I were to ask you about the action items for each of the -- each of the applicants or bidder, depending on your term, would your answer about the process be the same, that this was a request that was raised with the

casino team there at the interview and then you may or may not have followed-up, depending on what your notes reflect?

A. The -- sorry, could you repeat the question?

Q. Yeah. I'm sorry, that was a bad question.

What I'm asking is for each -- each place where you put action item, is that a request that was made at the interview to the -- to the project team?

A. Yes.

Q. Is it your belief based on the way you prepared these notes, that the -- that the notes accurately reflect the questions that were asked of the project teams during the interview process?

A. Yes.

Q. So, for example, if I were to ask you about Potawatomi, which I believe is the notes corresponding to the Potawatomi interviewer on Pages 7 and 9 of Exhibit 12, were there any questions asked of Potawatomi to your knowledge that are not reflected in questions 1 to 11 in

your -- in your notes?

A. Not to the best of my knowledge.

Q. Okay. And, Ms. Emmerton, I note there are no action items listed for Potawatomi. Am I correct in inferring from that that that's because there weren't any follow-up requests made of Potawatomi at their interview?

A. That is correct.

Q. So, Ms. Emmerton, you mentioned that you did follow-up with some of the project teams by e-mail on the action items. Let me ask you to take a look at Exhibit 17.

(Whereupon, Deposition Exhibit No. 17 was marked for identification.)

THE WITNESS: Yes.

BY MR. SMITH:

Q. Okay. Let me just ask you to place this in context in terms of the work that Johnson Consulting was doing at this point. This is an e-mail you sent to Alex Stolyar of Full House on Friday, September 13th. So if I'm following, this is the day after the interviews. Is that your understanding?

A. Yes.
Q. Okay. And am I right in understanding based on the sequence of events, that at this point in time, you were in the midst of working on the presentation that Johnson Consulting was going to need to make the following week at the public hearing that was scheduled to be held in Waukegan?
A. Correct.
Q. And you say in your -- by the way, what was your understanding of what Mr. Stolyar's role was with Full House?
A. I don't recall, but he was provided as the point of contact for follow-up.
Q. And you say in this e-mail to Mr. Stolyar on September 13th, if you could provide the -- as discussed, if you could provide the following, it would be appreciated, and you list two items there. Revisited estimates of property tax generated by the proposed project, and then supplemented detail regarding projected revenues and expenses and specifically gross revenue projections.
Am I right that you used the phrase, as

discussed, consistent with what you just testified to a moment ago because these were requests that had been made to Full House during the interview?
A. Correct.
Q. And I take it then the City -- the City representatives who sat in on the interview were aware that Johnson Consulting was following-up with at least some of the project teams?
A. Correct.
Q. And, Ms. Emmerton, number -- Number 2 in this e-mail to Mr. Stolyar asks for supplemental detail regarding projected revenues and expenses and specifically gross revenue projections. Am I right that this is an effort to supplement the information we had seen in the Full House proposal earlier, I think it was Exhibit 51, Appendix A, that included net revenues but didn't provide gross revenue numbers for Full House's casino proposal?
A. That is correct.
Q. And why did -- given what Johnson Consulting was doing for the City at that point in time, why did Johnson Consulting need gross

revenue numbers?
A. At that time, and I -- I'm not sure whether this was ultimately included in our deliverable, but we were trying to get each of the financial proposals to an apples-to-apples scenario. So by selecting line items -- and we didn't have the gross revenue for them, so therefore -- you know, we had the gross revenue for the four other bidders. But if we had theirs, then we would have an apples-to-apples comparison across the board.
Q. And then, Ms. Emmerton, I take it that you recall that Full House did provide the information requested in Exhibit 17 here?
A. Yes.
(Whereupon, Deposition Exhibit No. 18 was marked for identification.)
BY MR. SMITH:
Q. All right. And if we just quickly take a look if you could at Exhibit 18. Am I right that this is -- Exhibit 18, this e-mail and attachment are Mr. Stolyar providing the information that you had requested in your

e-mail Exhibit 17?
A. Yes.
(Whereupon, Deposition Exhibit No. 19 was marked for identification.)
BY MR. SMITH:
Q. Ms. Emmerton, let me ask you to take a look at what's already been marked as Exhibit 19, which is an e-mail chain between you and Mr. Stolyar that I think includes some of the e-mails that we had looked at previously.
So, Ms. Emmerton, feel free to kind of orient yourself by scrolling down to the bottom of Exhibit 19, you know, which will be the earlier e-mails in the chain and feel free to kind of just look up when you have oriented yourself.
A. Yes.
Q. So, Ms. Emmerton, within Exhibit 19, if I focus your attention on the document that has the Bates marking 1147 in the lower right-hand corner, which I think is the second page of the exhibit. Do you see there at the bottom of the page, the e-mail from Mr. Stolyar to you from

September 13th that we had just looked at in Exhibit 18 --
A. Yes.
Q. -- providing some supplemental information?
A. Yes.
Q. And then you ask Mr. Stolyar, am I okay to quote the gross gaming revenue in round numbers for year five only?
Ms. Emmerton, why were you asking permission from Mr. Stolyar to quote that particular number?
A. I was asking for permission because he had stated that it was proprietary. I was asking for permission to state the year five number as, again, that was a metric that we had from the other bidders.
So typically in the work that we do, we see year five as a stabilized year of operation. And so that was the one value that we wanted to be able to quote in our report to compare the bidders, compare the proposals.
Q. And if you then kind of move forward in time by scrolling back to the first page of

Exhibit 19. Mr. Stolyar said, okay, right, to use that number?
A. Correct.
Q. Okay. And then you wrote back, and this is September 16th, which would now be Monday, two days before the September 18th hearing. You say, thanks, Alex. Are you able also to confirm the number of jobs that will be created by the project on site as well as the indirect and direct -- I'm sorry, the direct and indirect jobs. Do you see what I'm referring to there?
A. Yes.
Q. All right. So my first question for you is -- well, let me -- let me get to the end of the chain you had with Mr. Stolyar so we have the full context and then I'll ask you.
Mr. Stolyar then e-mails you back and he provides some numbers for direct jobs and indirect jobs from construction and then also employment at the casino. Am I reading that right?
A. Correct.
Q. And we're going to look at documents

relating to this, so if you don't remember, that's fine. But am I correct that you ended up using the job numbers -- at least some of the job numbers that Mr. Stolyar provided in this e-mail in Johnson Consulting's presentation at the public hearing and ultimately in its report for the City?
A. I don't recall.
Q. Okay. Ms. Emmerton, you -- we had looked at earlier, and we can look back at it if you need your memory refreshed, that the information provided in Full House's provisional proposal and then in your summary proposal indicating that these job numbers were not included with Full House's proposal and -- and I recall that for you as context for the question I'm about to ask you, which is about your choice of wording. Why did you ask Mr. Stolyar if he could, quote, confirm the number of jobs that will be created by the project?
A. I don't recall.
Q. Ms. Emmerton, do you have any reason to believe that you had those numbers prior to sending this e-mail?

A. Not to the best of my knowledge without reviewing what was in his attachments, so I don't know.
Q. Okay. At least as best as you can recall sitting here, these numbers are being provided to you by Mr. Stolyar and you had not received them previously; is that correct?
A. That is correct.
Q. Okay. Ms. Emmerton, you've looked, for example, at the e-mails that you sent to Full House following-up on requests made during the interviews on September 11th and 12th, and I think you testified you recall sending similar follow-up requests to some of the other project teams.
Was there -- you know, again, based on conversations you participated in, was there any discussion at this point, and I'm focusing on this sort of September of 11th, 12th, 13th, 16th period, any discussions among the City about whether it was appropriate to be asking for these follow-up requests for information from project teams after they had already submitted their proposals?

Pl. SJ Ex. 133

estate appraisal?
A. Yes.
Q. Okay. Did you have any -- after you sent your e-mail to Mr. Long asking for the appraisal, did you have any conversations with him about that or with anyone from the City or did you just get this e-mail back from Tina?
A. I don't recall any conversation in between --
Q. At the time when you got this e-mail from Tina, did you understand it to be essentially responsive to your request to Mr. Long for the real estate appraisal?
A. Yes.
Q. And, Ms. Emmerton, what did you do -- you said earlier you couldn't recall why you were asking for this appraisal, the appraisal is attached to Ms. Smigielski's e-mail. Does seeing the appraisal itself refresh your memory at all on that front?
A. Sorry, is it in that exhibit or --
Q. Yeah, attached to -- the attachment to Exhibit 25 is the appraisal. Do you see that?
A. Yes, yeah.

Q. Does seeing the appraisal refresh your memory in any way about why you had been asking for it?
A. I believe we were asking for it because we understood there had been an appraisal done, we had not yet seen it and the appraised value was referenced in the Potawatomi proposal.
Q. Okay. Is there anything in the Potawatomi proposal that specifically references this appraisal by Leech & Denoma as of June 1, 2019?
A. I don't know.
Q. And, Ms. Emmerton, when you got this appraisal, what if anything did you do with it?
A. We used the appraised value to reflect the appraised value in Potawatomi's proposal plus or minus 15 percent.
Q. Okay. Did you yourself or to your knowledge anyone else from Johnson Consulting review the appraisal apart from pulling the number out of it?
A. I did not review it. I do not know if Charlie reviewed it.
Q. Okay. I take it from your answer, you

didn't have any conversations with Mr. Johnson where he suggested to you that he had reviewed it?
A. Not that I recall.
Q. Ms. Emmerton, did anyone from the City bring to your attention any aspects of this appraisal, apart from just e-mailing it to you?
A. No, not that I recall.
Q. Okay. Do you recall anyone from the City explaining to you what had prompted the City initially to obtain this appraisal in the first place?
A. No, I don't.
Q. Okay. Ms. Emmerton, let me ask you to take a look at what's been marked as Exhibit 13.
(Whereupon, Deposition Exhibit No. 13 was marked for identification.)
BY MR. SMITH:
Q. Exhibit 13 is a chain consisting of two e-mails from September 13th. They're from -- the first one is from Mr. Long to Mr. Johnson and you're copied on it and the second one Mr. Johnson responds to Mr. Long copying you.

Do you see that?
A. Yes.
Q. All right. And in the earlier e-mail, Mr. Long asks about contacting each of us for our input on the interviews.
Did -- did you -- I'm just asking about your understanding. When you saw this e-mail from Mr. Long, did you have an understanding about who he was referring to when he said each of us, contact each of us?
A. Yes.
Q. What was your understanding?
A. My understanding was that it was the team of the four City staff and Bob.
Q. And Mr. Johnson says, I think that's a good idea. We will try today and Monday. Today being Friday, September 13th, Monday being Monday, September 16th.
To your knowledge, did Johnson Consulting go ahead and reach out to the people from the City you mentioned for their input on the casino proposals?
A. Yes.
Q. And were you involved in that effort?

Johnson Consulting's casino review?
A. No specific conversations come to mind.
Q. Okay. What about with any other City representatives or officials?
A. Again, nothing specific is jogging my memory.
Q. Let me then have you take a look at Exhibit 38.
(Whereupon, Deposition Exhibit No. 38 was marked for identification.)
BY MR. SMITH:
Q. And Exhibit 38 is an e-mail you sent to Mr. Long copying Mr. Johnson on October 8, 2019 saying, hi, Bob, attached is a working draft of our report.
Does that refresh your memory that in this period in October, you were preparing your report for the City of Waukegan?
A. Yes.
Q. And just having seen that sequence on the off chance it does, the message is from Mr. Long by e-mail the day before, and then seeing this e-mail where you sent Mr. Long the

draft report, does that do anything to refresh your memory about whether there was a phone conversation or what the content of it was on October 17th -- 7th or thereabouts with Mr. Long?
A. It does not.
Q. Okay.
(Whereupon, Deposition Exhibit No. 43 was marked for identification.)
BY MR. SMITH:
Q. Ms. Emmerton, let me -- let me ask you to then take a look at Exhibit 43. And this is an e-mail you sent to Mr. Long on October 10th copying Mr. Johnson. Do you see that?
A. Yes, yes.
Q. And take a moment to look through the attachment if you need to. But am I correct in understanding that what's attached to this e-mail is what was the final version of Johnson Consulting's report to the City of Waukegan?
A. Yes, that is correct.
Q. Okay. And is there a way you're able to in particular to recognize it as the final

report?
A. It is not marked as draft.
Q. And, Ms. Emmerton, can you describe for me what your role was in actually drafting this report as opposed to Mr. Johnson's role?
A. My role was to draft the report and then Charlie reviewed it and edited it, made edits to it as appropriate.
Q. And how did the -- how did Mr. Johnson's editing process work? Would he give you handwritten markups, would you just discuss it and change it on the computer right there, are there drafts that he redlined?
A. I don't recall if he redlined anything. But typically our process is that he would review it on his computer.
Q. And then once he had reviewed it on his computer, how did he convey to you any changes he wanted to make?
A. For the most part, I may have interpreted them and then I would -- it seemed that we also had some conversations at the office about the edits that he was suggesting.
Q. I take it then that you were

essentially the initial draftsperson of this -- of this report?
A. Correct.
Q. Let me ask you to take a look at the report itself and focusing on the introduction, which is Bates stamped CHJC 902. It's the -- you know, the first substantive page of the report with the heading, introduction. Do you see where I am?
A. Yes.
Q. Okay. Ms. Emmerton, in the opening paragraph, it says in the second sentence, it is intended that the City will enter into an agreement with one or more selected developers and issue a letter of support to the Illinois Gaming Board by October 25, 2019, in accordance with the requirements of the Illinois Gaming Act.
Do you know where you got the -- what -- what the basis for that statement was that you've included in the report?
A. I don't know.
Q. Okay.
A. It may have been information included

in the RFQ.
Q. Okay. And just generally speaking, to be fair, am I -- am I right in assuming that to the extent you were talking about some of these background issues, the way the legislation was supposed to work or what was contemplated by the RFQ, that your principal reference for that would have been the City's RFQ itself?
A. Yes, I think that's fair.
Q. I guess another way of asking that is as you were sitting there drafting and realized, you know, you had to write some of this background stuff that's a little, you know, sort of not -- not the core of what Johnson Consulting was doing, did you, you know, pick up the phone and call anyone from the City and say, hey, I'm thinking about saying this, does this sound right to you or was this a more solitary process?
A. This was a more solitary process.
Q. Ms. Emmerton, if you turn to Figure 1, which is -- it's Bates stamped 905. Am I -- and there's a slide that's proposed site purchase price, Waukegan, Illinois. Am I correct that

this is basically a reproduction of a similar slide we saw in the presentation that Johnson Consulting did on September 18th?
A. Yes.
Q. Okay.
A. Removing the fifth bidder.
Q. Okay. And -- and thank you for that clarification. There was a fifth bidder who dropped out after the September 18th hearing but before the City Council met in October; is that right?
A. That's correct.
Q. Okay. So other than that change, eliminating that bidder as you call them, this is essentially the same slide as we saw from the September 18th presentation, right?
A. Yes.
Q. Okay. So let me ask you -- I'm doing this a little backwards, I guess. But if you jump to Figure 15, which is the end of the report where you have the rankings. It's the last page of Exhibit 43, Bates number 918.
A. Yeah.
Q. The score matrix, parens, ranking. Do

you see where I am?
A. Yes.
Q. Okay. And there are -- under the heading evaluation criteria, there are categories 1, 2, 3, 4. Am I right in understanding that these categories correspond to the submittal criteria in the RFQ that have the same number?
A. Correct.
Q. Okay. And this is where Johnson Consulting put together its overall rankings in this Figure 15, correct?
A. Correct.
Q. Can you explain to me the process by which these scores and rankings in Exhibit -- actually, let me put it this way. I guess it's -- it's -- the heading is overall ranking on the bottom line but it's not a 1, 2, 3, 4, so I'm going to refer to it as scoring if that's okay. But can you --
A. Sure.
Q. -- describe for me the process by which Johnson Consulting put together these scores for each of the evaluation criteria and then its

overall ranking?
A. Yes. So for each criteria -- so against each criteria, the four bidders were ranked. I think it's a little hard to explain in detail without looking back up at the criteria that we used.
So I suppose that the -- the property specifications we had and locations we had the appraised value and -- sorry, I'm just trying to get back up to it. So the appraised value was really -- that was one of the criteria, then we also had the location. They're all located on the same site obviously and then the property specification.
So it was our interpretation of the information that the bidders had presented and then we just ranked them accordingly. And then the reason that it comes out as a score is because we took an average of the rankings across each of the criteria.
Q. Okay. I think you anticipated one of my eventual questions, which is whether the values attributed to each offer for the Fountain Square site figured significantly in the score

Page 160

that was assigned for criteria 1, and it sounds from your answer that that was indeed the case.

A. It was a significant criteria, yes.

Q. Okay. So just backing up. I had a more general kind of process oriented question, which I probably really didn't articulate very well. Which is as I understand it and, you know, the -- for each of these criteria, a project team was assigned a score of either 1, 2 or 3. Am I right about that?

A. Yes.

Q. Okay.

A. In terms of what is presented, yes.

Q. Okay. Was there any possibility to get -- based on Johnson Consulting's methodology here, was there -- was there any possibility for a project team to get a score lower than -- well, 1's the best. But better than 1 or worse than 3? In other words, was it theoretically possible that you would have assigned a 0 or a 4 but it just happened that the -- none of the project teams in your view warranted those scores or were 1, 2 and 3 the range of responsibilities?

Page 161

A. 1 through 4 in theory, yes, a bidder could have been assigned a 0 if they were unresponsive to one of the criteria and could have been assigned a 4 since it was a ranking and there was 4. It was our evaluation though that under many of the criteria multiple bidders got the same rank. I did not articulate that as well as I could have. But I think the answer to your question is yes.

Q. And is this particular scoring format one that in your experience Johnson Consulting has used in the past?

A. Yes. We have ranked submittals against each other, yeah.

Q. And have you scored them in this -- in this manner with assigning a particular score and then averaging it in this way?

A. I believe so, yes.

Q. All right. Can you -- can you think of an example that in your mind comes closest to a similar scoring approach?

A. I am -- no examples really come to mind in terms of this ranking. You know, I was guided by Charlie in the assessment of it and --

Page 162

Q. I'm sorry, could you say that again?

A. Sure. I was -- I was guided by Charlie in terms of the methodology that we used for ranking them.

Q. What do you --

A. So his experience. In terms of the -- the tool that you use. Because I know there's, you know, a myriad of more complicated tools that we have used on other assignments where, you know, if the RFP lays out things like there's 20 points for evaluation criteria 1 and 10 for 2, then you have to -- you don't have to be, but you can -- the -- the math can be a little bit more complicated to, you know, assign values and then weight them.

In this RFP, there was no score assigned in the RFQ language for each of the evaluation criteria. Does that make sense? So it was our opinion that they were weighted equally.

Q. Yeah. So there's a -- there are a few things there that I'd like to unpack a little bit. When -- when you initially compiled your summary of proposals, I think you organized the

Page 163

tabs in your Excel spreadsheet, we saw this in 10A in recognition that there are a variety of subcategories of each of the four criteria listed in Figure 15 of Exhibit 43. Do you recall what I'm talking about there?

A. Yes.

Q. Okay. And in theory, you could have, even without weighting one or the other more, assigned a score to those subcategories, correct?

A. Theoretically, yes.

Q. Okay. And, for example, criteria 2 includes, as we've looked at, the issue of economic impact, right?

A. Yes.

Q. Okay.

A. Criteria 2, yes.

Q. Okay. Which includes jobs creation, right?

A. Oh, the economic benefits, yes. Criteria 2, yes.

Q. Okay. So explain why did -- what did Mr. Johnson say about why there should be a more detailed or granular scoring methodology here,

putting aside the issue of weighting?
A. I don't think there was a specific reason why they shouldn't be. Ultimately our report was to be presented to City Council and the general public, so I think, you know, part of our value is articulating it in a noncomplicated way that most simply communicates our evaluation of the various proposals.
Q. And, Ms. Emmerton, for these numbers that were assigned to -- let's just take criteria 2 as an example. 3, 1, 1, 3 going from Rivers to Full House to North Point to Potawatomi for description of proposed development.
If -- can you describe to me the process by which you and Mr. Johnson arrived at these numbers for that -- to focus on that criteria, to try to keep this a little simpler?
A. On criteria 2?
Q. Yeah.
A. So criteria 2 had a number of variables. So, you know, we analyzed each proposal based on all of those criteria and then assigned a ranking. And it was our opinion that

Full House and North Point ranked the highest -- is that correct, yeah. And that CDI and Potawatomi ranked the -- ranked lower. But it was our assessment that they ranked lower by a significant factor that caused us to give them a 3 rather than a 2.
Q. And so, again, just as a matter of process before getting into the judgments you made there. What I'm trying to figure out is if you could reconstruct to me how the two of you came up with these numbers. In other words -- and I'm just throwing these out as hypotheticals to give you a sense of what I'm trying to -- trying to understand.
I -- I could imagine knowing nothing about how you do this, that each of you separately put a number in a hat and then saw what each of you came up with and discussed or you talked it through and just sort of had a conversation and came to a consensus; or that there are backup numbers where even granted that in order to make this simple for the public, you did a more granular numerical analysis and there's backup to this that explains how you got

there. Those are just examples to give you a sense of what I'm hoping you can paint kind of paint the picture for me.
A. Sure.
Q. So can you explain the process?
A. Yeah. It was primarily a conversation between -- a discussion between Charlie and myself. We just sat, we took the Excel that we had that had the summary of them all where we had values that were populated, we put those in as well as to go alongside the commentary and we just sat there and went through each criteria and deliberated on how we would rank them.
Q. And did you -- did you do anything to keep track as to the various subcategories of these criteria and how they factored into the analysis?
A. In terms of the relative weight of the --
Q. Well, just in terms of, you know, 2, for example, I think we saw it goes from 2A to 2G. So there are a quite a number of subcategories there and I'm just wondering if you were able to keep that all straight in your

head or you needed to for each of those subcategories, you know, assign some subsidiary core score that went into the overall mix or how you kept track of it?
A. I don't recall keeping track of --
Q. And about -- and about how much time did you and Mr. Johnson spend coming up with these scores here?
A. We had, you know, consistent dialog over several weeks of discussing them.
Q. Describe as best you can in substance, I realize, you know, it would be impossible to give me a verbatim now, but describe for me everything you can recall in substance about that dialog.
A. Okay. In substance. So, I mean, effectively in terms of substance outside of our methodology or --
Q. No. I want to know what Mr. Johnson said to you about these scoring in substance and what you said to him over the course of your dialog.
A. I don't recall specifically going through each criteria what we discussed.

Q. Could you -- could you give me your best recollection generally?
A. Sure. Do you want me to walk through each of the criteria or --
Q. However -- however best you -- I want it from your recollection of what Mr. Johnson was saying to you and you were saying back to him. So however best you're able to -- whatever you can recall that, however you're best able to organize it, I'd like you to express to me.
I think I'll give you an opportunity as well to go through some of the particular inputs and explain to me how they factored into your score, but right now I want to know -- I'm actually trying to exhaust your memory about what Mr. Johnson said to you.
A. Sure. So -- so it was -- so based on our discussions and what we had looked at in the various proposals and what we had heard at the presentations, so we knew that Full House had the highest purchase price, we knew that -- sorry, I'm just trying to jog my memory a little bit here.
You know, I think -- I think we had

four compelling proposals and it was a matter for us of going through each of the criteria, communicating with each other about our interpretation of what they were presenting. You know, I did rely on Charlie a lot for the evaluation of the financial criteria.
And I don't feel like I'm answering the question very effectively. But -- yeah, I mean, I think we basically just walked through each of the proposals and discussed what we saw as the pros and the cons of each.
Q. At any point did Mr. Johnson convey in any respect that he thought the scoring should -- and I'm not asking about particular numbers, but in terms of where the -- where the different proposals shook out, you know, in terms of higher or lower scores, that he thought it was important to get to a particular outcome for a particular applicant or after, was there any process where when you saw how your initial scores for the a category shook out, there were some adjustments made based on how the overall numbers came out?
A. No, not that I recall.

MS. RIGNEY: John. John, I hate to interrupt. Can we just take a five-minute break?
MR. SMITH: Yeah, I'm sorry. And we've been going over an hour.
MS. RIGNEY: No. And I apologize. I just -- just to get up and walk around and then come back.
MR. SMITH: No, no, no. And we're getting -- we're getting close to the end. No, it's a very reasonable request.
MS. RIGNEY: So sorry.
THE VIDEOGRAPHER: Okay. Going off the record. The time is 2:44 p.m.
(Whereupon, a short break was taken.)
THE VIDEOGRAPHER: Okay. We're back on the record. The time is 2:48 p.m.
BY MR. SMITH:
Q. All right. Ms. Emmerton, thanks for hanging in there with me. I think we're getting -- getting close to the end here.
Let me ask you this about Figure 15. In the course of preparing the report and the

internal revision and dialog process that you've described for me, did Figure 15 go through more than one iteration?
A. I don't recall specifically. I don't recall.
Q. All right. Let's -- in fairness, I've sort of been asking you the questions a little bit divorced from the actual content of the report, so let me -- since it's a little -- I'm going to ask you to take a look at the substantive part of the report discussing the valuation criteria 2, which is description of proposed development.
And that begins, Ms. Emmerton, on -- I don't know if there's a page number in the report, but it's the -- it's the -- the Bates number is 906 at the bottom right-hand corner. It's Page -- oh, yeah, there it is. It's Page 6 of the report.
A. Yes.
Q. Do you see where I am?
A. I do.
Q. Okay. So Figure 3 talks about size of the proposed casinos and it provides numbers

Page 172

both as I understand it for slots and then gaming tables, and by way of gratuitous editorial, this will eliminate any James Bond like romanticism anyone has about casinos. But in Figure 3 Waukegan Potawatomi Casino, which I'll just call Potawatomi, seems to have at least as to slots, the highest number and it's certainly up there overall, Full House and -- sort of seems like a second there.

Can you just explain to me how this factor, these numbers reflected in Figure 3 factored into the evaluation that Johnson Consulting did of criteria 2 and the scores it assigned? I'm just asking for the impact of this particular set of numbers. I realize it's only one out of many.

A. Yeah. I mean, the size is important. As, you know, it can factor into the overall revenues and impact of a casino. But as you said, it was one of many criteria under this particular evaluation criteria.

Q. Understood. So I take it with that caveat as to this one factor, that's relatively speaking a positive for Potawatomi based on the

Page 173

numbers in this -- in this table, the fact that it's got quite a number of slots?

A. Relatively speaking, yes.

Q. Okay. And obviously as well there's some less quantitative, more subjective items discussed in this criteria 2 in fairness, correct?

A. Correct.

Q. And, I mean, among other things in -- if you turn to the next page, Page 7, the paragraph just above 2B, which is the phasing plans says, at this preliminary stage, detailed site planning has not been undertaken by any of the proposers, and this will be important. I take it that was an accurate statement in your view based on what you had seen of the various proposals?

A. Correct.

Q. Okay. So 2G talks about economic benefits. And one of the things that's noted here is that three of the four proposers included an estimated of total economic impact of ongoing operations, but Full House did not provide an estimate of the total economic output

Page 174

generated by the project.

So how did that impact -- again, granting that this is one factor among many, how did that impact the way Johnson Consulting scored criteria 2?

A. I don't recall specifically how that impacted the score.

Q. Okay. Was that a -- was that relatively speaking a negative factor for Full House?

A. Relatively speaking, yes.

Q. Okay. And then if we look at Figure 4, this is similar to a table we saw in the public presentation on September 18th with employment created by the proposed casinos. Do you see where I am on Page 8 of the report?

A. Yes.

Q. Okay. Would you agree with me that, again, the numbers from Full House come not from their original proposal but from the supplemental information that they provided after the interviews with the casino project teams?

A. Yes.

Page 175

MR. DAVIS: Asked and answered. Go ahead.

MR. SMITH: I think -- I think we got the answer there. Did the court reporter get it?

THE COURT REPORTER: (Nodding).

MR. SMITH: Okay. I'm getting a nod yes.

Glenn's been very patient with me all day so.

BY MR. SMITH:

Q. And, Ms. Emmerton, here Waukegan, would you agree with me, they had the most jobs created both at the casino and total jobs?

A. Based on the information they provided, yes.

Q. Okay. And that -- and that was really the information you had from the various casino applicants, right, the information they had provided?

A. Correct.

Q. You didn't do an independent evaluation of that information, right?

A. We did not.

Q. Okay. And was and I think we looked at this earlier. Was it your understanding that job creation was an important factor to the City of Waukegan in considering casino proposals, at least according to its request for qualifications and proposals?
MR. DAVIS: Asked and answered. Go ahead.
THE WITNESS: Yes.
BY MR. SMITH:
Q. Okay. And -- and so how did this with the numbers in Figure 4 factor into Johnson Consulting's evaluation of criteria? Was this a net positive for Waukegan relative to Full House?
A. I don't recall specifically.
Q. Well, just based on your understanding of the process, wouldn't more jobs have been a positive factor?
A. Yes. I mean, yes, that's a fair assessment.
Q. Ms. Emmerton, then if we turn to the next page, which is Page 9, which is Figure 5. We have gaming and admissions tax. Do you see

where I am?
A. Yes.
Q. Okay. And you would agree with me that those figures in Waukegan projected higher gaming an admissions tax than Full House or North Point?
A. Yes.
Q. Okay. And so relative to Full House, that would be a net positive for Waukegan based on this admittedly single criterion, right?
A. Yes.
Q. You know, granted all that, Ms. Emmerton -- and I realize I hit not every single part of criteria 2. But if I go back to the evaluation criteria 2 in Figure 15, which is Johnson Consulting's overall scoring, I'm having a hard time reconciling what we just reviewed with Full House having a 1 and Potawatomi and frankly Rivers, for that matter, having 3.
Can you explain just based on what -- what we looked at, how you got to those scores for Full House? What factors overrode the items we were just looking at which seem to favor Potawatomi over Full House?

A. Sure. I know one of the important factors that was a negative for Potawatomi was that they were the only bidder that didn't propose a temporary casino.
I believe one of the other bidders were -- didn't propose it in their proposal -- or sorry. Stated that they were open to discussing it or offering the City some form of compensation in lieu of the temporary casino. That's one of the factors that springs to mind.
There was also sort of various levels of information provided regarding the sustainability aspect, which was also part of that criteria. So there was a lot of more qualitative analysis that supplemented the items in that criteria that were purely qualitative -- quantitative, sorry.
Q. Ms. Emmerton, just so I understand, and in fairness, my question is what led you down this path. Is it you -- is it your testimony that in the analysis that you and Mr. Johnson conducted at the time, that you actually sat there and said, well, notwithstanding Potawatomi's superior job creation,

notwithstanding the higher revenues, notwithstanding the higher number of -- of gaming devices, based on those other things, we're going to give the things you mentioned, the temporary casino or sustainability issues as between Full House and Potawatomi, we think those are so strongly weighing -- and notwithstanding that, Full House didn't provide economic impact data called for by the RFQ, those other things weigh so much in favor, we're going to give Full House a 1, they're going to get a 1, notwithstanding those issues, and Potawatomi is going to get a 3? Is that the actual analysis you did at the time or in fairness are you responding to my questions now and coming up with a possible rationale for how you could get those numbers?
MR. DAVIS: I have to object to the form of the question. It's not only long, but it's almost un -- it's very difficult to follow what pieces and comparisons you're asking her to comment upon.
So subject to that, I suppose you can answer the question if you understand it. I

Page 180

think it boils down to at the end of the day, did the qualitative -- did you use qualitative factors to override the quantitative numbers and --

MR. SMITH: That's -- that's not my -- your objection's noted, but that's not my question. And I -- I take your point about the length of the question.

BY MR. SMITH:

Q. But, Ms. Emmerton --

MR. DAVIS: Well, I --

MR. SMITH: Let me --

BY MR. SMITH:

Q. Ms. Emmerton, to the extent you can, can you answer my question?

A. So in an assessment of the proposals, we used both qualitative and quantitative data. We worked systemically through all of the criteria to arrive at a ranking for each of the four proposals.

Q. And the points you just brought up a moment ago in response to my question, was that actually a discussion that occurred between you and Mr. Johnson, that there was criteria that

Page 181

you mentioned was the reason Full House got a 1?

A. Sorry, I don't understand exactly what you're referring to.

Q. Yeah. Here's what I'm getting at. In fairness, I asked you how could -- how could Full House have gotten a 1 and Potawatomi gotten a 3. And you gave -- you gave me an answer based on some other factors. And -- and in fairness, this is a confusion that I created perhaps with my question.

What I'm trying to understand is I want to make sure you gave -- in fairness, you answered my question and you cited some subjective factors that in your view were in Full House's favor and presumably could be considered in scoring Full House.

What I'm asking is are those -- is that a discussion in terms of those particular criteria that you actually had with Mr. Johnson at the time?

A. No. That was in response to your question.

Q. Okay, okay.

At the -- at the end of the day,

Page 182

Ms. Emmerton -- if you can answer this. Do you view the scores in Figure 15 as Mr. Johnson's or the product of a collaboration between you and Mr. Johnson in which -- you know, let me stop there.

A. I believe -- I mean, we worked together on this assignment. He brings more experience than I do, so I was under his tutelage, but I would view this cause as a collaboration between -- between Charlie and myself.

Q. Sorry, I think I stepped on the last part of your answer. Go ahead.

A. Sorry. A collaboration between Charlie and myself.

Q. And you used the word tutelage. Was it a collaboration where you were under his tutelage?

A. Yes, I think that's fair.

Q. Let me ask you to, Ms. Emmerton, take a look at Exhibit 27.

(Whereupon, Deposition Exhibit No. 27 was marked for identification.)

Page 183

BY MR. SMITH:

Q. Exhibit 27 consists of an e-mail chain between you and Mr. Johnson on October 15th. And the earlier e-mail -- and this is October 15, 2019 of course. You say to Mr. Johnson, I checked with Bob and the bidders aren't authorized nor were they invited to submit any additional information after the RFP due date (aside from the clarifications we specifically requested at the interviews). As such, we are not taking any of this into account for our assessment. Obviously we are aware of it and can take it under advisement, but that's the extent of it.

So, Ms. Emmerton, what prompted you to check with Bob about how to handle any additional information from the bidders?

A. I don't recall specifically, but it may be related to the e-mail that came from Doug with the supplemental information where he said that they weren't sure how to deal with it.

Q. Do you recall whether also other project teams that at some point in time also requested to submit additional information

before the -- before the City Council hearing on October 17th?

A. From recollection, yes.

Q. Let me ask you for some clarification about some of the language you used here. You said, I checked with Bob and the bidders aren't authorized nor were they invited to submit any additional information after the RFP due date, parens, aside from the clarifications we specifically requested at the interviews, closed parens. Was the word clarifications your term or Mr. Long's term?

A. I don't know.

Q. Okay. Then I think the answer to this next question is obvious, so I don't -- I'm going to ask it for the sake of completeness but it's not a trick question. Why did you use the term clarifications there?

A. I don't know.

Q. Okay. Would you agree with me that at least some of the information that we've looked at that Full House provided that had been specifically requested at the interviews in September 11th and September 12th was more than

just a clarification of information that was already included in Full House's proposal?

A. I think that's fair.

Q. Just moving on. You say, as such we are not taking any of this into account in our assessment. I think that speaks for itself.

You then go on to say, obviously we are aware of it and can take it under advisement, but that's the extent of it. Can you explain what you were conveying there? What does it mean to on the one hand not take the information into account as part of Johnson Consulting's assessment but on the other hand take it under advisement? What is -- explain how you reconcile those two things.

A. I think my point was just to Charlie that we were allowed to acknowledge that we knew that they had submitted additional information.

Q. Okay. I think I may be done. I'd like to just quickly look over my notes. Before -- I still want to do that, but this is one thing I know I want to do and then I'll ask if we could just take a three-minute break.

But, Ms. Emmerton, I kind of blew

through your background and experience a little quickly and I -- you may have said it and I may have missed it and I apologize. But when did you start at Johnson Consulting?

A. 2010.

Q. 2010, okay. So you've been there about nine years give or take when Johnson Consulting was engaged by the City of Waukegan?

A. Correct.

Q. Okay. And over the course of those nine years, had your responsibilities evolved in any respect?

A. I mean, I started as a project manager, which is still my day-to-day function. So I'm not quite sure how to answer that question.

Q. Sure, okay. But I take it you've gained experience over -- over that time?

A. Yeah, yeah.

Q. And do you primarily work with Mr. Johnson or are there other folks at Johnson Consulting you also work with?

A. Primarily -- primarily I -- so I will be the project manager, Charlie will function as the project executive, so he overseas everything

that we work on and then sometimes I will work with an analyst, as well.

Q. Okay. And I know in the Johnson Consulting proposal to the City, there was a list of some of its past experience with working on casino related projects, so I'm generally familiar with that.

Could you just describe for me, and a pretty high level overview is fine, what your experience had been on casino related projects for municipalities before the engagement with the City of Waukegan?

A. Sure. I worked on the Harrah's Casino in Atlantic City on an expansion study for that. When I first started I believe I played a very small kind of analyst role on a casino project that we worked on in West Springfield.

Outside of that, though, more of my experience has been on the developer recruitment side of it. I work across all land uses but for the most part, I specialize in mixed use developments that surround the various types of venues that we work on. I do a lot of fairgrounds work.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAUKEGAN POTAWATOMI CASINO, LLC, )
an Illinois limited liability )
company, )
)
Plaintiff, )
)
-vs- ) No. 1:20-cv-750
)
CITY OF WAUKEGAN, an Illinois )
municipal corporation, )
)
Defendant. )

Videotaped Rule 30(b)(6) deposition via videoconference of C.H. JOHNSON CONSULTING, INC., by and through its corporate representative CHARLES JOHNSON, taken before TRACY L. BLASZAK, CSR, CRR, and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 1625 Sheridan Road, in the Village of Wilmette, Cook County, Illinois at 9:31 a.m. on the 16th day of November, A.D., 2020.

There were present at the taking of this deposition via videoconference the following counsel:

FREEBORN & PETERS LLP by
MR. DYLAN SMITH
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 360-6394
dsmith@freeborn.com

on behalf of the Plaintiff;

HEPLER BROOM LLC by
MR. GLENN E. DAVIS
MS. MEGHAN A. RIGNEY
30 North LaSalle Street
Suite 2900
Chicago, Illinois 60602
(312) 230-9100
gdavis@heplerbroom.com
mrigney@heplerbroom.com
on behalf of the Defendant;

ALSO PRESENT: Mr. Michael Prager
Legal Videographer;
Mr. Wallace Zaccagnino
Veritext Concierge.

- - - - -

30(b)(6) DEPOSITION OF
C.H. JOHNSON CONSULTING, INC.
CORPORATE DESIGNEE CHARLES JOHNSON
November 16, 2020

| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Dylan Smith | 8 |
| | 288 |
| Mr. Glenn E. Davis | 262 |

* * * * * *

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena to testify at a deposition in a civil action to C.H. Johnson Consulting, Inc. | 16 |
| Exhibit 2 | E-mail from Long to Dowling 8/14/19 | 25 |
| Exhibit 3 | Johnson Consulting developer solicitation review 8/16/19 | 40 |
| Exhibit 4 | E-mail from Long to Johnson 8/20/19 | 51 |
| Exhibit 5 | Request for qualifications and proposals casino development and operator, Waukegan, IL deadline 8/5/19 | 63 |
| Exhibit 6 | Advisor to City of Waukegan casino development and operator 9/18/19 draft | 185 |
| Exhibit 7 | Casino developer and operator soliciation advisory services report submitted by Johnson Consulting 10/2019 | 146 |

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | E-mail from Long to Johnson 8/27/19 | 59 |
| Exhibit 9 | E-mail from Johnson to Long 9/4/19 | 61 |
| Exhibit 10 | E-mail from Emmerton to Long 9/6/19 | 65 |
| Exhibit 10A | Excel spreadsheet Waukegan Casino RFQ/P list of proposals received | 67 |
| Exhibit 11 | E-mail from Emmerton to Smigielski 9/11/19 | 91 |
| Exhibit 11B | Excel spreadsheet Waukegan Casino RFQ/P comparison of benefits to the City of Waukegan and its residents tab 2G | 94 |
| Exhibit 12 | Typed notes 9/11/19 12:30 p.m. WDA - Casino Fontana | 96 |
| Exhibit 13 | E-mail from Johnson to Long 9/13/19 | 105 |
| Exhibit 14 | Typed notes beginning with Douglas | 109 |
| Exhibit 15 | E-mail from Emmerton to Hochberg 9/11/19 | 119 |
| Exhibit 16 | E-mail from Emmerton to Wierbicki 9/12/19 | 121 |
| Exhibit 17 | E-mail from Emmerton to Stolyar 9/13/19 | 122 |
| Exhibit 18 | E-mail from Stolyar to Emmerton 9/13/19 | 123 |
| Exhibit 19 | E-mail from Stolyar to Emmerton 9/16/19 | 125 |
| Exhibit 20 | E-mail from Wierbicki to Casino 9/20/19 | 128 |
| Exhibit 21 | E-mail from Wierbicki to Emmerton 9/30/19 | 138 |

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 22 | E-mail from Emmerton to Wierbicki 9/30/19 | 138 |
| Exhibit 23 | E-mail from Emmerton to Dorando 9/30/19 | 139 |
| Exhibit 23A | Excel spreadsheet 9/30/19 | 141 |
| Exhibit 24 | E-mail from Emmerton to Long 9/13/19 | 149 |
| Exhibit 25 | E-mail from Smigielski to Emmerton 9/13/19 | 153 |
| Exhibit 26 | E-mail from Dorando to Johnson 10/4/19 | 160 |
| Exhibit 27 | E-mail from Johnson to Emmerton 10/15/19 | 166 |
| Exhibit 28 | E-mail from Johnson to Long 10/16/19 | 168 |
| Exhibit 29 | Video clip from Waukegan City Council meeting 10/17/19 | 175 |
| Exhibit 30 | E-mail from Emmerton to Long 9/16/19 | 180 |
| Exhibit 31 | E-mail from Johnson to Emmerton 9/18/19 | 181 |
| Exhibit 32 | Handwritten notes Waukegan casino public hearing 9/18/19 | 187 |
| Exhibit 33 | Video clip from Waukegan City Council meeting 10/17/19 | 189 |
| Exhibit 35 | Letter from Long to Ludwig 6/4/19 | 196 |
| Exhibit 36 | E-mail from Emmerton to Long 10/1/19 | 200 |
| Exhibit 37 | E-mail from Long to Emmerton 10/7/19 | 204 |

who the reviewers were.
Q Fair enough.
Mr. Johnson, one thing I forgot to mention at the beginning of the deposition, which I'll just mention now, if at any point you need a break, you know, a short five-minute break, restroom break, just feel free to speak up. It's not an endurance contest by any stretch.
A I just want to get a sense of timing so I can understand. We've gone through 4 exhibits and there are 58 of them.
Q The pace will pick up on the exhibits. I promise you. We may not end up using all of them. But we will be here certainly after -- We will take a break for lunch and we will be back in the afternoon.
A Okay. Good.
Q So if at any point you start feeling like you just need to catch a breather, let us know, okay?
A All right. Will do.
MR. DAVIS: Mr. Johnson, there is a hard limit of seven hours on a deposition. You may not be aware of that, so.
THE WITNESS: I did not know that.
MR. SMITH: That's exactly right. So we can ask our videographer for time checks.

MR. DAVIS: And, also, I may have a few questions for you, so bear that in mind, but we will be very brief.
THE WITNESS: All right. Thank you.
MR. SMITH: Q So you're okay right now, Mr. Johnson?
A I am fine. Thank you.
MR. SMITH: Let me ask you to take a look at what has been premarked as Exhibit 8 to your deposition.
(Exhibit 8 marked as requested.)
THE WITNESS: Okay.
MR. SMITH: Q And do you recognize Exhibit 8 as a series of e-mails you exchanged with Mr. Long?
A Let me look at --
MR. DAVIS: Just a second. I'm having a -- Okay. My exhibits turned horizontal, now they're upside-down, now they're right side up. Okay. I'm good. Thank you.
MR. SMITH: Q Okay. So just to make sure we're on the same page, so to speak, Mr. Johnson, the earliest e-mail in this chain in Exhibit 8 is from Ms. Emmerton to Mr. Long dated August 22nd, 2019.
Do you see that?
A Yes.
Q All right. And there is a discussion of various

dates to keep in mind. And then I want to direct your attention to the e-mail you sent to Mr. Long on August 22nd, 2019.
Do you see where I am?
A Meanwhile, we are analyzing?
Q Yes.
A Okay. I'm there.
Q Okay. And you recognize that as an e-mail you sent to Mr. Long?
A Correct.
Q All right. You say, meanwhile, we are analyzing the proposals now and we are developing a scope to look at market capacity/viability and will have that over to you early next week.
Explain what you meant in that e-mail to Mr. Long. What was the scope you were referring to?
A This may have been, I'm looking at the time sequence, the August 27th, this has to have been a follow-up in relation to doing a fuller, deeper market study for the project.
And, again, I can't recall if this was -- said don't worry about that because I don't remember submitting a fully executable contract for that. Maybe we did.

Q Thank you. Mr. Long then on August 27th, the most recent e-mail in Exhibit 8, says, Charlie, can you give me a quick call to update. The mayor asked me to follow up and I'm meeting with him in about an hour.
Did you, in fact, call Mr. Long back?
A I'd have to look at my AT & T records. If I did, it was only to give him a status report of how far we are.
Q Okay. Sitting here today, do you have any recollection of speaking with Mr. Long in this time period?
A No, but I always return calls.
Q That was going to be my next question.
MR. SMITH: Okay. Mr. Johnson, let's go to what's been marked as Exhibit 9.
(Exhibit 9 marked as requested.)
MR. SMITH: Q Just let me know when you're there.
A Okay. I'm there.
Q Exhibit 9, and unfortunately the exhibit sticker has cut out the Bates number.
A I'm there.
Q Okay. On the first page of Exhibit 9 there is an e-mail from you to Mayor Cunningham saying, Mr. Mayor, I am traveling to Texas and I will call you

later today. Thank you, Charlie Johnson.
My first question for you is: I take it this is an e-mail you sent to Mayor Cunningham on September 4th, 2019?
A I would think so, yes.
Q Okay. And do you recall what prompted you to send that e-mail to the mayor saying I'll call you later today?
A He may have called just to get a status report. This was a pretty pressurized situation at the City Council. And I think he was just trying to check in and see how our work was going.
Q Sitting here today, do you actually have a recollection of what prompted you to send that e-mail to the mayor?
A The only thing I could recall is that I was driving and he called, and I told Sarah that I would try to connect with him, that's the only thing.
Q And then Mr. Long, you will see, sends you an e-mail on September 4th saying, can you give me a call when your plane lands, and you ask Sarah Emmerton to try to set that up.
Did that call take place?
A Almost a year ago, I can't recall.

Q Always a fair answer, Mr. Johnson. And, you know, sometimes these documents may refresh your memory. Sometimes they won't. So if -- all I can ask is your best recollection. So if you don't recall something, there are no demerits for that.
MR. SMITH: Mr. Johnson, let me ask you to take a look -- we're going to go back now to something I premarked and it's a little bit out of order, which is Exhibit 5.
(Exhibit 5 marked as requested.)
MR. SMITH: Q Let me know when you've pulled that up.
A Okay. I've got.
Q And feel free to take a moment to scroll through it if you need to, but my first question for you is going to be: Do you recognize that as the request for qualifications and proposals that the City of Waukegan prepared in connection with soliciting casino proposals as amended to reflect the new deadline?
A Yes, I remember reviewing this or looking at it in the process of kicking our engagement off.
Q Did you say you do remember reviewing it?
A I remember looking at it as part of my kickoff work and understanding what the City had done.

Q Let me just direct your attention to what is page -- well, we'll go by the pages of the Bates numbers. It's 976. At the bottom of the page there is a section called submittal requirements.
Do you see where I am?
A Yes.
Q And do you see that under submittal requirements there are various subcategories and sub-subcategories?
A Yes.
Q So, for example, there are categories 1 through 5 below if you scroll down?
A I'm there.
Q And then within category 2, for example, there are various subcategories A through H.
Do you see what I'm referring to?
A Yes.
Q Mr. Johnson, am I correct in understanding that there came a time in October, 2009, when Johnson Consulting submitted a final report to the City of Waukegan?
A October of 2009?
Q 2019.
A I think that's probably about right.
Q And, Mr. Johnson, the reason I ask you about

that is to introduce this next topic and bring to mind your report, okay?
Am I right that ultimately the report included a ranking of casino proposals based on four categories?
A I think big picture that's probably about right.
Q And we'll look at that. I just want to see based on your recollection whether you would agree with me that the first four categories under submittal requirements are the categories that were used in the Johnson Consulting rankings in its report to the City of Waukegan that it ultimately submitted?
A That is correct. That's how we structured our response, our report.
Q Thank you.
MR. SMITH: So, Mr. Johnson, now going back to the order we were following in your exhibits, let me ask you to take a look at what's been premarked as Exhibit 10.
(Exhibit 10 marked as requested.)
MR. SMITH: Q Exhibit 10 appears to be an e-mail from Ms. Emmerton to Mr. Long copied to you on September 6th, 2019.
Do you recognize this, Mr. Johnson, as an e-mail you received on September 6th, 2019?
A If I'm copied on it and Sarah sent it, then I

time?
A Correct.
Q Would you agree with me that an appraisal can be conducted in connection with a particular transaction?
A Correct.
Q Would you agree with me that an appraisal can be conducted based on an understanding about what the highest and best use for a property is?
A Yes.
Q Would you agree with me there are various appraisal methodologies?
A Yes.
Q And asking Potawatomi about what it intended by appraisal could have brought out information about any of those things, couldn't it?
MR. DAVIS: Object to the form of the question, calls for speculation, lack of foundation of what information they -- additional information they had or would or could have provided.
MR. SMITH: Q You can answer.
A I don't have an answer.
Q Why?
A Because I don't understand the question. Can you repeat it.

Q Let me ask you this: When you read Potawatomi's proposal and the reference to appraised value, did you know what appraisal Potawatomi was referencing or whether this appraisal had even been conducted?
A No. I could not interpret what they meant. A person active in the real estate would mean that someone would get an appraisal and they would pay 15 to 20 percent or there is an appraised value for the land.
Q Was there anything to stop the City or Johnson Consulting, its consultant, from asking for clarification about that point from Potawatomi?
A No.
Q Did anyone from the City, to your knowledge, suggest that Johnson Consulting request clarification and follow-up to its interview with Potawatomi of that point?
A No.
Q And just to make sure the record is clear --
MR. DAVIS: Object to the form of the question.
You can answer, if you can.
MR. SMITH: Q Just so the record is clear, to your knowledge there was no such request from the City, is that right?
A To my recollection --

MR. DAVIS: Same objection.
MR. SMITH: Q Go ahead, Mr. Johnson.
To your recollection, was there any such request from the City to Johnson Consulting?
A No, not that I can recall.
Q And since there was a form objection, let me just go back over this a little bit.
Mr. Johnson, am I correct that you participated in interviews of casino applicants that were held in mid-September, 2019, with certain City personnel as well as Johnson Consulting?
A Yes.
Q And were you the lead person at Johnson Consulting in charge of the engagement with the City of Waukegan?
A Yes.
Q And were you generally aware of the fact that Johnson Consulting asked certain follow-up questions to various casino applicants after those interviews?
MR. DAVIS: Object to the form of the question. These documents speak for themselves as to who the questions were directed to. I don't know why you're beating that to death. It's up to you.
MR. SMITH: Q Mr. Johnson, at the time after the

interviews, were you generally aware that Johnson Consulting was asking follow-up questions of various applicants?
A Yes.
MR. DAVIS: Asked and answered.
MR. SMITH: Q And to your knowledge, were any follow-up questions directed by Johnson Consulting to Potawatomi?
MR. DAVIS: Asked and answered, objection.
MR. SMITH: Q You can answer.
A Same response. I asked -- you asked me that and I've answered that.
Q Yes, I'm asking again because there was a form objection.
So could you just answer, please.
MR. DAVIS: It's a different question than the former. Go ahead.
MR. SMITH: Q Go ahead, Mr. Johnson. We have a disagreement about whether it was the same question or not, so it really doesn't matter.
A If they're in the e-mails that I sent you, we asked them. If they're not in the e-mails that we sent you, then I didn't ask them. Black and white.
Q Thank you. That's fair.

information in the casino proposals, correct?
A And/or clarifications, correct.
Q Mr. Johnson, is there any, at this point, any number provided for Full House Resorts for jobs under annual operations amount?
A I do not see any number there.
Q All right. Is there an NA indicated there for jobs for Full House?
A Yes.
MR. SMITH: Mr. Johnson, let me ask you to take a look at Exhibit 7, which I don't think we've looked at but it's premarked as Exhibit 7.
(Exhibit 7 marked as requested.)
MR. SMITH: Q Let me know when you've got that up.
A Okay.
Q Mr. Johnson, take a moment to scroll through this if you need to, but my question for you is going to be: Do you recognize this as the final version of the report that Johnson Consulting submitted to the City of Waukegan?
A Yes.
Q Let me ask you to scroll down to figure 4.
A Okay.
Q Figure 4, just for the record, is on page 8 of

Exhibit 7.
A Okay.
Q Mr. Johnson, what is depicted in Exhibit 4?
A It looks like the reported full-time reports at the casino and total jobs.
Q Mr. Johnson, could I ask you to read the numbers that are provided for casino jobs and total jobs for Full House in figure 4?
A 820, 1,350.
Q Mr. Johnson, do you recognize that as the figures derived from the e-mail that Full House Resorts had sent to Ms. Emmerton that we looked at in Exhibit 19?
A Yes.
Q So would this be a case where Johnson Consulting's report includes supplemental information from Full House?
A I can't tell how these were arrived at. I would not necessarily do that. All the other data was presented elsewhere. That was apples to apples.
I don't know how we got this clarification or what the gist of it was, whether they were absent in their proposal, unclear. But, yes, it looks like these are in response to that information. And I can't answer

if they're supplemental or what was the other word?
Q Clarifying.
A Clarifying, correct.
Q Okay. So --
A And my assumption would be it would be clarifying.
Q And why is that your assumption?
A Because we would not ask for supplemental information.
Q Sitting here today, though, at this moment, you don't know, in fact, whether those numbers provided by Full House were supplemental or clarifying as you used the terms?
A I do not know, correct.
Q Mr. Johnson, you can put that exhibit aside for the moment. I'm going to turn your attention back to the question of appraisals.
We just looked at the spreadsheet that Ms. Emmerton prepared on or about September 6th compiling information that had come from the various proposals. And I'm not trying to tie you into any words. I'm just trying to draw your attention back to some earlier testimony.
Do you recall seeing in that spreadsheet that

as to the property, the Fountain Square property, there was a reference to Potawatomi's offer being appraised value plus or minus 15 percent?
Do you recall that in substance?
A Very well.
Q Okay. As of that time in September when Ms. Emmerton was compiling that information, did Johnson Consulting have access to whatever appraisal or appraisals the City had of the Fountain Square property?
A I can't recall specifically. I cannot answer that question. I remember discussion about an appraisal. I think one was completed and it was available to the City. But that's my recollection.
Q You don't -- Well, let me ask you this: Did you develop an understanding at some point that an appraisal had been conducted of Fountain Square on behalf of the City?
A I can't answer that. I don't know.
Q Oh, okay. Okay. Then we may go very quickly through these next exhibits.
MR. SMITH: Let me ask you to take a look at what's Exhibit 24.
(Exhibit 24 marked as requested.)
MR. SMITH: Q Mr. Johnson, Exhibit 24 is an e-mail

Page 154

A That's correct.
Q Okay. So before we get there, Mr. Johnson, I guess my first question is, did you on or about September 13th, 2019, receive a copy of this e-mail or the appraisal that was attached to it?
A I am not copied on this e-mail --
Q Right.
A -- so I don't think I did.
Q Okay. At any point in the course of Johnson Consulting's engagement for the City of Waukegan relating to the review of casino proposals, did you yourself review the appraisal or were you just made aware of the number that you just mentioned?
A I reviewed hundreds of appraisals. I did not review this one. I was made aware of the number.
Q Okay. Who reviewed this appraisal on behalf of Johnson Consulting?
A Are you talking about the technical accuracy of the appraisal? That's not our job.
Q Completely understood. I know that Johnson Consulting is not appraisers. I guess let me maybe ask a more precise question.
Are you aware of anyone from Johnson Consulting reading the appraisal, not to audit it or to do a

Page 155

second-guess of it, but reading it, reviewing it for information in there beyond the number that it was appraised at?
A I don't think that anything else had much germanity to it, so I don't recall. I can't say that Sarah didn't do it out of intellectual curiosity, sure, she may have, but we needed that number, the $5 million.
Q Do you have, sitting here today, Mr. Johnson, do you have an understanding of what the appraiser who performed the appraisal that's attached to Exhibit 25, what that appraiser assumed to be the highest and best use of the Fountain Square property?
A I can look at it real quick.
Q Well, before you do, and you're welcome to, I just want to know first sitting here today whether you are aware of that information?
A I do not know if it was -- an improved scenario or as-is scenario.
Q Okay. And let me ask one other question just so that we have a clean record on this. And I apologize if I asked this already.
Is it your understanding, Mr. Johnson, that the appraisal that's included in Exhibit 25 is, in fact, an appraisal conducted for the City of Waukegan for what's

Page 156

known as the Fountain Square property?
A I assume. I have no basis to dispute or not know that.
Q Okay. If I direct your attention to the cover page of the appraisal, which is the second page of Exhibit 25, you see there a reference to a 28.7 acre parcel on Lakehurst Road and then the words Fountain Square.
Is that generally consistent with your understanding of what Fountain Square as it was used in connection with casino proposals consisted of?
A Yes.
Q Mr. Johnson, to your knowledge, and I think this has been implicit in your answers, but I just want to be clear, to your knowledge, did anyone from the City, apart from sharing this appraisal itself, communicate to Johnson Consulting what the appraiser of this appraisal -- I'm sorry, that's an odd way to say it -- the appraiser who conducted this appraisal, what that person had assumed to be the highest and best use of Fountain Square?
A No.
Q No, they did not?
A No, I am not a party to that. I have no

Page 157

knowledge of that. I wasn't involved in the scoping of it. I have no idea.
Q Let me direct your attention to page 29 of the appraisal.
A Okay.
Q We'll linger here a while.
And just to be clear, I'm going by the page number in the appraisal itself rather than of the exhibit.
A Okay. I'm at page 29.
Q All right. You're faster than I am.
Okay. Let me direct your attention to the next and last paragraph on this page. The appraiser says, it is my opinion that considering all the economic impacting subject property, the most profitable use would be the subdivision of the site into smaller parcels for new commercial development similar to surrounding uses.
Do you see that?
A Yes.
Q Okay. I just want to draw your attention to one other passage in the appraisal before I ask you about that.
Let me ask you to scroll down to page 41.

A Okay. I'm there.
Q Okay. And the third paragraph under the continued heading of market value conclusion reads, the subject is a larger site that has a highest and best use to be split into smaller parcels for commercial development. It does not have the Route 43 frontage, which are the most valuable locations in this development. However, the potential for the new casino development nearby is a positive factor for the future development of the subject property.
Mr. Johnson, would you agree with me having had those passages brought to your attention that this appraisal does not appear to appraise Fountain Square as a casino site itself?
A That is correct.
Q Does that impact the appropriateness, in your view, of Johnson Consulting using this appraisal in connection with its analysis of Potawatomi's casino proposal?
A In our mind it was not specified by anybody what the appraised -- appraisal would be, all right?
This, in my mind, was common to everybody. So when the word appraised value was used, and if anyone had used it, we would have applied the same standard,

that this was the document that was in reference to.
Q And you're -- and I think you've been very candid about this. Your belief that, as you put it, this was common to everyone, meaning the appraisal, that was an assumption you made, correct?
A I don't remember the RFP having listed an exhibit of being the appraisal, but I knew that in the world of this discussion there was an appraisal that was done. Who that was communicated to or who it wasn't communicated to I have no idea.
But we made the assumption that everybody was working from the same set of rules.
Q And, again, sitting here today, do you recall where you -- what the source of information was that led you to that assumption?
A Probably a discussion with Sarah after she had done this clarification about asking what the appraised value was.
Q And your understanding was Sarah was in communication with the City about the appraisal, correct?
A I saw evidence of that today just like you, yes.
Q Were you aware of it at the time, in other words, back in this period that we're looking at?

A Yes, I think when we were doing our due diligence, we were trying to turn that into money. So we got the appraised value, and they said plus or minus 15 percent. And then everyone else gave calculations of how they got it. So that is the presumption that we made, correct.
MR. SMITH: Mr. Johnson, let me ask you, please, to turn to Exhibit 26.
(Exhibit 26 marked as requested.)
THE WITNESS: Okay. Opening.
MR. SMITH: Q Now, Mr. Johnson, Exhibit 26 is an e-mail with attachment from Douglas Dorando to you and others including Ms. Emmerton and Mr. Long and an address casino@waukeganil.gov dated October 4th, 2019.
Am I correct that you received this e-mail on October 4th, 2019?
A Yes.
Q And, Mr. Johnson, if you scroll down to the attachment, there is a letter dated October 4th, 2019, on Waukegan Potawatomi Casino letterhead, and it goes on.
My only question to you for right now about the attachment is do you recognize this October 4th, 2019, attachment as what came to be referred to as the

supplement to the Potawatomi Casino proposal?
A Is this the one where they had the offer to do stuff downtown?
Q Do you want to take a moment to look at it?
A Sure.
MR. DAVIS: Scroll down and you'll see it.
THE WITNESS: I'm looking at it. It's just a long document.
MR. DAVIS: Yes.
MR. SMITH: Q And tell me when you've had a chance to just kind of orient yourself, Mr. Johnson.
A I'm just trying to make sure it's one letter. I think that they were -- this may have been a clarification after the interview.
Then, if I'm not mistaken, either it's inherent in this, but there was something to do something downtown or modify their offer. Is that this same letter?
Q Well, I can't answer questions. But let me draw your attention to -- and it may not matter for the questions I'm actually going to ask.
But October 4th, 2019, is the date of the attachment. And the first item is downtown development project.

Do you see that?
A Yes.
Q Okay. So is this document, the attachment dated October 4th, a document you believe you've seen previously?
A I've seen this, yes.
Q Okay. And what's your general understanding of what that document is?
A I think it was a supplemental effort to communicate why Potawatomi is -- should be chosen, and they just wanted to add emphasis and support to points that they made in their interview.
And then they also realized, I think, that they were maybe weak in their land price, so they wanted to have a supplemental option entered into the consideration for being selected.
Q Did the, just to be clear, and I don't think you've testified otherwise, did the Potawatomi's original proposal include a dollar amount land offer price for Fountain Square?
A I can't recall. I do not believe they did.
Q Okay. And we've -- you've testified about the reference to appraised value plus or minus 15 percent, correct?

A Correct.
Q All right. So let's go back to the e-mail from Mr. Dorando which for the time being is what I wanted to ask you about.
A Okay.
Q Mr. Dorando writes, please see the supplemental letter delivered to us on behalf of Potawatomi. He says, I'm not sure yet how we will want to handle this, but it should be discussed as part of our planning meeting on Thursday.
Okay. Mr. Johnson, when you received this e-mail, you know, try to put yourself back on October 4th, 2019, what was your understanding of what Mr. Dorando was referring to when he said our planning meeting on Thursday?
A You know, honestly, I don't know if that was an internal meeting with them or if it was something that we participated in. I just don't have the context and sequencing exactly right.
So to answer your question what he meant, I can't answer 100 percent correctly.
Q Fair enough.
And more generally in the course of Johnson Consulting's engagement with the City, did the phrase

planning meeting come to mean something to you in particular?
A No.
Q Okay. There wasn't, at least as far as you recall, any sort of regular planning meeting that was referred to --
A No, we were in a very compressed timeframe. Everything was moving quickly.
Q I think we'll see some e-mails about this a little bit later on in terms of how to handle this submission from Potawatomi.
But my question for you right now is: Sitting here today apart from e-mails, do you have any recollection of discussions you had with Mr. Long or anyone from the City about --
A Real simple. Real simple. I said we ran an RFP process. If I am a purchasing person and I'm helping the City make right decisions, there is no mechanism in place to accept supplemental information. We didn't allow that process to be entered in with other people. There was no best or final offer process.
So, unfortunately, we didn't have any way to receive that information unless we reopened the process back up again.

Q And just to be clear, putting aside any -- quibbling over whether it was supplemental information or clarifying information, to the extent that Johnson Consulting had requested certain information from developers, that information you were willing to consider even if it had come in after the deadline for proposals, correct? The distinction here is that this wasn't requested, is that right?
A There was zero chance I would have taken anything after the fact from anybody.
Q Okay. Let me just be clear what I'm asking about.
We saw some e-mails and notes indicating that there were requests for some form of information from some of the developers after their interviews with the City.
Do you recall that?
A Yes.
Q Okay. And that information whether, you know, whether you call it clarifying or supplemental, I'm trying to move past that today, that information, if it was specifically requested, Johnson Consulting did feel it could take it into account, correct?
A That's correct because it was in the process of

Pl. SJ Ex. 134

our analytical process, that's correct. Nothing after the fact we submitted our report or anything like that unless there was an error, but I don't think we had any like that.

MR. SMITH: Mr. Johnson, let me ask you to take a look at Exhibit 27.

(Exhibit 27 marked as requested.)

MR. SMITH: Q Okay. Exhibit 27 is an e-mail chain consisting of two e-mails. The more recent of the two e-mails is -- appears to be from you, Mr. Johnson, to Ms. Emmerton dated October 15th, 2019, with a thumb's up symbol and a thank you.

Is this top e-mail, in fact, an e-mail you sent to Ms. Emmerton on October 15th, 2019?

A Yes.

Q And I take it you were responding to her e-mail below in Exhibit 27 of the same date?

A That is correct.

Q And Ms. Emmerton says, I checked with Bob. Did you understand that to be a reference to Bob Long?

A Yes.

Q She says, I checked with Bob and the bidders aren't authorized nor are they invited to submit any additional information after the RFP date (aside from

the clarifications we specifically requested at the interviews). As such, we are not taking any of this info -- I'm sorry, we are not taking any of this into our account for our assessment. Obviously, we are aware of it and can take it under advisement, but that's the extent of it.

Do you have an understanding, Mr. Johnson, of what prompted Ms. Emmerton to check with Mr. Long about this issue of additional information?

A It's fairly irregular for us to receive supplemental information like that after an RFP process has happened.

So we received that from the Potawatomi, so we didn't know how to deal with it. So I think she was just trying to figure out what to do.

Q Do you recall also that there -- and if you do, great. If you don't, fine.

Do you recall whether there were other -- any of the other applicants also trying to submit what you regarded as supplemental information?

A To the best of my knowledge, no. We may have received a thank you letter or two, but I don't remember seeing anything tantamount to like that.

Q And apart from what's reflected in this exchange

of e-mails in Exhibit 27, did you have a conversation with Ms. Emmerton about her conversation with Mr. Long that she is describing in this e-mail?

A Yeah, I told Sarah there is no way we can do that because, you know, that's not right. When we follow procedure by City's rules on purchasing, we have to follow the rules.

Q Mr. Johnson, my question probably wasn't as specific as it should have been.

I'm asking whether you spoke to Ms. Emmerton about what Mr. Long had told you on this document?

A No, with my thumb's up, I must have agreed.

Q Okay. So if I wanted to get sort of more of the -- any more detail or color on her conversation with Mr. Long beyond what's reflected in this e-mail, I would have to talk to Ms. Emmerton?

A Yeah, I don't think there is any more than that, if there is, but, sure.

MR. SMITH: Mr. Johnson, let me ask you to take a look at Exhibit 28, if you would.

(Exhibit 28 marked as requested.)

MR. SMITH: Q So Exhibit 28 is another e-mail chain with the most recent e-mail appearing to be an e-mail from you, Mr. Johnson, to Mr. Long and

Ms. Emmerton dated October 16, 2019, so a day after the series of e-mails we just looked at. And the subject line is Rivers Waukegan updated consultant report.

Mr. Johnson, is this, in fact, an e-mail you sent to Mr. Long on October 16th, 2019?

A I see at the 4:16 p.m.? That's correct.

Q Yes. I'm just looking at -- I'm just asking whether the top e-mail is an e-mail --

A The top e-mail. I was looking at the bottom. Okay. Sure.

Q Okay. And, Mr. Johnson, just to put this into some context, am I correct that the City Council of Waukegan had held a special meeting on October 17th, 2019, to consider casino proposals, is that your recollection?

A I can't remember the date.

Q Okay. All right. Just generally speaking, are you familiar with a special meeting that the City of Waukegan --

A Is that the one we presented at? Yes.

Q Do you recall presenting at a meeting --

A Sure, absolutely.

Q And that happened sometime in the second half of October, 2019?

A I think that's correct.
Q If I could ask you to scroll down in the e-mail chain to the e-mail on the bottom of the first page --
Well, let me ask you, actually, just to get the full context here, Mr. Johnson.
If you could look at the earliest e-mail in this chain, which is on the second page of Exhibit 28. It's dated October 16th, 2019, as well, from Paul Wierbicki. And it states, City review team, Charles and Sarah, we wanted to confirm that Johnson Consulting's report (and its associated bid scoring) would be updated prior to tomorrow's City Council hearing to reflect our updated proposal, the terms of which were not reflected in the October 11th report.
And that's from the Rivers Waukegan consultant. Do you see that?
A Yes.
Q Okay. Does that refresh your memory that Rivers was raising an issue about wanting to have your report updated with some information they had provided?
A Okay.
Q Do you remember that?
A Yes.
Q Okay.

A I don't remember it. I see it. My mind is refreshed. I don't understand all the context to it or anything else, but I remember that e-mail.
Q Okay. Fair enough. And then, Mr. Johnson, the next e-mail after the one we just looked at, also October 16th, 2019, you say to Ms. Emmerton and Mr. Long, I think a response tomorrow ought to be something along the lines of we received supplemental information from several groups. This indicates to us significant interest in the project. However, we had no framework to receive supplemental information as there was no request for best and final offers. Hence, we recommend that supplemental information be reviewed and taken under advisement.
What did you mean when you wrote we recommend that supplemental information be reviewed and taken under advisement? What did you mean by that?
A I think it's in context to the letter that we received from Potawatomi, maybe someone else expressed their interest.
I don't have in my brain the specific responses that were received. And I can't -- you know, we have now come to the form, term of art, supplemental versus clarifying, and I may have used clarifying --

supplemental when I meant clarifying.
So I can't tell you whether now that these have taken a hard form of definition, I can't tell you whether I meant supplemental or clarifying in that e-mail.
Q Okay. Fair enough. And, again, I apologize. I really have a much narrower question.
I'm trying to understand your choice of language there. You say, we recommend that supplemental information be reviewed and taken under advisement.
What did you mean by taken under advisement?
A We have good offers here. They're sending us more information. They seem like they're interested. We haven't cut a deal with anybody. Let's keep that over here so when we start negotiating, we have that material in our hands to negotiate with.
Q And when did you understand negotiations would take place?
A We knew that they were subject 100 percent to the State's approval process. So there was no timeline.
Q In your understanding, would the negotiation occur before or after the State's approval process?
A It would have to be after because we don't know who to negotiate with.

Q And where did you get that understanding?
A Just my experience in working with government, you know. We have a controlling agency here, we have a City that's requesting participation by the State, so it has to come back down to the State -- from the State to the City.
Q When you say best and final offers, what does that phrase refer to?
A In a purchasing process, you could go out for another bid and try to tighten down the specificity and the clarity of the offer. But that was not embodied in this RFP process. We didn't have that mechanism incorporated.
Q Did you understand the RFP to have put in motion a process of sealed bids?
A I don't understand the question.
Q All right. That's a fair answer.
Mr. Johnson, when you said in this e-mail -- I want to see if this refreshes your memory. This is, again, an e-mail on October 16th. You say, I think a response tomorrow ought to be something along the lines of, and then you provide the language we looked at.
When you say response tomorrow, to whom is that response to go?

A If this preceded the workshop with the City Council, which you said is the 17th, it had to be oriented towards that.

Q Mr. Long then responds to your e-mail on the same date, October 16th of 2019. Do you see that?

A Yes.

Q Apart from what's, again, reflected in this e-mail exchange, did you discuss this issue with Mr. Long or anyone else from the City, in other words, the issue of what to do with requests from the applicants to consider additional information?

A I don't think we had much to discuss because I think it was pretty clear that we don't have a mechanism to accept it. And so there was nothing more to discuss, really.

But to answer your question do I recall a specific discussion with him about that, no.

Q Did you have an understanding of what Mr. Long meant when he said that the entire idea flies in the face of the basic RFQ process which was intended to secure one final response from each of them?

A That's what I would interpret that to be.

Q Do you believe that the City and Johnson Consulting secured one final response from each

applicant?

A I don't know how you define the word final. It's not a negotiated deal. I think it was the best foot forward, put forward by everybody trying to abide by the RFP specifications, and we did due diligence on that. That's a closed process in my mind.

Q Okay. And did the City get a final response from each applicant at the same point in time?

A I don't know -- there was a due date that they were all due, and they were all in and in compliant with that due date and time stamp.

Q Okay. And --

A It wouldn't have made it to us if they weren't.

Q And you write back to Mr. Long, good, we're on the same page, correct? Sorry, I just didn't hear the response.

A I didn't hear the question.

Q I'm just confirming, you wrote back to Mr. Long, good, we are on the same page, correct?

A I think so, yes.

MR. SMITH: Mr. Johnson, I'm going to ask you now to pull up Exhibit 29.

(Exhibit 29 marked as requested.)

MR. SMITH: But before you do, let me give a little

explanation for everyone.

Exhibit 29 is a video clip. So everyone can take a moment to watch it. Unfortunately, it's going to take about four minutes, so everyone can catch their breath.

And then after having an opportunity to watch it, I'm going to ask you some questions about it, okay?

THE WITNESS: Is this an appropriate thing, City attorneys?

MR. SMITH: They can object if they want.

MR. DAVIS: This is a video of a public hearing, is it not?

MR. SMITH: It is.

THE WITNESS: I didn't have the context of it.

MR. DAVIS: I don't think there is any problem.

MR. SMITH: Just so there is no secret, Mr. Johnson, I was going to ask, but I'll represent to you this is a clip from the City Council meeting on October 17, 2019.

THE WITNESS: Okay. I got it.

MR. SMITH: And I also suggest we probably each should mute our microphones because if we're all listening to this, I think it could create --

MR. DAVIS: Mute.

MR. SMITH: Yes.

Q Okay. Mr. Johnson, I think you're still muted.

A All right.

Q Did you have an opportunity to review the video that's been marked as Exhibit 29?

A I didn't realize how good I was.

Q And that was -- You recognize that as a clip from your testimony before the Waukegan City Council?

A Correct.

Q And without getting bogged down in dates, was it your understanding that that was the hearing at which the City Council was considering the various casino proposals that had been submitted to the City?

A I think they were actually considering our report. They had already had the presentations and everything by others, if I am correct. I don't think it was accompanied by -- I think there were presentations that day, as well.

Q Okay. But did you understand that the City would be taking a vote based, in part, on your presentation later that evening?

A Yes.

Q One of the things --

A To answer your question, I did not know what the procedure was going to be at City Council, whether they

Page 178

would be taking a vote or not.
Q You just knew you were going to present your report in summary fashion to the City Council?
A That's correct.
Q Mr. Johnson, one of the things you said in substance I believe was that all four bidders are able to deliver the project.
Did I hear that correctly?
A Yes.
Q All right. When you say deliver the project, what did you mean by that?
A Get it through the licensing process, build, construct, and operate.
Q So is it fair to say that includes those issues of character, competence, and financial capability that we had discussed earlier?
A Yes. If they are all holding licenses, in most places that's the sign of integrity.
Q One of the things you said, again, in substance, I think this is pretty close, you, in response to one of the aldermen's questions, I believe you said after you make your recommendation to the Illinois Gaming Board, they will go through their technical process and probably come back with a hierarchy of bids and then you

Page 179

will enter into negotiations.
What did you mean by a hierarchy of bids?
A I would imagine the State has some scoring capability. And so I would imagine -- I would assume that's what the Gaming Board would do. They look at our work and they look at the proposals, and they came up with some basis to instruct Waukegan to do the next step.
And whether that's a ranking or whatever, but I'm sure there is going to be some communication of how Waukegan moves forward issued by the IGB.
Q So just to make sure I understand your answer, was it your understanding that the IGB could identify more than one applicant for Waukegan to enter into negotiations with?
A I do not know how that procedure works.
Q What was your basis for the answer you gave about a hierarchy of bids?
A I worked on developer scorings for hundreds of times, and there is usually some mechanism to say this one is better than this one. And so I would think that they would have -- what's the purpose of them doing it? Rather than just checking boxes.
Q Got you. So it was based on your experience

Page 180

more than any close study of the Illinois legislation?
A 100 percent.
Q Mr. Johnson, I'm going to now take you back in time. Sorry for that little detour.
Am I right that there came a time where Johnson Consulting participated in a public presentation of the various casino proposals at the Genesee Theatre in Waukegan?
A Yes.
Q And Johnson Consulting prepared a Power Point slide deck for that purpose, am I right about that?
A That is correct.
MR. SMITH: Mr. Johnson, let me ask you to take a look at Exhibit 30.
(Exhibit 30 marked as requested.)
MR. SMITH: Q Mr. Johnson, Exhibit 30 is an e-mail from Ms. Emmerton to Mr. Long copied to you dated September 16th, 2019.
And she says, hi, Bob, please find attached a confidential working draft of our presentation for Wednesday night.
Mr. Johnson, is it your understanding that this was an e-mail Ms. Emmerton sent to Mr. Long enclosing a draft of Johnson Consulting's presentation for the

Page 181

public casino hearing that I just asked you about?
A Yes.
Q And, Mr. Johnson, take a quick look. I'm really not trying to hold you to any specific wording.
My general question to you is, are you aware of any changes that were made between this draft that was sent to Mr. Long and the final version of the presentation that Johnson did?
A I am not aware of any.
MR. SMITH: Mr. Johnson, let me ask you to take a look at what's been premarked as Exhibit 31.
(Exhibit 31 marked as requested.)
THE WITNESS: Okay.
MR. SMITH: Q Mr. Johnson, just to start things off here, Exhibit 31 consists of an e-mail chain with the most recent e-mail being an e-mail that you sent to Ms. Emmerton copying Mr. Long and Mayor Cunningham on September 18th, 2019.
Is this, in fact, an e-mail you sent on that date?
A Yes, I recall this.
Q All right. And am I right that the general subject of the e-mails leading up to this was the upcoming public hearing at the Genesee Theatre on casino

proposals?
A Yes.
Q And if I could direct your attention to the earliest e-mail in this chain, Mr. Long says to you in his third subject of his September 18th e-mail, the mayor would like a final chance to talk to you before the meeting. Can you get to his office at City Hall by about 2:30 today? Bob. And the chain here in Exhibit 31 ends with you saying, I will come immediately to the mayor's office.
Do you see that?
A Yes.
Q All right. Did you, in fact, meet with the mayor before the public hearing?
A Was this the public hearing that happened at the Genesee?
Q Well, let's see.
A If this is the one that was at the Genesee, we didn't have time for that. So I think we just met with him incidentally in the lobby.
Q And, Mr. Johnson, you may have just --
MS. RIGNEY: It appears that Glenn has dropped off or he is not there right now, so I just want to make sure.

MR. SMITH: Let's go off the record.
THE VIDEOGRAPHER: We are going off the record. The time is 2:22 p.m.
(a brief recess was taken)
THE VIDEOGRAPHER: We are back on the record. The time is 2:28 p.m. Please proceed.
MR. SMITH: Q Mr. Johnson, just to orient you, I'm going to draw your attention to one passage in the earliest e-mail in Exhibit 31.
Mr. Long says three things, one, the venue changed from City Hall to the Genesee Theatre, I'll send you a copy of the letter we issued about that. So that's by way of teeing up where I think we were, which is you were about to describe a conversation that ended up happening with the mayor in the lobby of the Genesee Theatre.
Did I hear that right?
A I believe that's what happened. We may have met in the mayor's office. Logistically, I remember I was very late. I think I came in, I remember parking back behind the theater and walking around. So I don't remember going to the mayor's office, but I may have.
But, you know, it was just a check-in to see, make sure everything was going well.

Q And in substance, tell us what you remember about what the mayor said to you, what you said to the remember?
A I think, are you ready? Yes, sir, I think we've completed our work.
Q And when you said we've completed our work, what did you mean by that?
A I think we've -- we're prepared for the presentation. I can't remember -- I think the report was issued already by this point in time. Maybe it was in draft form or maybe it wasn't. I can't recall. But we were prepared for the meeting is what I meant.
Q And was anyone else present when you were talking to the mayor?
A It was in the lobby. I remember the seats there. I think some other people were around. I don't think that they were germane to his and my conversation.
Q Okay. Who from Johnson Consulting attended that public meeting at the Genesee Theatre?
A I know Sarah was there and I was there. I can't remember if one of my other staff. Ryan may have come. I don't think so. I think it was just Sarah and me representing Johnson. And I don't know, maybe Sarah wasn't even there. I think --

MR. SMITH: Sorry. Okay. Mr. Johnson, let me ask you to take a look at Exhibit 16, backing up -- Oh, no, I apologize. It should be I think Exhibit -- hold off on that. Exhibit 6, I'm sorry. I misspoke.
(Exhibit 6 marked as requested.)
THE WITNESS: Okay.
MR. SMITH: Q Now, this is labeled draft, Mr. Johnson, but it's dated September 18th, 2019.
I don't know -- well, I'll just ask the question. Are you able to identify this as the version of the slide presentation you presented on September 18th, 2019, at the Genesee Theatre?
A Yes. Our other one was in color, so I can't line by line look to see if this is the same thing, but generally this looks consistent with what I recall.
Q Let me direct your attention to the page about, I don't know, it's four or five pages in. It's got the Bates No. 1375. It begins with the heading process.
A Okay. I'm there, yes.
Q So if I -- tell me if I'm understanding this page correctly. The checkmark indicates things that have been done already, the arrow points to where as of that time the process stood, the process being the casino review process, casino proposal review process,

saying that.
Q Okay.
A We're saying relative to each other, here is how we assess them.
Q Okay. And how did -- and you just explained to me for No. 1 subjectively I think some of the considerations that went into your -- the numbers you assigned, right?
A Correct.
Q All right. Can you explain in a little more depth the methodology you used to assign particular applicant 1 versus 2 versus 3 for particular criteria.
Is there some -- and what I'm trying to get at, and these are just examples, is there some backup to these numbers, some computation that underlies these numbers, or is it just --
A Real simple. Real simple.
Q Yes.
A They're saying they're going to be able to do 200 and some odd million dollars in scale and Rivers is about the same. Others were below that.
We felt that the $200 plus million in sales was pretty aggressive and was probably a very complicated way to get to that level of sales.

And the other casinos had more scale that was more consistent with what we believed was achievable. It was somewhere more in the middle. And the Rivers and Potawatomi were way at the upper edge. Others were at the lower edge.
We felt that the ones that received a score of 1 and 2 were probably more in the consistency with what we felt the market and the product was that was applicable to the market. And it's an art, not a science.
Q Okay. I think you've clarified that for me. And tell me if I'm correct in drawing this inference from what you just described.
I take it that if I were to ask you about any of these numbers, whether it's the first line, you know, the 3 that you assigned to Rivers for property specification or the third line and the 2 that you gave to Lakeside for project team and experience, there isn't some backup worksheet you could show me that would show me how you arrived at those numbers, it was more the product of discussion between you and Ms. Emmerton, is that fair?
A Plus all the preceding work. I mean, it's real clear that Rivers and Potawatomi are big and the other

ones are small. So that's -- There is very clear work there.
So Potawatomi proposed they're going to have a sales volume of X, and we think that that was high and we have our justifications for that. And then we think that the Rivers was high, so we said those are probably not going to be achievable. The other ones are probably very much achievable, once it fit our market, are Full House and Lakeside with that variable.
Q Let me ask it in a more process way. Can you describe -- what I'm trying to figure out is, are there worksheets or some computations or tabulations, subcategories to these larger categories that you and Ms. Emmerton prepared --
A No.
Q -- and tallied up or -- No?
A Just all the data in the spreadsheets that you already have with you.
Q And how did that data feed into this? Explain that process to me.
A We looked at the data and we observed the data and then it went into this, as simple as that.
Q Yes. I'm just trying to get something more granular.

A Yes. You're looking for a statistician's response to a process that's not statistically organized.
Q Okay.
A You're looking for an engineer and you're talking to an artist.
Q Okay. And in terms of -- and just to help me understand the artist work process behind this, did you and Ms. Emmerton each do your own separate tables and then compare them or did you talk it through together?
A We talked it through together.
Q Okay. Now, one other question. The vertical axis, description of proposed development includes a number of subcomponents.
Would you agree with that?
A Of course, yes.
Q Okay. And, obviously, to a greater or lesser extent, that would be true of these other criteria, is that fair?
A That's fair.
Q And given that -- Well, let me ask the question.
I believe one thing you told the City Council was that you did not waive these various criteria. Did I get that right?

Pl. SJ Ex. 134

component. But it certainly would have affected that.

Q Okay. And then description of proposed involvement, why a 3 for Potawatomi there?

A The size and scale was large, which is a good thing on one front. But is it achievable and sustainable is another.

So could it have been too large and could it have been something out of scale and context for what we felt was appropriate for the market and could it have inherent risk. And we had the same dilemma with Rivers. It was too much.

Q Well, in the description of proposed development at least as it appeared in the City's request for proposal seems to encompass more than the facility itself, issues such as impact and the like.

Were those taken into account in your No. 2?

A I can't tell you which variable was where. I have to have Sarah with me on that.

Q If someone reading your report, Mr. Johnson, wanted to look at the ways -- I mean, you're fairly pointing out that there is discussion of some of these topics earlier in your report.

If I wanted to read your report and see how it tied in to, for example, the 3 that was assigned to

No. 2 and understand Johnson Consulting's thinking, how would I do that?

A Yes, No. -- figures 1 and 2 and figures -- the content of figures 3 would have gone into the assessment by the product.

Q Okay. So, for example, if I'm following you --

A Follow the order of the report.

Q Okay. Fair enough.

So if I'm following you, if I wanted to understand your ranking for description of proposed development, I would look at that section of your report?

A That's correct.

Q All right. So if you would, just so we have an example of your methodology, could you walk me through the description of proposed development in the body of your report and explain how that became a 3?

A Okay. So in figure 1 or figure 3 we see the scale of all of the casinos by operations, et cetera. So by definition, this one is very large and this one is very large, obviously, Full House is, too. But those are the scale and the history of operations of those two gaming companies are larger-scale operations. That's fairly visible from this.

And then when you get to the next one where we talked about the employment, excuse me, let me make sure I get that right. So the price is clear, so we can see exactly these are very discrete. And you took -- Potawatomi took a negative or a higher score because of the lower price and so did Rivers on that offer.

Q Okay. But I'm just trying to focus you on No. 2, description of proposed development.

A Okay.

Q Real estate prices under No. 1, property specifications and location, correct?

A Correct.

Q Okay. So the first table figure 3 one thing you're telling me is the size, the number of slots and gaming tables, the high number actually worked against Potawatomi?

A On two ways. There is so much activity happening in the marketplace, that we don't know what the full context of the competition is going to be.

So having higher projections and having an asset in an environment increased the risk profile of the offer. That's correct.

Q And is it -- where do you say in your report that that's a negative?

A We say that the scale -- we say -- I think throughout our report we mention -- I don't know if we actually called that out as a problem. I don't think we did it that way. I don't think we called anything out as a problem or a strength.

I think we were just reporting facts and drawing inferences and making conclusions upon that.

Q Is jobs created, that's part of No. 1, right -- I'm sorry, part of No. 2?

A I have to go back to the criteria.

Q Figure 4.

A Yes, I think that that would be in there.

Q Okay. And Full House provided information as we've seen after the deadline for that, correct?

A I can't answer that question. I don't -- everything that we did I think was in compliance with the timeframe. I do not think we accepted data after we had submitted reports.

Q Okay. I guess the record is what it is on that, right?

A That's correct.

Q Economic benefits, 2G.

A Okay. When you say 2G, I don't understand that reference.

Q Sure. So let me explain how I'm looking at your report. For example, you told me I could look at your ranking table at the end and I should look back up at the report for the content that fed into it.
A Correct.
Q So I see for No. 2 there is a section of your report entitled, description of proposed development that begins on page 6.
Am I right about that?
A Yes.
Q All right. And G, 2G, economic benefits, is part of No. 2, correct?
A Incorrect.
Q Okay. Explain to me how I'm incorrect.
A Where we have the gross revenue, et cetera, figures 9, et cetera, those tied more into I believe the financial data.
Q Well, I'm just going by your report, okay?
A Okay. Sure.
Q And under the heading 2, description of proposed development, there is a G, economic benefits.
A Okay. Let me see.
Yes, she did use that as part of the report.
Q And remember, and you can tell me if you do or

not, but do you recall that 2G in the request for qualifications and proposals from the City of Waukegan was also economic benefits?
A Yes.
Q And so all of these factors, 2A, B, C, D, E, F, G fed into your rankings for No. 2 in figure 15, correct?
A That's correct.
Q So you were weighting equally collectively 2A, B, C, D, E, F, G were given the same weight as No. 3 which is project team experience, correct?
A Asked and answered.
Q Okay. That's -- you're learning that's a good objection. And notwithstanding that objection, I'd like you to answer.
A Yes.
Q Okay. Now, in 2G it states that three of the four proposals included an estimate of total economic impact for ongoing operations.
Do you see that?
A Yes.
Q And tell me if I'm wrong. I assume higher economic benefits is good?
A Higher economic benefits is good if the project

is deemed achievable. So someone could say they're going to do 10 million jobs and the real capacity is only 1 million jobs. So if they give me 10 million jobs, I'm not going to believe that either.
Q Right. So how am I supposed to know how you're discounting these?
A I didn't discount them. I used the exact numbers.
Q Okay. So Potawatomi had the highest, right?
A Correct.
Q All right. Full House didn't provide the numbers, correct?
A I guess they did not.
Q And they got a 1 for category 2. How do you explain that, Mr. Johnson?
A Who got the -- I'm just trying to -- Bear with me for one second.
Q Let's go down to your figure 15.
A Okay.
Q Can you explain to me how Full House got a 1 for category 2, walk me through it. Take as much time as you need. I know it's late in the day. I just want to focus on description of proposed development No. 2. You have your report in front of you. I just want you to

walk me through it.
A So Full House. All right. So -- and the topic, which figure do you want me to react to?
Q You assigned, you being Johnson Consulting, for No. 2 criteria, description of proposed development, Full House got the best possible score, which is a 1. I'd like you to explain that.
A Yes. So as we looked at the scale of investment --
Q Okay. Point me to where you are in the exhibit.
MR. DAVIS: Let the witness answer. You have a question pending.
MR. SMITH: I just want to know where he is --
MR. DAVIS: Let him answer the question.
MR. SMITH: Q Mr. Johnson, go ahead. Just, if you could, let me know where you are.
A Okay. Figure 3.
Q Uh-huh.
A So you see the scale of the operations there. That's fact -- and a visualization I have in my mind. So that's --
Q Can I ask you a question about that?
A Yes.
Q Okay. I thought you said that the high number

for Waukegan was a negative on that table?
A In context with everything else.
Q Explain that.
A I have a brain and it gets information in. I have data and it gets information in. I have Sarah, she has the same thing. We sit down and talk about it and use our judgment to assign these.
Q Okay. We can come back to it, but I don't want to interrupt you. Keep going.
A Okay. So we have that attribute. And then we go through the other attributes. And then the scale here is a little lower. Obviously, being higher would be good. That's a good thing, to be higher.
But the relative level of -- we felt that the Potawatomi was too big because we didn't think the scale and the sales capability of a servicing of that level in this market was good.
So these by definition had an advantage because the scale was more apropos for the market, our judgment, okay? Here higher the number the better, are they reasonable or not.
Q I'm sorry, where are you?
A Figure 5. I'm sorry, you're not following me.
Q Okay.

A And you can see that, you know, Full House was still high, but they didn't have the risk factors of the size of the other variables.
Q And I'm sorry, Mr. Johnson, maybe I'm just following you too slowly, but what about all of the information on 2B through G?
A 2B through G. Let's see. We analyzed each of these variables.
Q Okay. All right. I didn't hear you talk about figure 4.
A We -- figure 4. Okay. Again, this gets back to the scale. So Potawatomi and Rivers were going to be much bigger casinos. The others were we felt more in concert with the market reality and the appropriateness for Waukegan.
Q So am I understanding correctly that it was your view that lower employment numbers were better because they were more in keeping with an appropriate scale for the City of Waukegan focusing on figure 4?
A I think that's what I said.
Q Okay. And what about the figure 5, how does that factor in to Full House's No. 1 score?
A The same thing. They're still going to be producing a lot without the risk factors of Rivers and

Waukegan -- Potawatomi having such a big investment. We felt the yield, assuming management was good, which we had already done due diligence on, that the return here would be less risky for -- with that for the physical plant variable being taken into account.
Q Mr. Johnson, going back to 2G, how did Full House's failure to provide total economic output impact its score for criteria 2, if at all?
A You're asking -- I assume we went through a proper procedure to obtain these numbers on figure 4. So that's that e-mail chain and when we got the data, I think, clarifying, et cetera.
So somehow or another we populated these numbers with the numbers that were given to us.
Q And, I'm sorry, just to clarify, Mr. Johnson, I'm not asking about figure 4. In 2G it's a narrative. I don't think a table or figure was created for this. I may be mistaken. So I'm just going by the narrative.
In 2G it states Full House did not provide an estimate of total economic output. How did that factor into its ranking for criteria 2 or, I'm sorry, the score for criteria 2?
A We felt that the sales volume was a better metric because other judgments could be made by the

preparers of the proposals, all these various assumptions.
So we said we know if a dollar is spent, it's going to operate equally whoever spends that dollar. So we said economic impact data from the bidders is not sufficient to be evaluated on an apples to apples basis. So let's look up at the top line and the volume of sales that they're having and use that as the indicator of economic benefits.
So it was not a directly quantified number because we couldn't get there.
Q Mr. Johnson, did you explain that in your report?
A We explained it at this level here. I mean, I think the text we have in our report is very clear on the explanation.
Q I guess the text speaks for itself, right?
A Correct.
Q Okay. Mr. Johnson, at any point in the course of Johnson Consulting's engagement with the City did you discuss Full House and the quality of its financials with anyone from the City that you recall?
A We had no sidebar conversations about data or the specific projects except for the debrief after the

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAUKEGAN POTAWATOMI CASINO, LLC, an Illinois Limited Liability Company,

Plaintiff,

-vs-

CITY OF WAUKEGAN, an Illinois Municipal Corporation,

Defendant.

JUDGE JOHN F. KNESS

MAGISTRATE JUDGE M. DAVID WEISMAN

No. 1:20-cv-750

Zoom videotaped deposition of JEFFREY ALLEN CRAWFORD, taken before KAREN KOSTAS, CSR, RMR, CRR, RDR and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 211 North Broadway, Suite 2700, in the City of St. Louis, Missouri, at 9:30 a.m. on the 23rd day of February, 2021.

APPEARANCES:

VIA ZOOM:
FREEBORN & PETERS LLP by
MR. DYLAN SMITH
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
312-360-6000
dsmith@freeborn.com

on behalf of the Plaintiff;

VIA ZOOM:
HEPLER BROOM LLC by
MR. GLENN DAVIS
MS. MEGHAN RIGNEY
211 North Broadway
Suite 2700
St. Louis, Missouri 63102
314-241-6160
glenn.davis@heplerbroom.com
meghan.rigney@heplerbroom.com

on behalf of the Defendant.

ALSO PRESENT:
MR. MARK CADENA
Legal Videographer
Veritext Legal Solutions.

- - - - - - - - - -

INDEX

| WITNESS | PAGE |
| --- | --- |
| JEFFREY ALLEN CRAWFORD | |
| Examination by Mr. Davis | 5 |
| Examination by Mr. Smith | 252 |

EXHIBITS

| NUMBER | MARKED FOR ID |
| --- | --- |
| WKGN Deposition Exhibit | |
| Exhibit 1 Notice of Deposition (Jeff Crawford) - Certificate of Service Exhibit A - Topics For Examination | 15 |
| Exhibit 2 Plaintiff's Answers and Objections to Defendant's First Set of Interrogatories Verification - Certificate of Service | 48 |
| Exhibit 3 First Amended Verified Complaint For Damages and Other Relief - Verification | 127 |
| Exhibit 4 Request for Qualifications and Proposals - Casino Development & Operator Waukegan, Illinois Bates WKGN 000975 - 986 | 149 |

EXHIBITS ATTACHED

- - - - - - - - - -

THE VIDEOGRAPHER: We are now on the record. My name is Mark Cadena. I am the videographer.

Today's date is February the 23rd, 2021 and the time is approximately 9:38. The deposition is being held by remote.

The case is being held in the United States District Court for the Northern District of Illinois, Eastern Division. Case Number 1:20-cv-750.

The name of the witness is Jeff Crawford.

Will counsel state your appearance for the record.

MR. DAVIS: Glenn Davis appearing for the defendant, City of Waukegan.

MS. RIGNEY: Meghan Rigney of Hepler Broom appearing for the City of Waukegan.

MR. SMITH: Dylan Smith of Freeborn & Peters for plaintiff, Waukegan Potawatomi Casino, LLC.

MR. SYVERTSEN: Martin Syvertsen for plaintiff as well with Freeborn & Peters.

THE VIDEOGRAPHER: Karen Kostas is our court reporter and will swear in the witness and then we can proceed.

(WITNESS SWORN)

JEFFREY ALLEN CRAWFORD,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

by Mr. Davis:

Q Good morning. Would you state your full name for the record, please.

A My name is Jeffrey Allen Crawford.

Q Well, good morning, Mr. Crawford. We haven't been previously introduced. My name is Glenn Davis, I'm a partner at the Hepler Broom law firm and represent the City of Waukegan in this litigation.

Our court reporter has kindly provided a couple of the ground rules, but I'm sure you've had some experience with depositions before. A couple of other quick pointers.

A I don't recall us talking about plus or minus 5 percent. I do know we submitted one at plus or minus 15 percent.
Q And that was plus or minus 15 percent of appraised value rather than fair market value, right?
A Correct.
Q And what appraisal were you referring to when you submitted that proposal?
A So we had -- I think we saw in a newspaper article that the City had an appraisal for the property. And we were assuming that was going to be made public. But then it gave us something to work off of in terms of our negotiations with the City. We were also believing that that appraisal was based on the land being used as a casino.
Q What was -- What was your basis for having a belief that the City had an appraisal of the land based on use as a casino?
A It would be kind of a useless appraisal if you didn't have one since that was one of the prime parcels they identified as being a casino site.

Q Well, I don't know about useless. But in your organization for real estate that you hold, do you have requirements for periodic appraisals of property you hold?
A No.
Q What about with respect to property that may be used as collateral on loans that you have, does that require periodic appraisals?
A No.
Q Were you aware that the City of Waukegan in its annual reports published information on its perception of the value of the Fountain Square property?
A No.
MR. SMITH: And Jeff, just pause enough to let me get an objection in.
THE WITNESS: Okay. Sorry.
MR. SMITH: Form objection as to the time frame there.
MR. DAVIS: I didn't understand the form objection. What was -- What was the problem with the question?
MR. SMITH: Yeah. I thought it was

vague as to the time frame you were talking about.
MR. DAVIS: All right.
BY MR. DAVIS:
Q Were you aware as you were putting together your proposal in 2019 that the City, as part of its annual report, published information on its real estate holdings?
A I remember looking at the City's -- some of the City's reports, and in particular I was focusing on the City's bond debt. So that may have been part of that discussion.
Q Okay. And do you remember seeing in the prior year an appraisal figure of 5.5 million on the Fountain Square property?
A I don't remember seeing that number.
Q Do you remember developing internally any valuation numbers on the Fountain Square property?
A Can you repeat the question. It was choppy on your end.
Q Do you remember internally developing any valuation numbers on the Fountain Square property?

A We -- We didn't know how to value it. I recall we were trying to figure out the City's debt for the Fountain Square area on their bonding and also with the Genesee Theatre as it was the improvements, I believe, for Genesee Theater were paid for by the City through their bonding.
Q Do you remember Bryan Winter providing to you an estimated range of the value of the property of 5 to $7 million?
A I remember him making a statement like that, but it was not clear to me where he got those numbers from.
Q Do you remember him providing to you an estimated value of the property at approximately $20 million for a casino operation?
MR. SMITH: Glenn, again, same form objection as to the time frame.
BY MR. DAVIS:
Q In 2019.
A I don't know. But we didn't hire Bryan Winter to be our real estate expert.
Q Who did you hire to be your

Q Well, we can take our -- You don't need to answer that.

MR. DAVIS: We can take our break at this point.

MR. SMITH: Okay.

THE VIDEOGRAPHER: All right. We're off the record at 2:21.

(RECESS)

THE VIDEOGRAPHER: We're on the record at 2:48.

MR. DAVIS: Okay. I apologize for the interruption.

BY MR. DAVIS:

Q So we were -- we were looking at something in the Amended Complaint and I want to switch to another part of it now.

If you would turn with me to Page 7, Paragraph 43, let me know, I'll have to hear it from you visually -- or orally when you're there.

MR. SMITH: Are you there, Jeff?

THE WITNESS: Yes, I'm there.

Sorry.

BY MR. DAVIS:

Q Okay. Paragraph 43 says: Prior to submitting its casino proposal to the City, Potawatomi did not know what the fair market value of the Fountain Square property was and like the other applicants did not have sufficient time to obtain its own appraisal in advance of the application deadline.

Did I read that correctly?

A Yes.

Q So you were similarly situated to the other applicants in terms of your ability to obtain your own appraisal in advance of the application deadline?

A Yes.

Q So nobody had an unfair head start against you regarding their ability to get an appraisal in advance of the application deadline?

MR. SMITH: Objection to form.

You can answer.

A Not to my knowledge.

BY MR. DAVIS:

Q It goes on, and you tried to tell me, I think, this earlier, they didn't negotiate I think was something you threw in in one of your answers.

I'm looking at Paragraph 44 and it says: Without an indication of the property's fair market value, Potawatomi's proposal contained a commitment to negotiate and pay cash upfront for the Fountain Square property within 15 percent of the property's appraised fair market value, which Potawatomi assumed would be determined based on its highest and best use as a casino site.

Did I read that paragraph right?

A Yes.

Q All right. What led you to think there would be a negotiation prior to the decision on certification?

A The state law said that the City would have to certify that they had good faith negotiations with the certified applicants.

The RFQ, I believe, said that there would be negotiations.

The statements from Consultant Johnson said that there would be negotiations. I believe the Johnson report said there would be negotiations.

And the resolutions approved certifying the applicants represented that there had been negotiations.

Q So those factors were what led you to believe in advance that Waukegan was going to negotiate the property price in advance of consideration of your proposal?

A Yes. We thought everything that was in the application was going to be subject to a negotiation.

Q And what led you to think the timing of the negotiation would be before the proposal was submitted?

A Because the state law said that there was good faith negotiations that would have taken place between the City and the applicants.

Q And that's right out of the Senate Bill 690?

A I believe so, yes.

Page 174

Q Okay. And so that's what led you to decide not to put a specific dollar value in your proposal?
A It was an offer to begin the negotiations, yes.
Q Okay. Have you seen any appraisal of the Fountain Square property in its highest and best use as a casino site?
A No.
Q Why did you assume that there would be an appraisal based on its highest and best use as a casino site completed within the time frame the City had to make its submission to the state?
A The City had -- It was reported in the newspapers, I believe, that the City had just completed an appraisal, I think it was in June or July.
Q And you had no idea what that appraisal was, did you?
A No.
Q You made an assumption that it would be based on the highest and best use as a casino site, is that right?

Page 175

A Yes.
Q And the City, when asked for whether it had a price for the Fountain Square property, declined to provide the applicants an asking price for the property, isn't that right?
A Yes.
Q So all of the four proposers were in the same boat with respect to the property issue, the City was not providing an asking price and was asking each to come up with an offer, correct?
A Yes.
Q Was your proposal to negotiate within 15 percent of the property appraised fair market value an agreement to agree?
MR. SMITH: Objection to form. Object to the extent it calls for a legal conclusion.
A I'm not sure. It was an opening offer. I'm pretty sure in the application we said that if we could not come to an agreement on the purchase of the land then we would both work in good faith to identify other land for

Page 176

the site.
BY MR. DAVIS:
Q Did you have in mind when you made this proposal any other contingencies on purchase of the land other than price?
A You mean within the application as a whole?
Q Within the application as a whole or just from the standpoint of whatever way you want to answer it. You know, let's just start within the confines of the application as a whole.
A Well, we would have had to come to an agreement on the land purchase, but also, you know, the scope of the project that we would commit to build to the City because we jointly have to represent to the state that's what we would be building if we were selected by the state.
Q And you understood that with regard to the Fountain Square property there were really going to have to be two votes, there was going to be a vote on who to certify to the state for their consideration for a

Page 177

recommendation of whom to license or their decision on whom to license and then the City would have to have a separate vote on the sale of the property itself?
A Yes.
Q And so what -- what led you to believe that that vote could precede submission of the information to the state on your proposal or anyone else's proposal?
MR. SMITH: I'm sorry, Glenn, can you repeat that question.
BY MR. DAVIS:
Q What made you think that there would be negotiation on the purchase price so there could be a vote on the sale of the property before anyone's proposal could be sent to the state for consideration?
MR. SMITH: I'm going to object to the form, asked and answered.
A Okay. One more time. Can you just rephrase that, please.
BY MR. DAVIS:
Q I'll try.
We just discussed that there were

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAUKEGAN POTAWATOMI CASINO, LLC, an Illinois limited liability company, )
Plaintiff, )
vs. ) No. 1:20-cv-750
CITY OF WAUKEGAN, an Illinois municipal corporation, )
Defendant. )

CONFIDENTIAL

The 30(b)(6) deposition of Waukegan Potawatomi Casino, LLC representative KEVIN HANSON, Part II, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Susan Haselkamp, Certified Shorthand Reporter for the State of Illinois, via Zoom, on March 2, 2021, beginning at the hour of 9:29 a.m. and ending at the hour of 12:39 p.m.

Reported by: Susan Haselkamp, CSR
License No. 084-004022
APPEARING REMOTELY FROM COOK COUNTY, ILLINOIS

REMOTE APPEARANCES:

FREEBORN & PETERS LLP, by
MR. MARTIN SYVERTSEN,
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 360-6000
msyvertsen@freeborn.com
Representing the Plaintiff;

HEPLER BROOM, LLC, by
MR. GLENN DAVIS,
MS. MEGHAN RIGNEY,
150 North Wacker Drive
Suite 3100
Chicago, Illinois 60606
(312) 205-7743
glenn.davis@heplerbroom.com
meghan.rigney@heplerbroom.com
Representing the Defendant.

ALSO PRESENT:
MR. MARK LYLE, videographer
VERITEXT LEGAL SOLUTIONS

INDEX

| WITNESS | EXAMINATION |
|---|---|
| KEVIN HANSON, | |
| By Mr. Davis | 6 |

EXHIBITS

| NUMBER | MARKED FOR ID |
|---|---|
| (none were marked) | |

THE VIDEOGRAPHER: Good morning. We're going on the record at 9:29 a.m. The date is March 2, 2021. Please note that microphones are sensitive and can pick up whispering or private conversations or cell similar interference. Please turn off all cell phones or place them away from microphones as they can interfere with deposition audio. Audio and video recording will continue until parties agree to go off the record.

This is media unit number one of the virtually recorded deposition of Kevin Hanson testifying as Potawatomi 30(b)(6). This is in the matter of Waukegan Potawatomi Casino versus City of Waukegan and the case is filed in the US District Court for the Northern District of Illinois, Eastern Division.

This deposition is being held remotely and our witness is located in Milwaukee, Wisconsin. My name is Mark Lyle, I'm today's video technician and our court reporter is Susan Haselkamp and we're here on behalf of Veritext Legal Solutions.

I am not authorized to administer an

oath and I'm not related to any party in this action, nor am I financially interested in the outcome.

First we'll have counsel introduce them receives and state who they represent, after which the court reporter will swear in the witness. And if there are any objections to the proceedings, please state them at the time of your appearance, and we'll begin with noticing attorney.

MR. DAVIS: Good morning, everyone. My name is Glenn Davis, I am counsel for Waukegan -- City of Waukegan, the Defendant.

MS. RIGNEY: Meghan Rigney from Hepler Broom, I'm here on behalf of the City of Waukegan, Defendants.

MR. SYVERTSEN: Mark Syvertsen from Freeborn & Peters for Plaintiff Waukegan Potawatomi Casino.

THE COURT REPORTER: Would you raise your right hand, please?

(Whereupon, the witness was duly sworn.)

THE COURT REPORTER: Thank you.

Pl. SJ Ex. 136

MR. SYVERTSEN: I object to form, foundation. You can answer.
THE WITNESS: I know of no direct steps to mitigate the damages. It's a lost business opportunity, kind of hard to mitigate.
BY MR. DAVIS:
Q. Well, I take it, for example, after the city did not certify the Potawatomi proposal to the Illinois Gaming Board, the FCPC or the WPC stopped work on architectural plans; is that right?
MR. SYVERTSEN: I object to foundation. Go ahead.
THE WITNESS: I don't know the answer to that.
BY MR. DAVIS:
Q. Okay. So and you don't know -- well, do you know whether or not you continued to work with banks on loans for financing the proposal?
A. We are not working with banks to finance the proposal.
Q. And you haven't done so since the certification did not happen; isn't that right?
A. Yes.

Q. Do the calculations that you have made include any costs involved in bringing the lawsuit?
A. No.
Q. So the calculations that you've made of your damages do not include attorneys' fees?
A. Correct.
Q. Is it correct that if the Potawatomi had been successful in being certified to the Illinois Gaming Board, you would have had to have paid $250,000 as a license fee and $50,000 as an investigation fee to the Illinois Gaming Board?
A. That's the way -- yes, I understood that that was correct.
Q. And you understood that was nonrefundable?
A. Yes.
Q. And you understood that even if you were certified to -- by the city to the Illinois Gaming Board, there was no assurance that the Illinois Gaming Board would award you the license for the casino; isn't that true?
A. Yes. That was my understanding, yes.

Q. And you had paid a substantial amount of funds into the -- we discussed earlier into the Dahlstrom, his law firm's trust account. Has that sum been transferred back to you?
MR. SYVERTSEN: Objection to form. Go ahead.
THE WITNESS: No.
BY MR. DAVIS:
Q. So you still have in excess of $250,000 sitting in Mr. Dahlstrom's trust account?
MR. SYVERTSEN: I object to the form.
THE WITNESS: I wouldn't know exactly what the balance is in Mr. Dahlstrom's trust account.
BY MR. DAVIS:
Q. And you understood at the time of the Waukegan opportunity, that there was a $25,000 fee payable to the City of Waukegan as part of the application process, correct?
A. Yes.
Q. And you understood similar to the Illinois Gaming Board's fees, that was a nonrefundable fee?
A. Yes.

Q. Is that fee included on your list of expenses or expenditures associated with the proposal?
A. Yes.
Q. Why would you exclude that if it's nonrefundable?
MR. SYVERTSEN: I object to form, foundation. Go ahead.
THE WITNESS: I don't understand the question.
BY MR. DAVIS:
Q. Well, you listed that as an item of damage that you're claiming, but you indicated to me you understood it was a nonrefundable fee.
A. It's still damages.
Q. Why -- why -- sorry.
MR. SYVERTSEN: Let him finish.
BY MR. DAVIS:
Q. In what sense do you consider it still to be damage?
A. From an expense perspective, it is an expenditure paid by the tribe in a lost effort.
Q. So from an accounting standpoint, you would view that as an expense?

A. Yes.
Q. But you're not here to tell me whether or not that's an item of recoverable damage legally?
A. I'm not a -- no.
Q. Did you ever --
A. I have no knowledge of it.
Q. Did you ever read the City of Waukegan request for quotation or proposal?
A. No.
Q. In connection with the calculations that you've made, you have a list of invoices there. Can you tell me who the -- well, first of all, how many invoices do you have on your list?
A. Four.
Q. Can you then name for me the invoices and the amounts?
A. The first invoice is to Hospitality and Gaming Solutions for the market impact studies, invoice for $72,250.
Q. Okay.
A. The next invoice to Cunningham Architect for initial design services on the

Waukegan Potawatomi Casino, which is $70,000 plus some out-of-pocket expenses. I don't have that number. Houlihan.
Q. Third?
A. Houlihan for $50,000 to do the projected financial data and the $25,000 application fee to the City of Waukegan.
Q. Okay. Are there any other costs or expenses that you attribute to the lost business opportunity that are out-of-pocket expenditures for the City of Waukegan proposal?
A. Yes.
Q. What others?
A. Well, not included on this list is the time and effort of the accounting staff at Forest County Potawatomi and the staff at the Milwaukee casino property. We didn't put any of that on the list.
Q. Do you have some estimate of hourly rates for those people or some other way --
A. No.
Q. -- to --
Is there any other way to calculate their cost of their time?

A. I'm going to say no.
Q. Okay. Was there a requirement in the City of Waukegan prior -- you indicated you haven't read it, so maybe you don't know the answer to this.
But was there a requirement in the City of Waukegan RFQP for any applicants for the license to perform a market impact study?
A. I don't know.
Q. That was something that the FCPC elected to do on its own, isn't it?
MR. SYVERTSEN: I object to form, foundation.
THE WITNESS: I don't know the answer to that, either.
BY MR. DAVIS:
Q. Do you know whether the purpose was to determine whether the FCPC was interested in making a proposal for a casino in Waukegan at all?
MR. SYVERTSEN: I object to form. Go ahead.
THE WITNESS: Could you repeat the question?

BY MR. DAVIS:
Q. Yeah. Was it a purpose of the market impact study for Mr. Repa's firm that it was to evaluate whether or not the FCPC was interested in making a proposal for a Waukegan casino at all?
A. No, there -- my understanding -- again, I wasn't involved in writing the proposal, but my understanding was it required some financial information about what the casino would look like once it was -- if the City of Waukegan approved it. That's what Mr. Repa did.
Q. Okay. Well, I was -- I thought you described it as a market impact study rather than developing pro forma or projections from what you might do. Was that one and the same in your mind or what am I missing?
A. Yeah, in my mind I was thinking of the pro forma numbers.
Q. Okay. And you needed Mr. Repa's firm to do that because you did not have the internal resources to do that?
A. Yes.
Q. In your 14 years at the FCPC, have you

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAUKEGAN POTAWATOMI CASINO, LLC, an Illinois limited liability company,

Plaintiff,

vs.

City of Waukegan, an Illinois municipal corporation,

Defendant.

No. 1:20-cv-750

The discovery videotaped videoconference deposition of KEVIN HANSON, CPA, taken in the above-entitled cause, before SUSAN HASELKAMP, Certified Shorthand Reporter for the State of Illinois, on March 2, 2021, beginning at the hour of 11:02 a.m. and ending at the hour of 2:53 p.m. via Zoom, pursuant to notice.

Reported by: Susan Haselkamp, CSR
License No. 084-004022
APPEARING REMOTELY FROM COOK COUNTY, ILLINOIS

REMOTE APPEARANCES:

FREEBORN & PETERS LLP, by
MR. MARTIN SYVERTSEN,
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 360-6000
msyvertsen@freeborn.com
Representing the Plaintiff;

HEPLER BROOM, LLC, by
MR. GLENN DAVIS,
MS. MEGHAN RIGNEY,
150 North Wacker Drive
Suite 3100
Chicago, Illinois 60606
(312) 205-7743
glenn.davis@heplerbroom.com
meghan.rigney@heplerbroom.com
Representing the Defendant.

ALSO PRESENT:
MR. MARK LYLE, videographer
VERITEXT LEGAL SOLUTIONS

INDEX

| WITNESS | EXAMINATION |
| --- | --- |
| KEVIN HANSON, | |
| By Mr. Davis | 6 |
| By Mr. Syvertsen | 126 |

EXHIBITS

| NUMBER | MARKED FOR ID |
| --- | --- |
| Deposition Exhibit | |
| Exhibit No. 1 | 47 |
| Exhibit No. 2 | 55 |
| Exhibit No. 3 | 59 |
| Exhibit No. 4 | 67 |
| Exhibit No. 5 | 69 |
| Exhibit No. 6 | 71 |
| Exhibit No. 7 | 79 |
| Exhibit No. 8 | 84 |
| Exhibit No. 9 | 87 |
| Exhibit No. 10 | 93 |
| Exhibit No. 11 | 114 |
| Exhibit No. 12 | 120 |
| Exhibit No. 13 | 122 |

THE VIDEOGRAPHER: We're going on the record. The time is 11:06 a.m. on Tuesday, March 2, 2021. Please note that microphones are sensitive and may pick up whispering or private conversation or cellular interference. Please place cell phones away from microphones as they can interfere with deposition audio. Audio and video recording will continue until parties agree to go off the record.

This is media unit number one of the virtually recorded deposition of Kevin Hanson. This is being taken by counsel for Defendants in the matter of Waukegan Potawatomi Casino versus City of Waukegan, case filed in the US District Court for the Northern District of Illinois, Eastern Division.

This deposition is being held remotely and our witness is located in Milwaukee, Wisconsin. My name is Mark Lyle and I'm today's video technician and our court reporter is Susan Haselkamp, and we're here on behalf of Veritext Legal Solutions. And I'm not authorized to administer an oath and I'm not related to any party in this action, nor am I financially

interested in the outcome.

First we'll have counsel introduce themselves and state who they represent, after which the court reporter will swear in the witness. And if there are any objections to the proceedings, please state them at the time of your appearance. We'll begin with noticing attorney.

MR. DAVIS: Glenn Davis from Hepler Broom, I'm here on behalf of the Defendant City of Waukegan.

MS. RIGNEY: Meghan Rigney from Helper Broom, here on behalf of City of Waukegan.

MR. SYVERTSEN: Mark Syvertsen from Freeborn & Peters on behalf of Plaintiff, Potawatomi casino.

THE COURT REPORTER: Would you raise your right hand, please?

(Whereupon, the witness was duly sworn.)

THE COURT REPORTER: Thank you.

KEVIN HANSON, CPA,

having been first duly sworn, was examined and testified as follows:

Page 114

action groups in Waukegan, Waukegan Voter Alliance, Video Gaming United, Waukegan Democratic Organization, Video Gaming United Association?

A. No.

Q. Were you involved in connection with any agreements with the Ho-Chunk Tribe in a Beloit facility?

A. No.

Q. Did you at any time review the Johnson Consulting report that the city had?

A. No.

Q. So you have no opinions or thoughts one way or the other as to that report?

A. I never saw it, so I can't have an opinion.

Q. Okay. I popped another exhibit up for you.

(Whereupon, Hanson Deposition Exhibit No. 11 was marked for identification.)

BY MR. DAVIS:

Q. You should have now something called Exhibit 11 with today's date and your name. Let

Page 115

me know when you see that.

A. Yes, I see it.

Q. Do you recognize the name Joseph Daniels, Sr.?

A. Yes.

Q. And he's the treasurer of the executive council for the FCPC?

A. At that time, yes.

Q. Do you remember it being brought to your attention that he was not in favor of filing a lawsuit against the City of Waukegan regarding the situation with the casino proposal?

A. Yes.

Q. Did you have any conversations with him about that?

A. No.

Q. So he never told you what his opinion was or why he had that opinion at one point?

A. No, he never did.

Q. It appears that you wrote an e-mail to Mr. Daniels, which is at the top of this exhibit. And you said, Joe, from an economic standpoint, the Waukegan casino is still a,

Page 116

quote-unquote, high risk venture because of the fees associated with gaming in Illinois. Very preliminary numbers indicate a difficulty in financing and profitability. Was that true on October 21, 2019?

A. For purposes of this e-mail, yes.

Q. For what other purposes would -- for what purposes would this statement not be true?

A. I was reiterating if -- a statement that the treasurer made in the executive council chambers that he had made to the chairman.

Q. So I'm reading your e-mail as Kevin Hanson wrote, Joe, which I assume is Joe Daniels. And then it goes on with the first two sentences of this e-mail. Aren't those your words?

A. Yes. I wrote them.

Q. And that's your thoughts?

A. Yes and no.

Q. Well, were you telling him the truth or were you just telling him what you thought he wanted to hear or what?

A. The operative -- this is where I get a little uncomfortable talking about tribal

Page 117

politics.

The treasurer was having difficulty with the whole idea of the lawsuit. What he wanted me to say is I don't think you should sue. And how I know that is if you look at who sent me the message below that, it was my administrative assistant informing me that the treasurer would like my opinion.

So rather than the treasurer asking me, he was asking my assistant to tell me he wanted my opinion. That's usually code from the previous treasurer that it's going to get political in that room, and I stay out of politics. Because it's -- I'm the numbers guy.

So that requires that I acknowledge Joe's fears but also let him know that I stay out of politics. This isn't my call. So, one, I acknowledged his fears of high risk. You will note the, quote, high risk because I don't think it's high risk, he thought it was high risk.

So I was basically providing him with while you're right that there's some risks society with that, I don't make the call on the -- on whether or not we get -- whether we

file a lawsuit.
Q. Well --
A. Basically --
Q. I'm sorry. Go ahead.
A. I said basically taking myself out of the politics.
Q. Were you still working with very preliminary numbers as of October 21, 2019?
A. No.
Q. So basically everything in the first two sentences is not true?
MR. SYVERTSEN: Objection to form and foundation.
THE WITNESS: In the context of who I was talking to, it was 100 percent accurate.
BY MR. DAVIS:
Q. Well, I mean, I understand you were trying to play politics and you balanced that off with the next paragraph by saying, this is more a political question than a financial question. Then you go on to state, filing a lawsuit at this point may result in delay in opening of the Waukegan casino, which would be helpful in the short term for the Milwaukee

casino. Those are your words, too, right?
A. That is true, yes.
Q. And you're trying to walk the fence without getting anybody unhappy with you, is that what I'm to understand?
A. That's not a very friendly way of putting it, but yeah, that's the sense of --
Q. Well, I don't mean to be unfriendly. Look, I don't want to be unfriendly. I'm not trying to be.
MR. SYVERTSEN: Sorry, we're just shutting a door here.
THE WITNESS: I realized the door was open.
BY MR. DAVIS:
Q. I don't want to be unfriendly. I'm not I'm not trying to be unfriendly. But it looks like -- you know, it looks like you're giving and you're taking away at the same time. You're agreeing in some fashion to make him feel okay with his views but at the same time you're pointing out on the other hand filing a lawsuit at this point could be helpful to us, right?
A. Yes.

Q. Did you attend the executive council meeting that went on to discuss this after this?
A. No.
Q. All right. We could put that aside.
MR. SYVERTSEN: You can close that out.
BY MR. DAVIS:
Q. Okay. You should see popping up soon Exhibit 12 with today's date and your name.
(Whereupon, Hanson Deposition Exhibit No. 12 was marked for identification.)
BY MR. DAVIS:
Q. Have you got it?
A. It's an e-mail from Connor Fabian?
Q. Correct. October 17th?
A. I have it.
Q. Okay. So Mr. Fabian is e-mailing Eric Dahlstrom, it looks like John Repa, Jeff Crawford and yourself and copies two other people at Houlihan Capital regarding final financial model. Do you see that?
A. Uh-huh, yes.
Q. And it says, please see attached for the final version of the financial model along

with a PDF highlighting the financial statements and the main schedules.
What was -- what was -- what was the need to look at the financial model at this point on October 17th?
A. We were in the middle of the project with Houlihan Capital. And when the word came down from the City of Waukegan, we needed to terminate that project so they'd stop working on it. So we asked them for the final copy of the report.
Q. Okay. And as I'm to understand this, the model had various assumptions underlying it which provided a base case, a downside case and an upside case; is that right?
A. Yes.
Q. And was it projected that if you had a base case, that if those -- if those assumptions were true, the Potawatomi casino in Waukegan would be profitable?
A. Yes.
Q. The downside case, it would be unprofitable?
A. As I recall, yes.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WAUKEGAN POTAWATOMI CASINO, LLC, )
an Illinois Limited Liability )
Company, )
)
Plaintiff, )
)
vs. ) 1:20 cv 750
)
CITY OF WAUKEGAN, an Illinois )
municipal corporation, )
)
Defendant. )

The Remote Deposition of KEVIN HANSON, called by the Defendants for examination, pursuant to Notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts, taken before Victoria D. Rocks, CSR, and Notary Public in and for the County of Cook, State of Illinois, commencing at 9:30 o'clock a.m., on the 14th day of September 2021, A.D.

APPEARANCES:

FREEBORN & PETERS, LLP
MR. MARTIN SYVERTSEN
MR. DYLAN SMITH
311 S. Wacker Drive
Suite 3000
Chicago, Illinois 60606
msyvertsen@freeborn.com

appeared on behalf of the Plaintiff;

HEPLERBROOM, LLC
MR. GLENN DAVIS
MR. CHARLES INSLER
150 N. Wacker Drive
Suite 31OO
Chicago, Illinois 60606
glenn.davis@heplerbroom.com
appeared on behalf of the Defendant.

VIDEOGRAPHER: PETER HUDSON

I-N-D-E-X

WITNESS: KEVIN HANSON

Direct Examination by MR. DAVIS: 5 - 103
Cross-Examination by MR. SYVERTSEN: 104 - 114
Redirect Examination by MR. DAVIS: 114 - 120

EXHIBITS PAGE
Exhibit 3 EBITDA spreadsheet 21
Exhibit 12 Houlihan email 10-17-19 18
Exhibit 344 Houlihan email 18
Exhibit 34O Rule 26 expert disclosures 28
Exhibit 345 Houlihan Capital report 47
Exhibit 341 Plaintiff expert rebuttal report 74
Exhibit 342 City of Waukegan Rule 26 disclosures 80

(Witness sworn.)

THE VIDEOGRAPHER: We're on the record at 10:01 a.m. central time on September 14, 2021, beginning the remote video recorded deposition of Kevin Hanson taken in the matter of Potawatomi Casino, LLC versus City of Waukegan filed in the United States District Court for the Northern District of Illinois, Eastern Division in the case number 1:20 cv 75O.

My name is Peter Hudson. I am the videographer, and the court reporter is Victoria Rocks, both representing Veritext Midwest. Will counsel please state your appearances.

MR. DAVIS: I am Glenn Davis on behalf of the defendant City of Waukegan.

MR. SYVERTSEN: Martin Syvertsen on behalf of plaintiff, Potawatomi Casino, LLC.

MR. SMITH: Dylan Smith on behalf of the plaintiff as well.

MR. INSLER: Charles Insler on behalf of the City defendant.

MR. DAVIS: Good morning, Mr. Hanson. It's good to see you again. How are you, sir?

THE WITNESS: Great.

MR. DAVIS: You understand that you have been designated as a testimonial expert to offer certain opinions in this case?

THE WITNESS: Yes.

MR. DAVIS: Have you done everything you needed to do to prepare to state all such opinions for me today.

THE WITNESS: Yes.

MR. DAVIS: Do you feel you are fully prepared to answer questions concerning your opinions?

THE WITNESS: Yes.

KEVIN HANSON,

called as a witness herein, having been first duly sworn, was examined upon oral interrogatories and testified as follows:

DIRECT EXAMINATION

BY MR. DAVIS:

Q. What did you do to prepare the opinions that you are going to offer to me today?

A. I did a number of calculations based on some financial models created by others to determine the value of the lost income opportunity for Wisconsin Potawatomi or Waukegan Potawatomi Casino, LLC.

Pl. SJ Ex. 138

to the negative cash flow. Two, on its face it makes no sense because if everyone was going to be in the position of negative cash flow even at a low discount rate why would there be five participants who wanted to open a casino in Waukegan. I don't understand.

But the biggest part of that is in order for him to go negative he must be equating some kind of loss factor in Milwaukee, which I would not do that.

Q. What do you mean by loss factor, in terms of gaming or what?

A. I don't know. The way I read it as I understood it was here's what you're going to lose in Milwaukee and here's your end result.

That is like mixing apples and oranges. My job is to evaluate the Waukegan casino. What would the Waukegan casino provide to the tribe. The Houlihan model provided a basis for what that revenue is going to be to the tribe.

Regardless of how they calculated it the numbers look very reasonable and accurate to me based on numbers I've seen before. Based on those revenue estimates I would discount Waukegan. If

Wells is adding Milwaukee to that mix, you're mixing apples and oranges.

Q. So your opinion really depends on the accuracy of the gaming revenue estimates for the Waukegan Potawatomi casino, right?

A. Yes.

Q. And you've taken those revenue projections in your calculations from Mr. Repa or others, right?

A. From Mr. Repa and in discussions with the Houlihan group.

Q. Did your analysis take into account in any way the benefit to the Potawatomi of not incurring a competing casino in Waukegan over the last approximately two years?

A. No.

Q. So for this purpose you have drawn a hard line between Waukegan casino and Milwaukee casino?

A. Yes.

Q. Have you calculated if not a direct flow through of $32.7 million in gaming revenue that the PHC preserved by not having a competitive casino in Waukegan, prepared an incremental analysis of what would be deducted on a present value basis to account for that?

A. No.

Q. Turning over to page 6, there's some discussion of the reconciliation payments, and I think you said you've indicated that the reconciliation payments have been changed to six years, right?

A. That is correct.

Q. And I think actually everybody is going to agree with that at the end of the day. Then on the next page, page seven is a recapitulation of your value of lost opportunity charts.

And this limits the reconciliation fees to years four through nine as opposed to the prior charts which were different, right?

A. Yes.

Q. So what's the net impact on the net value of lost opportunity on your EBITDA analysis here for this chart versus what we saw in your original disclosure?

A. Roughly 39 on the top line.

Q. 30 million more on the present value of EBITDA?

A. No. The net lost opportunity goes from $199 million down to $178 million. 21 million.

Q. I follow you. That is your final figure on your opinion on the net value of the lost opportunity?

A. Yes.

Q. Do you anticipate making any changes to that calculation?

A. I do not.

Q. Would you agree with me that if the revenue number used in your calculation is overestimated, the result of EBITDA would also be overestimated?

MR. SYVERTSEN: Form, foundation.

THE WITNESS: I'm going to answer no.

BY MR. DAVIS:

Q. No, because there are other variables you need to consider?

A. Yes. I would say there are other variables you need to consider. I am trying to say it's not a straight line between, okay.

Q. Assuming all else is equal if the revenue used in the calculation is overestimated the EBITDA is going to be also higher than it should be, right?

MR. SYVERTSEN: Object, form foundation.

THE WITNESS: All else being equal yes.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WAUKEGAN POTAWATOMI CASINO, LLC, an Illinois Limited Liability Company, | ) | JUDGE JOHN F. KNESS |
| | ) | MAGISTRATE JUDGE M. DAVID WEISMAN |
| Plaintiff, | ) | |
| -vs- | ) | No. 1:20-cv-750 |
| CITY OF WAUKEGAN, an Illinois Municipal Corporation, | ) | |
| Defendant. | ) | |

Zoom videotaped deposition of JOHN JOSEPH REPA, taken before KAREN KOSTAS, CSR, RMR, CRR, RDR and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 211 North Broadway, Suite 2700, in the City of St. Louis, Missouri, at 11:00 a.m. Central on the 6th day of May, 2021.

Pl. SJ Ex. 139

APPEARANCES:

VIA ZOOM:
FREEBORN & PETERS LLP by
MR. MARTIN SYVERTSEN
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606
312-360-6000
msyvertsen@freeborn.com

on behalf of the Plaintiff;

VIA ZOOM:
HEPLER BROOM LLC by
MR. CHARLES N. INSLER
MS. MEGHAN RIGNEY
211 North Broadway
Suite 2700
St. Louis, Missouri 63102
314-241-6160
charles.insler@heplerbroom.com
meghan.rigney@heplerbroom.com

on behalf of the Defendant;

DOUGLAS WHITNEY LAW OFFICE LLC by
MR. DOUGLAS E. WHITNEY
321 North Clark Street
Suite 1301
Chicago, Illinois 60654
312-279-0510
doug.whitney@dwlollc.com

on behalf of the Deponent.

ALSO PRESENT:

MR. MARK LYLE
Legal Videographer - Veritext Legal Solutions.

- - - - - - - - - -

I N D E X

WITNESS PAGE
JOHN J. REPA
Examination by Mr. Insler ....................9

E X H I B I T S

NUMBER — FIRST REFERENCED MARKED FOR ID
Deposition Exhibit
Exhibit 5 Waukegan, Illinois - Request for Qualifications and Proposals - Casino Development & Operator Waukegan, Illinois Bates WKGN 000975 - 986 ...........40
Exhibit 225 June 14, 2019 e-mail from Malcolm Chester to Jeff Crawford - Post Analysis of SB 690 and Investment Opportunity Bates WPC_0026007 - 0026012 .....155
Exhibit 232 June 4, 2019 e-mail from Malcolm Chester to Eric N. Dahlstrom ......156
Exhibit 244 October 17, 2019 e-mail chain from Donna B. More to Eric N. Dahlstrom ........17
Exhibit 245 John J. Repa - Hospitality and Gaming Solutions Qualifications .....34
Exhibit 246 Hospitality and Gaming Solutions Representative Clients .........35

Exhibit 247 Progress Bill from Hospitality and Gaming Solutions Bates RD_0003302 - 3304 ............44
Exhibit 248 Professional Services in Connection with the Proposed Waukegan Casino - Proposal June 2019 - John J. Repa Hospitality and Gaming Solutions Bates RD_0001124 - 1135 .......47
Exhibit 249 Hospitality and Gaming Solutions - Feasibility Analysis of a Waukegan Casino Report - July 2019 Bates WPC_0001578 - 1659 .........62
Exhibit 250 Hospitality and Gaming Solutions - Potawatomi Hotel Casino Impact Analysis - Illinois Gaming Expansion - Report July 2019 Bates RD_0000955 - 0001007 .........73
Exhibit 251 September 20, 2019 e-mail chain from Eric N. Dahlstrom to Jeff Crawford Bates WPC_0028461 - 0028463 ......92
Exhibit 252 Memorandum to Jeff Crawford, etc. from Hospitality and Gaming Solutions Bates RD_0000947 - 0000954 ............96
Exhibit 253 August 9, 2019 e-mail chain from John to Eric N. Dahlstrom, etc. Bates WPC_0008530 - 0008531 ...102
Exhibit 254 September 11, 2019 e-mail chain from Jeff Crawford to Ken Walsh, etc. Bates WPC_0026716 - 0026720 .....106

Exhibit 255 John J. Repa - Hospitality and Gaming Solutions October 31, 2019 - Progress Bill Bates RD_0006577 - 0006578 ...117
Exhibit 256 Memorandum To Waukegan Potawatomi Casino Team from John Repa, Hospitality and Gaming Solutions - Re: Comments on the Johnson Report Bates WPC_0003694 - 0003697 ........119
Exhibit 257 October 19, 2019 e-mail chain from Eric N. Dahlstrom to John J. Repa Bates WPC_0047038 .......125
Exhibit 258 Milwaukee Journal Sentinel September 28, 2013 - Midwest casino market draws from more limited pool of gamblers ....132
Exhibit 259 October 4, 2019 letter to Waukegan Casino Review Team from John J. Repa, Hospitality and Gaming Solutions Bates RD_0001110 - 0001116 .....137
Exhibit 260 October 1, 2019 e-mail chain from Joan Davis to John Bates RD_0005787 - 0005794 ........146
Exhibit 262 Menominee/Hard Rock International - Kenosha Bates RD_0006101 - 6151 ...........148
Exhibit 263 June 19, 2019 e-mail from Eric N. Dahlstrom to Malcolm Chester Bates WPC_0025359 .....152
Exhibit 264 July 31, 2019 e-mail chain from John to Eric N. Dahlstrom Bates RD_0003743 ....158

Page 102

And both of which have done numerous and current projects for Potawatomi. So I don't think there was a level of any concern that there was any error in the development cost itself.

Q Why was there a range to the development cost?

A I don't remember. Maybe that -- I'm trying to -- You know, I guess I just don't know enough to know. Because maybe part of it was the contingency, you know. I'd be guessing. I don't know.

Q Okay.

(Deposition Exhibit 253 marked.)

BY MR. INSLER:

Q Do you see Exhibit 253?

A Okay.

Q This is an e-mail from you to Eric Dahlstrom and Jeff Crawford, among others.

Do you see that?

A Yes.

Q Your last sentence says: The

Page 103

entertainment venue (1,500) may turn off the city and a 20-room boutique hotel - doesn't make sense in a grinder market.

Do you see that?

A Yes.

Q What is a grinder market?

A More meat and potatoes kind of market. As we talked about before, the -- the City of Waukegan itself has income levels that are below the averages.

Having worked in that market, it really struck me as odd to do a 20-room boutique hotel, it doesn't make any sense. It's not what the market wants.

The market wants free stuff. They want a quality facility. Easy access. To me that was a horrible misread of the market itself and not having done your homework.

Q And how far out does this grinder market -- Like what's the geographic region you're referring to there?

A I would -- I would say a lot of the Wisconsin, Illinois, Indiana corridor, that whole swath. I mean its nickname is the

Page 104

Midwest Grinder Market, you know. It is what it is. I think the concept that they were proposing is a mismatch of the people in the market and not really having done -- and not having done your homework in the market.

Q I understand the developer wants to make sure they have the appropriate hotel or casino for the market. If you put yourself in the shoes of the City Council or the population of Waukegan, is there a sense that they want to have a boutique hotel or they want to have a topnotch casino and maybe just not a local casino?

MR. SYVERTSEN: Object to form and foundation.

A I think --

BY MR. INSLER:

Q Is that ever a consideration?

A It may have been for them. But I think they should stick to what the criteria is and what casino development would provide the most economic development for the City of Waukegan and Lake County. And I think a -- a 20-room boutique hotel doesn't do anything for

Page 105

you. It's -- It's a nice amenity, however, it doesn't fit the market, and it particularly doesn't fit Fountain Square which has, I believe, I want to say eight limited service properties that are two and a half to three star quality.

Part of the approach taken by Potawatomi was not to hurt local businesses by building a hotel since market occupancy was, I believe in the low 70s, I would have to double-check that number. But there was a lot of excess capacity that could be absorbed by the existing local hotels that would really help local businesses, which there was quite a bit of pushback from some of the businesses within Fountain Square about the casino development itself.

So I think the approach taken not only by Potawatomi but by Rivers was probably a better way to approach the market.

Q Do you know how many casinos are in Wisconsin, Illinois and Indiana combined?

A I don't know the number off the top of my head, no. The total number.