# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| WAUKEGAN POTAWATOMI CASINO, LLC, an Illinois limited liability company, | ) ) ) | |
| | ) | Case No. 1:20-cv-750 |
| Plaintiff, | ) ) | Judge John F. Kness |
| v. | ) ) | Magistrate Judge M. David Weisman |
| CITY OF WAUKEGAN, an Illinois municipal corporation, | ) ) ) | |
| Defendant. | ) ) | |

## PLAINTIFF WAUKEGAN POTAWATOMI CASINO'S MEMORANDUM IN OPPOSITION TO DEFENDANT CITY OF WAUKEGAN'S MOTION FOR SUMMARY JUDGMENT

Michael J. Kelly
Dylan Smith
Martin Syvertsen
FREEBORN & PETERS LLP
311 S. Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 360-6000
mkelly@freeborn.com
dsmith@freeborn.com
msyvertsen@freeborn.com

Robert T. O'Donnell
Hayleigh Herchenbach
O'DONNELL CALLAGHAN LLC
28045 N. Ashley Circle, Suite 101
Libertyville, Illinois 60048
(847) 367-2750
rodonnell@och-law.com
hherchenbach@och-law.com

*Counsel for Plaintiff Waukegan Potawatomi Casino, LLC*

Dated: October 29, 2021

# TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Facts Precluding Summary Judgment ..................................................................................... 2

Argument .............................................................................................................................. 18

I.    The City Does Not "Enjoy Absolute Immunity" Against Potawatomi's Claims. ........... 18

    A.    A State Statute Cannot Immunize the City Against Potawatomi's Federal Claim..... 18

    B.    The Illinois Tort Immunity Act Does Not Grant "Absolute Immunity" From
        Potawatomi's State Claims. ....................................................................................... 19

    C.    Even Assuming the Tort Immunity Act Applied, It Would Bar Only Damages,
        Not the Other Relief Potawatomi Seeks. ................................................................... 22

II.   Because Potawatomi's § 1983 Claim Does Not Assert Sovereign Rights, It May
    Proceed Even Assuming Potawatomi Is An "Arm Of The Tribe." ................................. 23

III.  Potawatomi's Equal Protection Claim Raises Material Fact Issues For Trial. ................ 25

    A.    Whether the City Treated Potawatomi Differently Than Similarly Situated
        Applicants Is a Fact Issue for Trial. .......................................................................... 26

        1.    A jury could find that the City treated Potawatomi differently than similarly
            situated casino applicants. ................................................................................... 26

        2.    The City's attempt to shield its discriminatory conduct "as a matter of law"
            relies on out-of-circuit precedent that is contrary to governing Seventh Circuit
            case law. ............................................................................................................. 28

    B.    A Jury Could Find That There Was No Conceivable Rational Basis for the City's
        Discriminatory Treatment of Potawatomi. ................................................................ 29

    C.    Evidence of the City's Improper Motive Confirms Potawatomi's Right to a Trial
        on Its Equal Protection Claim. ................................................................................... 30

IV.  Potawatomi Is Entitled To Invoke The Gambling Act. ................................................. 33

    A.    Potawatomi Has a Private Right of Action for the City's Violation of the
        Gambling Act's Certification Provisions. .................................................................. 33

    B.    The City's "Exhaustion" Argument Is Baseless. ....................................................... 36

V.   Potawatomi Is Entitled To A Trial On Its Open Meetings Act Claim. ........................... 38

    A.    The City Violated the Open Meetings Act on October 17, 2019. ............................... 38

B.   The Evidence Supports a Finding That the City Improperly Refused to Put the Reconsideration Request on the October 21, 2019 Meeting Agenda. ....................... 39

C.   The Appropriate Remedy for the City's Violations Presents a Disputed Fact Issue. . 39

Conclusion ................................................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alarm Detection Sys. Inc. v. Orland Fire Prot. Dist.*,
194 F. Supp. 3d 706, 714 (N.D. Ill. 2016) ............................................................34

*Analytical Diagnostic Labs, Inc. v. Kusel*,
626 F.3d 135 (2d Cir. 2010) ...................................................................................28

*Booth Newspapers, Inc. v. Wyoming City Council*,
425 N.W.2d 695 (Mich. Ct. App. 1988) ................................................................40

*Bryant v. Oak Forest High School Dist.*,
No. 06 C 5697, 2007 WL 2738544 (N.D. Ill. Sept. 12, 2007) (Kocoras, J.) ..........18

*Caesars Mass. Mgmt. Co., LLC v. Crosby*,
778 F.3d 327 (1st Cir. 2015)...................................................................................28

*Cardinal Glass Co. v. Bd. Of Ed. of Mendota Cmty. Consol. Sch. Dist. No. 289*,
447 N.E.2d 546 (Ill. App. Ct. 3d Dist. 1983)..............................................34, 35, 36

*Castaneda v. Ill. Human Rights Comm'n*,
547 N.E.2d 437 (Ill. 1989) ...............................................................................36, 37

*Chemehuevi Indian Tribe v. McMahon*,
934 F.3d 1076 (9th Cir. 2019) ...............................................................................24

*Court St. Steak House, Inc. v. County of Tazewell*,
643 N.E.2d 781 (Ill. 1994) .....................................................................................34

*Cruz v. Town of Cicero*,
275 F.3d 579 (7th Cir. 2001) ............................................................................30, 31

*Del Marcelle v. Brown County Corp.*,
680 F.3d 887 (7th Cir. 2012) ..................................................................................30

*Emerald Casino, Inc. v. Ill. Gaming Bd.*,
852 N.E. 2d 512 (Ill. App. Ct. 1st Dist. 2006).......................................................36

*Engquist v. Oregon Dep't of Agric.*,
553 U.S. 591 (2008)...........................................................................................28, 29

*Esperanza Peace and Justice Ctr. v. City of San Antonio*,
316 F. Supp. 2d 433 (W.D. Tex. 2001)...................................................................40

*FKFJ, Inc. v. Village of Worth*,
111 F.4th 574, 589 (7th Cir. 2021) .........................................................................30

*Flowers v. City of Minneapolis,*
    558 F.3d 794 (8th Cir. 2009) ....................................................28

*Frederickson v. Landeros,*
    943 F.3d 1054 (7th Cir. 2019) ............................................30, 31

*Gerwin v. Livingston Cty. Bd.,*
    802 N.E. 2d 410 (Ill. App. Ct. 4th Dist. 2003)........................40

*Gonzalez v. O'Connell,*
    355 F.3d 1010 (7th Cir. 2004) ............................................36, 37

*Hanes v. Zurick,*
    578 F.3d 491 (7th Circ. 2009).....................................................28

*Inyo Cty., Cal. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony,*
    538 U.S. 701 (2003).........................................................23, 24, 25

*Keefe-Shea Jt. Venture v. City of Evanston,*
    773 N.E.2d 1155 ...........................................................................35

*Keweenaw Bay Indian Cmty. v. Rising,*
    569 F.3d 589 (6th Cir. 2009) .....................................................24

*L.E. Zannini & Co., Inc. v. Bd. of Ed., Hawthorn Sch. Dist. 73,*
    486 N.E.2d 424 (Ill. App. Ct. 2d Dist. 1985)....................33, 35, 36

*Miller v. City of Monona,*
    784 F.3d 1113, 1119 (7th 2015).................................................29

*Mlsna v. Union Pac. R.R. Co.,*
    975 F.3d 629 (7th Cir. 2020) ........................................... passim

*Mueller by Math v. Cmty. Consol. Sch. Dist. 54,*
    678 N.E.2d 660 (Ill. App. Ct. 1st Dist. 1997)........................20

*Muscogee (Creek) Nation v. Oklahoma Tax Comm'n,*
    611 F.3d 1222 (10th Cir. 2010) .................................................24

*PACE v. Reg. Transp. Auth.,*
    803 N.E.2d 13 (Ill. App. Ct. 2d Dist. 2003)......................22, 23

*Peeples v. Vill. Of Johnsburg,*
    932 N.E.2d 612 (Ill. App. Ct. 2010) ........................................37

*Pilditch v. Bd. of Ed. of the City of Chicago,*
    No. 90 C 5526, 1991 WL 195775 (N.D. Ill. Sept. 25 1991) (Hart, J.) ....................18

*Raintree Homes, Inc. v. Vill. of Long Grove*,
807 N.E.2d 439 (Ill. 2004) ........................................................22, 23

*Salazar v. City of Chicago*,
No. 84 C 10156, 1985 WL 2482 (N.D. Ill. Sept. 9, 1985) (Williams, J.)................18

*Sawyer Realty Group, Inc. v. Jarvis Corp.*,
432 N.E. 2d 849 (Ill. 1982) ...........................................................33

*Skokomish Indian Tribe v. United States*,
410 F.3d 506 (9th Cir. 2005) (*en banc*) ...................................................24

*Stanley Magic-Door, Inc. v. City of Chicago*,
393 N.E.2d 535 (Ill. App. Ct. 1st Dist. 1979) ..........................................33, 34, 36

*State Dep't of Health & Soc. Servs., Div. of Family & Youth Servs. v. Native Vill. of Curyung*,
151 P.3d 388 (Alaska 2006) ...........................................................24

*State Mech. Contractors, Inc. v. Village of Pleasant Hill*,
477 N.E. 2d 509 (Ill. App. Ct. 4th Dist. 1985) .........................................34

*Strauss v. City of Chicago,* 2021 IL App (1st) 191977 ....................................21

*Swanson v. City of Chetek*,
719 F.3d 780 (7th Cir. 2013) ..........................................................30

*Texas v. Ysleta del Sur Pueblo*,
367 F. Supp. 3d 596, 607 (W.D. Tex. 2019)...........................................24, 25

*Thomas ex rel. Smith v. Cook County Sheriff*,
401 F. Supp. 2d 867 (N.D. Ill. Sept. 25, 2005) ........................................18

*Thomas v. Sheahan*,
499 F. Sup. 2d 1062, 1099 ...........................................................18

*Thurmond v. Forest County Potawatomi Community*,
No. 2:18-CV-1047 (E.D. Wis.)........................................................24, 25

*Tree of Life Church v. City of Elgin*,
No. 07 CV 0217, 2007 WL 2790763 (N.D. Ill. Sept. 24, 2007) (Aspen, J.) ..........................19

*Vill. Of Bloomingdale v. CDG Enters., Inc.*,
752 N.E.2d 1090 (Ill. 2001) ..........................................................21

*Vill. of Itasca v. Vill. of Lisle*,
817 N.E.2d 160 (Ill. App. Ct. 2d Dist. 2004)...........................................20, 21

*Williams v. Big Picture Loans, LLC,*
    929 F.3d 170 (4th Cir. 2019) ............................................25

**STATUTES**

5 ILCS 120/2.06(g) .......................................................38

230 ILCS 10/2(b) .........................................................35

230 ILCS 10/5.3(a) .......................................................35

230 ILCS 10/5(b)(1) ..................................................35, 37

230 ILCS 10/7(e-5) ...................................................15, 19

745 ILCS 10/1-204 ........................................................18

745 ILCS 10/2-101 ........................................................22

745 ILCS 10/2-104 ....................................................19, 20

42 U.S.C. § 1983 ..................................................... passim

Code § 2-41 .............................................................38

Code § 2-61 .............................................................38

# INTRODUCTION

On the evening of October 17, 2019, the Waukegan City Council assembled for a special meeting. Up for consideration were four proposals to develop a Waukegan casino—a prospect the new state gaming expansion law made possible. Under the law, only proposals receiving City Council support would be considered by the Illinois Gaming Board for a casino license.

For the public gathered that evening in the council chamber, the meeting was supposed to be the culmination of a fair and open casino review process. But all was not what it seemed.

The City Council members took their seats on the dais at the front of the chamber, waiting for the meeting to begin. At that point, according to Alderperson Keith Turner's sworn testimony, Mayor Samuel Cunningham entered:

> . . . as the mayor entered, he came by, he had to pass by my chair, and he said to me, these are the three that we want to send to Springfield. Right. And that was what the vote was going to be. Right. Put those three down there.

(*See* Pl. LR 56.1 Stmt. of Additional Material Facts ("SAF") ¶ 69.) Four City Council members voted precisely as Cunningham had directed. Those four votes were decisive in the evening's results: The City Council advanced three casino proposals "to Springfield," but not Potawatomi's.

Cunningham's secret directive was the culmination of a rigged process—a process Cunningham manipulated to achieve the outcome he preferred. Although Cunningham took steps to project an appearance of municipal impartiality, the City's casino review process discriminated against plaintiff Potawatomi without any rational basis, disregarded the requirements of the gaming expansion law, and violated both the letter and the spirit of the Illinois Open Meetings Act.

These are not mere allegations. Discovery has yielded abundant and compelling evidence to support Potawatomi's claims. Rather than deal with that evidence, the City has attempted to barricade itself behind supposed legal defenses. But those defenses are either non-existent or

dependent on the outcome of factual disputes that cannot be resolved short of trial. Therefore, the City is not entitled to summary judgment.

FACTS PRECLUDING SUMMARY JUDGMENT

Based on the evidence adduced in discovery, a jury could find the following facts, which must be viewed, and from which all reasonable inferences must be drawn, in Potawatomi's favor. *Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 633 (7th Cir. 2020) (reversing summary judgment).

### The Bond-Cunningham Connection

As 2018 turned to 2019, Waukegan Mayor Samuel Cunningham and Michael Bond shared two related concerns—their mutual effort to elect a slate of Bond-backed candidates for City Council, and Bond's plans to develop a casino in Waukegan. *See infra*, pp. 2-7.

A former Illinois state senator, Bond was now CEO and part owner of Tap Room Gaming, a video gaming company. (SAF ¶ 3.) During Cunningham's successful 2017 run for mayor, Bond had advised Cunningham on campaign strategy. (*Id.* ¶ 2.) Through companies Bond controlled, political action committees, and business associates, Bond directed more than $50,000 in support to Cunningham's campaign during the critical final weeks before the 2017 election, making Bond by far the campaign's largest benefactor. (*Id.* ¶ 5.)

When Cunningham won, he took charge of one of the few Illinois municipalities with a strong-mayor form of government—meaning that, with few exceptions, Cunningham controlled all City departments and could appoint and remove municipal officers. (SAF ¶ 1.) As corporation counsel, Cunningham installed attorney Robert Long, who previously had represented Cunningham and his family, including on campaign-related issues. (*Id.* ¶ 6.)

### Bond Sponsors Candidates Receptive to His Casino Vision

Starting in late 2018, Bond met with a number of City officials and candidates, mostly at Tap Room's headquarters, to pitch his vision for a Waukegan casino, which included an

entertainment component. (SAF ¶¶ 8, 10.) Cunningham was one of those officials. (*Id.* ¶ 8.) Another was Thomas Maillard. (*Id.*) Formerly a Bond campaign staffer and Tap Room employee, Maillard worked on Cunningham's 2017 campaign at Bond's suggestion and then became a special projects analyst for the mayor. (*Id.* ¶ 9.) Bond also delivered versions of his casino pitch to, at a minimum, incumbent City Council members Sylvia Sims Bolton (First Ward), Greg Moisio (Third Ward), David Villalobos (Fourth Ward), Edith Newsome (Fifth Ward), Lynn Florian (Eighth Ward), and Ann Taylor (Ninth Ward), as well as Sixth Ward candidate Keith Turner. (*Id.* ¶ 8.)

Bond treated Second Ward alderman Patrick Seger and Fourth Ward candidate Roudell Kirkwood to tours of Tap Room, but Seger and Kirkwood claim that the tour did not include a casino pitch. (SAF ¶ 11.) At around the time Kirkwood received his tour, he was about to or had recently become president and owner of a bar and lounge, managed by his son, that featured five Tap Room Gaming video gaming terminals. *(Id.* ¶ 25.*)* From January through October 2019, those Tap Room Gaming devices generated more than $2.5 million in total wagering activity, yielding $216,020 in net wagering activity for Kirkwood's business before taxes. (*Id.*)

Once Bond had gauged City Council candidates' receptivity to his casino pitch, he threw his support behind six of them. (SAF ¶ 14, 18, 19-24.) Again using a network of companies he controlled, associates, and political action committees, including the Video Gaming United Association and the Waukegan Voter Alliance, Bond directed more than $250,000 in financial support to his six candidates in the April 2019 City Council election, providing all or almost all of the funding for the four candidates who won seats on the City Council. (*Id.* ¶¶18, 20-23.)[1]

---

[1] The only portions of those funds not originating with one of Bond's companies were $30,000 that Bond solicited from another gaming company (which later purchased Tap Room) and $2,500 that Bond solicited from Cunningham's campaign. (*Id.* ¶ 18.)

Bond delivered more than just financial support to his favored City Council candidates. He built them a turnkey campaign operation. Bond installed 28-year-old Jon Kozlowski as titular head of the Video Gaming United Association, an "industry association" Bond founded in 2016 that counted Tap Room as its only dues-paying member. (SAF ¶ 7.) Notably, Kozlowski had been instrumental in reaching out to City Council members and candidates to schedule their casino-related meetings with Bond. (*Id.* ¶ 8.) In the 2019 City Council elections, Kozlowski set up a joint campaign office for the Bond-backed candidates and provided campaign support that included coordinating mail programs and phone banks, overseeing campaign staff and field work, helping set up video shoots for campaign ads, and arranging for a consultant to handle the candidates' campaign filings. (*Id.* ¶ 14.) At times, Kozlowski himself picked up checks at Tap Room for the Waukegan Voter Alliance, the chief PAC through which Bond funded his candidates. (*Id.* ¶ 19.) Kozlowski also communicated with Bond about funding for the six campaigns. (*Id.*)

That was not all. Funded by Tap Room Gaming's "dues" to the Video Gaming United Association, Kozlowski retained a Springfield law firm recommended by Will Cousineau, a lobbyist who worked for Bond on gaming issues, to mount successful challenges to the candidacies of primary opponents to incumbent City Council members Bolton and Seger. (SAF ¶ 15.) Kozlowski later arranged for the same Springfield law firm to represent the Bolton and Kirkwood campaigns in response to complaints filed with the Illinois State Board of Elections. (*Id.* ¶ 16.) The firm's fees were paid by the Waukegan Voter Alliance. (*Id.*)

Cunningham and Maillard were allies in this effort to stack the City Council with Bond supporters. In March 2019, about two weeks before the election, Bond and Cunningham exchanged the following texts in a conversation that also included Maillard and Kozlowski:



Four of the Bond-backed candidates—Bolton, Seger, Kirkwood, and Turner—prevailed, with campaigns entirely or almost entirely financed by Bond's campaign-finance network. (SAF ¶¶ 20-23.) In late May 2019, weeks *after* the election, at a time when Turner's campaign had only $1,884 on hand, the Waukegan Voter Alliance contributed $6,273 to his campaign. (*Id.* ¶ 24.) That money enabled the campaign to repay Turner $2,700 he had loaned it earlier that year and to pay $4,783 the campaign owed to a printing company. (*Id.*.)

### The Bond-Cunningham Collaboration

Following his relative success packing the City Council, Bond turned his focus not only to Cunningham's political fortunes but also to Cunningham's control of City government. On April 8, 2019, Bond texted Cunningham advice about City Council committee assignments:

> Bond: Let's think through your [City Council] committee assignments when we get together on Tuesday. Hold off on commitments if you can. You need to make sure you have the right people in the right spots. You should not empower your enemies with powerful committee chairmanships or assignments. Just my thoughts.
>
> Cunningham: Will do and I think we have done that. I'll show you the list today. (SAF ¶ 28.)

In mid-April 2019, Bond invited Cunningham, Maillard, Kozlowski, lobbyist Cousineau, and attorney Michael Del Galdo to Bond's lake house for an early Cunningham re-election strategy session. (*Id.* ¶ 27.)

Bond and Cunningham also continued to communicate about Bond's plans for a casino in Waukegan. In May 2019, for example, a casino update from Bond provoked an enthusiastic response from the mayor:

> Bond: I'm in Las Vegas traveling to Hard Rock Casino in Tulsa later today. I'm not sure we need the Hard Rock brand but I want to make sure we have the option. They basically take a licensing fee and this just makes the economics more challenging. I'll let you know how it goes.
>
> Cunningham: Awesome (SAF ¶ 29.)

In mid-June 2019, Bond texted Cunningham about the Waukegan casino license fee , urging, "Host communities will need to take this into consideration when working with developers." (*Id.* ¶ 30.) Cunningham acknowledged the message and advised, "We [a]r[e] getting [ou]r RFQ [Request for Qualifications and Proposals] as we speak," prompting Bond to reply, "Awesome!!!" (*Id.*)

On June 28, 2019, Governor Pritzker signed SB 690 into law. (Doc. 116 ("Def. LR 56.1 Stmt.") ¶ 1.) That morning, Bond texted Cunningham to call "before 10am"—presumably to speak before the bill signing, at which point (as Bond reminded Cunningham) any communication between them would need to be reported to the Illinois Gaming Board. (SAF ¶ 31.)

When the City issued its casino RFQ on July 3, 2019, there was an added obstacle to further Bond-Cunningham communication, as the RFQ generally barred contact between would-be casino developers and City officials or employees. (SAF ¶ 32.) Yet on July 12, 2019, Cunningham texted Bond about the Milan Banquet Hall, a facility across the street from the presumed casino site (Fountain Square) and thus potentially useful to Bond in his quest to develop a casino:

<table>
<tr><td>Cunningham:</td><td>R u interested in the Milan Banquet Hall?</td></tr>
<tr><td>Bond:</td><td>Yes.</td></tr>
<tr><td>Cunningham:</td><td>Ok they might be open to sales</td></tr>
<tr><td>Bond:</td><td>Can you send me contact info?</td></tr>
<tr><td>Cunningham:</td><td>Yes, (*Id.* ¶ 33.)</td></tr>
</table>

At the end of July, as required by statute, the City submitted a report to the Illinois Gaming Board, with a copy to Cunningham, disclosing its contacts with casino developers over the past month. (*Id.* ¶ 34.) The report did not include Cunningham's July 12 text exchange with Bond. (*Id.*)

## The City's Casino RFQ Process—Phase 1

The Cunningham administration put in place a casino RFQ process that could not pass any objective test for fairness or transparency. Instead, a jury could draw the inference that the City deliberately stacked the process in Bond's favor. Released July 3, 2019, on the eve of what was essentially a four-day holiday weekend, the RFQ initially set a response deadline of July 22, 2019. (Def. LR 56.1 Stmt. ¶ 5.) Even granting that SB 690 imposed onerous time constraints on the City, this absurdly tight deadline seemed designed to deter rather than invite submissions, and to favor Bond, a founding partner in the casino applicant known as "North Point," (SAF ¶ 3), who, as noted, had been pitching his casino vision to Waukegan officials months earlier. As described above, after the RFQ issued, Cunningham communicated with Bond on a casino-related matter, in violation of the RFQ, and failed to report it, in violation of statute.

The City did not initially retain a consultant with casino expertise, either before or in the weeks after the RFQ's release. (SAF ¶ 42.) Rather, the City initially relied on a team Cunningham assembled to review casino proposals: Cunningham, Maillard (the former Bond staffer and Tap Room employee), corporation counsel Long, Long's deputy, the City's planning and zoning

director, and attorney James Vasselli of the Del Galdo law firm—the firm whose name partner attended Cunningham's re-election strategy session at Bond's lake house in April 2019. (*Id.*)[2]

## Increased Scrutiny of the Bond-Cunningham Connection

As the RFQ process moved forward, allegations about Bond's undue influence garnered some publicity. On the day SB 690 became law, the City sued aspiring casino developer Waukegan Gaming. (SAF ¶ 35.) The City sought a declaration that casino development rights Waukegan Gaming claimed under an agreement from the early 2000s were no longer operative. (*Id.*)

In mid-July, Waukegan Gaming alleged in counterclaims against the City that Bond's "substantial political contributions" to City officials, including Cunningham and City Council members, were intended to further his efforts to develop a Waukegan casino, and that Bond "appear[ed] to have the inside track with Mayor Cunningham . . . ." (SAF ¶ 37.) Commenting for a news story about the allegations, Cunningham stated that the City's "plan" was to recommend multiple developers for consideration by the Illinois Gaming Board, which "quashes the argument [Waukegan Gaming] is trying to make." (*Id.* ¶ 38) In retrospect, this statement was noteworthy, because the City Council—not Cunningham—would decide which proposals to forward to the Gaming Board. Yet Cunningham apparently believed he had sufficient control over the process to ensure that more than one applicant would move on to the next stage.

On August 6, 2019, the day after the City received casino proposals, new public scrutiny loomed for Cunningham. On that date, a reporter emailed him a series of pointed questions for "a story I plan to publish this week about the casino, political donations from Tap Room Gaming and its affiliates as well as Tap Room-funded PACs and a dark money group that pushed for a casino

---

[2] As that group prepared internal "score sheets" for reviewing casino proposals, drafts evolved from largely tracking the City's RFQ to reflecting the desire of Cunningham (who, as noted, was long privy to Bond's casino vision) to make Waukegan a "destination spot." (SAF ¶ 41.)

at Fountain Square, where one of Tap Room's owners purchased land a few months after funding your campaign for mayor." (SAF ¶ 43) Among the questions: "Why did you donate money to the [Waukegan Voter Alliance], which supported a slate of candidates favorable to Tap Room's interests in Waukegan?" and "How did you choose the selection committee for the casino? Why did you choose an attorney from the Del Galdo Group to sit on the commission?"[3] (*Id.*)

The very next day, the City began a search for an outside casino consultant. (SAF ¶ 44.) Around the same time, Vasselli (the Del Galdo firm attorney) and Maillard (because of his past association with Bond) stepped back from involvement in evaluating casino proposals. (*Id.* ¶ 46.)

### The City's Casino RFQ Process—Phase II

On August 19, 2019, the City retained Johnson Consulting. (Def. LR 56.1 Stmt. ¶ 16.) Although the outside consultant presumably lent a veneer of "independence," the City's review process did not treat casino applicants equally. To the contrary, based on the facts now described below, a reasonable jury could conclude that the City implemented a sham process along the lines Cunningham previewed when he announced the City's "plan" to "quash" suspicions about Bond's influence by selecting multiple proposals. In addition to Bond's North Point proposal, the City stacked the deck in favor of Full House, the most non-threatening competitor to North Point. A third applicant, Rivers, won favorable treatment by leveraging discovery it obtained in litigation against the City—discovery Cunningham had reason to want shielded from public view. A jury could find that pliant City Council members voted in favor of these three proposals, and against Potawatomi's, at Cunningham's behest.

---

[3] The story ran two days later, jointly published by ProPublica, WBEZ Chicago, and the Chicago Sun Times under the headline, "From Truck Stops to Elections, a River of Gambling Money Is Flooding Waukegan; Owners of one of Illinois' largest video gambling companies are behind efforts to influence city politics, expand gambling and build a casino near land they control." (*Id.* ¶ 45, Pl. SJ Ex. 71.)

In September 2019, based on its initial review, Johnson Consulting prepared a detailed summary of the casino proposals, which Cunningham and corporation counsel Long both received. (SAF ¶ 48.) ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Potawatomi's bank reference letter stated that Potawatomi could fully fund its casino project. ██████████████████████████ ████████████████████████████████████ ███████████████████████████ ██████████████████████████████████ (*Id.*)

The RFQ highlighted "a significant number of high quality jobs" as a development objective. (SAF ¶ 32, Pl. SJ Ex. 44 at 2.) To that end, one basic RFQ "submittal requirement" was for each applicant to "quantify . . . estimated economic impacts." (SAF ¶ 32, Pl. SJ Ex. 44 at 3, item 2G.) Yet the City did not ██████████████████████████████████████████ ██████████████████████ Instead, well after the RFQ submission deadline, with the knowledge and approval of Cunningham's casino team, Johnson Consulting solicited additional information from applicants other than Potawatomi, including pro forma financials, tax projections, supplemental detail regarding projected revenues and expenses, and, in Full House's case, job projections that Johnson Consulting subsequently included in its report to the City. (SAF ¶ 49.)

Potawatomi did not receive the same treatment. It proposed to purchase the City-owned Fountain Square site for its "appraised value +/ 15%." (Pl. LR 56.1 Resp. ¶ 26.) This offer assumed that negotiations would ensue, and that any appraisal used for the sale of the property would value it as a casino site. (*Id.*) But Johnson Consulting latched onto an existing City appraisal, not publicly available, that valued the site at $5.625 million, pre-gaming expansion, on the assumption that its highest and best use was "subdivision into smaller lots for new commercial development." (SAF

¶ 50.) Johnson Consulting equated Potawatomi's offer with this figure at a September 18, 2019 public hearing, (*id.*), leaving the impression that the City did not intend to negotiate with applicants before the certification process concluded. Therefore, in early October, Potawatomi advised that City that it would pay $12 million for Fountain Square. (Pl. LR 56.1 Resp. ¶ 43).

As noted, although Johnson Consulting incorporated supplemental information from other applicants into its analysis, including required job projections from Full House, it refused to do so for Potawatomi. (SAF ¶ 61, 71.) The City sanctioned this disparate treatment. In October 2019, after discussing the issue with Cunningham and City staff, Long advised Johnson Consulting that he could not consider supplemental information from applicants, including Potawatomi's, unless the information was specifically requested by the City. (*Id.* ¶ 61.)

The City's selective funneling of information also served to insulate Johnson Consulting from developments that would have undermined Bond's North Point proposal. In early October 2019, noting correctly that the Gambling Act required the City "to reach certain agreements with a [casino applicant] prior to advancing the [applicant] to the Illinois Gaming Board," North Point proposed to enter into either of two alternative memoranda of understanding with the City. (SAF ¶ 51.) If the City advanced North Point alone, then the terms would be consistent with the original casino proposal it had submitted. (*Id.*). But if the City certified multiple casino applicants, North Point proposed to match the terms of the [applicant] offering a lower financial contribution to the City" —*i.e.*, adjust the original North Point proposal to:

> *(i) reduce the City Revenue Share and Additional Donations from the levels in the Original North Point Development Proposal down to the lowest, aggregate minimum payments . . . proposed to he paid to the City under the Competing Proposal[s], (ii) incorporate the lease and purchase terms offered under the Competing Proposal[s] that are most favorable to the competing proponent[s]; and (iii) match any donation to the City or community project to the extent documented in publicly available REP responses to the City.* (*Id.* (emphasis in original).)

North Point's conditioning of its original proposal on being the City's sole selection should have been a show-stopper. According to Cunningham, the City already had a "plan" to certify multiple applicants. (SAF ¶ 38.) If so, then North Point's proposal was far less favorable than it seemed. In fact, each payment to the City, including for Fountain Square, would be only as good as the least favorable corresponding offer among the competing proposals. Moreover, upon reviewing the modified proposal, Long concluded that North Point was trying to gain an unfair advantage. (*Id.* ¶ 52.) Yet, according to Long's deposition testimony, he decided he did not want to "prejudice" the process, and therefore did not disclose North Point's modified proposal to Johnson Consulting, the City Counsel, or Cunningham. Long also did not disclose North Point's communication to the Illinois Gaming Board, as required by the Illinois Gambling Act. (*Id.*)

### Johnson Consulting's Inscrutable Rankings

Cunningham and Long reached out to Johnson Consulting on multiple occasions to arrange calls or meetings not involving other City personnel. (SAF ¶ 47.) On October 10, 2019, Johnson Consulting submitted to Long its report concerning the four remaining casino proposals. (*Id.* ¶ 53.)

The Johnson Consulting report included notable omissions and obfuscations that would have been apparent to anyone who, like Cunningham and Long, had access to its earlier, more detailed summary of proposals. The report stated that Full House reported $182.3 million of assets in 2017, ███████████████████████████████████████████████████████ ██████ (SAF ¶ 54.) Although the earlier summary had detailed material variations among the applicants' bank reference letters, including ██████████████████████████████ the Johnson Consulting report described the letters in identical terms, merely listing the financial institutions that issued them. (*Id.* ¶ 48, 55.) The Johnson Consulting report also included employment projections that, as described above, Full House submitted well after the casino proposal submission deadline. (*Id.* ¶ 49; Pl. SJ Ex. 81 at 8.) In addition, Johnson Consulting report

did not reflect that North Point's proposal would be substantially reduced if the City certified multiple applicants, as Long had not shared that information Johnson Consulting. (SAF ¶ 56.)

The Johnson Consulting report assessed "that all [applicant] teams include seasoned professionals with skills and resources necessary to deliver a high-quality project to the Waukegan market." (SAF ¶ 53, Pl. SJ Ex. 81 at 10.) In keeping with the City's stated development objectives, Potawatomi's proposal was projected to generate the most annual employment, the most gaming revenue, and (after Rivers), the second-most gaming and admissions taxes for the City. (SAF ¶ 57.)

Nevertheless, the Johnson Consulting report awarded Full House the best "overall ranking," followed by North Point, then Rivers, and ranked Potawatomi last of the four proposals. (SAF ¶ 58.) At deposition, the two responsible Johnson Consulting representatives could not articulate any reproducible method by which they arrived at these rankings. (*Id.* ¶ 60.) What's more, they gave diametrically conflicting testimony about various criteria factored into their analysis. (*Id.* ¶ 59.) In particular, Johnson Consulting's principal claimed that the Potawatomi proposal's relatively high number of gaming positions was a strike against it, and—contrary to the City's RFQ—that Full House's and North Point's *lower* employment numbers were a plus for applicants, because more appropriate for the Waukegan market. (*Id.* ¶ 59.) In contrast, his associate testified that Potawatomi's high employment and relative size were positive factors. (*Id.*)

### Rivers Leverages the Waukegan Gaming Litigation

In the meantime, the lawsuit between the City and Waukegan Gaming had taken on increased significance for the City's RFQ process. Waukegan Gaming had become a partner in the Rivers casino proposal, and was represented in the lawsuit by counsel to Rush Street Gaming, one of the original partners in the Rivers proposal. (SAF ¶ 62.)

In late September 2019, Cunningham was deposed in the Waukegan Gaming litigation. (SAF ¶ 63.) Among the exhibits were text messages between Cunningham and Bond, including

some of the texts quoted above. (*Id.*) The exhibits also included interrogatory answers by the City that identified Maillard as one of the people "involved in the . . . drafting, and distribution of" the City's casino RFQ. (*Id.*; Pl. SJ Ex. 99 at 3.) Cunningham testified that Maillard should not have been listed, which led to the following question and the following false answer by Cunningham:

Q.     Did Mr. Maillard have any responsibility for the [RFQ] in any way?
A.     No.  (SAF ¶ 64.)[4]

The litigants took pains to keep discovery materials out of the public record. On October 15, 2019, they exchanged summary judgment briefs and submitted courtesy copies to the presiding judge, but managed to keep even the fact of their submissions off the public docket. (SAF ¶ 65.) On the afternoon of October 17, 2019, however, Waukegan Gaming's counsel put the City's counsel on notice that matters would escalate, and likely spill into public view, if the City Council did not pass the Rivers certification resolution at the special meeting set for that evening:

> As we have previously discussed, please be advised that if our client is not Certified by the City tonight, we will be filing a TRO and presenting the TRO for hearing tomorrow morning at our scheduled court date and time at 9:00 am.

> The TRO will seek an order enjoining the City of Waukegan from submitting any certifications to the gaming board until after the ruling(s) on the motions for summary judgment that are set for hearing on Monday, October 24. . . .   (*Id.* ¶ 66.)

### The October 17, 2019 Special City Council Meeting

Under the gaming expansion law, the Illinois Gaming Board may consider issuing a Waukegan casino license only after the City's "corporate authority" certifies to the Board that certain conditions have been satisfied with regard to a particular applicant, including that the applicant has negotiated with the corporate authority in good faith, and that the applicant and the

---

[4] A jury could find that this was not an innocent memory lapse. (*See* SAF ¶ 39 (Cunningham email directing that Maillard be added as one of two "project managers to the Casino RFP/Q" email address); *id.* ¶ 40 (Maillard was point of contact between Cunningham and others responding to RFQ-related questions).

corporate authority have "mutually agreed" on certain things—the permanent and temporary location of the casino, the sharing of casino revenues, and "any zoning licensing, public health or other issues within the jurisdiction of" the City. *See* 230 ILCS 10/7(e-5). Further, the City "must subsequently *memorialize the details* concerning the proposed riverboat or casino in a resolution that must be adopted by a majority of the corporate authority . . . *before any certification is sent to the Board.*" *Id.* (emphasis added).

Notwithstanding these mandatory preconditions, the City did not engage in negotiations to any extent with the casino applicants. (SAF ¶ 67.) Nor did the City "mutually agree" with any casino applicant on the items required by the statue. (*Id.* ¶ 68.) Indeed, corporation counsel Long testified at deposition that it was "fundamentally impossible" to agree on the required statutory items with multiple applicants. (*Id..*) Needless to say, therefore, the City could not possibly "memorialize the details" concerning a proposed casino in any resolution.

Instead, for its special meeting on October 17, 2019, Long placed before the City Council resolutions for each casino proposal that purported to follow the statute but actually fudged the requirements. First, although there had been no negotiations whatsoever between the City and any applicant, the resolutions recited, falsely, that the applicant "has negotiated with the Corporate Authority in good faith." (SAF ¶ 74, Pl. SJ Ex. 101 at 3, 7, 11; Pl. SJ Ex. 103 at 2.) Then the resolutions recited that the City and the applicant had mutually agreed "*in general terms*" on the required items. (*Id.*) Finally, although there had been no mutual agreement, much less agreement on "details," the resolutions purported to certify the "Applicant," "with the details of the mutual agreements included in the Applicant's Response to the City's Request for Proposals, . . . which [in certain cases] should be read in conjunction with any additional materials submitted by the Applicant." (*Id.*). To be clear, North Point's alternative, reduced proposal, which underscored the

lack of any "mutual agreement," went unmentioned to the City Council and unreferenced in the applicable resolution. (*Id.* ¶ 52.)

On the evening of October 17, 2019, Cunningham presided over the City Council's special meeting to consider the casino resolutions. (SAF ¶ 71.) Alderman Turner's sworn testimony in this case is that he received the following directive from the mayor just before the start of the meeting:

> A.      So as I sat on the dais waiting for the meeting to start, preparing, as the mayor entered, he came by, he had to pass by my chair, and he said to me, these are the three that **_we_** want to send to Springfield. Right. ***And that was what the vote was going to be.*** Right. Put those three down there.
>
> Q.      . . . And how did he identify the three that they wanted to send down, did he name them or did he point to something?
>
> A.      No. He named them.  (SAF ¶ 69.)

Once the special meeting began, no public comment was allowed. (SAF ¶ 70.) During the meeting, Johnson Consulting's principal, Charles Johnson, addressed the City Council about his report. (*See id.* ¶¶ 71-73.) Johnson advised that "the process does not allow for supplemental information [provided after the RFQ's submittal deadline] to be considered," and that such information therefore was not reflected in Johnson Consulting's report to the City, "nor from a purchasing standpoint can it be from a technical standpoint included in our analysis." (*Id.* ¶ 71.) This statement was false, as both Cunningham and Long had reason to know: Johnson Consulting's own report included employment projections—prominently displayed in graph form—that Full House had provided weeks after the submittal deadline. (*Id.* ¶¶ 48-49.)

Johnson told the City Council that all four applicants were "qualified" and "able to deliver the project." (SAF ¶ 73.) Referring to his firm's report, he remarked, "I think we provided a ranking based upon the information that was available to us based upon the proposals, which we've supplied in our report; but you can't go wrong with either—all four of these bidders, in our

judgment." (*Id.*) Asked whether any applicant raised "ethical considerations," Johnson responded, "We certainly did our due diligence in looking at the nature of the quality of the companies and all of them have high integrity and we did not see any ethical components at the principal level of the proposals." (*Id.* ¶ 72.) Yet just a few months earlier, in a letter the City attached to its complaint against Waukegan Gaming (now a partner in the Rivers proposal), Long had questioned whether Waukegan Gaming "would even qualify" for a casino license: given Waukegan Gaming's "past affiliation with [William Cellini]"—"a state power broker who fell from grace and influence to spend time in federal prison"—that was "somewhat questionable," Long had written. (*Id.* ¶ 36.)

When the vote was taken, four City Council members, and only four members, voted precisely as the mayor had instructed Turner—against the Potawatomi resolution and for the other three. (SAF ¶ 74.) The four—Bolton, Seger, Kirkwood, and Turner—were the same members whose candidacies had been underwritten by Bond's companies. The other two "pro-casino" members (Moisio and Newsome) voted *for* the Potawatomi resolution (*id.*):

| Council Member | Potawatomi | North Point (Lakeside) | Full House | Rivers |
|---|---|---|---|---|
| Bolton | No | Yes | Yes | Yes |
| Seger | No | Yes | Yes | Yes |
| Moisio | Yes | Yes | Yes | No |
| Kirkwood | No | Yes | Yes | Yes |
| Newsome | Yes | Yes | Yes | Yes |
| Turner | No | Yes | Yes | Yes |
| Rivera | No | No | No | No |
| Florian | No | No | No | No |
| Taylor | No | No | No | No |

When the City Council reconsidered the Potawatomi proposal four days later, on October 21, 2019, the result was the same, except that Florian voted in favor. Def. LR 56.1 Stmt. ¶ 60. Cunningham yelled at Florian just for signing a request to add the reconsideration motion to the October 21 meeting agenda (which the City refused to do). (SAF ¶ 79.)

**ARGUMENT**

## I.    The City Does Not "Enjoy Absolute Immunity" Against Potawatomi's Claims.

The City argues that it has "absolute immunity" against Potawatomi's federal and state claims. (City Mem. at 9-11.) The City is wrong on both fronts.

### A.    A State Statute Cannot Immunize the City Against Potawatomi's Federal Claim.

The City assumes that the Illinois General Assembly can grant immunity from federal claims. (City Br. at 10 (citing 745 ILCS 10/1-204).) But under our constitutional system, a state legislature has no such power.

In this case, "the Illinois Tort Immunity Act does not shield" the City from Potawatomi's § 1983 claim, "because under the Supremacy Clause of the United States Constitution, federal laws are supreme to state laws." *Thomas ex rel. Smith v. Cook County Sheriff*, 401 F. Supp. 2d 867, 875 (N.D. Ill. Sept. 25, 2005); *see Thomas v. Sheahan*, 499 F. Sup. 2d 1062, 1099 n.20 (N.D. Ill. 2007) (quoting same); *Pilditch v. Bd. of Ed. of the City of Chicago*, No. 90 C 5526, 1991 WL 195775, at *3 (N.D. Ill. Sept. 25 1991) (Hart, J.) ("Under the supremacy clause, . . . the Illinois Tort Immunity Act can not immunize defendants where the cause of action is based on a federal statute."); *see also Bryant v. Oak Forest High School Dist.*, No. 06 C 5697, 2007 WL 2738544, at *6 (N.D. Ill. Sept. 12, 2007) (Kocoras, J.) ("[The defendant] cannot be shielded from personal liability for violations of federal law by operation of a state law, because under the Supremacy Clause of the United States Constitution, federal law preempt conflicting state laws."); *Salazar v.*

*City of Chicago*, No. 84 C 10156, 1985 WL 2482, at *5 (N.D. Ill. Sept. 9, 1985) (Williams, J.) (holding same).

In short, the City has no immunity from liability for Potawatomi's § 1983 claim.

**B. The Illinois Tort Immunity Act Does Not Grant "Absolute Immunity" From Potawatomi's State Claims.**

Turning to Potawatomi's state claims, the City's immunity argument rests on § 2-104 of the Tort Immunity Act, which precludes liability arising from the grant or denial of "any permit, license, certificate, approval, order or similar authorization." 745 ILCS 10/2-104. Seizing on the Gambling Act's use of the word "certify," the City argues that Potawatomi's injuries fall "within the plain language of the Tort Immunity Act." (City Br. at 10.) But even assuming that § 2-104 theoretically might apply to the passage or refusal to pass resolutions in the form prescribed by the Gambling Act[5], that is not what the City did. Therefore, § 2-104 does not immunize the City.

As noted, the applicable statute provides that "the [Gaming] Board shall consider issuing a license . . . only after the corporate authority of the municipality . . . has certified to the Board" that certain things have occurred—"that the applicant has negotiated with the corporate authority in good faith," and that the applicant and the corporate authority have "mutually agreed" on certain items. 230 ILCS 10/7(e-5). Further, "[t]he corporate authority . . . must subsequently memorialize the details concerning the proposed riverboat casino in a resolution that must be adopted . . . before any certification is sent to the Board." *Id.*

---

[5] Particularly given that "the Tort Immunity Act was enacted in derogation of the common law and must therefore be strictly construed against the public entity" *Tree of Life Church v. City of Elgin*, No. 07 CV 0217, 2007 WL 2790763, at *7 (N.D. Ill. Sept. 24, 2007) (Aspen, J.) (internal quotations and citation omitted), it is questionable whether the resolutions at issue could be covered by § 2-104. Certifying to the Board that the preconditions to Board action have been met is not the same as issuing a "certificate" or any of the various authorizations listed in § 2-104. But because there are facts to support a finding that § 2-104 is inapplicable here, the Court need not reach that issue.

Yet, consistent with his view that the gaming expansion law "stinks," corporation counsel Long deemed the statute's requirement of mutual agreement "fundamentally impossible" to achieve given Waukegan's consideration of multiple applicants. (SAF ¶ 68.) So he drafted resolutions for the City Council reciting that the parties had mutually agreed "in general terms" on the required items. (SAF ¶ 74, Pl. SJ Ex. 101 at 3, 7, 11; Pl. SJ Ex. 103 at 2.) Although the City did not engage in negotiations to *any* extent with casino applicants (SAF ¶ 67), each resolution also recited that the statutory requirement of good-faith negotiation between the applicant and the corporate authority had been satisfied. (SAF ¶ 74, Pl. SJ Ex. 101 at 3, 7, 11; Pl. SJ Ex. 103 at 2.) And rather than "memorialize the details" concerning the proposed casino, as the Gambling Act requires, the City threw up its hands. (*Id.*)[6]

In other words the City just ignored those statutory requirements it found inconvenient. But a municipality is not free to tweak statutory mandates to suit its preferences, and the fact that the City *purported* to consider resolutions contemplated by the Gambling Act does not make it so. Because the City "acted outside its statutory authority" in voting on the statutorily non-compliant resolutions, "Section 2-104 does not apply." *Vill. of Itasca v. Vill. of Lisle*, 817 N.E. 160, 173 (Ill. App. Ct. 2d Dist. 2004); *see also* 745 ILCS 10/2-104 (immunity only where public entity "is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked"); *cf. Mueller by Math v. Cmty. Consol. Sch. Dist. 54*, 678 N.E.2d 660, 666 (Ill. App. Ct. 1st Dist. 1997) ("[T]he School District's failure to comply with the statutorily

---

[6] *See also* Pl. SJ Ex. 122 (Long 4/27/2021 Tr.) at 97:3-98:6 (resolutions "ask[] the Gaming Board to look at the entire package . . . It's up to you. . . . We have certified these candidates, we have given you all of their materials as they've supplemented them and as they originally submitted them, and now it's up to you to decide what you're going to do with it."); *id.* at 100:23-102:3 ("All we can do, Board, is give you the stuff. . . . You decide whether or not you're going to give them, this particular applicant, the license, and then send them back to us and we'll complete our negotiations.").

imposed condition precedent vitiates any immunity it might otherwise have enjoyed under section 2-201 of the Tort Immunity Act for hiring [an employee].").

The cases on which the City relies (at 9-11) are therefore inapposite. In *CDG Enterprises*, the tortious interference claim at issue arose from a village's denial of a zoning petition. *See Vill. Of Bloomingdale v. CDG Enters., Inc.*, 752 N.E. 2d 1090, 1093-94 (Ill. 2001). As the City notes, the Illinois Supreme Court refused to read an exception into § 2-104 for "corrupt or malicious" motives, and similarly rejected CDG's attempt to frame its claim as a challenge to "the process by which the Village denied the petition." *Id.* at 1099-1100. The holding in *Strauss v. City of Chicago*, also cited by the City, was similar. *See* –N.E.3d–, 2021 IL App (1st) 191977, ¶¶ 67-68 ("Alderman Moreno's personal motives, malicious though they may have been, do not preclude immunity under section 2-201."). Notably, *CDG* affirmed that that a municipality "cannot claim immunity for the improper performance of ministerial tasks." 752 N.E.2d at 1099. But the denial of the zoning petition, on which CDG's claim depended, was a discretionary task and entitled to immunity under § 2-104. *Id.* at 1000.

Here, in contrast, Potawatomi's state-law claim under the Gambling Act does not require inquiry into underlying motive or process. Nor does it turn on the decision whether or not to pass a particular resolution. Rather, the claim rests on the City's straightforward failure to do what the Gambling Act requires. The circumstances here are akin to those in *Village of Itasca.* There, the Village of Lisle claimed that its decision to enter into a tax rebate agreement with a company was discretionary and immunized under not only § 2-104 but also § 2-103 (covering the adoption or failure to adopt an enactment or enforce any law). 817 N.E. 2d at 172-73. The appellate court agreed that the decision whether to enter into a rebate agreement was discretionary and would be protected by tort immunity. *Id.* at 172. "However, [Lisle's] approval of the [rebate] contract, based

on its finding that the requisite statutory factors had been met . . . was ministerial, because the state statute prescribed the set of facts under which the municipality could enter into the rebate agreement." *Id.* "Because plaintiff alleges noncompliance with the ministerial (statutory compliance) aspects of Lisle's entering into the contract, Lisle is not immune from suit." *Id.* In addition, as noted, the court held that § 2-104 did not apply to actions "outside [a municipality's] statutory authority." *Id.* at 173.

Such is the case here. The resolutions considered at the October 17, 2019 special City Council meeting were not the resolutions required by the Gambling Act. Whatever discretion may attach to the City's selection among casino applicants, the City did not have discretion to depart from the Gambling Act's mandates. Because the City acted "outside its statutory authority" in ignoring the Act's ministerial requirements, it cannot claim immunity under § 2-104.

### C. Even Assuming the Tort Immunity Act Applied, It Would Bar Only Damages, Not the Other Relief Potawatomi Seeks.

There is an additional, independent reason why the Tort Immunity Act does not entitle the City to summary judgment: "Nothing in [the] Act affects the right to obtain relief other than damages against a local public entity or public employee." 745 ILCS 10/2-101. The Act simply does not apply to Potawatomi's requests for declaratory and injunctive relief. (Doc. 56 at 34-35; Doc. 85-1 at 44-45.) *See Raintree Homes, Inc. v. Vill. of Long Grove*, 807 N.E.2d 439, 444 (Ill. 2004) (holding that claim for declaratory relief and refund of impact fees paid to village was for "relief other than damages" and "excluded from the [Tort Immunity] Act"); *PACE v. Reg. Transp. Auth.*, 803 N.E.2d 13, 29 (Ill. App. Ct. 2d Dist. 2003) ("It is well settled that the Tort Immunity Act applies only to tort actions seeking damages and not to actions seeking injunctive relief.").

The same is true of Potawatomi's claim for a refund of the $25,000 "non-refundable application fee" it paid the City for the opportunity to participate in what discovery has revealed

to be a sham RFQ process. (SAF ¶ 80.) *See Raintree Homes,* 807 N.E.2d at 444-46 (citing authority noting that "sometimes courts use the term damages when they mean restitution," but holding that requested refund "may be properly designated as seeking an award of restitution"); *PACE*, 803 N.E.2d at 29 ("Although the complaint seeks 'damages,' the monetary award Pace seeks is not for tort damages but in effect back subsidies.").

## II. Because Potawatomi's § 1983 Claim Does Not Assert Sovereign Rights, It May Proceed Even Assuming Potawatomi Is An "Arm Of The Tribe."

The City contends that, as an arm of the "Potawatomi Tribe," Potawatomi is "a sovereign entity that cannot bring a § 1983 lawsuit." (City Br. at 12.) The City then attempts to demonstrate, at some length, that Potawatomi is indeed an "arm of the tribe." But the City needn't have bothered. The relationship between Potawatomi and the Forest County Potawatomi Community is irrelevant, because Potawatomi can bring its § 1983 claim regardless. The City's premise rests on a misstatement of the law. There is no *per se* ban on § 1983 suits by Indian tribes. Instead, a tribe's ability to sue under § 1983 turns on whether it seeks to vindicate a "sovereign right." *Inyo Cty., Cal. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701, 711 (2003). Because Potawatomi's §1983 claim in this case does not seek to vindicate a sovereign right, Potawatomi may pursue it, whether or not Potawatomi is an "arm of the tribe."

In *Inyo County*, the Supreme Court addressed whether an Indian tribe was a "person" permitted to sue under § 1983. 538 U.S. at 709–12. There, the tribe and its wholly-owned gaming corporation alleged they were immune from execution of a state search warrant due to the tribe's sovereign status. *Id.* at 704, 711. Reasoning that § 1983 "was designed to secure private rights against government encroachment, not to advance a sovereign's prerogative to withhold evidence relevant to a criminal investigation," *Id.* at 712 (internal citations omitted), the Court held that the

tribe "may not sue under § 1983 *to vindicate the sovereign right it here claims*," *Id.* at 711 (emphasis added).

Courts have read *Inyo County* not as categorically barring § 1983 suits by tribes but, rather, as holding that "the viability of a tribe's § 1983 suit depend[s] on whether the tribe's asserted right [is] of a sovereign nature." *Muscogee (Creek) Nation v. Oklahoma Tax Comm'n*, 611 F.3d 1222, 1234 (10th Cir. 2010); *see also Keweenaw Bay Indian Cmty. v. Rising*, 569 F.3d 589, 596 (6th Cir. 2009) (under *Inyo County*, tribe could assert § 1983 claim if claim was not "dependent on its status as a sovereign"); *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 514 (9th Cir. 2005) (*en banc*) (distinguishing between suits brought in "capacity resembling a private person" and those asserting sovereign rights) (internal quotations omitted); *Texas v. Ysleta del Sur Pueblo*, 367 F. Supp. 3d 596, 607 (W.D. Tex. 2019) (tribe could bring equal protection claim under § 1983 that "could plausibly be asserted by a nonsovereign entity"); *State Dep't of Health & Soc. Servs., Div. of Family & Youth Servs. v. Native Vill. of Curyung*, 151 P.3d 388, 398–99 (Alaska 2006) (native villages could sue under § 1983 on members' behalf).

To suggest otherwise, the City cites *Chemehuevi Indian Tribe v. McMahon*, 934 F.3d 1076, 1082 (9th Cir. 2019), for the proposition that "an Indian tribe 'may not sue under § 1983 . . . .'" (City Mem. at 13.) Unfortunately, the quotation is materially incomplete. In full, the sentence includes important qualifying language: "An Indian tribe 'may not sue under § 1983 *to vindicate'* *a 'sovereign right,' such as its right to be free of state regulation and control.*" 934 F.3d at 1082 (quoting *Inyo Cty.*, 538 U.S. at 712)[7]. Indeed, in *Keweenaw Bay Indian Community*, the Sixth

---

[7] The City partially quotes, out of context, a brief filed on the Forest County Potawatomi Community's behalf in another case. (City Br. at 13.) The full quote, with citation, is as follows: "In addition to ruling that Indian tribes do not qualify as a 'person' who may sue under § 1983, the Supreme Court explained 'that a Native American Tribe, like a State of the United States, is not a 'person' subject to suit under 42 U.S.C. § 1983. *Inyo*, 538 U.S. at 704." *Thurmond v. Forest County Potawatomi Community*, No. 2:18-CV-1047 (E.D. Wis.) (Doc. 26 at 7). Admittedly, the summary description of *Inyo County* is less precise than

Circuit expressly rejected the argument the City advances here—that an Indian tribe can never be a "person" within the meaning of § 1983. That interpretation, the Sixth Circuit reasoned, "would render the *Inyo County* Court's focus on 'the 'legislative environment' in which the word appears' and its distinction between private rights and sovereign rights completely superfluous and nonsensical, since it could merely have held, as the State suggests, that 'Indian tribes cannot be considered a 'person' and stopped there." 569 F.3d at 596 n.5.

Notably, in *Ysleta del Sur Pueblo*, the district court held an Indian tribe could sue under § 1983 based on allegations that the tribe was treated differently than other nontribal gaming entities. 367 F. Supp. 3d at 607. The court ruled that the claim was permissible under *Inyo County* because "[a] nonsovereign entity could bring a similar claim alleging that the State's enforcement structure violated its rights and singled it out for special treatment." *Id.*

So too here. Potawatomi's claim is not "based on Tribal treaties, sovereign immunity, or other privileges granted only to sovereigns." *Id.* at 606. Instead, Potawatomi's equal protection claim is one any casino applicant could bring, regardless of tribal status, and is thus permitted under § 1983.

## III.  Potawatomi's Equal Protection Claim Raises Material Fact Issues For Trial.

Contrary to the City's argument, there is abundant evidence that the City intentionally treated Potawatomi differently from similarly situated applicants, without any rational basis for doing so. Therefore, Potawatomi's equal protection claim must be decided by a jury.

---

it could have been, but the cited page in *Inyo County* makes clear the limitation of its holding: "We hold that, *in the situation here presented*, the Tribe does not qualify as a 'person' who may sue under § 1983." 538 U.S. at 704 (emphasis added). Moreover, as the City acknowledges, the issue in *Thurmond* was whether the tribe could be sued under § 1983, not its capacity to sue under the statute, in whatever circumstance. The City's reliance (at 13) on *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019), is also misplaced, as that case addressed whether tribal enterprises were entitled to sovereign immunity, not whether they could sue under § 1983.

**A. Whether the City Treated Potawatomi Differently Than Similarly Situated Applicants Is a Fact Issue for Trial.**

Based on the evidence, a jury could find that, from beginning to end of the RFQ process, the City intentionally treated Potawatomi less favorably than other, similarly situated applicants. The City's contrary argument rests on two errors, one factual and one legal. As a factual matter, the City urges an unduly narrow view of its own conduct, analyzing Potawatomi's claim as if it concerned solely the City Council's selection following a fair and open process. (City Mem. at 20-21.) As a legal matter, the City argues, incorrectly, that "[t]he casino license application process cannot support a class-of-one claim." (*Id.* at 19-20.) Neither defense holds water.

**1. A jury could find that the City treated Potawatomi differently than similarly situated casino applicants.**

There is compelling evidence that, over the course of the casino RFQ process, the City intentionally treated Potawatomi less favorably than it did other casino applicants:

- The City's RFQ prohibited contact between any applicant (including Potawatomi) and any City official. (SAF ¶32.) Yet, after the City released the RFQ, Cunningham reached out to Bond to let him know land was available that could help his casino proposal. (*Id.* ¶ 33.)

- After the RFQ submission deadline, with the City's knowledge and approval, Johnson Consulting solicited supplemental information from Full House, which Johnson Consulting included in its report. (SAF ¶ 49.) Yet when it came to Potawatomi, corporation counsel Long instructed Johnson Consulting (after consulting Cunningham) that supplemental information could not be considered in its analysis. (*Id.* ¶ 61.) Consistent with that directive, Johnson Consulting informed the City Council that Potawatomi's supplemental information could not be considered because it was submitted after the deadline—leaving the impression that Potawatomi sought an unfair advantage. (*Id.* ¶ 71.)

- In contrast, when Long determined that Bond's North Point group *was* seeking an unfair advantage—by conditioning its proposal on being the City's sole selection—Long did not disclose to the City Council even the fact that North Point had done so, leaving the City Council in the dark as to North Point's reduced proposal and unaware that Long believed North Point had behaved unfairly. (*Id.* ¶¶ 51-52.)

- Similarly, the Johnson Consulting report omitted negative information about Full House's finances that had been shared with Cunningham and Long—in particular, ██████ ████████████████████████████████████████████ ████████████ ████████████████████████████████████████████████████ ████████████████████████ (*Id.* ¶ 48, 54, 55.) Based on the evidence, a jury could also find that Johnson Consulting's last-place ranking of Potawatomi's proposal was predetermined by Cunningham's preferred outcome. (*Id.* ¶ 47-50, 53-60, 71-72.)

- Finally, in the crowning blow, rather than leaving matters to the City Council's "discretion," Cunningham *directed* at least one City Council member (and, a jury could find, at least three others) to vote for the three other proposals and not Potawatomi's. (¶ 69.) If that is not intentionally disparate treatment, it is hard to imagine what is.

Once Potawatomi's claim is accurately characterized—as involving the City's *treatment of Potawatomi throughout the RFQ process*—it is clear that Potawatomi was similarly situated to the other applicants, or at the very least the evidence would support such a finding at trial. *See* City Br. at 19 ("[W]hether individuals are similarly situated is ordinarily a factual question reserved for the jury."). Of course, as the City observes, there were differences among the applicants and their proposals. For purposes of evaluating the disparate treatment summarized above, however, Potawatomi and the other applicants were similarly situated. Johnson Consulting itself

acknowledged "that all [applicant] teams include seasoned professionals with skills and resources necessary to deliver a high-quality project to the Waukegan market," and that "you can't go wrong with . . . all four of these bidders." (SAF ¶ 73; Pl. SJ Ex. 81 at 10.). Like its competitors (or even more so), Potawatomi was a credible applicant that paid the requisite $25,000 fee and was entitled to a fair, non-discriminatory process. That is not the treatment it received from the City, however.

**2. The City's attempt to shield its discriminatory conduct "as a matter of law" relies on out-of-circuit precedent that is contrary to governing Seventh Circuit case law.**

For its argument that the casino licensing process is off limits "as a matter of law," the City relies on the First Circuit's decision in *Caesars Mass. Mgmt. Co., LLC v. Crosby*, 778 F.3d 327 (1st Cir. 2015). That reliance is misplaced.

In *Crosby*, the First Circuit extended the Supreme Court's holding in *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 598 (2008)—"that the class-of-one theory of equal protection has no application in the public employment context"—to the casino-licensing context, holding, as a categorical matter, that a casino-licensing determination can never give rise to a class-of-one claim. *Crosby*, 778 F.3d at 336-37. In so holding, the First Circuit sided "with those federal courts that have found [*Engquist*] applicable beyond government staffing," including the Eight Circuit in *Flowers v. City of Minneapolis*, 558 F.3d 794 (8th Cir. 2009). *Crosby*, 778 F.3d at 336.

The problem for the City is that the Seventh Circuit is not among "those federal courts" the First Circuit joined in *Crosby*. In *Hanes v. Zurick*, 578 F.3d 491 (7th Circ. 2009), the Seventh Circuit declined to extend *Engquist* to foreclose class-of-one claims relating to police conduct. *See Hanes*, 578 F.3d at 495 ("*Engquist* does not support the officers' argument that malicious police conduct is off-limits from class-of-one claims."). *Hanes* rejected the defendants' invitation to follow the Eighth Circuit's *Flowers* decision—the very precedent the First Circuit embraced in *Crosby*. *Id.*; *see also Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 141-42 (2d Cir.

2010) (describing circuit split and "join[ing] the Seventh Circuit in holding that *Engquist* does not bar all class-of-one claims involving discretionary state action").

Six years later, borrowing a phrase from *Engquist*, the Seventh Circuit noted in *Miller v. City of Monona* that local land-use decisions "'involve discretionary decisionmaking based on a vast array of subjective, individualized assessments.'" 784 F.3d 1113, 1119 (7th 2015) (quoting *Engquist*, 553 U.S. at 603). Nevertheless, contrary to the First Circuit in *Crosby* and the tack the City urges here, *Miller* did not apply *Engquist* to bar all class-of-one claims involving land-use determinations. Notwithstanding the broad discretion and "subjective, individualized assessments" those determinations entail, *Miller* applied the Seventh Circuit's existing class-of-one framework. 784 F.3d at 1120.

In sum, the City's categorical argument—that the casino licensing process cannot support a class-of-one claim as a matter of law—is at odds with controlling Seventh Circuit precedent and thus provides no basis for summary judgment.

### B. A Jury Could Find That There Was No Conceivable Rational Basis for the City's Discriminatory Treatment of Potawatomi.

It goes without saying the City had an interest in conducting a fair and transparent RFQ process that generated the best possible proposals and enabled the City Council to evaluate them on the basis of the best available information.

The City's discriminatory treatment of Potawatomi was, therefore, contrary to the City's own self-interest. That is the height of irrationality. There was no conceivable rational justification for violating the RFQ's no-contact rule to favor North Point with information not available to other applicants; for leading the City Council to understand that ███████████████████ ██ ████████████████████████████████████████████████████████████████ for allowing Full House's supplemental information, but not Potawatomi's, to be considered, and then advising

the City Council that the "process" did not allow supplementation; or for withholding from the City Council the fact that North Point had made an alternative, reduced proposal to gain an unfair advantage. Nor was there any rational justification, when the City Council was supposedly meeting in "open" session, for Cunningham to direct City Council members, in off-the-record side discussion, to vote a certain way based on his own personal whim.

At a minimum, a jury could make these findings, which precludes summary judgment. *See Frederickson v. Landeros*, 943 F.3d 1054, 1064-65 (7th Cir. 2019) (affirming denial of summary judgment on class-of-one claim and admonishing that to accept defendant's stated rational purpose would be to "slip into the forbidden realm of disputed facts"); *see also Cruz v. Town of Cicero*, 275 F.3d 579, 589 (7th Cir. 2001) (upholding plaintiff's verdict despite evidence "which, if believed by a jury, would have put this case in the category of a run-of-the-mill zoning dispute").

## C. Evidence of the City's Improper Motive Confirms Potawatomi's Right to a Trial on Its Equal Protection Claim.

The role of improper motive in a class-of-one claim is unsettled in the Seventh Circuit. *See generally Del Marcelle v. Brown County Corp.*, 680 F.3d 887 (7th Cir. 2012) (*en banc* opinions disagreeing on treatment of improper motive). Nevertheless, there is consensus that, where evidence of improper motive exists, the burden to identify similarly situated comparators is less exacting. *See FKFJ, Inc. v. Village of Worth*, 111 F.4th 574, 589 (7th Cir. 2021) ("[W]e have overlooked failure to strictly comply with the similarly situated element in a very limited number of class-of-one cases where animus is readily apparent.") (citing *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013)); *Swanson*, 719 F.3d at 784 ("If animus is readily obvious, it seems redundant to require that the plaintiff show disparate treatment in a near exact, one-to-one comparison to another individual.") (reversing grant of summary judgment).

In addition, "the presence of animus is powerful evidence of potentially irrational government conduct." *Frederickson*, 943 F.3d at 1066. In this context, "animus" encompasses not just personal dislike but also illegitimate purpose unrelated to an official's public duties. *See Cruz*, 275 F.3d at 589 ("Hostility stemming from a person's failure to contribute to a politician's campaign fund . . . falls in the category of 'totally illegitimate animus.'").

As shown above, even without regard to motive, Potawatomi has presented trial-worthy evidence of irrational discrimination. But summary judgment is all the more unwarranted given the ample evidence, described in detail above, that the City's RFQ process was rigged. Based on Bond's campaign largesse and personal connection to Cunningham, North Point indeed had the inside track. But given public scrutiny of the Bond connection, the City also favored Full House as a relatively weak competitor that could "quash" the (accurate) perception of bias toward North Point. The selection of Rivers does nothing to negate this inference, because Rivers punched its own ticket in the form of damaging information it unearthed in the Waukegan Gaming litigation. Hence Cunningham's directive to send North Point, Full House and Rivers, but not Potawatomi, to the Illinois Gaming Board.

Moreover, while summary judgment is not the place to weigh evidence, the evidence of improper motive is compelling. Not only is there Bond's past support for Cunningham's campaign; there are text messages showing their ongoing affinity and collaboration. (SAF ¶¶ 26-31.) Bond's campaign finance network didn't just contribute to City Council campaigns; Bond first invited a parade of candidates to Tap Room for his casino pitch. (*Id.* ¶ 8.) Through Kozlowski and a Tap Room-funded "industry association," Bond then set up Bolton, Seger, Kirkwood, and Turner with a ready-made campaign operation. (*Id.* ¶ 14.) The same industry association financed a legal challenge to Seger's and Bolton's primary opponents. (*Id.* ¶ 15.) Kirkwood's business earned

substantial sums from Tap Room's gaming devices. (*Id.* ¶ 25.) Even as Bond prepared to pitch his casino vision to her, Bolton discussed with Kozlowski possible ways Bond could support businesses in her ward. (*Id.* ¶ 12.)[8] Weeks *after* the election, Bond's campaign finance network contributed to Turner's campaign, enabling Turner to repay himself money he'd loaned the campaign. (*Id.* ¶ 24.) Before the City even received casino proposals, Cunningham telegraphed the City's intention to certify "multiple" applicants. (*Id.* ¶ 38.) As discussed, Cunningham then ignored obvious holes in Full House's proposal, which the City invited Full House to plug. (*Id.* ¶¶ 48-49.) Johnson Consulting's principals provided vague and contradictory testimony about the opaque methodology behind its rankings—rankings Cunningham publicly touted as the reason Potawatomi's proposal wasn't advanced, when he knew he had instructed the Bond-backed City Council members how to vote. (*Id.* ¶¶ 59-60, 75.)

In addition, a jury could find that City officials made false and misleading statements to obscure Bond's influence or otherwise benefit North Point. A prime example is Cunningham's false testimony in the Waukegan Gaming litigation that Maillard, the mayoral aide who was a former Tap Room employee and Bond staffer, had no responsibility for the RFQ "in any way." (*Id.* ¶ 64.) A jury could also find that the Bond-backed City Council members testified falsely in this case about why they voted against Potawatomi's proposal. (Pl. LR 56.1 Resp. ¶¶ 49-52.) Although Kozlowski was there for Seger's tour of Tap Room and later informed candidates of his connection to the company, Seger testified, incredibly, that he was unaware of Kozlowski's connection to Bond. (SAF ¶¶ 11, 14, 17.) Such deliberate falsehoods, if found by a jury to be such, would be powerful evidence of improper motive, as would the City's failure to disclose casino-related contacts with Bond and North Point to the Illinois Gaming Board. (*Id.* ¶ 34, 52.)

---

[8] In July 2019, after Maillard intervened, Bolton reversed a previous vote and voted in favor of an ordinance favorable to the video gaming industry. (SAF ¶ 13.)

## IV.    Potawatomi Is Entitled To Invoke The Gambling Act.

The City argues that, even assuming it violated the Illinois Gambling Act (which it assuredly did), there is no private right of action, and, in any case, Potawatomi failed to exhaust administrative remedies. (City Br. at 23-28.) Both arguments badly misread Illinois law.

### A.    Potawatomi Has a Private Right of Action for the City's Violation of the Gambling Act's Certification Provisions.

The City asserts that, because the Gambling Act is "enabling legislation," it cannot imply a private remedy. (City Mem. at 24.) That argument is at odds with numerous Illinois decisions implying a private right of action where, as here, a public body violates specific statutory provisions within a larger piece of "enabling" legislation.

As a general matter, Illinois law is clear that "it is not necessary to show a specific legislative intent to create a private right of action." *Sawyer Realty Group, Inc. v. Jarvis Corp.*, 432 N.E. 2d 849, 852 (Ill. 1982). Illinois courts "have continually demonstrated a willingness to imply a private remedy where there exists a clear need to effectuate the purpose of an act." *Id.* at 853; *see generally Stanley Magic-Door, Inc. v. City of Chicago*, 393 N.E.2d 535, 537 (Ill. App. Ct. 1st Dist. 1979) ("[I]t has long been recognized that in general state courts are much more willing than federal courts to recognize standing to appeal on the part of any appellant who shows that he was in fact aggrieved by the administrative order, and palpable economic injuries have long been recognized as sufficient to lay the basis for standing with or without a specific statutory provision for judicial review.").

Applying that principle in a closely analogous context, Illinois courts have repeatedly implied private remedies for violations of statutory bidding requirements within larger enabling legislation. *See L.E. Zannini & Co., Inc. v. Bd. of Ed., Hawthorn Sch. Dist. 73*, 486 N.E.2d 424, 428-31 (Ill. App. Ct. 2d Dist. 1985) (unsuccessful bidder had standing to challenge contract award

under Illinois School Code); *State Mech. Contractors, Inc. v. Village of Pleasant Hill*, 477 N.E. 2d 509, 511 (Ill. App. Ct. 4th Dist. 1985) (same for Municipal Code) (citing *Stanley Magic-Door*, *supra*); *Cardinal Glass Co. v. Bd. Of Ed. of Mendota Cmty. Consol. Sch. Dist. No. 289*, 447 N.E.2d 546, 548-49 (Ill. App. Ct. 3d Dist. 1983) (recognizing private remedy for violation of contracting provision in Illinois School Code); *see also Court St. Steak House, Inc. v. County of Tazewell*, 643 N.E.2d 781, 784 (Ill. 1994) (under contracting provision in Illinois Counties Code, "*mandamus* will issue if a plaintiff alleges and proves fraud, lack of authority, unfair dealing, favoritism, or similar arbitrary conduct by a county").[9]

*Alarm Detection Systems,* on which the City relies, is inapposite. (*See* City Br. at 24 (citing *Alarm Detection Sys. Inc. v. Orland Fire Prot. Dist.*, 194 F. Supp. 3d 706, 714 (N.D. Ill. 2016).) There, rather than allege violation of specific statutory requirements, the plaintiff asserted a more generalized claim that fire protection districts lacked authority "to engage in fire alarm 'monitoring for fees.'" 194 F. Supp. 3d at 712. This was the context for the district court's observation that the Fire Protection District Act was "not the type of legislation that usually provides for a private right of action under Illinois law." 194 F. Supp. 3d at 714. Here, in contrast, Potawatomi alleges the City's non-compliance with specific statutory mandates governing the certification process. Moreover, even in *Alarm Detection Systems*, the court did not purport to identify a hard-and-fast rule but instead proceeded to evaluate the availability of a private remedy in that case using the familiar four factors. 194 F. Supp. 3d at 714-16.

---

[9] For such state-law claims, available remedies do not include lost profits but include declaratory and injunctive relief as well as recovery of expenses incurred in the bidding process (which are among the remedies Potawatomi has sought here). (SAF ¶ 80.) *See Court St. Steak House*, 643 N.E. 2d at 785-86; *State Mech. Contractors*, 477 N.E.2d at 511-512.

In this case, those factors weigh in favor of implying a private right of action. First, an implied private remedy is both consistent with and necessary to effectuate the Gambling Act's purposes, which include maintaining "public confidence and trust in the credibility and integrity of the gaming operations and the regulatory process." 230 ILCS 10/2(b).[10] Under the Act, only parties "aggrieved by an action *of the Board* denying, suspending, revoking, restricting or refusing to renew *a license*" may request a Gaming Board hearing. 230 ILCS 10/5(b)(1) (emphasis added). Absent an implied right of action, therefore, a municipality's power to decide which applicants are even considered by the Board will be largely unchecked. Moreover, as Illinois courts have recognized in the public contracting context, implying a private remedy for an unsuccessful applicant is the most effective way to achieve the Act's purposes. *See Cardinal Glass*, 447 N.E.2d at 549 ("[S]ecuring compliance with the statute, and thereby the benefits to taxpayers, will be more effectively handled by unsuccessful bidders, who for the most part have a greater stake in such matters . . ."); *Keefe-Shea Jt. Venture v. City of Evanston*, 773 N.E.2d 1155, 1162 (Ill. App. Ct. 1st Dist. 2002 (quoting same); *L.E. Zannini*, 486 N.E.2d at 430 (same).

Second, although the Act has a public purpose, Potawatomi is among the beneficiaries of the Act and has suffered an injury the Act was designed to prevent. As shown above, the Act's requirement of negotiation and "mutual agreement" on "details" concerning casino proposals benefits applicants at the municipal level. To take a prime example: had the City sought "mutual agreement" with applicants before voting on certifying resolutions, as required, it could not have swept North Point's reduced proposal under the rug. *See Keefe-Shea*, 773 N.E.2d at 1162 ("'The duty to award the contract to the lowest responsible bidder is owed both to the taxpaying public

_____

[10] *See also* 230 ILCS 10/5.3(a) ("Officials and employees of the corporate authority of a host community must carry out their duties and responsibilities in such a manner as to promote and preserve public trust and confidence in the integrity and conduct of gaming.").

and to the bidders, who are made an integral part of the statutory scheme.'") (quoting *Cardinal Glass*, 447 N.E.2d at 549); *L.E. Zannini*, 486 N.E.2d at 430 (same); *Stanley Magic-Door*, 393 N.E.2d at 537 ("[I]t is precisely such persons as the plaintiff who would have the incentive to challenge improper governmental action since they are the ones most directly injured by it . . . ").

In sum, Potawatomi's Gambling Act claim presents precisely the circumstances in which Illinois courts have not hesitated to imply private remedies.

### B. The City's "Exhaustion" Argument Is Baseless.

First, because Potawatomi does not claim to be "aggrieved by the action of an administrative agency" (City Mem. at 26-27), the exhaustion doctrine does not come into play. The City's own (inapposite) cases underscore this point. *See Castaneda v. Ill. Human Rights Comm'n*, 547 N.E.2d 437, 438-39 (Ill. 1989) (noting general rule applicable to "[p]arties aggrieved by the action of an administrative agency," and holding that "petitioners seeking judicial review of decisions by three-member panels of the Human Rights commission must seek an *en bloc* rehearing before the Commission in order to exhaust their administrative remedies . . . ."); *Emerald Casino, Inc. v. Ill. Gaming Bd.*, 852 N.E. 2d 512, 514-15 (Ill. App. Ct. 1st Dist. 2006) (noting same general rule and holding that, "[b]ecause Emerald is presently pursuing review [of Gaming Board license revocation] in the Fourth District, . . . Emerald cannot seek the same relief . . . in this appeal"); *Gonzalez v. O'Connell*, 355 F.3d 1010 (7th Cir. 2004) (*habeas* challenge to immigration judge's detention under Immigration and Nationality Act).

Noting the Gaming Board's statutory authority to conduct "all hearings pertaining to civil violations of" the Act "or rules and regulations promulgated hereunder," the City suggests that Potawatomi's Gambling Act claim "should have been presented to the Gaming Board." (City Mem. at 27.) But the City does not explain how this could be done. Tellingly, the City points to no statute, rule, or regulation providing for a hearing to challenge a municipality's certification

process. As noted, the Act permits "a party aggrieved *by an action of the Board* denying, suspending, revoking, restricting or refusing to renew a license" to request a hearing before the Board." 230 ILCS 10/5(b)(1). Because Potawatomi is not such a party, it obviously cannot avail itself of this mechanism. Therefore, even if the "exhaustion" doctrine somehow applied as a theoretical matter, any exhaustion requirement would be excused. *Castaneda*, 132 Ill. 2d at 308-09 (exception to exhaustion doctrine "where the agency cannot provide an adequate remedy or where it is patently futile to seek relief before the agency").

Aware of this reality, the City suggests that the City Council itself is the relevant "administrative agency" for exhaustion purposes. (City Mem. at 27-28 (citing *Peeples v. Vill. Of Johnsburg*, 932 N.E.2d 612, 617 (Ill. App. Ct. 2010).) There are a couple of problems with this argument. First, assuming the City Council played an "administrative" role, it did not conduct the type of hearing that triggers the exhaustion requirement. *See Peeples*, 932 N.E.2d at 618 (holding that trial court did *not* err "in providing a full forum for the presentation of all admissible evidence . . . rather than applying the procedures of administrative review," but hypothesizing that different conclusion would be possible if village had conducted hearing "with the opportunity to present testimony under oath, cross-examine witnesses, and present other admissible evidence"). Second, to the extent Potawatomi was required to "exhaust" before the City Council, it more than did so. Indeed, it was unsuccessful upon *reconsideration* of the certifying resolution for its proposal.[11]

In sum, the City cannot shield its conduct behind the exhaustion doctrine.

---

[11] Citing *Gonzalez*, the City also tries to equate Potawatomi's equal protection claim with its state statutory claim. (City Br. at 28 (citing *Gonzalez* for the notion that "the premise of [the] constitutional argument is statutory"). But Potawatomi's federal and state claims are distinct, and nothing in *Gonzalez* suggests otherwise. The sentence immediately following the City's quoted passage makes this clear. *See Gonzalez*, 355 F.3d at 1017 ("Mr. Gonzalez argues that, because he has raised a good-faith argument that he is not in fact deportable under the statute, to mandatorily detain him under § 1226(c) would violate his rights to due process under the law.").

## V.  Potawatomi Is Entitled To A Trial On Its Open Meetings Act Claim.

### A.  The City Violated the Open Meetings Act on October 17, 2019.

Neither of the City's arguments regarding the October 17, 2019 meeting satisfy its burden to demonstrate the absence of a trial-worthy issue.

First, the City insists that the October 17, 2019 meeting was a special meeting. This is true but irrelevant. The City Code provides that the first order of business at "each meeting" shall be "audience" time. Code of Ordinances of Waukegan, Illinois, ("Code") § 2-62.[12] There is no separate rule for *special* meetings. *See* Code § 2-41 ( "'meeting' as used in this Code" has same meaning as in Open Meetings Act); Code § 2-61 ("The rules established by this division shall govern conduct of the council meetings."). Under the Open Meetings Act, therefore, the City was required to allow audience time at the October 17, 2019 special City Council meeting. *See* 5 ILCS 120/2.06(g) ("Any person shall be permitted an opportunity to address public officials under the rules established and recorded by the public body.").

Second, the City argues that the October 17 *special meeting* was a continuation of the September 18 *public hearing*. That claim, however, is disputed, and thus cannot support summary judgment. (Pl. LR 56.2 Resp. ¶ 44.) As a practical matter, moreover, the City's refusal to allow public comment on October 17 foreclosed any opportunity to address the Johnson Consulting report, which the City did not receive until after any earlier opportunity for comment had expired. (*Id.*; SAF ¶ 53.) A jury could also find that the refusal to allow public comment was of a piece with Cunningham's efforts to direct the outcome of the vote ahead of the formal public meeting.

---

[12] The City Code provisions are available at https://library.municode.com/il/waukegan/codes/code_of_ordinances?nodeId=COOR_CH2AD_ARTIICICO_DIV1GE_S2-41MEDEATELME.

**B. The Evidence Supports a Finding That the City Improperly Refused to Put the Reconsideration Request on the October 21, 2019 Meeting Agenda.**

Potawatomi alleges that the City also violated the Act by refusing to place on the October 21, 2019 meeting agenda the request for reconsideration of the City Council's October 17 vote on the resolution for Potawatomi's proposal. The City argues that its failure to do so was the result of Potawatomi's "own frantic, last-minute request." (City Mem. at 32.) That argument is better addressed to the trier of fact. There is compelling evidence that the City received the request in time to place it on the agenda, but simply refused. (SAF ¶¶ 77, 79.) In fact, shortly after receiving the agenda, Cunningham and the City clerk called Florian, one of the City Council members who signed the request, yelling at her that they would not place the request on the agenda. (*Id.* ¶ 79.)

The City also argues that nothing precluded the City from taking up the motion for reconsideration, but that is a red herring. Potawatomi's claim is that the City was required to place the request on the meeting agenda. Notice protects the right to be heard, allowing City Council members and the public to prepare for discussion and investigate the merits of agenda items. The City's failure to notice the reconsideration motion should be evaluated in light of its earlier refusal to allow public comment at the October 17, 2019 meeting.

**C. The Appropriate Remedy for the City's Violations Presents a Disputed Fact Issue.**

The City argues that, even if it violated the Open Meetings Act, because the meetings in question were "open," voiding the City Council's actions is unwarranted. (City Mem. at 33.) Yet, in light of Cunningham's statement to Turner outside of public earshot, whether those meetings were truly "open" is an open question. (SAF ¶ 69 ("these are the three that we want to send to Springfield"; "that was what the vote was going to be").) Particularly given Cunningham's use of the collective "we" and his apparent confidence in what the outcome "was going to be," a jury could find that the meetings were not truly "open"—that Cunningham had engaged in serial

communication with and secured advance agreement of City Council members with the intent to circumvent the Act. If so, that would be a basis to void the City Council's certification votes. *Cf. Gerwin v. Livingston Cty. Bd.*, 802 N.E. 2d 410, 415 (Ill. App. Ct. 4th Dist. 2003) (in case involving "convenient" meeting place requirement, rejecting claim "that the Act requires only 'open' meetings in the technical sense," and instructing that "[t]he overall purpose of the Act is to prohibit secret deliberation") (internal quotations and citation omitted); *see Esperanza Peace and Justice Ctr. v. City of San Antonio*, 316 F. Supp. 2d 433, 472-77 (W.D. Tex. 2001) (finding Texas Open Meetings Act violation where "Mayor met and spoke with groups of council members of less than a quorum to reach a 'consensus' . . . prior to the formal meeting").[13] Accordingly, the question of remedy must be determined at trial.

## CONCLUSION

For the above reasons, the City's motion for summary judgment should be denied.[14]

Dated:  October 29, 2021

Respectfully submitted,

/s/ Dylan Smith
Michael J. Kelly
Dylan Smith
Martin Syvertsen
FREEBORN & PETERS LLP
311 S. Wacker Drive, Suite 3000
Chicago, Illinois 60606
(312) 360-6000
mkelly@freeborn.com
dsmith@freeborn.com
msyvertsen@freeborn.com

---

[13] *See also Booth Newspapers, Inc. v. Wyoming City Council*, 425 N.W.2d 695, 701 (Mich. Ct. App. 1988) ("To accept the city council's suggestion that a public body can avoid the OMA by deliberately dividing itself into groups of less than a quorum and still deliberate on public policy would circumvent the legislative principles as well as the overall objective of the OMA to promote openness and accountability in government.").

[14] With the limited exception that Potawatomi does not contest that punitive damages are unavailable.

Robert T. O'Donnell
Hayleigh Herchenbach
O'DONNELL CALLAGHAN LLC
28045 N. Ashley Circle, Suite 101
Libertyville, Illinois 60048
(847) 367-2750
rodonnell@och-law.com
hherchenbach@och-law.com

*Counsel for Plaintiff Waukegan*
*Potawatomi Casino, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he caused the foregoing **Plaintiff Waukegan Potawatomi Casino's Memorandum in Opposition to Defendant City of Waukegan's Motion for Summary Judgment,** as well as the accompanying **Plaintiff's LR 56.1 Response to Defendant's Statement of Material Facts**, and **Plaintiff's LR 56.1 Statement of Additional Material Facts** (with exhibits), to be served on defendant's counsel of record via the following email addresses:

glenn.davis@heplerbroom.com
charles.insler@heplerbroom.com

Dated: October 29, 2021

/s/ Dylan Smith