# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| WAUKEGAN POTAWATOMI CASINO, LLC, an Illinois limited liability company, | |
| Plaintiff, | No. 20-cv-00750 |
| v. | |
| CITY OF WAUKEGAN, an Illinois municipal corporation, | Judge John F. Kness |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

This case arises from the City of Waukegan's refusal to certify Plaintiff, an arm of the Potawatomi Indian Tribe, to the Illinois Gaming Board for the issuance of a casino license. After the Illinois legislature amended the Illinois Gambling Act to authorize its Gaming Board to issue one casino license in the City of Waukegan, the City invited prospective casino applicants to submit their proposals for a casino at available sites. Four experienced casino operators submitted their materials. Under the Illinois statute, to be eligible for consideration by the Gaming Board, casino applicants had to first obtain the City's certification. And to obtain a City certification, the statute provided certain prerequisites. On October 17, 2019, the City Council voted against certifying Plaintiff to the Gaming Board. On October 21, 2019,

the City granted Plaintiff's motion to reconsider and again voted against certifying Plaintiff.

Plaintiff originally filed this lawsuit in state court on October 21, 2019, a few hours before the City voted on Plaintiff's motion for reconsideration. The City removed the case to federal court based on federal question and supplemental jurisdiction. Plaintiff's operative complaint includes one claim under 42 U.S.C. § 1983 on the ground that the Gaming Board intentionally discriminated against Plaintiff by refusing to certify it to the Gaming Board in violation its Fourteenth Amendment Equal Protection rights, and two state-law claims under the Illinois Gambling Act and the Illinois Open Meetings Act. The City has since filed a motion for summary judgment.

As explained more fully below, Plaintiff, as a sovereign entity with openly sovereign interests, is not "person" entitled to bring a claim under § 1983. Even if Plaintiff's interests could be characterized as non-sovereign in nature, Plaintiff nevertheless does not fall within the "zone of interests" protected by § 1983. In any event, Plaintiff has failed to establish a § 1983 Equal Protection violation claim as a matter of law. No reasonable jury could find that Plaintiff was similarly situated to the other casino license applicants, and sufficient rational bases exist for the City's decision not to certify Plaintiff. Accordingly, Defendant's motion for summary judgment is granted, and the Court declines to retain jurisdiction over Plaintiff's remaining state-law claims.

## I.    BACKGROUND

Plaintiff Waukegan Potawatomi Casino LLC ("WPC") is an Illinois limited liability company fully owned by the Forest County Potawatomi Community of Wisconsin, descendants of the Potawatomi Indian Tribe (the "Potawatomi Tribe"). (Response to Defendant's Statement of Material Facts, ("Resp. Def. SOF"), Dkt. 127 (filed under seal) ¶¶ 12, 66–67.) The Potawatomi Tribe, doing business as the Potawatomi Hotel & Casino, formed Plaintiff WPC on October 11, 2019. (*Id.* ¶¶ 14, 70.) The Potawatomi Tribe is the sole member of Plaintiff WPC. (*Id.* ¶ 12.) The Potawatomi Tribe is a government and has a government-to-government relationship with the federal government. (*Id.* ¶ 62.) Plaintiff's board of directors was appointed by the Potawatomi Tribe, which also pays Plaintiff's bills. (*Id.* ¶¶ 81, 83.) Plaintiff does not have any employees and did not have a bank account in 2019. (*Id.* ¶¶ 74, 82).

On June 28, 2019, Illinois Senate Bill 690 went into effect, amending the Illinois Gambling Act to authorize the Illinois Gambling Board ("IGB") to issue a casino license in the City of Waukegan, Illinois. (Resp. Def. SOF ¶¶ 1, 2; *see also* 230 ILCS § 10/7(e-5). Under the statute, the IGB was required to consider issuing a license "only after the [City of Waukegan] has certified to the Board" certain information. *Id.* To be eligible for consideration by the IGB, the City of Waukegan had to certify:

(i)    That the applicant has negotiated with the corporate authority or county board in good faith;

(ii)    That the applicant and the corporate authority or county board have mutually agreed on the permanent location of the riverboat or casino;

(iii)   That the applicant and the corporate authority or county board have mutually agreed on the temporary location of the riverboat or casino;

(iv)   That the applicant and the corporate authority or county board have mutually agreed on the percentage of revenues that will be shared with the municipality or county, if any;

(v)   That the applicant and the corporate authority or county board have mutually agreed on any zoning, licensing, public health, or other issues that are within the jurisdiction of the municipality or county;

(vi)   That the corporate authority or county board has passed a resolution or ordinance in support of the riverboat or casino in the municipality or county;

(vii)   The applicant for a license under paragraph (1) has made a public presentation concerning its casino proposal; and

(viii)   The applicant for a license under paragraph (1) has prepared a summary of its casino proposal and such summary has been posted on a public website of the municipality or the county.

*Id.*

The statute further provides:

At least 7 days before the corporate authority of a municipality or county board of the county submits a certification to the Board concerning items (i) through (viii) of this subsection, it shall hold a public hearing to discuss items (i) through (viii), as well as any other details concerning the proposed riverboat or casino in the municipality or county. The corporate authority or county board must subsequently memorialize the details concerning the proposed riverboat or casino in a resolution that must be adopted by a majority of the corporate authority or county board before any certification is sent to the Board. The Board shall not alter, amend, change, or otherwise interfere with any agreement between the applicant and the corporate authority of the municipality or county board of the county regarding the location of any temporary or permanent facility.

*Id.*

On July 3, 2019, the City of Waukegan issued a Request for Qualifications and Proposals ("RFQ/P") for those applicants seeking certification by the City to the IGB. (Resp. Def. SOF ¶ 4.) The RFQ/P required applicants to submit materials by August

4

5, 2019, including property specifications and locations, a description of the proposed development, project team experience, and financial data. (*Id.* ¶¶ 6–7.) Five applicants responded to the RFQ/P with proposals for a casino, but one withdrew. (*Id.* ¶ 8.) The remaining four applicants were: (1) Lakeside Casino LLC ("North Point"); (2) CDI-RSG Waukegan, LLC ("Rivers"); (3) Full House Reports, Inc. ("Full House"); and (4) the Potawatomi Tribe, doing business as the Potawatomi Hotel & Casino (which later formed Plaintiff WPC). (*Id.* ¶¶ 8, 63, 70.)

Each applicant had experience in the casino business. North Point's casino operator, Warner Gaming, operates six casino properties in four states. (*Id.* ¶ 9.) Full House is a publicly traded company that runs five casinos in four states. (*Id.* ¶ 10.) Rivers is owned by Rush Street Gaming and Churchill Downs Incorporated; Rush Street operates four casinos in three states and Churchill Downs is a publicly traded company. (*Id.* ¶ 11.) The Potawatomi Tribe, doing business as the Potawatomi Hotel & Casino, operates two tribal casinos in Wisconsin: one in Milwaukee and the other in Carter. (*Id.* ¶¶ 13–14, 64–65.)

Under the gaming compact between Wisconsin and the Potawatomi Tribe for its casinos, the Potawatomi Tribe is required to pay the State annually 6.5% of net win for the previous fiscal year. (*Id.* ¶ 69.) The annual combined gaming tax and admission fee rates for a Waukegan casino, however, would be over 27%. (*Id.*) The median household income levels for the City of Waukegan are below state and national averages. (*Id.* ¶ 34.) According to a feasibility study and economic analysis prepared for the Potawatomi Tribe, an overwhelming majority of potential gaming

revenue for the proposed casino would emanate from within a 35-mile radius of the casino. (*Id.* ¶ 35.)

For the Potawatomi Tribe, the casino in Waukegan would be an investment made on behalf of a sovereign entity, rather than a private commercial investor. (*Id.* ¶ 84.) The Potawatomi Tribe views the City of Waukegan as within its formally occupied homelands and views its sovereignty as inextricably linked with these former tribal lands. (*Id.* ¶ 76.) The casino in Waukegan would be exempt from federal income tax because it is owned by a tribal entity and would operate for the benefit of its tribal members. (*Id.* ¶¶ 84–85.) As talking points for tribal members on operating a casino in Waukegan, the Potawatomi Tribe noted that it would be the best way to mitigate some of the financial losses at its Milwaukee casino, that it was "consistent with [the] Tribal goal of reclaiming land and commerce in treaty territory," and that it would be a natural progression for the Potawatomi Tribe. (*Id.* ¶ 75.)

On September 18, 2019, the casino applicants gave public presentations on their proposals. (*Id.* ¶ 17.) During the hearing, with approximately 500 people in attendance, the City heard from 44 people and reviewed 17 written comments. (*Id.* ¶ 20.) The City thereafter held the public comment period open for another 17 days, during which it received another 1,249 written or emailed comments. (*Id.* ¶ 21.) The City also received comments from 26 people during its October 7, 2019, City Council Meeting. (*Id.* ¶ 22.)

Each applicant proposed different terms for the development of a casino at the Fountain Square property in Waukegan. Rivers proposed to purchase the site for $11

6

million or to offer a long-term lease. (*Id.* ¶ 25.) Full House proposed to enter into a 99-year lease with the City for 2.5% of gaming revenues, subject to a minimum annual guarantee of $3 million, with an option to buy the site for $30 million at any time during the lease term. (*Id.*) North Point proposed $22 million for the site, with an initial payment of $10 million and another $1 million paid annually over twelve years. (*Id.*) Plaintiff WPC proposed to purchase the site for an amount equal to "+/- 15%" of the appraised value of the property. (*Id.* ¶ 26.) On June 13, 2019, the Fountain Square property was valued at $5,625,000. (*Id.* ¶ 27.)[1]

Each applicant proposed a casino of different square footage and with a different number of gaming positions. (*See id.* ¶¶ 36–40.) Full House proposed a casino of 75,000 square feet with 1,670 gaming positions. (*Id.* ¶ 36.) North Point proposed a casino of 53,500 square feet with 1,332 gaming positions. (*Id.* ¶ 37.) Rivers proposed a casino with 1,625 gaming positions and did not disclose its proposed square footage. (*Id.* ¶ 38.) Plaintiff WPC proposed a casino of 130,000 square feet with 1,890 gaming positions. (*Id.* ¶ 39.)

Plaintiff's proposal was projected to create the most annual employment, generate the second-most gaming/admission taxes (after Rivers), and generate the most gaming revenue. (Response to Plaintiff's Statement of Additional Material Facts, ("Resp. Pl. SOF") Dkt. 149 (filed under seal) ¶ 57.) Unlike Plaintiff's proposal,

---

[1] Plaintiff admits that it proposed "+/- 15%" of the appraised value of the property. (Resp. Def. SOF ¶ 26.) Plaintiff contends, however, that its proposal "assumed an appraisal valuing Fountain Square as a casino site" and not its "existing, non-public City appraisal that assumed Fountain Square's highest and best use was other than as a casino site." (*Id.*) Plaintiff disputes that the June 13 appraisal, which predated SB 690's coming into law, valued Fountain Square as a casino site or was an appropriate measure of its offer. (*Id.* ¶ 27.)

however, the proposals by Full House and North Point featured an entertainment complex and additional phases that could include the addition of a hotel. (Resp. Def. SOF ¶¶ 29–30.) Also, the proposals by Rivers, Full House, and North Point included an option for creating a temporary casino. (*Id.* ¶ 31.) Plaintiff's proposal did not include an entertainment complex or a temporary casino. (*Id.* ¶ 32.)

Johnson Consulting, the consulting group retained by the City to evaluate the proposals, ranked Plaintiff last among the applicants. (Resp. Pl. SOF ¶ 58.) The Johnson Consulting report included a "score matrix" that assigned Full House the best "overall ranking," followed by North Point, Rivers, and, in last place, Plaintiff. (*Id.*)

On October 4, 2019, Plaintiff delivered a letter to the City providing a revised offer of $12 million for the Fountain Square Parcel. (Resp. Def. SOF ¶ 43.) On October 10, 2019, Johnson Consulting delivered a summary report of the proposals (the "Johnson Report"). (Resp. Pl. SOF ¶ 53.) The Johnson Report did not include supplemental information provided after the RFP/Q's submittal date. (*Id.* ¶ 71.) The City was also advised by its counsel that it could not consider supplemental information from applicants, including Plaintiff WPC's October 4 letter, unless the City requested the information itself. (*Id.* ¶ 61.) The City did not engage in negotiations with any of the casino applicants during the RFP/Q process. (*Id.* ¶ 67.)

On October 17, 2019, the City Council met in a special session. (Resp. Def. SOF ¶ 45.) During the meeting, a representative from Johnson Consulting stated that all four bidders were "qualified" and "able to deliver the project," and the City "can't go wrong" with any of the four proposals. (Resp. Pl. SOF ¶ 73.) At the meeting, the City voted to certify North Point, Full House, and Rivers to the IGB. (Resp. Def. SOF ¶ 47.) The City voted against certifying Plaintiff by a vote of 7-2. (*Id.* ¶ 48.) A table summarizing the votes is reproduced below:

| Council Member | Potawatomi | North Point (Lakeside) | Full House | Rivers |
|---|---|---|---|---|
| Bolton | No | Yes | Yes | Yes |
| Seger | No | Yes | Yes | Yes |
| Moisio | Yes | Yes | Yes | No |
| Kirkwood | No | Yes | Yes | Yes |
| Newsome | Yes | Yes | Yes | Yes |
| Turner | No | Yes | Yes | Yes |
| Rivera | No | No | No | No |
| Florian | No | No | No | No |
| Taylor | No | No | No | No |

(Resp. Pl. SOF ¶ 74.)

The City Council members provided different reasons for not certifying Plaintiff's proposal to the IGB. Alderman Bolton "was looking [for] a proposal that would offer more than just a casino[,] but also [a] theater [and] entertainment,

restaurants, [and] things [that] would give us as the city an opportunity to develop economically." (Resp. Def. SOF ¶ 49.) Alderman Seger found Plaintiff's presentation to be short and fast, and its approach seemed to be "hurry up and get it done." (*Id.* ¶ 50.) Alderman Kirkwood found Plaintiff's proposal lacked detail and transparency with respect to the offer price. (*Id.* ¶ 51.) Alderman Turner believed Plaintiff was asking for special consideration as an Indian Tribe and found that to be "a turnoff." (*Id.* ¶ 52.)[2] Aldermen Rivera, Florian, and Taylor voted against all the casino applicants. (*Id.* ¶ 53.)

The day after the City Council's vote, the Potawatomi Tribe delivered a letter[3] to the City requesting that it reconsider its certification vote. (Resp. Def. SOF ¶ 54.) On October 21, 2019, Aldermen Florian and Riviera met with Jeffrey Crawford, the Attorney General of the Forest County Potawatomi Community, and Malcolm Chester, an Illinois gaming legislation monitor for the Potawatomi Tribe. (*Id.* ¶¶ 42, 56.) At the meeting, Crawford communicated that, because the motion for reconsideration had not been placed on the City Council's agenda, the Potawatomi

---

[2] Alderman Turner also testified that, before the October 17 meeting began, Mayor Samuel Cunningham told him, "[T]hese are the three that we want to send to Springfield. Right. And that was what the vote was going to be. Right. Put those three down there." (Resp. Pl. SOF ¶ 69.) Under Plaintiff's theory of the case, a former Illinois State Senator, Michael Bond, dictated the results of the casino selection process by leading Mayor Samuel Cunningham—for whom Bond was a campaign benefactor—to direct Aldermen Bolton, Seger, Kirkwood, and Turner to vote against Plaintiff and in favor of North Point, of which Bond was a founding partner. (*See* Dkt. 128 at 2–7.) Alderman Turner's admission, to the extent Plaintiff proffers it as evidence of intent or animus towards Plaintiff, is negated by the existence of rational bases, as explained more fully below.

[3] The letter was signed by Jeffrey Crawford in his capacity as the Attorney General of the Forest County Potawatomi Community and bore the letterhead of the Forest County Potawatomi Community Legal Department. (Def. SOF Resp. ¶¶ 55–56.)

Tribe was preparing litigation. (*Id.* ¶ 56.) At some time before 3:30 p.m. on that same day, Plaintiff filed this lawsuit. (*Id.* ¶ 58.) At some time after 7:00 p.m. on that same day, a majority of the City Council voted to approve the motion for reconsideration. (*Id.* ¶¶ 59–60.) On reconsideration, the City Council again voted against certifying Plaintiff WPC by a vote of 6-3, with Alderman Florian now voting in favor of certifying Plaintiff's proposal. (*Id.* ¶ 60.)

Plaintiff filed this action in state court on October 21, 2019. (Dkt. 1.) The City removed the case on January 31, 2020, based on federal question and supplemental jurisdiction. (*Id.*) The First Amended Complaint raises claims for violation of Plaintiff's Fourteenth Amendment Equal Protection rights (Count I), the Illinois Gambling Act (Count II), and the Illinois Open Meetings Act (Count III). (*Id.*)

On February 14, 2020, the City filed a motion to dismiss Counts I and II of the First Amended Complaint. (Dkt. 12.) On May 14, 2021, three days before fact discovery was set to close (*see* Dkt. 77), Plaintiff filed an opposed motion for leave to file a second amended complaint. (Dkt. 85.) The proposed Second Amended Complaint raises the same three causes of action. (Dkt. 86 (filed under seal).) On September 21, 2021, the City filed a motion for summary judgment that is intended to "apply with equal force to either version of the complaint." (Dkt. 114 at 3 n.2.) For the reasons that follow, the City's motion for summary judgment is granted, and the remaining motions are dismissed as moot.

## II.    LEGAL STANDARD

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All facts, and any inferences to be drawn from them, are viewed in the light most favorable to Plaintiff as the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

## III.    DISCUSSION

Plaintiff contends that, by not voting to certify its proposal to the IGB, the City discriminated against Plaintiff without any rational basis in violation of its Fourteenth Amendment rights under the Equal Protection clause, disregarded the requirements of the Illinois Gambling Act, and violated the Illinois Open Meetings Act. Defendant argues that summary judgment is appropriate as to all claims because: (1) Plaintiff cannot bring suit under 42 U.S.C. § 1983 as an arm of the Potawatomi Tribe and, even if it could, Plaintiff cannot prove that it was similarly situated or that the City acted irrationally in refusing to certify its proposal; (2) Plaintiff's state-law claims are barred by the Tort Immunity Act;[4] and (3) in the alternative, Plaintiff cannot establish either its ability to invoke the Illinois Gambling Act or that the City failed to comply with the Open Meetings Act. For the following reasons, the Court holds that Plaintiff cannot bring a constitutional claim under § 1983 and, even if it could, Plaintiff has failed to establish the necessary elements of the claim as a matter of law.

### A.    Plaintiff Is Not a "Person" Under 42 U.S.C. § 1983

As a preliminary matter, to bring a § 1983 claim against the City, Plaintiff must "fall within the zone of interests" protected by that statute. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). The controlling question in a "zone of interests" inquiry is "whether a legislatively conferred cause of action

---

[4] In its motion for summary judgment, Defendant argues that the Illinois Tort Immunity Act affords it "absolute immunity" against all claims. (*See* Dkt. 114 at 9–11.) Defendant later concedes in its Reply that the Act does not apply to Plaintiff's constitutional claim under § 1983. (Dkt. 148 at 7 n.5.)

encompasses a particular plaintiff's claim." *Id.* at 127. In making this determination, *Lexmark* prescribes applying "traditional principles of statutory interpretation." *Id.* at 128. What earlier cases described as "prudential standing" or "statutory standing," permitting courts to dismiss actions *sua sponte*, *Lexmark* reframed as a determination "on the merits whether the party had a cause of action under the statute." *Knopick v. Jayco, Inc.*, 895 F.3d 525, 529 (7th Cir. 2018); *Lexmark*, 572 U.S. at 128 n.4 (although "statutory standing" is "an improvement" over "prudential standing . . . [,] it, too, is misleading, since the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case." (cleaned up)).

As the Seventh Circuit has since explained, *Lexmark* requires both an Article III standing inquiry "and, separately, [an inquiry into] whether [Plaintiff] falls within the zone of interests Congress meant to protect in creating a civil cause of action in [§ 1983]." *Crabtree v. Experian Info. Sols., Inc.*, 948 F.3d 872, 883 (7th Cir. 2020); *see also T.S. ex rel. T.M.S. v. Heart of CarDon, LLC*, 43 F.4th 737, 741 (7th Cir. 2022) (interpreting the zone-of-interests doctrine to first require ascertainment of the interests to be protected by a statute, and then whether the interests claimed by the plaintiff are within those protections). With respect to Article III standing, the answer is straightforward: Plaintiff, by not having its proposal certified by the City Council as a result of alleged discrimination, suffered a redressable injury-in-fact that is traceable to the City. Under *Lexmark*, however, "identifying an injury is not the same as locating a viable statutory cause of action." *Crabtree*, 948 F.3d at 883; *see also T.S.*

14

*ex rel. T.M.S.*, 43 F.4th at 741 ("There may be some overlap between zone-of-interests and merits analyses, but a court must take care not to conflate the two."). Accordingly, the Court must determine whether Plaintiff fits within the zone of interests protected by § 1983 and, therefore, has a cause of action under the statute. *See id.*; *see also McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1063 (7th Cir. 2019) ("whether a plaintiff may sue is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim" (internal quotations omitted)).

In *Inyo County, California v. Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony*, the Supreme Court held that a Native American Tribe "does not qualify as a 'person' who may sue under § 1983." 538 U.S. 701, 704 (2003). In so holding, *Inyo* relied specifically on the nature of the "sovereign right" that the plaintiff, a Native American tribe, was attempting to vindicate, rather than "upon a bare analysis of the word 'person.'" *See id.* at 711–12. The plaintiff in *Inyo* sought relief under § 1983 on the grounds that a District Attorney's search warrant violated its Fourth and Fourteenth Amendment rights and its right to self-government. *Id.* at 706. *Inyo* reasoned that, because § 1983 was designed "to secure private rights against government encroachment, not advance a sovereign's prerogative[,]" the plaintiff's § 1983 claim, asserted "by virtue of [the plaintiff's] 'sovereign' status," did not fall within "legislative environment" of the statute. *Id.*

Plaintiff does not dispute that it is "an arm of" the Potawatomi Tribe, a sovereign Native American Tribe, and therefore enjoys sovereign privileges (*see* Dkt.

128 at 23); instead, Plaintiff argues that, unlike the plaintiff in *Inyo*, its equal protection claim is not based on a sovereign interest but is "one any casino applicant could bring, regardless of tribal status." (Dkt. 128 at 25.) Indeed, *Inyo* did not definitively resolve whether a sovereign could sue under § 1983 to vindicate non-sovereign rights. *See id.* at 711 (suggesting a distinction between an "allegation that the [defendant] lacked probable cause or that the warrant was otherwise defective" and the Tribe relying "only" on its " 'sovereign' status [to] claim[] immunity from the [defendant's] processes"). But *Inyo* does not foreclose such a result either.[5] Nor is it clear that Plaintiff's interest in this suit is non-sovereign.

As the record reflects, Plaintiff WPC is 100% owned by the Potawatomi Tribe and was formed in October 2019 by the Potawatomi Tribe, doing business as the Potawatomi Hotel & Casino. (Resp. Def. SOF ¶¶ 12, 64–67.) It is undisputed that Plaintiff is an arm of a sovereign government, seeks to enjoy the privileges associated with its sovereign status in operating a Waukegan casino tax-free, views its sovereignty as "inextricably linked" with the City of Waukegan, and believes that operating a casino would be "consistent with the Tribal goal of reclaiming land and commerce in treaty territory." Based on the foregoing, it is a Gordian knot to untangle Plaintiff's sovereign status and conspicuously sovereign interests in getting certified

---

[5] Since *Inyo*, several circuits have provided different answers to that question in differing contexts. *Compare Va. Off. for Prot. & Advoc. v. Reinhard*, 405 F.3d 185, 190 (4th Cir. 2005) (holding a state agency as "an arm of the state" cannot constitute a "person" under § 1983 because it is a sovereign entity), *with Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1234 (10th Cir. 2010) *and Keweenaw Bay Indian Cmty. v. Rising*, 569 F.3d 589, 596 n.5 (6th Cir. 2009) (rejecting the argument that an Indian tribe can never constitute a "person" under § 1983). The Seventh Circuit has not weighed in on the issue.

for a casino license from its putative "non-sovereign" interests. Even if, as Plaintiff argues, a sovereign could assert a § 1983 claim if the claim was not dependent on its status as a sovereign, Plaintiff fails to identify what its supposed "non-sovereign" interests would be under the circumstances. (*See* Dkt. 128 at 23–25.) Given the clear evidence of Plaintiff's sovereign interests, and absent evidence of Plaintiff's "non-sovereign" interests, Plaintiff does not qualify as a § 1983 plaintiff. *Inyo*, 538 U.S. at 704.

To the extent Plaintiff's interest in this suit can be hypothetically distinguished as "non-sovereign"—which, even drawing all reasonable inferences in Plaintiff's favor, Plaintiff has not established—*Inyo* does not preclude a finding that Plaintiff does not fall "within the zone of interests" protected by § 1983. Like a State, which the Supreme Court has previously held not to be a "person" amenable to suit under § 1983, *Will v. Mich. Dep't of State Po.*, 491 U.S. 58 (1989), a Tribe cannot be sued under § 1983, *Inyo*, 538 U.S. at 709 (citing *Kiowa Tribe of Okla. v. Mnfg. Tech., Inc.*, 523 U.S. 751, 754 (1998) ("an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity")). This is because, in enacting § 1983, "Congress did not intend to override well-established immunities or defenses under the common law," such as "[t]he doctrine of sovereign immunity." *Id.* at 709 (quoting *Will*, 491 U.S. at 67). This is consistent with the Court's "longstanding interpretive presumption that 'person' does not include the sovereign" absent "some affirmative showing of statutory intent to the contrary." *Id.* (citing *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 780–81 (2000)).

Section 1983 permits "citizen[s]" and "other *person*[*s*] within the jurisdiction" of the United States to seek legal and equitable relief from "person[s]" who, under color of state law, deprive them of federally protected rights. 42 U.S.C. § 1983 (emphasis added). Applying "traditional principles of statutory interpretation," *Lexmark*, 572 U.S. at 128, courts "generally presume that identical words used in different parts of the same [statute] are intended to have the same meaning.*" United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213 (2001). Congress's decision to use the word "person" to describe both the intended plaintiff and intended defendant under the statute, therefore, creates a presumption that those who are not "person[s]" amenable to suit under § 1983 cannot then also qualify as a "person within the jurisdiction" of the United States to bring a claim under § 1983.

Notwithstanding the traditional principles of statutory interpretation, the " 'legislative environment' in which the word ['person'] appears" does not permit a sovereign like Plaintiff to secure private rights against another sovereign's encroachment. *Inyo*, 538 U.S. at 711. Plaintiff is not "like other private persons" that "would have no right to immunity." *Id.* at 712. It follows that a sovereign, like Plaintiff, cannot both benefit from the immunities of § 1983 as a potential defendant as well as its protections as a potential claimant. *See Muscogee*, 611 F.3d at 1236 ("Of course, a 'person' within the meaning of § 1983 possesses neither 'sovereign rights' nor 'sovereign immunity.' ").

Plaintiff does not dispute its sovereign status and, therefore, its accompanying sovereign privileges. The Potawatomi Tribe is the sole member of WPC and enjoys a

government-to-government relationship with the federal government. (Resp. Def. SOF ¶¶ 12, 62.) Plaintiff's board of directors were all appointed by the Potawatomi Tribe. (*Id.* ¶ 81.) Until October 19, 2019, when Plaintiff was formed by the Potawatomi Tribe, all communications to the City on behalf of, what is now, Plaintiff, were made by representatives of the Potawatomi Tribe. (*See, e.g.*, *id.* ¶¶ 55–56.) In essence, Plaintiff WPC, which does not have any employees (*id.* ¶ 74) and whose expenses are paid for by the Potawatomi Tribe, is undisputedly an arm of the Potawatomi Tribe, if not the Tribe itself. *Cf. Holtz v. Oneida Airport Hotel Corp.*, 826 F. App'x 573, 574 (7th Cir. 2020) ("[W]e have not yet had occasion to consider the application of the 'arm of the tribe' test."). As a sovereign Native American Tribe, or at least an arm of one, Plaintiff is immune from suit under § 1983. *See Muscogee*, 611 F.3d at 1236. Plaintiff does not "fall within the zone of interests" protected by § 1983, *see Lexmark*, 572 U.S. at 127, and thus ought to be precluded from converting the defensive shield of § 1983 into an offensive sword. Accordingly, Plaintiff cannot maintain a § 1983 action against Defendant.

## B.    Plaintiff's § 1983 Claim Fails as a Matter of Law

Even if Plaintiff were a "person" within the meaning of the statute, Plaintiff fails to establish an Equal Protection violation as a matter of law. Plaintiff argues that Defendant singled it out for disparate treatment without a rational basis in violation of its Fourteenth Amendment rights. Specifically, Plaintiff claims that the

City, by refusing to certify Plaintiff to the IGB, intentionally treated Plaintiff less favorably than other similarly situated applicants.

The Equal Protection Clause of the Fourteenth Amendment protects individuals from governmental discrimination. U.S. Const. amend. XIV, § 1. A plaintiff who is not a member of a "protected class" may bring an Equal Protection claim under a "class-of-one theory." *Fares Pawn, LLC v. Ind. Dep't of Fin. Insts.*, 755 F.3d 839, 841 (7th Cir. 2014) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). To succeed under this theory, Plaintiff must establish that: (1) defendant intentionally treated it differently from others who were similarly situated, and (2) there is no rational basis for the difference in treatment. *Id.* at 845. So long as a "reasonably conceivable state of facts" exist to explain the disparate treatment—even if it is not "the actual justification"—sufficient rational basis exists as a matter of law. *145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 771 (7th Cir. 2021) (internal citations omitted); *see also Miller v. City of Monona*, 784 F.3d 1113, 1121 (7th Cir. 2015) ("Even at the pleading stage, all it takes to defeat a class-of-one claim is a conceivable rational basis for the difference in treatment." (cleaned up)).

### 1. Plaintiff fails to establish that it was similarly situated to the other casino license applicants.

The Court turns first to the similarly situated requirement. Whether individuals are similarly situated is usually a question of fact reserved for the jury. *Fares Pawn*, 755 F.3d at 846 (quoting *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004)). But summary judgment is appropriate where it is clear that "no reasonable jury could find that the similarly situated requirement ha[s] been

met." *Id.* And the Seventh Circuit further requires class-of-one plaintiffs to "strictly comply with presenting evidence of a similarly situated entity at the summary judgment stage." *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 589 (7th Cir. 2021). To meet this burden, Plaintiff must establish that the alternatives were "*prima facie* identical in all relevant respects." *Paramount Media Grp., Inc. v. Village of Bellwood*, 929 F.3d 914, 920 (7th Cir. 2019) (quoting *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 799 (7th Cir. 2015)).

Plaintiff admits that each applicant proposed different terms for the casino property. (Dkt. 128 at 27 ("Of course, as the City observes, there were differences among the applicants and their proposals.").) Rivers proposed to buy the casino site for $11 million or to enter into a long-term lease. (Def. SOF Resp. ¶ 25.) Full House proposed to enter into a 99-year lease with an option to purchase the casino site for $30 million. (*Id.*) North Point proposed to buy the property for $22 million, to be paid over thirteen years. (*Id.*) Plaintiff proposed to buy the site for "+/- 15%" of the appraised value of the property. (*Id.* ¶ 26.) The proposals also varied in available amenities, casino square footage, and number of gaming positions. (*Id.* ¶¶ 36–40.)

Plaintiff argues that, despite the differences in the other applicants' proposals, all four applicants were "qualified" according to the Johnson Consulting Report and, thus, a reasonable jury could find that Plaintiff was similarly situated to the other bidders, "or at the very least the evidence would support such a finding at trial." (Dkt. 128 at 27–28.) Being equally qualified, however, is only necessary—but not sufficient—to meet the requirement of being similarly situated. *See Paramount*, 929

F.3d at 920. And, at this "put up or shut up" moment in the case, Plaintiff cannot rely on evidence that may come up at trial and "would" support such a finding. *See Grant*, 870 F.3d at 568. Given the multifarious terms of the casino applicants' proposals, no reasonable jury could find that the other casino applicants were "identical in all relevant aspects." *Paramount*, 929 F.3d at 920 (finding no reasonable jury would conclude that two competitors offering different payment terms are similarly situated). Accordingly, Plaintiff has failed to establish as a matter of law that the other casino applicants were similarly situated. *See Fares Pawn*, 755 F.3d at 846.

Where, as here, a plaintiff cannot identify a similarly situated comparator for a class-of-one claim, it is "normally unnecessary to take the analysis any further; the claim simply fails." *Monarch Beverage Co. v. Cook*, 861 F.3d 678, 682 (7th Cir. 2017); *see Paramount*, 929 F.3d at 920 (disposing of a class-of-one claim on the sole basis that the entities were not similarly situated). In a small number of cases, however, the Seventh Circuit has excused failure to comply strictly with the similarly situated requirement where animus is readily apparent. *See, e.g.*, *Swanson v. City of Chetek*, 719 F.3d 780 (7th Cir. 2013); *Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012). Allegations of animus come into play, however, "only when courts can hypothesize no rational basis" for the disparate treatment. *145 Fisk*, 986 F.3d at 771 (quoting *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 547 (7th Cir. 2008)). As a result, the Court thus turns to the rational basis requirement of a class-of-one claim.

> ### 2. *Plaintiff fails to establish that the City acted irrationally.*

So long as a "reasonably conceivable state of facts exists" to explain the difference in treatment, Plaintiff cannot prevail on its claim. *See 145 Fisk*, 986 F.3d at 771. The rational basis requirement presents a "low legal bar," requiring only "a rational relationship between the disparity of treatment and some legitimate governmental purpose." *FKFJ*, 11 F.4th at 587 (cleaned up). To survive summary judgment, therefore, Plaintiff must "negative any reasonably conceivable state of facts that could provide a rational basis" for the City's conduct. *145 Fisk*, 986 F.3d at 772.

The record establishes many rational bases for the City's decision not to certify Plaintiff:

- *First*, the City could have reasonably found that Plaintiff's proposal did not match the realities of the economic market in Waukegan. For a City with lower-than-average median household income levels, and one in which a casino would, according to Plaintiff's own study, yield most of its clientele from within a 35-mile radius, Plaintiff's proposed casino could have been too large. Plaintiff's proposal included 1,890 gaming positions—the highest number of positions among the applicants. (*See* Resp. Def. SOF ¶ 37 (North Point proposed 1,332); *id.* ¶ 38 (Rivers proposed 1,625); *id.* ¶ 36 (Full House proposed 1,670).) Plaintiff's proposal also provided for a 130,000 square foot casino—the largest casino size proposed among the applicants. (*See id.* ¶ 37 (North Point

proposed 53,500 square feet); *id.* ¶ 36 (Full House proposed 75,000 square feet); *id.* ¶ 38 (Rivers did not disclose proposed square footage).)

▪ *Second*, the City could have reasonably preferred, as Alderman Bolton explained, "a proposal that would offer more than just a casino[,] but also [a] theater [and] entertainment, restaurants," and other things that would provide the City with "an opportunity to develop economically." (*Id.* ¶ 49.) Plaintiff's proposal did not include a temporary casino or entertainment complex. (*Id.* ¶¶ 31–32.)

▪ *Third*, the City could have reasonably prioritized maximizing the amount of money received for the Fountain Square property or, as Alderman Kirkwood explained, have been displeased by the lack of detail and transparency with respect to the offer price. (*Id.* ¶ 51.) Plaintiff was the only applicant that did not provide a specific price for the purchase or lease of the casino site by the August 5, 2019, deadline. Instead, Plaintiff offered "+/- 15%" of the appraised value of the property, without quantifying what it meant by "appraised value." (*Id.* ¶ 26.)

▪ *Fourth*, the City could have reasonably believed that Plaintiff was not as experienced in running a casino as the other applicants. Plaintiff operated only two casinos in one state while the other applicants operated at least four in multiple states. (*See id.* ¶ 9 (North Point operated six casinos in four states); *id.* ¶ 10 (Full House operated five in four states); *id.* ¶ 11 (Rivers' parent company operated four casinos in three states).) In the alternative, the City

could have conceivably believed that, despite being less experienced, Plaintiff was, as Alderman Turner explained, asking for special consideration as an Indian Tribe. (*Id.* ¶ 52.)

- *Fifth*, the City could have had reasonable competition concerns with Plaintiff's proposal because Plaintiff already operates two other casinos in Wisconsin. (*Id.* ¶¶ 13, 15.) Given the proximity of Plaintiff's Milwaukee casino to Waukegan, and the significantly more favorable revenue sharing rate with Wisconsin for its Milwaukee casino than Plaintiff would have with a Waukegan casino, the City could have reasonably determined that Plaintiff was not fully committed to operating a casino in Waukegan. (*See id.* ¶ 69.)

- *Sixth*, the City could have conceivably found Plaintiff's spiel at the September 18, 2019, hearing to be, as Alderman Seger explained, "hurry up and get it done." (*Id.* ¶ 50.)

Plaintiff argues, under its theory of a "rigged process" by which Michael Bond dictated the results the City's certification, that the City's failure to conduct a fair and transparent hearing "is the height of irrationality." (Dkt. 128 at 29–32.) Plaintiff does not, however, rebut the conceivable state of facts that could have reasonably explained the City's refusal to certify Plaintiff. Even if, as Plaintiff argues, the "Bond-backed City Council members testified falsely in this case about why they voted against Potawatomi's proposal," (*id.* at 32), "the finding of a rational basis is 'the end of the matter—animus or no' " *145 Fisk*, 986 F.3d at 773 (quoting *Fares Pawn*, 755 F.3d at 845). Because Plaintiff does not "negate any of the reasonably conceivable

state of facts that could provide a rational basis" for the City's conduct—even if they were not "the actual justification" for the City's refusal to certify Plaintiff—sufficient rational basis exists as a matter of law. *Id.* at 771–72.

*      *      *

Plaintiff fails to meet the "very significant burden" of a class-of-one claim. *Bell v. Duperrault*, 367 F.3d 703, 708 (7th Cir. 2004). No reasonable jury could find that Plaintiff was similarly situated to the other applicants. Nor does Plaintiff rebut any of the proffered rational bases. Accordingly, summary judgment as to Count I is granted in favor of Defendant. *See Swanson*, 719 F.3d at 784 (summary judgment appropriate where no reasonable jury could find "[plaintiff] and the comparator were similarly situated, or there was a rational basis for any differential treatment").

When Plaintiff filed its claim, the Court had supplemental jurisdiction over Plaintiff's state-law claims (Counts II and III). *See* 28 U.S.C. § 1367(a) ("[D]istrict courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy"). In view of this outcome on Plaintiff's § 1983 claim (Count I, its only federal-law claim), the Court declines to retain jurisdiction over Plaintiff's remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3) ("[t]he district courts may decline to exercise supplemental jurisdiction [if] . . . the district court has dismissed all claims over which it has original jurisdiction."); *see also Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) ("As a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the

remaining pendant state claims."). Counts II and III are therefore dismissed without prejudice.

## IV.   CONCLUSION

For the foregoing reasons, the City's motion for summary judgment (Dkt. 113) is granted. All remaining motions (Dkt. 12; Dkt. 85; Dkt. 96; Dkt. 158) are dismissed as moot.

SO ORDERED in No. 20-cv-00750.

Date: March 29, 2024

JOHN F. KNESS
United States District Judge